**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, *solely in its capacity as Trustee*, | : : : |
| Interpleader Plaintiff, | : : |
| - against - | : : : |
| TRIAXX ASSET MANAGEMENT LLC (f/k/a ICP Asset Management LLC); TRIAXX PRIME CDO 2006-1, LTD.; TRIAXX PRIME CDO 2006-2, LTD.; TRIAXX PRIME CDO 2007-1, LTD.; PACIFIC INVESTMENT MANAGEMENT COMPANY, LLC, GOLDMAN SACHS & CO.; PHOENIX REAL ESTATE SOLUTIONS LTD., CEDE & CO. and JOHN DOES 1-100, | : : : : : : : : Case No. 1:18-cv-04044-VM : : : |
| Interpleader Defendants. | : : : |

**ANSWER, COUNTERCLAIM AND AFFIRMATIVE DEFENSES OF INTERPLEADER DEFENDANT TRIAXX ASSET MANAGEMENT, LLC**

Interpleader Defendant Triaxx Asset Management, LLC ("Triaxx"), by its attorneys, answers the First Amended Interpleader Complaint ("FAC") of Interpleader Plaintiff U.S. Bank National Association (the "Trustee") as follows:

1.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 1, except admits that this is an interpleader action brought by the Trustee seeking adjudication of certain matters under the Indentures.

2.      Admits the allegations of Paragraph 2.

3.      Admits that Triaxx, as Collateral Manager and agent for and on behalf of the Issuers, periodically directs the Trustee to pay certain invoices of service providers to the Issuers, including Phoenix, as Administrative Expenses of the CDOs pursuant to Section 11.1(a) of the Indenture.  Denies knowledge or information sufficient to form a belief as to the truth of the

remaining allegations of Paragraph 3, except admits that PIMCO recently sent a letter objecting to the payment of Phoenix Invoices by the Trustee, and respectfully refers the Court to that letter for its complete contents.

4.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 4, except admits that Triaxx, as Collateral Manager and agent for and on behalf of the Issuers, has directed the Trustee to pay the Phoenix Invoices as Administrative Expenses of the CDOs.

5.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 5, except admits that PIMCO recently sent a letter objecting to the payment of any Interpleader Legal Fees to Triaxx and Phoenix, and respectfully refers the Court to that letter for its complete contents, and admits that Triaxx asserts that it and Phoenix are contractually entitled to payment of their Interpleader Legal Fees by the CDOs.

6.      States that the allegations of Paragraph 6 contain conclusions of law to which no response is required. To the extent a response is deemed required, denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 6.

7.      States that the allegations of Paragraph 7 contain conclusions of law to which no response is required. To the extent a response is deemed required, denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 7.

8.      States that the allegations of Paragraph 8 contain conclusions of law to which no response is required. To the extent a response is deemed required, denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 8.

9.      Admits the allegations of Paragraph 9.

10.     Admits the allegations of Paragraph 10.

11.     Admits the allegations of the first two sentences in Paragraph 11, but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 11.

12.     Admits the allegations of the first two sentences in Paragraph 12, but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 12.

13.     Admits the allegations of the first two sentences in Paragraph 13, but denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 13.

14.     Admits, on information and belief, the allegations of the first sentence in Paragraph 14. Denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 14.

15.     Admits, on information and belief, the allegations of the first sentence in Paragraph 15. Denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 15.

16.     Admits, on information and belief, the allegations of Paragraph 16.

17.     Admits, on information and belief, the allegations of the first two sentences in Paragraph 17.  Denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 17.

18.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 18.

19.     Admits the allegations of Paragraph 19, but respectfully refers the Court to the CMAs and Indentures for their complete terms.

20.     Admits the allegations of paragraph 20, but respectfully refers the Court to the CMAs and Indentures for their complete terms.

21.     Admits the allegations of Paragraph 21, but respectfully refers the Court to the CMAs and Indentures for their complete terms.

22.     Admits the allegations of Paragraph 22, but respectfully refers the Court to the CMAs and Indentures for their complete terms.

23.     Admits the allegations of Paragraph 23, but respectfully refers the Court to the CMAs and Indentures for their complete terms.

24.     Admits the allegation of Paragraph 24, but respectfully refers the Court to the CMAs and Indentures for their complete terms.

25.     Admits the allegations of Paragraph 25, but respectfully refers the Court to the CMAs and Indentures for their complete terms.

26.     Admits the allegations of Paragraph 26, but respectfully refers the Court to the CMAs and Indentures for their complete terms and denies that Section 2(g) of the CMAs has any application to the subject matter of this action.

27.     Admits the allegations of Paragraph 27, but respectfully refers the Court to the CMAs and Indentures for their complete terms.

28.     Admits the allegations of Paragraph 28, but respectfully refers the Court to the CMAs and Indentures for their complete terms.

29.     Admits the allegations of Paragraph 29, but respectfully refers the Court to the CMAs and Indentures for their complete terms.

30. Admits the allegations of the first two sentences in Paragraph 30 and denies the allegations of the third sentence in Paragraph 30, and respectfully refers the Court to the Indentures and CAAs for their complete terms.

31. Admits the allegations of Paragraph 31.

32. Admits the allegations of Paragraph 32.

33. Admits that PIMCO sent a letter containing the statements cited in Paragraph 33, and respectfully refers the Court to that letter for its full content, but denies knowledge or information sufficient to form a belief as to when the Trustee received that letter.

34. Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 34.

