UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, *solely in its capacity as Trustee,*<br><br>Interpleader Plaintiff,<br>- against -<br><br>TRIAXX ASSET MANAGEMENT LLC (f/k/a ICP ASSET MANAGEMENT LLC); TRIAXX PRIME CDO 2006-1, LTD.; TRIAXX PRIME CDO 2006-2, LTD.; TRIAXX PRIME CDO 2007-1, LTD.; PACIFIC INVESTMENT MANAGEMENT COMPANY, LLC; GOLDMAN SACHS & CO.; PHOENIX REAL ESTATE SOLUTIONS LTD., CEDE & CO. and JOHN DOES 1- 100,<br><br>Interpleader Defendants. | **THIRD AMENDED INTERPLEADER COMPLAINT**<br><br>Case No. 1:18-cv-04044 (VM) (BAM) |

Interpleader Plaintiff U.S. Bank National Association ("U.S. Bank" or the "Trustee"), as successor to Bank of America, National Association (successor by merger to LaSalle Bank National Association ("LaSalle")), solely in its capacity as Trustee under (i) the Indenture, dated as of September 7, 2006, by and among its predecessor LaSalle, Triaxx Prime CDO 2006-1, Ltd., as Issuer, and Triaxx Prime CDO 2006-1, LLC, as Co-Issuer (the "2006-1 Indenture"), (ii) the Indenture, dated as of December 14, 2006, by and among its predecessor LaSalle, Triaxx Prime CDO 2006-2, Ltd., as Issuer, and Triaxx Prime CDO 2006-2, LLC, as Co-Issuer (the "2006-2 Indenture"), and (iii) the Indenture, dated as of March 29, 2007, by and among its predecessor LaSalle, Triaxx Prime CDO 2007-1, Ltd., as Issuer, and Triaxx Prime CDO 2007-1, LLC, as Co-Issuer (the "2007-1 Indenture," and together with the 2006-1 Indenture and the 2006-2 Indenture, the "Indentures"),[1] alleges and states that:

---

[1] All capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the respective Indentures.

## INTRODUCTION

1.      This is both an interpleader action and an action for declaratory judgment, monetary damages, and equitable relief brought by U.S. Bank, in its capacity as Trustee for the collateralized debt obligations governed by the Indentures (the "Interpleader"). *First,* the Trustee seeks to obtain adjudication of the rights of the Interpleader Defendants with respect to (a) certain invoices (the "Phoenix Invoices") to be paid to Interpleader Defendant Phoenix Real Estate Solutions Ltd. ("Phoenix"), (b) the payment of legal expenses incurred by Interpleader Defendants Triaxx Asset Management LLC ("Triaxx Asset Management" or the "Collateral Manager"), Phoenix, and the Issuers in connection with this Interpleader (the "Interpleader Legal Fees"), and (c) the payment (or the reimbursement for any payment) for any judgment obtained by Phoenix or the Collateral Manager against the Issuers or by the Trustee, Phoenix or the Issuers against the Collateral Manager in connection with the claims raised in this Interpleader (the "Interpleader Judgment Fees") from amounts maintained by or delivered to the Trustee for deposit in the Accounts established under the Indentures. U.S. Bank faces competing demands by certain Interpleader Defendants with respect to the payment of the Phoenix Invoices, the Interpleader Legal Fees, and the Interpleader Judgment Fees from amounts maintained by or delivered to the Trustee for deposit in the Accounts established under the Indentures and cannot determine, without hazard to itself, how to proceed. *Second*, the Trustee seeks declaratory relief from the Court regarding the treatment of proceeds or recoveries in respect of Collateral received by or on behalf of the Issuers, or otherwise in the possession (or under the control of) the Issuers, which have not been delivered to the Trustee for deposit in the Accounts established under the Indenture (the "Collateral Recoveries"). *Third*, the Trustee seeks monetary damages for the Collateral Manager's and Issuers' breach of the Indentures, the CMAs, and as to Triaxx CDO 2006-1, Ltd. and Triaxx CDO 2007-1, Ltd., a breach of the UCC, by directly paying Phoenix and potentially others with

Collateral Recoveries instead of delivering such Collateral Recoveries to the Trustee. *Fourth*, the Trustee seeks monetary damages for the Collateral Manager's and Issuers' unlawful conversion of such Collateral Recoveries. *Fifth*, the Trustee seeks restitution for Phoenix's unjust enrichment and money had and received from the Collateral Recoveries to the detriment of the Secured Parties under the Indentures.

2.      U.S. Bank serves as both the Collateral Administrator and the Trustee for each of the Triaxx Prime CDO 2006-1, Ltd. transaction ("Triaxx 2006-1"), the Triaxx Prime CDO 2006-2, Ltd. transaction ("Triaxx 2006-2"), and the Triaxx Prime CDO 2007-1, Ltd. transaction ("Triaxx 2007-1," and together with Triaxx 2006-1 and Triaxx 2006-2, the "Triaxx CDOs"). As Collateral Administrator, U.S. Bank prepares reports (the "Note Valuation Reports") on behalf of each Issuer. The Note Valuation Reports indicate the distributions to be made on each scheduled payment date (each, a "Payment Date") using the collateral proceeds received by the Trustee on behalf of the Issuers, including distributions with respect to certain "Administrative Expenses" to be paid or reimbursed to various parties, as well as distributions to be made to the Noteholders of the Triaxx CDOs. Thereafter, the Trustee distributes the available proceeds on each Payment Date in accordance with the Note Valuation Reports. All such payments are made pursuant to a Priority of Payments waterfall identified in each Indenture, which permits a certain amount of Administrative Expenses (up to a specified cap) to be paid or reimbursed prior to any distributions being made to Noteholders.

3.      The Collateral Manager periodically directs U.S. Bank to include the Phoenix Invoices (including the 2006-1 Phoenix Invoice, the 2006-2 Phoenix Invoice, and the 2007-1 Phoenix Invoice) in the Note Valuation Reports and pay such invoices out of the available proceeds on the Payment Date. Specifically, the Collateral Manager has classified the Phoenix Invoices as

"Other Administrative Expenses" to be paid pursuant to Section 11.1(a)(i)(2), subclause (6), and thus paid before any interest payments or other payments are made to Noteholders. However, Noteholder Pacific Investment Management Company, LLC ("PIMCO"), whose holdings, upon information and belief, constitute a majority of the Controlling Class of Triaxx 2006-2 and Triaxx 2007-1, informed the Trustee of its position that the 2006-2 and 2007-1 Phoenix Invoices are not properly classified as Other Administrative Expenses and may not be paid or reimbursed out of any proceeds available on any Payment Date. PIMCO asserts that the Collateral Manager employs Phoenix as a third-party to render advice to it. PIMCO further asserts that pursuant to Section 2(g) of the Collateral Management Agreement, the Collateral Manager may employ third-parties such as Phoenix "at the Collateral Manager's expense," and that, therefore, the 2006-2 and 2007-1 Phoenix Invoices do not qualify for reimbursement as Other Administrative Expenses. Similarly, Noteholder South Tryon, LLC ("South Tryon"), whose holdings, upon information and belief, constitute a majority of the Controlling Class of Triaxx 2006-1, informed the Trustee of its position that the 2006-1 Phoenix Invoice seeking payment of certain "incentive fees" should not be paid. While South Tryon later withdrew its objection to the payment of the 2006-1 Phoenix Invoice,[2] Noteholder Goldman Sachs & Co. ("Goldman") then informed the Trustee of its position that it objects to the payment of the 2006-1 Phoenix Invoice.

4.    The Trustee finds itself in a situation where it cannot act without risk of legal liability to itself. On one hand, the Collateral Manager demanded that U.S. Bank include the Phoenix Invoices in the Note Valuation Reports and pay such invoices as Other Administrative

---

[2] After the filing of this Interpleader, South Tryon withdrew its objection to the payment of any "'incentive fees' to the Collateral Manager and its affiliates," including Phoenix.  As explained more fully below, on or about June 25, 2018, the Trustee published an Informational Notice to the Triaxx 2006-1 Noteholders, informing them of South Tryon's withdrawal of their objection to the payment of the "incentive fees." As a result of the withdrawal of its objection, this First Amended Interpleader Complaint does not name South Tryon as an Interpleader Defendant.

