

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/31/21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

U.S. BANK NATIONAL ASSOCIATION,

   Interpleader Plaintiff,

  -against-

TRIAXX ASSET MANAGEMENT LLC,
et al.,

   Interpleader Defendants.

18-CV-4044 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff U.S. Bank National Association (U.S. Bank or Trustee), in its capacity as Trustee of three collateralized debt obligations (CDOs) known as Triaxx Prime CDO 2006-1 (Triaxx 2006-1), Triaxx Prime CDO 2006-2 (Triaxx 2006-2), and Triaxx Prime CDO 2007-1 (Triaxx 2007-1) (collectively the CDOs), brought this interpleader action to resolve a dispute which until recently pitted two of the CDOs' senior noteholders, Pacific Investment Management Company LLC (PIMCO) and Goldman Sachs & Company LLC (Goldman) (collectively the Noteholders) against the CDOs' Collateral Manager, Triaxx Asset Management LLC (TAM or Collateral Manager), and TAM's affiliate Phoenix Real Estate Solutions Ltd. (Phoenix), which the Collateral Manager engaged as an advisor and consultant, nominally on behalf of the issuers of the CDOs, Triaxx Prime CDO 2006-1, Ltd. (Triaxx 2006-1 Ltd.), Triaxx Prime CDO 2006-2, Ltd. (Triaxx 2006-2 Ltd.), and Triaxx Prime CDO 2007-1, Ltd. (Triaxx 2007-1 Ltd.) (collectively the Issuers).

The original dispute concerned how and by whom Phoenix should be paid for its services in support of the Collateral Manager's "activist litigation strategy," which – according to TAM – has resulted in recoveries of tens of millions of dollars (the Recoveries) for the CDOs through litigation settlements with various non-parties. In March 2018, TAM directed the Trustee to pay

$18.25 million in "incentive fees" to Phoenix as administrative expenses. *See* Compl. (Dkt. No. 1) ¶¶ 26-28. Although TAM had previously directed (and the Trustee had previously paid, without controversy) various sums to Phoenix as administrative expenses, PIMCO objected to the payment of the substantial incentive fees in this manner, noting that the requested payments would reduce the funds potentially available to it and other noteholders out of the CDOs' collateral proceeds in accordance with the priority of payments waterfall (the Waterfall) set out in the indentures (Indentures) governing the CDOs, and arguing that TAM should pay Phoenix directly, out of its own fees. *Id.* ¶¶ 29-31. Declaring that it faced "irreconcilable demands" as to whether to pay the invoices reflecting the incentive fees (the Phoenix Invoices), the Trustee withheld the funds in dispute and asked the Court "for a judicial determination" as to whether the Phoenix Invoices constitute Other Administrative Expenses as that term is defined in the Indentures, and whether the Trustee was required to pay those invoices out of the CDO's collateral. *Id.* at 13 ¶ ii.

From that relatively modest beginning, this action rapidly expanded, ultimately becoming something of a four-ring circus as the interpleader defendants asserted various counterclaims and crossclaims, which in turn prompted the Trustee – as well as the crossclaim defendants – to amend, expand, or refine their own claims. Many of these claims, as discussed in more detail below, concern how and by whom the parties' legal fees in this action, as well as any potential judgment in this action, should be paid. In addition, as the pleadings developed, TAM and Phoenix (collectively the TAM Parties) asserted – based on certain "clarifications" to Phoenix's engagement letters that the Trustee and the Noteholders never previously saw – that Phoenix could be (and has been) paid outside of the Waterfall entirely, without notice to the Trustee, by taking its fees directly from the Recoveries "at the time such funds are disbursed." The Trustee

and the Noteholders cried foul, arguing that all funds generated by the collateral underlying the CDOs, including the Recoveries, are themselves Collateral, as that term is used in the Indentures, and must travel through the accounts controlled by the Trustee and be distributed in accordance with the Waterfall.

The Trustee now asserts three interpleader claims: as to the Phoenix Invoices, which the Trustee has not paid; as to the legal fees incurred by the TAM Parties and the Issuers herein (the Interpleader Legal Fees), which, to the extent those fees have been presented to it for payment, the Trustee likewise has not paid; and as to the indemnification of a potential future judgment against the TAM Parties or the Issuers (which the Trustee calls the Interpleader Judgment Fees). The Trustee also asserts non-interpleader claims for declaratory judgment, breach of contract, breach of the Uniform Commercial Code (UCC), and conversion against TAM and the Issuers. Additionally, it asserts claims for unjust enrichment and money had and received against Phoenix, seeking to recover, for the benefit of the CDOs, the funds that Phoenix has already received directly from the Recoveries. TAM and Phoenix assert declaratory judgment counterclaims against the Trustee and crossclaims against the Issuers on various contract and tort theories.[1] PIMCO, for its part, asserts three "affirmative claims to the *res*" seeking, in effect, to forbid the payment of the Phoenix Invoices, the Interpleader Legal Fees, or the Interpleader

---

[1] Phoenix also asserted a crossclaim against PIMCO for tortious interference with contract. However, on August 26, 2019, the Hon. Victor Marrero, United States District Judge, dismissed that crossclaim pursuant to Fed. R. Civ. P. 12(b)(6), holding that Phoenix failed to allege that PIMCO acted with "malice," as required under New York law before a plaintiff may recover for tortious interference against a party with an economic interest in the underlying dispute. *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, 2019 WL 4744220, at *10 (S.D.N.Y. Aug. 26, 2019).

Judgment Fees to the TAM Parties or the Issuers.[2] All parties have consented to the jurisdiction of the assigned Magistrate Judge to conduct all remaining proceedings in this action pursuant to 28 U.S.C. § 636(c).

Now before the Court are four competing motions for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), brought by the TAM Parties (Dkt. No. 227); the Trustee (Dkt. No. 230); the Issuers (Dkt. No. 232); and PIMCO (Dkt. No. 234) with respect to some (but not all) of the parties' various claims, counterclaims, and crossclaims.[3] For the reasons that follow:

> (1)    The Trustee's First Claim, for interpleader relief, will be dismissed insofar as it seeks relief concerning the Interpleader Judgment Fees, along with the corresponding portion of the Trustee's Second Claim, for a declaratory judgment, and PIMCO's Third Affirmative Claim to the Res.

> (2)    On its Second Claim, the Trustee is entitled to a limited declaratory judgment in its favor. The Recoveries are Collateral, as that term is used in the Indentures, and therefore must be disclosed to and turned over to the Trustee for deposit into the appropriate Account(s)

---

[2] Both Noteholders originally asserted similar claims to the *res*. However, on October 16, 2020, Goldman dismissed its claims with prejudice (Dkt. No. 318), leaving PIMCO as the sole Noteholder with affirmative claims. PIMCO is a Senior Noteholder only with respect to Triaxx 2006-2 and Triaxx 2007-1. Consequently, on January 11, 2021, the Trustee and the remaining parties requested that the Court dismiss the Trustee's interpleader claim, without prejudice, "as it relates to" Triaxx 2006-1. The Trustee's letter-application (Dkt. No. 327) explained that the remaining parties took the position that the claim could not proceed in the absence of a party asserting an adverse position, and stated, "The Trustee does not dispute that the failure of another party to appear in the Triaxx 2006-1 Interpleader following Goldman's withdrawal deprives the Court of Article III jurisdiction to adjudicate the Triaxx 2006-1 Interpleader." (*Id.*) The Court entered the requested order on January 12, 2021. (Dkt. No. 328.) Although the Trustee did not expressly dismiss its claims against Triaxx 2006-1 Ltd. (which still appears on the docket as an interpleader defendant and as a cross-defendant), it was the Court's understanding, at the time, that the parties considered the claims against Triaxx 2006-1 to be moot in the absence of an adverse noteholder as to that CDO. Consequently, in this Opinion and Order (unless the context demands otherwise), references to the Issuers are to Triaxx 2006-2 Ltd. and Triaxx 2007-1 Ltd.

[3] The Trustee also named Cede and Co. (Cede) as an interpleader defendant, because it is the "registered Noteholder of record of the Notes at issue . . . which are held for the ultimate benefit of others." Third Amended Interpleader Complaint (TAC) (Dkt. No. 203) ¶ 23. Cede is not accused of any misconduct, has not asserted any claims, and did not file any motions.

established by the Trustee. It follows from this that neither the Issuers nor the Collateral Manager may pay Phoenix's fees directly from the Recoveries, outside of the Waterfall. The corresponding declaratory judgment counterclaims of TAM and Phoenix will be dismissed insofar as they seek a contrary declaration.

(3)   The Trustee's Third, Fourth, and Fifth Claims for damages will be dismissed insofar as they are asserted against the Issuers, and its Fourth Claim will be dismissed as against the Collateral Manager as well.

Insofar as the parties seek judgment on the pleadings as to any other claims, counterclaims, or crossclaims, their respective motions will be denied.

## I.   BACKGROUND

Except where otherwise indicated, the following facts are taken from the parties' operative pleadings and from the Indentures and other contracts attached thereto, which set out the parties' respective rights and obligations. *See L-7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Roberts v. Babkiewicz,* 582 F.3d 418, 419 (2d Cir. 2009)) ("On a [Rule] 12(c) motion, the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.") (internal quotation marks omitted). When considering these documents, "we employ the same standard applicable to Rule 12(b)(6) motions to dismiss, 'accept[ing] all factual allegations in the [C]omplaint as true and draw[ing] all reasonable inferences in [the nonmoving party's] favor.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015) (quoting *L-7 Designs*, 647 F.3d at 429).

### A.   The Parties and the Governing Documents

Interpleader plaintiff U.S. Bank is a national banking association with headquarters in Cincinnati, Ohio. TAC ¶ 15. It serves as Trustee and Collateral Administrator for each of the three CDOs originally at issue in this action, under three substantially identical Indentures and Collateral Administration Agreements (CAAs) dated September 7, 2006 (governing Triaxx

2006-1), December 14, 2006 (governing Triaxx 2006-2), and March 29, 2007 (governing Triaxx 2007-1). TAC at 1; *id.* ¶ 15.[4]

The Issuers are "exempted corporations" organized under the laws of the Cayman Islands, which PIMCO describes as "'shell' companies or special purpose vehicles that exist for the limited purpose of issuing CDO Notes." *See* TAC ¶¶ 17-19; Answer and Affirmative Defenses of Interpleader Defendants Triaxx Prime CDO 2006-1, Ltd., Triaxx Prime CDO 2006-2, Ltd., and Triaxx Prime CDO 2007-1, Ltd. (Issuer Ans.) (Dkt. No. 208) ¶¶ 17-19; Interpleader Defendant Pacific Investment Management Company LLC's Answer to Interpleader Plaintiff's Third Amended Complaint (PIMCO Ans.) (Dkt. No. 212) ¶ 141. Under the Indentures, the Issuers are not permitted to engage in any business "other than issuing and selling the Notes." Indentures (Ind.) § 7.12(a). To that end, the Issuers granted to the Trustee, "for the benefit and security of" the noteholders and other secured parties, a pool of Collateral Debt Securities consisting of Residential Mortgage-Backed Securities (RMBS), as well as certain other assets, such as Equity Securities and Eligible Investments (collectively the Collateral). Ind. at 1-2.[5] Under the Granting Clause of each Indenture, the term Collateral includes all payments on or with respect to the Collateral Debt Securities and "all proceeds, accessions, profits, income benefits, substitutions and replacements, whether voluntary or involuntary, of and to" any property of the Issuers. TAC ¶ 26; Ind. at 1-2.

---

[4] The Indentures, executed by the Issuers and U.S. Bank's predecessor LaSalle Bank National Association (LaSalle), are appended to Answer, Counterclaim and Crossclaim of Interpleader Defendant Triaxx Asset Management LLC (TAM Ans.) (Dkt. No. 211) as Exhibits A, C, and E (Dkt. Nos. 211-1, 211-3, & 211-5). All capitalized terms used herein and not otherwise defined are taken from, and have the meanings ascribed to them in, the Indentures.

[5] Equity Securities are (with some exceptions) securities that do not pay interest. Ind. § 1.1. Eligible Investments are cash and various dollar-denominated non-equity investments such as government and corporate bonds, commercial paper, and money market funds. *Id.*

PIMCO and Goldman, which are limited liability companies, hold (or control the holders of) Senior Notes issued by one or more of the Issuers, making them Senior Noteholders as that term is defined in the Indentures. TAC ¶¶ 20, 21, 37; PIMCO Ans. ¶¶ 20, 37; Interpleader Defendant Goldman Sachs & Co. LLC's Answer to the Third Amended Interpleader Complaint (Goldman Ans.) (Dkt. No. 210) ¶¶ 21, 37, 40.[6] Within each CDO, the Senior Notes were issued in different classes or "tranches" but are all secured by the Collateral. TAC ¶ 25; Ind. at 1-2; PIMCO Ans. ¶ 25. The Senior Noteholders are entitled to certain proceeds generated by the Collateral, which the Trustee is required to distribute pursuant to the Waterfall set forth in § 11.1 of the Indentures. TAC ¶ 26. Generally speaking, the Waterfall specifies that, on each monthly Distribution Date, available cash goes to pay taxes and fees owed by the Issuers, if any, after which it is applied to pay certain Administrative Expenses, including Other Administrative Expenses,[7] up to a monthly cap. Ind. §§ 11.1(a)(i)(1)-(2), 11.1(a)(ii)(1). The cap is $175,000 per month for Triaxx 2006-1, and $200,000 per month for Triaxx 2006-2 and Triaxx 2007-1. TAC ¶ 36; Ind. § 11.1(a)(i)(2). Thereafter, the Noteholders are paid in seniority order, beginning with the holders of the Class A-1 Notes. *Id*. §§ 11.1(a)(i)(4)-(12), 11.1(a)(ii)(2)-(13).

TAM is a Delaware limited liability company, TAC ¶ 16; TAM Ans. ¶ 16, and serves as the Collateral Manager for all three CDOs. TAM Ans. ¶ 155. According to a Form ADV that TAM filed with the Securities and Exchange Commission (SEC) in 2018 (TAM Form ADV)

---

[6] Specifically, PIMCO holds or controls the holders of Class A-2 Notes under the 2006-2 Indenture and Class A-1D and A-1T Notes under the 2007-1 Indenture. TAC ¶¶ 20, 37; PIMCO Ans. ¶¶ 20. Goldman holds Class A-2 Notes under the 2006-1 Indenture. Goldman Ans. ¶ 21.

[7] The term Administrative Expenses includes, *inter alia*, amounts payable "by the Issuer to the Collateral Manager in respect of fees and expenses pursuant to the Collateral Management Agreement," but *not* including "any Management Fee payable to the Collateral Manager." Ind. § 1.1. Other Administrative Expenses means "all Administrative Expenses, but excluding Trustee Expenses (other than amounts payable pursuant to any indemnity)." *Id*.

(Dkt. No. 235-1), its only active clients are the three Triaxx CDOs. TAM Form ADV, at 4, 6. As Collateral Manager, TAM is bound by three substantially identical Collateral Management Agreements (CMAs), each executed on the same date as the Indenture for the relevant CDO. TAC ¶ 16; TAM Ans. ¶ 157.[8] Under the CMAs, the Collateral Manager directs the purchase and sale of Collateral Debt Securities and is required to manage the Collateral, on behalf of the Issuers, using "reasonable care" and "a degree of skill and attention no less than that which the Collateral Manager exercises with respect to comparable assets that it manages for itself." TAC ¶¶ 16, 39; CMA §§ 2(a), 2(d). In addition, the Collateral Manager must use "commercially reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would . . . (e) result in the Issuer violating the terms of the Indenture in any material respect, [or] (f) adversely affect the interests of the Trustee [or] the Noteholders in any material respect (other than the effect of such actions expressly permitted hereunder or under the Indenture)." CMA § 7.

