UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK
------------------------------:

U.S. BANK NATIONAL                :

ASSOCIATION,                      : Case No.: 18-cv-4044

                    Plaintiff ,:

       v.                         :

TRIAXX ASSET MANAGEMENT LLC., : New York, New York

et al.,                           :

                    Defendants.: February 7, 2023

------------------------------:



            TRANSCRIPT OF STATUS CONFERENCE HEARING

           BEFORE THE HONORABLE BARBARA C. MOSES

                UNITED STATES MAGISTRATE JUDGE




APPEARANCES:

For Plaintiff:     ALSTON & BIRD, LLP
U.S. Bank          BY:  Alexander S. Lorenzo, Esq.
National Assoc.         Carla Doe, Esq.
                        Elizabeth A. Buckel, Esq.
                   90 Park Avenue
                   New York, New York 10016

For Defendant:     FRIEDMAN KAPLAN SEILER
Triaxx             ADELMAN & ROBBINS LLP
                   BY:  Anne E. Beaumont, Esq.
                   7 Times Square
                   New York, New York 10036

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.


     AMM TRANSCRIPTION SERVICE - 631.334.1445

```
1                        APPEARANCES CONTINUED

2

3    For Defendant:      I/O CAPITAL, LLC
     TAM Parties         BY:  Matthew R. Maron, Esq.
4                        1 World Trade Center
                         New York, New York 10007
5

6    For Defendant:      WOLLMUTH MAHER & DEUTSCH LLP
     Triaxx Prime CDO    BY:  Randall R. Rainer, Esq.
7    2006-1, Ltd.        500 Fifth Avenue
                         New York, New York 10110
8

9    For Defendant:      NORTON ROSE FULBRIGHT US LLP
     PIMCO               BY:  Sandeep Savla, Esq.
10                            Anthony Lauriello, Esq.
                              Brandt Vernon, Esq.
11                       1301 Avenue of the Americas
                         New York, New York 10019
12

13   For Defendant:      DAVIS POLK & WARDWELL LLP
     Citigroup           BY:  Elliot Moskowitz, Esq.
14                            Adam Greene, Esq.
                         450 Lexington Avenue
15                       New York, New York 10017

16

17

18

19

20

21

22

23

24

25
```

PROCEEDINGS

1              THE DEPUTY CLERK:  The Court now calls

2     the matter of U.S. Bank National Association v.

3     Triaxx Asset Management, LLC et al.; Case Number:

4     18-CV-4044.

5              Counsel, please state your appearance and

6     spell your last name for the record, starting with

7     the plaintiff.

8              MR. LORENZO:  Good afternoon, Your Honor.

9     Alex Lorenzo from Alston & Bird -- and that's

10    L-O-R-E-N-Z-O -- for U.S. Bank National Association.

11    And I'm joined by two of my colleagues, who -- I

12    will let them introduce themselves.

13             MS. DOE:  Hi.  This is Carla Doe, also on

14    behalf of Alston & Bird -- on behalf of U.S. Bank.

15             THE COURT:  And spell your last name,

16    please, Ms. Doe.

17             MS. DOE:  Yes, D-O-E.

18             THE COURT:  As in Jane Doe.  You must

19    hear that three times a day.  I apologize.

20             MS. DOE:  No problem.

21             MS. BUCKEL:  And good afternoon, Your

22    Honor.  Elizabeth Buckel, also with Alston & Bird

23    for U.S. Bank as trustee.  My last name is spelled

24    B-U-C-K-E-L.

25             THE COURT:  All right.  Mr. Lorenzo,

PROCEEDINGS

1   Ms. Doe, Ms. Buckel for U.S. Bank.

2          Let's go to Triaxx, the Triaxx parties.

3   We have Friedman Kaplan, and we also have in-house

4   counsel, correct?

5          MS. BEAUMONT:  Yes, Your Honor.  This is

6   Anne Beaumont; Friedman Kaplan Seiler Adelman &

7   Robbins for Triaxx Asset Management and Phoenix Real

8   Estate Solutions.  My last name is spelled B, as in

9   boy, E-A-U-M-O-N-T.

10          THE COURT:  Thank you.

11          MR. MARON:  And, Your Honor, this is

12   Matthew Maron, M-A-R-O-N, and I'm an in-house

13   counsel for the TAM parties.

14          THE COURT:  Right.  And I saw your notice

15   of appearance, so welcome to the case.

16          MR. MARON:  Thank you.

17          THE COURT:  Let's go to the CDOs now.

18          MR. RAINER:  Good afternoon, Your Honor.

19   This is Randall Rainer from Wollmuth Maher & Deutsch

20   on behalf of each of the three issuers.  And my last

21   name is spelled R-A-I-N-E-R.

22          THE COURT:  Mr. Rainer.

23          Let's see.  PIMCO?

24          MR. SAVLA:  Good afternoon, Your Honor.

25          Sandeep Savla of Norton Rose Fulbright

PROCEEDINGS

1    for PIMCO.  I'm joined by, I believe, two of my

2    colleagues.  I'll let them introduce themselves.

3    One of them has not entered an appearance and is

4    simply observing.

5              THE COURT:  Okay.  And you are S-A-V-L-A,

6    Savla, correct?

7              MR. SAVLA:  Yes.  S-A-V-L-A.

8              MR. LAURIELLO:  Hello.  This is Anthony

9    Lauriello, also of Norton Rose Fulbright,

10   representing PIMCO.  My last name is spelled

11   L-A-U-R-I-E-L-L-O.  Thank you.

12             THE COURT:  And does your observer wish

13   to be introduced?

14             MR. SAVLA:  I think he may be having tech

15   issues, but to the extent he joins, his name is

16   Brandt Vernon.  Last name spelled V-E-R-N-O-N.

17             THE COURT:  All right.  Mr. Lauriello,

18   Savla, Vernon, welcome.

19             And last, but certainly not least,

20   Citigroup.

21             MR. MOSKOWITZ:  Thank you, Your Honor.

22   Good afternoon.  Elliot Moskowitz of Davis Polk,

23   representing Citigroup.  My last name is spelled M,

24   as in Mary, O S, as in Sam, K-O-W-I-T-Z.  I am

25   joined by my colleague, Adam Greene, and he can

PROCEEDINGS

1   introduce himself and spell his name accordingly.

