n4i3usb1

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   U.S. BANK NATIONAL
     ASSOCIATION,
 4
              Interpleader Plaintiff,
 5
                   v.                        18 CV 04044 (BCM)
 6
     TRIAXX ASSET MANAGEMENT, LLC,
 7   et al.,
                                             Bench Trial
 8
              Interpleader Defendants.
 9
     ------------------------------x
10                                    New York, N.Y.
                                      April 18, 2023
11                                    9:30 a.m.
     Before:
12                    HON. BARBARA C. MOSES,

13                                      U.S. Magistrate Judge

14                            APPEARANCES

15   ALSTON & BIRD
          Attorneys for Interpleader Plaintiff
16   BY:  ALEXANDER LORENZO
          ELIZABETH A. BUCKEL
17
     FRIEDMAN KAPLAN SEILER & ADELMAN
18        Attorneys for Interpleader Defendants Triaxx and Phoenix
     Real Estate
19   BY:  ANNE E. BEAUMONT
          PRIYANKA WITYK
20        ANIL K. VASSANJI
          GEOFFREY CAJIGAS
21
     NORTON ROSE FULBRIGHT
22        Attorneys for Interpleader Defendant PIMCO
     BY:  SANDEEP SAVLA
23        ANTHONY LAURIELLO
          BRANDT VERNON
24

25

n4i3usb1

APPEARANCES (Continued)

DAVIS POLK & WARDWELL LLP
        Attorneys for Interested Party Citigroup Global Markets
BY:   ADAM GREENE
        ISAAC GELBFISH

WOLLMUTH MAHER & DEUTSCH
        Attorneys for Interpleader Defendant Triaxx Prime CDOs
BY:   RANDALL RAINER

THE DEPOSITORY TRUST AND CLEARING CORPORATION
        Attorneys for Interpleader Defendant Cede & Co.
BY:   AIMEE BANDLER


Also Present:

JASON BERLAND, One Zero Capital

n4i3usb1

1                    (Trial resumed; case called)

2              MR. LORENZO:  Good morning.  Alex Lorenzo from Alston

3     & Bird.

4              THE COURT:  If the first counsel up for each party or

5     group of affiliated parties could introduce the team today so

6     it will go faster.

7              MR. LORENZO:  Understood, your Honor.  I'm joined

8     today by my colleague Ms. Buckel, also from Alston & Bird.

9              MR. SAVLA:  Good morning, your Honor.  Sandeep Savla

10    of Norton Rose Fulbright.  I'm joined by my colleague Andrew

11    Lauriello.  I'll also introduce colleagues from the Davis Polk

12    team, they represent Citi, and on my left is Adam Greene and

13    also Isaac Gelbfish.

14             THE COURT:  Welcome back.

15             MS. BEAUMONT:  Good morning, your Honor.  Anne

16    Beaumont, Friedman Kaplan Seiler Adelman & Robbins for Phoenix

17    Real Estate Limited and Triaxx.  And with me are my colleagues

18    Priyanka Wityk and Anil Vassanji.

19             MR. RAINIER:  Randall Rainier on behalf of the Triaxx

20    CDOs.

21             THE COURT:  Thank you.

22             MS. BANDLER:  Aimee Bandler from Cede & Co.

23             THE COURT:  Before we put Mr. Moon back on the stand,

24    is he outside?

25             MS. BEAUMONT:  Yes.

n4i3usb1

1          THE COURT:  I thought it might be helpful to counsel,

2     not necessarily for purposes of the continued examination of

3     Mr. Moon, but just on a going forward basis, to know what

4     issues I'm interested in having explained to me a little more

5     clearly.

6          At the moment, based on the thoughts I was having

7     about this case while I was in the shower this morning, I need

8     more guidance and assistance from the parties in terms of what

9     I will call loosely the flow of funds.

10          I've been told, for example, that the collateral

11     manager fee was effectively not being paid in the 2011 range

12     because the performance of the collateral was such that funds

13     were not getting to step six or step seven or whatever step the

14     collateral manager gets paid at.

15          I have also been told that the Phoenix fees, to the

16     extent they were put through the waterfall at step two as

17     administrative expenses were being paid for a while, but that

18     due to the performance of the collateral -- and I may be

19     getting this wrong, which is why I'm asking you these questions

20     now -- are the CDOs are now in an economic position such that,

21     even if I were to rule that the retained funds which have been

22     retained as Phoenix fees were properly charged through the

23     waterfall as administrative expenses, that there might not be

24     any actual money that comes out -- hold your thought,

25     Mr. Lorenzo.

n4i3usb1

1              So what I would be very interested in hearing, either

2       through the appropriate witnesses or through counsel at the

3       conclusion putting together the evidence, is a sort of flow of

4       funds on a what if basis.  By way of example only, and not to

5       suggest that I've committed or necessarily even that I'm

6       leaning towards any one of these positions.

7              If I were to take the, let me say, the most aggressive

8       anti-TAM position, which is the noteholders' position, and if I

9       were to rule that the engagement agreements were in effect

10      illegal when entered into, and consequently that none of the

11      Phoenix money was properly paid, and all of it had to come back

12      in some way, shape or form, where would it go?

13             If I were to take what I think of loosely as a middle

14      position, and hold that the contracts were not themselves

15      illegal or a violation of the governing documents, or that if

16      they were, there was some ratification or other mechanism that

17      protected them at this point, but that funds paid outside of

18      the waterfall, as I have already ruled, were a violation of the

19      governing documents, then what is the practical result of that?

20             For example, what happens to the money which has

21      currently been retained against the Phoenix fees in the

22      waterfall?  Where would it go?

23             So I'm looking for, again, what I think of in my head

24      as a flow of funds.  If I rule X, who gets what dollars and

25      why?  If I rule Y, who get what is dollars and why?

n4i3usb1

1          I don't know that I need to understand the actual

2     waterfall math, but I do need to understand the result of the

3     waterfall math as it pertains to different legal positions I

4     might take.

5          I have some related questions as well.  For example,

6     and if I am misunderstanding what I've been told so far, I'm

7     sure you'll straighten me out.  If, as I think I've been told,

8     the financial performance of the CDOs is such that the Phoenix

9     fees, even if legally okay to be paid through the waterfall as

10    expenses, would not as a practical matter be paid through the

11    waterfall as expenses.  Then why, what is the practical effect

12    of the TAM parties making the argument that they should be

13    paid.  Is that a protective legal position, for example, to

14    protect their right to indemnity, for example?  Or does it have

15    an actual practical significance in terms of those particular

16    funds?

17         So, be practical with me, ladies and gentlemen, and

18    tell me what actually happens if A, if B, if C.

19         Does anyone have any questions about my questions?

20    Mr. Lorenzo.

21         MR. LORENZO:  Your Honor, I just wanted to clarify.

22    Ms. Buckel pointed out I may not have understood fully your

23    question yesterday during my opening.  But, the distinction --

24    and I just say this because I think it might be helpful as

25    people plot out where the money goes.  There is, this is in I

1    think the undisputed statement of fact, 16-plus million that's

2    been retained.

3              THE COURT:  As against potentially being released

4    through the waterfall as administrative expenses.

5              MR. LORENZO:  Yes.  If your Honor were to rule in

6    favor of I guess the middle or the TAM parties' position, that

7    money would then be released, and then the sort of secondary

8    issue is --

9              THE COURT:  Then what happens.

10             MR. LORENZO:  I wanted to be clear, there is a bunch

11   of money that is sitting that would be disbursed.

12             THE COURT:  That is indeed one of the questions.

13   Okay.  Are we ready to go?  Ms. Beaumont.

14             Good morning, Mr. Moon.  You may take your seat.  You

15   do not need to be sworn in again.  You are still under oath.

16             When you're ready, Ms. Wityk.

17             MS. WITYK:  Thanks, your Honor.

18    JOHN G. MOON,

19        called as a witness by the Defendant,

20        having been previously sworn, testified as follows:

21   DIRECT EXAMINATION (Continued)

22   BY MS. WITYK:

23   Q.  Good morning, Mr. Moon.

24   A.  Good morning, Ms. Wityk.

25   Q.  Yesterday you testified that the Triaxx CDOs objected to a

1    settlement involving Countrywide?

2    A.  That is correct.

3    Q.  I had a followup question about that.  Did they get more

4    than they would have been entitled to as regular class members

5    under the settlement they entered into?

6    A.  Yes.

7    Q.  Do you know what they would have received as class members?

8    A.  They I think they, well, they did receive the 35,758,000.

9    Q.  Understood.  So I understand.

10         THE COURT:  I don't understand.

11   Q.  So then, what did they receive in total from the entire

12   settlement?

13   A.  So I believe as the Court corrected me, it was 69 million

14   upfront, plus the 35,758,000 that they received in the

15   settlement.

16   Q.  As class members you mean?

17   A.  Yes, except just one correction.  There was no class.  It

18   was not a class action.

19   Q.  Okay.  What kind of lawsuit was it then?

20   A.  It was an interpleader action.  And the reason why Triaxx

21   objected is, unlike a class action, it was not able to opt out

22   the way the settlement papers were written.

23   Q.  Yesterday I asked you about PRES' incentive fees.

24         THE COURT:  Ms. Wityk, I'm sorry to do this so early

25   in the morning, but before we leave this point.  I think you

1    were trying to elicit from Mr. Moon what would they have gotten

2    without the objection compared to what they ended up getting.

3              MS. WITYK:   Correct.

4              THE COURT:   What they ended up getting was 69 million

5    in the first payment, and approximately 35 million later.

6              Mr. Moon, in your view, what would the Triaxx CDOs

7    have received from that settlement in the absence of the

8    objection?

9              THE WITNESS:   I believe it simply would have received

10   the 35,758,000.

11             THE COURT:   Thank you.

12   Q.   Mr. Moon, so I asked you yesterday about PRES' incentive

13   fees, and you testified generally that you thought that it was

14   a better deal than a typical law firm contingency fee.  Do you

15   remember that?

16   A.   I do.

17   Q.   A better deal from whose perspective?

18   A.   From the perspective of the noteholders and the Triaxx

19   entities.

20   Q.   Why do you say that?

21   A.   As I recall the engagement letter, I'm sorry to use --

22   there was listed a number of CUSIPs, which is a unique

23   identifier number for each note of RMBS that the Triaxx

24   entities received.

25             For PRES to receive any contingency, all losses for

N4i3usb1                          Moon - Direct

1  those particular notes, those CUSIP numbers, had to be made up

2  before they received any contingency fee.  So all losses would

3  be erased, and then on top of that, PRES would receive a

4  contingency fee once that was met.

5          There were several small settlements later on in the

6  program where the settlement wasn't large enough to top off

7  those notes, and PRES received nothing.

8  Q.  Mr. Moon, yesterday we looked at Exhibit 3485 which was a

9  November 2014 letter from you to Ms. Martin.  Do you remember

10  that?

11  A.  I do.

12  Q.  Now, before that letter was sent to Ms. Martin, did anyone

13  seek legal advice about the recommendations contained in that

14  letter?

15  A.  Yes.

16  Q.  Please open your binder to Exhibit 3165 which is already in

17  evidence.  Do you recognize this document, Mr. Moon?

18  A.  One moment, Ms. Wityk.

19          Yes, I do.

20  Q.  What is this document?

21  A.  This is an e-mail communication among Tom Priore, myself,

22  David Nissenbaum, and Craig Stein, the last two of whom are

23  partners at Schulte Roth & Zabel, concerning their review of I

24  believe the first transaction, the first disbursement I'll call

25  it.

N4i3usb1                          Moon - Direct

```
 1   Q.  Is there an attachment to this e-mail?

 2   A.  There is.

 3   Q.  What's the attachment?

 4   A.  That is the letter that I testified about yesterday making

 5   the recommendations for multiple disbursements, and I think

 6   also reserving some funds.

 7   Q.  Do you have an understanding of why this draft was sent to

 8   Mr. Nissenbaum and Mr. Stein?

 9   A.  I do.

10   Q.  What is your understanding?

11   A.  I'm a litigator, right.  I fight over money, I fight over

12   people's liberty.  I'm not a transactional attorney.  I'm

13   certainly not a transactional attorney in the area of

14   structured finance.

15           It was clear to me that there needed to be

16   professional review of this transaction, because this was an

17   unusual situation.  With the settlement and CDOs, there was a

18   lot of new law being made at the time, and it was important to

19   have professional guidance, particularly Mr. Nissenbaum and

20   Mr. Stein, who I believe drafted some of the foundational

21   documents of Triaxx and were experts in the field.

22   Q.  Can you please turn to Trial Exhibit 3122, which is not yet

23   in evidence.

24           THE COURT:  Give me a minute.

25   A.  Yes, I see it.
```

N4i3usb1                    Moon - Direct

1   Q.  Do you recognize this document, Mr. Moon?

2   A.  Yeah, this is another instance of asking Mr. Nissenbaum and

3   Mr. Stein to review a disbursement before it goes out.

4   Q.  I just want to focus you on the first page of 3122.

5   A.  Okay, yes.

6   Q.  Is this a response to the exhibit we were just looking at,

7   at 3485?

8   A.  Yes, let's see.  One moment.  3485?

9   Q.  Correct.

10  A.  Yes.

11          MS. WITYK:  At this time the TAM parties would like to

12  move Trial Exhibit 3122 into evidence.

13          THE COURT:  Objections?

14          MR. LORENZO:  It looks like there might be another

15  e-mail with a different chain attached to the back, and I don't

16  know if there is a printing error on that.  So the first e-mail

17  is -- I don't have objections to it coming in separately, but

18  it's a combined e-mail.  If you flip the page over, all of a

19  sudden it goes to 2015.

20          MS. WITYK:  This was just the way the document was

21  produced.  I think the two e-mails were printed and produced as

22  one.

23          THE COURT:  Are you moving into evidence only the

24  e-mail with the Bates number ending 367?  Why don't we do that

25  at present, because that's all you've authenticated.  Then we

1  can take it page by page.

2           MS. WITYK:  That's fine.

3           THE COURT:  So the first page of 3122 is admitted.

4           (Joint Exhibit 3122 first page received in evidence)

5  Q.  Mr. Moon, was Schulte compensated for its advice that's

6  reflected in this November 20, 2014 e-mail?

7  A.  Yes, it was.

8  Q.  Do you recall how much it was compensated for its advice?

9  A.  Yes, I do.

10  Q.  How much?

11  A.  $25,000.

12  Q.  What happened with respect to the first recovery after you

13  sent your letter to Ms. Martin?

14  A.  As I understand your question, what happened was the wire

15  transfers were made in accordance with the letter to

16  Ms. Martin.

17  Q.  Mr. Moon, can you please turn to Trial Exhibit 3492, which

18  is not yet in evidence.

19  A.  Okay, I see it.

20  Q.  Do you recognize this document?

21  A.  Yes, I do recognize it.

22  Q.  What is it?

23  A.  This is a letter to Ms. Martin for the consumption of the

24  directors, the informing them of a settlement, the settlement

25  about a fee dispute with Keller Rohrback.

N4i3usb1                          Moon - Direct

1           MS. WITYK:  At this time the TAM parties would like to

2      move Trial Exhibit 3492 into evidence.

3           THE COURT:  Any objection?  3492 is admitted.

4           (Joint Exhibit 3492 received in evidence)

5      Q.  So, Mr. Moon, you just mentioned a fee dispute with Keller

6      Rohrback.  How was that resolved?

7      A.  As I recall, we went to retired Magistrate Judge Katz at

8      JAMS, and let's see.  We had a baseball style arbitration which

9      turned into a mediation, and we settled the matter for

10     $7,485,000.

11     Q.  How was that settlement amount paid?

12     A.  That was paid from the -- I believe that was paid from the

13     escrow account after a recommendation to the directors, and the

14     directors approved it.

15     Q.  You mentioned an escrow account.  Is this the account you

16     testified about yesterday that was a joint account with Miller

17     Wrubel and Keller Rohrback?

18     A.  Yes.  That was, just to be clear, that was one of -- there

19     were three successive escrow accounts.  That was paid out of

20     the first escrow account, yes.

21     Q.  So what happened with that joint account after the

22     resolution of this fee dispute?

23     A.  So, after the fee dispute was resolved, well, the reason

24     for the jointly held escrow account was because of the fee

25     dispute, and Keller Rohrback insisted it have co-signatory

1   authority over the escrow account, which was fine.  So then

2   after resolution of the fee dispute, those funds were

3   transferred to the Miller & Wrubel escrow account here in New

4   York.

5   Q.  To be clear, "those funds" refer to the remainder of the

6   first recovery?

7   A.  That is correct.

8   Q.  Please go to Trial Exhibit 3051, which is already in

9   evidence.

10  A.  Okay.

11  Q.  Mr. Moon, what is this document?

12  A.  Okay.  So, this is -- this is my seeking advice from David

13  Nissenbaum and Craig Stein on the -- I believe the second

14  distribution, again, with a fee, an agreed fee of $25,000 for

15  the review.

16  Q.  Why were you requesting their advice a second time?

17  A.  I thought it was the prudent thing to do.

18  Q.  Please go to Trial Exhibit 3052, which is not yet in

19  evidence.

20  A.  Okay.

21  Q.  Do you recognize this document?

22  A.  I do.

23  Q.  What is it?

24  A.  It is a document, a letter from I believe myself to Lori

25  Martin for the consumption of the directors, having in the

1    upper-right-hand corner my holographic writing.

2           MS. WITYK:  At this time the TAM parties would like to

3    move Trial Exhibit 3052 into evidence.

4           THE COURT:  Any objection?  3052 is admitted.

5           (Joint Exhibit 3052 received in evidence)

6    Q.  So the record is clear, Mr. Moon, is this Trial Exhibit

7    3052 the attachment to Trial Exhibit 3051?

8    A.  Yes.

9    Q.  Why did you draft this particular letter?

10    A.  Let me take a look.

11           So, there were a couple purposes to this letter.  One

12    was to notify the directors of some of these legal -- these

13    occurrences that had happened in court and tell them about the

14    change of escrow accounts.  There was -- there is also some

15    recommendations that we worked out with the collateral manager

16    for disbursements from the escrow account.

17    Q.  Were there any recommendations concerning disbursements to

18    PRES?

19    A.  Yes.  I see there is a recommendation for a disbursement of

20    approximately $1 million.

21    Q.  Did you do anything to confirm that this fee was properly

22    invoiced?

23    A.  Yeah, I would have looked at the engagement letter and the

24    calculation of fees.

25    Q.  Okay.  And were you recommending that any other entities be

1  paid at this time?

2  A.  Yes.  So I was recommending we -- my law firm must have had

3  a receivable from the litigation for the amount of 448,000, and

4  a disbursement to Schulte Roth & Zabel to review the

5  transaction for $25,000.

6  Q.  Now, please go to Trial Exhibit 3122, which we looked at

7  earlier and which has been partly introduced into evidence.

8  And please go to the second page of the document.

9  A.  Yes.

10 Q.  What is the e-mail thread appearing on the second page of

11 Trial Exhibit 3122?

12 A.  This is -- at the top it is a note from David to myself,

13 stating he has no comments on the transaction.

14        MS. WITYK:  At this time the TAM parties would like to

15 move the remainder of Trial Exhibit 3122 into evidence.

16        THE COURT:  So this would be the pages with the Bates

17 numbers ending 368 and 369.

18        MS. WITYK:  That's correct, your Honor.

19        THE COURT:  Any objection?

20        MR. LORENZO:  We have no objection, your Honor.  Would

21 it be better to do 3122A and 3122B?  I have no problem with

22 both e-mails.  The idea that they're together is the only thing

23 that gives me pause.

24        THE COURT:  I think we can handle it.

25        So 3122 is now admitted in toto.

1              (Joint Exhibit 3122 received in evidence)

2              MS. WITYK:  Thank you.

3    Q.  Mr. Moon, what did you do after receiving Mr. Nissenbaum's

4    e-mail?

5    A.  So I sent the recommendations to Ms. Martin for the

6    consumption and consideration of the directors.

7    Q.  Please go to Trial Exhibit 3493, which is not yet in

8    evidence.

9              THE COURT:  Housekeeping.  Did you tell me that 3492

10   was in evidence?  Or did you need to admit it?

11             MS. WITYK:  One moment, your Honor.  I do need to

12   admit that.  May I go back?

13             THE COURT:  It's your examination.

14             MS. WITYK:  The TAM parties would like to admit Trial

15   Exhibit 3492 into evidence.

16             THE COURT:  Any objection?  3492 is admitted.

17             (Joint Exhibit 3492 received in evidence)

18             MS. WITYK:  Thank you, your Honor.

19             THE COURT:  Which one are we on?

20             MS. WITYK:  3493.

21             THE COURT:  Thank you.

22   Q.  Do you recognize this document, Mr. Moon?

23   A.  Yes, I do.

24   Q.  What is it?

25   A.  This is a letter to Ms. Martin for the consideration of the

1   directors, apprising them of developments in the litigation,

2   and -- let's see.  Recommending some distributions to certain

3   service providers to Triaxx, and the reservation of certain

4   funds.

5   Q.  Is this the final version of the letter at Exhibit 3052?

6   A.  Yes, it bears my signature.

7   Q.  Does this letter differ substantively from the draft

8   Mr. Nissenbaum reviewed?

9   A.  I don't believe it does.  Not materially at least.

10  Q.  Did Ms. Martin respond to this letter?

11  A.  Well, I can tell you there is no negative response.  I

12  don't recall sitting here today if Ms. Martin and I discussed

13  the letter.  It would not be unusual for us to discuss the

14  contents of a letter, but she certainly did not indicate to me

15  that the directors would not approve the recommendations.

16  Q.  Same question with respect to the directors:  Did they

17  respond and in a negative way?

18  A.  No.  No.  No.  Not to this letter, no.

19  Q.  What happened next with respect to the funds in the Miller

20  Wrubel account following the sending of this letter?

21  A.  As I --

22          THE COURT:  So, when you say the funds in the Miller

23  Wrubel account, you mean the 20 million that was transferred,

24  roughly 20 million that was transferred into the second escrow

25  account?

1         MS. WITYK:  That's correct, your Honor.

2         THE COURT:  Thank you.

3    A.  So, what would happen is attached to this letter, all these

4    letters would be wire instructions given to us by the service

5    provider.  Those would be then summarized in a sort of an

6    omnibus way or instruction, if you will, that combined them all

7    for -- either Mr. Priore or Mr. Calamari would then sign that

8    order, and it would direct Miller & Wrubel to make the wire

9    transfers.  At that point, I did not have the authority to wire

10   that much money from our firm's escrow account, so one of our

11   senior partners would walk down to the bank and go through the

12   wire transfer process.

13   Q.  Do you believe that wires consistent with the

14   recommendations in the letter were made?

15   A.  Oh, I know they were.

16        MS. WITYK:  I'm sorry, your Honor.  I think I lost my

17   place.  I don't know if I actually moved 3493 into evidence.

18        THE COURT:  You did not.

19        MS. WITYK:  The TAM parties would like to move Trial

20   Exhibit 3493 into evidence.

21        THE COURT:  Any objection?  Admitted.

22        (Joint Exhibit 3493 received in evidence)

23   Q.  Mr. Moon, please turn to Trial Exhibit 3486.  And 3486 is

24   already in evidence.

25   A.  Okay.

1    Q.  Mr. Moon, what is this document?

2    A.  Okay, so again, this would be a followup letter, again, to

3    Ms. Martin for the consideration of the directors from me,

4    notifying them of the collateral managers three things:  To

5    apprise of events, to notify of recommended instructions to

6    service providers, and to recommend the reservation of funds.

7    Q.  Were you also informing Ms. Martin of any new settlements?

8    A.  One moment.

9           Oh, yes, so if you -- at the bottom of the first page

10   of the document, it talks about a -- yes, a settlement from

11   JPMorgan Chase withdrawing our objection.

12   Q.  What were the legal claims involved in that action?

13   A.  Our theory of the case was similar to the one that I

14   described yesterday, that Triaxx, based on PRES' analysis,

15   thought that the settlement terms were unfair, and were unfair.

16   We objected to the settlement.  I'd have to look at the papers.

17   I believe -- that's it.  So they settled with us early on.

18   Q.  Do you recall what kind of analysis PRES did for this

19   litigation?

20   A.  I vaguely recall that it was similar to the analysis I

21   described yesterday in the prior objection.  I would have to

22   look at the court papers to give you a detailed response.

23   Q.  Understood.

24          What monetary compensation did the Triaxx CDOs receive

25   from this settlement?

1   A.   They received $750,000.

2   Q.   In your letter, you call the settlement funds from this,

3   from the JPMorgan lawsuit, the second recovery; is that right?

4   A.   That's correct.

5   Q.   Did you make any recommendations with respect to the second

6   recovery?

7   A.   Yes.   There were, there were, there was at this point now,

8   there was also litigation going on against servicers, and as

9   you can see on the second page of the document, there was a

10  recommendation for McKool Smith and Kobre & Kim to be

11  compensated for their litigation against servicers.

12  Q.   Were there any proposed payments to PRES at this time?

13  A.   There were none.

14          THE COURT:   Ms. Wityk.

15          MS. WITYK:   Yes, your Honor.

16          THE COURT:   I may be slow this morning.   In this

17  letter, I see a section headed execution of the March 31, 2016,

18  instructions, and then I see headers for the third recovery,

19  the fourth recovery and so on.   Where is the second recovery?

20          MS. WITYK:   I'm sorry.   Are you at 3486, your Honor?

21          THE COURT:   I'm at 3487.   That explains a lot.   Okay.

22  Now I'm at 3486.

23          MS. WITYK:   Okay.

24  Q.   Mr. Moon, if you could please go to page three of your

25  letter.

1    A.  Yes.

2    Q.  You write, "The collateral manager will issue the attached

3    instructions by the close of business April 4, 2016, unless we

4    receive instructions from the directors otherwise."

5          Do you see that?

6    A.  I do.

7    Q.  Did you hear from the directors?

8    A.  I did not.

9    Q.  Did Ms. Martin respond to this letter?

10   A.  Again, we -- I don't recall the specifics, we probably

11   discussed it.  But she certainly did not give any negative --

12   any declination of the actions that we recommended.

13   Q.  What happened next with respect to the recommendations

14   contained in this letter?

15   A.  The same thing.  So, Mr. Calamari, I believe it would be

16   Mr. Calamari at this point, would sign an order to Miller &

17   Wrubel instructing that the wires be transmitted.  And they

18   were by one of my more senior partners in the firm.

19   Q.  Thank you.  Please go to Trial Exhibit 3487, which has not

20   yet been admitted into evidence.

21   A.  I see it.

22   Q.  Do you recognize this document?

23   A.  I do.

24   Q.  What is this document?

25   A.  This again is another letter to the directors through

1   Ms. Lori Martin, apprising them of events in the litigation,

2   asking for the reservation of certain funds, and also the

3   distribution of certain service providers to Triaxx.

4           MS. WITYK:  At this time the TAM parties would like to

5   move Trial Exhibit 3487 into evidence.

6           THE COURT:  Any objection?  3487 is admitted.

7           (Joint Exhibit 3487 received in evidence)

8   Q.  So, Mr. Moon, I'd like to refer you to the second page of

9   your letter where you discuss the third recovery.  Can you

10  describe what the third recovery was.

11  A.  Sure.  Right.  So the third recovery was the $35 million

12  payment from the Bank of America that we received -- that we

13  discussed yesterday.  And that was part of -- in compensation

14  for Triaxx withdrawing its objection from the Countrywide

15  settlement.

16  Q.  What was the fourth recovery?

17  A.  Let's see.  Fourth recovery.  Right.  Okay.

18          So, yes, so the third recovery was the guaranteed 35

19  million.  Because when we settled with Bank of America, it was

20  far from certain whether the settlement would go through,

21  whether Triaxx would receive anything more.  So we received

22  that guaranteed 35 million.  And then the settlement actually

23  did go through, and that's the 34,256,306, which is actually

24  what came through.

25  Q.  Did you make any recommendations with respect to the third

N4i3usb1                          Moon - Direct

1    recovery?

2    A.   Yes.

3    Q.   What was that recommendation?

4    A.   And that's set forth on the top of Bates number page 14291,

5    that Phoenix Real Estate Solutions be paid its contingency fee.