35. Admits the allegations of the first and third sentences in Paragraph 35 and that PIMCO has demanded that the Trustee not make payment on the Phoenix Invoices. Denies knowledge or information sufficient to form a belief as to the remaining allegations of the second sentence in Paragraph 35 and denies the allegations of the fourth sentence in Paragraph 35.

36. Admits the allegations of the second sentence in Paragraph 36 and that PIMCO has demanded that the Trustee not make payment on the Phoenix Invoices. Denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 36.

37. Denies knowledge or information sufficient to form a belief as to truth of the allegations of Paragraph 37.

38. Admits, on information and belief, the allegations of Paragraph 38.

39. Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 39.

40.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 40.

41.     Admits, on information and belief, that the Trustee has withheld funds payable to Phoenix under the Priority of Payments waterfall for the Payment Dates in May, June, and July 2018, in the amounts stated in Paragraph 41.   Denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 41.

42.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 42.

43.     Admits that PIMCO sent a letter containing the statements cited in Paragraph 43, and respectfully refers the Court to that letter for its full content, but denies knowledge or information sufficient to form a belief as to when the Trustee received that letter and the remaining allegations of Paragraph 43.

44.     Admits that Triaxx sent a letter containing the statements cited in Paragraph 44, and respectfully refers the Court to that letter for its full content, but denies knowledge or information sufficient to form a belief as to when the Trustee received that letter and the remaining allegations of Paragraph 44.

45.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 45.

46.     Admits the allegations of Paragraph 46.

47.     Admits that Triaxx has directed the Trustee to pay its and Phoenix's Interpleader Legal Fees pursuant to the Priority of Payments waterfall and that PIMCO has demanded that the Trustee not do so, but denies knowledge or information sufficient to form a belief as to the remaining allegations of Paragraph 47.

48.     Denies the allegations of Paragraph 48.

49.     Admits that Triaxx directed the Trustee to pay its Interpleader Legal Fees in the amounts stated in Paragraph 49 and that the Trustee did not pay those fees.  Denies knowledge or information sufficient to form a belief as to the remaining allegation of Paragraph 49.

50.     Admits that as of the date of the Amended Complaint, Triaxx had not submitted any invoices for payment of Phoenix' Interpleader Legal Fees, but states that it has subsequently done so and that those invoices have not been paid by the Trustee, but denies knowledge or information sufficient to form a belief as to the remaining allegations of Paragraph 50.

51.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 51.

52.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 52.

## COUNTERCLAIM

Triaxx, for its counterclaim against Interpleader Plaintiff U.S. Bank National Association, solely in its capacity as Trustee, hereby alleges as follows:

53.     Triaxx repeats and realleges the responses set forth in paragraphs 1 through 52 as if fully set forth herein.  The allegations herein are made on personal knowledge for the time period since Triaxx assumed the role of Collateral Manager in 2015, and on information, belief and the review of books and records for the time periods prior thereto.

54.     Despite the picture that the Trustee attempts to paint in the FAC, the claims asserted in this action challenging, questioning and suspending its (i) payment of invoices submitted by Triaxx on behalf of Phoenix for services provided pursuant to agreements with the Issuers, and (ii) payment of Triaxx's and Phoenix's legal fees and expenses incurred in

defending this action are the direct result of baseless allegations by a disgruntled Senior Noteholder and should not be followed.

55.     *First*, PIMCO apparently is alleging that the Collateral Manager was not authorized by the Governing Agreements to engage Phoenix on behalf of the Issuers and was not authorized to direct the Trustee to pay Phoenix's fees because it contends that no such authority exists in the Governing Agreements for either act by the Collateral Manager.

56.     However, with respect to that claim and as set forth below, the Issuers were expressly authorized by the Governing Agreements to hire third-party professionals such as Phoenix and to pay those professionals through the Administrative Expenses of the CDOs. Further, the Collateral Manager, as agent of the Issuers, was explicitly authorized by the Governing Agreements to engage such third-party professionals on behalf of the Issuers. Phoenix was engaged by the Collateral Manager, on behalf of the Issuers, pursuant to engagement agreements entered in 2011, years before Triaxx Holdco, which is owned in part by a director of Phoenix, acquired the Collateral Manager. Since such acquisition of the Collateral Manager, Triaxx has followed those agreements, consistent with past practice and past and subsequent approval of the Issuers.

57.     Because the Collateral Manager's authority to engage advisors and consultants such as Phoenix on behalf of the Issuers, and for those professionals to be paid by the CDOs, is explicitly set forth in the Governing Agreements, the Trustee's withholding of payments to Phoenix in violation of valid direction by the Collateral Manager is contrary to the requirements of the Indentures and the Collateral Management Agreements and years of course of dealing.

58.     *Second*, the indemnification by the CDOs for Triaxx's and Phoenix's legal fees is explicitly required by both the Governing Agreements and Phoenix's Engagement Agreements.

59.     Over the course of the last three years, in two other similar interpleader actions initiated by the Trustee, Triaxx has submitted invoices for legal fees to the Trustee and requested reimbursement for the specific amounts to be paid to its counsel.  These payments have been made by the Trustee and specifically detailed as "Admin Expenses" in the monthly Trustee reports.  Such payments to counsel have been methodically recorded, reviewed and paid for by the Trustee out of the CDO's funds, until now.