Expenses from the proceeds available on each Payment Date. On the other hand, PIMCO and Goldman, in their capacities as Noteholders for the Triaxx CDOs, demanded that the Trustee not pay the Phoenix Invoices. The Trustee, accordingly brought this Interpleader to resolve the dispute.[3]

5.     After the filing of the initial complaint, PIMCO informed the Trustee that it objects to the payment of any legal fees to the Collateral Manager and Phoenix as other Administrative Expenses under the Triaxx 2006-2 and Triaxx 2007-1 Indentures, and demanded that the Trustee refrain from making any such payments. Goldman also objects to the payment of the Collateral Manager's and Phoenix's legal fees in Triaxx 2006-1, and demands the Trustee not pay any of those fees. Upon information and belief, the Collateral Manager and Phoenix, however, assert that they are contractually entitled to the payment of legal fees and that the Trustee cannot legally withhold such payments. As a result, the Trustee cannot act without risk of liability to itself, and accordingly, amended this Interpleader to resolve this dispute.

6.     After the Trustee filed the First Amended Complaint, the Collateral Manager answered and asserted a declaratory judgment counterclaim against the Trustee seeking, among other relief, a declaration from the Court that "*Phoenix is entitled to be paid its fees and expenses [] out of settlement funds at the time such funds are disbursed . . . .*" *See* Triaxx Asset Management Am. Answer, Dkt. No. 78. In support of its counterclaim, the Collateral Manager attached three identical engagement agreements (one for each of the three Triaxx CDOs) (the "Engagement Agreements") between the Issuers and Phoenix entity ARAM Phoenix Real Estate Solutions, Ltd. dated March 22, 2011. *See* Dkt. No. 78, Exs. G, H, & I. The Engagement Agreements purport to

---

[3] As described more fully below, in connection with the filing of this Interpleader, the Trustee has retained (as of July 2018) a total of $1,206,494.73 across the three Triaxx CDOs, which became available for the payment of the Phoenix Invoices on the May, June, and July 2018 Payment Dates for Triaxx 2006-1, Triaxx 2006-2, and Triaxx 2007-1.

show that Phoenix was engaged by the Issuers, in part to "provide activist implementation services" in exchange for an "Activist Implementation Fee." This fee, pursuant to certain letters claiming to clarify the language in the Engagement Agreements (the "Clarification Letters"), is purportedly allowed to be paid out of the proceeds of any funds the Issuers receive in connection with litigation against originators, sponsors, trustees, and servicers of the RMBS underlying the Triaxx CDOs, rather than as "Administrative Expenses" under the Priority of Payments waterfall. *See* Dkt. No. 78, Exs. L, M, & N.

7.      The Trustee was previously unaware of the Engagement Agreements and the Clarification Letters, and believes that certain terms of the Clarification Letters are at odds with the provisions of the Indentures. Further, the Collateral Manager raised issues related to the treatment of Collateral Recoveries in the counterclaim it asserted against the Trustee. Accordingly, this Interpleader seeks the following declaratory relief against the Issuers and the Collateral Manager:

> a.      A declaration that no disbursements are to be made from any Collateral Recoveries;
>
> b.      A declaration that the Issuers and the Collateral Manager, either directly or through their agents, must provide the Trustee with the amount, source, and location (including any previous transfers, disbursements, or applications) of any Collateral Recoveries;
>
> c.      A declaration that the Issuers and the Collateral Manager, either directly or through their agents, must deliver any Collateral Recoveries to the Trustee for deposit in the Accounts established under the Indenture;
>
> d.      A declaration that the Issuers and the Collateral Manager, either directly or through their agents, must provide the Trustee with the existence and identity of any judgments, settlement agreements, general intangibles or other similar property of the Issuers which will or may entitle the Issuers to receive Collateral proceeds in the future; and
>
> e.      A declaration against the Issuers and the Collateral Manager (or their agents or affiliates) that any judgments obtained against the Issuers or the

Collateral Manager in this Interpleader cannot be satisfied from Collateral Recoveries.

8.     Through the pleadings and other filings in this action as well as other recent developments, the Trustee has also become aware that, over the life of the Triaxx CDOs, the Collateral Manager and the Issuers (or agents or counsel on their behalf) have received Collateral Recoveries from settlements from, or judgments against, originators, loan sellers, issuers, servicers, and/or other entities which participated in the structuring, offering, or other provision of services for Residential Mortgage-Backed Securities purchased by the Issuers for inclusion in the Collateral under the Indentures, and has deposited such Collateral Recoveries in accounts other than those established under the Indentures. Upon information and belief, the Collateral Manager and the Issuers have transferred Collateral Recoveries to Phoenix and other parties, rather than immediately delivering such Collateral Recoveries to the Trustee as required by the Indentures and CMAs. Such transfers constitute an express breach of the governing documents, unlawful conversion, and as to Triaxx 2006-1 and Triaxx 2007-1, a breach of the UCC. Accordingly, the Trustee amends this action to seek monetary relief for the misconduct of the Collateral Manager and the Issuers.

9.     As a result of payment to Phoenix (an affiliate of the Collateral Manager) directly from Collateral Recoveries in contravention of the provisions of the Indentures, Phoenix has become unjustly enriched to the detriment of the CDOs and the Secured Parties thereunder. Accordingly, the Trustee further amends this Interpleader to seek restitution for Phoenix's unjust enrichment and money had and received.

10.     On or about January 14, 2019, the Issuers represented in the Joint Pre-Conference Statement that "the sole recourse for any payment obligations of the Issuers, whether under the Indenture or the Engagement Letters with Phoenix, is the CDO collateral." PIMCO and Goldman

have informed the Trustee that they object to the Issuers and/or the Collateral Manager satisfying any judgment against either of them arising from the claims in the Interpleader by using Collateral. Thus, the Trustee cannot act without risk of liability to itself, and accordingly, the Trustee amends this Interpleader to resolve this additional dispute in respect of amounts maintained by, or delivered to, the Trustee under the Indentures.

11.     On or about February 14, 2019, PIMCO and Goldman informed the Trustee that they object to the payment of any legal fees to the Issuers as other Administrative Expenses under the Indentures, and demanded that the Trustee refrain from making any such payments. Upon information and belief, the Issuers, however, assert that they are entitled to the payment of legal fees and that the Trustee cannot legally withhold such payments. As a result, the Trustee cannot act without risk of liability to itself, and accordingly, amends this Interpleader to resolve this additional dispute.

**JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties hereto and the amount in controversy exceeds $75,000 exclusive of interest and costs, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

13.     This Court also has subject matter jurisdiction over this action under 12 U.S.C. § 632 (the "Edge Act"). This action satisfies the requirements of Section 632 because it was brought by U.S. Bank, a national banking association organized under the laws of the United States, and it arises out of banking activity with a distinct foreign aspect. Specifically, U.S. Bank provides corporate trust and other related services to, or on behalf of, the Issuers, which are organized under the laws of the Cayman Islands. Thus, this action arises out of the Trustee's execution of such services on behalf of foreign issuers, which is an international banking activity.

14.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1397 because one or more defendants reside within this judicial district.

## PARTIES

15.     Interpleader Plaintiff U.S. Bank is a national banking association with its main office in Cincinnati, Ohio. U.S. Bank serves as the Trustee under the Indentures and as the Collateral Administrator under the Indentures and (i) the Collateral Administration Agreement, dated September 7, 2006, by and between U.S. Bank as successor to Bank of America, National Association (successor by merger to LaSalle), Triaxx Prime CDO 2006-1, Ltd., and ICP Asset Management LLC (the "2006-1 CAA"), (ii) the Collateral Administration Agreement, dated December 14, 2006, by and between by and between U.S. Bank as successor to Bank of America, National Association (successor by merger to LaSalle), Triaxx Prime CDO 2006-2, Ltd., and ICP Asset Management LLC (the "2006-2 CAA"), and (iii) the Collateral Administration Agreement, dated March 29, 2007, by and between by and between U.S. Bank as successor to Bank of America, National Association (successor by merger to LaSalle), Triaxx Prime CDO 2007-1, Ltd., and ICP Asset Management LLC (the "2007-1 CAA," and together with the 2006-1 CAA, the 2006-2 CMA, and the 2007-1 CAA, the "CAAs" ).

16.     Upon information and belief, Interpleader Defendant Triaxx Asset Management LLC is a limited liability company organized and existing under the laws of the State of Delaware, and none of its members are citizens of the State of Ohio. Triaxx Asset Management serves as the Collateral Manager for the Issuer under the Indentures and (i) the Collateral Management Agreement, dated September 7, 2006, by and between Triaxx Prime CDO 2006-1, Ltd. and ICP Asset Management LLC (the "2006-1 CMA"), (ii) the Collateral Management Agreement, dated December 14, 2006, by and between Triaxx Prime CDO 2006-2, Ltd. and ICP Asset Management LLC (the "2006-2 CMA"), and (iii) the Collateral Management Agreement dated March 29, 2007,

by and between Triaxx Prime CDO 2007-1, Ltd. and ICP Asset Management LLC (the "2007-1 CMA," and together with the 2006-1 CMA, the 2006-2 CMA, and the 2007-1 CMA, the "CMAs").