Whenever the Collateral Manager, on behalf of an Issuer, directs or causes the acquisition of any Collateral Debt Security, Equity Security, or Eligible Investment (including Cash), the Collateral Manager must cause that asset to be transferred to the appropriate Custodial Account, established in the name of the Issuer, "for the benefit of the Trustee." Ind. § 3.3(b). All "Cash, Eligible Investments, Equity Securities and Collateral Debt Securities" must be "credited to one

---

[8] The CMAs are appended to the TAM Answer as Exhibits B, D, and F (Dkt. Nos. 211-2, 211-4, & 211-6). They were executed by the Issuers and by the Collateral Manager, which at that time was named ICP Asset Management LLC (ICP) and was owned by companies controlled by Thomas Priore. TAM Ans. ¶ 158. In 2015, the Collateral Manager was acquired by Triaxx Holdco and renamed Triaxx Asset Management LLC. *Id.* The Indentures and the CMAs are referred to collectively in this Opinion and Order as the Governing Documents.

of the Accounts" established under the Indenture, § 3.3(b)(iv), all of which are established in the name of the Issuer but administered by the Trustee. *See id*. § 1.1.

In performing its duties, the Collateral Manager may "retain legal counsel and other professionals to assist in the negotiation, documentation, and restructuring of Collateral Debt Securities," and may "exercise any other rights or remedies with respect to such Collateral Debt Securit[ies] . . . or take any other action consistent with the terms of the Indenture which the Collateral Manager reasonably believes to be in the best interest of the Noteholders." CMA §§ 2(d)(x)-(xi). Additionally, the Collateral Manager "may, without the prior consent of any Person, employ third parties (including, without limitation, the Collateral Manager's Affiliates), to render advice (including investment advice) and assistance at the Collateral Manager's expense." *Id*. § 2(g).

Phoenix is a Cayman Islands corporation that was first engaged by the Collateral Manager, nominally on behalf of the Issuers, pursuant to three substantially identical engagement letters (2011 Engagement Letters) dated March 22, 2011. TAC ¶ 22; TAM Ans. ¶¶ 22, 159; Answer, Crossclaims and Counterclaim of Interpleader Defendant Phoenix Real Estate Solutions, LLC (Phoenix Ans.) (Dkt. No. 209) ¶¶ 22, 146.[9] Under the 2011 Engagement Letters, Phoenix was to "consult with, and provide information and advice to, the Collateral Manager with respect to strategies to optimize the performance of the Designated Portfolio," that is, the portfolio of RMBS owned by "the CDO," and in particular was to provide "activist implementation services," 2011 Eng. Ltr. § 2, for which it was to be paid an "activist implementation fee" of $10,000 per month "per security for which [Phoenix] is engaged by the

---

[9] The 2011 Engagement Letters are appended to the TAM Answer as Exhibits G, H, and I (Dkt. Nos. 211-7, 211-8, & 211-9). Each was addressed to the relevant Issuer "c/o" ICP, and each was executed by Thomas Priore for ICP and by Vishal Garg for Phoenix.

CDO in writing to provide activist implementation services." *Id*. at 12 (Annex I). If the recovery with respect to any such security was determined by the CDO (or by the Collateral Manager on its behalf) to exceed $500,000, Phoenix was to be paid "an aggregate amount of Activist Implementation Fees in respect of such security (taking into account any Activist Implementation Fees paid . . . on or prior to such date of determination) equal to $250,000." *Id*. All of Phoenix's fees and expenses, including the activist implementation fee, were to be paid "as an Administrative Expense" under the Indentures, "in accordance with the Priority of Payments." *Id*. §§ 6, 12.

Since 2015, TAM and Phoenix have been affiliates, under common control and management. TAC ¶¶ 86-89; PIMCO Ans. ¶ 112. TAM is owned by Triaxx Holdco, LLC (Triaxx Holdco), which in turn is owned 55% by Vishal Garg, who signed the 2011 Engagement Letters on behalf of Phoenix, and 45% by Nicholas Calamari. PIMCO Ans. ¶ 113. The controlling member of Triaxx Holdco (that is, Garg) is also a director and manager of Phoenix, such that revenues and fees earned by Phoenix "indirectly benefit" Garg, which, as TAM explained on its Form ADV, "could result in potential conflicts of interest." TAC ¶ 86-87; PIMCO Ans. ¶ 114; TAM Form ADV at 9-10.[10] Calamari, the 45% member of Triaxx Holdco, is the Chief Compliance Officer (and one of only two employees) of TAM, and also acts on behalf of Phoenix as its General Counsel. PIMCO Ans. ¶ 107, 116, 118.

The CMAs provide that the Collateral Manager and its Affiliates "will not be liable" to the Issuers, the Trustee, or the Noteholders "for any losses, claims, damages, demands, charges,

---

[10] Garg was listed as one of two "key men" for Phoenix in the 2011 Engagement Letters, meaning that if both he and Raza Khan ceased to be "actively involved" in its management, and no suitable replacement was identified by Phoenix and approved by the CDO, the engagement would "immediately terminate." 2011 Eng. Ltr. at 10 (Annex I).

judgments, assessments, costs or other liabilities" except by reason of acts or omissions constituting a Collateral Manager Breach, including (as relevant here) acts or omissions "constituting bad faith, willful misconduct or gross negligence in the performance, or reckless disregard, of the obligations of the Collateral Manager hereunder and under the terms of the Indenture applicable to the Collateral Manager." CMA § 10(a). The corresponding mirrored indemnification clauses require the Issuer to indemnify and hold harmless the Collateral Manager from and against any claim caused by or arising from "any action taken by, or any failure to act by, the Collateral Manager or any of its Affiliates," unless those acts or omissions constituted a Collateral Manager Breach, in which case the Collateral Manager is to indemnify and hold harmless the Issuer from and against any resulting claims. CMA §§ 10(b), 10(c). If the Issuer is required to indemnify the Collateral Manager, "the obligations of the Issuer under this Section 10 shall be payable solely as an Administrative Expense out of the Collateral in accordance with the Priority of Payments set forth in the Indenture." CMA § 10(b).

## B.      Plaintiff's Allegations

 In its capacity as Collateral Administrator, plaintiff prepares regular Note Valuation Reports for each CDO. TAC ¶¶ 2; 38; Ind. § 10.7(b). These reports, which are based in part on information provided by the Collateral Manager, detail the payments and distributions to be made by plaintiff, in its capacity as Trustee, on the next Distribution Date, "using the collateral proceeds received by the Trustee on behalf of the Issuers." TAC ¶¶ 2, 38. The Note Valuation Reports constitute "instructions" to the Trustee to pay or transfer the amounts set forth therein in accordance with the Waterfall. TAC ¶ 38; Indentures § 10.7(b).

The "activist implementation services" provided by Phoenix included "litigation against originators, sponsors, trustees, and servicers of the RMBS underlying the Triaxx CDOs." TAC ¶¶ 77-78. As a result of this strategy, "the Collateral Manager has stated that the Issuers have

received 'over tens of millions of dollars in past and estimated future recoveries for the [Triaxx]

CDOs.'" *Id*. ¶ 79; *accord* TAM Ans. ¶ 162 ("over tens of millions of dollars").

Over the years since 2011, TAM periodically directed the Trustee to include invoices for

Phoenix's fees in the Note Valuation Reports and pay these invoices – classified by TAM as

"Other Administrative Expenses" – out of the available collateral proceeds. TAC ¶¶ 3, 48, 51.[11]

Pursuant to the Priority of Payments, "Other Administrative Expenses" are paid before any

interest or other payments are made to the Noteholders. *Id*. ¶¶ 3, 34-35. In the past, the Trustee

has included invoices from Phoenix Advisors & Managers USA LLC, Phoenix Real Estate

Solutions, Phoenix ABS, Aram Phoenix, and Phoenix Real Estate Solutions Ltd (collectively the

---

[11] Other Administrative Expenses are defined in the Indentures as "all Administrative Expenses, but excluding Trustee Expenses (other than amounts payable pursuant to any indemnity.)" TAC ¶ 35; Ind. § 1.1. Administrative Expenses are defined as:

> (a) Trustee Expenses and (b) all amounts (including indemnities) due or accrued with respect to such Distribution Date and payable by the Issuer or the Co-Issuer to (i) the Administrator in respect of fees and expenses under the Administration agreement, (ii) the Independent accountants, agents and counsel of the Issuer for reasonable fees and expenses (including amounts payable in connection with the preparation of tax forms on behalf of the Co-Issuers), (iii) the Collateral Manager in respect of fees and expenses pursuant to the Collateral Management Agreement, (iv) any other Person in respect of any governmental fee, registered office fee, charge or tax in relation to the Issuer or the Co-Issuer (in each case as certified by an Authorized Officer of the Issuer or the Co-Issuer to the Trustee), (v) the Placement Agents in respect of amounts payable to them under the Placement Agency Agreement, (vi) the Rating Agencies in respect of Rating Agency Expenses, (vii) any other Person in respect of any other fees or expenses permitted under this Indenture, the Fiscal Agency Agreement, the documents delivered pursuant to or in connection with this Indenture or the Fiscal Agency Agreement and the Notes and (viii) any exchange or any listing agent or paying agent appointed in connection with the listing of the Notes on any exchange; provided that Administrative Expenses shall not include (A) any amounts due or accrued with respect to the actions taken on or in connection with the Closing Date, (B) amounts payable in respect of the Notes or the Trustee Fee, (C) any Management Fee payable to the Collateral Manager and (D) amounts payable under any Hedge Agreement.

Ind. § 1.1.

Phoenix Entities) in its Note Valuation Reports and paid them pursuant to the Priority of Payments on each payment date. *Id*. ¶¶ 48-49. Nothing in the Indentures or the CAAs Documents requires the Trustee to "verify, approve, or investigate the invoices provided by the Collateral Manager" before including them in the Note Valuation Reports or paying them on the next payment date. *Id*. ¶ 49.

On March 29, 2018, TAM submitted the Phoenix Invoices now in dispute to the Trustee, to be paid on the next periodic payment dates. TAC ¶ 50. The invoices listed "incentive fees" in the aggregate amount of $18,250,000: $8,000,000 for Triaxx 2006-1, $5,500,000 for Triaxx 2006-2, and $4,750,000 for Triaxx 2007-1. *Id.*

### 1. First Interpleader Dispute: Payment of Phoenix Invoices

On May 2, 2018, the Trustee received a letter from PIMCO, which holds a majority of the controlling class of Triaxx CDO 2006-2 and Triaxx CDO 2007-1, demanding that the Trustee "cease making payments to the Phoenix Entities." TAC ¶ 52. PIMCO argued that the Phoenix Invoices were not properly classified as Other Administrative Expenses, because the CMA requires TAM to employ third-party consultants "at the Collateral Manager's expense," while the Indentures and CAAs do not give the Trustee any authority "to make[] payments to third parties such as the Phoenix Entities as 'Administrative Expenses.'" TAC ¶¶ 3, 40, 52; *see also* TAM Ans. Ex. O (May 2, 2018 objection letter from PIMCO). Thereafter, Goldman informed the Trustee that it too objected to the payment of Phoenix's incentive fees from Triaxx 2006-1. *Id.* ¶ 58. TAM itself, unsurprisingly, "asserted and continues to assert" that the Trustee not only may but "must" pay the Phoenix Invoices, up to the cap allowed in the Priority of Payments waterfall, on the periodic payment dates. TAC ¶ 54.

Finding itself unable to determine, without risking substantial liability, whether to pay the Phoenix Entities, the Trustee filed this interpleader action on May 4, 2018, to resolve the dispute

regarding the classification of Phoenix Invoices. TAC ¶ 4. In addition, the Trustee began

withholding funds allegedly payable to Phoenix under the Priority of Payments as of July 2018,

and continues to withhold such funds pending the outcome of this litigation. *Id.* ¶¶ 60-61.

### 2.    Second Interpleader Dispute: Payment of Interpleader Legal Fees

On May 18, 2018, after filing the initial Complaint in this action, the Trustee received a

letter from PIMCO objecting to the payment of the TAM Parties' legal fees incurred in this

action from funds belonging to Triaxx 2006-2 or Triaxx 2007-1. TAC ¶ 62. PIMCO argued that

"[t]he CMAs only permit the Collateral Manager's or Issuers' legal counsel to be reimbursed by

the CDOs in connection with the purchase and sale of Collateral Debt Securities and other

limited circumstances that do not pertain here," and therefore the TAM Parties "must bear their

own legal fees and expenses." *Id.* Goldman similarly objected to the payment of the TAM

Parties' legal fees from Triaxx 2006-1. *Id.* ¶ 64.

On June 1, 2018, TAM responded to PIMCO's letter, asserted its "right to the payment of

its legal expenses in connection with this Interpleader" under § 10(b) of the CMA, and argued

that PIMCO's letter was "a transparent effort to hinder the Collateral Manager's ability to defend

itself." *Id.* ¶ 63. Thereafter, on June 7, 2018, TAM submitted invoices for the payment of its legal

fees in this action as Administrative Expenses on the next payment date. *Id.* ¶ 67.[12]

As with the earlier Phoenix Invoices, the Trustee withheld the amounts available for

payment under the Priority of Payments on the July 2018 payment dates. *Id.* The Trustee states

that it will continue to withhold the Interpleader Legal Fees throughout this litigation but will be

---

[12] The June 7, 2018 invoices requested $38,758.81 in legal fees for Triaxx 2006-1, $38,546.81 for Triaxx 2006-2, and $38,546.81 for Triaxx 2007-1. TAC ¶ 67. As of the date of the TAC, Triaxx had not submitted any invoices for Phoenix's legal fees incurred in this action. *Id.* ¶ 68. TAM and Triaxx are represented by the same counsel herein.

"ready and willing to proceed in the manner in which the Court directs" regarding these funds. *Id*. ¶ 68.[13]

### 3. Third Interpleader Dispute: Payment of Interpleader Judgment Fees

On February 14 and 15, 2019, the Trustee received emails from PIMCO and Goldman, respectively, objecting to the payment of the *Issuers'* legal fees incurred in this action, and further objecting to the Collateral being used by the Issuers or the TAM Parties to "satisfy[] any judgment against either of them arising from the claims in the Interpleader." TAC ¶ 71. When the Trustee called the Issuers for a response, they took the position that they "have the right to the payment of their legal expenses and the Issuers' [sic] and the Collateral Manager's [sic] have the right to satisfy any judgment with Collateral." *Id*. ¶ 72.