2             THE COURT:  Okay.

3             MR. GREENE:  Good afternoon, Your Honor.

4   Adam Greene of Davis Polk on behalf of Citigroup.

5   And that is G-R-E-E-N-E.

6             THE COURT:  All right, Mr. Moskowitz,

7   Mr. Greene.  All right.  I think that's everybody.

8             Let me tell you what I have in addition

9   to the notice of appearance by Mr. Maron.  I have a

10   letter dated January 30th, signed by Mr. Maron,

11   which I construe as asking for three things.  Number

12   one, an undefined delay in the pretrial deadlines

13   and trial date for this case.  Number two, a

14   substitution of counsel, maybe, although no actual

15   request for leave for present outside counsel to

16   withdraw has been submitted.  And a request in the

17   nature of, I think, preliminary injunction that I

18   direct the release or advancement of funds to pay

19   either current counsel, current outside counsel,

20   which would be Friedman Kaplan, or unspecified new

21   incoming counsel who has not yet been identified.

22             That's how I read the letter.  I'll

23   circle back to that letter in a moment.  I have also

24   received responding letters.  Well, I would say,

25   first, a follow-up letter from Ms. Beaumont at

PROCEEDINGS

1   Friedman Kaplan, which seems to kind of hint that

2   maybe the firm wants to withdraw, but it's not

3   actually, as I read it, an application for leave to

4   withdraw.  Certainly not one that complies with

5   Local Civil Rule 1.4.

6            Then I received two letters on

7   February 1, one from PIMCO saying that I should not

8   permit current outside counsel to withdraw or

9   advance any fees or delay the trial, and one from

10  the trustee, U.S. Bank, saying, more or less, the

11  same thing and raising some questions about what the

12  heck is going on with respect to the TAM parties.

13           So who is speaking for the TAM parties

14  today on this call?

15           MR. MARON:  Your Honor, it's Matthew

16  Maron, and as I mentioned, I'm in-house counsel for

17  TAM.  I want to just -- I know you laid out the

18  three things we're asking for, but just, at the end

19  of our letter, we actually set a time deadline.

20  We're asking for 60 days.  We wouldn't put something

21  before you that was undefined.  That wouldn't be

22  right.  So, I mean, that's just the one thing.  But,

23  otherwise, the other things that you had mentioned

24  were accurate.

25           THE COURT:  Okay.  So you are correct.  I

PROCEEDINGS

```
1    stand corrected.  You have asked for 60 days on
2    everything.  And by "everything" -- I am taking a
3    look now at my pretrial scheduling order, which I
4    issued on September the 19th of last year.  At
5    present, the joint pretrial order is due on
6    February 22nd.  That's about two weeks away.  And
7    then there are a series of deadlines leading up to
8    the start of trial on April the 17th, two months and
9    a little bit away.
10             So, Mr. Maron, I have to say, I am
11   surprised and curious at getting this application at
12   this time.  When I set the trial schedule, when I
13   set the trial date, I did it mostly in the
14   courtroom.  And I took a poll, if I recall -- not a
15   formal poll -- but I asked all of the lawyers
16   present, including counsel for the TAM parties, what
17   trial date do you want?  Everybody agreed that April
18   would be great, thank you very much, Your Honor.  So
19   I issued an order saying, fine, we're going to have
20   a trial in April.
21             That was four months ago.  And if, as you
22   now say, this has been a problem that has been
23   building for literally years and years and years --
24   after all, Triaxx Asset Management hasn't been paid
25   since, I believe, 2018, and Friedman Kaplan
```

PROCEEDINGS

1    complained about that from time to time in the

2    courtroom, so this is not a new problem, why am I

3    hearing about it two months before trial?

4            MR. MARON:  Well, Your Honor, there's

5    been a couple things that obviously happened since

6    that I wanted to share, since you set the trial date

7    for April, which we were keenly aware of.  You know,

8    we attempted to try to mediate the matter in

9    December.  We were -- for settlement.  We were

10   unsuccessful in doing that.

11           We were informed by Friedman Kaplan less

12   than two weeks ago, on January 24th, that they would

13   be seeking leave to withdraw.  The moment we found

14   that out, we immediately began the efforts to try to

15   find new trial counsel.  And I'm sure you can

16   understand getting to find somebody to get ready for

17   trial in a matter like this that's going to happen

18   in under three months, it takes almost a Herculean

19   effort to be able to do something like that.  So,

20   henceforth, why we decided to put this application

21   before you to seek the extension time that we

22   sought, as well as the issue concerning payment of

23   funds.

24           As I mentioned in the letter that there

25   have been -- you know, we've done every effort for

PROCEEDINGS

1  non -- certain non-parties to pay Friedman Kaplan to

2  keep them going.  Obviously, they're a law firm,

3  they need to be paid -- you know, they need to be

4  paid for going to work.  They're not going to do it

5  for free.  But, now, we're in a situation where, you

6  know, our hands are tied.  We -- you know, they've

7  indicated they don't want to stay in this case going

8  forward, and we need to find some way to be able to

9  get someone to defend us.

10           We're the defendants in this case.  We

11  need to have counsel, you know, have -- and have

12  able counsel to help us at trial.  And the requests

13  we seek we think are reasonable.  We want the time

14  to be able to secure and lock down trial counsel.

15  But in addition, we wanted to be able to make the

16  attempt to be able to unlock only a portion of what

17  is around $16 million in the retained funds in

18  escrow to be able to pay Friedman Kaplan, to give

19  them something, and to put money towards a new trial

20  counsel.

21           I think, given that, and I understand the

22  history, and you are, you know, well aware of the

23  history of this dispute, it's been going on for

24  almost five years, that we thought this was a

25  request that was reasonable to put before you at

AMM TRANSCRIPTION SERVICE - 631.334.1445

PROCEEDINGS

1   this time.

2             THE COURT:  Ms. Beaumont?

3             MS. BEAUMONT:  Your Honor, it's --

4             THE COURT:  No, no.  I have a question

5   for you, Ms. Beaumont.

6             MS. BEAUMONT:  Yes.

7             THE COURT:  You've been with us

8   representing the TAM parties in this matter since

9   2018.  You were representing the TAM parties in 2019

10  when you weren't getting paid, in 2020 when you

11  weren't getting paid, or if you were getting paid,

12  you were being paid partially by these mysterious

13  non-parties.  But whatever.  That was your situation

14  in 2019, 2020, 2021, 2022.

15            Please explain to me how a firm,

16  particularly a firm of your stature, talent and

17  reputation, could tell your client two and a half

18  months before trial that you're bailing when this

19  situation hasn't changed for years?