6    Q.   I'm sorry.  I was asking about the third recovery.

7    A.   Oh, the third recovery.

8            THE COURT:  Did you have to send $35 million back to

9    BofA?

10           THE WITNESS:  Yes, we did.

11   Q.   With respect to the fourth recovery, what were your

12   recommendations?

13   A.   I'm sorry, yes.  So then with respect to the fourth, we

14   recommended that Phoenix be paid its contingency fee.

15   Q.   What was that fee?

16   A.   Yeah, this is where I described earlier, yes, each

17   individual CUSIP had received at least 500,000 recovery before

18   Phoenix would get its contingency, and they met that threshold,

19   so we recommended that each of the three funds, each the funds

20   had an engagement letter with Phoenix, and that each of those

21   funds honor its obligations under the engagement letter and pay

22   the contingency.

23   Q.   Do you know what the amount of the fee was?

24   A.   The fee is set forth in the box, the text box on page three

25   of my letter.

1   Q.  Where was the fourth recovery being held?

2   A.  Well, the fourth recovery was -- let's see.  There is, as

3   the letter says, the fourth recovery is being held in a

4   suspension account at U.S. Bank on Triaxx's behalf pending

5   instructions from the collateral manager.

6   Q.  Going back to the success fee or incentive fee for PRES,

7   did you do anything to confirm that that was being properly

8   billed?

9   A.  Yes, I would have reviewed the contract and looked at the

10  calculation.

11  Q.  Then again at the bottom of your letter on page -- excuse

12  me.  On the bottom of page three of your letter, you state,

13  "The collateral manager will issue the attached instructions

14  and directions before the close of business July 5, 2016,

15  unless we receive instructions from the directors otherwise."

16          Do you see that?

17  A.  I do.

18  Q.  Did you receive instructions from the directors otherwise?

19  A.  I did not.

20  Q.  Did Ms. Martin object to anything in this letter?

21  A.  They did not.

22  Q.  Please go to Trial Exhibit 3494, which is not yet in

23  evidence.  Do you recognize this document?

24  A.  I do.

25  Q.  What is this document?

N4i3usb1                         Moon - Direct

1    A.  It is a letter from myself to Ms. Martin, for the

2    consideration of the directors, again, apprising of events in

3    the litigation, recommending that certain distributions be

4    made, and the reservation of remaining funds.

5         MS. WITYK:  The TAM parties would like to move Trial

6    Exhibit 3494 into evidence.

7         THE COURT:  Objections?

8         3494, right?

9         MS. WITYK:  Correct.

10        THE COURT:  Didn't want to make the same mistake

11   twice.  3494 is admitted.

12        (Joint Exhibit 3494 received in evidence)

13   Q.  Mr. Moon, can you look at page two of your letter.

14   A.  Yes.

15   Q.  You write under the heading about the fourth recovery, you

16   write that "U.S. Bank, however, stated that due to the fact

17   that Depository Trust Company categorized the fourth recovery

18   as a principal payment, that it preferred to send all the

19   fourth recovery through the waterfall rather than pay PRES for

20   those funds."

21        Do you see that?

22   A.  I do.

23   Q.  Was the reason you described in your letter the only reason

24   given by the trustee for why it couldn't make the disbursement

25   from the fourth recovery?

1          MS. BUCKEL:  Objection.  That's hearsay.

2          THE COURT:  Let me hear the question again.

3  Q.  Was the reason you described the only reason given by the

4  trustee for why it couldn't make the disbursement from the

5  fourth recovery?

6  A.  I'm sorry.  I'm not understanding your question.

7          THE COURT:  Just a minute.  Hold on, Mr. Moon.

8          THE WITNESS:  Sorry.

9          THE COURT:  Mr. Moon may testify as to what the

10  trustee told him.

11  Q.  I'll make my question --

12          THE COURT:  Now you have to make him understand.

13  Q.  Now I have that job.

14          Mr. Moon, so I'm looking at your letter, and I don't

15  know if you found the part that I was quoting.

16  A.  Yes, I'm trying to understand it now.

17  Q.  Okay.  So my question was whether this reason about why the

18  disbursements couldn't made through the fourth recovery was the

19  only reason given by the trustee?

20  A.  I believe so, sitting here today.  I know I had some

21  telephone conversations with Mr. Sliwa about it, and I believe

22  there was some e-mail traffic.  I don't recall any other reason

23  than this administrative type reason.

24  Q.  Thank you.  And was PRES ultimately paid its incentive fee?

25  A.  Yes, I believe it was, if a -- if a recovery came in, and

1    it met the threshold, then it would receive an incentive fee.

2    If a recovery came in that did not meet the threshold, PRES

3    would receive nothing.

4    Q.  In this instance, do you know how PRES was paid its

5    incentive fee in July 2016?

6    A.  I believe what you're getting at is the recommendations on

7    page two under the fourth recovery.  So it was recommended that

8    PRES be paid those amounts in the text box under fourth

9    recovery.  If I'm following you correctly.

10   Q.  If you can take a look at page three.  I wanted to ask if

11   the recommendations under heading recommendations and

12   conclusions were carried out.

13   A.  Okay.  It is my belief that they were.  There is a

14   spreadsheet that shows all of this, that would confirm these

15   amounts.

16   Q.  So that spreadsheet is at Trial Exhibit 3050, and I believe

17   it is already in evidence.  I believe the spreadsheet you're

18   referring to is on the page ending in Bates number 66?

19   A.  Yes, that is one of I believe three spreadsheets that were

20   created to trace these funds.

21   Q.  Does this spreadsheet refresh your recollection that

22   Phoenix -- excuse me -- that PRES was paid in July 2016?

23   A.  July 2016.  Yes, it does.  So that would be indicated on

24   lines 36, 37, and 38.

25   Q.  Then going back to the letter we were just looking at, at

1    Trial Exhibit 3494, did Ms. Martin object to anything in that

2    letter?

3    A.  She did not.

4    Q.  Please go to Trial Exhibit 3148, please, which is not yet

5    in evidence.

6    A.  Was it 3148?

7    Q.  3148, yes.

8            Do you recognize this document?

9    A.  Well, I do.  I would need to see the attachment.

10   Q.  Sure.  Please turn to Trial Exhibit 3149, which is already

11   in evidence.

12   A.  I see.  Okay.

13   Q.  So what is 3148?

14   A.  Let's see here.  Huh.

15           Yes.  Okay.  So, that would be the next set of

16   recommendations from the collateral manager to the directors

17   for the disbursement of funds, the reservation of other funds,

18   and a litigation update.

19           MS. WITYK:  The TAM parties would like to move Trial

20   Exhibit 3148 into evidence.

21           THE COURT:  And you say 3149, which you represent to

22   have been the attachment to 3148, is already in evidence.

23           MS. WITYK:  That's correct, your Honor.

24           THE COURT:  Any objection to 3148?  3148 is admitted.

25           (Joint Exhibit 3148 received in evidence)

1   Q.  So let's take a look at 3149.  So this letter is addressed

2   to Mr. Brunekreef and Mr. Rewalt?

3   A.  That's correct.

4   Q.  Who are they?

5   A.  They were the directors at the time.

6   Q.  Now please take a look at Trial Exhibits 3150, 3151, 3152,

7   and 3153, none of which are in evidence.  And let me know if

8   you recognize them.

9   A.  Okay, yes.

10  Q.  What are they?

11  A.  3151, 3152, and 3153 are the backup for the requests for

12  disbursements from these law firms.  They are billing records

13  of the firms.

14  Q.  Did you say 3150 as well?

15  A.  No, I think -- let's take a look.  I'm sorry.  Yeah, 50,

16  51, 52, 53 are backup.

17  Q.  In other words, are they attachments to the letter at

18  Exhibit 3149?

19  A.  Yes.

20          MS. WITYK:  The TAM parties would like to move Trial

21  Exhibits 3150, 3151, 3152 and 3153 into evidence.

22          THE COURT:  Point of clarification.  Were these backup

23  materials at 3150 to 53 attached to 3149?

24          MS. WITYK:  I believe, based on page three of the

25  letter, these are the attachments, and that's how they are

1    produced.  They were produced in a family.

2              THE COURT:  I see.  Any objection to 3150 through 53?

3              MR. LORENZO:  No.  The only point for clarification, I

4    think the e-mail on 3148, which I think was admitted, I'm not

5    sure if that's coming in right now.

6              THE COURT:  3148 was admitted.

7              MR. LORENZO:  It lists the attachments as letter

8    Exhibit A, Exhibit B, Exhibit C and Exhibit D.  That may

9    clarify.

10             THE COURT:  That does seem to be the right number of

11   attachments.  All right.  So hearing no objection, 3150 through

12   3153 will be admitted.

13             (Joint Exhibit 3150 through 3153 received in evidence)

14   Q.  Mr. Moon, so just turning now to Trial Exhibit 3149.  Were

15   you making any recommendations to the directors in this letter?

16   A.  Yes, I was.

17   Q.  Generally, what were those recommendations?

18   A.  Those are set forth on page two, and I was -- we were

19   recommending disbursements to Wilmer Hale, to Kaye Scholer, to

20   my law firm at the time Miller & Wrubel, to McKool, and to

21   Kobre & Kim.

22   Q.  Were you recommending any payments to PRES at this time?

23   A.  I was not.

24   Q.  Please go to Trial Exhibit 1139, which is already in

25   evidence.

1   A.   Pardon me.  Which number?

2   Q.   1139.

3   A.   1139?

4   Q.   Correct.

5           THE COURT:  At the front of your book.

6           THE WITNESS:  Yes.

7   Q.   Do you recognize this document?

8   A.   Yes.  This is one of the directors approving the

9   recommendations that I had made.

10  Q.   Was he approving recommendations with respect to all the

11  law firms you were recommending be paid?

12  A.   One second.

13          No, they did not approve all of the payments.  All of

14  the recommendations.

15  Q.   Which ones did they not approve?

16  A.   It appears as though they did not approve the

17  recommendations involving Wilmer Hale and Kaye Scholer.

18  Q.   Do you have an understanding of why?

19  A.   Sitting here today, I don't recall.  I remember there was,

20  the directors were engaged and -- they were not a rubber stamp.

21  So there was also discussion about different disbursements and

22  my -- I can only guess sitting here, but it's that I believe

23  that the Wilmer Hale fees and the Kaye Scholer fees were not

24  generated from prospective litigation on behalf of the Triaxx

25  funds, would be my very vague recollection.  It may be in this

correspondence somewhere, but that's what I would think sitting

here today.

Q.   What were those fees in relation to?

A.   Wilmer Hale represented the funds in some indemnification

litigation against Tom Priore.  Mr. Priore had expended a

substantial amount of fees paying Williams & Connolly defending

himself against the U.S. Securities and Exchange Commission in

their enforcement action that was before Judge Kaplan.  The

directors took the position that under applicable law and under

the foundational documents, Mr. Priore's conduct was at least

reckless or was misconduct, and they felt that they had no

obligation to pay those legal fees.  So Mr. Priore sued them.

And in fact, as you will see at some point, he actually

restrained some of the fees -- some of the funds that were in

the escrow account.

Q.   Please go to Trial Exhibit 3490, which is not yet in

evidence.  Do you recognize this document?

A.   Yes, this is a set of recommendations to the directors for

the reservation of certain funds and the disbursement of others

and a litigation update.

          MS. WITYK:  The TAM parties would like to move Trial

Exhibit 3490 into evidence.

          THE COURT:  Any objection?  3490 is admitted.

          Ms. Wityk, perhaps in your direct examination you will

ask the witness why he is now writing directly to the directors

1    instead of to Ms. Martin.

2              (Joint Exhibit 3490 received in evidence)

3    Q.  Mr. Moon, why are you writing directly to the directors?  I

4    see Ms. Martin is copied.

5    A.  Yes.  So, at this stage, I developed -- we had developed a

6    working relationship, and they wanted to be written to

7    directly.  I believe also, at about -- at or around this time

8    the directors asked, they wanted to have affirmative, an

9    affirmation of disbursements, rather than a negative -- a

10   positive affirmation.  So those two changes were made at the

11   directors' request at or about this time.

12   Q.  You mentioned making recommendations about disbursements;

13   is that right?

14   A.  Yes, I did.

15   Q.  What were your recommendations, generally?

16   A.  You'll see that there is recommendations on page three of

17   the letter in the text box to my former law firm, McKool, and

18   Kobre & Kim.

19   Q.  Were there any recommendations about paying PRES at this

20   time?

21   A.  There were none.

22   Q.  All right.  And then what happened next with respect to the

23   recommendations?

24   A.  Let's see here.  Yes.  So, yeah, as I see on page four, we

25   state that the collateral manager will issue the attached wire

1   instructions which comport with these recommendations after we

2   receive confirmation from you.  So I received confirmation

3   either from Ms. Martin or the directors, Mr. Calamari would

4   sign the instruction, I would give it to my senior partners who

5   would walk over to the bank and execute Mr. Calamari's

6   instruction.

7   Q.  Please go to Trial Exhibit 3495, which is not yet in

8   evidence.  Do you recognize this document?

9   A.  Yes, I do.

10  Q.  What is it?

11  A.  This is a follow-on appraisal of litigation status,

12  recommendations with respect to disbursements, and reservation

13  of funds to the directors from myself on behalf of the

14  collateral manager.

15  Q.  Ms. Martin's copied?

16  A.  Yes, Ms. Martin and Mr. Calamari are copied.

17          MS. WITYK:  At this time the TAM parties would like to

18  move Trial Exhibit 3495 into evidence.

19          THE COURT:  Any objection?  Exhibit 3495 is admitted.

20          (Joint Exhibit 3495 received in evidence)

21  Q.  So, you mentioned recommendations concerning disbursements.

22  Generally, what were those recommendations?

23  A.  So, these recommendations are to service providers who are

24  engaging in prospective litigation on behalf of Triaxx.  So, as

25  I noted, McKool was doing servicing litigation, Miller & Wrubel

1    was doing litigation against the RMBS trustees, Edison I

2    believe was the -- I'd have to look at the -- I believe Edison

3    stored a lot of the e-mails, did a lot of IT work for the

4    litigation.  And there appears also to be a fee of $1,308 to

5    TransPerfect, which, again, for litigation support of some

6    manner.  I don't recall what it was sitting here today.

7    Q.  Were any payments to PRES being recommended at this time?

8    A.  No, they were not.  There was no -- there were no

9    recoveries during this period.

10   Q.  Were the recommendations in your letter followed?

11   A.  I'm confident that they were.

12   Q.  Please go to Trial Exhibit 3099, which has not yet been

13   admitted into evidence.  Do you recognize this document?

14   A.  Again, this is a follow-on set of recommendations from the

15   collateral manager through me to the directors, apprising of

16   updates, recommending the disbursement of funds, and the

17   reservation of others.

18          MS. WITYK:  The TAM parties would like to move Trial

19   Exhibit 3099 into evidence.

20          THE COURT:  Any objection?  Exhibit 3099 is admitted.

21          (Joint Exhibit 3099 received in evidence)

22   Q.  Now you mentioned recommendations concerning disbursements.

23   Generally, who were you recommending be paid?

24   A.  The recommendation is that Kobre & Kim be paid for

25   servicing litigation, Miller & Wrubel for RMBS trustee

N4i3usb1                        Moon - Direct

1    litigation, and Edison for information technology litigation

2    support services.

3    Q.  Were you recommending any payments to PRES at this time?

4    A.  I was not, as there were no recoveries during this period

5    of time.

6    Q.  Please go to Trial Exhibit 3161, which is not yet in

7    evidence.  Do you recognize this document?

8    A.  Hmm-hmm.

9    Q.  What is this document?

10   A.  This is correspondence between the directors and myself

11   about their recommendations we just discussed.

12          MS. WITYK:  The TAM parties would like to move Trial

13   Exhibit 3161 into evidence.

14          THE COURT:  Any objection?  3161 is admitted.

15          (Joint Exhibit 3161 received in evidence)

16   Q.  Were you making recommendations about payments in this

17   letter starting on page -- the page ending in 79?

18   A.  Sorry.  Ah.  Yes.  So, the letter beginning with Bates

19   number 1779 is my response to the directors' request for

20   information about the litigation.

21   Q.  Who were you recommending be paid in this letter?

22   A.  So, we were recommending payment to Kobre & Kim, and then

23   to Analytic Focus, which was -- I believe it may have been an

24   expert witness fee.  I'd have to look at Exhibit B.  And then

25   Edison was IT litigation support.  And GTI Global is also some

1   form of litigation support.

2   Q.  I want to draw your attention to the top of page two of

3   your letter.  The top of the page you say "There have been no

4   transfers from the reserved funds since the ones authorized on

5   the basis of our November 18, 2016, letter to you."

6   A.  Yes, I see that.

7   Q.  Do you know why there was this gap in payments?

8   A.  Well, well, first of all, I think -- I don't know if this

9   language is in my other letters to the directors, but it is

10  surplusage, because I always begin the letter with the present

11  balance, and I end the letter with the ending balance if the

12  recommendations are accepted.  So that's actually true for each

13  of these letters.

14          And the answer to your question is that the letters

15  would go to the directors on an as-needed basis.  So if there

16  were no large receivables or no big recoveries, I would not

17  send the directors a letter, because there was no purpose in

18  doing so.

19  Q.  Can you please go to Trial Exhibit 3135, which is already

20  in evidence.

21          THE COURT:  Ms. Wityk.

22          MS. WITYK:  Yes.

23          THE COURT:  Before you leave 3161, I wonder if you

24  could ask Mr. Moon to explain what's going on or what prompted

25  Mr. Brunekreef's discussion of payments outside of the

1    waterfall at the top of the page Bates stamped ending 777.

2                MS. WITYK:  Absolutely.

3                THE COURT:  Thank you.

4    Q.  Mr. Moon, can you go to the page ending in 77, and please

5    tell us what prompted Mr. Brunekreef's questions about payments

6    outside of the waterfall.

7    A.  Okay.  One moment.

8                THE COURT:  I'm not sure that's an appropriately

9    phrased question on direct examination, but I'll take the fall

10   for that because I prompted you to open this discussion.  Maybe

11   you can rephrase the question.

12               MS. WITYK:  Sure.  Absolutely.

13   Q.  Mr. Moon, please take a look at the top of the page ending

14   in 77.  Let me know when you're there.

15   A.  I'm reading it now.

16   Q.  Sure.

17   A.  So I can understand it.

18   Q.  Do you recall what prompted Mr. Brunekreef's questions in

19   this e-mail?

20   A.  I believe what prompted this is that there was a complaint

21   from a noteholder about use of the waterfall.  And he also

22   notes a phone call, and there were a number of phone calls

23   during that period among Ms. Martin and the directors, myself.

24   And I'm confident that's what prompted his request.

25               And I'll say also at a certain point they stopped the

1  program, because they would rather not deal with -- they didn't

2  want there to be complaints.  If there was a question about the

3  disbursements, they wanted to be -- they wanted to do the

4  prudent thing and not have disbursements.

5  Q.  I'm sorry.  What do you mean they stopped the program?

6  A.  In other words, they -- they said we're not going to do

7  anymore disbursements because there is litigation, there's

8  complaints, we are going to wait and see what happens.

9  Q.  Okay.

10 A.  Not that -- they were not affirming the correctness of

11 those complaint.  They wanted to be prudent.

12 Q.  Do you know which noteholder raised a concern?

13 A.  I do not.  I remember their attorney.  I don't remember the

14 name of the noteholder.

15 Q.  What was the name of the attorney?

16 A.  I think it was John Pickhardt over at Quinn Emanuel.

17 Q.  Please go to Trial Exhibit 3135.

18          THE COURT:  Is this already in?

19          MS. WITYK:  It's already in evidence.

20          THE COURT:  Thank you.

21 Q.  What is this document?

22 A.  This appears to be a continuation of the discussion we just

23 talked -- an e-mail discussion.

24 Q.  Okay.  And I guess to make the record clear, is this a

25 response to the letter we just looked at, at Exhibit 3161?

1   A.   Yes.

2   Q.   What was the issuer's response?

3   A.   Right.  So, the response I believe is set forth in the top

4   paragraph of 3135, which was the directors' position that

5   supporting the old or ongoing litigations was to the benefit of

6   Triaxx, and they would authorize that.

7   Q.   So were they approving the payments that we had looked at?

8   A.   Yes.

9   Q.   That were recommended?

10  A.   Yes, that is correct.

11  Q.   Please go to Trial Exhibit 3488, which is not yet in

12  evidence.  Do you recognize this document?

13  A.   Yes, I do.

14  Q.   What is it?

15  A.   It is the same type of request and advice to the directors

16  from the collateral manager through myself.

17          MS. WITYK:  The TAM parties would like to move Trial

18  Exhibit 3488 into evidence.

19          THE COURT:  Objections?  3488 is admitted.

20          (Joint Exhibit 3488 received in evidence)

21  Q.   What update did you provide them in this letter?

22  A.   Okay.  Right.  So this is the -- this is the

23  indemnification litigation that I referenced earlier with

24  Mr. Priore.  That -- yes.  That litigation settled.  And there

25  was, I believe there was a substantial amount of funds that had

N4i3usb1                         Moon - Direct

1    been reserved for that litigation.  And so, we were notifying

2    the directors of the settlement, and asking for certain

3    disbursements pursuant to the settlement.

4    Q.  Were those payments made?

5    A.  Yes, yes, indeed they were.

6    Q.  So there were no payments to PRES at this time?

7    A.  No, there were not.

8    Q.  Please go to Trial Exhibit 3496, which is not yet in

9    evidence.  Do you recognize this document?

10   A.  Yes.  Again, it is an appraisal, and set of recommendations

11   from the collateral manager through me to the directors.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. WITYK:  The TAM parties would like to move Trial

2     Exhibit 3496 into evidence.

3          THE COURT:  Any objection?

4          3496 is in evidence.

5          (Trial Exhibit 3496 received in evidence)

6     BY MS. WITYK:

7     Q.  What were you recommending, as a general matter, Mr. Moon?

8     A.  These are payments -- these are payments to law firms, and

9     I see there's one payment to Phoenix that's recommended.

10    Q.  Did you do anything to confirm that the fees sought by PRES

11    were proper?

12    A.  Yes, I would have reviewed the contract and the calculation

13    of the fees.

14    Q.  Please go to Trial Exhibit 3146, which is already in

15    evidence.

16    A.  Okay.

17    Q.  What is this document, Mr. Moon?

18    A.  It's an email exchange among the directors and myself,

19    copying Wilmer Hale and Mr. Calamari, approving the

20    recommendations.

21    Q.  To be clear, the recommendations in Exhibit 3496 that we

22    just reviewed?

23    A.  Correct.

24    Q.  Thank you.

25          So then those payments were made?

N4IKUSB2                          Moon - Direct

1    A.   Yes.

2    Q.   Mr. Moon, are there any distributions from settlement funds

3    that are not reflected in these letters that we've gone

4    through?

5    A.   There are no distributions from the escrow account.

6    Q.   That we haven't already covered through these letters?

7    A.   Correct.  I mean, there were other -- I know other

8    settlements came in, not involving myself or the escrow

9    account.  I have no knowledge of those -- well, I have a little

10   bit of knowledge of a couple of them, but, just to be clear,

11   there were no distributions other than what's detailed in my

12   letters to Ms. Martin and the directors and that are detailed

13   on the spreadsheets that my firm created.

14   Q.   Please go to Trial Exhibit 3115, which is already in

15   evidence.

16              Mr. Moon, what is this document?

17   A.   This is the settlement agreement between Triaxx and HSBC.

18   Q.   What was this litigation about?

19   A.   This was trustee litigation.  We were alleging that HSBC

20   didn't fulfill its duties as it was supposed to.

21   Q.   Did the Triaxx CDOs receive compensation in connection with

22   this settlement?

23   A.   They did.

24   Q.   How much did they receive?

25   A.   This was not -- so, at this point, this was a small

1   settlement, as I recall, because there was some judicial

2   holdings that were impacting -- one moment.

3              THE COURT:  The bottom of page 2.

4              THE WITNESS:  Thank you, your Honor.

5              Yes, $125,000.

6   BY MS. WITYK:

7   Q.  And did PRES work on this litigation?

8   A.  Yes, yes.

9   Q.  What did they do?

10  A.  As they did with the other trustee litigations, analysis of

11  the RMBS portfolio damages using their IT methodologies to

12  determine the failures or the alleged failures of the trustee.

13  Q.  Mr. Moon, you testified yesterday that you first became

14  familiar with the Triaxx CDOs because of an SEC enforcement

15  action against ICP?

16  A.  That is correct.

17  Q.  What happened with respect to the SEC enforcement action?

18  A.  As I recall, the SEC filed a motion for summary judgment

19  before Judge Kaplan.  ICP and Mr. Priore filed summary judgment

20  motions before Judge Kaplan.  And they were the largest summary

21  judgment papers I've ever seen in my life.  Judge Kaplan denied

22  both motions and said, let's have a trial, and the matter

23  settled shortly after that.  It was a very compressed schedule

24  before trial, and I recall that the matter settled quite

25  rapidly after Judge Kaplan denied both motions.

1   Q.  Did ICP stay on as collateral manager?

2   A.  Technically, yes.  However, ICP was subject to a -- two

3   things.  It was subject to a very large order that was entered

4   by Judge Kaplan, and it was subject to having its registration

5   removed in an administrative proceeding brought by the

6   Securities and Exchange Commission.  So the ideal was, ICP had

7   to exit as collateral manager.

8   Q.  And then how did that exit occur?

9   A.  So the exit took a great deal of time and effort, and there

10  were numerous discussions among ICP and its lawyers, including

11  me, and the staff of the SEC to find an appropriate new

12  collateral manager.  So the Triaxx funds were considered what

13  they called orphan funds; they needed a new manager.

14  Q.  Did they get a new manager?

15  A.  They ultimately did, which is TAM.  As I recall, in a very,

16  very heavily negotiated set of arrangements, ICP changed its

17  name to TAM.  There was no commercial transaction.  So there

18  wasn't a sale of assets or there wasn't a merger; there was a

19  name change, and, as I recall, that's when TAM came in, yes.

20  Q.  So was there governmental oversight over this process?

21  A.  Yes.  There was, I would say, intensive governmental

22  oversight over a number of these issues, which included the

23  escrow fund that I've been testifying about these last

24  two days.

25  Q.  Which were those governmental entities that were

N4IKUSB2                        Moon - Direct

1   overseeing?

2   A.   Oh, it was the Securities and Exchange Commission was, I

3   think, the primary government entity.

4   Q.   Was there any judicial oversight over that?

5   A.   Yes.  So Judge Kaplan had issued a freeze order over the

6   assets of ICP.  So, for example, when we discussed earlier the

7   litigation involving the indemnification, when that was

8   settled, we had to go back to the SEC and ask that Judge Kaplan

9   lift the freeze order for the specific purpose of -- so, for

10  example, that transaction, and you will see the SEC, as part of

11  that transaction, I think, received about a million dollars

12  from the escrow account.  That was one of my recommendations to

13  the directors.  So there was just extensive discussions on the

14  telephone and in person among myself, Williams & Connolly, and

15  Schulte Roth & Zabel.

16  Q.   Thank you, Mr. Moon.

17          MS. WITYK:  I have no further questions.

18          THE COURT:  I see that it is just about 11:00 o'clock,

19  so let us take a, hopefully, ten-minute break and be back at

20  11:10.

21          You will be on cross-examination, Mr. Moon, so you

22  will remain under oath, and you are not to discuss your

23  testimony with counsel.

24          THE WITNESS:  Yes, your Honor.

25          THE COURT:  Or others.

N4IKUSB2                          Moon - Cross

1              THE WITNESS:  Yes, your Honor.

2              THE COURT:  We are in recess.

3              (Recess; case called)

4              THE COURT:  I see that Mr. Moon is back on the stand

5    and ready for cross-examination.

6              Mr. Moon, I know you remember this, but I have to keep

7    saying it anyway:  You are still under oath.

8              Cross-examination?  Mr. Lorenzo.

9              MR. LORENZO:  Thank you, your Honor.  We have witness

10   binders, if it's okay to approach the witness?