60.     Not only have these payments for legal fees been required by the Governing Agreements, but they also have been consistently and transparently disclosed to all Noteholders through the monthly Trustee reports for many years, both before and after Triaxx assumed the role of Collateral Manager.  Indeed, the Trustee has acknowledged this fact by making such payments as Administrative Expenses and fully disclosing the amounts paid in monthly Trustee reports, without question or objection by the Trustee or any Noteholder for many years. Depriving Triaxx of its right to be indemnified for the payment of legal fees would constitute an unreasonable interference with Triaxx's attorney client relationship, its right to counsel and its ongoing representation in this litigation as well as a contravention of the Governing Agreements.

61.     As set forth below, Phoenix's Engagement Agreements also permit it to be indemnified by the Issuers for its legal fees pursuant to explicit indemnification provisions.

## FACTS

62.     Triaxx brings this counterclaim seeking a declaration of its rights and obligations under the Indenture and Collateral Management Agreement of Triaxx 2006-1 dated as of September 7, 2006, the Indenture and Collateral Management Agreement of Triaxx 2006-2 dated as of December 14, 2006, and the Indenture and Collateral Management Agreement of Triaxx 2007-1 dated as of March 29, 2007 (collectively for each of Triaxx 2006-1, Triaxx 2006-2 and

Triaxx 2007-1, the "Governing Agreements"), and judicial direction and approval as to how Triaxx should proceed in the face of the Trustee's refusal to honor valid invoices submitted by Triaxx on behalf of Phoenix and refusal to advance Triaxx's and Phoenix's legal fees and expenses incurred in defending this action pursuant to the Governing Agreements and the Phoenix Engagement Agreements.

**The Governing Agreements**

63.     Interpleader Defendant Triaxx Asset Management, LLC ("Triaxx") is the current Collateral Manager for the Triaxx Prime CDO 2006-1 ("Triaxx 2006-1"), Triaxx Prime CDO 2006-2  ("Triaxx 2006-2") and Triaxx Prime CDO 2007-1 ("Triaxx 2007-1") transactions, (collectively, the "Triaxx CDOs").

64.     Triaxx Prime CDO 2006-1, Ltd., Triaxx Prime CDO 2006-2, Ltd., and Triaxx Prime CDO 2007-1, Ltd. are each special purpose vehicles established to issue securities for the transactions (collectively, the "Issuers").  The Issuers issued Senior Notes through collateralized debt obligation ("CDO") structures that were created in 2006 and 2007.  The Triaxx CDOs purchased Collateral Debt Securities, specifically residential mortgage backed securities ("RMBS"), with the proceeds received from the sale of these Notes.

65.     Triaxx 2006-1 is governed by an Indenture and a Collateral Management Agreement, each dated September 6, 2006.  Ex. A & Ex. B. Triaxx 2006-2 is governed by an Indenture and a Collateral Management Agreement, each dated December 14, 2006. Ex. C & Ex. D. Triaxx 2007-1 is governed by an Indenture and a Collateral Management Agreement, each dated March 29, 2007. Ex. E and Ex. F. The Indentures and the Collateral Management Agreements (the "CMAs") for each of the Triaxx CDOs are collectively referred to as the "Governing Agreements." The Governing Agreements are each governed by New York law and

10

are substantially identical in form and substance to their equivalent agreement across each of the Triaxx CDOs insofar as the issues presented in this action are concerned.

66.    The Governing Agreements jointly set forth the rights and obligations of the Issuer, the Collateral Manager, the Trustee and the Senior Noteholders of the Triaxx CDOs.  U.S. Bank is the successor trustee under the Indentures (the "Trustee").  As Trustee, U.S. Bank holds the Collateral Debt Securities owned by the Triaxx CDOs as security for the Issuers' obligations to Senior Noteholders.  When the Triaxx CDOs were initially formed, the Collateral Manager was named ICP Asset Management, LLC ("ICP") and was owned by companies controlled by Thomas Priore.  Triaxx Holdco acquired the Collateral Manager in 2015, under the supervision of the SEC, from the prior owner of ICP, Thomas Priore, and renamed it Triaxx Asset Management, LLC.

**The Issuers' Engagement of Phoenix**

67.    ARAM Phoenix Real Estate Solutions, Ltd. ("Phoenix") was engaged by the respective Issuers pursuant to three identical engagement agreements dated March 22, 2011, one for each of the three Triaxx CDOs (collectively, the "Engagement Agreements") while ICP served as the Collateral Manager.  Exs. G, H, and I.

68.    Phoenix was initially engaged in the wake of the financial crisis in connection with ICP's gradual discovery of severe deficiencies in the underwriting, origination, securitization and servicing practices relating to the residential mortgages serving as collateral for RMBS.  ICP identified these issues as the RMBS underlying the Triaxx CDOs started taking losses and, for the benefit of the Noteholders, decided to investigate and potentially execute an activist litigation strategy with the assistance of Phoenix to hold parties accountable for poor underwriting and servicing, as many RMBS investors ultimately did.  ICP, as agent of and on

behalf of the Issuers, hired counsel to assist with these efforts and engaged Phoenix as an advisor and consultant to the CDOs that could conduct an in depth analysis of the RMBS and their underlying collateral to support those efforts.  Phoenix was an entirely independent and separate entity from both the Issuers and the Collateral Manager, ICP.

69.     The Engagement Agreements were executed by Thomas Priore, principal of ICP, on behalf of the Issuers.  Pursuant to the Engagement Agreements, Phoenix was engaged by the Issuers, among other things, to "consult with, and provide information and advice to, the Collateral Manager with respect to strategies to optimize the performance of the Designated Portfolio" and "provide activist implementation services for the Activist Implementation Fee." Exs. G, H, & I at 1.