17.     Interpleader Defendant Triaxx Prime CDO 2006-1, Ltd. is an exempted corporation organized under the laws of the Cayman Islands. Triaxx Prime CDO 2006-1, Ltd. is the Issuer under the 2006-1 Indenture. Triaxx Prime CDO 2006-1, Ltd. is named as a Defendant because it acquired the Collateral Debt Securities and pledged such securities as Collateral under the Indenture.

18.     Interpleader Defendant Triaxx Prime CDO 2006-2, Ltd. is an exempted corporation organized under the laws of the Cayman Islands. Triaxx Prime CDO 2006-2, Ltd. is the Issuer under the 2006-2 Indenture and the owner of certain Collateral Debt Securities. Triaxx Prime CDO 2006-2, Ltd. is named as a Defendant because the Collateral Debt Securities held under the 2006-2 Indenture are held for its benefit.

19.     Interpleader Defendant Triaxx Prime CDO 2007-1, Ltd. is an exempted corporation organized under the laws of the Cayman Islands. Triaxx Prime CDO 2007-1, Ltd. is the Issuer under the 2007-1 Indenture and the owner of certain Collateral Debt Securities. Triaxx Prime CDO 2007-1, Ltd. is named as a Defendant because the Collateral Debt Securities held under the 2007-1 Indenture are held for its benefit.

20.     Upon information and belief, Interpleader Defendant Pacific Investment Management Co. LLC is a limited liability company organized and existing under the laws of the State of Delaware, and none of its members are citizens of the State of Ohio. Upon information and belief, PIMCO is a Holder (or controls one or more Holders) Class A-1A Notes and Class A-1B Notes under the 2006-2 Indenture and a Holder (or controls one or more Holders) of Class A-1D Notes and Class A-1T Notes under the 2007-1 Indenture.

21.     Upon information and belief, Interpleader Defendant Goldman Sachs & Co. is a limited liability company organized and existing under the laws of the State of Delaware, and none of its members are citizens of the State of Ohio. Upon information and belief, Goldman is a Holder (or controls one or more Holders) of Class A-2 Notes and Class B Notes under the 2006-1 Indenture.

22.     Upon information and belief, Interpleader Defendant Phoenix Real Estate Solutions Ltd. is an exempted corporation organized under the laws of the Cayman Islands. Upon information and belief, Phoenix's principal place of business is located at 459 Broadway, New York, NY 10013.

23.     Upon information and belief, Interpleader Defendant Cede & Co. ("Cede") is the nominee name of the Depository Trust Company, a limited purpose trust company organized under the laws of the State of New York. Further, upon information and belief, Cede is the registered Noteholder of record of the Notes at issue in this Interpleader Complaint, the Notes which are held for the ultimate benefit of others. As the registered Noteholder of certain Notes, Cede may have an interest in the Retained Funds and the Retained Fees, as those terms are defined below.

24.     John Does 1 through 100 are sued in this action because, upon information and belief, they include the beneficial owners of certain Notes held in the nominee name of Cede through the Depository Trust Company. The Trustee is not aware of the identities of all the beneficial interest holders in the Notes held by Cede. John Does 1 through 100, as owners of beneficial interests in certain Notes held by Cede, may have an interest in the Retained Funds and the Retained Fees, as those terms are defined below.

## BACKGROUND

25.     Pursuant to the Indentures, the Issuers issued certain Notes that are secured by a pool of Collateral Debt Securities and other Collateral. The Notes were issued in various different

classes, or tranches, each of which is entitled to certain proceeds generated by the Collateral in a specified Priority of Payments.

26.     Pursuant to the "Granting Clauses" of each Indenture, the Issuers granted the Collateral Debt Securities and other Collateral to the Trustee in order to secure the Issuers' obligations under the Indentures. The Trustee holds the Collateral on behalf of the Noteholders and other Secured Parties under the Indentures, and receives and distributes the available proceeds pursuant to Section 11.1 of the Indentures, referred to as the Priority of Payments waterfall. Such Collateral includes not only the Collateral Debt Securities, but also "all proceeds, accessions, profits, income benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of" the Collateral Debt Securities or other property of the Issuers.

27.     All Collateral and the proceeds thereof are subject to a security interest granted to the Trustee for the benefit of the Noteholders and other Secured Parties.

28.     Section 3.3(b) of the Indentures requires that "[e]ach Collateral Debt Security, Equity Security and Eligible Investment" be credited to the appropriate Account under the Indenture and that "[e]ach time that the Issuer, or the Collateral Manager on behalf of the Issuer, [] direct[s] or cause[s] the acquisition of any Collateral Debt Security, Equity Security and Eligible Investment," the Issuer or Collateral Manager must transfer such Collateral Debt Security, Equity Security and Eligible Investment so that it will "be held in and credited to the Custodial Account for the benefit of the Trustee."   An Eligible Investment includes Cash. *See* § 1.1 (Definitions). Moreover, under Section 3.3(b)(iv) of the Indentures, the Issuers represent that all "Cash, Eligible Investments, Equity Securities and Collateral Debt Securities will be credited to one of the Accounts" established under the Indenture at the time any Collateral "is acquired or otherwise becomes subject to the lien of this Indenture."

29. Section 7.8(a)(ii) of the Indentures prohibits the Issuers from "sell[ing], assig[ing], participat[ing], transfer[ing], exchang[ing] or otherwise dispos[ing] of, or pledg[ing], mortgag[ing], hypothecat[ing] or otherwise encumber[ing] (or permit[ting] such to occur or suffer[ring] such to exist), any part of the Collateral, except (a) as expressly permitted by [the] Indenture, and (b) a security interest in a Synthetic Security Counterparty arising under a Defeased Synthetic Security."

30. Section 7.8(a)(x) of the Indentures prohibits the Issuers from "enter[ing] into any agreements unless such agreements contain 'non-petition' and 'limited recourse' provisions with respect to the Issuer or amend or waive such provisions."

31. Section 7.8(a)(xiv) of the Indentures prohibits the Issuers from "amend[ing] or waiv[ing] the 'non-petition' or 'limited recourse' provisions of this Indenture, the Notes, the Account Control Agreement, the Hedge Agreements, the Fiscal Agency Agreement, the Collateral Management Agreement, the Administration Agreement or the Collateral Administration Agreement or any other material agreement to which the Issuer is a party."

32. Section 7.8(b) of the Indentures prohibits the Issuers from "sell[ing], transfer[ing], exchang[ing] or otherwise dispos[ing] of Collateral" except "as expressly permitted by [the] Indenture and the Collateral Management Agreement."

33. Pursuant to Sections 10.1 and 10.2 of the Indentures, the Trustee is allowed to "demand payment or delivery of, and shall receive and collect . . . all Cash and other property payable to or receivable by the Trustee," and the Trustee is the Entitlement Holder to any Account which contains any Cash or other property held for the Issuer or the Co-Issuer. Any "amounts received by the Issuer and not otherwise required to be remitted to a particular Account" must be remitted to the Trustee's Principal Collection Account.

34. Section 11.1(a)(i)(2) of the Indentures describes the payments which are to be made pursuant to the second step of the Priority of Payments waterfall, which payments are made prior to any proceeds being distributed to Noteholders:

> (1) first, to the payment to the Trustee of the accrued and unpaid Trustee Fee; (2) second, to the payment to the Administrator of the accrued and unpaid fees under the Administration Agreement; (3) third, to the payment to the Trustee of accrued and unpaid Trustee Expenses (other than amounts payable pursuant to indemnities) under this Indenture and the Fiscal Agency Agreement (and, if an Event of Default has occurred and is continuing under this Indenture or the Fiscal Agency Agreement, payment to the Trustee of accrued and unpaid expenses (including amounts payable pursuant to the indemnity)); (4) fourth, to the payment of Rating Agency Expenses; (5) fifth, to the Trustee of Trustee Expenses constituting indemnities; (6) **sixth, to the payment of accrued and unpaid Other Administrative Expenses then due and payable** . . .

(emphasis added).