---

[13] Notwithstanding the dismissal of Goldman's affirmative claims, as well as the Trustee's interpleader claims as to Triaxx 2006-1, the Trustee has apparently continued to withhold funds allegedly due to Phoenix (on the Phoenix Invoices) and to TAM (for its legal fees) in all three CDOs, including Triaxx 2006-1. On January 12, 2021 (the same day this Court dismissed the Trustee's interpleader claims as to Triaxx 2006-1), the Trustee filed a petition against TAM, Phoenix, and Triaxx 2006-1 Ltd. in New York Supreme Court, New York County, pursuant to N.Y. C.P.L.R. Article 77, seeking judicial instructions regarding its continued withholding of such funds. On January 19, 2021, TAM and Phoenix (with the consent of Triaxx 2006-1 Ltd.) removed the new case (the Second Action) to this Court, invoking its federal question jurisdiction. *See* Notice of Removal, *U.S. Bank Nat'l Assoc. v. Triaxx Asset Mgmt.*, No. 21-CV-0439 (VM) Dkt. No. 1. The Second Action was accepted as related to the instant action, assigned to Judge Marrero (to whom the instant action was assigned before the parties consented to my jurisdiction), designated (but not referred) to me, and, on February 23, 2021, consolidated with this action for all pretrial purposes. *See Order*, No. 21-CV-0439, Dkt. No. 20. Judge Marrero further directed the parties in the Second Action to "indicate their consent to proceeding with the recently removed action" before me, and directed the Clerk to close the higher-numbered case. *Id.* at 2. Meanwhile, the TAM Parties answered the complaint (No. 21-CV-0439, Dkt. Nos. 15, 16); the Trustee submitted a letter stating its intent to file a remand motion, "as soon as a judge is assigned" on the ground that the Second Action is not within this Court's "limited jurisdiction" (No. 21-CV-0439, Dkt. No. 17); and the TAM Parties submitted a responding letter stating that the remand motion would be meritless because, notwithstanding Goldman's withdrawal, the Second Action presents an actual "case or controversy" and that this Court has federal question jurisdiction pursuant to the Edge Act. (No. 21-CV-0439, Dkt. No. 19.)

The TAC does not disclose any request by the Issuers for payment of their legal fees incurred in this action. And of course there has been no judgment entered. The Trustee nonetheless states that it is facing "irreconcilable demands" as to whether to "pay the Interpleader Judgment Fees," that is, whether to reimburse the TAM Parties or the Issuers for any money judgment that may be entered against them. TAC ¶ 73.

### 4.    The Recoveries

On August 27, 2018, when TAM filed an answer to one of the Trustee's earlier pleadings, the Trustee learned that the TAM Parties claimed a right to pay Phoenix directly "out of settlement funds at the time such funds are disbursed" – that is, out of the Recoveries obtained from non-parties through the various litigations that are part of the Collateral Manager's activist litigation strategy – without notice to the Trustee, thereby bypassing the Waterfall entirely. TAC ¶ 76. As noted above, the 2011 Engagement Letters stated that Phoenix's fees "shall be paid as an Administrative Expense under the Indenture," "in accordance with the Priority of Payments." 2011 Eng. Ltr. §§ 6, 12. However, TAM relies on three substantially identical Clarification Letters, dated August 8, 2014,[14] which "confirm the understanding between the parties" that, notwithstanding their seemingly clear language, §§ 6 and 12 of the 2011 Engagement Letters "were intended to allow for Phoenix to be paid its fees and expenses *out of settlement funds at the time such funds are disbursed*." Clar. Ltr. at 1 (emphasis added). The 2014 correspondence also "clarified" that, notwithstanding the seemingly clear language of Annex I to the original engagement letters, which limited Phoenix's incentive payment for any one security to the

---

[14] The Clarification Letters are appended to the TAM Answer as Exhibits L, M, and N (Dkt. Nos. 211-12, 211-13, & 211-14). Like the 2011 Engagement Letters, each was addressed to the relevant Issuer "c/o" ICP. The Clarification Letters were signed by Nicholas Calamari as General Counsel of Phoenix. They do not appear to be countersigned by or on behalf of the Issuers or the Collateral Manager.

"aggregate amount" of $250,000, inclusive of monthly fees previously paid with respect to that security, the parties "intended to provide that Phoenix is entitled to a payment of $250,000 per security, *in addition to the $10,000 per month per security*," on the securities where recoveries exceed $500,000 per security. *Id*. (emphasis added).

According to the Trustee, it had never previously seen either the 2011 Engagement Letters or the 2014 Clarification Letters, TAC ¶¶ 77, 81, and the Noteholders never consented to them. *Id*. ¶ 81. The Trustee alleges that the Clarification Letters "violate the terms of the Indentures, which among other things, prohibit payments outside of the Indenture's [sic] Priority of Payments Waterfall." *Id*. ¶ 81. The Trustee further alleges, on information and belief, that at some time prior to the filing of the TAC "the Collateral Manager and the Issuers authorized the distribution [of] Recoveries directly to Phoenix and potentially other parties, rather than turning over such . . . Recoveries to the Trustee to distribute in accordance with the Indenture's Priority of Payments waterfall." *Id*. ¶ 85.

The Trustee's information and belief have been validated. As the TAM Parties now describe their conduct, Phoenix's invoices were "sometimes . . . paid by the Trustee through the 'waterfall,' subject to monthly caps on the amount of 'Administrative Expenses' payable by each CDO." TAM Parties' Memorandum of Law (TAM Pty. Mem.) (Dkt. No. 228), at 5. However, both before and after the Clarification Letters were sent, "the Issuers primarily paid Phoenix directly from proceeds generated by litigation settlements and other recovery proceedings at the same time those proceeds were disbursed to the CDOs." *Id*. As discussed in more detail below, the TAM Parties assert vigorously that the Trustee and the Noteholders have known from the outset of the engagement in 2011 about the payments made to Phoenix *through* the Waterfall. *See* TAM Ans. ¶¶ 177, 178. However, they do not allege any facts showing that the Trustee or

the Senior Noteholders knew – until after this action was filed – that Phoenix was also being paid directly from the Recoveries, *outside of* the Waterfall.

### C.    Procedural History

The Trustee filed its original complaint on May 4, 2018, and amended it on July 20, 2018. (Dkt. No. 42.) At that point, the only issues in dispute were the payment of the Phoenix Invoices (as Administrative Expenses) and the Interpleader Legal Fees. On August 3, 2018, TAM moved for a preliminary injunction to "preserve the status quo" with regard to the payment of its legal fees. (Dkt. No. 50.) On September 17, 2018, Judge Marrero denied the motion on the ground that TAM had "failed to show that – in the absence of a preliminary injunction – it would suffer an immediate injury that cannot be remedied after trial." Decision & Order dated Sept. 17, 2018 (Dkt. No. 80), at 3. Thereafter, all parties further amended their pleadings.

On December 11, 2018, Judge Marrero referred this action to me for general pretrial management (Dkt. No. 133), and on January 8, 2019, following an initial case management conference, the Issuers and TAM stipulated that the only Recoveries currently under their control (in the amount of $552,936.41) were held in a certain attorney trust account; that they would not move or disburse those Recoveries during the pendency of this action absent further Court order; and that they would provide notice to the Trustee of any receipt of future and/or additional Recoveries during the pendency of the Action. (Dkt. No. 157.) Thereafter, on February 12, 2019, the parties consented to my jurisdiction for all remaining proceedings, except for PIMCO's motion to dismiss Phoenix's crossclaim for tortious interference under Fed. R. Civ. P. 12(b)(1) and (6).[15] (Dkt. No. 171.) At that point, the Trustee's operative pleading was its Second

---

[15] After another round of amendments, Phoenix reasserted the same cross-claim in response to the TAC. Phoenix Ans. ¶¶ 210-16. Thereafter, as noted above, Judge Marrero granted Phoenix's motion to dismiss that cross-claim.

Amended Complaint (Dkt. No. 97), which all parties had answered. (Dkt. Nos. 111, 112, 113, 115, 116, 138.) In addition, TAM had asserted a declaratory judgment counterclaim against the Trustee and affirmative claims to the *res* with respect to the Phoenix Invoices and the Interpleader Legal Fees (Dkt. No. 111); Phoenix had asserted a declaratory judgment counterclaim against the Trustee and crossclaims against the Issuers and PIMCO (Dkt. No. 113); and both Noteholders had asserted affirmative claims to the *res* with respect to the Phoenix Invoices, the Interpleader Legal Fees, and the Recoveries. (Dkt. Nos. 115, 116.)[16]

On February 19, 2019, the Trustee moved for leave to amend its complaint yet again. (Dkt. No. 172.) On April 10, 2019, following oral argument, I granted the Trustee's motion and set a schedule for the parties to file another round of amended pleadings, as well as their motions for judgment on the pleadings. (Dkt. No. 201.)

On April 11, 2019, the Trustee filed its TAC. The Interpleader Defendants answered on April 15 and April 24, 2019 (Dkt. Nos. 204, 208-212), asserting (or re-asserting) the various counterclaims, crossclaims, and affirmative claims to the *res* discussed below, to which the relevant parties responded on May 8, 2019. (Dkt. Nos. 215-223.) On June 5, 2019, the parties filed their respective motions for judgment on the pleadings, and on October 3, 2019, I held oral argument on those cross motions. *See* Transcript of Oct. 3, 2019 Oral Argument (Tr.) (Dkt. No. 285).

---

[16] The Trustee sometimes refers to the sums that it has retained with respect to the unpaid Phoenix Invoices (but not, oddly, the sums that it has retained with respect to TAM's legal fees) as the "Retained Funds." *E.g.*, TAC ¶ 60. It refers to the sums that it has retained with  respect to TAM legal fees and will retain with respect to Phoenix's legal fees (but not, oddly, the sums that it will retain with respect to the Issuers' legal fees) as the "Retained Fees." *E.g.*, TAC ¶¶ 60, 67-68, 71-74. The Court finds these labels confusing and avoids them when possible.

## II.     THE OPERATIVE PLEADINGS

### A.     The Trustee's Claims

The Trustee invokes this Court's subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity jurisdiction), 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act), and 12 U.S.C. § 632 (the Edge Act). TAC ¶¶ 12-13,[17] and asserts seven causes of action.

In its First Cause of Action for Interpleader, the Trustee asks the Court to resolve three disputes: (a) "whether the Phoenix Invoices constitute 'Other Administrative Expenses' pursuant to Section 1.1 and Section 11.1(a)(i)(2) of the Indentures, [and therefore] whether the Trustee is required to apply the Retained Funds in payment of the Phoenix Invoices"; (b) "whether the Trustee is required to release for payment the Interpleader Legal Fees to the Collateral Manager, the Issuers, and/or Phoenix from amounts maintained by or delivered to the Trustee for deposit in the Accounts established under the Indentures," and (c) "whether the Issuers and Collateral

---

[17] The Trustee appears to be correct as to two of the three grounds upon which it relies. Assessing diversity jurisdiction is complicated where, as here, several parties are limited liability companies. *See Bayerische Landesbank, New York Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012) (a limited liability company "takes the citizenship of each of its members"). However, the Trustee, which is a citizen of Ohio, has alleged, as to each of the LLC defendants, that "none of its members are citizens of the State of Ohio," TAC ¶¶ 16, 20, 21, and no other party has alleged differently. Diversity jurisdiction has therefore been adequately pleaded. The Trustee is also entitled to invoke the Edge Act, which provides federal district courts with an independent basis for subject matter jurisdiction over "all suits of a civil nature at common law or in equity" that (i) involve a party that is "a federally chartered corporation," such as U.S. Bank, and (ii) "arise out of an offshore banking or financial transaction of that federally charted corporation." *Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 784 (2d Cir. 2013). *See also U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, 826 F. App'x 115, 116 (2d Cir. 2020) (agreeing with Judge Nathan that an earlier interpleader action involving the Triaxx CDOs, the Trustee, the Issuers, and PIMCO was within this Court's subject matter jurisdiction pursuant to the Edge Act). However, the Declaratory Judgment Act provides no independent basis for subject matter jurisdiction. *See Warner-Jenkinson Co. v. Allied Chem. Corp.*, 567 F.2d 184, 186 (2d Cir. 1977) ("The Declaratory Judgment Act, 28 U.S.C. [§] 2201, does not independently create federal jurisdiction."); *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996) ("Section 2201 provides no independent basis for subject matter jurisdiction.").

Manager are entitled to payment (or reimbursement for payment) for the Interpleader Judgment Fees from amounts maintained by or delivered to the Trustee for deposit in the Accounts established under the Indentures." TAC ¶ 93(ii).

In its Second Cause of Action, the Trustee seeks a declaration that no disbursements can be made from the Recoveries (including to satisfy any judgment obtained in this action); that the Issuers and the Collateral Manager must deliver all Recoveries "to the Trustee for deposit in the Accounts established under the Indenture"; and that the Issuers and the Collateral Manager must keep the Trustee informed about the amount and location of current and anticipated Recoveries. TAC ¶ 97.[18]

Alleging that TAM and the Issuers improperly authorized "the distribution [of] Recoveries directly to Phoenix and potentially other parties, rather than turning over such . . . Recoveries to the Trustee to distribute in accordance with the Indenture's Priority of Payments waterfall," TAC ¶ 85, the Trustee also asserts five claims for damages against TAM, Phoenix, and/or the Issuers. The Third Cause of Action alleges that the Issuers and the Collateral Manager breached the Indentures "by making payments directly to Phoenix and other parties from the . . . Recoveries rather than delivering such . . . Recoveries to the Trustee for payment through the Indenture's Priority of Payments waterfall." *Id.* ¶¶ 101. The Fourth Cause of Action runs against the Issuers and accuses them of violating § 9-609 of the UCC with respect to Triaxx 2006-1 and Triaxx 2007-1, which have each entered into an event of default, requiring that the Issuers deliver all Collateral to the Trustee. *Id.* ¶¶ 108-14. The Fifth Cause of Action, for conversion,

---

[18] The Trustee uses the term "Collateral Recoveries" to refer to the funds recovered from settlement agreements in the RMBS litigation managed by TAM and Phoenix. The Issuers and the TAM Parties object to the phrase and argue that such funds are not in fact Collateral as that term is used in the Indentures. Consequently, the Court has adopted the more neutral term Recoveries for purposes of this Opinion and Order.

runs against TAM and the Issuers. *Id.* ¶¶ 115-20. The Sixth Cause of Action is for unjust enrichment, and runs only against Phoenix, *id.* ¶¶ 121-26, as does the Seventh Cause of Action, for money had and received, *id.* ¶¶ 127-32.