20            MS. BEAUMONT:  Well, it may help if I try

21  to explain, kind of, the sequence of events that has

22  led us here.

23            Prior to the case being assigned to Your

24  Honor for all purposes, our firm originally only

25  represented Phoenix.  At some point in late 2018, it

PROCEEDINGS

1  was claimed that the Arnold & Porter firm, which was

2  then representing Triaxx Asset Management, may have

3  had a conflict with respect to Goldman Sachs, which

4  the Court will recall was at one point a party to

5  the case.  And in light of that, and in order to

6  reduce the overall spend associated with the case,

7  our firm was engaged to represent both Phoenix Real

8  Estate Solutions and Triaxx Asset Management --

9          THE COURT:  Which you have done

10  (inaudible) ever since.

11          MS. BEAUMONT:  Thank you very much,

12  Your Honor.  I don't take that lightly.

13          As -- and we were very clear that we were

14  not, by any stretch, doing this on a contingency

15  basis, and we were assured that we would be paid.

16  And for some short period of time, we were.  We were

17  assured multiple times over the years that

18  eventually we would be paid what we are owed.  We

19  made various accommodations to the client in light

20  of the overall relationship that we do have, and we

21  assured and we believed our client when they told us

22  that we would be paid.

23          As of the end of January --

24          THE COURT:  Let me just interrupt you

25  there.  Where did you think you would be paid from

PROCEEDINGS

1    since the CDO funds were frozen?

2         MS. BEAUMONT:  I guess that is something

3    I -- I'm not sure I feel comfortable discussing that

4    with all the parties on the phone.  I -- perhaps

5    Mr. Maron wants to weigh in on that.  That's not the

6    sort of thing that is -- ordinarily we would get

7    into it in this group.

8         THE COURT:  If you make a motion for

9    leave to withdraw, under Local Civil Rule 1.4,

10   you're going to have to discuss that.  But why don't

11   you continue with your --

12        MS. BEAUMONT:  Okay.

13        THE COURT:  -- response.

14        MS. BEAUMONT:  So as of this time, our

15   firm is owed over $2 million.  And our firm is a

16   small firm.  We don't have hundreds of lawyers like

17   each of the other firms on the phone here, other

18   than Mr. Rainer's firm.  And that enormous

19   outstanding balance has already caused enormous

20   financial hardship to our firm.

21        There was a mediation before Judge

22   Holwell in December, and there was some hope that

23   that mediation would obviate the need for us to seek

24   to withdraw.  The case, obviously, was not resolved

25   at that mediation.  And in the weeks after that

AMM TRANSCRIPTION SERVICE - 631.334.1445

PROCEEDINGS

1    mediation, it really became clear for the first time

2    that our firm was not going to be paid.

3                THE COURT:  Was that mediation amongst --

4    was it a global mediation amongst all of the parties

5    here, or was it just that slice of the case?

6                MS. BEAUMONT:  It was the -- it was a

7    global mediation.

8                THE COURT:  All right.  Go ahead.

9                MS. BEAUMONT:  And in light of this new

10   information that we were not, in fact, going to be

11   paid, or, I guess, perhaps more precisely, that our

12   clients, at last, told us that it was not possible

13   to pay us, we advised our clients, specifically Mr.

14   Maron, that we were going to seek leave of this

15   Court to withdraw.  And we sent Mr. Maron copies of

16   the draft withdrawal motion papers.

17               Mr. Maron stated that the clients were

18   seeking replacement counsel and asked that we wait

19   to move to withdraw in the hope that we could be

20   replaced with substitute counsel.  And I told

21   Mr. Maron that we would do so no later than

22   February 1st, on which date, we were going to file

23   the motion.

24               On January 30th, I asked Mr. Maron for an

25   update on the status of the retention of other

AMM TRANSCRIPTION SERVICE - 631.334.1445

PROCEEDINGS

 1    counsel.  And a couple of hours later, Mr. Maron

 2    filed a notice of appearance in the case, followed

 3    by his letter.  And we were not aware of these

 4    filings ahead of time, and we were not involved in

 5    their preparation or filing.

 6                  Recognizing that Mr. Maron's letter

 7    would, in all likelihood, not be viewed as

 8    satisfying Local Rule 1.4, we wanted to make clear

 9    to the Court that we are ready, willing and able to

10    file a motion to withdraw that does satisfy those

11    requirements, and that our firm is asserting a

12    charging lien.  And that is why I filed the

13    January 31st letter.

14                  We remain prepared to file such a motion.

15    We didn't think it was appropriate to do that once

16    Your Honor had scheduled this conference.  But to be

17    sure, this is not a situation that we take lightly,

18    and we don't lightly seek to withdraw from any

19    representation, but we have gone from a situation in

20    which we were assured over and over of being paid to

21    a situation in which we are now told we cannot be

22    paid.  And it is not tenable for our firm and for

23    multiple lawyers in my firm to effectively work for

24    the next several months for free, in addition to all

25    the work we, as it turns out, seem to have done for

PROCEEDINGS

1    free for the past couple of years.  And so --

2              THE COURT:  Do I understand correctly

3    that there have been partial payments from some

4    source?

5              MS. BEAUMONT:  Yes.  Yes.

6              THE COURT:  Okay.  But you're still

7    $2 million short, roughly?

8              MS. BEAUMONT:  That's correct.

9              THE COURT:  Can you divulge to me what

10   percentage of your overall bill that represents?

11             MS. BEAUMONT:  Well, we have been paid, I

12   believe -- I'm sorry.  I don't have the figure right

13   in front of me, but I think we've been paid about

14   $1 million.  Is it $2 million?  $2 million.  So I

15   guess it's about half.

16             THE COURT:  So you've been paid about --

17             MS. BEAUMONT:  We have it divided up

18   between the two clients, so I don't...

19             THE COURT:  And is the payment deficit on

20   behalf of both of your clients or just on behalf of

21   Triaxx Asset Management?  Does Phoenix have funds to

22   pay you?

23             MS. BEAUMONT:  It is on behalf of both

24   clients.