11             THE COURT:  You may give my copy to my deputy.

12             You may proceed.

13   CROSS-EXAMINATION

14   BY MR. LORENZO:

15   Q.  Good morning, Mr. Moon.  My name, as you likely know, is

16   Alex Lorenzo.  I'm an attorney for U.S. Bank, and I am going to

17   be asking you some questions this morning.

18             Before we start, I did just want to say, and I know

19   the Judge had said this yesterday, if at any time, you need a

20   break, just please let me know, and I'm happy to provide that,

21   obviously subject to the Judge's permission.

22             So you haven't reviewed any of the publicly available

23   filings in this litigation, correct?

24   A.  That's not correct.

25   Q.  What have you reviewed from the publicly available filings

1    in this litigation?

2    A.   There's two.  One is, as this trial date approached, I

3    would get notices, and I didn't open the filings, but I -- so,

4    for example, I'd see in the docket summary my name, that the

5    judge issued an order about me, so I reviewed that.

6            Also, some time ago, the Court issued an opinion, and

7    pursuant to that opinion, I was to transfer what was remaining

8    in the escrow account to your law firm, and so I reviewed that

9    to ensure that that was what I should do.

10   Q.   Is that the extent of the documents from this litigation

11   that have been posted on that public docket that you reviewed?

12   A.   I'm quite confident that's all there is.  I can't think of

13   anything other than -- when you say "this litigation," you

14   know, we have filed a complaint against your client, you know,

15   those -- which has now been incorporated into this litigation.

16   That would be the only other thing that I've reviewed.

17   Q.   To be clear, you did not review any direct testimony

18   submitted by other witnesses in this litigation, correct?

19   A.   I did not.

20   Q.   Have you spoken with counsel for any of the other parties

21   to the litigation about this trial?

22   A.   I have not.

23   Q.   In the last six months, have you spoken with Mr. Calamari?

24   A.   I have.

25   Q.   Did any of your discussions touch upon this litigation?

N4IKUSB2                        Moon - Cross

 1   A.  They did not.

 2   Q.  In the last six months, have you spoken with Mr. Garg?

 3   A.  I have.

 4   Q.  Did any of your discussions with Mr. Garg touch on this

 5   litigation?

 6   A.  In no way whatsoever.

 7   Q.  In the last six months, have you spoken with

 8   Mr. Nissenbaum?

 9   A.  I have not.

10   Q.  What about anybody in Mr. Nissenbaum's firm?

11   A.  If I did, Mr. Lorenzo, it was for something having nothing

12   to do with this litigation.

13   Q.  You're an attorney, correct?

14   A.  I am.

15   Q.  As you alluded to, you are currently representing the

16   issuers and collateral manager in other litigations, correct?

17   A.  I think singular, one litigation.

18   Q.  Is that the litigation that you had mentioned against my

19   client, U.S. Bank?

20   A.  Yes, sir.

21   Q.  Let's talk about your engagement in connection with the

22   Triaxx CDOs.

23         Who engaged you to pursue what you have referred to as

24   the activist litigation?

25   A.  Do you mean which person or which -- I'm sorry, which

N4IKUSB2                          Moon - Cross

1   entity or which person?

2   Q.  Let's start with which person.

3   A.  So, my conversations were with Tom Priore, but he was

4   speaking to the directors about my engagement and they approved

5   my engagement.  But I believe I spoke with Mr. Priore.

6   Q.  And, to be clear to that question, which entity did you

7   represent in connection with the activist litigation?

8   A.  The three Triaxx CDOs.

9   Q.  Let's turn to tab 1 of your binder, which is a document

10  marked as Exhibit 3482.

11          MR. LORENZO:  I believe this is a copy of the document

12  that was introduced yesterday, but the Bates stamp,

13  unfortunately -- or, rather, the exhibit stamp didn't make it

14  over, but I can represent that this is Exhibit 3482.

15          THE COURT:  Ms. Kay, is 3482 already in evidence?

16          This is a test of our recordkeeping systems.

17          THE DEPUTY CLERK:  Give me one second.

18          Yes, it's admitted.

19          THE COURT:  Excellent.

20          You may proceed, Mr. Lorenzo.

21          MR. LORENZO:  Thank you.

22  BY MR. LORENZO:

23  Q.  You testified about this document yesterday, correct?

24  A.  I did.

25  Q.  So this letter was meant to cover your representation of

1   the issuers in this Bank of New York action and other matters

2   that were directed and authorized by your client, correct?

3   A.  That would be my understanding, yes.

4   Q.  Besides this engagement letter, are there other engagement

5   letters with the issuers related to the activist implementation

6   strategy?

7   A.  With Miller & Wrubel?  Or with whom?

8   Q.  Well, let's start with Miller & Wrubel.

9   A.  I do not believe there are other engagement letters with

10  Miller & Wrubel, but there are engagement letters with other

11  law firms.

12  Q.  But as it relates to the work you did, there was an

13  engagement letter with Miller & Wrubel.  Were there any other

14  engagement letters?

15  A.  Pardon me, Mr. Lorenzo.  Yes, there would have been an

16  engagement letter with the Olshan firm.  Pardon me.

17  Q.  Were there any other engagement letters with a

18  collateral manager that you entered into related to the

19  activist implementation strategy?

20  A.  I don't believe we did enter into any engagement letter

21  with the collateral manager as a client.

22  Q.  You testified a moment ago about a second engagement letter

23  when you moved to the Olshan firm, correct?

24  A.  That is correct.

25  Q.  Was that engagement letter substantially identical to the

1   one in your previous firm?

2   A.   It probably was not substantially identical.  It was

3   probably quite different.

4   Q.   When you say "quite different," what do you mean by "quite

5   different"?

6   A.   Just a different form.  I think it probably covers many of

7   the same topics, but, you know, law firms have their own form

8   of engagement letter.

9   Q.   Looking at what has been marked as Exhibit 3482, if we flip

10  to the Bates stamp page TRI0186215.

11            Do you see that?

12  A.   I do.

13  Q.   In the accepted and agreed signature block, that's

14  Mr. Priore's signature, correct?

15  A.   That is.

16  Q.   Is it correct that your position is that your engagement

17  with the Triaxx CDOs was limited to providing legal advice

18  concerning the pursuit of the activist litigations?

19  A.   No, that would not be my position.

20  Q.   Do you remember that you and I met at your deposition?

21  A.   Yes, sir, yes.

22            MR. LORENZO:  And so this is a little bit of a test of

23  our technology, but I'd ask Tom to put up Moon deposition

24  page 37, lines 10 through 20.

25            (Video playback:)

N4IKUSB2                         Moon - Cross

1    "Q.  Now, at some point, did you also get engaged to do other

2    work for ICP or Mr. Priore?

3    "A.  Yes.

4    "Q.  And what was that work?

5    "A.  Yeah, so I --

6    "Q.  Go ahead.

7    "A.  So I believe it was -- I believe it was post settlement of

8    the litigation.  I was retained by the issuers to conduct a

9    program of what they call activist litigation."

10   Q.  Does that refresh your recollection as far as the scope of

11   your engagement, Mr. Moon?

12   A.  Well, no.  Sitting here today, I realize that I've also

13   been asked by Triaxx to give general advice from time to time.

14   So, I guess I'm supplementing the answer that I gave during my

15   deposition with my recent recollection.

16   Q.  When you say "general advice," was that limited in any way?

17   A.  I mean, if they asked for advice, and I was competent to

18   give it, I would give the advice.

19   Q.  When you say if you were competent to give it, you're a

20   litigator, right?

21   A.  Correct.

22   Q.  So would the advice that you would be competent to give

23   relate only to litigation?

24   A.  Well, you know, I also have some experience with SEC

25   regulation.

1    Q.  So just to get the categories, litigation, SEC regulation —

2    anything else that you're competent to give advice on?

3    A.  I guess I would have to ask -- it would be a more nuanced

4    question than that.  So, for example, there's litigation, such

5    as antitrust litigation, I'm not competent to give advice on,

6    or family law litigation.  The kind of litigation that Triaxx

7    gets itself into, if I feel competent to answer their

8    questions, I will do so.

9    Q.  What about the interpretation of the Triaxx indentures?

10   A.  No.  That falls outside my competency.

11   Q.  Would that include whether or not certain amounts should be

12   distributed under the priority of payments waterfall or outside

13   the priority of payments waterfall?

14   A.  That is correct.

15   Q.  Turning back to your engagement agreement, you were paid

16   for this work, correct?

17   A.  That is correct.

18   Q.  Was this an hourly engagement?

19   A.  Yes, yes, it was an hourly engagement.

20   Q.  Is it your understanding that the majority of your fees

21   were paid through the priority of payments waterfall?

22   A.  Sitting here today, I don't have an understanding of what

23   was paid through the waterfall versus what was paid through the

24   escrow fund.

25            MR. LORENZO:  Tom, if we could put up Moon deposition

N4IKUSB2                          Moon - Cross

1    page 59, lines 18 through 23.

2              (Video playback:)

3              "Did you subsequently come to an understanding of how

4    your firm's invoices were paid by the CDOs?

5    "A.  Sitting her today, my understanding is that the vast

6    majority of the fees were paid like all through the waterfall."

7    Q.  How did you come to the understanding, that you just

8    testified a moment ago, that the majority of your fees were

9    paid through the waterfall?

10   A.  Simply my recollection.

11   Q.  Do you recall sending invoices to somebody named Barbara

12   Ann at the collateral manager?

13   A.  Barbara Ann Wislowski, yes.

14   Q.  Is it your position that you never provided legal advice to

15   the collateral manager regarding the method for the payment of

16   your legal fees?

17   A.  Can you repeat that, please?

18   Q.  Sure.

19              Is it your position that you never provided legal

20   advice to the collateral manager regarding the method for the

21   payment of your legal fees?

22   A.  I don't believe I did.  I don't like the word "never."  I

23   never like to use the word "never," but I don't recall giving

24   any advice about the payment of my legal fees to the Triaxx

25   CDOs.

N4IKUSB2                          Moon - Cross

```
 1   Q.  So let's turn to tab 3 in your binder, which is marked as
 2   Exhibit 1072.  This document has already been admitted into
 3   evidence.
 4   A.  Okay.
 5   Q.  As you look at this document, this is an email and
 6   attachment from you to Mr. Calamari dated August 17, 2015,
 7   correct?
 8   A.  Correct.
 9   Q.  Then you write, "This is the invoice for the JPM
10   Article 77."
11           Do you see that?
12   A.  Yes.
13   Q.  This is referring to the attachment to the email, which is
14   an invoice for your work done in one of the activist
15   litigations, correct?
16   A.  Yes, I believe that is correct.
17           THE COURT:  I'm sorry, I'm lost.  You said tab 3 of
18   the binder?  Tab 3 is 1058.
19           MR. LORENZO:  We have --
20           THE COURT:  In my binder, tab 3 is 1058, and so is tab
21   4, strangely enough.  Would someone like to give me a copy of
22   what we are supposed to be looking at here, 1072?
23           MR. LORENZO:  Apologies, your Honor.
24           MS. BANDLER:  Permission to approach the bench?
25           THE COURT:  Ms. Kay.  Here, I'll swap my tab 3 for
```

1    your tab 3.

2             All right, we're back in business.

3    BY MR. LORENZO:

4    Q.  You then write, "We will roll this invoice, today's other

5    invoices, and the receivable into the distribution of the

6    $20 million that is expected to come from Wells Fargo in the

7    next few days."

8             Do you see that?

9    A.  I do see that, yes.

10   Q.  And you were putting together a request to the directors

11   for authorization of payment of these invoices, correct?

12   A.  I don't know if that was being prepared at this time or

13   not.  So this is 8/17 of 2015.  I don't know when the first

14   request for a distribution was made to the directors, sitting

15   here right now.  If you know the date of that request, I can

16   answer your question.

17   Q.  Well, we're going to go through it, but I can show you how

18   you answered this question when I asked it to you at your

19   deposition.

20   A.  Okay.

21            MR. LORENZO:  Tom, if you could put up Moon deposition

22   page 34, lines 5 through 24.

23            134 apologies.

24            (Video played:)

25   "Q.  And so what do you mean by 'roll this invoice, today's

N4IKUSB2                     Moon - Cross

1    other invoices and the receivable'?

2    "A.  I can tell you what I understand it to mean today.

3    "Q.  Okay.  Well, why don't we go with that.

4    "A.  Okay.  Probably there is -- there was a receivable that --

5    whatever the waterfall didn't cover for whatever reason, I

6    don't know.  I wasn't privy to.

7         "So I'm asking -- we have an additional invoice here

8    for the -- it's for $51,000.  And I'm asking Nick -- I presume

9    we were putting together a request to the trustees, and I'm

10   saying, 'Here's another invoice, we'll put them all in

11   together.'

12   "Q.  When you say 'the trustees,' do you mean the directors?

13   "A.  Pardon me.  One second -- yes.  I meant the directors."

14   Q.  So, the invoices and receivable were paid inside the

15   waterfall or outside the waterfall?

16        THE COURT:  You mean the $51,000?

17        MR. LORENZO:  Yes.

18        THE COURT:  Thank you.

19        THE WITNESS:  I don't know.  That would be reflected

20   in the letters and the spreadsheets.

21   BY MR. LORENZO:

22   Q.  In fact, isn't it true that you were paid outside of the

23   waterfall if, for whatever reason, the waterfall didn't cover

24   the amount?

25   A.  Can you repeat that question, please?

N4IKUSB2                          Moon - Cross

1   Q.  Sure.

2           Isn't it true that you were paid outside of the

3   waterfall if, for whatever reason, the waterfall did not cover

4   the amount?

5   A.  I was -- yeah, I was paid both under the waterfall and

6   outside the waterfall.

7   Q.  And, in fact, you did not keep track of what might be paid

8   inside the waterfall, correct?

9   A.  That's incorrect.

10  Q.  Let's put up, from your deposition, page 138, line 14,

11  through 139, line 13.

12          (Video played:)

13  "Q.  How did you keep track of what might have been paid inside

14  the waterfall and out of the waterfall?

15  "A.  You know, I didn't.  I mean, I knew, as you can see, with

16  great specificity, what was paid outside the waterfall.  But I

17  didn't -- you know, I didn't really have any visibility as to

18  what was paid inside the waterfall.

19          "As I said to you before, when I received or when the

20  firm received three payments on, you know, whatever, the 7th

21  day of the month in similar amounts that were very odd, then I

22  knew that was probably coming from inside the waterfall, right?

23          "When I received -- well, when I worked on a

24  recommendation and, you know, it would set forth funds for the

25  firm from the escrow account that would come from outside the

N4IKUSB2                        Moon - Cross

1   waterfall.

2          "But as to what all was paid inside the waterfall, I

3   had, I don't think, any visibility into that.  I just wasn't

4   privy to it."

5   Q.  Let's talk a little bit about the activist litigations.

6          So, you previously testified that you were engaged to

7   pursue litigation with regard to the underlying RMBS collateral

8   on behalf of the Triaxx CDOs, correct?

9   A.  I'm sorry, sir, that was quite a bit in a quick sentence.

10  Could you slow it down and repeat it?

11  Q.  Sure.

12         So, you previously testified that you were engaged to

13  pursue litigation with regard to the underlying RMBS collateral

14  on behalf of the Triaxx CDOs, correct?

15  A.  Yes, that is correct.

16  Q.  Isn't it true that there were class actions filed against

17  originators and servicers with regard to the same underlying

18  RMBS collateral?

19  A.  There may well have been.

20  Q.  And isn't it true that the issuers had to opt out of these

21  class actions if they wanted to pursue individual actions?

22  A.  I'm sorry, who do you mean by "the issuers"?  Are you

23  talking about Triaxx?

24  Q.  Yes.  The issuers, when I'm talking about the issuers here,

25  the Triaxx issuers.

1  A.  Why don't you start over.  So Triaxx -- obviously, if

2  Triaxx was in a class, a class action litigation, it would have

3  the ability to opt out.

4  Q.  And did the Triaxx issuers opt out of certain class action

5  litigations?

6  A.  They may have, I don't recall.  They probably did.

7  Q.  Were you involved in the decision to opt out of any class

8  action litigations?

9  A.  You know, I was involved -- I was very tangentially

10 involved in one class action involving the manipulation of the

11 LIBOR rate.  I was not lead counsel.  And I don't even recall

12 if Triaxx opted out or not.  I know they received a settlement

13 from that litigation, but that's literally all I know about it.

14 Q.  Do you know if the Triaxx CDOs, in fact, received funds

15 from class action settlements related to RMBS?

16 A.  I believe they did, yes.

17 Q.  And you don't know whether all the monies that came into

18 the collateral manager from those class action settlements were

19 deposited in the accounts established under the indentures,

20 correct?

21 A.  I would have no insight as to how monies were treated other

22 than what we've seen today and what's on our spreadsheets, yes,

23 that's correct.

24 Q.  Let's talk a little bit about the collateral recoveries in

25 the settlement memos.  The Triaxx CDOs recovered funds from

N4IKUSB2                      Moon - Cross

1    settlements in connection with the activist litigation,

2    correct?

3    A.  Yes, that is correct.

4    Q.  And the settlement funds were not all deposited in the

5    Triaxx CDOs' accounts, correct?

6    A.  They were -- the things I handled were put into the escrow

7    account that our law firms managed.  If --

8    Q.  Was that -- your firm's escrow account, was that an account

9    that was maintained by the trustee?

10   A.  No.  I mean, it was a law firm escrow account.

11   Q.  So that wasn't, in your view, an account that was

12   controlled by the trustee established under the indentures,

13   right?

14   A.  Do you mean -- "by the trustee," do you mean U.S. Bank?

15   Q.  Yes, the trustee for the Triaxx CDOs.

16   A.  No.  I mean, U.S. Bank did not control Miller & Wrubel's

17   escrow account, clearly.

18   Q.  And your rationale for why you did not put the money in the

19   accounts controlled by U.S. Bank for the benefit of the Triaxx

20   CDOs is that you believed it would be more beneficial to the

21   issuers to replicate the success of the Countrywide settlement,

22   correct?

23   A.  Well, I think that's such a dramatic oversimplification,

24   that it's incorrect.

25   Q.  Let's look at what you said at your deposition.

1          MR. LORENZO:  If we could put up Moon deposition

2     page 75, lines 6 through 14.

3          (Video played:)

4     "Q.  So why not just put the money in the escrow account into

5     the accounts established under the indentures and then, as you

6     said, it would be paid out pursuant to the priority of payments

7     waterfall?

8     "A.  Oh, I see your question.  I believe the thinking at the

9     time was it would be more beneficial to the issuers to

10    replicate the success of the Countrywide settlement."

11    Q.  Who directed where the settlement funds would be deposited?

12          THE COURT:  Deposited in the first instance?

13          MR. LORENZO:  Yes, deposited in the first instance.

14          THE COURT:  Thank you.

15          THE WITNESS:  Who directed?  Well, I mean, this was

16    all -- everything done with settlement funds was done at the

17    direction of the directors, I believe, and with the advice of

18    legal counsel.

19    BY MR. LORENZO:

20    Q.  Were you that legal counsel?

21    A.  Pardon me?

22    Q.  Were you that legal counsel?

23    A.  No, no.  Wilmer Hale was the directors' legal counsel, and

24    then Schulte Roth & Zabel gave further legal opinions on how

25    those settlement funds were treated.

N4IKUSB2                      Moon - Cross

1    Q.  So, to go back to the question, though, in the first

2    instance, it was Wilmer Hale who directed where the settlement

3    funds would be deposited?

4    A.  I don't think I said that.  I said the director -- I'm

5    getting confused by your question because the very first

6    deposit of funds was put into a jointly held account between

7    Keller Rohrback and Miller & Wrubel, and that was part of a

8    negotiated settlement so that the funds could start to be

9    utilized on behalf of the Triaxx entities.

10        So, this first instance, I'm having a hard time with

11   that one because we were trying to find an escrow account to

12   hold the funds and put them to corporate use.

13   Q.  Let me break it down.  I'm not trying to confuse you with

14   this, I'm trying to understand.

15        In the first instance, there was a settlement, and

16   then who made the decision where that settlement money should

17   go?

18   A.  So, if memory serves, I mean, this all would have been

19   done -- we would have made our recommendations to the

20   collateral manager for approval by the directors, and that's

21   how it would have ended up in the account at Wells Fargo.

22   Q.  So when you say "we would have made our recommendations,"

23   is that you and your law firm?

24   A.  Right.  So, I mean, with almost all these transactions, you

25   know, the collateral manager would have a notion or an idea of

1    how funds should be settled.  We would handle the legal aspects

2    of it, as you can see in my letters, and that would be approved

3    by the directors, to my understanding.

4    Q.  Right.

5            So I'm just trying to walk through how the money came

6    in.  So there was a settlement, you and your law firm made a

7    recommendation to who about putting this money into the escrow

8    account?

9    A.  Well, let's see.  At that point, it would have been --

10   there would have been discussions with Mr. Priore, and

11   Mr. Priore would have had discussions with the directors.  This

12   is early, very early on, for that initial deposit.

13   Q.  And was your law firm involved in that decision to deposit

14   these settlement funds in the escrow account?

15   A.  Involved -- yeah, of course, we were involved.  We were one

16   of the cosignatories on the account.

17   Q.  But what I'm trying to get to is you had testified, right,

18   that you were not engaged by the collateral manager to provide

19   legal advice regarding payments outside the waterfall, right?

20   A.  Correct.

21   Q.  But you did provide advice about where the settlement

22   monies should be deposited; is that correct?

23   A.  I don't know if it's -- I don't know if I was providing

24   advice.  If Triaxx wanted the funds, it had to go into an

25   escrow account.  I mean, the funds were coming.  Keller

N4IKUSB2                         Moon - Cross

1    Rohrback was objecting and had the ability to prevent any funds

2    from coming.  And a jointly held account seemed like a very

3    good solution so that Triaxx could have access to the funds.

4    Q.  I want to make my question clear for the record, so I

5    apologize if this is slightly repetitive.

6          But you were also not engaged by the issuers to

7    provide legal advice regarding payments outside the waterfall,

8    correct?

9    A.  No, no, I was not.  Schulte Roth was.

10   Q.  We'll get to Schulte Roth in just a minute, but I just want

11   to be clear.  You did not, in fact, provide legal advice to the

12   collateral manager regarding the propriety of distributing the

13   settlement payments outside the waterfall, correct?

14   A.  I did not.

15   Q.  And, similarly, for the issuers, you did not, in fact,

16   provide legal advice to the issuers regarding the propriety of

17   distributing the settlement payments outside the waterfall,

18   correct?

19   A.  That's correct, yes.

20   Q.  So let's flip to tab 4, which is what has previously been

21   marked as Exhibit 1058, which, hopefully, is in everybody's

22   binder.  So, this is an email and attachment, and attached to

23   it is a letter dated November 20, 2014, from you to Ms. Martin,

24   of Wilmer Hale, correct?

25   A.  Yes, that is correct.

N4IKUSB2                        Moon - Cross

1   Q.  And you had looked at this, I believe, yesterday.  I know

2   you looked at a bunch of letters this morning as well, but I

3   think this was a letter that you had looked at yesterday,

4   correct?

5   A.  I probably did, yes.

6   Q.  And yesterday, when we looked at this, I believe you said

7   that you needed to email Ms. Martin rather than the directors

8   at the issuers because the issuers were represented by counsel,

9   correct?

10  A.  Yes, that is correct.

11  Q.  But weren't you also the issuers' counsel?

12  A.  I was the issuers' counsel, yes.

13  Q.  So you represented the issuers, right?

14  A.  That's correct.

15  Q.  Now, as we look at the letter, which is on the page ending

16  with 310 on the Bates stamp, this is your firm's letterhead,

17  correct?

18  A.  Yes, it is.

19  Q.  And if we flip to the page ending in 312, that's your

20  signature on the letter, right?

21  A.  Yes, it is.

22  Q.  And you drafted this letter, correct?

23  A.  I am not sure if I did or an associate did.  I probably

24  did.

25  Q.  But somebody in your firm drafted this letter, not you?

N4IKUSB2                           Moon - Cross

1   A.  I probably drafted it.  It was 2014, almost a decade ago.

2   Q.  So if we look at the first page, ending in 310, that first

3   bullet point, it's the last item on the first page, do you see

4   in the first sentence that the letter indicates that a

5   $69 million payment received in October 2014 will be referred

6   to as the first recovery?

7   A.  Are you asking me if I see that?

8   Q.  Yes.

9   A.  Yes, I do, sir.

10  Q.  And Tom has also put it up on the screen, if that's easier

11  for you to see.  It's that first bullet point.

12  A.  Yes, I do see it, yes.

13  Q.  It says this sum was transferred into a custodial account

14  at Wells Fargo Bank, correct?

15  A.  That is correct.

16  Q.  And you had testified to this a minute before, but this

17  custodial account at Wells Fargo Bank was not one of the Triaxx

18  CDOs' accounts as established under the indentures, correct?

19  A.  It was not.

20  Q.  So if we flip to the next page, ending at Bates stamp 311,

21  there's a heading that says "Recommendations."

22          Do you see that?

23  A.  Yes, I do see that.

24  Q.  And so, is that your law firm's recommendations about how

25  this 69 million should be treated?

N4IKUSB2                         Moon - Cross

1    A.  No, it is not.  It's the collateral manager's.  We would

2    forward these, talk to the collateral manager about what they

3    thought was appropriate and, as I said, assist them with the

4    letters and recommendations, et cetera.

5    Q.  So, just to be clear, this recommendation is actually the

6    collateral manager's recommendation?

7    A.  Yes, I would say this is the -- I mean, we obviously had a

8    lot of -- there's a lot of legal recommendations in these

9    letters, but it's really the province of the collateral manager

10   to determine the finances of the entity.

11   Q.  So, even though this is on your letterhead, you signed the

12   letter, you're saying that this recommendation is, in fact, not

13   the recommendation of you or your law firm?

14   A.  I think it was clear to everyone, sir, yes.  But I don't

15   see that on the letter.

16   Q.  Just to be clear, you represented the issuers, correct?

17   A.  I represented the issuers, yes.

18   Q.  And not the collateral manager; is that correct?

19   A.  That is correct.

20   Q.  So, then, if you look -- and I'm still on this page ending

21   at 311 -- there's a table with what look to be amounts for the

22   three CDOs.

23            Do you see that?

24   A.  Uh-huh.

25   Q.  So how did you decide how much should be transferred to the

N4IKUSB2                          Moon - Cross

1    three CDOs?

2    A.  I just told you, I didn't.  It was the collateral manager.

3    Q.  Do you know how the collateral manager made that

4    determination?

5    A.  Yes, I do.

6    Q.  And how did the collateral manager make that determination?

7    A.  I believe they relied upon Phoenix to do a calculation of

8    which CDOs owned which RMBS that were a part of the settlement

9    and how to attribute these proceeds to the three different

10   CDOs.

11   Q.  So let's go to the first line.  It says, "Transfer to

12   Triaxx CDO 2006-1 Ltd."

13           Do you see that?

14   A.  I do see that.

15   Q.  And then there's a number, $10,149,350.48.

16           Do you see that?

17   A.  I do see that.

18   Q.  So do you know why that number was picked, why not

19   12 million, why not 13 million?

20   A.  Yes.  As I just testified, that number is based upon the

21   RMBS owned by Triaxx CDO 2006-1 that were part of the

22   Countrywide settlement.

23   Q.  So if you total these numbers up for the Triaxx CDOs, that

24   amount reflects the RMBS that was owned by the three CDOs?

25   A.  That were subject to the Countrywide settlement, yes.

1    Q.  What I'm trying to understand is, are these numbers just

2    the leftovers after the expenses are taken out, or was there a

3    determination that the CDOs are only entitled to these specific

4    amounts from the settlement?

5    A.  I don't recall sitting here now.  I believe a -- well, I

6    don't know, to be honest with you.

7    Q.  So, in fact, the CDOs might have only been entitled to

8    these specific amounts, and the rest was just bonus money; is

9    that correct?

10   A.  I don't know what you mean by --

11   Q.  What I'm trying to get to is, isn't it a fact that these

12   amounts are really the leftovers after all these expenses on

13   the next page are taken out?

14   A.  I don't think so.  Are they?  Let me look at the whole

15   document.

16   Q.  Well, why don't you take a look at the next page, ending in

17   312.