70.     Specifically, Phoenix was engaged by the Issuers as an "activist advisor" to utilize its expertise in proprietary analytical capabilities to conduct detailed analyses of the mortgage loans underlying the RMBS to support litigation against originators, sponsors, trustees and servicers of the mortgage loans and the RMBS.  As described in more detail below, these litigation efforts, which would not have been possible without Phoenix's substantial assistance, have generated over tens of millions of dollars in past and estimated future recoveries for the CDOs that would not have been realized otherwise.  As a result, these CDOs have significantly outperformed similar CDOs that did not pursue that activist litigation strategy.

71.     Section 8 of the Phoenix Engagement Agreements also provides Phoenix with explicit indemnification rights, stating:

> Neither ARAM nor their affiliates or their respective directors, partners, members, managers, shareholders, officers and employees and subcontractors (including their executives, heirs, assigns, successors or other legal representatives) (each, an "Indemnified Person") shall be liable to the CDO (or any of its affiliates or investors) for any liabilities, obligations,

losses…damages, actions, proceedings, suits, costs, expenses (including without limitation legal expenses) claims and demands ("Liabilities") suffered by the CDO in connection with the subject matter of this Agreement unless such Liabilities arise from the fraud, willful misconduct, gross negligence or reckless disregard of the Indemnified Person in the discharge of its functions under this Agreement. …[T]he CDO shall indemnify and keep indemnified each Indemnified Person from and against any and all Liabilities which may be suffered or incurred by or asserted against such indemnified Person arising out of or in connection with the performance of its or their duties hereunder... .

Exs. G, H, & I at 4-5.

72.     The Governing Agreements authorize the Issuers to engage advisors and consultants such as Phoenix in this manner and permit the Collateral Manager, as the Issuers' agent, to engage such advisors and consultants on behalf of the Issuers. Phoenix was not and is not the Collateral Manager's agent employed to perform the services of the Collateral Manager. Rather, Phoenix was engaged on behalf of the Issuers by the Collateral Manager at the time, pursuant to the authority set forth in Sections 2(a) and 2(d) of the CMAs.

73.     Section 2(a) of the CMAs states, in relevant part:

Subject to and in accordance with the terms of the Indenture and this Agreement (including without limiting the generality of the foregoing, the investment guidelines attached as Exhibit A hereto (the "Investment Guidelines")), the Collateral Manager agrees to … perform on behalf of the Issuer (or direct the performance of) those duties and functions assigned to the Issuer or the Collateral Manager in the Indenture (unless such duties have been assigned to the Trustee thereunder or to the Collateral Administrator under the Collateral Administration Agreement) and those duties and functions assigned to the Collateral Manager in the other Operative Documents, including, without limitation, the furnishing of Issuer Orders, Issuer Requests and officer's certificates relating thereto, and providing such certifications as are required of the Collateral Manager under the Operative Documents with respect to permitted acquisitions and dispositions of Collateral Debt Securities and Equity Securities. The Collateral Manager shall have the power to execute and deliver all necessary and appropriate documents and instruments on behalf of the Issuer with respect thereto (including

> the execution of assignments and other related documents on behalf of the Issuer reasonably necessary or advisable in connection with the acquisition or disposition of any Collateral Debt Security or other Collateral by the Issuer). The Collateral Manager shall perform its duties hereunder in accordance with the terms and conditions of the Operative Documents.

Exs. B, D, & F at § 2(a) (emphasis added).

74.     Sections 2(d)(x) and (xi) further authorize the Collateral Manager to "take on behalf of the Issuer or direct the Trustee to take the following actions with respect to a Collateral Debt Security…

> (x) retain legal counsel and other professionals (such as financial advisers) to assist in the negotiation, documentation and restructuring of Collateral Debt Securities; or

> (xi) exercise any other rights or remedies with respect to such Collateral Debt Security, Equity Security or Eligible Investment as provided in the related Underlying Instruments or take any other action consistent with the terms of the Indenture which the Collateral Manager reasonably believes to be in the best interests of the Noteholders."

Exs. B, D, & F at § 2(d)(x) and (xi).

75.     Section 2 of the CMAs goes on to define the Collateral Manager's power of attorney authority and states:

> In furtherance of the foregoing, the Issuer hereby appoints the Collateral Manager the Issuer's true and lawful agent and attorney-in-fact, with full power of substitution and full authority in the Issuer's name, place and stead and without any necessary further approval of the Issuer, in connection with the performance of the Collateral Manager's duties provided for in this Agreement, including the following powers (subject in all cases to the limitations set forth in the Indenture): (a) to sign, execute, certify, swear to, acknowledge, deliver, file, receive and record any and all documents which the Collateral Manager reasonably deems necessary or appropriate in connection with its investment management duties under this Agreement and (b) to (i) vote in its discretion any securities, instruments or obligations included as Collateral, (ii) execute proxies, waivers, consents and other

14

> instruments with respect to such securities, instruments or
> obligations, (iii) endorse, transfer or deliver such securities,
> instruments and obligations, (iv) participate in or consent (or
> decline to consent) to any modification, work-out, restructuring,
> bankruptcy proceeding, class action, plan of reorganization,
> merger, combination, consolidation, liquidation or similar plan or
> transaction with regard to such securities, instruments and
> obligations and (v) take any other action specified in Section 2(d).
> The foregoing power of attorney is a continuing power, coupled
> with an interest, and shall remain in full force and effect until
> revoked by the Issuer in writing by virtue of the termination or an
> assignment of this Agreement; provided that any such revocation
> shall not affect any transaction initiated prior to such revocation.