35. The Indentures define "Other Administrative Expenses" as "all Administrative Expenses, but excluding Trustee Expenses (other than amounts payable pursuant to any indemnity)." The Indentures define "Administrative Expenses" as:

> (a) Trustee Expenses and (b) all amounts (including indemnities) due or accrued with respect to such Distribution Date and payable by the Issuer or the Co-Issuer to (i) the Administrator in respect of fees and expenses under the Administration Agreement, (ii) the Independent accountants, agents and counsel of the Issuer for reasonable fees and expenses (including amounts payable in connection with the preparation of tax forms on behalf of the Co-Issuers), (iii) the Collateral Manager in respect of fees and expenses pursuant to the Collateral Management Agreement, (iv) any other Person in respect of any governmental fee, registered office fee, charge or tax in relation to the Issuer or the Co-Issuer (in each case as certified by an Authorized Officer of the Issuer or the Co-Issuer to the Trustee), (v) the Placement Agents in respect of amounts payable to them under the Placement Agency Agreement, (vi) the Rating Agencies in respect of Rating Agency Expenses, (vii) any other Person in respect of any other fees or expenses permitted under this Indenture, the Fiscal Agency Agreement, the documents delivered pursuant to or in connection with this Indenture or the Fiscal Agency Agreement and the Notes and (viii) any exchange or any listing agent or paying agent appointed in connection with the listing of the Notes on any exchange; provided that Administrative Expenses shall not include (A) any amounts due or accrued with respect to the actions taken on or in connection with the Closing Date, (B) amounts payable in respect of the Notes or the Trustee Fee, (C) any Management Fee

payable to the Collateral Manager and (D) amounts payable under any Hedge Agreement.

*See* § 1.1 (Definitions).

36.     Section 11.1(a)(i)(2) of the Indentures further provides that all payments made pursuant to subclauses (2) through (6) of the second step of the Priority of Payments waterfall do not exceed on each Distribution Date a certain cap (the "Cap"), which is approximately $175,000 per month for Triaxx 2006-1, and $200,000 per month for each of Triaxx 2006-2 and Triaxx 2007-1.

37.     Section 11.1(a)(i)(4) and Section 11.1(a)(i)(5) of the Indentures describe the payments to be made pursuant to the fourth and fifth steps of the Priority of Payments waterfall. Under these provisions, the Class A-1 and Class A-2 Triaxx 2006-1 Notes; the Class A-1A, Class A-1B, and Class A-2 Triaxx 2006-2 Notes; and the Class A-1T, Class A-1D, and Class A-2 Triaxx 2007-1 Notes (collectively, the "Senior Notes") are to receive interest payments on each periodic Payment Date.

38.     Pursuant to Section 2(b)(vi) of the CAAs, U.S. Bank, as Collateral Administrator, prepares Note Valuation Reports, based in part upon information provided by the Collateral Manager, on behalf the Issuers. Section 10.7(b) of the Indentures, in turn, provides that Note Valuation Reports constitute instructions to U.S. Bank as Trustee to withdraw on the related Payment Date and pay or transfer amounts set forth in the Note Valuation Reports in accordance with the Priority of Payments waterfall.

39.     Pursuant to Section 2(a) of the CMAs, the Collateral Manager, in performing its duties under the Operative Documents:

> [S]hall exercise reasonable care, using a degree of skill and attention no less than that which the Collateral Manger exercises with respect to comparable assets that it manages for itself and in a commercially reasonable manner consistent with practices and procedures followed by institutional managers of national standing in

connection with the management of assets of the nature and the character of the Collateral Debt Securities and Eligible Investments. . . . The Collateral Manager shall comply in all material respects with all of the terms and conditions of the Indenture affecting the duties and functions that have been delegated to it thereunder and hereunder.

40.    Pursuant to Section 2(g) of the CMAs, the Collateral Manager, "[i]n providing services hereunder" may "employ third parties (including, without limitation, the Collateral Manager's Affiliates) to render advice (including investment advice) and assistance at the Collateral Manager's expense."

41.    Pursuant to Section 6 of the CMAs:

The Collateral Manager shall maintain appropriate books of account and records relating to services performed hereunder, and such books of account and records shall be accessible for inspection by authorized representatives of the Issuer, the Trustee, the Fiscal Agent and the Independent Accountants appointed by the issuer pursuant to the Indenture at a mutually agreed-upon time during normal business hours and upon reasonable prior notice; *provided* that the Collateral Manager shall not be obligated to provide access to any non-public information if the Collateral Manager in good faith determines that the disclosure of such information would violate any applicable law, regulation or contractual arrangement. The Collateral Manager shall promptly forward to the Trustee any information in its possession or reasonably available to it concerning any Collateral Debt Security, Eligible Investment or Hedge Agreement that the Trustee reasonably may request as necessary to enable the Trustee to prepare any report or perform any duty or function on its part to be performed under the terms of the Indenture.

42.    Section 7(e), (f) of the CMAs requires the Collateral Manager "to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action which would . . . result in the Issuer violating the terms of the Indenture in any material respect" or "adversely affect the interests of the Trustee [or] the Noteholders in any material respect."

43.    Pursuant to Section 8(b) of the CMAs, the Collateral Manager:

[S]hall be responsible for all expenses incurred by it in the performance of its obligations under this Agreement; provided that (i) the fees and expenses of employing outside lawyers on behalf of the Issuer in connection with the purchase and sale of Collateral Debt Securities, Equity Securities or Eligible Investments and the possible amendment, default, bankruptcy or restructuring of any Collateral Debt Security or Equity Security, (ii) reasonable travel expenses in connection with the

Collateral Manager's performance of its duties hereunder and (iii) the fees and expenses payable by the Issuer in accordance with the Indenture, including any fees, expenses or other amounts payable to the Rating Agencies, the Collateral Administrator, the Trustee or the Independent accountants appointed under the Indenture, in each case, shall constitute Administrative Expenses and be reimbursed by the Issuer in accordance with the Indenture; provided, however, that salaries of employees of the Collateral Manager and overhead of the Collateral Manager shall not be included in any of clauses (i) through (iii) as Administrative Expenses.

44.     Pursuant to Section 9 of the CMAs, the Collateral Manager shall:

[P]erform its duties hereunder in accordance with the terms of this Agreement and the terms of the Indenture applicable to it. The Collateral Manager agrees that such duties shall be enforceable by . . . the Trustee, on behalf of the Senior Noteholders . . . as provided in the Indenture . . .

45.     Under Section 10(a) of the CMAs, a "Collateral Manager Breach" is defined as "bad faith, willful misconduct or gross negligence in the performance, or reckless disregard, of the obligations of the Collateral Manager hereunder and under the terms of the Indenture applicable to the Collateral Manager."

46.     Pursuant to Section 10(b) of the CMAs:

The Issuer shall indemnify and hold harmless (the Issuer in such case, the "Indemnifying Party") the Collateral Manager and each Collateral Manager Affiliate from and against any Liabilities, and will reimburse the Collateral Manager and each Collateral Manager Affiliate (such parties collectively in such case, the "Indemnified Parties") for all reasonable fees and expenses (including reasonable fees and expenses of counsel) as such fees and expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation, caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Circular, the Indenture or this Agreement, and/or any action taken by, or any failure to act by, the Collateral Manager or any of its Affiliates; provided that the Collateral Manager and its Affiliates will not be indemnified for any such Liabilities or any fees or expenses that they incur as a result of any acts or omissions constituting a Collateral Manager Breach. Notwithstanding anything contained herein to the contrary, the obligations of the Issuer under this Section 10 shall be payable solely as an Administrative Expense out of the Collateral in accordance with the Priority of Payments set forth in the Indenture.

47.     An event of default has occurred under each Triaxx 2006-1 and Triaxx 2007-1. Under UCC § 9-609(a)(1), "[a]fter default, a secured party may take possession of the collateral." Under UCC § 9-609(c), "[i]f so agreed, and in any event after default, a secured party may require the debtor to assemble the collateral and make it available to the secured party at a place to be designated by the secured party which is reasonably convenient to both parties."

## THE FIRST INTERPLEADER DISPUTE

48.     The Collateral Manager periodically directs U.S. Bank to include invoices in the Note Valuation Reports and pay such invoices out of the available proceeds on each Payment Date as "Other Administrative Expenses" to be paid pursuant to Section 11.1(a)(i)(2), subclause (6). From time to time, the Collateral Manager has directed that such proceeds be used to pay invoices from Phoenix Advisors & Managers USA LLC, Phoenix Real Estate Solutions, Phoenix ABS, Aram Phoenix, and Phoenix Real Estate Solutions Ltd (collectively, the "Phoenix Entities").

49.     Pursuant to the Collateral Manager's instruction, these invoices have in the past been included in the Note Valuation Reports and paid pursuant to the Priority of Payments waterfall on each Payment Date, except in respect of the Phoenix Invoices submitted for or outstanding on the most recent Payment Dates and subject to this Interpleader Complaint. Neither the Indentures nor the CAAs provide for U.S. Bank to verify, approve, or investigate the invoices provided by the Collateral Manager before they are included in the Note Valuation Reports or paid on any Payment Date.