### B.   TAM's Answer, Counterclaim and Crossclaim

TAM "assumed the role" of Collateral Manager of the CDOs in 2015, TAM Ans. ¶ 142, following the 2015 acquisition of ICP by Triaxx Holdco, which then changed the name of its new subsidiary to TAM. *Id.* ¶¶ 158, 192. The change-in-control transaction, which appears to have been planned since at least early 2014, was "monitored by the SEC," *id.* ¶ 192, because it occurred "in connection with the resolution of claims made by the SEC against Mr. Priore and ICP." *Id.*; *see also* TAM Ans. Ex. K (Dkt. No. 211-11) (notice from Collateral Manager to Noteholders, dated April 24, 2014, seeking consent for the assignment of the CMA from ICP to a Phoenix affiliate, since "over the past few years ICP has been in the process of winding down its business following the 2012 resolution of claims made by the [SEC]").[19]

Prior to this transaction, the Collateral Manager (then controlled by Priore) discovered "severe deficiencies in the underwriting, origination, securitization, and servicing practices relating to the residential mortgages serving as collateral for the RMBS" underlying the CDOs in the wake of the 2008 financial crisis. TAM Ans. ¶ 160. As a result, ICP developed an "activist

---

[19] The SEC alleged, among other things, that beginning in 2007, as the mortgage markets deteriorated, Priore and ICP engaged in improper transactions that violated the federal securities fraud laws and "defrauded the Triaxx CDOs of tens of millions of dollars." *See* Amend. Compl., *SEC v. ICP Asset Mgmt.*, LLC, 10-CV-4791 (LAK) (JCF), Dkt. No. 54 (S.D.N.Y. June 30, 2011), ¶ 1. The final judgment in that case, entered on September 5, 2012, enjoined Priore and ICP from violating the securities laws and ordered them, together with certain ICP affiliates, to pay over $23 million in disgorgement, interest, and penalties. *See* Final Judgment, *SEC v. ICP Asset Mgmt.*, Dkt. No. 226 (Sept. 6, 2012). The money was used to establish a Fair Fund for distribution to investors in the Triaxx CDOs. *See* Order Appointing Distribution Agent, *SEC v. ICP Asset Mgmt.*, Dkt. No. 273 (August 17, 2020).

litigation strategy" to "hold parties accountable for poor underwriting and servicing," and engaged Phoenix "as an advisor and consultant to the CDOs that could conduct an in-depth analysis of the RMBS and their underlying collateral to support those efforts." *Id*. TAM points out that the Collateral Manager executed the 2011 Engagement Letters "on behalf of the Issuers," *id*. ¶ 161, and asserts that it was authorized to do so by § 2(a) of the CMA, which states that "the Collateral Manager agrees to … perform on behalf of the Issuer (or direct the performance of) those duties and functions assigned to the Issuer or the Collateral Manager in the Indenture," and gives the Collateral Manager "the power to execute and deliver all necessary and appropriate documents and instruments on behalf of the Issuer with respect thereto." *Id.* ¶ 163; CMA § 2(a). TAM also points to § 2(d)(x) of the CMA, which permits the Collateral Manager to "retain legal counsel and other professionals (such as financial advisers) to assist in the negotiation, documentation and restructuring of Collateral Debt Securities," TAM Ans. ¶ 164; CMA § 2(d)(x); Ind. §§ 7.5(a) and 7.7(a).[20] Therefore, according to TAM, "Phoenix is employed by the Issuers (not the Collateral Manager) as their agent." TAM Ans. ¶ 168. TAM further alleges that "[t]he Issuers, and separate counsel to the directors of the Issuers, . . . have authorized the engagement of and payments made to Phoenix," *id*., and that the engagement has "generated in excess of tens of millions in recoveries for the CDOs," as well as tens of millions in "increased

---

[20] Section 7.5(a)(iv) of the Indentures provides: "The Issuer (or the Trustee on behalf of the Issuer) . . . shall take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Secured Parties hereunder and to: . . . (iv) enforce any of the Pledged Securities or other instruments or property included in the Collateral[,]" Section 7.7(a) permits the Issuer "with the prior written consent of a majority of the Controlling Class and the Hedge Counterparties," to "contract with other Persons, including the Collateral Administrator, the Collateral Manager and the Bank, for the performance of actions and obligations to be performed by the Issuer . . . hereunder by such Persons[.]"

value from a bankruptcy and global RMBS settlement that remain to be received by the CDOs."
*Id*. ¶ 169.

TAM concedes, as it must, that §§ 6 and 12 of the 2011 Engagement Letters "provided that the payment of all amounts to which Phoenix was entitled would be Administrative Expenses subject to the Priority of Payments and would 'be payable only to the extent funds are available in accordance with the Priority of Payments.'" TAM Ans. ¶ 178 (quoting 2011 Eng. Ltr. § 12). However, it alleges, the 2014 Clarification Letters "reflected the understanding of the parties at the time and sought to clarify the terms of Sections 6 and 12 of the Engagement Agreements to allow incentive payments to be made out of the proceeds of settlement funds." *Id*. ¶ 181. TAM does not explain how by 2014 the parties could have had an "understanding" so dramatically at odds with the clear and unmistakable language of the 2011 Engagement Letters. Nor does it discuss when, or by whom, that understanding was developed.[21] Although the 2014 Clarification Letters were not countersigned by the Issuers (or by the Collateral Manager on their behalf), TAM alleges that the 2014 terms were "confirmed by the Issuers through their approval of the payment of Phoenix's incentive fees in accordance with and out of settlement agreement proceeds consistent with the Clarification," *id*. ¶ 181, and "later adopted and accepted by the Issuers' directors . . . through their approval of those terms during and subsequent to" a September 15, 2014 Board Meeting. *Id*. ¶ 191.

---

[21] The 2014 Clarification letters are dated August 24, 2014. Although the transaction that put Phoenix "key man" Garg and Phoenix General Counsel Calamari in control of the Collateral Manager did not close until January 2015, *see* TAM Ans. ¶ 192, some version of that transaction was contemplated at least as early as April 24, 2014, when the Collateral Manager asked the Noteholders to approve the assignment of the CMA to Phoenix as a means of "ensuring the continuity of the Triaxx transaction management and capitaliz[ing] on the continued success of the teams' [sic] restitution strategies." TAM Ans. Ex. K, at ECF page 7. The same note referred to Phoenix as "our activist agents," *id*., and praised its work in "direct[ing] the activist and litigation strategies" initiated by ICP. *Id*.

TAM asserts that Phoenix's engagement and continuing role as an "activist advisor" has repeatedly been disclosed to the Noteholders since 2011. TAM Ans. ¶ 170. From 2011 until May 2018, the Trustee regularly paid Phoenix's invoices as Administrative Expenses, and listed them as approved line items in its Note Valuation Reports, with no objection from any Noteholder. *Id.* ¶¶ 146, 177. Not only did the Noteholders receive (and/or have access to) the Note Valuation Reports, *id.* ¶ 173; they also received periodic "notices" from the Collateral Manager informing them, *inter alia*, of the "efforts being made by the CDOs to assert their rights under the terms of the applicable agreements for RMBS securities it held," as well as "the CDOs' efforts to initiate strategies to improve loan servicing performance." *Id.* ¶ 175; *see also id.* Ex. J (Dkt. No. 211-10) at ECF page 3 (undated notice from the Collateral Manager, allegedly sent "in or around 2011," advising the Noteholders that "we have taken steps, along with other RMBS investors, to retain [various law firms] as legal counsel and [Phoenix] as activist agents on behalf of Triaxx under a capped expense structure that rewards these parties for net recoveries to the fund"). TAM contends that the Trustee's recent decision to withhold payments to Phoenix, at the urging of the Noteholders, "is contrary to the requirements of the Indentures and the [CMAs] and years of course of dealing." TAM Ans. ¶ 147.

The Trustee and the Noteholders were also aware of the payment of TAM's legal fees incurred in litigation among the Trustee and the Noteholders as Administrative Expenses. TAM Ans. ¶ 195. In three prior interpleader actions initiated by the Trustee (involving "disputes between Senior Noteholders and Junior Noteholders regarding how [TAM] should manage the assets of the CDOs"), TAM "retained counsel and submitted invoices for counsel's legal fees to the Trustee to be paid through the Priority of Payments waterfall of the CDOs," without objection. *Id.* According to TAM, "indemnification" of its legal fees (and Phoenix's) by the

Issuers "is explicitly required by the Governing Agreements and Phoenix's Engagement Agreements." *Id.* ¶¶ 148, 205-06. In TAM's view, the Noteholders' "unsupported objection[s]" to the payment of its legal fees is a "transparent litigation tactic to hinder [TAM's] ability to defend and prosecute this action." *Id.* ¶ 205.

TAM brings a single counterclaim against the Trustee, for declaratory judgment, alleging that "a bona fide judicial and substantial controversy exists" as to whether:

> (i) the Collateral Manager, pursuant to the CMAs and Indentures and as the Issuers' agent was authorized to engage third party professionals on behalf of the Issuers; (ii) the Collateral Manager, on behalf of the Issuers was authorized to hire third-party professionals and permit those professionals' fees to be paid as Administrative Expenses of the CDOs; (iii) whether Triaxx, pursuant to the Indentures, is entitled to its bargained-for right to indemnification for its legal fees and expenses, including indemnification for any judgment against it, incurred in defending this action; (iv) whether Phoenix, pursuant to the Engagement Agreements, is entitled to be indemnified by the Issuers for its legal fees and expenses, including indemnification for any judgment against it, incurred in defending this action; (v) whether Phoenix is entitled to be paid its fees and expenses both out of settlement funds at the time such funds are disbursed and as Administrative Expenses from the Priority of Payments under the Indentures; and (vi) whether Phoenix is entitled to the payment of the "Activist Implementation Fee" of $250,000 per security, in addition to the $10,000 per month per security, on the securities in which it is engaged for activist implementation where recoveries to Triaxx exceed a minimum of $500,000 for each security.

TAM Ans. ¶ 208. TAM argues that a judgment on these issues "would serve a useful purpose in clarifying and settling the legal issues" and would "offer relief from uncertainty." *Id.* ¶ 210. Unlike its prior answer, TAM's current pleading does not include any affirmative claim to the *res*. It does include a crossclaim against the Issuers, for breach of contract, which alleges that it "demanded indemnification of its reasonable legal fees and expenses in this action" but the Issuers failed to pay, thereby breaching § 10(b) of the CMAs. TAM Ans. ¶¶ 212-17.

### C.    Phoenix's Answer, Counterclaim and Crossclaims

Like TAM, Phoenix alleges that it was engaged by the Issuers (not by the Collateral Manager) pursuant to the 2011 Engagement Agreements to provide valuable "activist

implementation services." Phoenix Ans. ¶¶ 142, 147. In exchange for these services, the Issuers agreed to pay Phoenix a "monthly due diligence fee," an "activist implementation fee" for each security for which it provided activist implementation services, *and* an "incentive fee" of $250,000 per security, if "funds or assets recovered by [the Issuers] relating to a security exceed[] $500,000." *Id*. ¶¶ 148-49. Phoenix understood, at the time, that its bills would be paid as Administrative Expenses through the Waterfall, subject to the cap set forth in the Indentures. *Id.* ¶ 150. "Accordingly, it was possible that Phoenix would be paid a portion of its monthly fees while the outstanding amount would be paid over the following months, depending on the amount of Administrative Expenses the Issuers owed to others." *Id*. Phoenix further alleges that the 2011 Engagement Agreements required the Issuers to "indemnify and keep indemnified [Phoenix] from and against any and all Liabilities which may be suffered or incurred by or asserted against [Phoenix] arising out of or in connection with the performance of its or their duties hereunder except such as may be due to the fraud or willful misconduct of [Phoenix]." *Id.* ¶ 152 (quoting 2011 Eng. Ltr. § 8).

The parties "further confirmed their agreement" through the 2014 Clarification Letters, which among other things "provided that Phoenix's incentive fees could be paid from settlement proceeds." Phoenix Ans. ¶ 153. "The Issuers confirmed that they agreed with those terms by approving the payment of Phoenix's incentive fees in accordance with those letters." *Id*.

Like TAM, Phoenix points out that for seven years, from 2011 to 2018, "the Issuers paid Phoenix in accordance with the Engagement Letters without objection by the Trustee or the noteholders," who were aware of the payments through the Note Valuation Reports. Phoenix Ans. ¶¶ 155-156. Moreover, in or around May 7, 2014, "PIMCO and Phoenix had a call in which PIMCO asked Phoenix to describe the work it was doing for the Issuers and explain its

27

compensation structure." *Id.* ¶ 163. In response, Phoenix explained the nature of its work, and "further told PIMCO that it received both monthly fees and incentive fees when recoveries exceeded a certain threshold." *Id.*[22] During its engagement, Phoenix has helped the Issuers recover over $100 million "by identifying and analyzing deficiencies in the underwriting, origination, securitization, and servicing of the [RMBS] that are owned by the Issuers," *id.* ¶ 157, using systems and technology that it developed "from scratch." *Id.* ¶ 158. The Trustee "had to have been aware of the litigation proceeds" because it "saw millions of dollars in recoveries flowing to the Issuers." *Id.* ¶ 167.

With respect to the payment of its fees outside of the Waterfall, Phoenix alleges, on information and belief, that the Collateral Manager "followed a 'negative consent' system whereby [TAM] would inform the Issuers in writing not only that the proceeds were being paid to the Issuers but also that a portion of the proceeds also were being paid directly to the Issuers' counsel and Phoenix. Thereafter, the Issuers approved the payments by not objecting; and at times, affirmatively approved payments to Phoenix." Phoenix Ans. ¶ 165.

In May 2018, PIMCO falsely claimed that it had "*recently* learned that the Trustee [had] made substantial payments to Phoenix," Phoenix Ans. ¶ 170, when, in fact, as noted above, the Trustee had "disclosed payments to Phoenix in monthly reports" to the Noteholders, and "PIMCO and Phoenix discussed the engagement," including Phoenix's methods and compensation structure, during a phone call in May 2014. *Id.* ¶ 163, 170. According to Phoenix, PIMCO objected in 2018 as a "litigation tactic," with the objective of ending Phoenix's

---

[22] Phoenix, like TAM, does not allege any facts that would suggest that the Trustee or the Noteholders knew about the payments made directly from Recoveries, outside of the Waterfall. Nor does it disclose how much it has been paid in that manner, or when.

engagement for the Triaxx CDOs so that it can counter an argument made by the Collateral manager in another litigation to the effect that certain securities (which PIMCO wants the Collateral Manager to sell) "will improve in value due to the activist litigations." *Id.* ¶ 172.[23]

Phoenix asserts crossclaims against the Issuers for (i) breach of contract or, in the alternative, (ii) unjust enrichment, (iii) promissory estoppel, or (iv) quantum meruit, alleging that it is entitled to payment of its invoices. Phoenix Ans. ¶¶ 180-203. Additionally, it crossclaims against the issuers for indemnification of its legal fees. *Id.* ¶¶ 204-09.[24] Finally, Phoenix brings a counterclaim against the Trustee seeking a declaratory judgment that it is entitled to receive its incentive fees and expenses "from settlement proceeds before such proceeds are subject to the payment waterfall set forth in the Indentures," or, alternatively, through the "payment waterfall set forth in the Indentures." *Id.* ¶¶ 217-22.

### D.    PIMCO's Answer and Affirmative Claims to the Res

PIMCO does not assert any counterclaims or crossclaims denominated as such. However, it asserts three "affirmative claims to the *res*" with respect to the funds retained in relation to the Phoenix Invoices, the Interpleader Legal Fees, and the Interpleader Judgment Fees. PIMCO Ans. ¶¶ 98, 102-03.

With respect to Triaxx 2006-2 and Triaxx 2007-1, PIMCO alleges that TAM, in violation of the Indentures, has "improperly and intentionally retained tens of millions of dollars that belongs to the CDOs and distributed them to [its] related entity Phoenix." PIMCO Ans. ¶ 96.

---

[23] The other litigation was the earlier interpleader action before Judge Nathan, which went to trial in October 2018 and resulted in a decision in PIMCO's favor shortly after the briefing closed on the instant motions. *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, 2019 WL 9511402, at *16 (S.D.N.Y. Sept. 16, 2019) (the *Prior Interpleader*), *aff'd,* 826 F. App'x 115 (2d Cir. 2020).

[24] Phoenix's fifth crossclaim, pleaded against PIMCO for tortious interference with contract, was dismissed by Judge Marrero. *See U.S. Bank*, 2019 WL 4744220, at *8-10.