25             THE COURT:  Okay.

PROCEEDINGS

```
 1              MS. BEAUMONT:  Roughly, half and half.
 2              THE COURT:  All right.  So, Mr. Maron, I
 3     think I have a question for you, which is that,
 4     since your current counsel is $2 million in the hole
 5     and you have informed them that they will not be
 6     paid and they're going to assert a charging lien
 7     against you, who are you going to get to take this
 8     case?  How are you going to pay them?
 9              MR. MARON:  Hopefully, someone less
10     expensive.
11              THE COURT:  Well --
12              MR. MARON:  (Audio distortion) --
13     somebody.  We can't handle -- and I, obviously,
14     being the in-house lawyer, can't handle this as
15     trial counsel.  And we're going to have to have --
16     we're going to need a firm, so we're in the -- we're
17     trying to find that right now, and we've been
18     trying.
19              THE COURT:  That's a very -- that's a
20     very real and a very practical question.  You say,
21     "someone less expensive," but nobody, no matter
22     whether they charge $1,000 an hour or $100 an hour,
23     is going to take a case a few months before trial
24     with zero payment, are they?
25              MR. MARON:  I would venture to think that
```

PROCEEDINGS

1    there would be something.  You know, one of the
2    things, as I mentioned at the outset of the call, is
3    that there's money that was earmarked in the
4    retained funds for Friedman Kaplan.  That money is
5    sitting there in escrow, and it's being held up by
6    the trustee.  We would love to be able to free that
7    money up to cover Friedman Kaplan's bills, but we
8    can't at this time, given the current status of
9    where the case sits right now.
10           But in the meantime, we have to find
11   something, you know, and we're -- again, as I said
12   from the outset, we're trying.  And if it's someone
13   who's going to be, you know, less expensive or, you
14   know, half the price per hour rate, you know, so be
15   it.
16           THE COURT:  I'm looking at your
17   January 30th letter in which you said -- and this
18   was a week ago now, that you have "immediately began
19   speaking with new law firms about trial
20   representation," and you were close to securing new
21   counsel.
22           MR. MARON:  Right.
23           THE COURT:  What happened?  You said you
24   would be ready in a --
25           MR. MARON:  The conversation --

PROCEEDINGS

1          THE COURT:  You said you would be ready

2     in a matter of days.

3          MR. MARON:  Right, but those are -- you

4     know, again, I was hoping to get that locked up, you

5     know, by the -- around -- in or around the days

6     after the letter.  But, again, it's taken a couple

7     days also with this application now in the

8     conference before Your Honor.  You know, there's

9     still some moving parts in this.  So I apologize if

10    that hasn't been done with that -- with the -- that

11    expediency.

12          THE COURT:  All right.  So you don't have

13    new counsel, and it doesn't sound like you're

14    particularly close to having new counsel, correct?

15          MR. MARON:  I -- it's not like we're

16    completely far off.  I would think that -- like I

17    said, I would like to -- you know, if it's by the

18    end of, you know, next week, you know, I'd love to

19    be able to get someone set and be able to inform the

20    Court of, you know, the appearance of trial counsel.

21          THE COURT:  Well, we'd all love that, but

22    I'm trying --

23          MR. MARON:  Well, yeah.

24          THE COURT:  -- to sense, Mr. Maron, as to

25    whether you're just blowing smoke here because I

PROCEEDINGS

1  don't see who you're going to get or who would say

2  yes to you, given the bleak picture that you've

3  painted.

4           MR. MARON:  I have to make the -- I have

5  to make -- the application was made, like, I have to

6  be able to do it.  And if there's some other

7  arrangement that can be done from a financial

8  standpoint, you know, I have to at least try.  Like,

9  I -- we can't not defend ourselves.  We -- and

10  that's, you know, something --

11           THE COURT:  No, you can't, but --

12           MR. MARON:  -- especially as a corporate

13  defendant.

14           THE COURT:  I agree with you, that

15  although you are a member of the Bar, I'm guessing

16  here that you're not equipped to try the case by

17  yourself.

18           MR. MARON:  Sadly, no.

19           THE COURT:  I get that.  But there's some

20  other options here.  As everyone on this call is

21  aware, a motion for leave to withdraw is committed

22  to the sound discretion of the trial judge.  And one

23  of the considerations for the trial judge -- in this

24  case, me -- is how close to trial are we and to what

25  extent would that process and the other parties be

PROCEEDINGS

1   prejudiced if I let counsel out?  And if the answer

2   is that this case will never come to trial because

3   Triaxx Asset Management is never going to get it

4   back together to actually find trial counsel to

5   represent it, then the answer is, I shouldn't let

6   current counsel out.

7          Let me tell you what my tentative views

8   are, and then I'm going to give the noteholders and

9   the trustee an opportunity to weigh in.  But my

10  tentative view at this point is that, of course,

11  Friedman Kaplan can make the application should it

12  wish to do so.  I give you no guarantee that it will

13  be granted, given the considerations that I just

14  outlined.

15         The TAM parties are, of course, free to

16  make a motion, which I do view as a motion in the

17  nature of a preliminary injunction motion for the

18  release of funds sufficient to pay its trial

19  counsel.  But given that that motion has already

20  been denied not once, but twice by Judge Marrero

21  when he had this case.  He denied it initially, and

22  then again, as you know, on reconsideration.  I

23  think that was back in -- was that 2018 or 2019?

24         And given that I haven't heard a peep

25  about this issue for the last, approximately, four

PROCEEDINGS

1    years, it seems to me that all of the issues that

2    resulted in Judge Marrero's decision are still going

3    to be a problem for the TAM parties.

4              Plus, now, they'll have the additional

5    issue of not having -- ironically, not having sought

6    the injunctive relief in a timely fashion to prevent

7    the alleged irreparable harm.  So I think that's

8    going to be uphill sledding as well.

9              So that's kind of where I'm coming from

10   on this, but let me hear -- Mr. Savla, do you want

11   to chime in for the noteholders?

12             MR. SAVLA:  Yes, Your Honor.  I'm happy

13   to begin, and Mr. Moskowitz can amplify as needed.

14             As a housekeeping matter, I'll just note

15   that our submission was a joint submission by both

16   PIMCO and Citi.  But moving on to the substance, the

17   first thing is, at least from PIMCO's perspective,

18   having read the motion, the letter motion by

19   Mr. Maron, it's unclear whether there's an inability

20   to pay or a reluctance to pay, because on page 2 of

21   the letter motion it states, "Absent advancement

22   now, one or more parties will be required to come

23   out of pocket even more to pay for replacement

24   counsel."