18            (Pause)

19   A.  To answer your question, I would have to look at the

20   spreadsheet.  I would have to look at the spreadsheet, and that

21   would help me understand what was reserved.  So, for example, I

22   see there's also, in the first bullet point of page 2, the

23   amount of 13,500,000 was restrained by a TRO.

24   Q.  So, let's look at that for a moment.

25            You're looking at the first bullet point on page 2.

1   Is that amount also reflected on the third page, ending in 312,

2   the last entry in the table?

3   A.   Oh, yeah, okay.  So that is -- yeah, there's 13 million.

4   Q.   So the 13 million -- let's work up from the bottom.

5   A.   Okay.

6   Q.   The next one up from the bottom, it's the reserve for the

7   KR disputed fees.

8            Is that the Keller Rohrback fee dispute?

9   A.   That is, yes.

10  Q.   So that was 14 million, and I think you testified this

11  morning that, in fact, that was settled for, like, 7 million

12  and change; is that correct?

13  A.   Whatever my testimony was, yes.

14  Q.   I'll represent that it was 7 million and change.

15           So 7 million and change is, obviously, less than the

16  amount that was retained, right?

17  A.   Correct.

18  Q.   So what happened -- once the settlement was reached with

19  Keller Rohrback, right, what happened to the balance of that

20  14.2 million that was retained?

21  A.   It stayed in -- it would be demarcated in the spreadsheet

22  that I mentioned earlier.

23  Q.   So was it transferred back to the accounts established

24  under the indentures, like that money that we looked at, the

25  first three entries in the table?

```
1    A.  No.  Obviously, as the spreadsheet details, settlement
2    money came in, recommendations were made to the directors for
3    disbursements.  Oftentimes they were authorized.  What wasn't
4    authorized would remain in the escrow account, would be
5    reserved.
6    Q.  What I'm trying to understand is, so that 14.2 million was
7    retained for a dispute with Keller Rohrback, right?
8    A.  Yes.
9    Q.  But this is the -- the money is actually the CDOs' money,
10   correct?
11   A.  The money is actually the CDOs' money?
12   Q.  Well, when this money is retained, whose money is in your
13   escrow account?
14   A.  Well, it's being held on behalf of Triaxx.
15            And, by the way, this was reviewed by counsel, who's
16   expert in the matter --
17   Q.  We'll get to that in a minute.
18   A.  -- and there were no objections in the way this was
19   handled, and you will see the fee for $25,000 to review this
20   very paper that you're questioning me about.
21   Q.  Well, when you say there were no objections, the
22   noteholders didn't object to that?
23   A.  No.  I said legal counsel, Schulte Roth & Zabel.
24   Q.  So let's talk about Schulte Roth & Zabel.
25            MR. LORENZO:  Judge, it looked like you might have a
```

1   question.  I apologize.

2            THE COURT:  Well, I was going to caution the witness

3   to answer the question that you asked him, but you seem to be

4   interested in the more expansive answer that he gave you.  So,

5   proceed.

6   BY MR. LORENZO:

7   Q.  Let's go back to that, Mr. Moon.

8   A.  Yes.

9   Q.  So, let's drill down.  Whose money was this that was being

10  held in this joint escrow account between your firm and Keller

11  Rohrback?

12  A.  My -- as a person who's not a structured finance expert, I

13  would say it's Triaxx's money.

14  Q.  When you say Triaxx, what entity are you referring to?  The

15  Triaxx CDOs?

16  A.  Yes.

17  Q.  And, so, when the settlement occurred, and, all of a

18  sudden, 14.2 million had been retained, but only 7 and change

19  was needed to pay Keller Rohrback, right, why isn't that money

20  then transferred into the accounts established under the

21  indentures?

22  A.  I mean, that would run counter to the program that was

23  directed by the directors of the Triaxx CDO.

24  Q.  So, ultimately, it was a decision of the directors of the

25  Triaxx CDO not to return that money to the accounts established

1    under the indentures?

2    A.  As a person who's just a litigator, it seems to make sense

3    to me that the directors of an institution can direct where its

4    assets go, not a noteholder.

5    Q.  So, just to get back to my earlier question, is it your

6    understanding that the money you were holding was the money

7    subject to the direction of the directors so that they

8    ultimately controlled all this money that was held at this

9    escrow account?

10   A.  I think the directors or the trustees of a body that board

11   a corporation is the highest governing body of that entity in

12   my, again, practically layperson's view of structured finance.

13   Q.  I know you've mentioned Schulte a couple of times.  In

14   fact, you didn't give any legal advice, one way or the other,

15   about whose money this was; is that correct?

16   A.  I don't recall.  I may well have used the words it's

17   Triaxx's money, but I certainly would not intend to give legal

18   advice because it is outside my field.

19   Q.  So let's talk a little bit about Schulte.

20           So, as I go up the table from the bottom, it looks

21   like there's a line that says, "Transfer to Schulte Roth &

22   Zabel for legal fees as per Exhibit G of submission," and then

23   it says $25,000.

24           Do you see that?

25   A.  I do, sir.

N4IKUSB2                         Moon - Cross

1   Q.  And Exhibit G, is that an invoice from Schulte?

2   A.  There's -- in my binder, there's no attachments.

3   Q.  Well, as we flip, are there pages past -- in my binder, it

4   goes to -- I'm looking at Bates stamp page ending at 324.  And

5   I will represent in this exhibit, this is all that we have seen

6   as it relates to Schulte.

7           Do you have that document in your binder?

8   A.  I'm sorry, sir, what tab?

9   Q.  So we are in tab 4.

10  A.  Right.

11          THE COURT:  My tab 4 contains a page ending 3524,

12  which is a wire transfer instruction into the Schulte business

13  account.  Is that correct?

14          MR. LORENZO:  Yes.  It might be 5324, your Honor.

15          THE COURT:  I have 324, thank you.

16  BY MR. LORENZO:

17  Q.  Do you have that page?  It's the very last page of tab 4 in

18  my binder.  If not, I'm happy to hand it up, Mr. Moon.

19  A.  No, I see it, Mr. Lorenzo.

20  Q.  So, this is -- what is being referred to, these are wire

21  instructions for Schulte, right?

22  A.  That appears to be a wire instruction, yes.

23  Q.  Do you know whether there was an invoice from Schulte for

24  $25,000?

25  A.  I don't recall.  I mean -- I don't recall, sir.

N4IKUSB2                        Moon - Cross

1    Q.  That $25,000, was that a flat fee?

2    A.  Yes.

3    Q.  Now, skipping over the 28,000, there's also a transfer to

4    M&W for legal fees and expenses of $50,034.81.

5            Do you see that?

6    A.  I do.

7    Q.  Did the collateral manager make the recommendation to the

8    issuers that that invoice from your firm be paid to Miller &

9    Wrubel?

10   A.  Yes.

11   Q.  And all of these payments listed on this page 3, Bates

12   stamp 312, these were all outside the waterfall payments,

13   correct?

14   A.  Yes, these were all paid from the escrow fund.

15   Q.  And at the time you sent this letter to Ms. Martin, it was

16   your understanding that Schulte had approved these payments

17   outside the waterfall, correct?

18   A.  That is correct, yes.

19   Q.  Do you know when this approval happened?

20   A.  Pardon me, sir?

21   Q.  Do you know when this approval by Schulte happened?

22   A.  It -- at or about the time of this transaction.

23   Q.  Do you know the work that Schulte did to approve these

24   payments?

25   A.  I do not.

1   Q.  Who was Schulte representing when they made this approval?

2   A.  You know, I don't believe I was privy to that engagement

3   letter.  I can't tell you sitting here.  I don't believe I

4   recall or I'm not sure I ever knew.

5   Q.  You had never reviewed the indentures for the purposes of

6   determining whether fees should be paid inside or outside the

7   waterfall, correct?

8   A.  That is correct.

9   Q.  And the entity responsible for making the recommendations

10  to make the payments outside of the priority of payments

11  waterfall was the collateral manager, correct?

12  A.  Yes, that would be correct -- well, yes, I'll say that's

13  correct.

14  Q.  And the person at the collateral manager who was the

15  decision-maker at that time and who would have been responsible

16  for making that recommendation was Tom Priore, correct?

17  A.  Well, you know, for making the recommendation?  Yes, that's

18  correct.

19  Q.  In fact, the decisions about who and when to pay outside of

20  the waterfall were not made by you, correct?

21  A.  That is correct.

22  Q.  You were just the messenger, right?

23  A.  That's in-- I'll take issue with that.  I'm a lawyer, not a

24  messenger.  Although being a messenger is quite a fine

25  vocation.

N4IKUSB2                          Moon - Cross

1   Q.  And pursuant to this letter, the one we are looking at, the

2   collateral manager made this recommendation to the issuer,

3   correct?

4   A.  Can I ask you, Mr. Lorenzo, to -- I know you're reading

5   your questions.  Could you just slow down a little for me?

6   Q.  Sure.

7           Do you need a break?

8   A.  No.  It's easy to read a question.  It's more difficult to

9   understand it and formulate an honest answer.  So if you could

10  slow down, that would be helpful to me.

11  Q.  That is no problem.  I'm mindful of the time, so I will

12  slow --

13  A.  I have all day, sir.

14  Q.  I don't think I might, but we'll see.

15          So let me ask you:  And pursuant to this letter, the

16  collateral manager made this recommendation to the issuer,

17  correct?

18  A.  Yes, that is correct.

19  Q.  And then the issuer then sought the advice of its counsel

20  at Wilmer Hale?

21  A.  I mean, that is my understanding, yes.

22  Q.  And your understanding is that the lawyer at Wilmer Hale

23  who was responsible for this was Ms. Martin, correct?

24  A.  I know Ms. Martin was the -- you know, she was the

25  relationship partner, and she was involved.  I don't know what

1   resources at Wilmer Hale she relied upon to give advice to the

2   directors.

3   Q.  When you were talking a moment ago about Schulte approving

4   the recommendation in your letter, the lawyer at Schulte who

5   made that approval, that was David Nissenbaum; is that correct?

6   A.  I believe, at various times, it was Mr. Nissenbaum and

7   Mr. Stein.

8   Q.  Was Mr. Priore involved in the drafting of this letter?

9   A.  In the drafting?  No.  He was probably more of an -- well,

10  he would have been -- I would say, no, he wasn't involved in

11  the drafting.

12  Q.  Did Mr. Priore sign off or approve this letter?

13  A.  Yes, I'm confident that he did.  I don't specifically

14  recall, but I would not have sent it without the approval of

15  the collateral manager.

16  Q.  And the recommendations that were made regarding payments

17  outside the waterfall were because payments inside the

18  waterfall did not generate enough in fees to efficiently or

19  effectively pursue recoveries; is that correct?

20  A.  That's my rough understanding.  I wasn't privy to a lot of

21  those discussions, but that would be a general understanding

22  that I had.  I don't know -- for example, I don't know how much

23  the waterfall kicks off each month, so I don't want to

24  overstate my knowledge.  That is my general understanding,

25  though.

1    Q.  And the guiding principle that determined whether a

2    particular invoice was paid inside or outside the waterfall was

3    to ensure that law firms and other service providers, like

4    Phoenix, received adequate payment, correct?

5    A.  I think the guiding principle was to benefit the Triaxx

6    CDOs.

7    Q.  Let's look -- because I had asked you a question about this

8    at your deposition.

9    A.  Yeah.

10        MR. LORENZO:  If we could put up Moon deposition

11   page 136, line 9, through 137, line 6.

12        (Video played:)

13   "Q.  No, and that gets to what I think we're trying to

14   understand, which is, is there some sort of rule or guiding

15   principle that determines if a particular invoice was paid

16   inside the waterfall or outside the waterfall?

17   "A.  I don't believe, you know -- is there a rule or principle?

18        "You know, as I said before, I think these

19   outside-the-waterfall payments would go up to the directors.  I

20   think most of them, not all of them, would be approved.  But

21   there had to be a legitimate -- this had to benefit the issuer.

22   It had to make sense for the issuer, for it to make sense.

23        "And probably if there was -- if people were getting

24   paid adequately inside the waterfall, we wouldn't be in a

25   position to, you know, recommend that there be a disbursement

1    outside the waterfall.  That would be the principle.  And you

2    can see how that evolved over time, what was getting paid out

3    of the waterfall."

4    Q.  You testified earlier that your firm, Miller & Wrubel, was

5    also paid inside of the priority of payments waterfall,

6    correct?

7    A.  Yes, that is correct.

8    Q.  So now, turning back to the letter and the page -- it's the

9    last page of the letter, ending at Bates stamp 312.  At the end

10   of the letter -- this is the second sentence in the last

11   paragraph -- the collateral manager -- it says, "The collateral

12   manager will issue the attached instruction on November 25,

13   2014, unless we receive instructions from the directors

14   otherwise."

15            Do you see that?

16   A.  Yes, I do.

17   Q.  Did you receive any response from the directors or its

18   counsel?

19   A.  You know, I may have received some response.  As I

20   testified earlier, it wouldn't be uncommon for Ms. Martin and I

21   to discuss a letter such as this, but I can tell you, I

22   received no negative response.

23   Q.  So let's go to the next letter in the sequence of letters

24   that you had looked at this morning.  If you'd just turn the

25   page to tab 5, and I'm a little nervous, but I hope that this

1   is Exhibit 1175, which has previously been entered.

2              THE COURT:  In my notebook, 1175 was oddly tucked at

3   the end of tab 4, but I have rescued it, and I will place it

4   behind tab 5.

5              Was 1175 previously admitted?

6              MR. LORENZO:  Yes, your Honor.

7              THE COURT:  The question is:  Does Mr. Moon have 1175?

8              THE WITNESS:  I do, your Honor.  Thank you.

9              THE COURT:  Excellent.  I'm the one who got the rogue

10  notebook, apparently.

11             MR. LORENZO:  Apologies, your Honor.

12  BY MR. LORENZO:

13  Q.  Now, I believe you had looked at a version of this document

14  this morning.

15             Do you recall that?

16  A.  They are all sort of blending together, but -- oh, yes, I

17  did.  I saw -- I believe the cover page is different, but this

18  has my holographic writing on Bates number 55310, so I do

19  recognize that, yes.

20  Q.  And this is an email thread with a draft letter dated

21  October 22nd, 2015, from you to Ms. Martin, correct?

22  A.  I'm seeing -- the first page of this exhibit is from

23  Mr. Calamari to Eric Whitney, and then the third page of this

24  exhibit that's before me is a letter from myself to Ms. Martin.

25  So, if you're referring to 55310, then, yes.

N4IKUSB2                        Moon - Cross

1    Q.  So let's look at that draft letter ending in Bates stamp

2    310.

3            If we look at that first bullet point, all the way at

4    the bottom, it says, "The sum of $20,260,809.94 was transferred

5    from a custodial account at Wells Fargo Bank (the first

6    recovery) to our client escrow account and is held on behalf of

7    Triaxx."

8            Do you see that, sir?

9    A.  One moment, sir.

10           (Pause)

11   A.  Yes, I do see that.

12   Q.  And so this is the post-Keller Rohrback settlement when the

13   balance of that joint escrow account was then transferred to

14   your firm's escrow account?

15   A.  Okay.

16   Q.  Is that correct?

17   A.  I believe so.  I'd need to refer to the spreadsheets to

18   confirm, but that sounds correct.

19   Q.  When you say the spreadsheets to confirm, what are you

20   referring to?

21   A.  So, my law firm made spreadsheets that accounted for every

22   recovery and every distribution from the escrow fund, and with

23   great effort, to make sure that everything balanced and that

24   the letters comported with what was in the spreadsheet.  There

25   were a total of three of them, two made by Miller & Wrubel.

N4IKUSB2                        Moon - Cross

1    There was a third one that was created at Olshan that had very

2    little activity because at that point, there were no further

3    distributions, there were a couple of recoveries, and the

4    amount -- which have been produced in this action.

5              So when people ask me, well, was this approved, you

6    know, I see this as a draft letter, unsigned by me, so I don't

7    know for sure, but if I have the spreadsheet, I can see the

8    date of the transfers and to whom they went.

9    Q.  So you had looked at a spreadsheet, I believe it was

10   Exhibit 3050, this morning.

11             Is that the spreadsheet you were referring to?

12   A.  That would be one of them.  The one you're referring to,

13   Mr. Lorenzo, that's the main spreadsheet, if you will.

14   Q.  So why don't we -- I think -- sorry, I think you have your

15   big binder.

16   A.  I have my big binder.

17   Q.  Why don't we look at 3050.

18             THE COURT:  So we're looking at 1175 from your binder,

19   Mr. Lorenzo, and the spreadsheet, Exhibit 3050, from the last

20   binder?

21             MR. LORENZO:  That's correct.  And I think we'll shift

22   our attention to 3050.

23   BY MR. LORENZO:

24   Q.  And, specifically, I think we're looking at the page

25   starting with Bates stamp ISSUERS 666.

N4IKUSB2                        Moon - Cross

1          Is that what you are looking at, Mr. Moon?

2    A.  Yes, sir.

3    Q.  And, so, when we see the entry at line 3, which matches

4    that number that I just read to you -- do you see that?

5    A.  I do, sir.

6    Q.  -- so that's the amount that came in from that joint escrow

7    account to the escrow account that was established at your

8    firm?

9    A.  Yes.

10   Q.  Earlier, we had looked at that November 2014 letter that

11   you had written, yes?  You remember that?

12   A.  I'm trying to get it straight in my mind.  November --

13   Q.  It was a letter we just looked at a moment ago to

14   Ms. Martin --

15   A.  Yeah.

16   Q.  -- which detailed the payments, right?

17   A.  Yeah.

18   Q.  There were three payments to the Triaxx CDOs to the

19   accounts established under the indenture.  Remember we talked

20   about that?

21   A.  Uh-huh.

22   Q.  And so I took a look at this spreadsheet.

23          Did you see, were there any other payments to the

24   accounts established under the indentures?  I didn't see any on

25   this spreadsheet, Mr. Moon.  Do you see any?

N4IKUSB2                        Moon - Cross

1    A.  I'm sorry, you're asking my legal -- can you repeat the

2    question?

3    Q.  No, what I'm asking is, after those original three

4    transfers to the accounts established under the indentures,

5    were there ever any future transfers to those accounts from the

6    escrow funds?

7    A.  I don't believe so.  Unless you literally transferred what

8    was left in the account to you, and if you put them into --

9    sent them to the U.S. Bank, then the answer would be yes.

10   Q.  That was -- at the very end, I think you referred to the

11   court order that required you to transfer --

12   A.  Yes.

13   Q.  -- at that point, I think it was under a million dollars;

14   is that correct?

15   A.  Probably.  I mean -- no, sorry.  I mean, just so you know,

16   Mr. Lorenzo, the prior spreadsheet, the one that was made to

17   cover the period of time prior to the one that's marked as an

18   exhibit, is the one that would have reflected those payments to

19   Triaxx.

20   Q.  Right.

21       What I'm trying to understand is after those three

22   payments to the accounts established under the indentures,

23   there was never any future transfer to those accounts?

24   A.  That is -- from the escrow account, other than my transfer

25   to you, that is correct, in my understanding.

N4IKUSB2                          Moon - Cross

1    Q.  Now, as we're looking at this, on line 5 of the spreadsheet

2    in 3050, there is a wire to Schulte.

3          Do you see that?

4    A.  I do.

5    Q.  That's 10/30/2015; is that correct?

6    A.  That is correct.

7    Q.  So that was that first $25,000 payment that we had talked

8    about, correct?

9    A.  That is correct.

10   Q.  And then as we flip through this, was there another payment

11   to Schulte in connection with the letter to Ms. Martin on or

12   around October 22nd, 2015?

13   A.  Yes, there was a second payment to Schulte in the amount of

14   25,000.

15   Q.  I'm sorry, I know I -- so that payment that I was pointing

16   to, in fact, that was this 2015 payment; is that correct?

17   A.  Yes, indeed, yes.  Yes, that's correct.

18   Q.  What was that $25,000 for?

19   A.  For Schulte to review the transaction with respect to the

20   indentures and all that stuff that is not in my repertoire.

21   Q.  But after that second payment to Schulte, was Schulte ever

22   asked to review another one of your memos, all the ones that we

23   looked at this morning?

24   A.  They were -- I don't know what -- well, the answer is, they

25   were asked, I think, to write one or -- one letter, one opinion

letter, and then there were two other advices of counsel.  I
don't recall whether they saw my letters or not in giving that
legal advice.

Q.  Was there a reason that they stopped seeing your letters?

A.  Oh, I don't know if they stopped seeing my letters or not.
So, I did not -- I believe it was Mr. Calamari who worked with
Schulte on the subsequent legal advice.  That's why I'm saying
I don't know if they viewed my letters or not, but I can't say
they stopped seeing them.

Q.  But there were no more $25,000 payments after those
first --

A.  Oh, that is correct, yes.

Q.  And then there was a payment in connection with what we're
calling the Stein memo.  I think you had referred to it a
moment ago, correct?

A.  I don't believe that had anything to do with the escrow
account.

        The payment for the Stein memo?

Q.  So you don't believe that the Stein memo came out of the
escrow account funds?

A.  I don't believe so, no.  Except let me, just for the sake
of clarity, unless Schulte Roth considered -- used the $50,000
that it was paid to write the Stein memo, I was not privy to
that.  But I am only aware of two payments of $25,000 to review
the first two transactions, and then that stopped.

N4IKUSB2                        Moon - Cross

1    Q.  So, let's now look at that legal advice.  If we flip to

2    tab 15, which is a document marked Exhibit 1057, and that's

3    previously been entered, do you see, below the redacted section

4    of this email, it's an email from Mr. Priore to Mr. Nissenbaum

5    and Mr. Stein, cc'ing you, dated November 20, 2014, correct?

6    A.  That is correct.

7    Q.  And in that email, Mr. Priore asks Mr. Nissenbaum and

8    Mr. Stein to review "John's letter."

9           I assume that's you, Mr. Moon, correct?

10   A.  Yes.

11   Q.  And it says that he does not need -- it says that "He does

12   need an all-clear from you guys.  Should not take more than

13   five minutes."

14          Do you see that?

15   A.  Yes, I do see that.

16   Q.  So, this was related to that letter we looked at to

17   Ms. Martin from the same date, right, November 20, 2014,

18   correct?

19   A.  That is correct.

20   Q.  And this letter related to the Countrywide settlement and

21   that $69 million payment, correct?

22   A.  I'm sorry, one more time?  I was reading the letter, pardon

23   me.

24   Q.  Oh, sure.

25          And that recommendation in that November 20, 2014

1    letter relates to that $69 million settlement payment, correct?

2    A.  Yes, yes, it would relate to the $69 million settlement

3    payment.

4    Q.  So, let's flip now to the next exhibit in your binder,

5    tab 16, which should be -- though it looks like, in my binder,

6    it's not the marked copy, but this is Exhibit 2017, which has

7    previously been admitted.  It's Bates stamp starting with

8    TRI36367.

9          So, this document, it appears to be the document we

10   looked at earlier.  It contains two email threads.  The first

11   page has the email thread that we just looked at, but it's got

12   one additional email, right?

13   A.  Yes.

14   Q.  And that additional email is an email from Mr. Nissenbaum

15   to Mr. Priore, cc'ing Mr. Stein and you, correct?

16   A.  That is correct.

17   Q.  And it reads, "This version looks fine"?

18   A.  That is -- well, yes, I see that, yes.

19   Q.  And then if we flip the page over, we're now into 2015.

20   And, again, it's an email thread between you and Mr. Nissenbaum

21   and Mr. Stein, and, this time, Mr. Calamari and Mr. Garg are on

22   the email thread.

23          Do you see that?

24   A.  I do.

25   Q.  And you see that in your email, which we looked at this

N4IKUSB2                          Moon - Cross

1    morning from Thursday, October 22nd, 2015, on Bates stamp 368,

2    you're sending a draft of the October 2015 letter?

3    A.  I believe so.

4          I believe so, yes.

5    Q.  And in this email, Mr. Nissenbaum writes to you, at the top

6    email chain, "I have no comments."

7          Do you see that?

8    A.  Yes, I do.

9    Q.  I know you talked a little bit about this, but I just want

10   to be clear for the record.  Was there a reason that you needed

11   to get this legal advice from Schulte Roth?

12   A.  Well, I wanted to get it from Schulte Roth because they

13   seemed best qualified, not needed.

14   Q.  So had you gone out and engaged Schulte Roth to provide

15   this advice?

16   A.  I did not engage Schulte Roth.  I think Schulte Roth had an

17   existing engagement with Triaxx and gave advice of this sort

18   frequently to Triaxx.

19   Q.  So Schulte had already approved that November 2014 letter,

20   correct?

21   A.  That is correct.

22   Q.  Was there a reason that you needed Schulte to approve this

23   letter effectively a little under a year later?

24   A.  It wasn't needed, it was wanted, just to be cautious or

25   prudent.  It's the second time.

1    Q.  This was the last time that Schulte approved one of your

2    letters, correct?

3    A.  That is correct.

4         I'm sorry, it's the last time they were asked to

5    approve one of my letters.

6    Q.  Let's talk a little bit about Phoenix.

7         So, you were first introduced to Phoenix around the

8    time that you signed the engagement letter with the issuers on

9    or about August 23rd, 2011, correct?

10   A.  That is correct.

11   Q.  And Phoenix provided litigation support to your firm,

12   correct?

13   A.  They sort of -- yes, yes.

14   Q.  And you gave direction to Phoenix in connection with your

15   engagement by the issuers, correct?

16   A.  Yes, I did.

17   Q.  Did your firm formally engage Phoenix?

18   A.  My firm did not.

19   Q.  You were not involved in the negotiation of any fees

20   payable to Phoenix, correct?

21   A.  No, I was not.

22   Q.  But you were part of the discussions with Schulte about

23   whether Phoenix's fees should be paid inside or outside the

24   waterfall, correct?

25   A.  Yes, yes, I was involved in those discussions.

1   Q.  The purpose of those discussions was to provide advice to

2   the collateral manager and the issuers, correct?

3   A.  Yes.

4   Q.  And you were also involved in determining the amounts owed

5   to Phoenix, correct?

6   A.  I wouldn't state it that way, Mr. Lorenzo.  I reviewed what

7   was done.  I didn't determine those fees.  I reviewed

8   determinations of those fees.

9   Q.  Well, let's look --

10          MR. LORENZO:  Tom, if you could put up Mr. Moon's

11  deposition transcript, or video, I guess, of page 116, line 17

12  through 19.

13          (Video played:)

14  "Q.  So you were involved in determining whether these amounts

15  were owing?

16  "A.  Yes."

17  Q.  And your involvement was that you reviewed Dr. Tang's

18  calculations of amounts owed under the contract, correct?

19  A.  I did.  And I reviewed -- looked at the contract as well,

20  yes.

21  Q.  And you were not aware of any economic relationship between

22  Mr. Priore and Phoenix, correct?

23  A.  That is correct.  I don't believe so, no.

24  Q.  Now, yesterday, when you were being asked about Phoenix's

25  work product, do you recall testifying that you used their work

N4IKUSB2                          Moon - Cross

1    product in support of a -- I believe you called it a 4401

2    motion?

3    A.  Yes, sir.

4    Q.  And that was in the Bank of New York Mellon case, correct?

5    A.  That is correct.

6           THE COURT:  So that I can follow along at home, this

7    is also what we have referred to as, ultimately, the

8    Countrywide/B of A settlement, right?

9           MR. LORENZO:  That is my understanding, your Honor.

10   It goes by many names.

11          If it's okay to approach, your Honor, I have a copy of

12   what we understand to be an affirmation filed in connection

13   with that motion.

14          THE COURT:  Have you shown it to all counsel?

15          MS. BANDLER:  We'll put it on the screen.  We couldn't

16   print all these copies.

17          MR. LORENZO:  We didn't have the ability to print

18   everything, but we can put it on the screen, and I'm happy --

19          THE COURT:  Well, if anyone else wants a moment to

20   look at it, I note it's about 12:25.  Do you want to take our

21   lunch break now, and then everyone can read, you can make more

22   copies, and we can pick this up at 1:30?