Exs. B, D, & F at § 2.

76.    The Issuer's authority to engage professionals (as exercised by the Collateral

Manager pursuant to its authority through the CMAs) exists pursuant to the terms of the

Indentures.  Sections 7.5 and 7.7 of the Indentures so authorize the Issuers.  Section 7.5(a)(iv) of

the Indentures provides:

> The Issuer (or the Trustee on behalf of the Issuer)  …. shall take
> such other action as may be necessary or advisable or desirable to
> secure the rights and remedies of the Secured Parties hereunder
> and to:…. (iv) enforce any of the Pledged Securities or other
> instruments or property included in the Collateral; …"

Exs. A, C, & E at § 7.5(a)(iv).

77.    Section 7.7(a) of the Indentures states:

> The Issuer or the Co-Issuer may, with the prior written consent of a
> Majority of the Controlling Class and the Hedge Counterparties
> (except for agreements entered into as of the Closing Date, which
> shall not require such prior consent) contract with other Persons,
> including the Collateral Administrator, the Collateral Manager and
> the Bank, for the performance of actions and obligations to be
> performed by the Issuer or the Co-Issuer hereunder by such
> Persons. Notwithstanding any such arrangement, the Issuer or the
> Co-Issuer, as the case may be, shall remain liable for all such
> actions and obligations. In the event of such contract, the
> performance of such actions and obligations by such Persons shall
> be deemed to be performance of such actions and obligations by

> the Issuer or the Co-Issuer; and the Issuer or Co-Issuer, as the case may be, will punctually perform, and use its commercially reasonable efforts to cause such other Person to perform, all of their obligations and agreements contained in any related agreement.

Exs. A, C, & E at § 7.7.

78.     As authorized by the CMAs and Indentures, and evidenced by the Phoenix Engagement Agreements, Phoenix is employed by the Issuers (not the Collateral Manager) as their agent.  Through the Governing Agreements, the Issuers have delegated their responsibility to manage the Issuers' agents and counsel to the Collateral Manager.  Through this delegation, the Collateral Manager has engaged with Phoenix, as the Issuers' agent, pursuant to Section 2(a) of the CMAs for more than seven years, to the substantial benefit of the Triaxx CDOs.  The Issuers, and separate counsel to the directors of the Issuers, Wilmer Cutler Pickering Hale and Dorr LLP, have authorized the engagement of and payments made to Phoenix.

79.     As set forth below, Phoenix has successfully assisted the Issuers in pursuing legal claims with respect to the RMBS underlying the collateral which to date have generated in excess of tens of millions in recoveries for the CDOs as well as tens of millions in increased value from a bankruptcy and global RMBS settlement that remain to be received by the CDOs. Several of those proceedings are ongoing, seeking hundreds of millions in additional recoveries for Noteholders.

**Notification to Noteholders**

80.     Phoenix's engagement and ongoing role as an activist advisor to the Triaxx CDOs and its successful assistance to the Triaxx CDOs in generating recoveries for Noteholders, has been repeatedly disclosed to Noteholders beginning in as early as 2011.  Specifically, the payment of Phoenix's fees as Administrative Expenses of the Triaxx CDOs has been

prominently disclosed in every one of the Trustee's monthly reports dating back to March 2011, when Phoenix was engaged.

81.     Indeed, the FAC concedes these disclosures, stating that the "Collateral Manager periodically directs U.S. Bank to include invoices in the Note Valuation Reports and pay such invoices out of the available proceeds on each Payment Date as 'Other Administrative Expenses'…." FAC ¶ 3, 29. The Complaint goes on to confirm that "these invoices have in the past been included in the Note Valuation Reports…." FAC ¶ 30.

82.     Beyond the information contained in the Trustee's monthly reports, the Trustee and Collateral Manager have kept the controlling classes of Noteholders apprised of Phoenix's engagement and ongoing role as an activist advisor to the Triaxx CDOs through a sequence of notices to noteholders.

83.     In or around April 2011, a letter from Mr. Priore was disseminated to the CDO investors, informing them of (i) the efforts being made by the CDOs to assert their rights under the terms of the applicable agreements for RMBS securities it held, and (ii) the CDOs' efforts to initiate strategies to improve loan servicing performance. Ex. J. The notice specifically referenced the Phoenix engagement, stating that "[w]orking with transaction counsel at Schulte Roth and Zabel we have taken steps, along with other RMBS investors, to retain Talcott Franklin PC and Kobre and Kim LLP as legal counsel and ARAM Global as activist agents on behalf of [the] Triaxx [CDOs] under a capped expense structure that rewards these parties for net recoveries to the fund." Ex. J. To Triaxx's knowledge, investors raised no objection to the engagement of Phoenix that was memorialized by this notice.