50.     On or about March 29, 2018, U.S. Bank received from the Collateral Manager Phoenix Invoices to be paid on the next periodic Payment Date—May 2, 2018 for Triaxx 2006-2 and Triaxx 2007-1, and May 3, 2018 for Triaxx 2006-1. The Phoenix Invoices were for the following amounts, each identified as an "Incentive fee":

- Triaxx CDO 2006-1, $8,000,000

- Triaxx CDO 2006-2, $5,500,000
- Triaxx CDO 2007-1, $4,750,000

51.    U.S. Bank continues to receive from the Collateral Manager Phoenix Invoices to be paid on periodic Payment Dates for Triaxx 2006-1, Triaxx 2006-2, and Triaxx 2007-1.

52.    On or about May 2, 2018, the Trustee received a letter from counsel for PIMCO demanding that the "Trustee cease making payments to the Phoenix Entities." In the letter, PIMCO asserted that Phoenix is an "agent of the Collateral Manager" and "purports to perform a variety of services on its behalf, including analyses of the value of securities in the CDOs." PIMCO then argued that the "Collateral Manager must bear its own expense for the work of its agents" because "[t]he CMAs expressly prohibit such payments to third parties retained by the Collateral Manager" and "[t]here is no authority in the Governing Documents to demand, or for U.S. Bank to make, payments to third parties such as the Phoenix Entities as 'Administrative Expenses.'"

53.    On or about May 3, 2018, the Trustee received an email from counsel for South Tryon objecting to the payment of any "incentive fees" to Phoenix. In the email, South Tryon asserted that Phoenix is an agent or affiliate of the Collateral Manager and that "South Tryon bases its objection upon, among other reasons, concerns arising from the Manager's prior taking of certain fees from Triaxx 06-1 to which it was not entitled, along with other adjudicated breaches of its duties."

54.    The Collateral Manager asserted and continues to assert that the Trustee must pay that portion of the Phoenix Invoices up to the Cap pursuant to Section 11.1(a)(i)(2) of the Indentures on the periodic Payment Dates. PIMCO and South Tryon (as Senior Noteholders of the Triaxx CDOs) demanded that the Trustee not make any payment on the Phoenix Invoices on the periodic Payment Dates. If that portion of the Phoenix Invoices are paid as "Other Administrative Expenses," Phoenix would receive funds. However, if any portion of the Phoenix Invoices are not

paid as "Other Administrative Expenses," the proceeds allegedly allocable to Phoenix would be available to pay additional amounts owing under the Priority of Payments waterfall and would increase the amount of proceeds available to pay PIMCO and South Tryon, as Senior Noteholders, in the future.

55.     As described above, the Trustee faced and continue to face irreconcilable demands as to whether to make any payment on the Phoenix Invoices, subject to and in accordance with the terms and conditions of the Indentures. The Collateral Manager insisted that the Trustee should pay that portion of the Phoenix Invoices up to the Cap pursuant to Section 11.1(a)(i)(2) of the Indentures. Senior Noteholders PIMCO and South Tryon, on the other hand, instructed the Trustee not to make any payment on the Phoenix Invoices. The Trustee is therefore unable to determine, without exposing itself to risk of liability, whether to make any payment on the Phoenix Invoices.

56.     On or about June 18, 2018, the Trustee received an email from counsel for South Tryon withdrawing its objection to the payment of any "'incentive fees' to the Collateral Manager and its affiliates," including Phoenix. In the email, South Tryon explained that while it "continues to have concerns about the Collateral Manager's conduct, the harm caused by the conduct is primarily borne by more junior noteholders with the residual interest in assets of Triaxx 2006-1, who South Tryon views as the appropriate parties to assess the costs and benefits of pursuing this dispute."

57.     On or about June 25, 2018, the Trustee published an Informational Notice to Triaxx 2006-1 Noteholders, informing them of South Tryon's withdrawal of its objection to the payment of the 2006-1 Phoenix Invoice. The Notice indicated that as of the date of the Notice, no other Noteholder had conveyed its position to the Trustee regarding the payment of the 2006-1 Phoenix Invoice. The Notice further stated that "[t]o the extent that any Noteholder supports or objects to

the payment of the [2006-1 Phoenix Invoice], such holder should immediately inform the Trustee of its position or otherwise determine whether it should intervene in the Interpleader Action."

58.     On or about June 29, 2018, the Trustee received a letter from counsel for Goldman objecting to the payment of the 2006-1 Phoenix Invoice. Goldman objects to the payment of all invoices submitted by the Collateral Manager on behalf of Phoenix.

59.     Upon information and belief, other 2006-1 Noteholders may object to the payment of the 2006-1 Phoenix Invoice and, upon receipt of the Notice of South Tryon's withdrawal of its objection, will communicate their objection to the Trustee.

60.     There were Payment Dates in May, June, and July 2018 for the Triaxx CDOs. Because of this dispute, the Trustee withheld funds allegedly allocable to Phoenix under the Priority of Payments waterfall in the amount of $373,990.84 in Triaxx 2006-1, $380,714.20 in Triaxx 2006-2, and $451,789.69 in Triaxx 2007-1 (collectively, the "Retained Funds"), as of July 2018. The Trustee is holding these Retained Funds pending the outcome of this Interpleader, and is ready and willing to proceed in the manner in which the Court directs. The Trustee intends to withhold any future funds allegedly allocable to Phoenix under the Priority of Payments waterfall (or any other source) on future periodic Payment Dates.

61.     U.S. Bank has no interest as a claimant in the Retained Funds that are the subject of this dispute, except to the extent of administrative fees and expenses owing to the Trustee and the Collateral Administrator by the Issuers, and its costs and disbursements, including legal fees and expenses, with respect to this action, as may be awarded by the Court.

## THE SECOND INTERPLEADER DISPUTE

62.     On or about May 18, 2018, after the filing of the initial complaint, the Trustee received a letter from counsel for PIMCO objecting to the payment of the Collateral Manager's and Phoenix's legal fees in Triaxx 2006-2 and Triaxx 2007-1. In the letter, PIMCO, citing Section

8(b) of the CMAs, asserted that "[t]he CMAs only permit the Collateral Manager's or Issuers'
legal counsel to be reimbursed by the CDOs in connection with the purchase and sale of Collateral
Debt Securities and other limited circumstances that do not pertain here." Therefore, the Collateral
Manager and Phoenix "must bear their own legal fees and expenses."

63.     On or about June 1, 2018, the Trustee received a letter from counsel for the
Collateral Manager responding to PIMCO's May 18, 2018 letter and asserting the Collateral
Manager's right to the payment of its legal expenses in connection with this Interpleader. In the
letter, the Collateral Manager stated that PIMCO's letter is an "attempt to deprive the Collateral
Manager of its right to be indemnified by the CDOs for its legal fees in [this Interpleader], which
is a transparent effort to hinder the Collateral Manager's ability to defend itself" and "should be
rejected by the Trustee." Specifically, it argued that Section 10(b) of the CMAs "expressly relates
to fees and expenses (including counsel fees) incurred by the Collateral Manager . . . in defending
litigation arising out of any action taken, or alleged failure to act, by the Collateral Manager,"
which includes this Interpleader. The letter further asserted that "[s]hould the Trustee refuse to
process the Collateral Manager's direction for payment of its legal fees in [this Interpleader] and
submit that question to the Court, [the Collateral Manager] reserves the right to challenge payment
of the Trustee's related legal fees pending resolution of that issue by the Court."

64.     Goldman also objects to the payment of the Collateral Manager's and Phoenix's
legal fees in Triaxx 2006-1.

65.     Upon information and belief, the Collateral Manager also asserts that Phoenix is
entitled to the payment of its legal fees pursuant to a direction from the Collateral Manager to pay
such fees.

66.     As described above, the Trustee faced and continues to face irreconcilable demands as to whether to release for payment, pursuant to the Priority of Payments waterfall, the legal fees as directed by the Collateral Manager. Noteholders PIMCO and Goldman have instructed the Trustee not to release for payment any of the Collateral Manager's or Phoenix's legal fees. The Collateral Manager, on the other hand, insists that the Trustee should release for payment the Collateral Manager's legal fees pursuant to Section 10(b) of the CMAs and Section 11.1(a)(i)(2) of the Indentures. Upon information and belief, the Collateral Manager also asserts that Phoenix is entitled to the payment of its legal fees and that the Trustee cannot legally withhold such payments. The Trustee is therefore unable to determine, without exposing itself to risk of liability, whether to release for payment, pursuant to the Priority of Payments waterfall, the Collateral Manager's and Phoenix's legal fees.