PIMCO notes that TAM and Phoenix are Affiliates, under common ownership and control. *Id*. ¶ 112. Since 2015, the Collateral Manager has been owned by Triaxx Holdco, which in turn is owned by Garg (who signed the 2011 Engagement Letters for Phoenix and was a "key man" for Phoenix at that time) and Calamari (who signed the Clarification Letters for Phoenix). *Id*. ¶ 113. Phoenix is now owned by 1/0 Capital, LLC (1/0 Capital), which was founded by Garg and in which Garg and Calamari are partners, and Phoenix, TAM, and 1/0 Capital share the same address and office space. *Id*. ¶¶ 114-17. Moreover, other than an administrative assistant, Calamari is the sole employee of TAM. *Id.* ¶ 113.

According to PIMCO, Phoenix is an agent of TAM (not the Issuers) and in fact performs "virtually all of the Collateral Manager's functions and responsibilities." PIMCO Ans. ¶¶ 100, 108.[25] PIMCO notes that under the CMAs, the Collateral Manager is permitted to "employ third parties (including, without limitation, the Collateral Manager's Affiliates) to render advice (including investment advice) and assistance," but must do so "at the Collateral Manager's expense." *Id*. ¶ 133 (quoting CMA § 2(g)). Additionally, PIMCO notes, § 8(b) of the CMA makes the Collateral Manager "responsible for all expenses incurred by it in the performance of its obligations under this Agreement." *Id*. ¶ 134 (quoting CMA § 8(b)) (alterations omitted). Thus, PIMCO alleges, TAM should be responsible for paying the Phoenix Invoices out of its own fees – not as Administrative Expenses – because Phoenix is an agent of TAM, to which the

---

[25] With regard to this issue, PIMCO relies in part on the evidence developed in the prior interpleader action before Judge Nathan. PIMCO Ans. ¶ 107. *See Prior Interpleader*, 2019 WL 9511402, at *6-7 (describing testimony of "Mr. Calamari, who serves as the Collateral Manager"). According to PIMCO, Calamari admitted, during that action, that Phoenix's engagement agreements were between it "and *the Collateral Manager*, not the Issuers." PIMCO Ans. ¶ 138 (emphasis in the original). This admission, if made, is not reflected in Judge Nathan's opinion.

Collateral Manager essentially outsourced its own responsibilities, making Phoenix the *de facto* Collateral Manager. *Id.* ¶¶ 107-111, 135.

PIMCO further alleges that – regardless of which entity retained Phoenix as its agent – both the 2011 Engagement Letters and the 2014 Clarification Letters are "invalid and unenforceable" because they violate the Indentures, which require the Issuers to obtain "prior written consent of a Majority of the Controlling Class and the Hedge Counterparties" when entering into contracts "with other Persons" and prohibit the Issuers from engaging in "any business or activity other than issuing and selling the Notes." PIMCO Ans. ¶¶ 140-43; Ind. §§ 7.7(a), 7.12(a). PIMCO specifically alleges that it was not aware of the existence of the 2011 Engagement Letters or the 2014 Clarification Letters until they were disclosed by the TAM Parties in this lawsuit. PIMCO Ans. ¶ 139.[26]

With regards to the fees paid to Phoenix directly from Recoveries, PIMCO argues that they violate the Indentures, because the Recoveries are part of the "CDO Collateral," which must be paid directly to the Trustee. PIMCO Ans. ¶ 124. To the extent the Clarification Letters say otherwise, they violate the Indentures because the Issuers, which are "shell companies" that exist "for the limited purpose of issuing CDO Notes," are not permitted to "dispose of Collateral," such as paying Phoenix directly out of the Recoveries without first turning the funds over to the Trustee. *Id.* ¶¶ 140-41

According to PIMCO, the Collateral Manager's dealings with Phoenix also breached the CMAs, which require the Collateral Manager to "use skill and attention in its duties" and avoid

---

[26] However, PIMCO does not claim that it was unaware of Phoenix's existence, its work, or the fees paid to it through the Waterfall. *See* PIMCO Ans. ¶ 129 (alleging that TAM submitted Phoenix Invoices to the Trustee "each month since mid-2011," and that various Phoenix Entities "have been paid" more than $21.5 million "for monthly services" by Triaxx 2006-2 and 2007-1).

"any action that would constitute gross negligence, bad faith, or harm the interests of the Noteholders in the CDOs." PIMCO Ans. ¶¶ 144-47. By funneling unauthorized fees to its affiliate Phoenix – in some instances directly from the Recoveries, with no notice to the Trustee – the Collateral Manager "intentionally flouted the requirements of and its duties under the Governing Documents," "improperly enriched its own owners from CDO Collateral," and "directly harmed PIMCO and other CDO Noteholders," because the funds diverted to Phoenix would otherwise "be available for distribution to PIMCO and other Noteholders" through the Waterfall. *Id*. ¶¶ 148-51. These actions, PIMCO alleges, amount to a "Collateral Manager Breach" under the CMAs, *id.* ¶ 150, prohibiting the indemnification of the Collateral Manager's legal fees, and requiring TAM itself to indemnify the Issuers for their fees incurred herein. *Id.* ¶ 158.

In its three claims to the *res*, PIMCO alleges that it "and the Noteholders" are the "rightful claimants" to (i) the funds retained with respect to the Phoenix Invoices, which the Trustee must distribute "to the CDOs"; (ii) the Interpleader Legal Fees, which the Trustee must also distribute through the Waterfall; and (iii) the (so far hypothetical) Interpleader Judgment Fees, which the Trustee "must not distribute" to TAM or the Issuers. PIMCO Ans. ¶¶ 167-79.

### E.    The Issuers' Answer

The Issuers did not assert any counterclaims, crossclaims, or affirmative claims to the *res*. However, they do claim, as an affirmative defense, that "pursuant to Section 2.6 of the Indentures, the sole recourse with respect to any claim by the Trustee or Noteholders against the Issuers is the Collateral." Issuer Ans. at 19.

### III.    THE MOTIONS

#### A.    The TAM Parties' Rule 12(c) Motion

In their jointly-filed Rule 12(c) motion, the TAM Parties ask the Court to dismiss the Trustee's First Claim, for interpleader relief, and to dismiss PIMCO as a party altogether, because "[t]here is no scenario under which . . . PIMCO could be a recipient of the 'res' (insofar as there even is one)" and in any event PIMCO has not "actually threatened the Trustee with a claim," TAM Pty. Mem. at 1-2, has not satisfied the preconditions required before it could do so, *id*. at 9, and lacks standing to sue under the CMAs, which may only be enforced by the Trustee. *Id*. at 10. Even if an interpleader were otherwise proper, the TAM Parties argue, the Trustee's First Claim should be dismissed as to the so-called Interpleader Judgment Fees because there is no judgment, no request for indemnification with respect to such a judgment, and no judgment-related *res* to which PIMCO has made or could make a claim. *Id*. at 14-15. For similar reasons, the TAM Parties seek the dismissal of the Trustee's declaratory judgment claim concerning the Interpleader Judgment Fees. *Id*. at 23-24. Additionally, the TAM Parties seek the dismissal of all of the Trustee's damages and disgorgement claims against them for failure to state a claim upon which relief can be granted. *Id*. at 16-23.

#### B.    The Trustee's Rule 12(c) Motion

The Trustee asks the Court to issue a judgment in its favor on its Second Claim, for declaratory relief, by declaring that "no disbursements are to be made" from the Recoveries before they are delivered to the Trustee for deposit in the Accounts established under the Indentures, and to deny the TAM Parties' request for a contrary declaration that Phoenix "is entitled to be paid its fees and expenses [ ] out of settlement funds at the time such funds are disbursed[.]" Trustee Memorandum of Law (Trustee Mem.) (Dkt. No. 231) at 3-4, 21.

### C.      The Issuers' Rule 12(c) Motion

The Issuers ask the Court to dismiss the Trustee's First Claim, for interpleader relief, on the same grounds articulated by the TAM Parties, adding that PIMCO has no "legal basis" for objecting to the payment of the Issuers' fees in this action. Issuer Memorandum of Law (Issuer Mem.) (Dkt. No. 233) at 9-12. The Issuers also move to dismiss the Third, Fourth, and Fifth Claims against them as barred by § 2.6(i) of the Indentures, which states that their obligations are "payable solely from the Collateral" and protects them, as "pass-through" entities, from personal damages claim or deficiency judgments. *Id.* at 3-4, 8.

### D.      PIMCO's Rule 12(c) Motion

In a motion originally filed jointly with Goldman, PIMCO seeks judgment on the pleadings with respect to its first affirmative claim to the *res*, in the form of a ruling that "the Phoenix Invoices are invalid as matter of law, and the funds that the Trustee is retaining relating to the Phoenix Invoices should increase the amount allocable to noteholders under the Priority of Payments provisions." Noteholders' Memorandum of Law (PIMCO Mem.) (Dkt. No 236) at 3. PIMCO argues that the Issuers (and hence TAM) lacked the authority to enter into the 2011 Engagement Letters, which violated various negative covenants in the Indentures, and therefore that the Trustee should not pay the Phoenix Invoices (whether as Administrative Expenses or otherwise). *Id.* at 9-16. "Only the Phoenix Invoices" are at issue in PIMCO's motion. *Id.* at 8.

## IV.    LEGAL STANDARDS

### A.      Motions for Judgment on the Pleadings

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c). In deciding a motion pursuant to Rule 12(c), the courts apply the same standards applicable to Rule 12(b)(6) motions to dismiss. *Vega*, 801 F.3d at 78. Consequently, the Court must "accept all factual allegations in the complaint as

true and draw all reasonable inferences in favor of the [non-moving party]." *Bank of New York v. First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010) (internal quotations omitted). To survive a Rule 12(c) motion, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. (quoting *Hayden v. Paterson,* 594 F.3d 150, 160 (2d Cir. 2010)).

Judgment on the pleadings is appropriate only "where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988). "On a 12(c) motion, the court considers 'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'" *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Roberts v. Babkiewicz,* 582 F.3d 418, 419 (2d Cir. 2009)). "A complaint is [also] deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Id*. (quoting *Sira v. Morton,* 380 F.3d 57, 67 (2d Cir. 2004)).

## B.    Contract Interpretation

"An indenture is essentially a written agreement that bestows legal title of the securities in a single Trustee to protect the interests of individual investors who may be numerous or unknown to each other." *Cortlandt St. Recovery Corp. v. Bonderman*, 31 N.Y.3d 30, 39 (2018) (quoting *Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 555 (2014)). "[U]nlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement." *Id*. (quoting *Meckel v. Continental Res. Co.*, 758 F.2d 811, 816 (2d Cir. 1985)).

"[T]he interpretation of Indenture provisions is a matter of basic contract law." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016) (quoting *Bank of N.Y. Trust Co. v. Franklin Advisers, Inc.*, 726 F.3d 269, 276 (2d Cir. 2013)). Under New York law, which governs the Triaxx indentures, *see* Ind. § 14.10, courts must construe a contract "so as to give full meaning and effect to all of its provisions." *In re AMR Corp.*, 730 F.3d 88, 98 (2d Cir. 2013) (quoting *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir.1996)). The primary goal of contract interpretation "is to give effect to the intent of the parties as revealed by the language of their agreement." *Chesapeake Energy Corp. v. Bank of New York Mellon Tr. Co.*, 773 F.3d 110, 113-14 (2d Cir. 2014) (internal quotations omitted). Therefore, "[a] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 530 (S.D.N.Y. 2013) (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 569-70 (2002)).

"[P]rovisions in a contract are not ambiguous merely because the parties interpret them differently." *Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd.*, 88 N.Y.2d 347, 352 (1996). Rather, under New York law, a contract is ambiguous "if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Orchard Hill*, 830 F.3d at 156-57 (quoting *Chesapeake Energy*, 773 F.3d at 114). "Whether a contract is ambiguous is a question of law for the courts to resolve." *In re AMR Corp.*, 730 F.3d at 98 (citing *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)). "[W]hen a contract is ambiguous, a court may accept extrinsic evidence of the contract's meaning and the parties' intent when

drafting it to assist in the court's interpretation of the contract." *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, 2017 WL 3610584, at *7 (S.D.N.Y. July 26, 2017) (citing *Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC,* 692 F.3d 42, 56 (2d Cir. 2012)). Therefore, "if the contract is ambiguous, the Court cannot resolve the parties' dispute on a motion to dismiss or a motion for judgment on the pleadings." *Id*.

## V.    ANALYSIS

### A.    The Trustee's Interpleader Claim

"Rooted in equity, interpleader is a handy tool to protect a stakeholder from multiple liability and the vexation of defending multiple claims to the same fund." *Washington Elec. Co-op., Inc. v. Paterson, Walke & Pratt, P.C.*, 985 F.2d 677, 679 (2d Cir. 1993). An interpleader claim may be brought pursuant to Fed. R. Civ. P. 22 (known as a rule interpleader) or pursuant to the Federal Interpleader Act, 28 U.S.C. § 1335 (known as a statutory interpleader). The TAC is silent as to which type of interpleader claims are asserted in this action. However, as Judge Marrero previously noted, the Trustee did not comply with the deposit requirements of § 1335(a)(2), and therefore the Court must construe this action as a Rule 22 interpleader. *See Triaxx Asset Mgmt.*, 2019 WL 4744220, at *7 ("this action is not one brought under Section 1335, and is instead a rule interpleader action").

Under Rule 22, a plaintiff may join as defendants "[p]ersons with claims that may expose a plaintiff to double or multiple liability." Fed. R. Civ. P. 22(a)(1).[27] An interpleader action

---

[27] Additionally, "[i]n a Rule 22 interpleader, 'there is no difficulty in allowing the claimants to assert cross-claims against each other, as in any other civil action, . . . [if] the requirements of Rule 13(g) are met.'" *Triaxx Asset Mgmt.*, 2019 WL 4744220, at *8 (quoting 7 Wright & Miller, *Federal Practice and Procedure* § 1715 (3d ed. 2019)). Rule 13(g) provides that "[a] pleading may state as a crossclaim any claim by one party against a coparty if the claim arises out of the transaction or occurrence that is the subject matter of the original action or of a counterclaim, or if the claim relates to any property that is the subject matter of the original action." Fed. R. Civ. P. 13(g).

generally proceeds in two steps: "a court first determines whether interpleader relief is appropriate, and then adjudicates the adverse claims." *Hausler v. JP Morgan Chase Bank, N.A.*, 127 F. Supp. 3d 17, 45 (S.D.N.Y. 2015). Courts determine "whether the interpleader action is appropriate by assessing whether the plaintiff has a real and reasonable fear of double liability or vexatious, conflicting claims . . . regardless of the merits of the competing claims." *Madison Stock Transfer, Inc. v. Exlites Holdings Int'l, Inc.*, 368 F. Supp. 3d 460, 476 (E.D.N.Y. 2019) (quoting *Hartford Life Ins. Co. v. Simonee*, 2015 WL 8490998, at *3 (E.D.N.Y. Dec. 10, 2015)).

Here, the TAM Parties (joined by the Issuers) seek to dismiss the Trustee's First Claim, for interpleader relief, and with it all claims asserted by the remaining Noteholder, PIMCO. TAM Pty. Mem. at 7-13; Issuer Mem. at 12. The relief requested will be granted in part, with respect to the so-called Interpleader Judgment Fees.