25             So the assertion seems to be that -- not

PROCEEDINGS

1    so much -- at least in that sentence, not so much

2    that there's an inability to pay, but a lack of

3    willingness to pay.  So that's the first point we'll

4    make.   In terms of Your Honor's sound discretion,

5    one of the considerations is whether the attorney's

6    client is truly unable to fulfill the payment

7    obligations.

8           The second point is that, as

9    Judge Marrero noted in his decision on the

10   reconsideration motion, the then general counsel of

11   Triaxx Asset Management said Triaxx does not have

12   available funds or sources of income sufficient to

13   advance counsel fees pending the outcome of this

14   litigation.  He put that in an affidavit that was

15   filed with the Court.  And Judge Marrero noted that

16   in his decision of January 2019.  It really begs the

17   question as to what sources of funds, if any, have

18   been paid to Friedman Kaplan in the intervening

19   period.  And it also deserves scrutiny now as to

20   these assertions because, clearly, between January

21   2019 through the present, there's been some

22   arrangement with Friedman Kaplan, notwithstanding

23   the assertion in the Calamari (phonetic)

24   declaration.  And this seems to be a repeat of an

25   assertion that was made back in January of 2019.

PROCEEDINGS

 1          The third point is, to echo what the
 2  Court said, it's surprising to PIMCO that this issue
 3  is being raised on the cusp of trial, given that
 4  this seems -- it seems to be a long-running issue.
 5  And the assertion that the tipping point was a
 6  mediation that took place just seems like it's too
 7  little too late.  This has been a long-running
 8  issue, and it can't be that the decision whether to
 9  withdraw or not hinged on a single mediation.  And
10  so we submit that these issues deserve more
11  scrutiny.
12          The other thing is, as Judge Nathan found
13  in her trial dealing with the Triaxx/Phoenix work,
14  these are interrelated parties.  And so when
15  Mr. Maron refers to certain non-parties that have
16  been funding the litigation, I think that opens the
17  door to precisely the identity of these non-parties.
18  Because one of the inquiries that the trial -- that
19  the Court can undertake is whether there's been an
20  inducement to withdraw -- an inducement to withdraw
21  an attorney by non-payment of fees in order to stall
22  the judicial proceedings.
23          And so -- and given that there are these
24  related parties, notably, Mr. Maron, when he entered
25  the notice of appearance, used a 1/0 Capital e-mail

PROCEEDINGS

1   address, he is filing a letter on Triaxx Asset
2   Management's letterhead, but is appearing for
3   Phoenix.  And we see from Judge Nathan's decision
4   that these parties are all interrelated.  They have
5   the same address and the principals work at these
6   same entities.  Both Judge Nathan found and
7   discovery has shown that there's been movement of
8   assets between these entities.  And so I think we
9   would take the position that we're entitled to know
10  how it is -- you know, which non-party has been
11  paying, and why is it that now the non-party has
12  apparently decided to stop paying?
13          The next point is advancement.  There's
14  no provision in the Collateral Management Agreement
15  for advancement and nor has any been cited.  So we
16  would submit that there's no contractual support for
17  an advancement argument.  Even putting aside the
18  fact that Judge Marrero has already ruled on these
19  issues, Your Honor ruled in the context of her
20  decision on the motion for judgment on the
21  pleadings, and we've also cited a New York State
22  Court case to the same effect.  And so I think with
23  that, I'll stop and pause my submissions there.
24          THE COURT:  Thank you, Mr. Savla.  A
25  couple of actual -- actually, a couple of follow-up

PROCEEDINGS

1  questions, not to you, but prompted by what you just

2  said.

3           Mr. Maron, Mr. Savla, I think, did make a

4  fair point, that there seems to be some tension

5  between what you say on page 2 of your January 30th

6  letter, where you write that it would be "unjust and

7  inequitable that those non-parties be required to

8  pay for remaining outstanding fees or soon to be

9  incurred trial fees."

10          That suggests that it is possible to get

11 Friedman Kaplan paid via these non-parties.  And

12 what Ms. Beaumont told me, her firm was told by

13 Triaxx, which is simply, you won't get paid, it's

14 not going to happen.  So perhaps you could --

15 perhaps you could address that point, please.

16          MR. MARON:  I -- it's -- again, it's not

17 questionable and just, like, we just -- we can't.

18 We can't do -- we can't under the current -- we

19 can't do it right now.  And -- you know, and one of

20 the things -- I know Mr. Savla took the position,

21 but we said in our letter that --

22          THE COURT:  So what did you mean in your

23 letter, Mr. Maron, when you said it would be unjust

24 and inequitable to have those non-parties continue

25 to pay?

PROCEEDINGS

1              MR. MARON:  Because if they're
2    non-parties that are trying to, basically, fund and
3    put money into this case on behalf of the defense of
4    these parties who are, you know, not necessarily
5    obligated to do so -- they're doing it to prevent,
6    you know, obviously, default from happening -- it
7    can't continue the way it is because they would
8    be -- they're forced to come out of pocket on
9    something that they're not necessarily -- that
10   they're not necessarily required -- they're doing it
11   because, obviously, they want to prevent default
12   from happening or anything of that sort.
13              So, at this point, you know, we're trying
14   to basically use this as a way to open up the
15   opportunity -- and I know you mentioned about the
16   prior applications before Judge Marrero -- to get,
17   you know, this small portion of what's in the
18   retained funds to be able to use it to pay
19   Friedman Kaplan, and to potentially get to new trial
20   counsel, which is what the whole main point of what
21   we're asking for, the -- which is, I think, the
22   whole point of our letter application.
23              THE COURT:  Yeah, I -- I'm not sure
24   you've completely answered my question.  It may be
25   that this will have to be elucidated under oath in a

PROCEEDINGS

 1   Rule 1.4 application, where I would require more

 2   granular detail.  For future reference, I do

 3   ordinarily require -- permit, I should say.  I do

 4   ordinarily permit, at least in the first instance,

 5   that sensitive portions of affidavits or

 6   declarations supporting motions for leave to be --

 7   motions for leave to withdraw be filed under seal.

 8   But that motion as well, the sealing motion, you

 9   know, has to be considered by me under the strict

10   standards of the <u>Lugosch</u> decision, so I can't -- I

11   can't guarantee you that whatever your financial

12   arrangements are will not be revealed to the other

13   parties here.

14          But speaking of financial arrangements

15   and other parties, as Mr. Savla was speaking, I

16   remembered, or I thought I remembered that the

17   issuers in this case have made some sort of

18   arrangement, have they not, to have their legal fees

19   advanced?  Who can speak to that?