23          MR. LORENZO:  That sounds great, your Honor.

24          THE COURT:  All right.

25          So, we will be in recess until 1:30 this afternoon.

N4IKUSB2                        Moon - Cross

1             Mr. Moon, you know the drill by now — you remain under

2      oath, don't talk about the case or your testimony.

3             Thank you.

4             (Luncheon recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            AFTERNOON SESSION

2                                 1:30 p.m.

3          (Case called)

4          THE COURT:  Is Mr. Moon ready to retake the stand?

5   Before we do that, let me just ask, can we have a time

6   estimate, Mr. Lorenzo, for your cross.

7          MR. LORENZO:  Your Honor, I estimate we have about

8   five minutes left.  Not too much.

9          THE COURT:  All right.  In that case, I don't have to

10  go to step two which is giving you limits.  All right.  So

11  let's have Mr. Moon back on the stand.

12         Whoever is responsible for making sure that

13  Mr. Nissenbaum is available, make sure that Mr. Nissenbaum is

14  available, please.

15         MR. LORENZO:  Your Honor, I spoke with his counsel

16  right at the break, and he indicated that he would be bringing

17  him back at 1:45, so he'll be ready to go.

18         THE COURT:  That's pretty available.  Okay.

19         Good afternoon, Mr. Moon.  You can take your place on

20  the stand.  I will remind you that you are still under oath.

21         THE WITNESS:  Thank you, your Honor.

22         THE COURT:  When you're ready, you may proceed.

23         MR. LORENZO:  Thank you, your Honor.

24         I think when we broke for lunch, I handed Ms. Beaumont

25  a copy of the prospective exhibit that we wanted to ask

1    Mr. Moon about.  If I have your Honor's permission, can I

2    approach the bench to pass up copies?

3              THE COURT:  Yes, please.

4              MR. LORENZO:  So we have provisionally marked this as

5    Exhibit 1207, but it has not been admitted into evidence.

6              THE COURT:  I have a copy of Exhibit 1207.  Did this

7    appear or did not appear on your premarked exhibit list?

8              MR. LORENZO:  It did not.  This is impeachment,

9    offered for impeachment.  It just came up as a result of

10   Mr. Moon's testimony yesterday.

11             THE COURT:  All right.  You may proceed.

12   BY MR. LORENZO:

13   Q.  So Mr. Moon, you've been handed what's provisionally been

14   marked as Exhibit 1207.  Do you recognize this document?

15   A.  I do.

16   Q.  Is it an affirmation with exhibits filed by you in what is

17   captioned the Bank of New York Mellon case, but what we have

18   been referring to as the Countrywide case.

19   A.  This is part of a series of documents I filed.  This is one

20   of I believe it started at exhibit -- docket no. 947, and

21   continued on for a few docket entries.

22             But yes, this something that I filed, but it is

23   incomplete.  It was one of several filings.

24   Q.  When you say incomplete.  In fact it's titled your

25   affirmation of John Moon in support of Triaxx's motion pursuant

1    to CPLR 4401 for judgment during trial?

2    A.  It is, sir.

3            MR. LORENZO:  We'd ask the Court to move this in as

4    Exhibit 1207.

5            THE COURT:  Any objection?  New Exhibit 1207 is

6    admitted.

7            (Joint Exhibit 1207 received in evidence)

8    Q.  Is this the affirmation you referred to yesterday when you

9    testified that you had used Phoenix's work product to attach to

10   an affidavit?

11   A.  This is one example of Phoenix work product that I attached

12   to an affidavit in this case.

13   Q.  Now if we look at the two pages that are your affirmation,

14   do you see it refers to several exhibits, Exhibit A, Exhibit B,

15   C, D, E and F?

16   A.  Yes, I do.

17   Q.  If you look at Exhibit A, do you see that it is a one-page

18   graphic?

19   A.  Yes, I do.

20   Q.  It's titled "Repurchase provisions of modified loans among

21   530 trusts"?

22   A.  Yes.

23   Q.  If you look at Exhibit B, that is also a one-page graphic.

24   Do you see that?

25   A.  I do, sir.

1   Q.  That's titled "Breakdown:  Repurchase provisions of

2   modified loans among 530 trusts."

3            Do you see that?

4   A.  It is so titled, yes.

5   Q.  Yesterday you testified another example of their work

6   product, this is referring to Phoenix, would be very graphic

7   visuals that would synthesize all this data.  Do you recall

8   that?

9   A.  I do, sir.

10  Q.  Are these examples?

11  A.  These are limited examples of the synthesized data, yes.

12  Q.  Let's look at Exhibit A, the first one of the two graphics

13  that I had you take a look at.  Drawing your attention to the

14  sort of bottom of the page starting with that bolded words

15  "source."  Do you see where that is?

16  A.  I do, yes.

17  Q.  And that says "Source:  All data above is gathered from the

18  trustee report published by the Bank of New York Mellon at the

19  end of May 2013."

20           Do you see that?

21  A.  Yes, I do.

22  Q.  If we turn to Exhibit B, at the bottom there is also a

23  bolded source.  Do you see that?

24  A.  Yes, I do, sir.

25  Q.  That says "Source:  All data above is gathered from the

1    trustee report published by the Bank of New York Mellon at the

2    end of May 2013."

3              Do you see that?

4    A.  I do, sir.

5              MR. LORENZO:  At this time, your Honor, we have no

6    further questions of Mr. Moon.

7              THE COURT:  All right.  Well, I'm not going to call

8    for a break because we just got back from lunch.  So, do the

9    noteholders have cross-examination for this witness?

10             MR. LAURIELLO:  Yes, your Honor.

11             THE COURT:  You may proceed, Mr. Lauriello.  Do you

12   have a binder?

13             MR. LAURIELLO:  I do not, your Honor.

14             THE COURT:  That's just as well.  We're running out of

15   space.

16             MR. LAURIELLO:  I'll be referring to a few electronic

17   documents, but most of the exhibits will have already been

18   shown.

19             THE COURT:  Well, if you are referring to an exhibit

20   that happens to be in one of the Moon binders, it would

21   probably be helpful if you're able to cross reference to tell

22   us that for those of us who sometimes prefer paper.

23             MR. LAURIELLO:  Yes, your Honor.  I'll in fact start

24   with Exhibit 3115 which is in the Moon binder that the TAM

25   parties used with Mr. Moon.

1    CROSS-EXAMINATION

2    BY MR. LAURIELLO:

3    Q.  Mr. Moon, do you remember being shown this exhibit earlier

4    today?

5    A.  I do, sir.

6    Q.  Earlier today you testified that the settlement referenced

7    in Exhibit 3115 was small because it was impacted by, quote,

8    some judicial holdings, right?

9    A.  I don't think they were sub-judicial.  They were judicial.

10               THE COURT:  "Some."

11   A.  Yes, pardon me.  Some.  Yes, sir.

12   Q.  Those judicial holdings concerned Triaxx's standing,

13   correct?

14   A.  This one I believe predated the decision on Triaxx's

15   standing.  I was referring to a decision by the Appellate

16   Division of the New York State Supreme Court regarding

17   settlements, and the ease with which a trustee filed an

18   interpleader action could have a settlement approved.

19   Q.  But it is correct that at some time courts held that Triaxx

20   CDOs lacked standing to bring these litigations because that

21   right had been granted to the trustee, correct?

22   A.  That is a summary of those decisions.  But yes, sir, you

23   are correct.  I believe the Second Circuit held that, yes.

24   Q.  Earlier today you testified that Phoenix would get nothing

25   if it did not meet requirements for the incentive fees,

1    correct?

2    A.  Well, PRES would get no incentive fee if the settlement was

3    not large enough.  Yes, I think just so we're clear, I believe

4    the engagement letter had two sorts of payment.  One is like

5    some sort of monthly or quarterly fee, that was a management

6    type fee, and the other one was this success fee or some sort

7    of contingency fee.  That's what I was referring to, the latter

8    one, yes, sir.

9    Q.  Earlier today you testified that you would confirm

10   Phoenix's fees were properly billed by reviewing the engagement

11   agreement and looking at the calculations, right?

12   A.  Yes, I did, yes.

13          MR. LAURIELLO:  Mr. Gibson, can you please put Exhibit

14   12 on the screen, please.  And this is already been admitted

15   into evidence, your Honor.

16   Q.  Mr. Moon, Exhibit 12 is the engagement letter between

17   Phoenix and the collateral manager, correct?

18   A.  Do you happen to have a paper version?  I hate to ask.  It

19   would make it easier for me to scroll through it.  It appears

20   to be.  I think it is.

21          MR. LAURIELLO:  I'm sorry.

22          THE COURT:  We can help.  It is Joint Exhibit 12?

23          MR. LAURIELLO:  Yes, your Honor.

24          THE COURT:  You were wondering why I had all these

25   binders.

1              MR. LAURIELLO:  Thank you, your Honor.

2              THE COURT:  I hope this is worth it.  It is a short

3     document.

4              THE WITNESS:  If it pleases the Court, I will say yes.

5              THE COURT:  No, no, don't stop us now.

6              MR. LAURIELLO:  While you are out there, for the ease

7     of everyone, can you also get Exhibit 15, please.

8              THE COURT:  Ms. Kay, let me see 12.  Looks right to

9     me.  Shall I show it to Mr. Lauriello before it goes to the

10    witness?

11             MR. LAURIELLO:  I trust you, your Honor.

12             THE COURT:  Okay.  Ms. Kay, would you staple Exhibit

13    12, please, so it holds together and give it to the witness.

14             THE WITNESS:  Thank you so much.

15             THE COURT:  The witness has been given a paper copy of

16    Exhibit 12.  Proceed.

17    Q.  So just to confirm for the record, is Exhibit 12 the

18    engagement letter between Phoenix and the collateral manager,

19    correct?

20    A.  Yes, that's correct, sir.

21    Q.  And the engagement letter is dated March 22, 2011, correct?

22    A.  That is correct, yes.

23    Q.  Please turn to page 16.  Do you see this is a chart for the

24    diligence fees?

25    A.  Pardon me, sir.  Which page?

1    Q.  16, please.

2    A.  I do not have a page 16.

3    Q.  It's titled Annex II at the top.

4    A.  Oh.  I have an Annex II on page 15.

5    Q.  Apologies for the confusion about the page numbers.  Does

6    Annex II, do you see there a chart that says diligence fees?

7    A.  I do, sir.

8    Q.  Is this one of the monthly fees you were referring to

9    earlier?

10   A.  Yes, it is.

11   Q.  So this diligence fee is not a contingency fee?

12   A.  No, it is not a contingency fee.

13   Q.  Do you see that for years one and two of the initial term

14   the fee is $20,000?

15   A.  I do.

16   Q.  And because this engagement agreement is dated in 2011,

17   years one and two would be up to March 22, 2013, correct?

18   A.  I believe so, yes.

19   Q.  Then for years three and four, it is $10,000?

20   A.  It is.

21   Q.  And that would be up to March 22, 2015?

22   A.  Yes, I believe so.

23   Q.  After that the fee is $5,000, right?

24   A.  Yes.

25   Q.  Please turn to page I believe 13.  It is actually I believe

N4i3usb3                          Moon - Cross

1    it may be 12.  The Bates stamp is 4187.

2    A.  I am looking at 4187.

3    Q.  Thank you.  Do you see at the top it says that ARAM shall

4    be entitled to an activist implementation fee equal to $10,000

5    per month for security for which ARAM is engaged by the CDO?

6    A.  I do see that.

7    Q.  Is that another fee that is not a contingency fee?

8    A.  It does not appear to be a contingency fee.

9    Q.  Then if we move on to the next paragraph, do you see that

10   the cap for that $10,000 a month activist implementation fee is

11   $250,000, and I am looking after part A.

12   A.  If could you please ask the question again.

13   Q.  Why don't we take it in steps.  Do you see in this

14   paragraph it says that:  "Until the earlier of (a) the

15   distribution date on which the aggregate activist

16   implementation fee paid by the CDO in respect of such security

17   exceeds $250,000."

18   A.  I do see that, sir.

19   Q.  Or in part (b) the date determined by the CDO --

20          MS. WITYK:  Objection.  It says "and."

21          THE COURT:  It does say "and."

22          MR. LAURIELLO:  Thank you.

23   Q.  "And (b) the date determined by the CDO in its sole

24   discretion or the collateral manager on its behalf on which the

25   CDO is completed the recovery of funds or assets related to

such security.  Provided that the value, as determined by the

CDO in its sole discretion or the collateral manager on its

behalf or of funds or assets recovered by the CDO relating to a

security exceeds $500,000, the CDO shall pay to ARAM an

aggregate amount of activist implementation fees in respect of

such security, taking into account any activist implementation

fees paid by the CDO to ARAM on or prior to such date of

determination equal to $250,000."

A.  I do see that, yes.

Q.  Does this show that the activist implementation fee

referred to on this page has a cap of $250,000?

A.  To be honest with you, I'm not sure.  This is not clear

writing to me at all.  Because first (a) and (b) are linked.

It uses a defined term, distribution date, that I'd need to

look up, and a date of recovery that I'd need to look up.

Sitting here right now, it's unclear the meaning of this

particular paragraph.

Q.  But you reviewed this engagement letter in order to

determine if Phoenix's fees were accurate, correct?

A.  I did about a decade ago, sir.  More than a decade ago.

Q.  Can you please turn to tab five of the trustee's binder and

what has been marked as Exhibit 1175.

A.  Tab five, sir?

Q.  Yes, please.

A.  I have it.

1    Q.  Thank you.  And can you please turn to the attachment.

2    A.  Okay.

3    Q.  Is this a letter from you to Ms. Martin?

4    A.  Yes.

5    Q.  Did you review this letter for accuracy when you sent it to

6    Ms. Martin?

7    A.  I don't mean to be difficult, sir.  This is a draft letter.

8    I'm sending this particular draft to Schulte Roth.  So this

9    would have gone to Schulte Roth before it went to Ms. Martin.

10   Q.  Did you review this letter for -- that the fees referenced

11   in this letter were accurate?

12          THE COURT:  Before he sent the draft?

13   Q.  Before you sent the draft.  Thank you.

14   A.  Yes, I imagine I would have reviewed the fees before I sent

15   the draft, yes.

16   Q.  Can you please turn to page two of the letter.

17   A.  Yes.

18   Q.  Do you see at the bottom there is a description of fees to

19   Phoenix totaling $1.167 million?

20   A.  I do.

21   Q.  Do you see that those outstanding fees are comprised of a

22   monthly diligence fee and a monthly activist implementation fee

23   per CUSIP?

24   A.  I do.

25   Q.  Those are not contingency fees, correct?

1    A.  That is correct.

2    Q.  Do you see that the paragraph reference is an attachment B

3    for the invoices that support that amount?

4    A.  I do.

5    Q.  Can you please turn to attachment B.

6    A.  Okay.  I have attachment B.

7    Q.  Mr. Moon, would you have reviewed these invoices when

8    submitting this letter?

9    A.  Yes, I imagine, I'm confident that I did.

10   Q.  Do you see that one of the invoices is dated September 15,

11   2015?

12   A.  I do.  Well, yes, I do.

13          THE COURT:  I don't.  What page are we on?

14          MR. LAURIELLO:  This is the page with the Bates stamp

15   Triaxx 0055327.  And I believe it may be rotated the wrong

16   direction.

17          THE COURT:  I have 55327.  This is an invoice.

18          MR. LAURIELLO:  This is referencing several invoices.

19          THE COURT:  Referencing invoices.

20   Q.  Just to make sure we are all on the same page.  You see it

21   is referencing an invoice dated September 15, 2015?

22   A.  Yes.

23          MR. LAURIELLO:  Mr. Gibson, can you please show

24   Exhibit 3468 on the screen.  Exhibit 3468 is not in the binder.

25          THE COURT:  Is it in evidence?

1          MR. LAURIELLO:  Not yet, your Honor.

2          THE COURT:  Okay.

3   Q.  Mr. Moon, do you see this is an invoice dated September 15,

4   2015?

5   A.  Yes, I do, sir.

6          MR. LAURIELLO:  I'd like to move Exhibit 3468 into

7   evidence, your Honor.

8          THE COURT:  Objection?

9          MS. WITYK:  No objection, your Honor.

10         THE COURT:  3468 is admitted.

11         (Joint Exhibit 3468 received in evidence)

12  Q.  Do you see that the due diligence fee in this invoice is

13  $20,000?

14  A.  Yes, I do.

15  Q.  But as we discussed, that amount should be $5,000, because

16  this invoice is dated after March 22, 2011, correct?

17  A.  I don't know sitting here now.  I would ask Dr. Tang to

18  give me backup for these figures.  If he did, I reviewed them,

19  and if the figures were accurate, I would put it in for

20  payment.

21  Q.  But, just to be clear, this due diligence fee is calculated

22  using the chart we looked at in the engagement letter, correct?

23  A.  I understand that's your position.  I can't tell you with

24  specificity what I did back in 2015 with respect to this fee,

25  other than that I did my diligence.  I reviewed materials from

1   Dr. Tang, they appeared to be accurate, and I put them through.

2   Q.  Sitting here today, does this $20,000 figure appear

3   accurate, considering the engagement letter?

4   A.  You know, I don't know, to be honest with you.  I'd have to

5   study it further.

6           MR. LAURIELLO:  No further questions.  Thank you.

7           THE COURT:  Okay.  Issuers?

8           MR. RAINIER:  Just a few minutes, your Honor.

9           THE COURT:  Which binder shall we put away,

10  Mr. Rainier?

11          MR. RAINIER:  All of them.

12          THE COURT:  Give us a moment.

13          MR. RAINIER:  Mr. Moon's deposition transcript might

14  be useful.  That was at the front of the large black binder in

15  front of you, Mr. Moon.  I have my copy.  If I could approach,

16  it might be easier should we need it.

17          THE COURT:  All right.  So, the paper copy of

18  Mr. Moon's deposition transcript is at the front of the thick

19  binder.

20          Mr. Moon and I are ready.

21  CROSS-EXAMINATION

22  BY MR. RAINIER:

23  Q.  Good afternoon, Mr. Moon.

24  A.  Good afternoon.

25  Q.  I'm Randall Rainier who I think you know represents the

1    issuers in this case.

2    A.   Nice to see you again, sir.

3    Q.   Nice to see you as well.

4              Yesterday you testified that you and your firm

5    represented the issuers in Article 77 proceedings with respect

6    to RMBS settlements, claims against RMBS trustees, and claims

7    against RMBS servicers.  Do you remember that testimony?

8    A.   I do.

9    Q.   Other than the letters that were shown to you today that

10   you sent to Lori Martin at Wilmer Hale with status updates on

11   various cases, did you ever have any other communications

12   directly with the directors about the various activist

13   litigations?

14   A.   I did, sir.

15   Q.   Can you explain the nature of those discussions without

16   getting into any privileged information.

17   A.   Yeah, sure.  So, firstly, those communications were with

18   Ms. Martin's permission, because they are represented people.

19   Secondly, I would always keep Ms. Martin informed of what went

20   on.  She has a very busy schedule.  I think her spouse is the

21   president of Princeton, and sometimes she was out of pocket.

22   So, we couldn't always have a mutually convenient time for a

23   call.

24             The nature of the communications were essentially the

25   objective was to advance the interests of the three Triaxx

1    trusts and to do so lawfully and ethically, and in a way that

2    paid homage or did not violate the foundational documents.  The

3    directors took an active role in assessing what was going on.

4    They had questions.

5           That was essentially the nature of our conversations.

6    Q.  Thank you.  Now, there has been questions today about the

7    Phoenix engagement letters that each of the issuers were

8    entered into by the collateral manager for the engagement of

9    Phoenix or PRES to provide work in connection with those cases.

10   Do you remember that testimony?

11   A.  I do.

12   Q.  At the time of the engagement which you just saw was in the

13   August of -- or March of 2011 time period, did you have any

14   conversation -- excuse me.  2014 time period.  Let me try that

15   again.

16          The engagement letters for Phoenix were in March of

17   2011?

18   A.  Correct.

19   Q.  Yes.  And sticking with that time period, did you have

20   conversations with the issuers regarding Phoenix and what

21   Phoenix might do?

22   A.  You know, I am confident that we did.  I don't specifically

23   recall the conversations.  But Phoenix was a substantial part

24   of the program, and I imagine that we did have, that would be

25   part of our verbal communications.

1    Q.  So, you don't recall specifically; is that fair to say?

2    A.  I don't recall a specific conversation.

3    Q.  Is there something that might help you remember?

4    A.  Probably.  As Mr. Lorenzo has reminded me of some of my

5    deposition testimony, I'm sure you will remind me of some of it

6    as well.

7         MR. RAINIER:  To help refresh the witness's

8    recollection, I'd like to direct him to the deposition

9    transcript.  The transcript of the deposition he gave in this

10   case, your Honor.

11   Q.  Do you have it, sir?

12   A.  I do, sir.

13   Q.  Okay.  If you could open and take a look at page 53 and 54

14   of the transcript.  And just if you could read to yourself what

15   you see at page 53, line 14, through page 54, line 25.

16        THE COURT:  You should read that to yourself.

17   A.  53 until what?

18   Q.  Through the end of page 54.

19   A.  Okay.

20        (Pause)

21   A.  Okay, yes, this refreshes my recollection.

22   Q.  If you can please not refer to the transcript.  I would say

23   turn it over, but that looks a little cumbersome.  Has that

24   refreshed your recollection?

25   A.  Yes, sir, it has.

1   Q.  So let me ask the question again.

2          At around the time that Phoenix was engaged, did you

3   have any communications with the directors of the issuers about

4   Phoenix?

5   A.  I did.

6   Q.  What was discussed?

7   A.  The fact that Phoenix was my litigation support, and that

8   all of us agreed that the communications between Phoenix and me

9   were privileged and confidential.

10  Q.  Thank you.  You testified earlier that before you sent the

11  first of the letters to Lori Martin with the collateral

12  manager, with the collateral manager's payment recommendations,

13  and that first letter was November of 2014.  That prior to

14  then, legal advice was sought on the propriety of using funds

15  from the escrow account to pay those types of expenses.  Is

16  that correct?

17  A.  That is correct.

18  Q.  Okay.  And you were part of those conversations?

19  A.  I was.

20  Q.  Did any of those conversations include the directors of the

21  issuers?

22  A.  Yes.  Yes, of course.

23  Q.  And did they include Ms. Martin of Wilmer Hale?

24  A.  I believe so, yes.

25  Q.  And did you speak with the directors about that subject on

1  more than one occasion in that time period?

2  A.  I believe so, yes.

3  Q.  Same with Ms. Martin?

4  A.  Yes.

5  Q.  Thank you.

6         Now, you were asked earlier by Mr. Lorenzo, actually

7  shown some deposition testimony, where you described I think

8  the thinking behind using the funds in the escrow account to

9  help replicate the success of the Countrywide settlement.  Do

10  you remember that?

11  A.  I do.

12  Q.  We heard it would be more beneficial to do so?

13  A.  Despite the poor grammar, yes.  It would be more

14  beneficial.

15  Q.  Can you explain what you mean when you say using the funds

16  in the escrow account for the litigations would be more

17  beneficial to the issuers?

18  A.  Yes.  So, after the success of the Countrywide settlement,

19  we understood that Triaxx had approximately several hundred

20  million dollars in losses that we believed could be recovered.

21  And you know, my law firm's fees were reasonable.  Phoenix was,

22  not all, but by and large working on a contingency.  So the

23  thinking was if we could continue that success, then more

24  noteholders would benefit, than if we simply did not pursue

25  those recoveries using the escrow funds.

1    Q.  How would more noteholders benefit?

2    A.  My rough understanding is that proceeds flowed down from

3    the most senior tranches of noteholders, down to the lowest

4    tranches of noteholders.  So, obviously, the more that is

5    recovered, the greater the number of noteholders are benefited.

6    Q.  Thank you.

7              In connection with the legal advice and the

8    discussions that happened in 2014, prior to the utilization of

9    the escrow account at Miller & Wrubel for the payment of

10   litigation expenses, in connection with that and your

11   discussions with the issuers on that topic, did you form an

12   opinion of how the directors were approaching that question?

13             THE COURT:  Can I hear that question back?

14             (The record was read)

15             THE COURT:  Objection sustained.  Can you rephrase.

16             MR. RAINIER:  Yes, I can, your Honor.

17   Q.  What types of questions did the directors ask you if you

18   remember when discussing with them the propriety of utilizing

19   the escrow funds?

20   A.  You know, I don't really recall the precise questions.

21   Q.  Were there questions?

22   A.  I'm confident, yes, there would have been questions.

23   Q.  Is there anything that might refresh your recollection of

24   that subject?

25   A.  Again, I think you would be well advised to follow

1   Mr. Lorenzo's lead and direct me to my deposition transcript.

2   Q.  If you could please turn to your deposition transcript in

3   that case, and please turn to page 88.  If you could please

4   read more specifically page 88 line 10, through just to the

5   right of that, page 89, line 4.

6         THE COURT:  You can read that to yourself, Mr. Moon.

7         (Pause)

8   A.  Okay.  My recollection is refreshed.

9   Q.  Great.  So let me ask the question again then.

10        Do you recall what the directors said to you in your

11  discussions on that subject?

12  A.  Yes.  The directors were concerned that payment of

13  Phoenix's success fee or contingency fee outside the waterfall

14  was lawful.  They wanted to ensure that it was lawful.

15  Q.  Do you have any other recollection or understanding of how

16  they approached that issue?

17  A.  With prudence and conservatism.

18        MR. RAINIER:  Thank you.  That's all I have, your

19  Honor.

20        THE COURT:  The Court has a few questions.  Would

21  anyone else like a brief opportunity before that?

22        MR. LAURIELLO:  Can we have a minute or two for

23  recross?

24        THE COURT:  You may have two minutes for recross.

25        MR. LAURIELLO:  I think that would be more than enough

1  time.

2  RECROSS EXAMINATION

3  BY MR. LAURIELLO:

4  Q.  Mr. Moon, when you sent the engagement letters to

5  Ms. Martin, you didn't provide any commentary or analysis,

6  correct?

7  A.  I'm sorry, sir.  Which engagement letters?

8  Q.  The engagement letters between Phoenix and the collateral

9  manager.

10  A.  You know --

11         MR. RAINIER:  Objection.  I'm not sure this is within

12  the scope of what we just discussed.

13         THE COURT:  Are you going to link it up?

14         MR. LAURIELLO:  Sorry?

15         THE COURT:  Are you going to link this up to the last

16  round of cross, which is what you're responding to?

17         MR. LAURIELLO:  Mr. Rainier asked about the sending of

18  the engagement letters to the issuers.

19         THE COURT:  I'll hear a couple of questions, but this

20  is not an opportunity to ask questions you just forgot to ask

21  last time.

22         MR. LAURIELLO:  This is about the sending of the

23  engagement letters to the issuers, your Honor.

24         THE COURT:  I'll allow it.

25  Q.  When you sent the engagement letters to Ms. Martin, between

1   Phoenix and the collateral manager, you didn't provide any

2   commentary or analysis, correct?

3   A.  I don't recall one way or the other.

4   Q.  Can you please turn to your deposition, page 170.

5   A.  I see it.

6   Q.  Do you see that on lines 10, I asked you:

7   "Q.  When you sent the engagement letters to Ms. Martin, do you

8   remember providing any commentary or analysis with the

9   engagement letters?

10  "A.  No.  I'm confident that I did not."

11  A.  I remain confident that I did not.  That's what it says.  I

12  don't recall any commentary or advice.  That would have fit

13  with my practice, as I've testified repeatedly today, that I am

14  not a transactional attorney.

15  Q.  And you didn't provide commentary or analysis because you

16  don't view yourself as being competent to opine on the

17  engagement letters, correct?

18  A.  Yes, I would agree with that statement.

19              MR. LAURIELLO:  No further questions.  Thank you.

20              MS. WITYK:  Your Honor, may I briefly redirect?

21              THE COURT:  You may have two minutes as well.

22  REDIRECT EXAMINATION

23  BY MS. WITYK:

24  Q.  Mr. Moon, do you have Exhibit 1207 in front of you, the one

25  that Mr. Lorenzo marked?

1    A.  Yes, I do.

2    Q.  Could you flip to Exhibit A of 1207?

3              THE COURT:  That's the first pie chart?

4              MS. WITYK:  Yes, your Honor.

5              THE COURT:  Thank you.

6    A.  Yes, I see that.

7    Q.  Mr. Moon, can you tell us what kind of analysis went into

8    creating this demonstrative exhibit?