84.     On April 24, 2014, another notice signed by Mr. Priore was distributed to the Triaxx 2006-1, 2006-2 and 2007-1 investors. Ex. K. This notice updated investors on the

Collateral Manager's ongoing RMBS activist work on behalf of the Issuers.  It stated "through the collaborative efforts of counsel for [the] Triaxx [CDOs] and Phoenix Advisors and Managers USA, LLC as our activist agents, we have constructed a robust analytics system…" and that "the results achieved through the hard work of Phoenix Advisors, ICP and our counsel thus far speak for themselves."  Ex. K.  It went on to inform investors that "Phoenix possesses the analytics engine to validate the instances of breach, a working knowledge of the administrative and management responsibilities of the vehicle, working relationships with [the] Triaxx [CDOs] litigation and transaction counsel and its Trustee and most importantly a successful track record helping [the] Triaxx [CDOs] win [their] claims in court."  Ex. K.

85.     Together, the monthly Trustee reports and notices to noteholders disclosed to the controlling classes of Noteholders the engagement of and payments to Phoenix as well as its successful and ongoing efforts at obtaining recoveries for the CDOs.  Through the monthly trustee reports, the Trustee also informed the Issuer each time the Collateral Manager added a third party vendor to the list of payment invoices.  Through the Issuers' review of these disclosures it has, together with counsel, approved the payments made to Phoenix in connection with its services.  As a result, Phoenix's role and the payments made to it as Administrative Expenses of the CDOs have been disclosed to the Noteholders free of objection and approved by the Issuers and their counsel for over seven years.

**The August 2014 Clarification to the Engagement Agreements**

86.     The "Fees and Expenses" and "Priority of Payments" that Phoenix was entitled to were initially governed by Sections 6 and 12 of the Engagement Agreements and corresponding portions of the Governing Agreements.  Section 6 stated that Phoenix's fees for the services described in the Agreement would be as set forth in Annex I and paid as

"Administrative Expense" under the Indentures.  Exs. G, H & I at 4.  Section 12 provided that the payment of all amounts to which Phoenix was entitled would be Administrative Expenses subject to the Priority of Payments and would "be payable only to the extent funds are available in accordance with the Priority of Payments."  Exs. G, H & I at 6.

87.     On August 8, 2014, Nicholas Calamari, at that time acting as attorney to Phoenix, sent three identical letters on behalf of Phoenix, one for each of the Triaxx CDOs, to the Issuers, care of the Collateral Manager ICP, and counsel for the Issuers, Schulte, Roth & Zabel.  Exs. L, M, & N.  These letters sought to clarify the language contained in Sections 6 and 12 of the Engagement Agreements (the "August 2014 Clarification").

88.     The August 2014 Clarification confirmed the understanding between the parties to the Engagement Agreements relating to the payment of fees due to Phoenix, specifically where recoveries on securities were in excess of $500,000.  The letters set forth the payment structure that would apply under those circumstances, stating:

> as per the intent of the parties at the time the Agreement was negotiated and executed, and the understanding on which the parties have been operating: Section 6 and 12 of the Agreement, and Annex I thereto, i) were not intended to be a mechanism to prevent Phoenix from receiving its fees and expenses; ii) were intended to allow for Phoenix to be paid its fees and expenses out of settlement funds at the time such funds are disbursed, and iii) the "Activist Implementation Fee" was intended to provide that Phoenix is entitled to a payment of $250,000 per security, in addition to the $10,000 per month per security, on the securities in which it is engaged for activist implementation where recoveries to Triaxx exceed a minimum of $500,000 for each security.

Exs. L, M, & N.

89.     The structure set forth in the Collateral Manager's August 2014 letters reflected the understanding of the parties at the time and sought to clarify the terms of Sections 6 and 12 of the Engagement Agreements to allow incentive payments to be made out of the

proceeds of settlement funds.  As set forth below, the terms of the August 2014 Clarification were confirmed by the Issuers through their approval of the payment of Phoenix's incentive fees in accordance with and out of settlement agreement proceeds consistent with the Clarification.

**The RMBS Settlements**

90.     Phoenix's ongoing engagement has generated substantial recoveries with respect to the Triaxx RMBS litigations, resulting in payments to the CDOs of tens of millions of dollars.  The settlement agreements and recoveries resulting from these litigation efforts reflect a portion of the fruits of the Collateral Manager's efforts, together with Phoenix, to initiate legal action on behalf of the CDOs against the issuers of certain securities representing the collateral of the Triaxx CDOs and obtaining monetary settlements for the benefit of all Noteholders.

91.     In the wake of the financial crisis, investors in RMBS such as the Collateral Debt Securities discovered severe deficiencies in the underwriting, origination, securitization and servicing practices relating to the residential mortgages serving as collateral for the RMBS.

92.     As a result of these deficiencies, various parties, including ICP, and later Triaxx, on behalf of the Triaxx CDOs, engaged in extensive negotiations with, and assisted the Issuers to initiate numerous damages actions against, the originators, underwriters and servicers of residential mortgages and the sponsors, underwriters and issuers of RMBS seeking to recover the losses sustained by investors in RMBS resulting from these practices.

93.     On behalf of the Issuers, ICP and later Triaxx pursued litigation and settlements, both together with other investors and on its own, against issuers, underwriters and trustees of the RMBS and originators and servicers of the underlying mortgages, resulting in substantial past recoveries as well as substantial projected future recoveries for the benefit of all Noteholders of the Triaxx CDOs.

94.     On August 27, 2014, the Triaxx CDOs entered into a Settlement Agreement resulting from litigation with entities hereinafter referred to collectively as "Bank A" for confidentiality purposes (the "Bank A Settlement Agreement").   The Bank A Settlement Agreement reflected a substantial victory for the benefit of the CDOs.