67.     On or about June 7, 2018, the Collateral Manager submitted to the Collateral Administrator invoices for payment of the Collateral Manager's and Phoenix's legal fees as Administrative Expenses. The invoices were for the following amounts:

- Triaxx CDO 2006-1, $38,758.81
- Triaxx CDO 2006-2, $38,546.81
- Triaxx CDO 2007-1, $38,546.81

The Trustee withheld amounts available for the payment of the Collateral Manager's legal fees, which, in the aggregate, total $115,852.53 (the "Collateral Manager's Retained Fees") on the July 2018 Payment Dates and intends to withhold any amounts available for the payment of the Collateral Manager's legal fees on future periodic Payment Dates for the Triaxx CDOs pending the outcome of this Interpleader, and is ready and willing to proceed in the manner in which the Court directs.

68.     To date, Triaxx has not submitted to the Collateral Administrator any invoices in respect of legal fees for Phoenix to be paid as Administrative Expenses. To the extent any such

invoices are submitted for payment, the Trustee intends to withhold payment of Phoenix's legal fees ("Phoenix's Retained Fees" and together with the Collateral Manager's Retained Fees, the "Retained Fees") on future periodic Payment Dates pending the outcome of this Interpleader, and is ready and willing to proceed in the manner in which the Court directs.

69.     U.S. Bank has no interest as a claimant in the Retained Fees that are the subject of this dispute, except to the extent of administrative fees and expenses owing to the Trustee and the Collateral Administrator by the Issuers, and its costs and disbursements, including legal fees and expenses, with respect to this action, as may be awarded by the Court.

70.     The above-entitled action is not brought by collusion with any of the Interpleader Defendants.

### THE THIRD INTERPLEADER DISPUTE

71.     On February 14 and February 15, 2019, the Trustee received emails from counsel for PIMCO and Goldman, respectively, objecting to the payment of the Issuers' legal fees in Triaxx 2006-1, Triaxx 2006-2 and Triaxx 2007-1, and to the Issuers and/or the Collateral Manager satisfying any judgment against either of them arising from the claims in the Interpleader by using Collateral.

72.     On the morning of February 15, 2019, the Trustee called counsel for the Issuers regarding PIMCO's and Goldman's objections to the payment of the Issuers' legal fees and to the Issuers and/or the Collateral Manager satisfying any judgment against either of them arising from the claims in the Interpleader by using Collateral. Upon information and belief, the Issuers' position is that the Issuers have the right to the payment of their legal expenses and the Issuers' and the Collateral Manager's have the right to satisfy any judgment with Collateral.

73.     As described above, the Trustee faced and continues to face irreconcilable demands as to whether to release for payment the Issuers' legal fees and whether to pay the Interpleader

Judgment Fees from amounts maintained by or delivered to the Trustee for deposit in the Accounts established under the Indentures. Noteholders PIMCO and Goldman have instructed the Trustee not to release for payment any of the Issuer's legal fees and not to pay the Interpleader Judgment Fees from amounts maintained by or delivered to the Trustee for deposit in the Accounts established under the Indentures. Upon information and belief, the Issuers, on the other hand, insist that the Trustee should release for payment the Issuers' legal fees and Interpleader Judgment Fees from amounts maintained by or delivered to the Trustee in the Accounts established under the Indentures. The Trustee is therefore unable to determine, without exposing itself to risk of liability, whether to release for payment the Issuers' legal fees or the Interpleader Judgment Fees from amounts maintained by or delivered to the Trustee in the Accounts established under the Indentures.

74.     U.S. Bank has no interest as a claimant in the Issuers' legal fees or the Interpleader Judgment Fees that are the subject of this dispute and allegedly payable from amounts maintained by or delivered to the Trustee in the Accounts established under the Indentures, except to the extent of administrative fees and expenses owing to the Trustee and the Collateral Administrator by the Issuers, and its costs and disbursements, including legal fees and expenses, with respect to this action, as may be awarded by the Court.

75.     The above-entitled action is not brought by collusion with any of the Interpleader Defendants.

## THE COLLATERAL RECOVERIES DISPUTE

76.     On August 27, 2018, the Collateral Manager answered the First Amended Complaint (later amended on September 14, 2018). *See* Triaxx Asset Management Am. Answer, Dkt. No. 78. In the Answer, the Collateral Manager asserts a counterclaim against the Trustee seeking, in part, a declaratory judgment from the Court regarding "*[w]hether Phoenix is entitled*

*to be paid its fees and expenses [] out of settlement funds at the time such funds are disbursed . . .* " and takes the position that such question should be answered in the affirmative.

77.     As support, the Collateral Manager attached three Engagement Agreements (one for each of the three Triaxx CDOs) between the Issuers and Phoenix affiliate ARAM Phoenix Real Estate Solutions, Ltd., dated March 22, 2011. *See* Dkt. No. 78, Exs. G, H, & I. The Engagement Agreements – which were executed by the Collateral Manager on behalf of the Issuers – purport to show that Phoenix was engaged by the Issuers, in part to "provide activist implementation services" in exchange for an "Activist Implementation Fee." The Trustee had not previously seen the Engagement Agreements, nor was aware of their existence. At this time, the Trustee takes no position as whether the Engagement Agreements are valid and enforceable.

78.     As more fully described in the Engagement Agreements, the activist implementation services were to be performed by Phoenix in connection with the Collateral Manager's activist implementation strategy in which it pursued litigation against originators, sponsors, trustees, and servicers of the RMBS underlying the Triaxx CDOs. The services, as described by the Engagement Agreements, included "[a]nalyz[ing] the underlying borrowers within the RMBS pools," "[c]reat[ing], recommend[ing] and assist[ing] in implementing default mitigation, modification and refinancing strategies for underlying loans," and "[a]ssist[ing] the CDO[s] (and the Collateral Manager on its behalf) in pursuing servicer remedies, servicer enhancements, special servicer enhancements, modifications to assets . . . and loan put backs to originators/sellers." *See* Dkt. No. 78, Exs. G, H, & I, at ¶ 2.

79.     As a result of such a strategy, the Collateral Manager has stated that the Issuers have received "over tens of millions of dollars in past and estimated future recoveries for the [Triaxx] CDOs." *See* Triaxx Asset Management Am. Answer, Dkt. No. 78, at ¶ 72. The Trustee

understands that most of these recoveries have been a result of litigation settlements between the parties.

80.     The Engagement Agreements outline that "[Phoenix's] fees for providing the services described in [the] Agreement[s] . . . shall be paid as an Administrative Expense under the Indenture" and that Phoenix "agrees that the payment of all amounts to which it is entitled . . . shall be as an Administrative Expense subject to the Priority of Payments as described in the Indenture and shall be payable only to the extent funds are available in accordance with the Priority of Payments." *See* Dkt. No. 78, Exs. G, H, & I, at ¶¶ 6, 12; *see also id.* at Annex I, p. 12 ("the Activist Implementation Fee shall be payable on each Distribution Date . . .").

81.     On August 8, 2014, Nicholas Calamari ("Calamari"), then the General Counsel of Phoenix, purportedly sent Clarification Letters to the Issuers for each of the Triaxx CDOs purporting to clarify that Sections 6 and 12, and Annex I of the Agreement "were intended to allow for Phoenix to be paid its fees and expense out of settlement funds at the time such funds are disbursed." *See* Dkt. No. 78, Exs. L, M, & N. In other words, the fee was allowed to be paid out of settlement recoveries rather than as "Administrative Expenses" under the Priority of Payments waterfall. The Trustee had not previously seen the Clarification Letters, nor was aware of their existence. The Clarification Letters violate the terms of the Indentures, which among other things, prohibit payments outside of the Indenture's Priority of Payments waterfall. Neither the Collateral Manager nor the Issuers obtained Noteholder consent or approval to enter into the Clarification Letters.

82.     In the Indenture's Granting Clause, the Issuers granted the Collateral Debt Securities and other Collateral to the Trustee in order to secure the Issuers' obligation under the Indentures. The Trustee, in turn, holds the Collateral on behalf of the Noteholders and other

Secured Parties under the Indentures, and it receives and distributes the available proceeds pursuant to the Priority of Payments waterfall set forth in Section 11.1(a) of the Indentures. Such Collateral includes not only the Collateral Debt securities, but also "all accounts, general intangibles, chattel paper, instruments, securities, investment property and any and all other property. . .including. . . all proceeds, accessions, profits, income benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property of the Issuer." *See* Indentures at 1-2.

83.     Pursuant to the Indentures, the proceeds or recoveries in respect of Collateral received by or on behalf of the Issuers, or otherwise in the possession (or under the control of) the Issuers, including settlement recoveries are subject to the lien as provided for in the Granting Clause of the Indenture and must be delivered or transferred to the Trustee for deposit in the Accounts established under the Indenture. *See* Indentures §§ 3.3(b), 7.8(a)(ii), 7.8(b), 10.1, 10.2.