### 1.   First Interpleader Dispute: Phoenix Invoices

#### a)   *The First Interpleader Dispute is an Appropriate Interpleader*

Having been notified of the Noteholders' objections to the payment of the Phoenix Invoices and the TAM Parties' demands that they be paid pursuant to the Waterfall, the Trustee alleges that it could not act "without risk of legal liability to itself." TAC ¶ 4. The TAM Parties (joined by the Issuers) argue that PIMCO (the remaining Noteholder) merely raised "objections" to the Trustee's payment of the Phoenix Invoices (as well as to any payment of the legal fees incurred by the TAM Parties or the Issuers), but did not actually assert or threaten any legal claims ("other than in this action"). TAM Pty. Mem. at 11.

However, "whether a stakeholder legitimately fears multiple liability with respect to a single fund . . . need not be supported by an existing legal action." *Great Wall De Venezuela C.A. v. Interaudi Bank*, 117 F. Supp. 3d 474, 483 (S.D.N.Y. 2015). Rather, "[i]t is sufficient that the stakeholder 'faces even the prospect of adverse claims being asserted against property in its

38

possession.'" *Id*. (quoting *Glenclova Inv. Co. v. Trans–Res., Inc.,* 874 F. Supp. 2d 292, 302 (S.D.N.Y.2012)). *See also Madison Stock Transfer*, 368 F. Supp. 3d at 476-77 ("the interpleader plaintiff need only have a good faith concern about duplicitous litigation and multiple liability if it responds to the requests of certain claimants and not to others"); *Bank of New York Mellon Trust Co., Nat'l Ass'n v. Telos CLO 1006-1 Ltd.*, 274 F. Supp. 3d 191, 213 (S.D.N.Y. 2017) (*Telos*) (interpleader appropriate where Trustee received "mutually exclusive directions" from collateral manager and from noteholder regarding payment of incentive fees to collateral manager). In a rule interpleader, moreover, the defendants need not all have claims to the same identifiable property; rather, the threat of double or multiple liability may arise from their competing claims as to "some single right or obligation which the interpleader plaintiff has in relation to one of the defendants." *Fitzgerald v. Nationwide Life Ins. Co.*, 2007 WL 1659200, at *2 (S.D.N.Y. June 6, 2007) (quoting *Bankers Trust Co. v. Manufacturers Nat'l Bank of Detroit,* 139 F.R.D. 302, 307 (S.D.N.Y. 1991)). Here, the competing claims of PIMCO and the TAM Parties with regard to the payment of the Phoenix Invoices are sufficient to sustain this interpleader action.

It is true, as the TAM Parties argue, that PIMCO has no *direct* claim to the $5,500,000 that the Trustee did not pay Phoenix in Triaxx 2006-2 or the $4,750,000 that it did not pay Phoenix in Triaxx 2007-1. *See* TAC ¶ 50; TAM Pty. Mem. at 9. PIMCO gets paid through the Waterfall, along with other noteholders (in order of seniority), after permissible Administrative Expenses are paid. TAC ¶ 54. Thus, in its Prayer for Relief on what it calls its affirmative claims to the *res*, PIMCO requests, in effect, declaratory relief, including a declaration that "the Trustee cannot pay the Phoenix Invoices," which "do not constitute other Administrative Expenses under the Indentures." PIMCO Ans. at 39. It is also true that PIMCO did not clearly allege that the

sums in dispute at the time the TAC was filed, if paid to Phoenix as Administrative Expenses, would have reduced any payment made or due to PIMCO.[28] Rather, PIMCO asserts that the payment of the Phoenix Invoices as Administrative Expenses would harm it in the future, and conversely that "[i]f the Retained Funds are not paid to the Phoenix Entities," they will "be available for distribution to PIMCO and other Noteholders pursuant to the Indentures' payment waterfall." PIMCO Ans. ¶ 151. As further explained by its counsel at oral argument, "the overall collateral pool is not sufficient to pay the noteholders over time," and therefore, even for a Senior Noteholder like PIMCO, payment of Phoenix Invoices will – at some point in the future – have an "impact on PIMCO." Tr. at 31:15-33:12.

In a different context, Judge Marrero accepted these allegations to show that PIMCO "has a sufficient economic interest in the underlying dispute." *U.S. Bank Nat'l Ass'n*, 2019 WL 4744220, at *9 (dismissing Phoenix's tortious interference cross-claim because PIMCO's economic interest required Phoenix to plead malice, which it failed to do). The same economic interest is sufficient to give PIMCO standing as an interpleader defendant and counterclaimant herein. In that regard, this case is similar to many other interpleader actions brought in this district (and others) by the trustees of CDOs and similar investment vehicles to resolve disputes between noteholders and collateral managers. *See*, *e.g.*, *Telos*, 274 F. Supp. 3d at 214 (interpleader by trustee was "appropriate" where noteholders objected to payment of collateral manager's fees); *U.S. Bank N.A. v. Black Diamond CLO 2005-1 Adviser, L.L.C.*, 839 F. Supp. 2d

---

[28] PIMCO's counsel did make that claim, albeit somewhat vaguely, at oral argument. *See* October 3, 2019 Hr'g Tr. (Tr.) at 33:13-34:3 (arguing that PIMCO would suffer a "direct injury by virtue of these Phoenix invoices" because, although the "check for interest would be the same," "[t]he check for principal over time would fluctuate"). However, its pleading did not expressly allege that the sums in dispute would have made a concrete difference to any interest or principal payment due to PIMCO to date. Therefore, I do not consider its "direct injury" contention for purposes of the pending motions.

639 (S.D.N.Y. 2011) (adjudicating interpleader dispute, filed by trustee, pitting senior noteholders against collateral manager regarding disposition of $65 million in principal payments received on the collateral). Some of those cases involve the same parties now before this Court. *See*, *e.g.*, *Prior Interpleader*, 2019 WL 9511402 (adjudicating interpleader dispute filed by Trustee after PIMCO and another senior noteholder objected to TAM's classification and management of certain securities); *U.S. Bank Nat'l Ass'n v. Triaxx Prime CDO 2006-1, Ltd.*, 2016 WL 3552272, at *3 (S.D.N.Y. June 23, 2016) (adjudicating interpleader dispute in which Trustee sought a declaratory judgment regarding "the proper disposition of the Three Year Defaulted Securities," after various senior noteholders and TAM could not agree on whether to sell them), *aff'd sub nom. U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, 687 F. App'x 8 (2d Cir. 2017).[29]

The TAM Parties further argue that PIMCO is barred by the no-action clause in the Indentures from suing the Trustee unless certain requirements, not pleaded here, have been met. TAM Pty. Mem. at 13. Section 5.8 of the Indentures states that no Senior Noteholder may "institute any Proceedings, judicial or otherwise, with respect to this Indenture," unless (among other things) the holders of 25% of the Controlling Class of Notes has made a written demand on the Trustee to initiate the proceeding and the Trustee has failed to do so. Ind. § 5.8(b), (d). The short answer to this, of course, is that PIMCO did not initiate this proceeding; the Trustee did. Nor does the no-action clause mean that the Trustee did not face a "real and reasonable" fear of

---

[29] *Hartford Cas. Ins. Co. v. Lexington Ins. Co.*, 2016 WL 1267801, at *1 (S.D.N.Y. Mar. 30, 2016), on which the TAM Parties rely for the proposition that PIMCO is not a proper interpleader defendant because it has no direct claim to the *res*, *see* TAM Pty. Mem. at 10, was a statutory interpleader. Judge Karas was therefore required to determine whether "there is a single fund at issue and there are adverse claimants to that fund." *Id*. at *2. As noted above, that requirement is "relaxed" in a rule interpleader. *Fitzgerald*, 2007 WL 1659200, at *2.

litigation from PIMCO, which points out that § 5.8 would not bar suit against the Trustee itself. *See Cruden v. Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992) ("it would be absurd to require the debenture holders to ask the Trustee to sue itself"); *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 717 (S.D.N.Y. 2016) ("the no action clause does not provide a basis for dismissing the plaintiffs' breach of contract claims" against the trustee). Moreover, as noted above, the Trustee is not required to evaluate the merits of competing claims (including the merits of a potential defense under the no-action clause) before bringing an interpleader action. *See* 7 Wright & Miller, *Federal Practice & Procedure* § 1704 (3d ed. 2019) (many courts "stress that the vexation and expense of possible multiple litigation warrants the use of interpleader even absent a substantial danger of multiple liability"). The Court therefore denies the motion of the TAM Parties (and the Issuers) to dismiss the Trustee's First Claim, for interpleader relief, as to the Phoenix Invoices.

### b)  The Merits of the First Interpleader Dispute

To the extent that PIMCO's Rule 12(c) motion asks the Court to decide the merits of the first interpleader dispute on the pleadings, it must be denied. PIMCO appears to assume that the 2011 Engagement Letters and 2014 Clarification Letters are contracts between the Issuers and Phoenix, and on that basis argues that they were prohibited by multiple provisions of the Triaxx 2006-2 and 2007-1 Indentures, including the Granting Clause, various negative covenants within § 7.8, the "prior written consent" clause of § 7.7, and § 8.2, because the 2011 Engagement Letters and 2014 Clarification Letters "amended the Indentures by adversely affecting or impairing the Collateral and affecting the payment of principal and interest on the Notes." PIMCO Mem. at 1-2, 9-13. Thus, according to PIMCO, the engagement of Phoenix was "invalid" from the start, as are the Phoenix Invoices, which cannot be paid by the CDOs either

through the Waterfall or outside of it. In response, the TAM Parties and the Issuers contest PIMCO's reading of the Indenture – which, they assert, does not even "speak to the matters at issue in this case," TAM Parties' Memorandum in Opposition (TAM Pty. Opp. Mem.) (Dkt. No. 243) at 2 – and argue vigorously that that PIMCO's motion ignores "the allegations in the pleading concerning the seven years of practice" under the challenged agreements, during which PIMCO was well aware that Phoenix had been engaged and was being paid, through the Waterfall, to assist the Collateral Manager with its activist litigation strategy. *Id.* at 3 ("After seven years of quietly accepting the fruits of Phoenix's efforts, . . . [PIMCO] now seek[s] to invalidate that arrangement on the basis of disputed facts and silent contracts").

As to PIMCO's motion, the TAM Parties and the Issuers are correct (although not entirely for the reasons they present). To begin with, although it is PIMCO's current premise (and has always been the position of the TAM Parties and the Issuers) that Phoenix was retained by the Issuers, PIMCO previously took a different position, arguing that the Phoenix Invoices could not be paid as Other Administrative Expenses because Phoenix was retained by the Collateral Manager, as its agent, which under CMA § 2(g) was at its own expense. *See* TAC ¶¶ 3, 52; TAM Ans. Ex. O (May 2, 2018 objection letter from PIMCO, asserting that the Phoenix entities were "agents of the Collateral Manager" who were properly retained "at the Collateral Manager's expense"). In its current pleading, PIMCO is still taking that position. *See* PIMCO Ans. ¶ 100 ("Under the CMAs, TAM is required to retain any affiliates and agents at its own expense"). Although the language of the 2011 Engagement Letters and the 2014 Clarification Agreements suggests that it was the Issuers that retained Phoenix, all of the signatures on both sets of contracts are those of Phoenix/TAM personnel, and it is not otherwise clear from the pleadings whether and when the Issuers themselves learned about, accepted or approved those

arrangements. Moreover, in written correspondence to the Noteholders, the Collateral Manager referred to Phoenix somewhat ambiguously as "our activist agents." TAM Ans. Ex. K.

Without resolution of this foundational issue, which cannot be determined on the pleadings, the Court could not grant PIMCO's motion. Moreover, regardless of which party retained Phoenix, the Court could not ignore the denials and defenses raised by the TAM Parties and the Issuers in their own pleadings, including their defenses rooted in the parties' course of conduct. *Bailey v. Pataki*, 2010 WL 234995, at *1 (S.D.N.Y. Jan. 19, 2010) (in considering a motion for judgment on the pleadings, "the Court must assume as true all well-pleaded allegations in defendants' Answers"); *see also* 5C Wright & Miller, *Federal Practice & Procedure* § 1368 ("the [moving party] may not secure a judgment on the pleadings when the answer raises issues of fact that, if proved, would defeat recovery"). Here, TAM has alleged (and PIMCO has not denied) that for seven years, PIMCO knew that Phoenix was working on the activist litigations, and further knew that its fees were being paid, as Other Administrative Expenses, through the Waterfall. *See* TAM Ans. ¶¶ 146-47. On that basis TAM has pleaded defenses including waiver, laches, estoppel, ratification, and express or implied consent. *Id*. ¶¶ 135-36; *see also* Phoenix Ans. ¶¶ 136-37. Because PIMCO's claim turns not only on the meaning of the Indentures, but also on extrinsic materials and the course of dealing between the parties, it cannot be determined on a motion for judgment on the pleadings. *See Sellers*, 842 F.2d at 642 (judgment on the pleadings is appropriate only where "material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings").

### 2.     Second Interpleader Dispute: Payment of Interpleader Legal Fees

The Court denies the motion to dismiss the Trustee's First Claim as to the Interpleader Legal Fees for the same reasons discussed above in connection with the Phoenix Invoices. Due to the competing claims of TAM and the Issuers, on the one hand, and PIMCO (as well as

Goldman, at the time), on the other hand, the Trustee faced a "real and reasonable" threat of multiple liability, *Madison Stock Transfer*, 368 F. Supp. 3d at 476, notwithstanding that PIMCO does not have a direct claim to the funds at issue. *Fitzgerald*, 2007 WL 1659200, at *2. The Issuers' contention that the Indentures "unambiguously provide" for their fees to be paid as Administrative Expenses, Issuer Mem. at 10, goes to the merits of PIMCO's claim (as to which no party has requested a ruling pursuant to Rule12(c)) and thus does not render the Trustee's interpleader claim inappropriate insofar as it relates to the Interpleader Legal Fees. I note as well that in the event the Collateral Manager is found to have engaged in Collateral Manager Breaches, as defined in CMA § 10(a), it will be the Collateral Manager's obligation, not the Trustee's, to indemnify the Issuers against the legal fees incurred as a result of those Breaches. CMA § 10(c).

### 3.      Third Interpleader Dispute: Payment of Interpleader Judgment Fees

The TAM Parties and the Issuers are on firmer ground when they argue that the Trustee's interpleader claim is inappropriate insofar as it seeks a ruling as to whether any future judgment against them could be paid out of the CDOs, because the entire dispute is "speculative, hypothetical and contingent on the outcome of intervening events." TAM Pty. Mem. at 15. Unlike the first and second interpleader disputes, the third does not involve any actual request for funds from the Trustee. Nor is there any judgment as to which such a request could be made. Instead, the TAC alleges that the Trustee received emails from PIMCO and Goldman "objecting" prospectively to a request that had not been (and still has not been) made. TAC ¶ 71. Thus, not only is there no single "fund" to which the parties have disputed claims, *Madison Stock Transfer*, 368 F. Supp. 3d at 476; the Trustee does not yet have any judgment-related "obligation . . . in relation to [even] one of the defendants." *Fitzgerald*, 2007 WL 1659200, at *2.