20          MR. RAINER:  This is Mr. Rainer.  I can

21   on behalf of the issuers.

22          We reached a stipulation with the other

23   parties, principally with the noteholders, who had

24   objected to the resumption of our fees on a

25   going-forward basis in the case.  So it was

PROCEEDINGS

 1    simply -- and so that's coming out of the monthly

 2    available cash flows of the underlying transactions.

 3              THE COURT:  So you are getting paid?

 4              MR. RAINER:  Well, the objection --

 5    they've stood down on the objection.  We are subject

 6    to cash flows, and there was a long gap of

 7    payment -- of non-payment that we're actually in the

 8    process of exploring.  But for the most part, we are

 9    being paid, and the prior objection to our payment

10    has been held in abeyance.

11              THE COURT:  Okay.  And has -- have the

12    TAM parties attempted to negotiate something with

13    the trustees and the trustee and/or the noteholders?

14              MR. MARON:  The whole -- sorry.  Go

15    ahead.

16              MS. BEAUMONT:  Your Honor, we have not,

17    but I -- we viewed that as a futile exercise.

18              THE COURT:  Because you think Mr. Savla

19    and his clients are going to say no, no, and forget

20    about it?

21              MS. BEAUMONT:  I'm confident they would.

22              THE COURT:  Okay.

23              MR. LORENZO:  Your Honor -- oh, go ahead.

24              THE COURT:  Go ahead.

25              MR. LORENZO:  This is Alex Lorenzo from

PROCEEDINGS

1    Alston & Bird.  Mr. --

2                    THE COURT:  I had not forgotten you.  I

3    was going to give you a chance to speak.

4                    MR. LORENZO:  Well, no -- and I don't

5    mean to jump in.  I just wanted to highlight

6    something that Mr. Rainer, I think, alluded to,

7    which is one of the issues -- and this is in the

8    note valuation report, so everybody's aware of it.

9    But by virtue of a number of circumstances,

10   primarily the fact that a bunch of the collateral

11   was three year defaulted -- and there's a whole

12   series of litigation about whether the collateral

13   manager had to sell that collateral or had the

14   option not to, and two courts ruled that it had to

15   be sold.

16                   The deals, and especially two of the

17   deals, don't have significant assets at this point.

18   And so what Mr. Rainer was alluding to is that there

19   is not a tremendous amount of cash flow coming in

20   such that there really isn't sufficient funds on a,

21   sort of, month-to-month basis.  Certainly, some

22   months, there's a little bit more, but these are

23   not, sort of, going strong deals, at least 061 and

24   071.  And so that is just -- it's another

25   consideration as we're talking about, sort of,

PROCEEDINGS

1   potential solutions.

2           THE COURT:  All right.  But on the other

3   hand, the TAM parties have been required to be far

4   more active in this litigation than the issuers

5   have, so I'm sure there's also a difference in the

6   size of the bills.

7           MR. RAINER:  This is Mr. Rainer.  I will

8   say, Your Honor, there is in a relative basis, but

9   as it stands, we're still owed a half a million

10  dollars.

11          THE COURT:  I'm sorry to hear that, but

12  that was a little bit of a side excursion because

13  you don't have -- you don't have a letter motion

14  before me today.

15          MR. RAINER:  I do not.

16          THE COURT:  All right.  Mr. Lorenzo --

17          MR. RAINER:  Your Honor --

18          THE COURT:  -- what else do you want me

19  to know?

20          MR. LORENZO:  So I think Mr. Savla has

21  covered most of the points.  As Your Honor alluded

22  to, I mean, the TAM party's letter motion just

23  raises a host of questions.

24          I will say this, sort of, one other, just

25  practical point that has come up in the discussions,

PROCEEDINGS

1    that the retained funds are all earmarked.  So that

2    it's not a situation where there is, sort of, an

3    undifferentiated amount of money that has been

4    retained pursuant to the --

5              THE COURT:  No.  If the TAM parties

6    prevail at trial, they get a lot of money, right?

7              MR. LORENZO:  They get a lot of money,

8    but, specifically, they have directed, basically,

9    how every dollar should be allocated pursuant to the

10   process for the note valuation reports each month so

11   that there isn't -- there's, sort of, practical

12   questions about -- there isn't, sort of, unallocated

13   funds that could be used for advancement of legal

14   fees.

15             THE COURT:  Well, aren't some of the

16   earmarked funds -- don't some of the earmarked funds

17   represent unpaid legal fees?  I thought that was one

18   of the things you were withholding for.

19             MR. LORENZO:  That is correct, Your

20   Honor, but that would be -- well -- and this is one

21   of the questions we have, to the extent that TAM --

22   the Friedman Kaplan firm has been paid amounts, if

23   amounts were released from the retained funds, would

24   that make them whole, or would there then be a

25   refund to the unnamed third parties?  Sort of, what

PROCEEDINGS

1   exactly is going on and what is requested?

2                    THE COURT:  So that's an interesting

3   question as well.  Are these payments by the unnamed

4   non-parties -- have they been previously reported to

5   the trustee, or has that been not a process you've

6   had visibility into?

7                    MR. LORENZO:  We have not had visibility

8   into that, Your Honor.

9                    THE COURT:  All right.  So let me ask the

10  TAM parties then.  I don't know if this is a

11  question for Mr. Maron or Ms. Beaumont.  Either one

12  of you can take it.

13                   The amounts that you have -- the TAM

14  parties have requested for legal fees from the

15  trustee that the trustee has withheld and reserved,

16  are those gross numbers or net numbers?  Is that a

17  clear enough question?

18                   MS. BEAUMONT:  I believe Mr. Maron is in

19  the best position to speak to that.

20                   THE COURT:  Okay.  Do you understand the

21  question?