9    A.  Oh.  An extraordinary amount of analysis.  So, to

10   Mr. Lorenzo's question, the source of the data was voluminous

11   data from the Bank of New York Mellon.

12             So for example, this $11.1 billion of repurchase

13   amount, if there are 535 RMBS trusts in question, each of those

14   had a notional value of approximately between 900 million and

15   $1.1 billion.  So each of those 535 trusts are comprised of

16   hundreds if not thousands of loans.

17             And so for there to be a repurchase obligation

18   calculated, you would have to determine how many people prepaid

19   the mortgages, how many mortgages were foreclosed, how -- how

20   many mortgages had a second lien added.  It was an enormous

21   amount of data that Phoenix analyzed to come up with that

22   11.1 billion, and that's just one aspect of their analysis on

23   the information that was sourced from the Bank of New York

24   Mellon.

25   Q.  Can you tell us a little bit more about how the other

1  categories in this chart were analyzed.

2  A.   Sure.  Well, simply coming up -- so, one of the things that

3  made this chart powerful is its simplicity.  It is a very

4  simple chart, a pie chart with three sections.  To get to those

5  three sections, the PSAs of the 535 I believe trusts had to be

6  analyzed.  And so, Phoenix used its information technology

7  systems to isolate provisions in the 530 trust foundational

8  documents to determine these simple categories.

9          Of course, there is not just categories, there is

10 sub-sub-categories which go into the next page.  And you can

11 see the breakdown and tabular data following in this exhibit of

12 the different trusts and the different variants.  So, as a --

13 Q.   Just so the record is clear, are you on Exhibit B now of

14 Exhibit 1207?

15 A.   Yes.

16 Q.   I didn't mean to interrupt.  Please continue your thought.

17 A.   Yeah.

18          THE COURT:  I actually think he's encroaching into

19 Exhibit C.

20 Q.   Oh.

21 A.   I'm going way too far, so I'm going to stop talking and

22 answer a question.

23 Q.   So before we leave Exhibit B, can you explain the type of

24 analysis that went into Exhibit B.

25 A.   Yes.  So, this similar analysis took place.  However,

1    Exhibit B now goes into different subvariants of these first --

2    these three major categories.  And now we see among those three

3    major categories there are I believe seven variants.  And

4    again, Phoenix broke down the repurchase amounts required for

5    each of those subvariants, again in the billions.  I see

6    variant four is only 337 million, but the other ones appear to

7    be in the billions of dollars.  It would take numerous loans,

8    many, many loans to calculate how much was subject to each

9    variant.

10   Q.  Can you explain what you mean by variant?

11   A.  Yeah.  So I can.  So Exhibit C has the various -- the

12   variants, multiple variants in the provisions of the servicing

13   agreements, so different provisions with respect to repurchase.

14   Q.  Was PRES' work used to compile Exhibit C as well?

15   A.  Yes, oh, yes, absolutely.  So, yes.  So, again they used

16   their systems to locate the various provisions in the 530-odd

17   PSAs.

18   Q.  You referenced foundational documents for each of these

19   trusts.  About how lengthy are those documents?

20   A.  They are extremely lengthy.  They are probably similar to

21   the Triaxx indentures.  They're torturous in their language and

22   hard to understand.

23          MS. WITYK:  Thank you, Mr. Moon.  No further

24   questions.

25          THE COURT:  Anyone else?  All right.  I have a few

1  questions for you, Mr. Moon, and I'm a little rusty, so bear

2  with me.

3         We have looked at a number of issues in fairly close

4  detail.  I'd like you to draw back the lens and just help me

5  understand some overall big picture issues.

6         If I understand it correctly, in terms of your

7  involvement in what's been called activist litigation, there

8  were a total of roughly $105 million in recoveries; is that

9  fair?

10         THE WITNESS:  That's fair.

11         THE COURT:  And that came, if I'm following the

12  testimony correctly, that came in the following pieces.  What

13  you call the first recovery of $69 million from the Countrywide

14  BofA case, correct?

15         THE WITNESS:  Correct.

16         THE COURT:  Then a second small recovery of

17  approximately 750,000 from JPMorgan.

18         THE WITNESS:  Your Honor, I would have to refer to the

19  spreadsheet.  I'm --

20         THE COURT:  Well, I don't remember what exhibit number

21  that spreadsheet is.

22         MS. WITYK:  Exhibit 3050.

23         THE COURT:  The peanut gallery tells me it is Exhibit

24  3050.

25         THE WITNESS:  The spreadsheet really tells the story.

1    And there are, unfortunately, there are two additional

2    spreadsheets that have not been admitted into evidence or

3    proffered for evidence that would tell the whole story, so you

4    would know precisely how much came in, and how much went out to

5    whom.

6            THE COURT:  If you could just concentrate on what's in

7    evidence, please.  3050.  This spreadsheet of course is not

8    where the language I'm using comes from.  The first recovery,

9    second recovery, and so forth.

10           THE WITNESS:  Right.

11           THE COURT:  Just to proceed with my big picture.

12   There was a second recovery of approximately 750,000 from the

13   JPMorgan settlement.

14           THE WITNESS:  Yes, that is correct, your Honor.

15           THE COURT:  Then there was a third recovery in the

16   amount of approximately 35 million, again from the

17   Countrywide/BofA matter, which I know ultimately went back.

18           THE WITNESS:  Yes.  Yes.  Yes.

19           THE COURT:  Then there was a fourth recovery of also

20   approximately $35 million which covered the third, so you had

21   to send the third back.

22           THE WITNESS:  I'm sorry, your Honor, we're getting --

23   that's not quite accurate.

24           THE COURT:  Make it accurate.

25           THE WITNESS:  Okay.  So it is the third recovery which

N4i3usb3                    Moon

1   is the problem.  So, I understand the second recovery from

2   JPMorgan of $262,936.41.

3               THE COURT:  Where is that, sir?

4               THE WITNESS:  That is Column G on Bates number page

5   667.

6               THE COURT:  I think we may have gotten a little off

7   track here.  That figure appears to be some sort of net balance

8   for the second recovery.  If you look at the top of column G,

9   do you see $750,000?

10              THE WITNESS:  At column -- the second page of the

11  exhibit?

12              THE COURT:  First page.

13              THE WITNESS:  Yes.  First page, second recovery --

14  yes, $750,000.  Thank you.

15              THE COURT:  That was the gross from the JPMorgan

16  settlement.

17              THE WITNESS:  That was the JPMorgan settlement, yes.

18              THE COURT:  Then the third recovery.

19              THE WITNESS:  So the third recovery is Column I.  That

20  comes in 35 million.

21              THE COURT:  35 million.  Excellent.

22              THE WITNESS:  If you can see -- pardon me, your Honor,

23  for interrupting.

24              THE COURT:  Don't get ahead of me.  Thank you.

25              Then the fourth recovery came in at 34 million and

N4i3usb3                    Moon

1    change in Column J, correct?

2             THE WITNESS:  Correct.

3             THE COURT:  Now explain what you had to send back.

4             THE WITNESS:  So, let's see here.  I -- so if you look

5    at the Column I, third recovery we were looking at.  So you got

6    the 35 million.

7             THE COURT:  Yes.

8             THE WITNESS:  We were only entitled to 34 million --

9    under the settlement we were entitled to only $34,256,000.

10             THE COURT:  Which you received in the form of the

11   fourth recovery.

12             THE WITNESS:  Yup.  So we received that in the fourth

13   recovery, so we had to send back -- let's see.  So let's see.

14   We had --

15             THE COURT:  I believe it is in Column I, about a third

16   of the way down.

17             THE WITNESS:  Right.  There it is, yes.

18             THE COURT:  So you had to send back an equivalent

19   number of dollars, 34 million and change, correct?

20             THE WITNESS:  Yes.

21             THE COURT:  Okay.  So those two more or less almost

22   cancel each other out.

23             THE WITNESS:  Correct.

24             THE COURT:  Then I believe you testified that late in

25   the day in 2020, there was another $125,000 that came in from

1   HSBC; is that right?

2                THE WITNESS:  Yes, your Honor.

3                THE COURT:  Which is not on this spreadsheet.

4                THE WITNESS:  There are subsequent spreadsheets that

5   show multiple additional recoveries.  Small ones.  At that

6   point the recoveries were small.  And those recoveries were put

7   into the escrow account at Olshan.  There were no distributions

8   from those recoveries.  And the remaining balance I sent to

9   Mr. Lorenzo's client.

10               THE COURT:  In terms of your direct and

11  cross-examination testimony today, though I think the furthest

12  we got was the 125,000 that came in in 2020.  I don't recall

13  any additional testimony about additional small recoveries.

14               THE WITNESS:  That may be.  I don't recall.

15               THE COURT:  So we're up to once the 35 million has

16  come in and out again, we're up to about $105 million.

17               THE WITNESS:  Yes, your Honor.

18               THE COURT:  Okay.  From those recoveries, among other

19  things -- I'm not trying to be comprehensive here -- certain

20  payments were made outside of the waterfall to Phoenix,

21  correct?

22               THE WITNESS:  Correct.

23               THE COURT:  Certain payments were made outside of the

24  waterfall to various law firms?

25               THE WITNESS:  Correct.

1           THE COURT:  And certain payments were made outside of

2     the waterfall to other litigation associated vendors?

3           THE WITNESS:  Yes, your Honor.

4           THE COURT:  And certain payments were made outside of

5     the waterfall that were not directly related to the activist

6     litigation, correct?  Such as to the SEC and to Mr. Priore.

7           THE WITNESS:  Yes, yes.

8           THE COURT:  All right.  The law firms who were working

9     directly on the activist litigation who were paid in whole or

10    in part outside of the waterfall, were, number one, your firm,

11    correct?

12          THE WITNESS:  Correct.

13          THE COURT:  Number two, McKool.

14          THE WITNESS:  Yes.

15          THE COURT:  Number three, Kobre & Kim.

16          THE WITNESS:  Yes.

17          THE COURT:  And number four, what was the firm you had

18    the fight with?

19          THE WITNESS:  Keller Rohrback.

20          THE COURT:  Keller Rohrback.  Were all four of these

21    firms working on the activist litigation in some way, shape or

22    form?

23          THE WITNESS:  Yes, they were.

24          THE COURT:  Were payments made out of these settlement

25    recoveries outside of the waterfall to law firms who did not

1    work directly on the activist litigation?

2              THE WITNESS:  So, I'm a little confused on that point.

3    What I think I recalled from the documents was that, for

4    example, Kaye Scholer put in for payments and the directors did

5    not approve them.

6              THE COURT:  Okay.

7              THE WITNESS:  That is my interpretation of the

8    documents that I saw today.

9              THE COURT:  Of course we saw some invoices from

10   Schulte that were arguably in connection with the activist

11   litigation, but they weren't working on the litigation itself,

12   right?

13             THE WITNESS:  It was advisory.  That is correct.

14             THE COURT:  Do you recall any other law firms who were

15   paid outside of the waterfall from these activist litigation

16   recoveries who didn't work on the activist litigation

17   recoveries?

18             THE WITNESS:  No, I do not recall that.

19             THE COURT:  Okay.  And with regard to the Phoenix fees

20   that were paid directly outside of the waterfall from these

21   litigation recoveries, the amount was based in part on a

22   contingency calculation relating to which RMBS securities were

23   involved in the activist litigation recoveries.

24             Is that an awkward but fair way of putting it?

25             THE WITNESS:  Yes, it is, your Honor.

N4i3usb3                        Moon

1          THE COURT:  So what was, for example, if you take a

2     look at 3487 which I had marked at one point.  Probably don't

3     now.  There we go.

4          So I picked 3487 out of the binder because it's one of

5     many places where this particular $6.25 million payment is laid

6     out.  Not the only place.

7          THE WITNESS:  Okay.

8          THE COURT:  So you see that those payments to Phoenix

9     that add up to 6.25 million on page three?

10          THE WITNESS:  Yes, your Honor.

11          THE COURT:  So I think you testified that those

12     calculations, which you checked, were based on which RMBS

13     securities underlay the activist litigations, correct?

14          THE WITNESS:  Correct.

15          THE COURT:  Is it fair to say that you did not -- that

16     the payments that were made to Phoenix, at least the

17     contingency payments that were made to Phoenix outside of the

18     waterfall from the litigation recoveries that you were involved

19     in, were only with respect to securities that were involved in

20     those activist litigations that were the subject of those

21     activist litigations?

22          THE WITNESS:  Yes, your Honor.

23          THE COURT:  So if, for example, Phoenix provided value

24     in a non-litigation manner, for example, if Phoenix were to

25     have advised the collateral manager with respect to securities

1    that should be sold, securities that should be retained and so

2    forth, that were not the same securities that were involved in

3    the activist litigations, the fee payments that you reviewed

4    and that were made out of the activist litigation recoveries

5    were not for those services.

6                    THE WITNESS:  Correct.

7                    THE COURT:  Those are all the questions that the Court

8    has.  Anybody else or shall we take our afternoon break?

9                    MR. LORENZO:  Your Honor, just one quick question

10   related to your questions.

11   RECROSS EXAMINATION

12   BY MR. LORENZO:

13   Q.  Mr. Moon, the Judge was asking you about payments to

14   Phoenix and whether basically payments were only coming out of

15   recoveries for work they had done.  She was pointing you

16   specifically to an exhibit which listed like $6 million and

17   change in payments to Phoenix, right?

18                    But if you look at the spreadsheet that you were

19   directing the judge to, and maybe I'm misunderstanding, I'm

20   looking at 3050, Bates stamped 667.

21                    THE COURT:  Hold on.

22                    I'm ready.

23   Q.  So, we were talking or you were being asked about that

24   roughly $6 million in payments, and it was broken up into three

25   discrete amounts.  And as I'm looking at the spreadsheet,

1    again, this is Bates stamped 667, I'm seeing those payments

2    coming out of a Column K.  Mr. Gibson will highlight that.

3    But, that's titled money movement from other reserves.  Do you

4    see that?

5         I wanted to understand, that seems to be in contrast

6    with the testimony that you just gave a moment ago in response

7    to the judge's question about how payment came directly from

8    recoveries for work provided.

9    A.  Okay.  So, were these -- that very well could be.  Were

10   these three payments, were these the monthly fees or were

11   these -- these must have been the contingency fees, because I

12   see they are not in odd numbers.

13        THE COURT:  They are in round increments of $250,000.

14   A.  Right.  So that would be -- that was an exception to the

15   practice that the work had to be for straight recovery --

16   activist work.  That is correct.

17   Q.  So that was an exception.  And you said something about

18   round numbers versus specific numbers.  So if you flip the page

19   to 668, and I am looking at the very last entry, line 75.  So

20   now, this is another payment to Phoenix.  It looks like it is

21   November 17, 2017, right?

22   A.  I'm not so sure.  It says reserve.

23   Q.  I am looking at the date.  This is a payment to Phoenix on

24   November 17, 2017, correct?

25   A.  Let me see.  Okay.  So I'm sorry.  Your question, sir?

1   Q.   This is a payment to Phoenix on November 17, 2017.

2   Correct?

3   A.   That appears to be, yes.

4   Q.   So we were talking about round numbers verse not round

5   numbers.  So this is what you would characterize as one of the

6   monthly fees?

7   A.   No.  I thought the monthly fees were -- it would seem to me

8   from everything I've seen today, the round numbers are monthly

9   fees.  Like the line 75 on this exhibit, this looks to be more

10  like a success fee, because it's not a round number.

11  Q.   So this success fee came from what recovery?

12  A.   Let me look.  So if you go to page 667, Column D -- I'm

13  trying to remember this.  I think what this is indicating is

14  that, so, for example, there was a balance of 9.5 million in

15  line D.  And then as payments are made, that balance gets

16  reduced.  So, that 9.5 million may have been, that was an

17  existing reserve, so that may have been a mix of -- I think

18  that at that point that may have been a mix of settlement

19  funds.

20  Q.   So that wasn't -- it wasn't specific.  What I'm trying to

21  get to is your testimony to the judge that work Phoenix was --

22  money Phoenix was paid was specifically for recoveries that

23  came in for that thing.  So they worked on a particular case,

24  they got paid from recoveries for that case.  I understood the

25  question to be, it wasn't a situation where there was mixed

1    money.  We just talked about an exception to that rule.

2    A.  I understand.

3    Q.  What I am trying to get, is this is another exception to

4    that rule?

5    A.  No.  I think if we went to the letter to Ms. Martin

6    involving this wire, it would tell you exactly what Phoenix did

7    and what recovery it came out of.  But, from this spreadsheet,

8    it's not clear to me either.

9    Q.  Maybe if you flip the page to triple six, I know not a

10   great number.  It looks like this money, the original balance

11   for Column D, right, it is a reserve coming out of the first

12   recovery.  Is that correct?

13   A.  Column D is a reserve of 13.5 million which came -- which

14   was reserved for the indemnification litigation that came out

15   of the first recovery.  I believe, yes.

16             MR. LORENZO:  Nothing further, your Honor.

17             THE COURT:  If nobody has any further questions for

18   Mr. Moon, we will excuse the witness.  Thank you, Mr. Moon.

19             THE WITNESS:  Thank you, your Honor.

20             (Witness excused)

21             THE COURT:  Anybody have any housekeeping before the

22   next witness is called?  Shall we take our afternoon break now?

23             MR. SAVLA:  Your Honor, I do have one housekeeping

24   matter.

25             THE COURT:  Mr. Savla.

N4i3usb3

1            MR. SAVLA:  A question came up yesterday about the

2      securities at issue and in the case before Judge Nathan and

3      Judge Pauley.

4            THE COURT:  Yes.

5            MR. SAVLA:  We intend to put in a notice to take

6      judicial notice of the orders in that case and the CUSIPs at

7      issue.  Just so it's before you.  It wasn't an exhibit.

8      Because it came up in the --

9            THE COURT:  Do you need to use it with a witness?

10     Because if you are going to use it with a witness, there is no

11     point in asking me to take judicial notice of it.  If you are

12     going to use it in closing or some such thing, you can simply

13     point me to the opinion.

14           MR. SAVLA:  We could use it with a witness, but the

15     likelihood is a witness, particularly --

16           THE COURT:  Is not going to know or remember.

17           MR. SAVLA:  Is not going to know or remember.

18           THE COURT:  Right.  So why don't you save your request

19     for judicial notice until such time you actually want me to

20     take judicial notice.

21           MR. SAVLA:  Very good.

22           THE COURT:  So it is 12:40.  Let's take 15 -- sorry.

23     2:40.  The day has gone so quickly.  Let's take 15 minutes and

24     be back at five minutes to 3 o'clock with Mr. Nissenbaum.

25           Thank you.
            (Recess)

1          THE COURT:  All right, ladies and gentlemen.  Is our

2    next witness ready?

3          MR. LORENZO:  He is, your Honor.  I believe

4    Mr. Nissenbaum is sitting in the gallery.

5          THE COURT:  All right.

6          Mr. Nissenbaum, step forward, please.

7    DAVID NISSENBAUM,

8         called as a witness by the Plaintiff,

9         having been duly sworn, testified as follows:

10          THE WITNESS:  My name is David Nissenbaum, D-a-v-i-d

11   N-i-s-s-e-n-b-a-u-m.

12          THE COURT:  Thank you, Mr. Nissenbaum.

13          Mr. Lorenzo, you may examine.

14          MR. LORENZO:  Thank you, your Honor.  And if I have

15   permission to approach, we have a small binder for your Honor

16   and the witness.

17          THE COURT:  A small binder?  Then, by all means,

18   approach.

19          When you're ready, Mr. Lorenzo.

20          MR. LORENZO:  Thank you, your Honor.

21   DIRECT EXAMINATION

22   BY MR. LORENZO:

23   Q.  Mr. Nissenbaum, my name is Alex Lorenzo.  I'm an attorney

24   with Alston & Bird, and we represent U.S. Bank National

25   Association, as trustee in this action.  I'm going to ask you

1    some questions to start this afternoon.

2            Do you understand that you're testifying today in the

3    matter of U.S. Bank National Association v. Triaxx Asset

4    Management, et al.?

5    A.  Yes.

6    Q.  Do you understand what this litigation is about?

7    A.  No.

8    Q.  Have you reviewed any of the publicly available filings in

9    this litigation?

10   A.  I have not.

11   Q.  Have you reviewed any other documents related to this

12   litigation?

13   A.  I have.

14   Q.  What have you reviewed?

15   A.  A letter and an agreement.

16   Q.  Other than a letter and an agreement, did you review

17   anything else?

18   A.  No.

19   Q.  When you say "a letter," can you tell me what that letter

20   was?

21   A.  It was a letter, I believe, sent by Phoenix to me some

22   years ago.

23   Q.  When you refer to "an agreement," can you tell me what the

24   agreement is that you reviewed?

25   A.  I don't remember the title of the agreement, but I believe

1  it was an agreement for services referencing ARAM, A-R-A-M.

2  Q.  Just to be sure, you did not review any of the direct

3  testimony submitted by the other witnesses in this litigation?

4  A.  No.

5  Q.  Did you speak with counsel for the TAM parties in

6  connection with your testimony today?

7  A.  No.

8  Q.  Mr. Nissenbaum, what is your current occupation?

9  A.  Lawyer.

10  Q.  Is who is your employer?

11  A.  Schulte Roth & Zabel.

12  Q.  How long have you worked at Schulte Roth & Zabel?

13  A.  Since 1998.

14  Q.  What is your title at Schulte?

15  A.  Partner.

16  Q.  Could you describe your law practice at Schulte?

17  A.  Yeah.  I am a specialist in investment management.

18  Q.  Has that specialty in investment management been your

19  practice since you joined the firm in 1998?

20  A.  Nearly.  It's probably since about 2000/2001.

21  Q.  In this role, do you work on structured finance

22  transactions such as CDOs?

23  A.  Not primarily.

24  Q.  When you say "Not primarily," what do you mean by that?

25  A.  If a partner of mine who has that specialty, and we share a

1  client or my partner has questions or, you know, wants my

2  judgment on something, that's when I'll get involved in that

3  type of matter.

4  Q.  But, otherwise, if a partner doesn't ask you, you wouldn't

5  independently have clients who were involved in structured

6  finance transactions?

7  A.  No, that I handle myself, no.

8  Q.  How often would you say you've worked on structured finance

9  transactions?

10 A.  A fair amount over the years.

11 Q.  By "a fair amount," do you have a sense of the number of

12 deals you've worked on?

13 A.  I don't really work on the deals.  The way it works in my

14 world is, we may have a client that has investment funds, which

15 is my specialty, and also has structured products, which are my

16 partners' specialties.  So sometimes the questions overlap, the

17 issues overlap.

18 Q.  And I apologize if this question is rather basic, but when

19 you say "investment funds," could you just elaborate, sort of

20 specifically, what you're talking about?

21 A.  Sure.

22      It's a private pool of capital.  So if you think about

23 a mutual fund where you can contribute money to a fund, and the

24 fund invests your money along with hundreds of other investors,

25 a private investment fund is the same thing, it just doesn't --

1   it's not registered with the SEC, but it's basically a bunch of

2   investors — it could be 2, it could be 200, or something like

3   that — they put their money together in a partnership, and they

4   decide to invest it in any number of things.

5   Q.  So let's focus in now in roughly the 2006/2007 time period,

6   which I know is quite a few number of years ago.

7   A.  Yep.

8   Q.  Were you working on CDO transactions during that time

9   period?

10  A.  Just to be clear, I don't work on CDO transactions.  That's

11  not my specialty.  But if there was a client, again, where my

12  judgment was requested on investment management matters — you

13  know, fiduciary matters, contracts, business judgment — I might

14  be working with my partners on issues like that.

15  Q.  And so would that answer apply, then, if I asked you about

16  your practice in the 2010 to 2015 time frame as well?

17  A.  Right, right.  I am not a structured products lawyer, so

18  I'm just involved in some ancillary way with those kinds of

19  clients.

20  Q.  So would it fair to say that structured finance

21  transactions, such as CDOs, are not the core of your practice?

22  A.  Correct.

23  Q.  Would it be fair to say that you do not hold yourself out

24  as an expert in structured finance transactions?

25  A.  Correct.

1  Q.  If a client came to you for advice concerning a structured

2  finance transaction, would you be comfortable fully advising

3  that client yourself, or would you confer with one of your

4  colleagues?

5  A.  It depends upon the question.  If it was a question about a

6  particular deal and the deal documents, I would definitely

7  defer to my colleagues.

8  Q.  Let's talk now a little bit about your engagement by the

9  collateral manager in the three transactions that are the

10  subject of this litigation, the Triaxx CDOs.

11  A.  Uh-huh.

12  Q.  Was there a point in time where your firm, and you

13  specifically, were engaged to do work related to the Triaxx

14  CDOs?

15  A.  So, could you just clarify for me, are those the three CDOs

16  that are named in the caption to the case?

17  Q.  Yes.

18  A.  Okay.

19       I'm sorry, repeat the question?

20  Q.  Sure.

21       Was there a point in time where your firm, and you

22  specifically --

23  A.  Yeah.

24  Q.  -- were engaged to do work related to the Triaxx CDOs?

25  A.  Yes.

1    Q.  Do you remember when that was?

2    A.  So my partner, I believe, was the lead lawyer in creating

3    each of those CDOs.  I don't remember what years other than

4    looking at the names, which is 2006 and '7.  I had done other

5    work for the sponsor and the investment manager of those CDOs,

6    but I had done -- they had an investment fund as well, so I

7    would handle the investment fund work and then just related

8    advice about the business generally.  I had no involvement in

9    putting together the CDOs, but then, you know, during and after

10   the financial crisis, I worked with my partner on a range of

11   questions that that client had.

12   Q.  So let me just break that down a little bit because I want

13   to make sure the record is clear.

14   A.  Sure.

15   Q.  So, I think, first off, I was just taking notes, but tell

16   me if I'm out of order.

17           I think you mentioned your partner?

18   A.  Yes.

19   Q.  Can you tell me which partner you're referring to?

20   A.  Craig Stein.

21   Q.  And then you said that your client was the sponsor of the

22   CDOs; is that correct?

23   A.  Yes.

24   Q.  When you say your client, what entity are you referring to?

25   A.  Institutional Credit Partners.

1   Q.  Is that sometimes abbreviated as ICP?

2   A.  It is, yes.

3   Q.  You said that -- I'm now subbing in ICP for the sponsor,

4   but you said ICP also had an investment fund that you worked

5   on?

6   A.  Yes.

7   Q.  Did that investment fund have a name?

8   A.  It did.  I couldn't tell you -- I don't remember what the

9   name was exactly.

10   Q.  Was the individual -- can you tell me the name of the

11   individual at ICP that you worked with?

12   A.  Most of the time, Tom Priore.

13   Q.  So, just as a bit of shorthand — and you already beat me to

14   this — if I refer to Triaxx Prime CDO 2006-1 Ltd., Triaxx Prime

15   CDO 2006-2 Ltd., and Triaxx Prime CDO 2001 Ltd. as the issuers,

16   will you understand that?

17   A.  Yes.

18   Q.  If I refer to Triaxx Asset Management, LLC, and ICP

19   Management LLP as their collateral manager, will you understand

20   that?

21   A.  Yes.

22   Q.  Was there a point in time that Schulte represented the

23   issuers?

24   A.  The CDOs?  Yes, I believe that was Craig's role.

25   Q.  Do you know when Schulte first began to represent the

1  issuers?

2  A.  I don't know.

3  Q.  Was there a point in time that Schulte represented ICP in

4  its role as collateral manager for the issuers?

5  A.  I believe that was contemporaneous, but Craig would be the

6  right one to answer that question.

7  Q.  I'm going to ask you to turn to the binder that I had

8  handed you, and if you could open to tab 3, a document that has

9  provisionally been marked as Exhibit 1001.

10  A.  Yes.

11  Q.  Do you recognize this document?

12  A.  I think so.

13  Q.  What is this document?

14  A.  It looks like my engagement letter with ICP.

15         MR. LORENZO:  There was an objection to this document.

16  I'll ask the Court to move this in as an exhibit.

17         THE COURT:  Is there an objection today?

18         All right.  Exhibit 1001 is admitted.

19         (Trial Exhibit 1001 received in evidence)

20  BY MR. LORENZO:

21  Q.  So, looking at Exhibit 1001, this is a July 29, 2005

22  engagement letter between Schulte and ICP, correct?