95.     The Triaxx CDOs also intervened in the Rescap bankruptcy proceeding and, in part through its efforts with Phoenix, a different methodology of allocating representation and warranty losses to trusts covered by the bankruptcy plan was adopted, resulting in an increase of expected allowed claim payments from the bankruptcy estate to the Triaxx CDO securities, expected to be in the tens of millions of dollars.

96.     The Triaxx CDOs commenced litigation against HSBC, US Bank NA, and The Bank of New York Mellon, alleging violations by the servicers and trustees of obligations relating to underlying defaulted securities.  Triaxx has since issued notices of default and entered into tolling agreements with other servicers of mortgages serving as collateral for defaulted securities.  Triaxx, on behalf of the CDOs, has also pursued litigation against servicers of RMBS, and has reached a confidential settlement agreement one party prior to the initiation of that party's claim, as well as initiated litigation against Ocwen, a large servicer of RMBS seeking more than $100 million in damages.

97.     Additionally, Triaxx was recently able to obtain agreement to a consent solicitation resulting in the formation of a trust-wide suit against Wells Fargo that relates to several of the RMBS held by the Triaxx CDOs.  This action will permit the Triaxx CDOs to recover pre-solicitation expenses in addition to a pro rata share of any recoveries obtained through the action.

98.     The August 2014 Clarification and the payments made pursuant to the terms of the Clarification were later adopted and accepted by the Issuers' directors and invoices rendered pursuant thereto through their approval of those terms during and subsequent to a September 15, 2014, Board Meeting.

**Triaxx Assumes the Role of Collateral Manager**

99.     In 2014, in connection with the resolution of claims made by the SEC against Mr. Priore and ICP, Mr. Priore sought to sell the  Collateral Manager.  In January of 2015, Mr. Priore sold ICP to Triaxx Holdco and ICP was renamed Triaxx Asset Management, LLC.  The transition of the Collateral Manager's duties from ICP to Triaxx under the ownership of Triaxx Holdco was monitored by the SEC.  Since January of 2015, the Collateral Manager duties have been fulfilled by Triaxx.

100.     Since assuming the role of Collateral Manager, Triaxx, on behalf of the Issuers, has at all material times complied with its obligations by managing the Collateral Debt Securities in accordance with the Governing Agreements and has exercised its reasonable business judgment, in good faith, based on its own experience and with the assistance of professional advisors to the Issuers, including Phoenix.  Triaxx has continued to follow the Phoenix Engagement Agreements consistent with past routine and prior and subsequent Issuer approval.  Noteholders have continued to reap the benefits of Phoenix's services and analyses despite ongoing litigation initiated by PIMCO and other Senior Noteholders demanding that Triaxx sell certain Defaulted Securities.  In fact, Triaxx's decision to wait to liquidate securities held by the Triaxx CDOs, which was based in part on Phoenix's analyses, performed in connection with its litigation consulting work resulted in a substantial benefit to the Noteholders of over $700 million.

101.     This action is the third interpleader action initiated by the Trustee in this Court since 2015, each of the prior actions resulting from disputes between Senior Noteholders and Junior Noteholders regarding how Triaxx should manage the assets of the Triaxx CDOs.[1]  In the course of Triaxx's involvement in and defense of those litigations, it has retained counsel and submitted invoices for counsel's legal fees to the Trustee to be paid through the Priority of Payments waterfall of the Triaxx CDOs.

102.     Pursuant to Section 10(b) of the CMAs, Triaxx is entitled to be reimbursed by the CDOs for:

> all reasonable fees and expenses (including reasonable fees and expenses of counsel) as such fees and expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation, caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Circular, the Indenture or this Agreement, and/or any action taken by, or any failure to act by, the Collateral Manager or any of its Affiliates; provided that the Collateral Manager and its Affiliates will not be indemnified for any such Liabilities or any fees or expenses that they incur as a result of any acts or omissions constituting a Collateral Manager Breach.

Exs. B, D & F at § 10(b).

103.     Counsel to the Trustee and the Issuers have been paid pursuant to the same procedures and similar provisions of the CMAs.  All such payments made to Triaxx's counsel, as well as to counsel for the Trustee and Issuers, have been prominently disclosed through the Monthly Trustee Reports for many years.

**Phoenix Incentive Fees and Counsel's Legal Fees**

---

[1] *See U.S. Bank National Association v. Triaxx Asset Management LLC et al*, No.16-cv-08507 (AJN); *U.S. Bank National Association v. Triaxx Prime CDO 2006-1, Ltd*., No. 15-cv-01072 (WHP).

104.    On March 29, 2018, Triaxx submitted three Phoenix invoices to the Trustee requesting payment of incentive fees to Phoenix in connection with the activist implementation strategy services it rendered for each of the Triaxx CDOs.  On May 2, 2018, PIMCO's counsel sent a letter to the Trustee objecting to any payments being made to Phoenix, mischaracterizing the Phoenix entities as "agents of the Collateral Manager."  Ex. O.  The Trustee then filed this Interpleader Action, requesting adjudication of the issues with respect to the payment of the Phoenix invoices.   On May 18, 2018 PIMCO's counsel sent another letter to the Trustee informing the Trustee that it should refrain from making payments to Triaxx's legal counsel, Phoenix or the Issuers with respect to legal fees incurred in this action. Ex. P.  On July 19, 2018, the Trustee amended the third interpleader to include the issue of the payment of legal fees.[2]

105.    Interpleader Defendant PIMCO's current objections to Phoenix's engagement and payment are directly at odds with their acceptance of tens of millions of dollars of recoveries already received and expected to be received in the future as a direct result of Phoenix's efforts as set forth above.   Similarly, any interference with the Trustee's obligation to honor valid direction for the payment of Triaxx's legal fees in this action is baseless.