84.     The Issuers (or Collateral Manager on behalf of the Issuers) may not hold, nor disburse to Phoenix or any other party, the Collateral Recoveries; rather, the Issuers or Collateral Manager must deliver any Collateral Recoveries to the Trustee to distribute pursuant to the terms of the Priority of Payments waterfall. *See* Indentures §§ 7.8(a)(xiv)(b), 10.1 10.2, 11.1; CMAs § 7(e), (f).

85.     Upon information and belief, the Collateral Manager and the Issuers authorized the distribution in Collateral Recoveries directly to Phoenix and potentially other parties, rather than turning over such Collateral Recoveries to the Trustee to distribute in accordance with the Indenture's Priority of Payments waterfall. As such, the Collateral Manager and the Issuers have improperly enriched Phoenix at the expense of the CDOs and the Secured Parties thereunder.

86.     As the Collateral Manager admits in its Form ADV, and as Phoenix has admitted in its Answer to Goldman's Second Amended Answer and Claim to Res, Phoenix Advisors is indirectly owned by Vishal Garg ("Garg") and Calamari. Phoenix also admits that the Collateral Manager is owned by Triaxx Holdco, LLC ("Triaxx Holdco") and Triaxx Holdco is, in turn, owned by Garg and Calamari. Phoenix further admits that the controlling member of Triaxx Holdco is a director of Phoenix.

87.     The controlling member of Triaxx Holdco manages Phoenix, and indirectly benefits from the revenues and fees earned by both Phoenix and Phoenix Advisors.

88.     Phoenix Advisors is a subsidiary of 1/0 Capital, LLC ("1/0 Capital"), of which Garg is the founding partner and Calamari is a partner. Upon information and belief, Phoenix Advisors has a contract with Phoenix for the "activist implementation services," and as such, Phoenix is indirectly working for 1/0 Capital.

89.     The Collateral Manager, 1/0 Capital, and the Phoenix Entities share the same office address, the same floor, and the same conference rooms, and payments to the Phoenix Entities benefit both Garg and Calamari.

90.     By withholding the Collateral Recoveries from immediate delivery to the Trustee, the Collateral Manager and the Issuers breached the Indentures, which require that all such Collateral Recoveries be delivered or transferred to the Trustee for deposit in the Accounts established under the Indentures. In addition, as a result of the occurrence of an event of default, Triaxx CDO 2006-1, Ltd. and Triaxx CDO 2007-1, Ltd. breached the UCC by not delivering possession of the Collateral Recoveries to the Trustee.

91.     The Collateral Manager also breached Sections 2(a), 7(f), 9, and 10(a) of the CMAs, which require the Collateral Manager to use skill and attention in its duties and prohibit the

Collateral Manager from taking any action that would constitute gross negligence, bad faith, or harm the interests of the Noteholders in the CDOs, and to perform its duties in accordance with the terms of the Indentures. By failing to immediately deliver the Collateral Recoveries to the Trustee to distribute according to the Priority of Payments waterfall under the Indentures, and instead making direct payments to Phoenix from such Collateral Recoveries, the Collateral Manager has failed to use skill and attention in performing its duties in accordance with the terms of the Indentures.

**FIRST CLAIM**
**INTERPLEADER PLEA FOR RELIEF**
***(Against All Interpleader Defendants)***

92.    The Trustee repeats the foregoing allegations as if set forth fully herein.

93.    **WHEREFORE**, the Trustee asks this Court:

    (i)    To order the Interpleader Defendants to interplead and to settle all claims regarding (a) the Retained Funds and the Phoenix Invoices and (b) the Retained Fees, Interpleader Legal Fees and the Interpleader Judgment Fees that are the subject of this dispute among themselves and any other persons who claim or may claim an interest, beneficial or legal, in such Retained Fees, Interpleader Legal Fees and Interpleader Judgment Fees under the Priority of Payments waterfall or any other source;

    (ii)    For a judicial determination as to (a) whether the Phoenix Invoices constitute "Other Administrative Expenses" pursuant to Section 1.1 and Section 11.1(a)(i)(2) of the Indentures, (b) whether the Trustee is required to apply the Retained Funds in payment of the Phoenix Invoices, (c) whether the Trustee is required to release for payment the Interpleader Legal Fees to the Collateral Manager, the Issuers, and/or Phoenix from amounts

-30-

maintained by or delivered to the Trustee for deposit in the Accounts established under the Indentures, and (d) whether the Issuers and Collateral Manager are entitled to payment (or reimbursement for payment) for the Interpleader Judgment Fees from amounts maintained by or delivered to the Trustee for deposit in the Accounts established under the Indentures;

(iii)    To restrain Interpleader Defendants and all claiming through or acting with them, or claiming any interest in the Retained Funds, the Interpleader Legal Fees and/or the Interpleader Judgment Fees under the Priority of Payments waterfall or from amounts maintained by or delivered to the Trustee for deposit in the Accounts established under the Indentures, from commencing or prosecuting any separate proceeding against the Trustee concerning or relating to the Retained Funds, the Interpleader Legal Fees and/or the Interpleader Judgment Fees absent an agreement with the Trustee;

(iv)    To award the Trustee its costs and disbursements, including legal fees and expenses, with respect to this action and the distribution of funds in dispute; and

(v)    To award the Trustee such other and further relief as the Court may deem just, proper, and equitable.

## SECOND CLAIM
## DECLARATORY JUDGMENT
### *(Against Triaxx Asset Management LLC, Triaxx Prime CDO 2006-1, Ltd.; Triaxx Prime CDO 2006-2, Ltd.; Triaxx Prime CDO 2007-1, Ltd.)*

94.    The Trustee repeats the foregoing allegations as if set forth fully herein.

95.    A bona fide judicial and substantial controversy exists between and among the Trustee and the Issuers and the Collateral Manager as to whether under the terms of the Indentures

and the governing documents: (a) Disbursements can be made from any Collateral Recoveries; (b) The Issuers and the Collateral Manager, either directly or through their agents, are required to provide the Trustee with the amount, source, and location (including any previous transfers, disbursements, or applications) of any Collateral Recoveries; (c) The Issuers and the Collateral Manager, either directly or through their agents, are required to deliver any Collateral Recoveries to the Trustee for deposit in the Accounts established under the Indenture; (d) The Issuers and the Collateral Manager, either directly or through their agents, are required to provide the Trustee with the existence and identity of any judgments, settlement agreements, general intangibles, or other similar property of the Issuers which will or may entitle the Issuers to receive Collateral proceeds in the future; and (e) Any judgments against the Issuers or the Collateral Manager in connection with the claims raised in the Interpleader can be satisfied with Collateral Recoveries.

96.    A judgment would serve a useful purpose in clarifying and settling the legal issues and would finalize the controversy and offer relief from uncertainty.

97.    **WHEREFORE**, the Trustee seeks a declaration from this Court that is binding on the Issuers and the Collateral Manager that:

(i)    No disbursements are to be made from any Collateral Recoveries;

(ii)    The Issuers and the Collateral Manager, either directly or through their agents, must provide the Trustee with the amount, source, and location (including any previous transfers, disbursements, or applications) of any Collateral Recoveries;

(iii)    The Issuers and the Collateral Manager, either directly or through their agents, must deliver any Collateral Recoveries to the Trustee for deposit in the Accounts established under the Indenture;

(iv)   The Issuers and the Collateral Manager, either directly or through their agents, must provide the Trustee with the existence and identity of any judgments, settlement agreements, general intangibles, or other similar property of the Issuers which will or may entitle the Issuers to receive Collateral proceeds in the future; and

(v)   The Issuers and the Collateral Manager cannot use Collateral Recoveries to satisfy, in whole or in part, any judgments obtained against the Issuers or the Collateral Manager in this Interpleader.

**THIRD CLAIM**
**BREACH OF CONTRACT**
*(Against Triaxx Asset Management LLC, Triaxx Prime CDO 2006-1, Ltd.;*
*Triaxx Prime CDO 2006-2, Ltd.; Triaxx Prime CDO 2007-1, Ltd.)*

98.   The Trustee repeats the foregoing allegations as if set forth fully herein.

99.   The Indentures constitute valid and enforceable contracts between the Trustee and the Issuers.

100.   The Trustee has fully performed, and continues to fully perform, its obligations under the Indentures.

101.   The Issuers and the Collateral Manager breached the Indentures by making payments directly to Phoenix and other parties from Collateral Recoveries rather than delivering such Collateral Recoveries to the Trustee for payment through the Indenture's Priority of Payments waterfall.