"Although interpleader is an equitable remedy intended to be 'liberally construed,' 'it cannot be used to solve all the vexing problems of multiparty litigation' and was never intended 'to be an all-purpose bill of peace.'" *CF 135 Flat LLC v. Triadou SPV S.A.*, 2016 WL 1109092, at *2 (S.D.N.Y. Mar. 18, 2016) (quoting *State Farm Fire & Cas. Co. v. Tashire,* 386 U.S. 523, 533, 535 (1967)). *See also Great Wall De Venezuela*, 117 F. Supp. 3d at 483 ("interpleader is not appropriate when the party seeking interpleader offers 'only the barest speculation' that such claims will be interposed"). Nor does an interpleader function as a vehicle to obtain advisory court opinions on issues that may or may not present themselves in the future. *See Hollister v. Soetoro*, 258 F.R.D. 1, 4 (D.D.C. 2009) ("interpleader requires real claims, or at least the threat of real claims"), *aff'd,* 368 F. App'x 154 (D.C. Cir. 2010).

The Court therefore grants the motions of the TAM Parties and the Issuers to dismiss the Trustee's First Claim insofar as it seeks relief concerning the Interpleader Judgment Fees, and to dismiss the Trustee's Second Claim, for a declaratory judgment, to the same extent, *see* TAC ¶ 97(iv), in both cases without prejudice. The Court notes that PIMCO's Count III, which similarly seeks a declaration that TAM and the Issuers "are not permitted to satisfy any judgment against them out of CDO Collateral," PIMCO Ans. ¶ 178, is infirm for the same reason and will also be dismissed without prejudice. *See* 28 U.S.C. § 2201(a) ("actual controversy" required for declaratory judgment).

## B.    Declaratory Judgment

The Trustee and the TAM Parties all plead claims for declaratory judgment related to the payment of Phoenix's fees directly from the Recoveries rather than as Administrative Expenses through the Priority of Payments waterfall. TAC ¶¶ 94-97; TAM Ans. ¶¶ 207-209; Phoenix Ans. ¶¶ 217-22. The Trustee moves for judgment on the pleadings on its Second Claim, for declaratory judgment, and specifically requests the Court to declare that:

> [N]o disbursements are to be made from any . . . Recoveries, that all such . . . Recoveries be delivered immediately to the Trustee for deposit in the CDO Accounts, and that all information concerning the . . . Recoveries (including the amount, source, and location of any . . . Recoveries, and the existence and identity of any judgments, settlement agreements, general intangibles, or other similar property of the Issuers which will or may entitle the Issuers to receive Collateral proceeds in the future) be provided to the Trustee.

Trustee Mem. at 3. Additionally, the Trustee seeks a declaration that the Issuers and TAM cannot use the Recoveries to satisfy any judgments against them in this action, *id.* at 21, and asks the Court to deny the TAM Parties' counterclaims seeking a contrary declaration; that is, that Phoenix is entitled to recover its incentive fees directly from the Settlement Proceeds at the time they are disbursed. *Id.* at 21-22. In opposition, the TAM Parties argue that the language of the Indentures regarding the proper treatment of the Recoveries is ambiguous, *see* TAM Pty. Opp. Mem. at 11, and that there are disputed facts, requiring further discovery, such that the Trustee's Rule 12(c) motion must be denied. *Id.* at 10, 14.

I agree with the Trustee that under the unambiguous language of the Indentures, the Recoveries are Collateral as that term is used in the Indentures' Granting Clause. It therefore follows that that the Recoveries must be disclosed to and turned over to the Trustee for deposit into the appropriate Account(s) established by the Trustee, and that, notwithstanding the language of the 2014 Clarification Letters, neither the Issuers nor the Collateral Manager may pay Phoenix's fees directly from the Recoveries, outside of the Waterfall.

Under 28 U.S.C. § 2201(a), this Court cannot issue a declaratory judgment except in "a case of actual controversy." "[T]his requirement is satisfied when 'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality.'" *Effie Film, LLC v. Murphy*, 932 F. Supp. 2d 538, 553 (S.D.N.Y. 2013), *aff'd,* 564 F. App'x 631 (2d Cir. 2014) (quoting *Maryland Cas. Co. v. Pac.*

*Coal & Oil Co.,* 312 U.S. 270, 273 (1941)). A declaratory judgment is appropriate when such a judgment will "(1) serve a useful purpose in clarifying and settling the legal relations in issue, and (2) terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *United Specialty Ins. Co. v. CDC Hous., Inc.*, 233 F. Supp. 3d 408, 412 (S.D.N.Y. 2017). That standard is met here. There is a "substantial controversy" over the proper treatment of the Recoveries under the Indentures, with the Trustee and PIMCO, on the one hand, at odds with the Collateral Manager, the Issuers, and of course Phoenix. Moreover, the answer to this fundamental question (which does not require the Court to determine by whom Phoenix was engaged) will assist the parties in resolving their disputes as to past Recoveries paid to Phoenix (or escrowed) and order their affairs as to the future Recoveries that TAM and Phoenix anticipate generating for the benefit of the CDOs. Hence, the issuance of a declaratory judgment is appropriate.

### 1.     The Recoveries Are Collateral

The parties are agreed that the question whether Phoenix can be paid directly from the Recoveries turns on whether those Recoveries are Collateral, as that term is used in the Indentures, and therefore come within the grant of all such Collateral to the Trustee for the benefit of the Noteholders. *See* Trustee Mem. at 10-11; TAM Pty. Opp. Mem. at 14; Issuers Memorandum in Opposition (Issuer Opp. Mem.) (Dkt. No. 246)  at 13. Under the Granting Clause of the Indentures, Collateral means:

> all accounts, general intangibles, chattel paper, instruments, securities, investment property and *any and all other property* (other than Excepted Property) *of any type or nature* owned by [the Issuer], including (a) . . . the Collateral Debt Securities . . . which the Issuer causes to be delivered to the Trustee (directly or through a Securities Intermediary) herewith, all Collateral Debt Securities and Equity Securities which are delivered to the Trustee (directly or through a Securities Intermediary) after the Closing Date pursuant to the terms hereof and *all payments thereon or with respect thereto*, . . . and (e) all proceeds, accessions, profits, income benefits, substitutions and replacements, whether voluntary or

involuntary, of and to any of the property of the Issuer described in the preceding clauses, but excluding Excepted Property (collectively, the "Collateral")

Ind. at 1-2 (emphases added).

The Recoveries do not come from thin air. As Phoenix explains it, the Recoveries are generated by suing various nonparties for "deficiencies in the underwriting, origination, securitization, and servicing of the residential mortgage-backed securities that are owned by the Issuers and held by the Trustee as collateral for the benefit of the noteholders." Phoenix Ans. ¶ 157. As Phoenix acknowledges, the underlying RMBS are unquestionably Collateral; specifically, they are Collateral Debt Securities previously granted and delivered to the Trustee. Under the express language of the Granting Clause, therefore, any "payments thereon or with respect thereto" are also Collateral, as are all "proceeds, accessions, profits, income benefits, substitutions and replacements . . . of and to" the RMBS. Given the breadth of the contractual language and the clear intent to keep all funds generated by existing Collateral within the grant, for the benefit of the Noteholders, a plain reading of the language places the Recoveries as "proceeds" of or "payments . . . with respect to" the RMBS.

The TAM Parties and the Issuers argue that the Recoveries are not Collateral because the funds are not "generated by the RMBS . . . in the ordinary course," but rather were "obtained as a result of extraordinary events," requiring litigation, and because the money comes from the various non-party originators, servicers and underwriters of the RMBS who are named as defendants in the activist litigation, in order to resolve the claims against them for deficiencies in their origination, underwriting, securitization or servicing of the underlying RMBS. TAM Pty. Opp. Mem. at 14-15; Issuer Opp. Mem. at 13-14. Since "Recoveries are different," the TAM Parties explain, and since the Indentures do not expressly include this type of "payment" or "proceed" in the Granting Clause, this Court should use its "common sense" to read the

49

Recoveries out of the Granting Clause, notwithstanding that they fit comfortably within its plain language, and rule instead that Recoveries do not become Collateral until the Collateral Manager delivers them (net of litigation costs and incentive fees to Phoenix) to the Trustee. TAM Pty Opp. Mem. at 15-16.

A court interpreting the meaning of a contract must "look[] to all corners of the document rather than view sentences or clauses in isolation." *UMB Bank, Nat'l Ass'n v. Airplanes Ltd.*, 260 F. Supp. 3d 384, 393 (S.D.N.Y. 2017) (quoting *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 99 (2d Cir. 1989)). Moreover, "a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties." *Greenwich Capital Fin. Prod., Inc. v. Negrin,* 903 N.Y.S.2d 346, 348 (1st Dep't 2010) (internal quotations omitted). Although it is true that the Indentures do not specifically enumerate proceeds from activist litigation in their definition of Collateral (quite possibly, as discussed below, because the drafters of the Indenture did not anticipate the collapse of the housing market in 2007 and the wave of RMBS litigation that followed), to read the Recoveries *out* of the broad language of the Granting Clause would, in my view, defy both logic and common sense. *See Airplanes Ltd.*, 260 F. Supp. 3d at 393–94 ("Courts must reject interpretations of agreement provisions that are commercially unreasonable or illogical.") (collecting cases).

The purpose of the activist litigation was and is to *recover* ordinary-course RMBS revenues lost due to the mismanagement of the originators, servicers, underwriters (and in some cases trustees and collateral managers) of the securities underlying the CDOs; that is, the Collateral. *See* TAM Ans. ¶¶ 183-85; Phoenix Ans. ¶¶ 142, 157. Moreover, regardless of the legal theories employed, the damages won (or settlements negotiated) in RMBS litigation are typically *compensatory* in nature. *See*, *e.g.*, *Deutsche Alt-A Sec. Mortg. Loan Tr., Series 2006-*

*OA1 v. DB Structured Prod., Inc.*, 958 F. Supp. 2d 488, 501 (S.D.N.Y. 2013) ("whether the Trustee's remedy is characterized as 'compensatory damages,' 'rescissory damages,' or 'specific performance' thus has little practical significance given that the form of the relief (if not necessarily the quantum) is the same in each case: the payment of money to make Plaintiff whole."). The fact that the CDOs were required to recover these payments through litigation, rather than in the ordinary course, does not change their fundamental nature: they are payments made by the litigation defendants with respect to the CDOs' Collateral Debt Securities, and received by the Collateral Manager for the benefit of the Noteholders. Hence, the Recoveries are themselves Collateral. The TAM Parties' alternative interpretation not only departs from the language of the Granting Clause (which contains no such carve-out); it produces a "commercially unreasonable result," namely, that the Issuers and the Collateral Manager would have the unfettered ability to determine among themselves what the "net" Recoveries are – even when the deductions are substantial and only partially-disclosed payments to the Collateral Manager's affiliates – and when those net Recoveries should be delivered to the Trustee. The pendency of this lawsuit is ample evidence of the problems inherent in such a structure.

It may be true, as the TAM Parties suggest, that the highly sophisticated drafters of the lengthy, complex, and detailed Indentures did not anticipate the looming mortgage crisis or consider whether the CDOs, after taking a beating in the resulting financial crisis, might need to sue nonparties to ameliorate their RMBS market losses. TAM Pty. Opp. Mem. at 4. But it is also irrelevant to the contract interpretation question before the Court. *See, e.g., Levin v. U.S. Life Ins. Co. in City of New York*, 2006 WL 3755182, at *3 (S.D.N.Y. Dec. 20, 2006) (insurance company not entitled to create exception to disability contract clear on its face upon discovery that Levin's self-issued salary was higher than company thought appropriate). Moreover, by including a

miscellaneous, catch-all provision in the definition of Collateral ("all payments . . . with respect thereto"), *without* any limiting or qualifying language, the drafters of the Indenture anticipated the possibility of payments beyond whatever specific categories were contemplated at the time the Indentures were drafted and indicated their intent to include such payments in the definition. Thus, under the Granting Clause, the Recoveries are Collateral.[30]

> **2.      The Recoveries Must be Disclosed to and Turned Over to The Trustee and Therefore May Not be Used to Pay Phoenix's Fees Outside of the Waterfall**

Because the Recoveries are Collateral, and therefore within the Granting Clause, it follows that they must be promptly disclosed (to the extent adequate disclosure has not already occurred during discovery in this action) and delivered to the Trustee (to the extent still in the custody or control of the Issuers or the Collateral Manager) for deposit into the appropriate Account(s) established under the Indenture. The Trustee contends that §§ 3.3, 17.8, 10.1(a), and 10.2(c) of the Indentures specifically require such delivery. Apart from the specifics of these provisions, the Granting Clause itself confers on the Trustee all of the Issuers' "right, title, and interest in and to" the Collateral, which surely includes the right to have the Recoveries deposited in the Account(s) established by the Trustee for that purpose. The contrary arguments of the TAM Parties and the Issuers are premised on their insistence that the Recoveries are not in fact Collateral, and are therefore unavailing. *See, e.g.*, Tam Pty Opp. Mem. at 17-20; Issuer Opp. Mem. at 17.

---

[30] The TAM Parties point out that, as in any litigation, the "counsel and experts" retained for the activist litigation have to be paid. TAM Pty. Opp. Mem. at 15-16. However, the record now before the Court does not contain sufficient information concerning these service providers – for example, what their fees have been, and whether they have been paid through the Waterfall or outside of it – to determine the impact of the requested declaratory judgment on them. Nor has any party asked the Court for a ruling regarding service providers other than TAM's affiliate Phoenix.

The Trustee did not ask for a ruling concerning which Account(s) should receive the Recoveries. The Issuers remind me, however, that their litigation counsel "already has remitted tens of millions of dollars in Activist Litigation settlement recoveries to the Trustee for distribution through the waterfalls for the benefit of Noteholders, albeit net of payment to the attorneys, Phoenix, and other service providers[.]" Issuer Opp. Mem. at 20. If the Issuers and the Trustee know how to direct net Recoveries – which the TAM Parties *concede* to be Collateral, *see* TAM Pty Opp. Mem. at 16 – surely they can determine how to handle present and future Recoveries, which are also Collateral.

Because the Recoveries are Collateral, it also follows that neither the Issuers nor the Collateral Manager may pay Phoenix's fees directly from the Recoveries, outside of the Waterfall, before the Recoveries are delivered to the Trustee. In so declaring, the Court makes no ruling as to the validity of the 2011 Engagement Letters or the 2014 Clarification Letters, the validity of the Phoenix Invoices themselves (or the incentive fees provisions therein), or whether the Trustee may or must pay the Phoenix Invoices, up to the applicable cap, through the Priority of Payments provisions in § 11.1 of the Indentures. To the extent rulings were requested on these issues, the Court determined, for the reasons stated above, that they could not be resolved pursuant to Rule 12(c). Since the Recoveries are Collateral, however, the TAM Parties' counterclaims seeking a declaration that "Phoenix *is* entitled to be paid its fees and expenses . . . out of settlement funds at the time such funds are disbursed," TAM Ans. at 36 ¶ (ii)(v) (emphasis added); *see also* Phoenix Ans. at 33 ¶ (c), will be dismissed.

### C.   Damages Claims

The TAM Parties and the Issuers move to dismiss the Trustee's Third, Fourth, and Fifth Claims, which seek damages against them. TAM Pty. Mem. at 16; Issuer Mem. at 8.