22                   MR. MARON:  Can you say it again, please.

23                   THE COURT:  Sure.  I'll do it in round

24  numbers as a hypothetical.  Friedman Kaplan has

25  billed you $4 million, roughly, over the course of

PROCEEDINGS

1  this case, but someone other than Phoenix or Triaxx
2  Asset Management has paid roughly 2 million of that.
3          Have you requested and has the trustee
4  withheld for legal fees 2 million or 4 million?
5          MR. MARON:  Less than.  It's about -- I
6  believe they've held back 2 million.
7          THE COURT:  2 million.  So the amount
8  that you've reported in unpaid legal fees that you
9  still want the trustee to release is only 2 million?
10          MR. MARON:  Yes.
11          THE COURT:  So if the trustee were to
12  release those 2 million, would it go to Friedman
13  Kaplan or would it go to these non-parties?
14          MR. MARON:  It would go to Friedman
15  Kaplan.
16          THE COURT:  So the third parties did not
17  advance or loan that money.  It was a gift.  It was
18  an investment.
19          MR. MARON:  It's -- it was their way
20  of -- yeah, it was their way investing in the peace.
21          THE COURT:  They're not looking for that
22  money back?
23          MR. MARON:  I'd have to confirm all the
24  arrangements --
25          THE COURT:  You'd have to --

AMM TRANSCRIPTION SERVICE - 631.334.1445

PROCEEDINGS

1           MR. MARON:  -- but I know that they put

2    the -- I need to check what the full arrangements

3    are.  I know there were some -- there were funds

4    advanced that, you know, could be subject to certain

5    loans.  I'm not certain, but they've been -- in the

6    interim, at least, like, you know, from Friedman

7    Kaplan, there was moments when they needed to get

8    paid.  There were payments made over the course of

9    the representation.  This is going back to 2018,

10   when they first took on both TAM and Pres, and then,

11   you know, as -- during -- they made sporadic

12   payments from then until, I would think, you know,

13   last summer.

14           THE COURT:  All right.

15           MR. MOSKOWITZ:  Your Honor?

16           THE COURT:  Yes.  Who's this?

17           MR. MOSKOWITZ:  I apologize for any

18   interruption, but it's Elliot Moskowitz at Davis

19   Polk for Citi.  I just want to have the opportunity

20   to be heard for a minute at an appropriate time.

21   Just one.  Don't forget about me.

22           THE COURT:  Let me just finish up with

23   Mr. Maron.

24           I think what you're saying to me is that

25   you think that if the trustee released or "advanced"

PROCEEDINGS

1   the funds which have been withheld for payment of

2   the Triaxx Asset Management legal fees, they would

3   go to counsel to pay counsel's bills rather than

4   going to pay back the third parties which have -- I

5   don't know what word to use -- fronted?  Advanced?

6   Gifted?

7             MR. MARON:  Yes.

8             THE COURT:  Invested?

9             MR. MARON:  The --

10            THE COURT:  -- funds to pay a portion of

11   the firm's bills, but you're not certain.

12            MR. MARON:  Well -- but just to go back

13   for a second to what Mr. Lorenzo pointed out before,

14   you know, there's a process that happens when -- you

15   know, when the -- their administrative expense is

16   thrown off from each of the deals and, you know,

17   invoices are submitted.  And as part of that,

18   including invoices from -- you know, from Friedman

19   Kaplan and, you know, monies are allocated for

20   certain bills, but then they're held in escrow.  But

21   Friedman Kaplan doesn't get those because they're

22   all being -- they're all made part of what this,

23   what this retained funds group is.

24            THE COURT:  Okay.  So maybe I'm just not

25   asking the question the right way since, obviously,

AMM TRANSCRIPTION SERVICE - 631.334.1445

PROCEEDINGS

1    I'm not, you know, in the back office seeing the

2    documents go back and forth.

3             When you have submitted those bills for

4    payment, and then you don't get payment because they

5    withhold the money and keep a running tab of what

6    they're withholding --

7             MR. MARON:  Right.

8             THE COURT:  -- are you submitting the

9    full Friedman Kaplan bills or only the portion that

10   these third parties are not paying?

11            MR. MARON:  The full bills.

12            THE COURT:  Well, in that case, there

13   should be 4 million, shouldn't there, being

14   escrowed, not 2 million?

15            MR. MARON:  I need to go back and look at

16   the latest reports because there's multiple -- you

17   know, because of all the work that was done for the

18   parties, but I have to go back and check.

19            THE COURT:  Okay.

20            MS. BEAUMONT:  Your Honor, perhaps --

21            THE COURT:  Hold -- sorry.  Ms. Beaumont,

22   yes?

23            MS. BEAUMONT:  I was just going to

24   explain.  There -- the full amount of our bills,

25   while it may have been submitted to the CDOs for

PROCEEDINGS

1   payment, has not all been set aside and retained

2   because there is not always enough money each month

3   to cover all of the various invoices that are out

4   there that require payment.  There's a cap on how

5   much is allocated each month for each --

6           THE COURT:  So because of the monthly

7   cap, in some months, you don't even ask for the full

8   amount?

9           MS. BEAUMONT:  It's -- yeah.  It's not as

10  if each month we send a monthly bill to the CDOs.

11  It's whatever is available gets applied and set

12  aside.

13          THE COURT:  All right.  Okay.  That's

14  about as much understanding as I'm going to glean

15  from today.

16          Mr. Moskowitz, here's your minute.

17          MR. MOSKOWITZ:  Oh, thank you.  Maybe 90

18  seconds.  Thank you very much, Your Honor.  Just a

19  few quick points, and I'll aim to not be

20  duplicative.

21          As Mr. Savla noted, Citi did join the

22  letter that PIMCO submitted, so that letter was --

23  and the points made in the letter and the points

24  that Mr. Savla made today are all endorsed by Citi

25  as well.

PROCEEDINGS

1          Just a few additional glosses on the

2    things that have been said.  So, first of all, just

3    in case there's any doubt about this, there are some

4    parties in the case that are paying their own fees

5    out of their own pockets, and that would be PIMCO

6    and Citi.  And we've paid our own fees throughout,

7    and we continue to bear our own fees.  And we're

8    talking about the equities and what should happen

9    here.  It's not like, you know, we -- it's not like

10   anybody -- anyone on the noteholder side is getting

11   a free ride.  To the contrary, we're bearing a

12   substantial legal expense.

13          In addition, Your Honor, we're having a

14   nice discussion about these funds, but it should be

15   noted that if these funds were to be paid out for

16   legal fees at this point in time, that would work a

17   severe prejudice on the noteholders because this

18   is -- I'm not sure there's any way to get that money

19   back, and these funds are potentially a significant

20   portion of what our potential recovery would be in

21   the case because there's a finite amount of money

22   that exists right now.  And if that money goes out

23   the door, then the noteholders potential recovery is

24   potentially greatly imperiled.  So it's not just an

25   idle question about what's fair.  It's actually

PROCEEDINGS

1    quite prejudicial to the noteholders if the money

2    goes out the door.