23  A.  Yes.

24  Q.  It's addressed to Mr. Thomas Priore?

25  A.  Yes.

1  Q.  And at the time of the letter, Mr. Priore was the chief

2  investment officer of ICP, correct?

3  A.  Yes, I believe so.

4  Q.  Was Mr. Priore a client of the firm before this engagement?

5  A.  I got to know Tom several years prior.  I don't remember in

6  which capacity.  I think my -- I first advised Tom on something

7  in some capacity maybe three years before that, maybe

8  five years before that.

9  Q.  How did you get to know Mr. Priore roughly three years

10  before this?

11  A.  From my partner, Craig, and also from another partner at

12  the firm who had represented Tom before I got to know him.

13  Q.  At the time did you have a personal relationship with

14  Mr. Priore?

15  A.  No.

16  Q.  At any time between the engagement letter and today, have

17  you had a personal relationship with Mr. Priore?

18  A.  No.

19  Q.  Does this engagement letter also cover Schulte's

20  representation of Triaxx Asset Management?

21  A.  I couldn't tell you for sure because the matter, as we

22  define it in the first sentence of the letter, refers to

23  formation of investment funds and related advice.  That could

24  be broad enough, if Tom then said to Craig, please do my CDO

25  transaction or Craig may have gotten a separate engagement

1    letter, I really don't know.

2    Q.  Are you aware whether there is a separate engagement letter

3    with either the issuers or with the collateral manager?

4    A.  I'm not aware.

5    Q.  Did Schulte end up providing legal advice to the collateral

6    manager?

7    A.  Yes.

8    Q.  What was the general nature of that legal advice?

9    A.  That's kind of hard to answer because it was so many years

10   ago.  Craig would have provided, honestly, virtually all of the

11   advice in the capacity of collateral manager.  Craig and I

12   together were consulted on some issues.  Where my involvement

13   came in was much later, probably, I don't remember, 2009, '10,

14   '11, something like that, '12.

15   Q.  So we've talked about Schulte's representation of the

16   collateral manager.

17          Did Schulte also represent the issuers?

18   A.  I believe you asked that.  That was Craig's role as CDO

19   counsel.

20   Q.  Just to confirm so the record's clear, there are no

21   separate engagement letters between Schulte and the issuers,

22   correct?

23   A.  I really don't know.

24   Q.  Were there any agreements to this engagement letter that

25   we're looking at, Exhibit 1001?

1    A.   I don't know.

2    Q.   Another question that sort of parallels a question I asked

3    you about the collateral manager:  Can you describe the general

4    nature of Schulte's representation of the issuers?

5    A.   That's -- you really have to ask Craig that question.  That

6    wasn't really my role, so that really wasn't what I did.

7    Q.   Would it be fair to say that you drafted and negotiated the

8    governing agreements related to the Triaxx CDOs, including the

9    indentures in the CMAs?

10   A.   No, I had no involvement in that.

11   Q.   Is that something that Mr. Stein was involved in?

12   A.   I presume so, but I don't know for sure.

13   Q.   So would it fair to say that you considered yourself

14   knowledgeable about the provisions in the indentures in the

15   CMAs?

16   A.   Not necessarily.  If we had to focus on a particular issue,

17   I'd focus on that issue, but I really don't work on documents

18   like those.

19   Q.   What was the length of Schulte's engagement with the

20   collateral manager and the issuers?

21   A.   I can only speak to the collateral manager, and

22   specifically ICP, because we did not represent Triaxx Asset

23   Management.  The similar name is confusing, but that was not

24   our client.  Institutional Credit Partners, we represented,

25   again, possibly predating this engagement letter for a while,

1   but, obviously, at least since the time of the engagement

2   letter up through probably 2011, '12, '13, something like that.

3   Q.   Was there a letter sent that ended your engagement --

4   A.   No.

5   Q.   -- with the collateral manager?

6   A.   No.

7   Q.   Have you performed -- strike that.

8            Is Mr. Priore currently a client of Schulte?

9   A.   I don't think so.

10  Q.   Was there ever a time between that 2011/'12 period, when

11  ICP stopped being a client, and the present, when Mr. Priore

12  was a client of Schulte?

13  A.   Sorry, I didn't follow.

14  Q.   Was there a time between the sort of end of the

15  relationship with ICP where Mr. Priore or an entity controlled

16  by Mr. Priore was a client of Schulte?

17  A.   Yeah, we represented another business that Tom owned.

18  Q.   What was that business?

19  A.   Priority Payment Systems.

20  Q.   Do you recall what your hourly rate was at the time of this

21  engagement letter?

22  A.   I don't, but it would have been in the range in that first

23  paragraph of the engagement letter referring to partner rates.

24  Q.   Just so the record's clear, we're looking at Exhibit 1001,

25  and you're looking in the second paragraph, the third line

1    down, at 530 to 775 for partners?

2    A.  Yep, that's right.

3            THE COURT:  This really was a long time ago.

4            THE WITNESS:  Yeah, tell me about it.

5    BY MR. LORENZO:

6    Q.  So, we talked a little bit about how Mr. Stein might have

7    been involved in the drafting of the CDO and CMAs, collateral

8    management agreements, correct?

9    A.  Yes.

10   Q.  So, after the deals closed, do you recall when the

11   collateral manager or the issuers next reached out to you for

12   legal advice?

13   A.  I couldn't say specifically.  It's too long ago.

14   Q.  Let's switch subjects a little bit and talk about an entity

15   called Phoenix.

16           If I say Phoenix, will you understand it to mean

17   Phoenix Resolutions Ltd.?

18   A.  Yes.

19   Q.  Is there an engagement letter between Schulte and Phoenix?

20   A.  I don't know.  I don't think so, but I really don't know.

21   Q.  So would it be fair to say that Schulte was not engaged to

22   represent Phoenix?

23   A.  Yeah, I'm pretty sure they were not a client of ours.

24   Q.  Are you aware that the issuers, through the collateral

25   manager, engaged Phoenix?

1    A.   Yes.

2    Q.   And how are you aware of that?

3    A.   There was a period of time where we were advising Tom, ICP,

4    and the people who -- a couple of people who controlled and

5    worked for, I believe it was, Triaxx Asset Management — not our

6    client, the other Triaxx, the successor collateral manager, if

7    you will — and that's when I was brought in to discuss their

8    questions around Phoenix.

9    Q.   When you say -- just sort of when you say "their

10   questions," who are you referring to?

11   A.   Sometimes -- it could be any of them.  I mean, we'd be on

12   the phone together, you know, they'd be asking whatever

13   question they had.  They had a collaborative relationship.

14   Q.   I'm not trying to sort of drill down too much, but I'm just

15   trying to understand, is the "they" Mr. Priore, is it somebody

16   else?

17   A.   Sure.  It could have been Tom Priore, Vishal Garg, Nick

18   Calamari.  Principally those three, I think.

19   Q.   But of those three, it was only Mr. Priore that you were

20   representing?

21   A.   Correct -- well, not Mr. Priore, ICP.

22   Q.   Mr. Priore's entity, right?

23   A.   Yes, correct.

24   Q.   Do you have an understanding of the work Phoenix was doing

25   for the Triaxx CDOs in 2014?

1    A.  From what they told me, I do, yeah.

2    Q.  And "they" being Mr. Garg and Mr. Calamari?

3    A.  Correct.

4    Q.  And Phoenix was charging fees for its work; is that

5    correct?

6    A.  Yes.

7    Q.  Did Schulte ever advise Phoenix with respect to its

8    engagement agreements with the Triaxx CDOs?

9    A.  No.

10   Q.  Did Schulte ever advise Phoenix with respect to how it

11   would be paid its fees by the Triaxx CDOs pursuant to the

12   engagement agreements?

13   A.  So just to clarify my answers, I don't recall -- I had no

14   involvement, I don't believe any of my partners had any

15   involvement, in drafting those agreements, advising on the

16   terms that are in those agreements.  I believe we were -- when

17   we were brought in, we were brought in for our judgment, for

18   our advice, around how those agreements would work.

19   Q.  So when you came in, the agreements had already been

20   negotiated and executed?

21   A.  Yes.

22   Q.  Did you ever have conversations with Mr. Priore about

23   Phoenix's incentive fees?

24   A.  Probably, yeah.

25   Q.  What did you discuss with Mr. Priore about those incentive

1    fees?

2    A.   What did I discuss?

3           He probably asked me some specific questions.  I don't

4    know that we ever just discussed it.  I was asked some

5    questions about how the fees might be paid.

6    Q.   Were you asked questions about whether the fees had to be

7    paid, what we're calling, inside the deal pursuant to priority

8    of payments waterfall?

9    A.   Yes, we talked about that.

10   Q.   Do you have an understanding, when I say inside the deal

11   pursuant to the priority payment waterfall, what that means?

12   A.   Yes, I do.

13   Q.   Does it work for me to refer to payments not made inside

14   the deal pursuant to the priority payments waterfall as outside

15   the waterfall payments?

16   A.   Yes.

17   Q.   So you had discussions with Mr. Priore about whether

18   Phoenix's fees could be paid outside the priority of payments

19   waterfall?

20   A.   Correct.

21   Q.   And what did you tell Mr. Priore about that question?

22   A.   We talked about it quite a bit.  The circumstances of the

23   financial crisis were obviously unexpected.  The fact that the

24   Triaxx CDOs had owned other assets, other structured assets,

25   was a complicated situation.  Ultimately, the value of the

1    investments that the CDOs owned would have been determined

2    after the financial crisis by the outcome of various

3    litigations against — and this is very general — against,

4    ultimately, banks that had made home loans, mortgages, to

5    hundreds and thousands of borrowers in California and in other

6    areas.

7            So, in those circumstances, there was a general

8    belief — just all this has been reported in the news over the

9    years — that the way that the mortgages were being administered

10   was possibly not correct, that there was a lot of fraud

11   involved in terms of the making of the loans, that in separate

12   litigations involving the mortgages and the residential real

13   estate trusts that owned those mortgages, that if there was a

14   way to gather evidence, that that could influence the outcome

15   of those litigations.

16           The way that would influence the outcome would be —

17   and I only know this very, very generally — that with the

18   assistance of having evidence that wasn't readily available at

19   the time in that litigation, the outcome could be changed such

20   that the bonds that were ultimately owned by the Triaxx CDOs

21   would be worth much more money.

22           My understanding was that Phoenix had the ability, as

23   a business, to gather that data from public sources, that they

24   had created some system to do that, and that they had

25   ultimately submitted to the courts in those litigations this

1  additional evidence, and, in fact, it had been very successful

2  in settlements that resulted in many millions of dollars of

3  value coming back to the Triaxx CDOs that otherwise would not,

4  in all likelihood, have come back to those CDOs.

5  Q.   I realize you were sort of giving a background of what

6  Phoenix did, but how did that relate to the specific question I

7  asked you about, which was payment inside or outside the

8  waterfall of Phoenix's fees?

9  A.   Right.

10       So, the waterfall -- I know enough about CDOs to know

11  that the trust indenture is a very specific contract, and it

12  tries to specify for the trustee where every dollar of cash

13  that's received by the CDO, who it goes to, how it is spent, or

14  who it is sent to between service providers and the various

15  types of bondholders.

16       So the discussion there was, since this was an --

17  since the source of the cash, which was the proceeds from these

18  successful litigations, was not something that the CDOs -- that

19  was ever contemplated when the trust indentures were put

20  together, that the contracts simply didn't cover these

21  circumstances.

22       And we collectively, my partner and I, perhaps others,

23  we looked at this, and the question was -- the question put to

24  us was, should these payments -- are they in the waterfall or

25  are they outside of the waterfall?

1          And the documents simply, in our opinion, didn't

2     address that, but, in looking at the circumstance, and

3     especially the fact that CDOs are supposed to own bonds, and

4     the source of money coming in here was obviously not coming

5     from a bond, at least as far as we understood, and was coming

6     from litigation settlements, you know, we looked at the

7     circumstance, and our advice was something to the effect of

8     there looks like there's a good argument here that -- that the

9     source of proceeds is outside of the CDOs and, therefore,

10    outside of the waterfall and, therefore, not subject to the

11    trust indenture until that cash became -- the cash became

12    within the CDO, whatever that's supposed to mean.

13          In connection with that, we said we thought that that

14    was a logical interpretation.  We certainly thought that that

15    could be an equitable result or interpretation, given the

16    circumstances with the financial crisis, those other

17    litigations, and what had been pursued on behalf of the CDOs,

18    but the agreement doesn't address it.  So, as part of that, we

19    believed that there were certainly credible arguments to be

20    made about that result.

21    Q.  So, just to be clear, from your testimony, you're saying

22    that the source of proceeds from these litigations and

23    settlements weren't covered by the granting clause of the

24    indenture?

25    A.  Yes, it was outside of what was contemplated to be a part

1   of a normally functioning CDO.

2   Q.  And is it also your testimony that it was not possible to

3   pay Phoenix inside the waterfall?

4   A.  I think when you look at the waterfall, you've got certain

5   specific provisions.  There is a provision for administrative

6   expense at the top of the waterfall, and I don't really

7   remember accurately, there was another bucket, if you will,

8   toward the bottom of the waterfall, where payments could be

9   made.  But the waterfall was constraining.

10  Q.  So it wasn't feasible to pay Phoenix inside the waterfall;

11  is that your testimony?

12  A.  I think there were limitations in terms of how much money

13  could be available to Phoenix following the waterfall, right.

14  Q.  So if you wanted to get Phoenix more money, you needed to

15  pay them outside the waterfall; is that correct?

16  A.  I wouldn't phrase it that way.  You had to analyze what the

17  circumstance was exactly, you know, was Phoenix being paid out

18  of assets that were outside the CDO itself, right, the

19  litigation recovery proceeds.

20  Q.  So your view is that the litigation proceed recoveries are

21  outside the CDO, and until some entity decides to put some

22  amount of them inside the CDO, they are not subject to the

23  terms of the indenture?

24  A.  Yeah, we never drew a conclusion on that.  We were never

25  asked to draw a conclusion on that.  I suspect some people in

1  this room are hoping for a conclusion to be drawn on that, but

2  our advice to the client, very specifically, was, there is an

3  argument, which we thought was a very credible argument, that

4  given the activity Phoenix was engaging in, and given the state

5  of the assets and the fact there's litigation recoveries, that

6  seemed to us to be a very, very credible argument that the

7  proceeds from the litigations were — we can express this in

8  different ways, but one way you could express it was outside of

9  the waterfall.

10 Q.  Just to be clear for the record, when you say the client,

11 is there a person or entity that you're referring to that you

12 were giving this advice to?

13 A.  We were.

14       So, ICP wanted to know the answer to the question.

15 Vishal and Nick from TAM, also, of course, wanted to know the

16 answer to the question.  They really all wanted my and Craig's

17 judgment on that legal issue.

18 Q.  When did these conversations that we're talking about

19 occur?

20 A.  You'll have to remind me, but my guess is somewhere 2011 to

21 '13, maybe, something like that.

22 Q.  Do you recall how many conversations you had on this

23 subject?

24 A.  Quite a few.

25 Q.  Let's go now -- I think we had been looking at tab 3 in

 1  your binder, and let's go to tab 2, which is marked Exhibit 15,
 2  and this exhibit has been previously admitted.
 3  A.  Yeah.
 4  Q.  Do you recognize this document?
 5  A.  I do.
 6  Q.  This is a letter addressed to you as counsel to the
 7  collateral manager, correct?
 8  A.  Yes.
 9  Q.  And it was sent by Mr. Calamari, who signs this letter as
10  general counsel of Phoenix.
11          Do you see that?
12  A.  Yes.
13  Q.  The letter is dated August 8, 2014, correct?
14  A.  Yes.
15  Q.  Were you involved in the drafting of this letter?
16  A.  Give me a second just to reread it, if you would.
17  Q.  Sure.
18          (Pause)
19  A.  Okay.
20  Q.  So my question was:  Were you involved in the drafting of
21  this letter?
22  A.  I didn't draft it.  I may have seen an earlier iteration of
23  the letter.
24  Q.  Who would have provided you with a copy of your earlier
25  iteration of that?

1    A.  It was probably Nick.  I mean, Nick would call me on a few

2    things.

3    Q.  At the time of this letter, were you aware of the

4    relationship and agreements between Phoenix, on the one hand,

5    ICP, and then Mr. Priore?

6    A.  What are you referring to?  What agreements?

7    Q.  Were you aware that there was an agreement between Phoenix

8    or an affiliate of Phoenix and a company controlled by

9    Mr. Priore whereby Mr. Priore would be entitled to some kind of

10   fees?

11             MS. BEAUMONT:  Objection.

12             THE COURT:  Let's hear the rest of the question first.

13             THE WITNESS:  You'll have to clarify for me what

14   you're referring to.

15   BY MR. LORENZO:

16   Q.  Were you aware whether there was an agreement between

17   Phoenix or an affiliate of Phoenix and Mr. Priore or an entity

18   controlled by Mr. Priore whereby that entity would get a cut of

19   Phoenix's fees?

20             MS. BEAUMONT:  Objection.

21             THE COURT:  Hold off, hold off.  What's the nature of

22   the objection, Ms. Beaumont?

23             MS. BEAUMONT:  There is no good-faith basis for

24   suggesting such an agreement existed at the time of this

25   letter.

1    THE COURT:  All right.  Can you provide a foundation?

2    MR. LORENZO:  So this is where one of the challenges

3    of not having rulings on previous witness testimony comes in,

4    your Honor.  There's an objected to -- Mr. Priore's deposition

5    has been submitted via designation, and there's an objection to

6    those exhibits, as well as testimony around those exhibits.

7    So, I can certainly try and provide a foundation, but,

8    ultimately, it then comes to whether or not, in the context of

9    Mr. Priore, that would come in.

10   THE COURT:  All right.  Under the circumstances, I

11   think I have to hear the question and hear the answer.

12   Your objection will be preserved, Ms. Beaumont.

13   MS. BEAUMONT:  Thank you, Judge.

14   THE COURT:  Proceed.

15   Now you're going to have to say the question again.

16   MR. LORENZO:  That's what I was going to say, your

17   Honor.

18   BY MR. LORENZO:

19   Q.  At the time of this letter, were you aware whether there

20   were any agreements between Phoenix or any of its affiliates

21   and Mr. Priore and any entity controlled by Mr. Priore as far

22   as splitting fees that were payable to Phoenix?

23   A.  So what I can say to that is that I had heard about such an

24   agreement, but to answer your question, I can't tell you

25   exactly when in time I knew that.

1    Q.  How did you hear about such an agreement?

2    A.  It would have been in conversations with Tom or Vishal or

3    Nick or any of them, or all of them.

4    Q.  So turning back to this letter, to your knowledge, was

5    anyone at Schulte involved in drafting this letter?

6    A.  I can only speak for myself, but I'm pretty sure -- well, I

7    can only speak for myself, but I don't believe anyone at my

8    firm drafted the letter.

9    Q.  And at this point, in August of 2014, Schulte was counsel

10   for the collateral manager, correct?

11   A.  Yes.

12   Q.  Was Schulte also counsel for the issuers?

13   A.  I presume so.  I don't think we -- well, actually, I'll

14   back up on that.  I know that the issuers had -- either the

15   issuers or their directors had hired Wilmer Hale at some point

16   in time.  So, I can't actually say for sure.

17          We were certainly counsel to ICP.  I don't know if we

18   were ever -- if our engagement with the CDOs was ever formally

19   terminated.  To the extent that the directors of the CDOs were

20   taking advice from anyone in that -- some period of time around

21   then, you know, Wilmer Hale was retained at some point, and my

22   guess is — you'd have to ask Craig — they were turning to

23   Wilmer Hale and not Craig.

24   Q.  Did you have any conversations with Mr. Calamari

25   specifically regarding this letter before it was sent?

1    A.  I might have.

2    Q.  What was discussed during those conversations?

3    A.  My recollection was -- you know, the -- ICP and TAM, I

4    guess Phoenix, I didn't really -- when I was dealing with Nick

5    and Vishal, it was really as TAM.  I don't know -- it may be a

6    distinction without a difference in terms of them -- I don't

7    really know who owns Phoenix.  I know that they were involved.

8            But, anyway, we talked about the situation of how you

9    interpret the trust indenture in light of the circumstances.

10   They received my advice, Craig's advice, which is what I had

11   just mentioned a couple of answers ago.  And they were really

12   looking for the best confirmation they could get about what

13   that advice was.  And that's what this letter -- that's what

14   Nick is trying to memorialize in this letter.

15   Q.  Let's go to the second paragraph of the letter.  It says

16   that sections 6 and 12 of the agreement and annex I thereto,

17   were intended to allow for Phoenix to be paid its fees and

18   expenses out of settlement funds at the time such funds were

19   disbursed.

20           Do you see that?

21   A.  Yes.

22   Q.  Do you understand what the agreement in this section refers

23   to?

24   A.  This refers to what I think people call the ARAM agreement,

25   A-R-A-M.

1    Q.  Is that the engagement agreement between ARAM/Phoenix and

2    the CDOs?

3    A.  I believe so, right.

4    Q.  So let's flip backwards in your binder to tab 1, which is

5    Exhibit 12, a document that has been previously admitted in

6    this case as an exhibit.

7    A.  Okay.

8    Q.  Do you recognize this document?

9    A.  Yes.

10   Q.  This is a copy of the engagement agreements between the

11   Triaxx CDOs and Phoenix, correct?

12   A.  Yes.

13   Q.  Now let's turn to section 6, titled "Fees and Expenses."

14           Do you see that on page 4178?

15   A.  Yes.

16   Q.  It says that such fees "will be paid as an administrative

17   expense under the indenture," correct?

18   A.  Yes.

19   Q.  Let's turn to section 12, which is, I think, two pages

20   over, on the Bates stamp page 4180.  We're looking at the

21   section titled "Priority of Payments."

22           Do you see that?

23   A.  Yes.

24   Q.  If says, "Phoenix agrees that the payment of all amounts to

25   which it is entitled pursuant to this agreement shall be an

1    administrative expense subject to the priority of payments."

2              Do you see that?

3    A.   Yes.

4    Q.   Let's turn to annex I.  That's page, I believe, 11 of this

5    document.  It's Bates stamped 4186.

6              THE COURT:  I think it begins on 4185.  Are you on

7    4186?

8              MR. LORENZO:  So, yes, thank you, your Honor.  The

9    annex begins at 4185.

10   BY MR. LORENZO:

11   Q.   You can see the heading, "Annex I:  Additional Terms of

12   Engagement."

13             Do you see that?

14   A.   Yes.

15   Q.   And then if you flip the page over, right at the bottom of

16   4186, there is a heading on the left, "Diligence Fee."

17             Do you see that?

18   A.   I do.

19   Q.   And then if you look at the next page, page 4187, it talks

20   about an activist implementation fee.

21             Do you see that?

22   A.   Yes.

23   Q.   Now, if we go back to the clarification letter, which is

24   tab 2 of your binder, Exhibit 15 --

25   A.   Okay.

Q.  -- and looking at that second paragraph that we had
highlighted before, do you understand that the language here is
in accord with the language in the engagement agreements?

A.  Sorry, what do you mean by that?

Q.  Well, what do you understand the second paragraph of this
clarification letter to be saying?

A.  Sorry, you have to say that a different way.

Q.  Sure.

        Do you have an understanding of what this second
paragraph of the engagement letter is saying?

A.  I mean, this -- I think that --

Q.  I'm sorry, clarification letter.

A.  Yeah, I think Phoenix was trying to memorialize in
writing — for what purpose, I don't recall, right — what their
view was of how the fees were structured in this arrangement.

Q.  And this covers all of Phoenix's fees and expenses under
its engagement agreement?

A.  I mean, it says what it says.

Q.  Does this comport with the language in sections 6, 12, and
annex I of the engagement agreements?

A.  You're asking me to interpret that?

Q.  I had understood, from the conversations that you had had
about inside and outside the waterfall payments, that you had
discussed these issues.

A.  Yes, we did, right.

1   Q.   So my question was:  Does this language in the second

2   paragraph of the clarification letters comport with the

3   language in sections 6, 12, and annex I of the engagement

4   agreements?

5   A.   So what the letter says, right, it talks about intent of

6   the parties.  That's just factual, right?  As a lawyer, I can't

7   opine on someone's intent.  It is what it is, and I wasn't

8   involved.  You know, I couldn't speak to it because I was not a

9   witness or a part of anything having to do with the ARAM

10  contract.  Obviously, there was a feeling there about how the

11  fees were structured, which really was just the opinion or the

12  belief of probably all three of those guys on the phone.

13  Q.   So, you had testified a little while ago that you

14  understood that there was some sort of agreement where

15  Mr. Priore or an entity controlled would get a cut of the

16  Phoenix fees, right?

17            MS. BEAUMONT:  Objection.

18            THE COURT:  I'll allow it.

19            THE WITNESS:  Yeah, I don't think I gave you -- yes, I

20  had heard -- I was told that that was the case at some point in

21  time, yes.

22  BY MR. LORENZO:

23  Q.   And did that factor into your evaluation of whether Phoenix

24  could be paid inside or outside the waterfall?

25  A.   That I knew that my client was getting paid from another

1   source?

2   Q.   Yes.

3   A.   Definitely not.

4   Q.   So, as we look at the clarification letter, at the very

5   end, Mr. Calamari asks you to confirm this clarification,

6   correct?

7   A.   Yeah, confirm my understanding -- I'm just reading what it

8   says.  Please confirm that your, meaning my, understanding

9   related to such, which I assume is a reference to the whole

10  letter, is consistent with the understanding of the agreement

11  stated above.

12           Right, okay.  So, I'm sorry, what's your question on

13  that?

14  Q.   My question is only that Mr. Calamari asks, at the bottom

15  of the letter, for you to confirm this clarification, correct?

16  A.   Yeah, they were seeking -- right, they were seeking the

17  best -- you know, they were seeking the best understanding they

18  could get of what they thought the agreement -- what they had

19  intended the agreement could cover, you know, what the

20  intentions were, right, versus what the agreement says.

21  Q.   And do you remember receiving this letter?

22  A.   Vaguely.

23  Q.   Did you speak with your client, Mr. Priore, about this

24  letter?

25  A.   I think the letter was the end product of a bunch of

1  discussions about the legal interpretation that I gave that

2  long answer to a few minutes ago.

3  Q.  Did you speak with anyone else at your firm about this

4  letter?

5  A.  Probably Craig.

6  Q.  Did you speak with the directors at the issuers regarding

7  this letter?

8  A.  No.

9  Q.  Did you countersign this letter?

10  A.  No.

11  Q.  Did, to your knowledge, anyone else countersign this

12  letter?

13  A.  It doesn't appear to have any countersignature, and I don't

14  recall anyone else being asked to do that.

15  Q.  Did you have any conversations with Mr. Calamari regarding

16  this letter after it was sent?

17  A.  After?  I don't think so.

18  Q.  Did you respond to this letter?

19  A.  I might have.

20  Q.  When you say you might have, do you have a recollection of

21  whether you did, one way or another?

22  A.  Someone would have to show me emails or something like

23  that.

24  Q.  But, sitting here today, you don't have a recollection that

25  you did respond; is that correct?

1    A.  I don't remember one way or the other.

2    Q.  Let's turn now to tab 5 of your binder.  And this is a

3    document that has been marked Exhibit 1103 and has previously

4    been admitted.

5    A.  Okay.

6    Q.  Do you recognize this email chain?

7    A.  I don't remember it.

8    Q.  So if we look, I guess, slightly from the top, it looks

9    like an email from you to Mr. Priore on November 20, 2014,

10   copying Mr. Stein and Mr. Moon.

11            Do you see that?

12   A.  Yes.

13   Q.  Do you recall sending this email?

14   A.  No.

15            THE COURT:  Is 1103 in evidence?

16            MR. LORENZO:  Yes, it is, your Honor.

17            THE COURT:  Thank you.

18   BY MR. LORENZO:

19   Q.  So if we look below your email, about a third of the way

20   down the page, Mr. Priore appears to have written to you.