106.    As referenced above, beginning in 2015, certain Senior Noteholders have caused interpleader actions to be filed demanding that Triaxx sell three-year defaulted securities held in the Triaxx CDOs.  The current interpleader lawsuit, initiated at the insistence of PIMCO, is pending before Judge Nathan.  *U.S. Bank National Association v. Triaxx Asset Management LLC et al*, 1:16-cv-08507-AJN (the "First Interpleader").  In each of the prior actions and over a period of more than three years, Triaxx has regularly submitted its invoices for the related legal

---

[2] Notably, the FAC alleges that Senior Noteholder South Tryon withdrew its objections to both the payment of Phoenix fees and counsel's legal fees in the Amended Complaint and as a result, South Tryon is not named as an Interpleader Defendant.

fees and expenses to the Trustee for payment and they have been paid as Administrative Expenses of the CDO, with full disclosure of that fact to Noteholders of the CDO and without question or objection by the Trustee or any Noteholder.  As a result, PIMCO and all Senior Noteholders have been made aware of the fees paid to Triaxx's counsel in actively defending these matters.  Only now, as a transparent litigation tactic to hinder Triaxx's ability to defend and prosecute this action, has PIMCO raised an unsupported objection to these payments.

107.     Similarly, Phoenix is entitled to be indemnified for its legal fees and expenses incurred in this action, pursuant to the explicit indemnification provision provided for in Section 8 of the Engagement Agreements.

**CLAIM FOR RELIEF**
**(For Declaratory Judgment)**

108.     Triaxx repeats and realleges the allegations set forth in paragraphs 53 through 107 hereof, as if set forth fully herein.

109.     A bona fide judicial and substantial controversy exists between and among Triaxx and the Trustee as to whether (i) the Collateral Manager, pursuant to the CMAs and Indentures and as the Issuers' agent was authorized to engage third party professionals on behalf of the Issuers, (ii) the Collateral Manager, on behalf of the Issuers was authorized to hire third-party professionals and permit those professionals' fees to be paid as Administrative Expenses of the CDOs, (iii) whether Triaxx, pursuant to the Indentures, is entitled to its bargained for right to indemnification for its legal fees and expenses incurred in defending this action, (iv) whether Phoenix, pursuant to the Engagement Agreements, is entitled to be indemnified by the Issuers for its legal fees and expenses incurred in defending this action, (v) whether Phoenix is entitled to be paid its fees and expenses both out of settlements funds at the time such funds are disbursed and as Administrative Expenses from the Priority of Payments under the Indentures,   and (vi)

whether Phoenix is entitled to the payment of the "Activist Implementation Fee" of $250,000 per security, in addition to the $10,000 per month per security, on the securities in which it is engaged for activist implementation where recoveries to Triaxx exceed a minimum of $500,000 for each security.

110.     The controversy is between parties with adverse legal interests as to either present or prospective obligations.

111.     A judgment would serve a useful purpose in clarifying and settling the legal issues and would finalize the controversy and offer relief from uncertainty.

112.     Accordingly, Triaxx is entitled to a declaratory judgment, which declaration should be binding upon the Trustee.

**AFFIRMATIVE DEFENSES**

Triaxx reserves the right to supplement or amend its Answer to include additional affirmative defenses as additional information becomes available.  In setting forth the following affirmative defense, Triaxx does not concede that it has the burden of proof or production on any of them.

**FIRST AFFIRMATIVE DEFENSE**

The Trustee and Noteholders have been made aware of the engagement of Phoenix, other advisors to the Issuers, counsel to the Collateral Manager and the payments they now challenge for many years through notices to Noteholders and the disclosures contained in the Trustee's monthly reports.   Any allegations asserted in the FAC based on new objections to these payments have been unreasonably delayed.  As a result, any objections to those engagements and past or continuing payment of those fees as Administrative Expenses of the CDOs are barred in whole or in part, by the doctrine of waiver, laches, estoppel and/or other equitable defenses.

## SECOND AFFIRMATIVE DEFENSE

To the extent that the Trustee or Noteholders allege that they did not consent to the engagement and payment of Phoenix, they or their predecessors in interest provided express and/or implied consent through their receipt of and failure to object to notices from the Collateral Manager and the Trustee's monthly reports.  As a result, any objections to those payments are barred in whole or in part under the principles of assumption of the risk and/or informed consent.

## PRAYER FOR RELIEF

WHEREFORE, Triaxx demands judgment:

(i)      Dismissing the First Amended Interpleader Complaint as against it;

(ii)     On Triaxx's counterclaim, granting the declaration requested herein; and

(iii)    Granting such further and other relief as the Court deems appropriate.

Dated: New York, New York
       August 27, 2018

**ARNOLD & PORTER KAYE
SCHOLER LLP**


By:   /s/ Eric N. Whitney
       Eric N. Whitney
       Diana E. Mahoney
       Arnold & Porter Kaye Scholer LLP
       250 West 55th Street
       New York, New York 10019
       (212) 836-7930
       eric.whitney@arnoldporter.com
       diana.mahoney@arnoldporter.com

       *Attorneys for Interpleader Defendant
       Triaxx Asset Management, LLC*