102.   The CMAs constitute valid and enforceable contracts between the Collateral Manager and the Issuers. Under Section 9 of the CMA and the rights granted to the Trustee under the Indentures, the Trustee (on behalf of the Senior Noteholders) may enforce the Collateral Manager's duties under the CMAs in accordance with the terms of the CMAs and the Indentures.

103.     The Collateral Manager breached the CMAs by taking such action that would constitute gross negligence or bad faith, or would harm the interests of the Noteholders in the CDOs, and by failing perform its duties in accordance with the terms of the Indentures.

104.     The failure to deliver Collateral Recoveries to the Trustee for payment through the Indenture's Priority of Payments waterfall constitutes a breach of contract.

105.     The Trustee (and the Secured Parties under the Indentures) have suffered damages as a proximate result of the conduct of the Collateral Manager and the Issuers. This includes, without limitation, all Collateral Recoveries held outside of the Accounts established under the Indentures, which were required to be delivered directly to the Trustee but were instead diverted to other parties as a result of the Collateral Manager's and the Issuers' misconduct.

106.     The Trustee (on behalf of the Secured Parties under the Indentures) is entitled to all legal and equitable remedies available under the law.

107.     WHEREFORE, the Trustee asks this Court:

    (i)    To award the Trustee compensatory damages in an amount to be proved at trial;

    (ii)    To award the Trustee its costs and disbursements, including legal fees and expenses, with respect to this action and the distribution of funds in dispute; and

    (iii)    To award the Trustee such other and further relief as the Court may deem just, proper, and equitable.

## FOURTH CLAIM
## BREACH OF THE UNIFORM COMMERCIAL CODE § 9-609
### *(Against Triaxx Prime CDO 2006-1, Ltd.; Triaxx Prime CDO 2007-1 Ltd.)*

108.     The Trustee repeats the foregoing allegations as if set forth fully herein.

109.     Triaxx 2006-1 and Triaxx 2007-1 have each entered into an event of default.

110.    Triaxx Prime CDO 2006-1, Ltd. and Triaxx Prime CDO 2007-1, Ltd. have failed to deliver all Collateral to the Trustee upon the event of default.

111.    Triaxx Prime CDO 2006-1, Ltd. and Triaxx Prime CDO 2007-1, Ltd. have breached UCC Section 9-609 by failing to deliver all Collateral to the Trustee upon the event of default.

112.    The Trustee (and the Secured Parties under the Indentures) have suffered damages as a proximate result of the conduct of Triaxx Prime CDO 2006-1, Ltd. and Triaxx Prime CDO 2007-1, Ltd.

113.    The Trustee (on behalf of the Secured Parties under the Indentures) is entitled to all legal and equitable remedies available under the law.

114.    WHEREFORE, the Trustee asks this Court:

    (i)    To award the Trustee compensatory damages in an amount to be proved at trial;

    (ii)    To award the Trustee its costs and disbursements, including legal fees and expenses, with respect to this action and the distribution of funds in dispute; and

    (iii)    To award the Trustee such other and further relief as the Court may deem just, proper, and equitable.

### FIFTH CLAIM
### CONVERSION
***(Against Triaxx Asset Management LLC, Triaxx Prime CDO 2006-1, Ltd.;***
***Triaxx Prime CDO 2006-2, Ltd.; Triaxx Prime CDO 2007-1, Ltd.)***

115.    The Trustee repeats the foregoing allegations as if set forth fully herein.

116.    All Collateral Recoveries belong to the Trustee for the benefit of the Secured Parties to deposit in the Accounts established under the Indentures in order to be distributed pursuant to the Priority of Payments waterfall.

117.   The Collateral Manager and the Issuers wrongfully assumed dominion and control over the Collateral Recoveries belonging to the Trustee and the Secured Parties under the Indentures by delivering such Collateral Recoveries directly to Phoenix and potentially other parties. The Trustee and the Secured Parties under the Indentures never authorized the Collateral Manager or the Issuers to use such Collateral Recoveries for their benefit or the benefit of their affiliates.

118.   The Trustee has an absolute and unconditional right to immediate possession of all Collateral Recoveries pursuant to the Indentures, the CMAs, and as to Triaxx 2006-1 and Triaxx 2007-1, the UCC.

119.   The Trustee and the Secured Parties under the Indentures have suffered and will continue to suffer damages as a direct and proximate result of the Collateral Manager's and Issuers' unlawful conversion of their property.

120.   WHEREFORE, the Trustee asks this Court:

> (i)   To award the Trustee compensatory damages in an amount to be proved at trial;
>
> (ii)   To award the Trustee its costs and disbursements, including legal fees and expenses, with respect to this action and the distribution of funds in dispute; and
>
> (iii)   To award the Trustee such other and further relief as the Court may deem just, proper, and equitable.

**SIXTH CLAIM**
**UNJUST ENRICHMENT**
*(Against Phoenix Real Estate Solutions Ltd.)*

121.   The Trustee repeats the foregoing allegations as if set forth fully herein.

122.    The Collateral Manager and the Issuers caused Phoenix (an affiliate of the Collateral Manager) to be paid directly from Collateral Recoveries held outside of the Accounts established under the Indentures.

123.    Pursuant to the provisions of the Indentures, Phoenix was never entitled to be paid directly from Collateral Recoveries outside of the Priority of Payments waterfall.

124.    Upon information and belief, Phoenix obtained substantial monetary benefits as a direct and proximate result of the unlawful conduct alleged above to the detriment of the Trustee and the Secured Parties under the Indentures.

125.    Retention of those benefits by Phoenix would violate fundamental principles of justice, equity and good conscience.

126.    WHEREFORE, the Trustee asks this Court:

    (i)    To require Phoenix to disgorge all amounts it unlawfully obtained;

    (ii)    To award the Trustee its costs and disbursements, including legal fees and expenses, with respect to this action and the distribution of funds in dispute; and

    (iii)    To award the Trustee such other and further relief as the Court may deem just, proper, and equitable.

### SEVENTH CLAIM
### MONEY HAD AND RECEIVED
### *(Against Phoenix Real Estate Solutions Ltd.)*

127.    The Trustee repeats the foregoing allegations as if set forth fully herein.

128.    All Collateral Recoveries belong to the Trustee for the benefit of the Secured Parties to deposit in the Accounts established under the Indentures in order to be distributed pursuant to the Priority of Payments waterfall.

129.     The Trustee has an absolute and unconditional right to immediate possession of all Collateral Recoveries pursuant to the Indentures, the CMAs, and as to Triaxx 2006-1 and Triaxx 2007-1, the UCC.

130.     Phoenix has received Collateral Recoveries that rightfully belong to the Trustee for the benefit of the Secured Parties and has not returned such Collateral Recoveries to the Trustee. Phoenix likewise has benefitted from the receipt of such Collateral Recoveries.

131.     Equity and good conscience require full restitution of the moneys received, directly or indirectly, from the Collateral Manager, as well as any assets derived from the Collateral Recoveries.

132.     WHEREFORE, the Trustee asks this Court:

(i)      To require Phoenix to disgorge all amounts it unlawfully obtained;

(ii)     To award the Trustee its costs and disbursements, including legal fees and expenses, with respect to this action and the distribution of funds in dispute; and

(iii)    To award the Trustee such other and further relief as the Court may deem just, proper, and equitable.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Trustee demands judgment:

(i)      On the Trustee's first claim for interpleader relief, granting the interpleader relief requested herein;

(ii)     On the Trustee's second claim for declaratory relief, granting the declaration requested herein;

(iii)    On the Trustee's third claim for breach of contract, granting the relief requested herein;

(iv)     On the Trustee's fourth claim for breach of the UCC, granting the relief requested herein;

(v)      On the Trustee's fifth claim for conversion, granting the relief requested herein;

(vi)     On the Trustee's sixth claim for unjust enrichment, granting the relief requested herein;

(vii)    On the Trustee's seventh claim for money had and received, granting the relief requested herein; and

(viii)   Granting such further and other relief as the Court deems appropriate.

Dated:       New York, New York
             April 11, 2019

                                        ALSTON & BIRD LLP

                              By:  */s/ Alexander S. Lorenzo*

                                   Alexander S. Lorenzo
                                   Elizabeth A. Buckel
                                   Kristen C. Kuan
                                   90 Park Avenue
                                   New York, New York 10016
                                   (212) 210-9400
                                   alexander.lorenzo@alston.com
                                   elizabeth.buckel@alston.com
                                   kristen.kuan@alston.com

                                   *Attorneys for Interpleader Plaintiff U.S.*
                                   *Bank National Association, solely in its*
                                   *capacity as Trustee*