1.      **The Damages Claims Against the Issuers**

The Trustee alleges that the Issuers have breached the Indentures and engaged in conversion by directing or permitting the Recoveries to be distributed directly to Phoenix without being reported to or deposited with the Trustee as required under the Granting Clause. TAC ¶¶ 101, 117. In addition, with respect to Triaxx 2007-1, which has "entered into an event of default," the TAC alleges that the Issuers have breached the UCC by failing to deliver all Collateral to the Trustee. *Id*. ¶¶ 110-11. On all of these claims, the Trustee seeks money damages from the Issuers. *Id*. ¶¶ 107, 114, 120.

The Issuers argue that all three damages claims against them should be dismissed pursuant to § 2.6 of the Indentures, which states:

> Notwithstanding any other provision to the contrary, the obligations of the Co-Issuers under the Senior Notes and this Indenture are limited-recourse obligations of the Co-Issuers payable solely from the Collateral in accordance with the Priority of Payments . . . . It is understood that the foregoing provisions of this Section 2.6(i) shall not (i) prevent recourse to the Collateral for the sums due or to become due under any security, instrument or agreement which is part of the Collateral or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Senior Notes or secured by this Indenture until such Collateral has been realized, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing provisions of this Section 2.6(i) shall not limit the right of any Person to name the Issuer or the Co-Issuer as a party defendant in any action or suit or in the exercise of any other remedy under the Senior Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity.

Indentures § 2.6(i). Section 2.6 exists, in part, because the Issuers are "special purpose vehicles acting in a pass-through capacity," with no assets other than the Collateral (which, in any event, they granted to the Trustee). Issuer Mem. at 4; *see also* PIMCO Ans. ¶ 141 (Issuers are "shell companies" that "exist for the limited purpose of issuing CDO Notes"). Here, the Issuers contend that the plain language of § 2.6 bars all claims "seeking personal liability" against them, including the three damages claims pleaded by the Trustee. Issuer Mem. at 8.

In response, the Trustee argues that § 2.6 "is inapplicable because the damages the Trustee's claims seek is the very Collateral held outside the CDO Accounts that the Issuers have improperly disbursed." Trustee Opp. Mem. (Dkt. No. 244) at 32. However, the Trustee points to no authority, from any jurisdiction, that has permitted a damages claim against an issuer in the face of a similar no-recourse clause. Moreover, in these claims the Trustee does not in fact seek "the Collateral," which (with the exception of a relatively small sum in an attorney trust account) the Issuers do not have. Rather, the Trustee seeks money damages to compensate for the Issuers' alleged misconduct in directing or permitting the Recoveries to be disbursed to Phoenix. *See Id.* at 33 (Trustee seeks "[d]amages for the . . . ***Recoveries that have already been distributed*** to Phoenix and other third parties") (emphasis in the original). A damages judgement seeks "personal liability" and is therefore barred by § 2.6

Subsection (i) is similarly of no help to the Trustee, as it permits "recourse to the Collateral" for certain sums due – not for damages claims against the Issuers. Consequently, the Issuers' motion is granted insofar as it seeks the dismissal of the Trustee's Third, Fourth, and Fifth Claims against the Issuers.

## 2.    The TAC Adequately Alleges a Breach of Contract Claim Against TAM

With respect to the Trustee's Second Claim, for breach of contract, the TAM Parties argue that it fails to state a claim because it "identifies no contractual provision that has been breached by [TAM] and alleges no damages to any of the Senior Noteholders on whose behalf it purports to sue." TAM Pty. Mem. at 16-17. The Court disagrees.

Under New York law, "a party seeking to recover for a breach of contract must establish: '(1) the existence of a contract; (2) performance of the contract by one party; (3) breach [of the contract] by the other party; and (4) damages suffered as a result of the breach.'" *Citigroup*

*Mortg. Loan Tr. 2007-AMC3 ex rel. U.S. Bank, Nat. Ass'n v. Citigroup Glob. Markets Realty Corp.*, 2014 WL 1329165, at \*3 (S.D.N.Y. Mar. 31, 2014) (quoting *Beautiful Jewellers Private Ltd. v. Tiffany & Co.,* 438 F. App'x 20, 21-22 (2d Cir.2011)). "A party advancing a breach of contract claim need not satisfy the particularity requirement of Rule 9(b)." *Murray Eng'g P.C. v. Remke*, 2018 WL 3773991, at \*6 (S.D.N.Y. Aug. 9, 2018) (quoting *Bayerische Landesbank, N.Y. Branch*, 692 F.3d at 64). Rather, "relatively simple allegations will suffice to plead a breach of contract claim even post-*Twombly* and *Iqbal.*" *Id.* (quoting *OneWest Bank N.A.* v. *Lehman Bros. Holding Inc.*, 2015 WL 1808947, at \*4 (S.D.N.Y. Apr. 20, 2015)); *see also Pangaea (H.K.) Ltd. v. Dynamax Imaging, LLC*, 2016 WL 9582835, at \*3 (W.D.N.Y. June 22, 2016) ("A sufficient pleading for breach of contract must, at a minimum, allege the terms of the contract, each element of the alleged breach and the resultant damages in a plain and simple fashion.").

Here, the relevant contracts are the Indentures, which run between the Issuers and the Trustee for the benefit of the Noteholders, and the CMAs, which run between the Issuers and the Collateral Manager. Although the Collateral Manager is not a signatory to the Indentures, the CMAs generally require it to comply with those Indentures. *See*, *e.g.*, CMA § 2(a) (Collateral Manager must "perform its duties herein in accordance with the terms and conditions of the Operative Documents," including the Indentures, and must "comply in all material respects with all of the terms and conditions of the Indenture affecting the duties and functions that have been delegated to it thereunder and hereunder:"); § 7(e) ("Collateral Manager shall use commercially reasonable efforts to ensure that no action is taken by it . . . which would . . . result in the Issuer violating the terms of the Indenture in any material respect"); § 9 (Collateral Manager "shall perform its duties hereunder in accordance with the terms of this Agreement and the terms of the Indenture applicable to it"). In § 9 of the CMAs, moreover, the Collateral Manager specifically

"agrees and consents to Section 15.4 of the Indenture," under which "(a) the Collateral Manager shall . . . agree to perform any provisions of this Indenture expressly applicable to the Collateral Manager." Also in § 9 of the CMAs, the Collateral Manager agrees that its duties "shall be enforceable by . . . the Trustee, on behalf of the Senior Noteholders." The Trustee is therefore empowered to bring a breach of contract claim against the Collateral Manager if the Collateral Manager violates a provision of the Indentures that is applicable to it, or engages in conduct that causes the Issuer to violate the terms of the Indentures.

Here, the Trustee plausibly alleges that by disbursing Recoveries directly to Phoenix, without notice to the Trustee and without depositing those funds into the applicable Account to be distributed in accordance with the Indentures, the Collateral Manager has caused the Issuer to violate the Granting Clause of the Indentures (thereby violating § 7(e) of the CMAs) and has itself violated § 3.3(b) of the Indentures, which applies specifically to it and requires, among other things, that:

> Each time that the . . . Collateral Manager, on behalf of the Issuer, shall direct or cause the acquisition of any Collateral Debt Security, Equity Security, or Eligible Investment [including Cash], the Collateral Manager (on behalf of the Issuer) shall . . . cause the transfer of such Collateral Debt Security, Equity Security, or Eligible Investment to the Custodian to be held in and credited to the Custodial Account for the benefit of the Trustee in accordance with the terms of this Indenture.

*See* TAC ¶¶ 26, 28, 82, 83, 90. The Trustee has also alleged that the Collateral Manager's conduct violated, or caused the Issuer to breach, Ind. § 7.8(a)(ii) (prohibiting the Issuer from disposing of "any part of the Collateral" except in accordance with the Indenture), § 7.8(b) (similar), and § 10.1(a) (permitting Trustee to demand, receive, and collect all "Cash and other property payable to or receivable by the Trustee"). TAC ¶¶ 83, 84.

Additionally, the Trustee seeks to sue TAM directly on the CMA, alleging, for example, that it violated § 2(a) (requiring the Collateral Manager to "exercise reasonable care, using a

degree of skill and attention no less than that which the Collateral Manager exercises with respect to comparable assets") and § 10(a) (which states that the Collateral Manager is *not* liable to the Trustee or the Noteholders *unless* it engages in acts or omissions constituting bad faith, willful misconduct, or gross negligence in the performance of its obligations under the CMA or the Indenture). TAC ¶ 91.

To be sure, the Trustee has likely overpled its contract claim, portions of which may not survive closer analysis on summary judgment or otherwise. At this preliminary stage of the case, however, and on the face of the TAC, I cannot say that the Trustee has failed adequately to notify the Collateral Manager of the claims against it, as required by Fed. R. Civ. P. 8(a), nor that the Trustee has failed to allege facts which, if proven, would constitute a breach of contract.

### 3. Conversion Claim against TAM

Under New York law, conversion "is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006) (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.*, 87 N.Y.2d 36, 44 (1995)). To withstand a motion to dismiss a conversion claim, a plaintiff must allege that "(1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another, (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused." *Patriarch Partners Agency Servs., LLC v. Zohar CDO 2003-I, Ltd.*, 2017 WL 1535385, at *6 (S.D.N.Y. Apr. 20, 2017) (quoting *Polanco v. NCO Portfolio Mgmt., Inc.*, 23 F. Supp. 3d 363, 370 (S.D.N.Y. 2014)).

The Collateral Manager argues that the Trustee's Fifth Claim, for conversion, must fail against it because it "is authorized to take various actions – many of them amounting to the exercise of dominion and control – with respect to the funds the Trustee alleges were converted,"

that is, the portion of the Recoveries paid to Phoenix outside of the Waterfall. TAM Pty. Mem. at 21. Thus, in order to sustain a claim for conversion, TAM contends that the Trustee must allege "specific actions" taken by TAM with regard to the allegedly converted funds "that are outside the scope of its contractual authority." *Id.* at 21-22. The Trustee, of course, alleges – and the Court agrees – that the Collateral Manager was not contractually authorized to pay Phoenix's fees directly from the Recoveries, outside of the Waterfall.

Nonetheless, the Trustee's conversion claim will be dismissed. "Where an independent tort duty is present, a plaintiff may maintain both tort and contract claims arising out of the same allegedly wrongful conduct." *Bayerische Landesbank, New York Branch*, 692 F.3d at 58. If, however, the basis of a party's claim is a breach of solely contractual obligations, such that the plaintiff is merely seeking to obtain the benefit of the contractual bargain through an action in tort, the claim is precluded as duplicative. *Id.* (citing *New York Univ. v. Continental Ins. Co.,* 87 N.Y.2d 308, 316 (1995)). Here, the Trustee's breach of contract claim against TAM stems from the same set of obligations as the conversion claim. TAC ¶¶ 116-17. The TAC alleges no independent duty with regard to the Recoveries that the Collateral Manager has violated, outside of its contractual obligations under the Indentures and the CMAs. The conversion claim is therefore duplicative of the Trustee's contract claim.

### 4.      Unjust Enrichment and Money Had and Received Claims Against Phoenix

The Trustee's Sixth and Seventh Claims, for unjust enrichment and money had and received, are asserted only against Phoenix, which argues that the claims should be dismissed because the Trustee has not alleged a sufficient relationship – contractual or otherwise – with Phoenix. TAM Pty. Mem. at 22-23.

The "essence" of these two claims "is that one party has received money or a benefit at the expense of another." *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 479 (S.D.N.Y. 2014) (quoting *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir. 2000)). To state a claim for unjust enrichment, the plaintiff must allege that "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Georgia Malone & Co. v. Rieder,* 19 N.Y.3d 511, 516 (2012) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011)). "Although privity is not required for an unjust enrichment claim, [such] a claim will not be supported if the connection between the parties is too attenuated." *Mandarin Trading Ltd.*, 16 N.Y.3d at 182.

Similarly, a claim for money had and received requires that: "(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." *Cohen v. BMW Investments L.P.*, 144 F. Supp. 3d 492, 501 (S.D.N.Y. 2015), *aff'd*, 668 F. App'x 373 (2d Cir. 2016) (quoting *Middle E. Banking Co. v. State St. Bank Int'l,* 821 F.2d 897, 906 (2d Cir.1987)). Like unjust enrichment, a claim for money had and received is a quasi-contract claim. *Id.* It allows a plaintiff "to recover money which has come into the hands of the defendant impressed with a species of trust because under the circumstances it is against good conscience for the defendant to keep the money." *Cohen v. Dunne*, 2017 WL 4516820, at *5 (S.D.N.Y. Sept. 27, 2017) (quoting *BMW Investments L.P.*, 144 F. Supp. 3d at 501).

The Trustee contends that it "has not only sufficiently alleged a relationship with Phoenix vis-à-vis the Issuers' granting of all its rights and title to all Collateral to the Trustee, but has also sufficiently alleged a relationship with Phoenix vis-à-vis the Trustee's relationship with the

Collateral Manager, an affiliate of Phoenix." Trustee Opp. Mem. at 31. I agree, at least as to the first point. The money that came into the hands of Phoenix was Collateral, as that term is used in the Indentures, and therefore should have been delivered to the Trustee for deposit into the CDOs' Accounts for the benefit of the Noteholders. TAC ¶¶ 123-25. Consequently, the Trustee – which has no direct contractual relationship with Phoenix – has adequately pleaded claims for unjust enrichment and money had and received against it.

## VI.    CONCLUSION

For the reasons stated above, the Rule 12(c) motions brought by the Collateral Manager and Phoenix (Dkt. No. 227), the Trustee (Dkt. No. 230), and the Issuers (Dkt. No. 232) are GRANTED IN PART and DENIED IN PART, while the Rule 12(c) motion brought by PIMCO (Dkt. No. 234) is DENIED. It is hereby ORDERED that:

1.    The Trustee's First Claim, for interpleader relief, is DISMISSED insofar as it seeks relief concerning the Interpleader Judgment Fees.

2.    The Trustee's Second Claim, for a declaratory judgment, is DISMISSED insofar as it seeks a declaration concerning the Interpleader Judgment Fees.

3.    PIMCO's Third Affirmative Claim to the *Res*, concerning the Interpleader Judgment Fees, is DISMISSED.

4.    The Court DECLARES that the Recoveries are Collateral, as that term is used in the Indentures, and therefore must be disclosed and turned over to the Trustee for deposit into the appropriate Accounts(s) established by the Trustee under the Indentures. Neither the Issuers nor the Collateral Manager may pay Phoenix's fees directly from the Recoveries, outside of the Waterfall.

5.     The Collateral Manager's Counterclaim is DISMISSED insofar as it seeks a declaration that Phoenix "is entitled to be paid its fees and expenses . . . out of settlement funds at the time such funds are disbursed."

6.      Phoenix's Counterclaim is DISMISSED insofar as it seeks a declaration that "its incentive fees and expenses must be paid from settlement proceeds before such proceeds are subject to the payment waterfall set forth in the Indentures."

7.     The Trustee's Third, Fourth, and Fifth Claims, for breach of contract, violation of the UCC, and conversion, are DISMISSED as against the Issuers.

8.     The Trustee's Fifth Claim, for conversion, is also DISMISSED as against the Collateral Manager.

All relief not expressly granted herein is DENIED.

Dated: New York, New York
          March 31, 2021                          **SO ORDERED.**

**BARBARA MOSES**
**UNITED STATES MAGISTRATE JUDGE**