3              In addition, as I think you heard -- and

4    I don't know what they're going to say in their

5    motion, but -- if they make one -- but this is

6    entirely a self-created hardship where this is

7    coming to Your Honor, like, on the eve of trial.  A

8    lot could have been done differently to have avoided

9    the self-created problem that they're bringing to

10   your doorstep right now, and there has to be

11   consequences for that.

12             I would also add that I think -- I mean,

13   I don't know what they're going to say in their

14   motion, but it's like -- I would think it's, sort

15   of, law of the case already.  And, frankly, any

16   motion that they put before you, if it just says the

17   same things that they previously argued before

18   Judge Marrero, I mean, the -- I'm not sure that

19   there's an -- even, like, a Rule 11 basis to make

20   such a motion at this point in time.  Certainly,

21   there would be no basis to make a motion that has as

22   its predicate unnamed parties or not showing up in

23   court.

24             I mean, to me, just taking a step back

25   from all of this, this is a last-minute play before

PROCEEDINGS

1    the trial to try to get some of these funds released

2    to help cover legal fees that somebody, who they

3    won't tell you who it is, has been covering to this

4    point in time.

5            I've -- I'm firmly of the belief that, if

6    this were to be denied, somebody's going to continue

7    to cover those legal fees because they've been doing

8    it to this point not based on charity.  They've been

9    doing it because it's in their own financial

10   interest.

11           But it doesn't matter anyways what my

12   speculation is.  If someone's coming to the Court on

13   the eve of trial with a self-created hardship,

14   making arguments that have already been rejected to

15   this Court twice before, I don't think there should

16   be much sympathy for that.  And so I know that it --

17   the Court's being very patient with our adversaries

18   in talking about where the funds might go, but from

19   our perspective, this is working a severe prejudice

20   and should not be seriously countenanced as we're

21   all preparing for trial.

22           Just wanted to put those thoughts before

23   Your Honor.

24           THE COURT:  All right.  Thank you, all,

25   very much.  I --

PROCEEDINGS

1          MR. MARON:  Your Honor, can I -- it's
2    Matthew Maron again.  Can I just add one thing to
3    what -- I want to say something in response to what
4    Mr. Moskowitz just said.
5          THE COURT:  One minute.  Go ahead.
6          MR. MARON:  I'll be done in 30 seconds.
7          We're not Citi.  We're not PIMCO.  We're
8    not U.S. Bank.  It's a big difference when
9    Mr. Moskowitz says, well, his client can pay their
10   fees.  It's Citibank.  We're not Citibank.  It's a
11   very different animal.
12         The other thing is we're -- again, this
13   isn't the eve of trial.  We made this application
14   almost -- you know, close -- a little under three
15   months before.  We didn't want to have to do this,
16   but the circumstances were we were told that, you
17   know, our current counsel was intending to withdraw
18   necessitated us making this application.  So that's
19   it.
20         MR. SAVLA:  Your Honor, this is
21   Mr. Savla.  If I may respond to a couple of
22   points --
23         THE COURT:  Gentlemen, I've heard enough.
24   Thank you, all, very much.
25         I am not going to issue any orders,

PROCEEDINGS

```
1    whether scheduling orders or funding orders or
2    withdrawal orders on the basis of the tantalizingly
3    incomplete record that I have in the form of,
4    essentially, from the moving parties, three pages of
5    letter brief, total.  So your pretrial deadlines
6    stand.
7              If Friedman Kaplan wishes to be let out
8    of its responsibilities as counsel of record for
9    Triaxx Asset Management and Phoenix, it must make a
10   motion supported by admissible evidence in
11   compliance with Local Civil Rule 1.4.  It may
12   accompany that motion with a sealing motion with
13   respect to matters which are deemed sensitive, but I
14   want to be clear, I am making no guarantee as to --
15   I don't want to prejudge, in other words, how that
16   sealing motion will come out.
17             With regard to the schedule, if, in fact,
18   Triaxx Asset Management and Phoenix are seriously
19   negotiating with a potential successor firm, if
20   that's real and not just smoke, and if they find
21   such a firm, and if that firm in short order -- and
22   by "short order," I mean perhaps this week or next
23   week -- appears in this case and is ready, willing
24   and able to take the case through trial, I would, at
25   that point, consider a reasonable extension of
```

PROCEEDINGS

1    whatever the remaining pretrial deadlines may be,

2    including the trial date itself, to allow new

3    counsel to get up to speed.  But I'm not going to be

4    doing that given the current state of play.

5            With regard to letting -- with regard to,

6    really, ordering the trustee, over the strenuous

7    objections of the noteholders, to advance funds to

8    the Triaxx parties for purposes of funding the

9    remainder of their defense costs in this case, let

10   me be as candid as I can with you.  You can make the

11   motion, which I would consider a preliminary

12   injunction motion, which would have to meet all of

13   the ordinary prongs of a preliminary injunction

14   motion.  If you're short on cash, pay your trial

15   counsel.  I don't know that I would recommend you

16   spending your motion -- your money on that motion

17   because I think you have a very, very steep bit of

18   uphill sledding to do on any such motion, given the

19   law of the case, given the timing, and given the

20   fact that, as a preliminary injunction motion, I

21   would view it as having been made awfully late in

22   the day.  But I don't tell people what motions they

23   can make.  I just try to be clear about what odds

24   they are facing.

25            So I don't think there's anything further

PROCEEDINGS

1   for me to do today.  If you're going to make the

2   motions, make them as quick as you can.

3           Will there be anything further?

4           All right.  Looking --

5           MR. MARON:  No, Your Honor.

6           THE COURT:  I am reminded, and I will

7   remind you as well, that you have a joint pretrial

8   order due on February the 22nd, so I hope you're

9   working on that.

10          Thank you, all, very much.  We'll be

11  adjourned.

12          MR. MOSKOWITZ:  Thank you, Your Honor.

13

14                      0o0

15

16

17

18

19

20

21

22

23

24

25

```
1              C E R T I F I C A T E

2

3        I, Adrienne M. Mignano, certify that the

4   foregoing transcript of proceedings in the case of

5   U.S. Bank National Association v. Triaxx Asset

6   Management LLC; Docket #18CV4044 was

7   prepared using digital transcription software and is

8   a true and accurate record of the proceedings.

9

10

11  Signature   Adrienne M. Mignano
                _____

12              ADRIENNE M. MIGNANO, RPR

13

14  Date:      April 20, 2023

15

16

17

18

19

20

21

22

23

24

25
```