21            Do you see that?

22   A.  Yes.

23   Q.  In that email, Mr. Priore writes, "David and Craig, can one

24   of you guys please give a quick read of John's letter

25   (attached)?  It is important we get this out today.  And he

1    does need an all clear from you guys.  Should not take more

2    than five min."

3              Do you see that?

4    A.  Yes.

5    Q.  And John there refers to John Moon, correct?

6    A.  I think so, yeah.

7    Q.  Do you have an understanding of Mr. Moon's role as it

8    relates to the Triaxx CDOs?

9    A.  My understanding was he was the lawyer, I guess,

10   representing the CDOs, I think representing the CDOs in

11   connection with getting that evidence that I had mentioned

12   earlier, Phoenix's work product, into those various mortgage

13   lawsuits.

14   Q.  Now, does this email relate to the clarification letters?

15   A.  I really can't tell.

16             THE COURT:  By "clarification letters," Mr. Lorenzo,

17   you mean the 2014 letter that we just looked at as Exhibit 15?

18             MR. LORENZO:  Yes.  And I can represent that there are

19   substantially identical letters for the other two CDOs.

20             THE COURT:  Thank you.

21   BY MR. LORENZO:

22   Q.  So let's talk about Mr. Moon briefly.

23             Did you work with Mr. Moon in connection with your

24   work on the Triaxx CDOs?

25   A.  Again, I didn't work on the Triaxx CDOs, but I spoke to

1   John many times in the course of the subject matter you and I
2   are discussing.
3   Q.  Just to be clear, when you were talking to Mr. Moon, but
4   not working on the Triaxx CDOs, what were you working on?
5   A.  I didn't work on any CDOs.  John would be a part of the
6   conversations about these topics, payments in the waterfall,
7   status of those other lawsuits, things like that.
8   Q.  Again, how were you involved in the payments in the
9   waterfall if you weren't working on the Triaxx CDOs?
10  A.  Yeah, I just want to stay clear that I don't represent the
11  CDOs, and I'm not a structured products lawyer.  That's all.
12  John was involved in the conversations we're talking about.
13  Q.  So, let's flip to tab 4 in your binder, which is an earlier
14  version of the email that we were just looking at, but has the
15  benefit, I believe, of the attachment.  And this is
16  Exhibit 1057, which has been admitted previously.
17          So as we look roughly in the middle of the page, this
18  is a November 20, 2014 email from Mr. Priore to you and
19  Mr. Stein, correct?
20  A.  Yes.
21  Q.  And this attaches a letter.  If you flip to the next page,
22  we have the letter that it attaches to this email.
23          Do you see that?
24  A.  Yes.
25  Q.  Did you review the letter that was attached to this email

1    when you received it from Mr. Priore?

2    A.   I don't remember.

3    Q.   Did you speak with Mr. Priore or Mr. Moon about this email

4    or the letter attached thereto prior to this email?

5    A.   Really, I'd have to read this letter to remember.

6    Q.   So, the same question for the directors of the issuers —

7    had you spoken with them about this letter before this email

8    had come in?

9    A.   Just looking at this, I think I do recall the letter, I

10   recall reading the letter.

11   Q.   Do you recall approving the letter?

12   A.   I don't know what approving the letter means, so -- I mean,

13   this letter covers a lot of things, including a lot of things,

14   payments that John laid out, I guess, related to all the

15   different litigations and all the various expenses that were

16   owing.

17   Q.   So what were you doing in connection with this letter?

18   A.   That's a good question.  I don't know that I really

19   remember.  I may have just been confirming the amount of our

20   fees that were on here.  All the details in these various

21   bulleted paragraphs, I mean, that's not anything I had anything

22   involvement in.  So there's not much in here that I had

23   knowledge of that I would be capable, or logically be even

24   asked, to approve.

25   Q.   So other than your fees — and we'll get to that in a

1    minute — is there anything else in this letter that you had

2    knowledge of?

3    A.  I don't think so.

4    Q.  Let's look at the, I guess, third page of the letter — it's

5    maybe easier with Bates stamps — the Bates stamp ending in 777.

6    A.  Yes.

7    Q.  As we are looking at the table there, do you see third from

8    the bottom transfer to Schulte Roth & Zabel for legal fees --

9    A.  Yes.

10   Q.  -- as per Exhibit G of submission and then $25,000?

11   A.  Yes.

12   Q.  Is that the legal fees that you were referring to?

13   A.  Yes.

14   Q.  What were those legal fees for?

15   A.  Probably advice related to these issues we're talking

16   about, I think.

17   Q.  So was that legal fee for your review of this draft letter?

18   A.  No, I doubt that.

19   Q.  And had you provided any invoice for that $25,000?

20   A.  I'm sure I did.

21   Q.  Do you know if the invoice was attached to Mr. Moon's

22   letter?

23   A.  I have no recollection.

24   Q.  Was that a flat fee or was that an hourly bill?

25   A.  Probably -- with a number like that, I probably agreed to a

1    flat fee, yeah.

2    Q.   And this advice, was this advice in connection with the

3    activist litigation?

4    A.   It probably just related to this whole set of issues that

5    we're talking about, yeah.

6    Q.   I may have asked you this, but this is me getting older:

7    Prior to receiving this letter, did you speak to Mr. Priore or

8    Mr. Moon about the distribution of funds in connection with

9    settlements on behalf of the Triaxx CDOs?

10   A.   Just looking at the date on this letter, I'm sure we had

11   those conversations, you know, beforehand, and quite a bit

12   beforehand.

13   Q.   Did you also speak with the directors of the issuers about

14   the distribution of funds in connection with the settlements on

15   behalf of the Triaxx CDOs?

16   A.   No.

17   Q.   Do you recall if Schulte was specifically engaged to

18   provide advice concerning the distribution of funds in

19   connection with settlements on behalf of the Triaxx CDOs?

20   A.   Specifically engaged by whom?

21   Q.   Good question.

22         Do you know if Schulte was engaged by any client to

23   provide advice concerning the distribution of funds in

24   connection with settlements on behalf of the Triaxx CDOs?

25   A.   Well, we were counsel to ICP.  If it's in terms of Triaxx,

1    that would have been a question for Craig.

2    Q.  So your testimony is that advice regarding the distribution

3    of funds in connection with settlements on behalf of the Triaxx

4    CDOs was something that Mr. Stein would have had expertise in?

5    A.  Yes.

6    Q.  But you don't have expertise in that, correct?

7    A.  It really depends upon -- we were both asked for our

8    judgment about how to read these contracts.

9    Q.  Right, but I'm trying to understand, because I think you

10   said you had no knowledge of the information in this draft

11   letter, correct?

12   A.  You have to be more specific.  So in terms of -- what this

13   letter -- when you refer to the information, it refers to a lot

14   of the activity undertaken by Phoenix and by Triaxx in relation

15   to those various other lawsuits.  So, I mean, I was briefed on

16   what those activities were, and that was a part of it, it was

17   part of the background information I was given around the

18   question of how should we read this contract with ARAM, and how

19   should we read this contract with Phoenix, and what do you guys

20   think, where do you think we stand, ICP, the collateral

21   manager, you know, in terms of how we get paid.

22         So, sure, I knew generally a lot -- in general, a lot

23   of things happening here.  Did I know the specifics of what's

24   in each element of this letter?  No, that wasn't my role, that

25   wasn't my involvement.

1   Q.  So, to be clear, you didn't provide legal advice approving

2   payments outside the waterfall in the amount specified here; is

3   that correct?

4   A.  That's correct.  I think I've answered this already.

5   That's not quite the full picture.  We were asked for our

6   judgment about how to read these contracts and the

7   circumstances, and that's what our advice was about.

8   Q.  So, as we look on the second page of this draft letter,

9   ending in 776, there's a heading "Recommendations."

10          Do you see that?

11  A.  Yes.

12  Q.  And certain amounts were recommended to be transferred to

13  the trust accounts, correct?

14  A.  If that's what it says.  I really didn't have anything to

15  do with this aspect of the letter.

16  Q.  So you don't know how these amounts were determined?

17  A.  No.

18  Q.  And you don't know why these specific amounts were chosen

19  versus other amounts?

20  A.  Correct.

21  Q.  And if you flip the page, we were looking at this just a

22  moment ago, ending in 777, it similarly recommends the transfer

23  of certain funds to certain third parties, correct?

24  A.  You're just referring to what the chart says?

25  Q.  Yes.

1    A.  Yes, I agree.

2    Q.  Did you have an understanding about whether a

3    recommendation was being made in this letter to make payments

4    outside the waterfall versus inside the waterfall?

5    A.  I mean, the letter says what it says.  I mean, I didn't

6    write this, I don't have the knowledge -- looks like it was

7    John or his firm making the recommendation, so I don't really

8    think I could speak to any of that.

9    Q.  So your understanding is that it was Mr. Moon who you're

10   referring to as John --

11   A.  Yeah.

12   Q.  -- or his firm who was making the recommendation?

13   A.  I mean, it's their letter, yeah, that's what I'll surmise

14   by reading it.

15   Q.  So if we flip back to the next tab in your binder, tab 5,

16   which is Exhibit 1103 --

17   A.  Okay.

18   Q.  -- just a moment ago, we were looking at that email from

19   Mr. Priore on November 20, 2014, sort of in the middle of the

20   page, right?

21   A.  Yes.

22   Q.  And that attached the draft letter that we were just

23   looking at, and then above that email you sent an email to

24   Mr. Priore.

25            Do you see that?

1  A.  Yes.

2  Q.  You wrote, "This version looks fine."

3        Do you see that?

4  A.  Yes.

5  Q.  Now, had you seen a prior version of this draft letter?

6  A.  I have no recollection, I have no idea.

7  Q.  Had you provided any comments to the draft letter?

8  A.  Not that I recall.

9  Q.  Did you speak with anyone before your email responding to

10  Mr. Priore?

11  A.  I don't remember if I did.

12  Q.  Did you review any documents before responding to

13  Mr. Priore's email?

14  A.  I doubt it.

15  Q.  Did you consider your response to Mr. Priore to be legal

16  advice?

17  A.  What response are you referring to?

18  Q.  "This version looks fine," your email.

19  A.  Is it legal advice?  No.

20  Q.  Were you paid for this email from -- strike that.

21        Did you bill anyone for this email that you sent to

22  Mr. Priore?

23  A.  I have no idea.  For this particular email?

24  Q.  Yes.

25  A.  I have no recollection.  Maybe I did, maybe I didn't.

1   Q.  When we're talking about this outside-the-waterfall pool of

2   money, are there any sort of rules that apply — and I will be

3   more specific.  One of those rules is do settlement proceeds

4   from one litigation, can they only be used to pay service

5   providers for that particular litigation?

6   A.  I don't understand what you're asking me.

7   Q.  So what I'm --

8          THE COURT:  Are you asking for this witness' legal

9   view, or are you asking him to interpret a document?

10          MR. LORENZO:  Not interpret a document.  The witness

11   had earlier testified that he had had a bunch of discussions

12   about inside-the-waterfall payments and outside-the-waterfall

13   payments, and I'm just trying to understand the framework of

14   rules that might apply to outside-the-waterfall payments.

15          THE COURT:  Well, I don't recall this witness talking

16   about rules.  I recall him talking about credible arguments.

17   BY MR. LORENZO:

18   Q.  Are there any rules for money that exists outside the

19   accounts established under the indentures?

20   A.  The way I would frame it is, you know, we had a financial

21   crisis, right?  Tom, Vishal, Phoenix, whomever, decided to take

22   some action to try to enhance the recoveries.  The situation

23   was simply unprecedented and just not contemplated by these

24   documents that were written before the crisis.

25          We did not get into -- we got into, you know, the

1   question, as I've said twice before, you know, where do we
2   think we stand here, right?  How could this work?  Is it
3   inside, is it outside the waterfall?  We were not involved to
4   any extent in engineering rules or anything like that, saying,
5   you know, fact pattern A should be treated in the following
6   way, fact pattern B should be treated in the following way,
7   right?  Our involvement our interpretation, the concerns, were
8   pretty much focused on the contractual agreement you've been
9   asking me about and, again, what Nick wanted to try to
10  memorialize in some way in that letter.
11  Q.  Let's talk a little bit now about the indentures for three
12  Triaxx CDOs.
13         Is it possible to amend those indentures?
14  A.  Yes.
15  Q.  To the best of your knowledge, were any amendments proposed
16  to the indentures?
17  A.  I have no idea.
18  Q.  In the course of your legal analysis, these discussions
19  that you were talking about, did you ever recommend that there
20  be an amendment made to the indenture?
21  A.  That's outside of my expertise.  So I wouldn't have -- I
22  didn't recommend anything, but it wouldn't have been my place
23  to propose an amendment.
24  Q.  Now, fast-forwarding, we had been in 2014, in October of
25  2015, Mr. Moon emailed you another draft letter, correct?

 1   A.  Okay.

 2   Q.  If you flip to tab 7 of your binder, this is Exhibit 1175,

 3   and this has previously been admitted.

 4   A.  Okay.

 5   Q.  Now, the email from Mr. Moon to you starts about a third of

 6   the way down the page.

 7           Do you see that?

 8   A.  Yeah, the David Craig email?

 9   Q.  Yes.

10   A.  Yes.

11   Q.  Do you remember receiving this email?

12   A.  I don't remember, but I don't have any reason to believe I

13   didn't get it.

14   Q.  As we flip to the third page, it's Bates stamped 310, this

15   is the draft letter.

16           Do you see that?

17   A.  Okay, yes.

18   Q.  And, as with the first letter that we looked at, this

19   letter also outlined the proposed transfer of certain

20   recoveries in connection with Triaxx's activist litigations,

21   correct?

22   A.  That appears to be what it is, yeah.

23   Q.  If we look at the recommendation section on the third page,

24   Bates stamp ending in 312, this letter also recommended

25   transfers of funds to third parties, correct?

1    A.  That's what it says.

2    Q.  And it recommended, at the very bottom of that chart, an

3    additional $25,000 to Schulte, correct?

4    A.  Yes.

5    Q.  Do you recall what that $25,000 was for?

6    A.  Again, probably just for continuing discussions, advice,

7    around these issues.  I don't know, I'd have to go back and

8    look.  I'd have to go back and look, I don't know.

9    Q.  Was that $25,000 for your review of this letter?

10   A.  I doubt it.

11   Q.  And, again, were the fees listed in Mr. Moon's letter

12   intended to be paid outside of the waterfall?

13   A.  No idea.

14   Q.  Let's go to tab 8 --

15           THE COURT:  Can I hear that last question and answer

16   back again, please, Mr. Court Reporter.

17           (Record read)

18           THE COURT:  Thank you.

19   Q.  When you say you have no idea, you don't know whether these

20   fees are going to be paid inside the waterfall or outside the

21   waterfall?

22   A.  Correct.

23   Q.  So let's now go to tab 8, which -- and this is a little bit

24   confusing, and I apologize.  This has been previously admitted.

25   The first page is sort of a combined email, two different email

1    chains.  The first page is that November 20, 2014, email chain

2    that we looked at, but if you turn to the second page of

3    Exhibit 2017, it has a separate email chain in October of 2015.

4           Do you see that?

5    A.  Yes.

6    Q.  So this is a continuation of the chain that we had looked

7    at.

8           Do you see halfway the page there's Mr. Moon's email

9    to you on October 22nd of 2015?

10   A.  Yes.

11   Q.  And then it looks like Mr. Moon follows up on October 23rd,

12   2015.

13          Do you see that?

14   A.  Yes.

15   Q.  So he writes, "David, Craig, do you have an estimation as

16   to when we can expect to hear from you?"

17          Do you see that?

18   A.  Yes.

19   Q.  And on Sunday, October 25th, 2015, it looks like you

20   respond to Mr. Moon, copying Mr. Stein, Mr. Calamari and

21   Mr. Garg.

22          Do you see that?

23   A.  Yes.

24   Q.  You responded, "I have no comments."

25          Do you see that?

1    A.  Yes.

2    Q.  And had you reviewed a prior version of this October 2015

3    draft letter that Mr. Moon had sent you?

4    A.  I don't recall, but I don't think so.  Usually, I didn't

5    really have anything much to say about John's letters.

6    Q.  Did you speak with Mr. Moon regarding the content of the

7    draft letter before responding to him?

8    A.  I doubt it.

9    Q.  Did you speak with the directors of the issuer regarding

10   the content of the letter before responding to Mr. Moon?

11   A.  No.

12   Q.  Did you review any documents, such as the indentures,

13   before responding to Mr. Moon?

14   A.  Certainly not the indentures.  I don't think I reviewed

15   anything.

16   Q.  Your response to Mr. Moon on Sunday, October 25th, 2015,

17   is, "I have no comments."

18            Do you see that?

19   A.  Yes.

20   Q.  Did you consider this response to be legal advice?

21   A.  No.

22   Q.  Was the $25,000 payment to Schulte in exchange for this

23   email?

24   A.  I really doubt it, no, I don't do business like that.

25   Q.  When you say, "I have no comments," did this constitute

1  your endorsement of the contents of the draft letter?

2  A.  No.  It was, did I have anything to say about it, and, as

3  same observation with the other letter you showed me, I really

4  don't have — and everybody knows this — I wasn't involved in

5  virtually anything that the letter details, so...

6  Q.  Let's talk about what we have been calling the Stein memo,

7  which you'll see why we use that name in just a minute.

8           If you flip to tab 6 of your binder, this is

9  Exhibit 1158 --

10  A.  Which tab?

11  Q.  Sure.  It's tab 6 of your binder.

12  A.  6?  Okay.

13  Q.  This is Exhibit 1158, and this has previously been

14  admitted.

15  A.  Yes.

16  Q.  The first page, that says "Privilege Withheld," but if you

17  flip over, this is the memorandum that I had said we were

18  referring to as the Stein memo.

19  A.  Uh-huh.

20  Q.  Do you recognize this document?

21  A.  No.

22  Q.  From the top of this document, it's a memorandum written by

23  Mr. Stein, your partner, dated May 4, 2017, correct?

24  A.  That's what it looks like.

25           THE COURT:  Mr. Lorenzo, is 1158 stipulated to?

1          MR. LORENZO:  Yes, I believe it's been admitted

2     already, your Honor.

3          THE COURT:  Thank you.

4     Q.  If we look at the first paragraph of this memo, it says it

5     concerns advice "as to whether the indentures permit payment of

6     legal fees and expenses from the settlement proceeds currently

7     held in escrow in Miller Wrubel."

8          Do you see that?

9     A.  You're on -- where are you?  The introductory paragraph?

10    Q.  Yes.

11    A.  I don't know if I'm looking at the same thing you're

12    looking at.  I don't see the reference to Miller Wrubel.

13    Q.  Oh, maybe I'm --

14         THE COURT:  At the end of paragraph 4.

15         THE WITNESS:  That's not what I'm seeing on the

16    screen.

17    Q.  Oh, I'm sorry, I'm looking at the wrong "You have asked my

18    advice."  My apologies.  A long day.

19         So if we look at 362, the first full paragraph after

20    the bullet point 4 --

21    A.  Second page?

22    Q.  Second page.

23    A.  All right.

24    Q.  -- "You have asked my advice as to whether the indentures

25    permit payment of such legal fees and expenses (and to continue

1    to pay ongoing legal fees and expenses) from the settlement

2    proceeds currently held in escrow at Miller Wrubel."

3           Do you see that?

4    A.   Yes.

5    Q.   And then if you look a little bit farther down in that

6    paragraph, roughly seven lines up, starting with, "I believe"

7    on the right-hand side, the conclusion appears to be, "I

8    believe that the indentures and related documents do not

9    preclude the use" — I think an "of" is missing — "of such

10   escrowed proceeds to make such payments."

11   A.   I see that.

12   Q.   Did you speak with Mr. Calamari about this memo or the need

13   for legal advice concerning payments outside of the priority of

14   payments waterfall?

15   A.   No.

16           MS. BEAUMONT:   Objection.

17           THE COURT:   Let me hear the question again.

18           (Record read)

19           THE COURT:   Basis?

20           MS. BEAUMONT:   The witness testified he does not

21   recognize this document.

22           THE COURT:   That wasn't the question.  I'll allow the

23   question.

24           THE WITNESS:   The answer is no.

25   Q.   And, in fact, that was because as of April 17, Schulte

1    wasn't representing Triaxx Asset Management, correct?

2    A.  I have no idea.  I had no involvement in the memo or who

3    requested it or anything like that.

4    Q.  Did you communicate with Mr. Stein about this memo?

5    A.  No.

6    Q.  Did you offer any other advice to Mr. Moon, Mr. Priore, or

7    the issuers regarding the Triaxx CDOs that we did not discuss

8    today?

9    A.  I want to say no, but you're asking me to remember

10   conversations from ten to fifteen years ago, so -- that's the

11   best I can say.

12           MR. LORENZO:  At this time, your Honor, we don't have

13   any further questions.

14           THE COURT:  Thank you very much.

15           Who's next?

16           MS. BEAUMONT:  We have no questions.

17           THE COURT:  The TAM parties have no questions.

18           Noteholders?

19           MR. SAVLA:  No questions.

20           THE COURT:  Issuers?

21           MR. RAINER:  No questions.

22           THE COURT:  It is 4:17, so we will call it a day.

23           And you are excused.

24           (Witness excused)

25           THE COURT:  Lawyers, stay behind for a moment, and

N4IKUSB4

1     we'll talk logistics.

2            Ms. Beaumont?

3            MS. BEAUMONT:  Your Honor, I just wanted to clarify —

4     I got tangled up in my chronology, and I withdraw the

5     objections to Mr. Lorenzo's two questions.

6            THE COURT:  So the 25 percent contract was in

7     existence at the time of the document he was cross-examining

8     on?

9            MS. BEAUMONT:  Correct.

10           THE COURT:  Thank you.  I appreciate you clarifying

11    that.

12           In light of Mr. Nissenbaum's testimony, is there any

13    renewed interest in settlement among the parties?

14           Just asking.

15           So we will start with Mr. Garg in the morning; is that

16    correct?

17           MS. BEAUMONT:  Yes, Mr. Garg will be here in the

18    morning.

19           THE COURT:  So what will the order of examination be

20    with respect to Mr. Garg?  I see that he has an affidavit,

21    which means I better read it tonight.  And we'll start, then,

22    with putting his affidavit into the record.

23           And who will cross-examine him initially?

24           MR. SAVLA:  The noteholders will.

25           THE COURT:  All right.  So the noteholders will

N4IKUSB4

1      cross-examine Mr. Garg initially.

2              And what is your time estimate?

3              MR. SAVLA:  It's hard to say, of course, but I'll

4      estimate two and a half hours.

5              THE COURT:  So that will pretty much take us the whole

6      morning, if your estimate is accurate.

7              MR. SAVLA:  Correct.

8              THE COURT:  All right.  What about the issuer?  Will

9      you have cross-examination for Mr. Garg?

10             MR. RAINER:  No, your Honor.

11             THE COURT:  What about the trustee?

12             MS. BUCKEL:  Yes, your Honor, we will.

13             THE COURT:  Time estimate?  I know it's only an

14     estimate at this point and you don't know how many of your

15     targets the noteholders are going to knock down, but what do

16     you think?

17             MS. BUCKEL:  Exactly, your Honor.

18             We're hoping the noteholders will knock down a good

19     number of the targets, but I would say right now we're around

20     an hour and a half.

21             THE COURT:  All right.

22             So we do need to have Mr. Calamari ready at some point

23     in the afternoon.  With luck, we should get to him by then.

24             And will the order of examination be the same with

25     respect to Mr. Calamari?  Or do you want to switch it off?

N4IKUSB4

```
 1          MR. LORENZO:  The trustee can go first for
 2   Mr. Calamari.
 3          THE COURT:  All right.  So, with respect to
 4   Mr. Calamari, after his direct affidavit comes in, we will have
 5   trustee, and then we'll have noteholders?
 6          MR. SAVLA:  Yes, that sounds fine.
 7          THE COURT:  All right.  Is it too early to ask for
 8   cross-examination estimates with respect to Garg and Calamari?
 9   Because, remember, we have three more after that, and it
10   doesn't look like we're going to get done with Calamari on
11   Wednesday.  So that means we're going to have to continue with
12   Calamari, do both of the — I want to say number crunchers but
13   I'm afraid that's disrespectful to the witnesses — do both of
14   the consultants on Thursday and perhaps into a little bit of
15   Friday morning so that we can get Ms. Beaumont's testimony in.
16          Now, the other thing we could do — I'm very reluctant
17   to broach this subject because I already turned it down once
18   when you asked me — if we think there is a real risk that you
19   won't be able to present your closing arguments on Friday
20   afternoon, you can talk about that with each other overnight,
21   and if you have an alternate proposal for me tomorrow, you can
22   make that proposal.  Anything else for today?
23          MS. BANDLER:  Yes, your Honor.
24          THE COURT:  Ms. Bandler speaking.
25          MS. BANDLER:  We didn't think I would speak.
```

N4IKUSB4

1              Given the particular facts and circumstances that are

2       open in this trial, we'd like to respectfully request that the

3       Court permit Cede & Co. to not appear on the remaining days of

4       the trial.

5              THE COURT:  Does anyone have any objection to excusing

6       Cede & Company's lawyer?

7              Does everyone promise that they're not going to seek a

8       default judgment against Cede or other adverse consequences due

9       to counsel's excusal?

10             All right, you are excused, Ms. Bandler.

11             MS. BANDLER:  Thank you, your Honor.

12             THE COURT:  I think that be it for this afternoon --

13      not quite yet.

14             MR. SAVLA:  I just have a question that may bear on

15      our discussions as to the closing argument.

16             THE COURT:  Yes.

17             MR. SAVLA:  If we do adjourn to another date --

18             THE COURT:  It won't be the following week.  I'm fully

19      booked.  And I will have to look at my calendar to see when I'm

20      less fully booked.

21             MR. SAVLA:  Okay.  Thank you.

22             THE COURT:  All right.  So we'll stand in recess until

23      9:30 tomorrow morning.  Thank you.

24                  (Adjourned to April 19, 2023 at 9:30 a.m.)

25                                  * * *

```
 1                      INDEX OF EXAMINATION
 2   Examination  of:                          Page
 3    JOHN G. MOON
 4   Direct By Ms. Wityk . . . . . . . . . . . . 227
 5   Cross By Mr. Lorenzo . . . . . . . . . . . . 269
 6   Cross By Mr. Lauriello . . . . . . . . . . . 324
 7   Cross By Mr. Rainier . . . . . . . . . . . . 333
 8   Recross By Mr. Lauriello . . . . . . . . . . 341
 9   Redirect By Ms. Wityk  . . . . . . . . . . . 342
10   Recross By Mr. Lorenzo . . . . . . . . . . . 354
11   DAVID NISSENBAUM
12   Direct By Mr. Lorenzo  . . . . . . . . . . . 359
13                        JOINT EXHIBITS
14   Exhibit No.                              Received
15    3122 first page  . . . . . . . . . . . . . 233
16    3492     . . . . . . . . . . . . . . . . . 234
17    3052     . . . . . . . . . . . . . . . . . 236
18    3122     . . . . . . . . . . . . . . . . . 238
19    3492     . . . . . . . . . . . . . . . . . 238
20    3493     . . . . . . . . . . . . . . . . . 240
21    3487     . . . . . . . . . . . . . . . . . 244
22    3494     . . . . . . . . . . . . . . . . . 247
23    3148     . . . . . . . . . . . . . . . . . 250
24    3150 through 3153  . . . . . . . . . . . . 252
25    3490     . . . . . . . . . . . . . . . . . 255
```

1    3495   . . . . . . . . . . . . . . . . . . 256

2    3099   . . . . . . . . . . . . . . . . . . 257

3    3161   . . . . . . . . . . . . . . . . . . 258

4    3488   . . . . . . . . . . . . . . . . . . 262

5    1207   . . . . . . . . . . . . . . . . . . 321

6    3468   . . . . . . . . . . . . . . . . . . 332

7                        TRIAL EXHIBITS

8    Exhibit No.                              Received

9    3496   . . . . . . . . . . . . . . . . . . 264

10   1001   . . . . . . . . . . . . . . . . . 367

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25