UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, solely in its capacity as Trustee,<br><br>Interpleader Plaintiff,<br><br>- against -<br><br>TRIAXX ASSET MANAGEMENT LLC et al.,<br><br>Interpleader Defendants. | Case No. 1:18-cv-04044-BCM<br><br>PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF PACIFIC INVESTMENT MANAGEMENT COMPANY LLC AND CITIGROUP GLOBAL INC. |

Interpleader Defendants Pacific Investment Management Company LLC ("PIMCO") and Citigroup Global Markets Inc. ("Citi," and together with PIMCO, the "Noteholders"), by their respective attorneys, Norton Rose Fulbright US LLP and Davis Polk & Wardwell LLP, hereby submit the following post-trial Proposed Findings of Fact and Conclusions of Law.

## Table of Contents and Outline


PROPOSED FINDINGS OF FACT ....1

I. THE ENGAGEMENT LETTERS ....1

A. Negotiations Regarding the Purchase of ICP ....1

B. Negotiation of the Engagement Letters ....2

C. The March 22, 2011 "Structure" of Contracts ....4

i. The Engagement Letters ....4

ii. The March 22, 2011 Associated Agreements ....6

iii. Subcontracting Agreements ....8

D. Lack of Disclosure to Noteholders ....8

E. The *Countrywide* Settlement and the Clarification Letters ....10

F. The TAM Parties' Billing Practices ....12

G. The Prior Interpleaders ....14

H. PRES Charges Incentive Fees on Court-Ordered Sales ....15

I. The Present Interpleader ....16

PROPOSED CONCLUSIONS OF LAW ....17

I. The Engagement Letters Violate the Indentures and the CMAs ....17

A. The Collateral Manager Must Bear Its Own Expenses ....17

B. The Collateral Manager Could Not Act on behalf of the Issuers ....19

i. The Issuers Granted the Authority to Enter Into the Engagement Agreements to the Trustee ....19

ii. Section 2 of the CMAs Does Not Override the Indentures ....21

iii. The Issuers Did Not Obtain the Required Consents of the Noteholders ....22

II. THE NOTEHOLDERS ARE ENTITLED TO THE *RES* ....22

A. The TAM Parties' Claimed Incentive Fees Violate the Engagement Letters ....22

B. The Other Fees Claimed by the TAM Parties are Not Enforceable ....27

III. The TAM Parties and Issuers Are Not Entitled to Their Legal Fees ....28

IV. The TAM Parties' Affirmative Defenses and Quasi-Contract Claims Fail ....30

A. The Noteholders Cannot Prove their Affirmative Defenses ....30

i. The Indentures Have an Enforceable No Waiver Clause ....30

ii. Disclosure Was Not Adequate ....32

B. The TAM Parties Are Not Entitled to Quasi-Contract Remedies ....33

# TABLE OF AUTHORITIES

PAGE(S)

## CASES

*Abakan Inc. v. Uptick Cap. LLC*,
943 F. Supp. 2d 410 (S.D.N.Y. 2013) ........ 30

*Banco de La Republica de Colombia v. Bank of N.Y. Mellon,*
No. 10-CIV-536 AKH, 2013 WL 3871419 (S.D.N.Y. July 26, 2013) ........ 32

*Blue Ridge Invs., LLC v. Anderson-Tully Co.,*
No. 04-CIV-3777 2005 WL 44382 (S.D.N.Y. Jan. 10, 2005) ........ 31

*Busher v. Barry,*
No. 14-CV-4322 (NSR), 2016 WL 2742428 (S.D.N.Y. May 10, 2016) ........ 33

*Cammeby's Mgmt. Co., LLC v. Alliant Ins. Servs., Inc.*,
720 F. App'x 18 (2d Cir. 2017) ........ 33

*Campbell v. Thomas*,
897 N.Y.S.2d 460 (2nd Dep't 2010) ........ 26

*Cap. Ventures Int'l v. Republic of Argentina*,
652 F.3d 266 (2d Cir. 2011) ........ 21

*CUnet, LLC v. Quad Partners, LLC,*
No. 16-CV-6327 (CM), 2017 WL 945937 (S.D.N.Y. Mar. 7, 2017) ........ 34

*Hindsight Sols., LLC v. Citigroup Inc.*,
53 F. Supp. 3d 747 (S.D.N.Y. 2014) ........ 35

*Joshi v. Trs. of Columbia Univ.*,
515 F. Supp. 3d 200 (S.D.N.Y. 2021) ........ 34

*Kingman v. Zmoore Ltd.,*
No. 570019/14 2015 WL 871937 (1st Dep't 2015) ........ 32

*Kirschner v. KPMG LLP*,
15 N.Y.3d 446 (2010) ........ 25

*Kronisch v. United States*,
150 F.3d 112 (2d Cir. 1998) ........ 24

*Learning Annex Holdings, LLC v. Rich Glob., LLC*,
860 F. Supp. 2d 237 (S.D.N.Y. 2012) ........................................................................ 34

*In re Malinowski*,
156 F.3d 131 (2d Cir. 1998) ..................................................................................... 28

*In re McMahon*,
129 F.3d 93 (2d Cir. 1997) ....................................................................................... 28

*Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*,
898 F.3d 243 (2d Cir. 2018) ..................................................................................... 20

*N.Y. State Elec. & Gas Corp. v. Century Indem. Co.*,
767 F. App'x 188 (2d Cir. 2019) ............................................................................... 32

*U.S. Bank Nat'l Ass'n v. Triaxx Prime CDO 2006-1, Ltd. et al.*,
No. 15-CV-10172 (WHP), 2016 WL 3552272 (S.D.N.Y. June 23, 2016) ...................... 14, 25

*Oscar Gruss & Son, Inc. v. Hollander*,
337 F.3d 186. (2d Cir. 2003) .................................................................................... 28

*Park Irmat Drug Corp. v. Optumrx, Inc.*,
152 F. Supp. 3d 127 (S.D.N.Y. 2016) ........................................................................ 32

*PenneCom B.V. v. Merrill Lynch & Co.*,
372 F.3d 488 (2d Cir. 2004) ..................................................................................... 31

*Phx. Light SF DAC v. U.S. Bank Nat'l Ass'n,*
No. 20-1312-CV-2021 WL 4515256 (2d Cir. Oct. 4, 2021) ........................................ 20

*Phx. Light SF Ltd. v. U.S. Bank Nat. Ass'n,*
No. 14-CV-10116 KBF 2015 WL 2359358 (S.D.N.Y. May 18, 2015) .......................... 19-20

*Preferred Acc. Ins. Co. of N.Y. v. Grasso*,
186 F.2d 987 (2d Cir. 1951) ..................................................................................... 23

*In re Refco Sec. Litig.*,
890 F. Supp. 2d 332 (S.D.N.Y. 2012) ................................................................... 28, 30

*In re Ridgemour Meyer Properties, LLC*,
791 F. App'x 279 (2d Cir. 2020) ............................................................................... 25

*Schoeps v. Museum of Modern Art*,
594 F. Supp. 2d 461 (S.D.N.Y. 2009) ........................................................................ 23

*Triaxx Prime CDO 2006-1, Ltd. v. Bank of N.Y. Mellon,*
No. 16-CIV-1597 (NRB), 2017 WL 1103033 (S.D.N.Y. Mar. 21, 2017) ............................ 20

*Triaxx Prime CDO 2006-1, Ltd. v. Bank of N.Y. Mellon,*
No. 16-CIV-1597 (NRB), 2018 WL 1417850 (S.D.N.Y. Mar. 8, 2018) *report and recommendation adopted*, No. 9:17-CV-80203, 2017 WL 4415912 (S.D. Fla. Oct. 4, 2017)........................................................................................ 20

*Triaxx Prime CDO 2006-1, Ltd. v. Ocwen Loan Servicing, LLC,*
No. 9:17-*CV*-80203, 2017 WL 4415912 (S.D. Fla. Oct. 4, 2017) ......................................... 20

*Triaxx Prime CDO 2006-1, Ltd. v. Bank of N.Y. Mellon*,
No. 16-CV-1597 (NRB), 2018 WL 1417850 (S.D.N.Y. Mar. 8, 2018), *aff'd*, 741 Fed. App'x 857 (2d Cir. 2018) ........................................................................................ 20

*Triaxx Prime CDO 2006-1, Ltd. v. U.S. Bank Nat'l Ass'n,*
741 F. App'x 857 (2d Cir. 2018) ........................................................................................ 20

*Triaxx Prime CDO 2006-1, Ltd. v. Ocwen Loan Servicing, LLC,*
No. 9:17-CV-80203-CIV 2017 WL 3701251 (S.D. Fla. Aug. 21, 2017) .............................. 20

*Triaxx Prime CDO 2006-1, Ltd. v. Ocwen Loan Servicing, LLC*,
762 F. App'x 601 (11th Cir. 2019) ........................................................................................ 20

*U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*,
687 F. App'x 8 (2d Cir. 2017) ........................................................................ 15, 21, 25

*U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC,*
No. 16-CV-8507 (AJN), 2019 WL 9511402 (S.D.N.Y. Sept. 16, 2019) ...................... *passim*

*U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC,*
No. 16-CV-8507 (AJN), 2017 WL 3610584 (S.D.N.Y. July 26, 2017) 15

# PROPOSED FINDINGS OF FACT[1]

## I. THE ENGAGEMENT LETTERS

### A. Negotiations Regarding the Purchase of ICP

1. This case concerns three Collateralized Debt Obligation transactions: Triaxx 2007-1, in which PIMCO is a Holder (or controls one or more Holders) of Class A-1D Notes and Class A-1T Notes, Triaxx 2006-2, in which Citi is a Holder (or controls one or more Holders) of Class C Notes under the 2006-2 Indenture, and Triaxx 2006-1 (collectively, the "Triaxx CDOs" or the "Issuers"). (Joint Fact Stipulations ("Joint Stip.") ¶¶ 3, 15, 17.) The Triaxx CDOs are governed by Indentures, which grant the Trustee the Collateral as well as the Issuers' right, title and interest under that Collateral, including the right to "make waivers or other agreements" and to "file any claims . . . or institute any proceeding." (*Id.* ¶ 24; Tr. Ex. 2 at 8-10; Tr. Ex. 3 at 8-10.)

2. At their inception, the Triaxx CDOs engaged ICP Asset Management LLC ("ICP") as Collateral Manager under Collateral Manager Agreements (the "CMAs"). The CMAs prohibit any action "which would . . . result in the Issuer violating the terms of the Indenture in any material respect." (Tr. Ex. 5 – § 7(e) at 11; Tr. Ex. 6 – § 7(e) at 11.)

3. In 2010, Vishal Garg saw a business opportunity in residential mortgage-backed securities. (Trial Tr. 423:11-19.) By April 2010, Mr. Garg and his business partners in an entity called ARAM Global were "looking at potentially purchasing ICP." (Trial Tr. 425:17-427:14.) In an email exchange dated April 20, 2010 with his business partners regarding ICP, Mr. Garg described how he had read the "indenture and [was] now familiar with the ins/outs of events of default, removal of collateral manager" and stated that "we could do many things (some of which

[1] Unless otherwise stated, defined terms have the meaning set forth in this Court's Opinion and Order on the parties' motions of judgment on the pleadings. (Dkt. 331.)

sound counterintuitive but would be very effective) if we took over the ICP vehicle which is the collateral manager." (Tr. Ex. 2041 at 1; Trial Tr. 425:17-427:14.)

4. After Mr. Garg's initial meeting with ICP, he "learned that ICP was for sale" and he entered into talks with ICP, negotiating with Mr. Priore. (Trial Tr. 429:4-8; Joint Stip. ¶ 49.) In late 2010, Mr. Garg asked Sigurgeir Jonsson "to look at whether [purchasing ICP] made sense or not" and so Mr. Jonsson reviewed the Indentures and CMAs for the Triaxx CDOs. (Trial Tr. 429:9-17; Tr. Ex. 2109.) In August 2010, Mr. Jonsson highlighted various portions of the 2006-2 CMA, including section 8(b), which stated "[t]he Collateral Manager shall be responsible for all expenses incurred by it in the performance of its obligations under this Agreement." (Tr. Ex. 2110 at 12.) Mr. Jonsson shared this highlighted document with Mr. Garg. (Tr. Ex. 2109; Tr. Ex. 2110.)

5. Meanwhile, in June 2010, the SEC charged ICP and Mr. Priore with securities fraud. *SEC v. ICP Asset Management LLP*, et al., 1:10-cv-04791-LAK (S.D.N.Y. 2010); (*see also* Tr. Ex. 2022 (SEC Press Release).) The SEC alleged that, ICP—at Mr. Priore's direction—defrauded the Triaxx CDOs and caused them to lose tens of millions of dollars and that Mr. Priore and his companies improperly obtained tens of millions of dollars in advisory fees and undisclosed profits at the expense of their clients and investors. (*See* Tr. Ex. 2022.)

6. On September 21, 2010, Mr. Garg signed a letter of intent for ARAM Global to acquire ICP. (Tr. Ex. 2030; Trial Tr. 430:25-431:6.) ARAM Global and Mr. Garg ultimately decided, however, not to acquire ICP "because of the SEC investigation" into ICP and because ARAM did not want to take on ICP's liabilities. (Trial Tr. 431:25-432:7.) Instead, Mr. Garg and ARAM opted for a "different transaction" with Mr. Priore and ICP. (Trial Tr. 432:8-25.)

**B. Negotiation of the Engagement Letters**

7. After the purchase of ICP fell through, Mr. Garg and, to a lesser degree, his business partner, Raja Visweswaran, negotiated with Mr. Priore to enter into three "Engagement Letters,"

whereby ICP would pay fees to new entity, ARAM Phoenix Real Estate Solutions Ltd., which would later become Phoenix Real Estate Solutions ("PRES"). (Trial Tr. 433:17-21; 433:25-434:2.)

8. The evidence shows that the Issuers were not involved at all in the process. Mr. Garg's testified that "PRES's fees were negotiated between Mr. Priore and myself." (Dkt. 535 ¶ 28.) Mr. Priore testified that he was "directly involved in the negotiations" with Mr. Garg (Priore Dep. 66:8-11, 73:20-74:3), and did not recall any direct interaction with the Issuers regarding the Engagement Letters. (Priore Dep. 66:8-11, 70:18-24.)

9. The Issuers also did not retain any counsel. Kramer Levin Naftalis & Frankel LLP ("Kramer Levin") represented PRES, and Schulte represented ICP. (Trial Tr. 434:3-7.) Schulte's engagement letter only set forth ICP as its client and both Mr. Nissenbaum and Mr. Stein of Schulte testified that they were not aware of whether there was a separate engagement letter with the Issuers. (Tr. Ex. 1001; Trial Tr. 369:20-23; Schulte Dep. 18:3-19:4.) Similarly, there is no evidence in the record of a waiver or client consent permitting Schulte to represent both the Issuers and the Collateral Manager simultaneously with respect to the Engagement Letters.

10. The Issuers themselves testified that they do not know whether they were consulted in connection with the engagement of PRES (Issuers Dep. 164:16-22), or whether they provided their acceptance of the Engagement Letters. (Issuers Dep. 168:23-169:3.) The Issuers also testified that they "ha[d] given the grant [of powers to enter into agreements] to the [T]rustee." (Issuers Dep. 252:22-25.) The Trustee, as party to the Indentures, was not involved in the negotiation of the Engagement Letters and did not become aware of them until 2018 when the documents were filed as exhibits in this action. (*See* Dkt. 533 ¶¶ 43-44.)

11. On March 22, 2011, Mr. Garg, on behalf of ARAM Phoenix Real Estate Solutions Ltd., and Mr. Priore, on behalf of the Collateral Manager, executed the Engagement Letters. (Joint

Stip. ¶52; Tr. Ex. 10 at 1, 9-10; Tr. Ex. 11 at 1, 9-10; Tr. Ex. 12 at 1, 9-10.) Each Engagement Letters was addressed to one of the three Triaxx CDOs, but sent to ICP, attention Thomas Priore. (Tr. Ex. 10 at 1; Tr. Ex. 11 at 1; Tr. Ex. 12 at 1.)

**C. The March 22, 2011 "Structure" of Contracts**

i. <u>The Engagement Letters</u>

12. To understand the purpose and effect of the Engagement Letters, it is necessary first to review the Priority of Payments "waterfall" for the CDOs. The Trustee receives and distributes proceeds from the Collateral pursuant to the Priority of Payments "waterfall" described in Section 11.1 of the Indentures. (Joint Stip. ¶ 25.) The Priority of Payments waterfall specifies that on each distribution date, available cash goes first principally to pay trustee fees and expenses, after which it is applied to pay "Administrative Expenses," including "Other Administrative Expenses," up to a monthly cap of up to $200,000 per month for the Triaxx 2006-2 and Triaxx 2007-1 CDOs. (*Id.* ¶ 26-27; *see, e.g.*, Tr. Ex. 3 § 11.1(a)(i)(2) at 171).

13. In the next step of the waterfall, the Trustee distributes payments to noteholders. (*See, e.g.*, Tr. Ex. 3 §11.1 at 171). The Collateral Manager is then entitled to two types of management fees, a Subordinated Management Fee and an Incentive Management Fee, paid after the Class A through Class C Noteholders and paid at the bottom of the Priority of Payments waterfall, respectively. (Tr. Ex. 2 – § 11.1 at 165-166; Tr. Ex. 3 – § 11.1 at 173-174.)

14. By 2010 or shortly thereafter, ICP was not receiving these management fees because there was insufficient collateral in the Triaxx CDOs. (Trial Tr. 568:7-14.) The TAM Parties were also aware that Section 8(b) of the CMAs required the Collateral Manager to bear the expenses of its agents. (*See supra* ¶ 4; *see also* Trial Tr. 429:18-430:24.) To circumvent this lack of payment, the Collateral Manager entered into the Engagement Letters, in which it purported to act on behalf of the Issuers to seek payment of PRES's fees as Other Administrative Expenses of

the Issuer, an earlier step in waterfall, *i.e.*, *before* any of the noteholders. (Tr. Ex. 11 at 4; Tr. Ex. 12 at 4.) In short, the Engagement Letters inverted the Priority of Payments "waterfall" so that the Collateral Manager's vendor would be paid before the Noteholders.

15. The Engagement Letters stated that PRES would provide purported "Diligence" and "Activist Implementation" services. (Tr. Ex. 11 at 1-2; Tr. Ex. 12 at 1-2.) According to Dr. Tang, one of PRES's consultants, the Triaxx CDOs consist of "a static portfolio," with the Indentures "not permit[ing] constantly trading in and out of positions." (Trial Tr. 907:23-908:5.) To this end, the Indentures provide that the Collateral Manager could only purchase securities until the first quarterly distribution after the closing of the CDOs and then could only reinvest until the close of a Reinvestment Period in 2012. (*See*, *e.g.*, Tr. Ex. 3 – § 12.2(f) at 53, 188.) As Dr. Tang stated, however, PRES's services transformed the CDOs from "passive" to "actively managed," which, in practice, meant supporting "active litigation." (Trial Tr. 907:23-908:17, 909:4-21.)

16. The Engagement Letters also purported to require the Issuers to pay PRES a series of fees: (i) a monthly "Diligence Fee" the amount of which began at $50,000 for the 2006-2 CDO and $20,000 for the 2007-1 CDO, but declined after years two and four of the Engagement Letters to $25,000 and $5,000, respectively, (Tr. Ex. 11 at 16; Tr. Ex. 12 at 16.); and (ii) an "Activist Implementation Fee" of $10,000 per month up to a maximum of $250,000 per RMBS CUSIP, or, in the event that the "CDO (or the Collateral Manager)" in its sole discretion" determined that "the recovery of funds or assets related to such security . . . exceeds $500,000, the CDO shall pay to ARAM an *aggregate* amount of Activist Implementation Fees in respect of such security (*taking into account* any Activist Implementation Fees paid by the CDO to ARAM on or prior to such date of determination) equal to $250,000." (Tr. Ex. 11 at 12-13; Tr. Ex. 12 at 12-13 (emphasis added).) In other words, the $250,000 cap for the Activist Implementation Fee in the Engagement Letters

could be met either through (i) monthly billing for up to 25 months per security, or (ii) an aggregate fee of $250,000, "taking into account" prior monthly Activist Implementation Fees, if the Collateral Manager determined, in its "sole discretion," that the security's recovery exceeded $500,000. (Tr. Ex. 11 at 12-13; Tr. Ex. 12 at 12-13.)

ii. The March 22, 2011 Associated Agreements

17. On the same day the Engagement Letters were executed, March 22, 2011, Mr. Garg, Mr. Priore, or Mr. Priore's wife, executed additional agreements as "part of one structure" (the "Associated Agreements"): (*See* Garg Dep. 123:18-22, 124:3-25; Trial Tr. 443:18-444:4.)

(A) *Repurchase Agreements*. Mr. Garg and Mr. Priore executed two Sale and Repurchase Agreements, in which ARAM Phoenix Investments Ltd. ("ARAM") purchased ICP's future fees for the Triaxx CDOs for $4.5 million (the "Repurchase Agreements"). (Trial Tr. 435:9-437:11; Tr. Ex. 2034 at 1, 8-10; Tr. Ex. 2035 at 1, 7-9.) ARAM is a subsidiary of Phoenix Holdco L.P. and an affiliate of PRES. (Trial Tr. 435:17-22.) PRES is likewise a subsidiary of Phoenix Holdco L.P. (Trial Tr. 486:16-20.) Kramer Levin, representing PRES and Schulte, representing ICP, negotiated the Repurchase Agreements. (Trial Tr. 437:12-19.)

(B) *Option Agreement.* Mr. Garg and Mr. Priore also executed an Option to Purchase Agreement, which granted ARAM the option to purchase "the right to manage" ICP for $1 (the "Option Agreement"). (See Tr. Ex. 2029; Trial Tr. 437:20-439:7.) Mr. Garg entered into the Option Agreement to protect his and ARAM's "$4.5 million investment on the fees purchased through the secondary sale and repurchase agreements." (Trial Tr. 536:18-537:9.) Kramer Levin negotiated the Option Agreement for ARAM and Schulte represented ICP. (Trial Tr. 439:10-19.)

(C) *P.S.D. Agreement.* Mr. Garg, on behalf of behalf of PRES, ARAM Phoenix Holdco L.P., and ARAM., and Mr. Priore's wife, on behalf of P.S.D. Partners, entered into a consulting agreement (the "P.S.D. Agreement"). (Trial Tr. 440:4-441:16.) Mr. Priore was a member of

P.S.D. Partners. (*See id.*; Priore Dep. 97:19-98:4.) Under the P.S.D. Agreement, P.S.D. Partners received 25% of the net cash flow to the Phoenix entities after the investors in Phoenix Holdco recouped their investment. (Tr. Ex. 2033 at 2-3.) Thereafter, P.S.D. Partners, and by extension Mr. Priore, was entitled to receive 25% of the net cash flow from "the [Engagement Letters] or from any profits from the residuals" starting around the end of 2014. (Trial Tr. 543:8-25.) Mr. Garg testified that P.S.D. Partners has been paid $2.75 million under the P.S.D. Agreement. (Trial Tr. 582:24-583:5.) Schulte represented P.S.D. Partners in this transaction. (Trial Tr. 443:9-14)

18. While Mr. Garg did not consummate the purchase of ICP as contemplated in his Letter of Intent, (Tr. Ex 2030), he had, for all practical purposes, accomplished the same goal with the "structure" of Associated Agreements: (i) PRES's affiliate had purchased a right to ICP's fees pursuant to the Repurchase Agreements; (ii) Mr. Garg and PRES's affiliates had the option to purchase the right to manage ICP for $1 pursuant to the Option Agreement; and (iii) Mr. Priore worked both as Collateral Manager and as a consultant for PRES and PRES's affiliates pursuant to the P.S.D. Agreement and received 25% of the Phoenix entities' net cash flow. Indeed, Dr. Tang acknowledged that he had previously testified that PRES was "doing work that was previously done by" the Collateral Manager. (Trial Tr. 779:11-780:23.) At times the TAM Parties themselves seemed to elide the difference between TAM and PRES, and PRES's fees were listed in the Note Valuation Reports ("<u>NVR</u>s") as being the fees and expenses of the Collateral Manager. (*See e.g.*, Trial Tr. 172:16-174:7; Tr. Ex. 282 at 7, 11.)

19. Mr. Garg did take formal control of the Collateral Manager in a sale that concluded on January 3, 2015. (Tr. Ex. 2057.) Triaxx Holdco LLC agreed to purchase ICP for approximately $1.2 million, minus attorneys' fees, and subject to a post-closing adjustment for liabilities, including with respect to the SEC. (*Id.* at 6-7.) Although ARAM. had an option to purchase ICP

for $1, Mr. Garg testified that "the SEC was not going to approve the purchase by ARAM Phoenix Investments Ltd." for $1 because the SEC wanted a larger payment and "did not want . . . any entity where [Michael Balboa a partner of ARAM Global] had an association, past or present, involved in the purchase of the collateral manager." (Trial Tr. 455:6-456:22.)

20. Priore had to sell ICP because, by September 2012, the SEC had entered a final judgment in its fraud case against him and ICP. (*See* Tr. Ex. 2023.) The final judgment in that case ordered them, together with certain ICP affiliates, to pay over $23 million in disgorgement, interest, and penalties. (Dkt. 331 at 22 n.19 (internal quotation marks omitted).

iii. <u>Subcontracting Agreements</u>

21. PRES has never had employees, so Mr. Garg signed and countersigned a series of subcontracts from 2011 through 2015 as part of "the plan" to perform the work under the Engagement Letters. (Trial Tr. 444:5-18.) The terms, subsequent alterations, and the interrelationship between PRES and the contracting entities are discussed in the Noteholders' pre-trial submission, (Dkt. 502 ¶¶ 30-39) and in the Trustee's post-trial submissions. Mr. Garg and Mr. Visweswaran paid discretionary bonuses and distributions outside of the Priority of Payments waterfall to Mr. Garg, Mr. Calamari, Mr. Jonsson, Dr. Tang, and Mr. Savino. (Trial Tr. 487:2-489:5, 597:5-14, 721:12-19, 845:6-9.) These individuals now stand to receive an aggregate amount of $5 million in bonuses if the TAM Parties prevail in this case. (Trial Tr. 584:15-585:3.)

**D. Lack of Disclosure to Noteholders**

22. As the TAM Parties concede in their RFA Responses, they never sent the Engagement Letters, Clarification Letters or the Associated Agreements to the Trustee or the Noteholders until this litigation began. (Tr. Ex. 45 at 6.) The TAM Parties, however, claim that PRES's engagement was disclosed in three sets of communications (*see* Dkt. 499 at 30.):

(A) *Mr. Priore's 2011 Letter to Noteholders.* In 2011, Mr. Priore, then the Collateral Manager, asked the Trustee to send identical letters to noteholders in the Triaxx CDOs. (Tr. Ex. 2027; Tr. Ex. 2028; Tr. Ex. 2090; *see also* Tr. Ex. 2089 at 3.) The letters do not mention PRES, describe how PRES charged its fees or for how much, or any of the Associated Agreements, such as the P.S.D. Agreement. (Tr. Ex. 2027; Tr. Ex. 2028; Tr. Ex. 2090.) Ms. Bui of PIMCO testified that the letter did not provide her with information about which entities were being paid, who was paying, and what the language in the letter about a "capped expense" structure referred to. (Bui Dep. 157:21-158:21, 159:25-160:12.)

(B) *Mr. Garg's Alleged Calls with PIMCO*. Mr. Garg testified that he had two calls with Ms. Bui at PIMCO. (Garg Decl. – Dkt. 535 ¶ 60.) The first call was allegedly in 2011 "around when [PRES] got the mandate from ICP to pursue the activist strategy." (Garg Dep. 282:21-284:18.) Mr. Garg testified that there may also have been more calls. (Trial Tr. 459:25-460:1, 460:20-461:3.) Ms. Bui, for her part, testified that she did not recall any calls with Mr. Garg "at any point in time." (Bui Dep. 180:17-181:12.) Rather, Ms. Bui only recalled one call in 2012 with Mr. Priore about defaulted securities. (Bui Dep. 175:6-16, 184:25-185:11, 187:9-16.) Mr. Garg testified that there were no notes of his alleged calls with Ms. Bui and that he could not remember the exact dates of calls. (Trial Tr. 460:13-19, 461:12-14.) Mr. Garg testified that he discussed the contents of the Engagement Letters with Ms. Bui, but testified in his deposition that he did not "discuss the Phoenix engagement letter with Ms. Bui." (Trial Tr. 465:6-23; Garg Dep. 286:21-23.) Mr. Garg admitted that he did not discuss with Ms. Bui the Associated Agreements or bonuses paid to Mr. Jonsson or Dr. Tang. (Trial Tr. 466:9-12, 466:23-467:6)

23. *Mr. Priore's 2013 Letters to Noteholders*. On January 8, 2013 and May 28, 2013, the Collateral Manager sent two additional and identical letters discussing opposition to a proposed

settlement in the *Countrywide matter*. (*See* Tr. Exs. 3058 at 6-7; 3069 at 6.) As before, these letters did not contain any information about the work performed by PRES, the amount of fees it was to receive, how these fees would be paid, the Associated Agreements, or the conflicts of interest among the Collateral Manager and PRES. (*See* Tr. Exs. 3058; 3069.)

**E. The *Countrywide* Settlement and the Clarification Letters**

24. According to John Moon, PRES's litigation support assisted his firm Miller Wrubel in objecting to a settlement in an interpleader action in *Triaxx Prime CDO 2006-1 Ltd. et al. v. Countrywide Fin. Corp. et al.,* No. 2:14-cv-00252-MRP-MAN (C.D. Cal.). (Trial Tr. 197:19-199:14.) That objection was settled for approximately $69 million, and approximately $35 million was also paid to Miller Wrubel in the same action independent of that objection. (Trial Tr. 228:24-229:10.) Mr. Moon testified that the Triaxx CDOs would have been entitled to the $35 million payment even if they had not objected. (*Id.*) The TAM Parties have only provided a categorical privilege log to support their purported work, which is neither sufficient nor competent evidence of how PRES's efforts contributed to the Countrywide or any other settlement. (*See* Tang Decl. – Dkt. 539 ¶ 56; *see also* Trial Tr. 784:10-785:8.)

25. Under the Indenture's Priority of Payment waterfall, PRES's fees (even if valid) were subject to the monthly cap on Administrative Expenses of $200,000 for Triaxx 2006-2 and 2007-1 CDOs, and the balance of any settlement would have constituted Principal Proceeds payable to the noteholders. (*See e.g.*, Tr. Ex. 3 at 45-46, § 11.1 at 171-177.) The TAM Parties sought to circumvent this cap. In August 2014, in response to "a large recovery that had come in" from the *Countrywide* settlement, Nicholas Calamari, as General Counsel for PRES, sent three so-called "Clarification Letters" addressed to the attention of Schulte Roth & Zabel as "counsel for the Collateral Manager" because "PRES wanted to be paid out of those available [funds]." (Trial Tr. 614:12-21, 615:6-14; Tr. Ex. 13; Tr. Ex. 14; Tr. Ex. 15.) In the same vein as the Engagement

Letters, the Clarification Letters were nominally addressed to the CDOs, and were neither sent to the Directors of the Issuers nor countersigned by them. (*See* Trial Tr. 616:4-9, 676:5-677:19.)

26. Before drafting the Clarification Letters, Mr. Calamari purportedly spoke with Mr. Garg, Mr. Priore, and Mr. Nissenbaum as "ICP's counsel" to confirm the original intent of the parties to the Engagement Letters. (Trial Tr. 621:7-11.) Mr. Nissenbaum could not state whether Schulte was the Issuers' counsel, but testified that it was "certainly counsel to ICP" in 2014. (Trial Tr. 384:4-23.) There is no evidence that Mr. Calamari spoke to the Issuers about the original intent. The Issuers testified that they did not even receive the Clarification Letter at the time, (Issuers Dep. Tr. 188:8-189:9), and in response to the Issuers' request in November 2015 for the contracts with PRES, Mr. Calamari only sent the Engagement Letters. (Trial Tr. 676:19-677:9.)

27. As the Trustee's post-trial brief states, the Clarification Letters contradicted the Engagement Letter, including the express provision that PRES's fees "shall be paid as an Administrative Expense under the Indenture[s]" and "in accordance with the Priority of Payments." (Tr. Ex. 11 at 4, 6; Tr. Ex. 12 at 4, 6.) The Clarification Letters also contradicted the Engagement Letters' aggregate cap of $250,000 for the Activist Implementation Fee. (*Compare* Tr. Ex. 11 at 13 *and* Tr. Ex. 12 at 13 *with* Tr. Ex. 14 *and* Tr. Ex. 15.) The Engagement Letters state that ARAM would receive "an *aggregate* amount of Activist Implementation Fees in respect of such security (*taking into account* any Activist Implementation Fees paid by the CDO to ARAM on or prior to such date of determination) equal to $250,000." (Tr. Ex. 11 at 13; Tr. Ex. 12 at 13 (emphasis added).) Nevertheless, despite this clear language, the Clarification Letters effectively doubled the cap for the Activist Implementation Fee to $500,000 by newly declaring "the 'Activist Implementation Fee' was intended to provide that Phoenix is entitled to a payment of $250,000 per security, *in addition to* the $10,000 per month per security." (*See* Tr. Ex. 14; Tr. Ex. 15.) Mr.

Calamari acknowledged that the language in the Engagement Letter about "taking into account" Activist Implementation Fee "does not exist" in the Clarification Letters. (Trial Tr. 673:8-12; *see also* Tr. Ex. 14; Tr. Ex. 15.) Mr. Garg stated that he reads the Engagement Letters to set forth two separate fees of $250,000 each for an aggregated total of $500,000, but conceded that the paragraph was "poorly worded" as it referred to an "aggregate fee of $250,000." (Trial Tr. 479:5-21.)

28. After the *Countrywide* litigation, the TAM Parties were not able to secure recoveries of any substantial, value to the Triaxx CDOs. (*See* Tr. Ex. 40 at 3.) This was, in part, due to holdings that the Triaxx CDOs lacked standing to bring litigation or object to settlements, because the Indentures had granted all of those rights to the Trustee. (Trial Tr. 324:6-23.)

**F. The TAM Parties' Billing Practices**

29. The TAM Parties engaged in at least six irregular, erroneous, and improper billing practices that violated both the spirit and the letter of the Engagement Letters:

(A) *First*, as described in the Trustee's Proposed Findings of Fact and Law, PRES directed TAM to make payments outside the Priority of Payments waterfall to itself and others, totaling including $22,799,194.75 to PRES ($18,000,000 in "incentive fees" and $4,799,194.75 in monthly fees). (*See* App. 1; *see also* App. 2 at 2.)

(B) *Second*, PRES charged "incentive fees" of $250,000 for CUSIPS on top of Activist Implementation fees already charged for those CUSIPs. It is impossible to calculate the exact amount of this overcharge because TAM has marked only one exhibit showing which CUSIPs were charged a monthly Activist Implementation Fee that is dated January 2013 and produced by a third-party. (Tr. Ex. 3507; Trial Tr. 896:4-897:9.) Even that one exhibit, however, shows that Phoenix charged "incentive fees" for 26 of 32 CUSIPs after having already charged Activist Implementation Fees. (*See* Tr. Ex. 3507; *see also* App. 5.)

(C) *Third*, PRES overcharged Due Diligence Fees, as admitted by Mr. Garg. (Trial Tr. 472:6-475:25.) The Engagement Letters set forth schedules for "Diligence Fees" in declining amounts over time in Annex II to each document. (Tr. Ex. 11 at 16; Tr. Ex. 12 at 16.) For Triaxx 2007-1, the fee declined from $20,000 for the first two years, $10,000 for years three and four, and $5,000 for any year thereafter. (Tr. Ex. 12 at 16.) For Triaxx 2006-2 the Diligence Fee similarly declined from $50,000 to $35,000 to $25,000 across the same periods. (Tr. Ex. 11 at 16.) Yet the TAM Parties never decreased the Diligence Fees for any of the CDOs. As shown in Appendix 3, the TAM Parties' failure to follow the terms of their Engagement Letters resulted in overcharged Due Diligence fees for an amount of $3,535,000 across the three Triaxx CDOs. (App. 3.)

(D) *Fourth*, in deciding which securities (identified by a CUSIP) to charge a monthly Activist Implementation Fee, PRES "rotated" the CUSIPs to maximize its fees. In light of the 25 months of eligibility for Activist Implementation Fees and the cap on Other Administrative Expenses, the TAM Parties would "rotate" which CUSIPs were being charged fees. (Tr. Ex. 2045.) Mr. Garg testified that this was simply "rotating the focus of [PRES's] efforts" (Trial Tr. 480:12-14, 485:16-486:15) and that "[t]here was also just a limit to the amount of work we could do. So, we couldn't really manage more than 30 deals at the same time." (Trial. Tr. 590:20-591:1.) But Dr. Tang testified that "there was no limit" in resources to how many CUSIPs Phoenix could analyze and that "the reason [PRES was] rotating the securities is so that PRES would not hit the other [Other Administrative Expenses] cap." (Trial. Tr. 772:14, 775:15-776:10; 918:2-15.)

(E) *Fifth,* PRES charged multiple CDOs for work on the same CUSIP, even though Dr. Tang testified that which of the Triaxx CDOs owned a given CUSIP was "not an important distinction." (Trial Tr. 802:9-15.) Rather, as Dr. Tang testified, when analyzing the loans of a given CUSIP, the work was the same, no matter which Triaxx CDO had the CUSIP as part of its

collateral. (Trial Tr. 802:16-21.) PRES nonetheless charged multiple CDOs if more than one CDO was invested in a single CUSIP. (Trial Tr. 802:22-806:12; 815:12-816:1, 816:9-17, 822:17-823:22; Tr. Ex. 3487 at 116-119; Tr. Ex. 3497 at 7-14; Tr. Ex. 3137; App. 4.) As a result, for CUSIPs owned by all three Triaxx CDOs, PRES charged $500,000 per CDO ($250,000 of monthly Activist Implementation Fees and $250,000 of incentive fees) totaling $1.5 million for the same work on a single CUSIP. (Trial Tr. 804:15-805:12; *see also* Tr. Ex. 3497; App. 4.)

(F) *Sixth*, Dr. Tang admitted in his direct testimony that PRES also overcharged incentive fees. (Dkt. 539 ¶ 64.) Dr. Tang stated that "PRES submitted an invoice to 2006-1 for an incentive fee of 4,750,000, and an invoice to 2006-2 for an incentive fee of $5,000,000, whereas PRES was only entitled to incentive fees of $4,500,000 and $4,750,000 respectively." (Dkt. 539 ¶ 64.) Dr. Tang's calculations form the sole basis for the TAM Parties' claimed incentive fees in this action (*see* Trial Tr. 822:14-15; Tang Decl. – Dkt. 539 ¶¶ 67-71), yet Dr. Tang testified that "I do not know why this discrepancy exists." (Dkt. 539 ¶ 64.)

**G. The Prior Interpleaders**

30. The Indentures require that the Collateral Manager sell securities that are Defaulted for three years or more ("Three-Year Defaulted Securities"). (Tr. Ex. 2 – § 12.1(a)(ii) at 171; Tr. Ex. 3 – § 12.1(a)(ii) at 178.) But the sale of such Securities would have resulted in a reduction of the fees flowing to PRES and PSD Partners, and the TAM Parties refused to sell.

31. As a result of this refusal, TAM has been the interpleader defendant in two prior cases. In the first case, *U.S. Bank National Association v. Triaxx Prime CDO 2006-1, Ltd. et al.*, Judge Pauley held that TAM was obligated to sell Three-Year Defaulted securities for the Triaxx 2006-1 CDO. No. 15cv10172 (WHP), 2016 WL 3552272, at *3-*6 (S.D.N.Y. June 23, 2016). The Second Circuit affirmed, holding that "the mandatory timing of the sale is designed to protect the most senior noteholders (who received lower interest payments) and who will be paid first

under its waterfall payment scheme." *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, 687 F. App'x 8, 9-10 (2d Cir. 2017) (internal quotations omitted).

32. The second case was brought by the Trustee in 2016 as an interpleader regarding whether TAM were obligated to sell Three-Year Defaulted Securities related to Triaxx 2006-2 and 2007-1. *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, No. 16-CV-8507 (AJN), 2019 WL 9511402 at *1 (S.D.N.Y. Sept. 16, 2019) ("*Prior Interpleader*"). In a Judgment on the Pleadings decision on June 26, 2017, Judge Nathan ordered that the Three-Year Defaulted at issue were required to be sold. *Prior Interpleader*, 2017 WL 3610584 at *10 (S.D.N.Y. June 26, 2017).

33. Judge Nathan held, however, that a determination as to certain securities that TAM argued were "credit improved" could not be made at the Judgement on the Pleadings stage. *Id.* After a trial, on September 16, 2019 Judge Nathan held that TAM's refusal to sell the credit improved securities also violated the governing documents of the Triaxx CDOs. *See Prior Interpleader*, 2019 WL 9511402 at *16. Judge Nathan held that TAM and PRES suffered from "significant conflicts of interest" and that Mr. Calamari, who acted as both the "sole employee" of TAM and General Counsel for PRES, "failed to meet a standard of good faith" and "was not acting faithfully or forthrightly." *Id.* at *6, 16. Judge Nathan also found that the refusal to sell the Three-Year Defaulted Securities represented a conflict of interest because "Mr. Calamari has a material interest in preventing the sale of the Disputed Securities because they represent a source of income to separate entities with which he is deeply enmeshed" and "[t]hat the benefits to these entities are at times disbursed in a non-transparent manner and with priority over the Noteholders renders these conflicts only more problematic. *Id.* at *7.

**H. PRES Charges Incentive Fees on Court-Ordered Sales**

34. As a result of the decisions by Judge Pauley, the Second Circuit, and Judge Nathan, TAM was ordered to sell Three-Year Defaulted Securities. The TAM Parties nonetheless

determined that the court-ordered sale presented an opportunity to earn "incentive fees." (Tang Decl. – Dkt. 539 ¶¶ 67-71.) As impeachment testimony showed, Dr. Tang had little knowledge of PRES or how incentive fees should be calculated: (i) he did not have "actual knowledge" of what the "due diligence and activist strategy" meant (Trial Tr. 761:4-7, 761:24-762:10); (ii) he did not know what an "incentive fee" was or how it was calculated (Trial Tr. 792:14-793:17, 794:16-19); and (iii) he had only heard PRES's name "in passing." (Trial Tr. 747:16-749:21.)

35. Nonetheless, in 2018, Dr. Tang created a spreadsheet that listed securities sold pursuant to the court orders from Judge Pauley, the Second Circuit, and Judge Nathan in 2016 and 2017. (Tr. Ex. 3137; Trial Tr. 789:18-792:15.) Dr. Tang's spreadsheet simply calculated the difference between (a) an estimate of what the security would have sold for on March 25, 2011 and (b) the actual sale price plus all principal proceeds from March 25, 2011 to the actual sale date. (Tr. Ex. 3137; Trial Tr. 818:1-819:1.) If the difference between the two was $500,000 or more and the security had not previously earned an incentive fee, the extent of Dr. Tang's calculation was that he automatically recorded that the security earned an incentive fee of $250,000, totaling $18.25 million. (Tr. Ex. 3137; Trial Tr. 819:4-822:7.)

36. Dr. Tang's spreadsheet did not calculate the increase in value from the date that the CUSIPs first became Three-Year Defaulted and should have been sold. (Tr. Ex. 3137; Trial Tr. 901:2-4.) Dr. Tang's spreadsheet also did not account for any improvement in the securities due to the housing market from 2011 to 2018. (Trial Tr. 901:5-7.)

### I. The Present Interpleader

37. In March 2018, PRES submitted $18.25 million of invoices based on Dr. Tang's spreadsheet that were dated November 30, 2017. (Trial Tr. 822:14-15; Tang Decl. – Dkt. 539 ¶¶ 67-71.) The Noteholders objected in May 2018, (Dkt. 203 ¶¶ 52, 61-70), and the Trustee has since retained the funds that the Collateral Manager sought on behalf of PRES and law firms (the

"Retained Funds"). (*Id.* ¶¶ 61, 69.) The Noteholders have claims to the these Funds, which as of February 22, 2023 amount to $16,285,232.17. (Dkt. 212 ¶¶ 167-175; Dkt. 404 at 9; Dkt. 470-4.)

38. The TAM Parties' invoices exceed the current Retained Funds. As of February 22, 2023, PRES has invoiced and seeks an additional $23,470,387.61. (Dkt. 470 at 10.) As described in the invoices and the TAM Parties' interrogatory responses, $17,841,423.13 of the invoiced fees were for incentive fees resulting from the court-ordered sales of the Three-Year Defaulted Securities that were invoiced in March 2018. (*See* Tr. Ex. 49.) PRES submitted to the Trustee invoices for a further $1,230,000 in Diligence Fees, and $4,420,000 in monthly Activist Implementation Fees. (*See* App. 2.) The TAM Parties also seek $5,317,296.88 from the CDOs in legal fees. (Dkt. 470 at 10.)

39. The Noteholders at this time do not seek any of the approximately $30 million that the Collateral Manager directed the Trustee to pay PRES between 2011 and May 2018 that were paid inside the waterfall, but instead seek only the Retained Funds. (Dkt. 212 ¶¶ 94-103.)

## PROPOSED CONCLUSIONS OF LAW

### I. The Engagement Letters Violate the Indentures and the CMAs

40. For the reasons described below, the Engagement Letters violate the Indentures and the CMAs. This Court has held that the Noteholders have standing to bring an interpleader claim regarding the Engagement Letter fees due to their economic interest in the Triaxx CDO Collateral. (Dkt. 331 at 39-40; *see also* Trial Tr. 172:4-6 (describing how there are not enough assets in the Triaxx CDOs to pay the Noteholders).). They also have standing because of, among other things, their consent rights under Section 8.2 of the Indentures. (Tr. Ex. 2 at 135; Tr. Ex. 3 at 139.)

#### A. The Collateral Manager Must Bear Its Own Expenses

41. The Engagement Letters were entered into between Mr. Garg and Mr. Priore on behalf of PRES and the Collateral Manager, respectively. (*See, e.g.*, Tr. Ex. 11 at 9-10; Tr. Ex. 12

at 9-10.) The Issuers were not involved at all in the process of drafting, negotiating, or entering into the Engagement Letters. (*See* Trial Tr. 433:17-21, 433:25-434:2; Priore Dep. 66:8-11, 70:18-24, 73:20-74:3; Issuers Dep. 164:16-22). The Engagement Letters were merely a "different transaction" arising out of the negotiation between Mr. Garg and Mr. Priore for PRES's purchase of ICP. (Trial Tr. 432:8-25.)

42. Section 2(g) of the CMAs states: "[i]n providing services hereunder, the Collateral Manager may, without the prior consent of any Person, employ third parties (including, without limitation, the Collateral Manager's Affiliates) to render advice (including investment advice) and assistance *at the Collateral Manager's expense*." (*See*, *e.g.*, Tr. Ex. 6 at 5 (emphasis added).) Section 8(b) of the CMAs similarly provides that "[t]he Collateral Manager shall be responsible *for all expenses incurred by it in the performance of its obligations under this Agreement*," with limited exceptions not applicable here. (Tr. Ex. 5 at 12-13; Tr. Ex. 6 at 12-13 (emphasis added).)

43. Because the CMAs do not permit the payment of the fees of the Collateral Manager's agents and affiliates out of the CDO Collateral, the PRES Invoices are not payable as Other Administrative Expenses. Under the Indentures, the definition of "Other Administrative Expenses" is "Administrative Expenses, but excluding Trustee Expenses (other than amounts payable pursuant to any indemnity)." (*See*, *e.g.*, Tr. Ex. 3 – § 1.1 at 41.) "Administrative Expenses," in turn, is defined as amounts due and payable to "the Collateral Manager in respect of fees and expenses pursuant to the Collateral Management Agreement." (*Id.* – § 1.1 at 11.)

44. Because the March 22, 2011 "structure" was tantamount to a takeover of the Collateral Manager, they also violated Section 15(a) of the CMAs, which require that the CMAs "shall not be assigned or delegated by the Collateral Manager, in whole or in part, without (i) the

prior written consent of or affirmative vote by a Majority of the Controlling Class (excluding any Collateral Manager Securities.)" (Tr. Ex. 5 at 20; Tr. Ex. 6 at 20.)

**B. The Collateral Manager Could Not Act on behalf of the Issuers**

45. Even if the Court finds that Mr. Priore was validly acting on behalf of the Issuers, the Engagement Letters, which encumber the Collateral of the Triaxx CDOs with monthly and other fees, are still invalid for the reasons described below.

i. <u>The Issuers Granted the Authority to Enter Into the Engagement Agreements to the Trustee</u>

46. According to the Indentures, each Issuer "Grants to the Trustee, for the benefit and security of the Secured Parties, all of its right, title and interest in, to and under" the Collateral Debt Securities as well as "all proceeds, accessions, profits, income benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of" the Collateral Debt Securities. (Tr. Ex. 2 at 8-9; Tr. Ex. 3 at 8-9.) The definition of "Grant" includes "all rights, powers and options (but none of the obligations) of the granting party thereunder, including . . . the immediate continuing right . . . to make waivers or other agreements." (Tr. Ex. 2 – § 1.1 at 31; Tr. Ex. 3 – § 1.1 at 32.) Indeed, the Issuers understood the Indentures' Granting Clause as granting to the Trustee the right, title and interest in the Collateral. (Issuers Dep. 248:12-14, 249:17-250:6.)

47. Section 7.12(a) of the Indentures states that the Issuers "shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture . . . and acquiring, holding, pledging and selling, solely for its own account, Collateral Debt Securities and other Collateral." (*See*, *e.g.*, Tr. Ex. 3 at 132.) Section 7.8 similarly prohibits the Issuers from encumbering or disposing of Collateral unless "expressly permitted" by the Indenture, reflecting that the Issuers granted those rights to the Trustee. (*Id*. at 126-128.)

48. Starting in 2015, several courts have held that the Granting Clauses prohibit the

Issuers from pursuing litigation on behalf of the CDOs. *Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, No. 14-CV-10116 KBF, 2015 WL 2359358, at *2 (S.D.N.Y. May 18, 2015) (holding that a similar granting clause constituted a "full assignment" that "divest[ed] plaintiffs of any rights they otherwise may have had to commence litigation on their own behalf").

49. In *Phoenix Light SF DAC v. U.S. Bank National Association*, No. 20-1312-cv, 2021 WL 4515256, at *2 (2d Cir. 2021), the Second Circuit considered whether issuers that purchased RMBS certificates could institute litigation on their own and expressly held that the "the law of our Circuit . . . support[s] the conclusion[] . . . that a grant of 'all . . . right, title, and interest' to an indenture trustee is a 'complete transfer.'" (quoting *Nat'l Credit Union Admin. Bd. V. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 253 (2d Cir. 2018)). Numerous courts have reached the same conclusion: *See Triaxx Prime CDO 2006-1, Ltd. v. Bank of N. Y. Mellon*, No. 16 Civ. 1597 (NRB), 2017 WL 1103033, at *3-5 (S.D.N.Y. Mar. 21, 2017) (holding that the Issuers lack standing because, among other things, they assigned such rights away in the Indentures' Granting Clauses); *Triaxx Prime CDO 2006-1, Ltd. v. Bank of N. Y. Mellon*, No. 16 Civ. 1597 (NRB), 2018 WL 1417850, at *3-4 (S.D.N.Y. Mar. 8, 2018), *aff'd*, 741 F. App'x 857 (2d Cir. 2018) (same); *Triaxx Prime CDO 2006-1, Ltd. v. Ocwen Loan Servicing, LLC*, No. 9:17-CV-80203-CIV, 2017 WL 3701251, at *4 (S.D. Fla. Aug. 21, 2017), *report and recommendation adopted*, No. 9:17-CV-80203, 2017 WL 4415912 (S.D. Fla. Oct. 4, 2017) (same); *Triaxx Prime CDO 2006-1, Ltd. v. Ocwen Loan Servicing, LLC*, 762 F. App'x 601, 605 (11th Cir. 2019) (same).

50. For the same reasons that numerous courts have held that the Issuers did not have standing to bring litigation, they also lacked the authority to enter into the Engagement Letters to hire PRES as a litigation support vendor. The Issuers conceded as much when they testified that

they granted the right to enter into agreements to the Trustee. (Issuers Dep. 252:22-25.) The Engagement Letters are therefore invalid as a matter of law.

ii. Section 2 Of the CMAs Do Not Override the Indentures

51. This case law renders irrelevant the TAM Parties' assertion that Sections 2(a), 2(d)(x), and 2(d)(xi) of the CMAs and Section 7.5 of the Indentures authorize it, as the agent of the Issuers, to enter into the Engagement Letters on behalf of the Issuer. (Dkt. 211 ¶¶ 163-167.)

52. Even aside from the precedent regarding the Issuers' lack of standing, the CMA provisions that the TAM Parties cite do not alter the Granting Clause's language. Section 2(a) of the CMAs states that the Collateral Manager's duties are "[s]ubject to and in accordance with the terms of the Indenture," that the Collateral Manager "shall perform its duties hereunder in accordance with the terms and conditions of the Operative Documents," and that "[t]he Collateral Manager shall comply in all material respects with all of the terms and conditions of the Indenture affecting the duties and functions that have been delegated to it thereunder and hereunder." (Tr. Ex. 5 at 2; Tr. Ex. 6 at 2.) Section 2(d) similarly states that the Collateral Manager shall act " subject to and in accordance with the Indenture." (Tr. Ex. 5 at 4; Tr. Ex. 6 at 4.)

53. Further, Section 2 of the CMAs sets forth only the "General Duties of the Collateral Manager." (Tr. Ex. 5 at 2; Tr. Ex. 6 at 2.) But such general provisions must cede to the specific requirements of the Indentures. *See U.S. Bank Nat'l Ass'n*, 687 F. App'x at 9 (quoting *Cap. Ventures Int'l v. Republic of Argentina*, 652 F.3d 266, 271 (2d Cir. 2011)) ("'New York . . . follows the common (and commonsensical) rule that a specific provision . . . governs the circumstance to which it is directed, even in the face of a more general provision.'"); *see also Prior Interpleader* 2019 WL 9511402, at *13. The general provisions of Section 2 of the CMAs cannot override the specific provisions of the Indentures granting the right to enter agreements to the Trustee.

iii. The Issuers Did Not Obtain the Required Consents of the Noteholders

54. Section 7.7(a) of the Indentures provides that the Issuers may enter into contracts with third parties only "with the prior written consent of a Majority of the Controlling Class." (Tr. Ex. 2 at 122; Tr. Ex. 3 at 126.) TAM has admitted that "a Majority of the Controlling Class never provided prior written consent for TAM (or TAM, as agent of the Issuers) to enter into the Engagement [Letters]." (Tr. Ex. 45 at 5.) Under Section 8.2, any amendment to the Indenture also requires majority consent of all Classes of noteholders "adversely affected." (Tr. Ex. 2 at 135; Tr. Ex. 3 at 139.) Because the Engagement Letters adversely affected the Priority of Payments to pay PRES before Noteholders they required full consent to amend the Indentures. (*See* Tr. Ex. 2 at 135; Tr. Ex. 3 at 139.) Further, Section 14.2(a) requires such consent to be in writing. (Tr. Ex. 2 at 185; Tr. Ex. 3 at 192-193.) The execution of the Engagement Letters violated these Indenture provisions because TAM and the Issuers never obtained the written consent required by these provisions. (*See, e.g.*, Tr. Ex. 45 at 5.)

## II. THE NOTEHOLDERS ARE ENTITLED TO THE *RES*

55. Even if the Engagement Letters were enforceable, the TAM Parties' declaratory judgment claims to the $23,470,387.61 fail because they violated their own Engagement Letters.

### A. The TAM Parties' Claimed Incentive Fees Violate the Engagement Letters

56. Of the $23,470,387.61 invoiced since May 2018 and claimed by the TAM Parties in their claims to the *res*, $17,841,423.13 are made up of "incentive fees," which are nearly all of the $18.25 million invoiced by PRES as a result of the sale of Three-Year Defaulted Securities calculated by Dr. Tang. These invoices are invalid because the incentive fees violate the terms of the Engagement Letters and because there is no valid recovery attributable to PRES on Dr. Tang's theory that PRES's refusal to sell the securities increased their value or that changed the market perception of "responsible parties."

57. *The Incentive Fees Violate the Engagement Letters.* The Engagement Letters cap "an *aggregate* amount of Activist Implementation Fees" of $250,000 for securities, including those that receive what the TAM Parties later termed "incentive fees" and state that this $250,000 cap should be calculated "*taking into account* any Activist Implementation Fees paid by the CDO to ARAM on or prior to such date." (*See* Tr. Ex. 11 at 13; Tr. Ex. 12 at 13 (emphasis added).) The TAM Parties argue that the Clarification Letters transform this language to mean that PRES is entitled to both monthly fees of up to $250,000 *and* "incentive fees"—a term that does not even appear in the Engagement Letters—also up to $250,000. (*See* Trial Tr. 478:20-479:1, 673:8-12.) Thus, at a minimum, any of the "incentive fees" invoiced by Dr. Tang must take into account all monthly Activist Implementation that were previously charged. (*See* Tr. Ex. 3137.)

58. The TAM Parties bear the burden of showing what monthly fees were charged because they "assert[] the affirmative of [the] issue" in their claim for declaratory relief that they are entitled to their fees. *Preferred Acc. Ins. Co. of N.Y. v. Grasso*, 186 F.2d 987, 991 (2d Cir. 1951); *Prior Interpleader*, 2019 WL 9511402, at *3 (discussing burden for declaratory judgment in interpleader); *Schoeps v. Museum of Modern Art*, 594 F. Supp. 2d 461, 463 (S.D.N.Y. 2009) (holding that a party bears the burden if it "would bear it if the action were brought in due course as a claim for non-declaratory relief"); (*See* TAM Answer – Tr. Ex. 28 ¶¶ 212-217; PRES Answer – Tr. Ex. 26 ¶¶ 180-209.) The TAM Parties, however, cannot meet this burden.

59. The only list reflecting the CUSIPs for which PRES charged monthly Activist Implementation Fees was produced by a third party and is "as of Jan[uary] 2013." (Tr. Ex. 3507.) Without a subsequent list, it is impossible to determine how much PRES previously charged for monthly Activist Implementation Fees. (Trial Tr. 896:21-897:9.) Not only is this evidence insufficient to meet the TAM Parties' burden, it also suggests that PRES charged the maximum or

near the maximum of monthly incentive fees for all CUSIPs for which it charged an incentive fee. In the one list showing monthly Activist Implementation Fees, 26 of the 32 CUSIPs were already charged incentive fees, (*see* App. 5), and Mr. Garg testified that PRES never charged an incentive fee for a CUSIP it did not also charge a monthly fee on. (Trial Tr. 591:12-17.)

60. Similarly, the TAM Parties have failed to produce evidence, which was in their exclusive control, of which CUSIPs PRES worked on for monthly Activist Implementation Fees. Based on this failure, this Court may draw an adverse inference that the information would have been unfavorable to the TAM Parties. *See Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) ("The failure or refusal to produce a relevant document, or the destruction of it, is evidence from which alone its contents may be inferred to be unfavorable to the possessor . . . .").

61. *No Recovery by PRES.* The Engagement Letters state that PRES may only charge an incentive fee if there is a "recovery of funds or assets related to such security" that is "determined by the CDO in its sole discretion (or the Collateral Manager on its behalf)." (Tr. Ex. 11 at 13; Tr. Ex. 12 at 13.) Mr. Garg testified that this recovery was required to be tied to some concrete action by PRES because "market conditions improved during the depths of the credit crisis" and that "we didn't earn more fees just because the market price of the bonds and the CDO deals went up." (Trial Tr. 503:24-504:15.) According to Mr. Garg, "we would have had to do something to have triggered those fees" such as litigation or "pressuring a servicer to improve their servicing standards." (Trial Tr. 503:24-506:15.)

62. Dr. Tang did not attribute the "recovery" in value of over $500,000 for the CUSIPs to any specific action taken by PRES. Instead, his spreadsheet calculated the difference between estimated sale price when the Engagement Letters were signed in March 2011 to the date of their court-ordered sale in 2016 and 2017. (Tr. Ex. 3137; Trial Tr. 820:9-822:7.) Dr. Tang offered two

explanations for why this increase was tied to PRES's work: (i) that PRES's refusal to sell the securities increased their value and (ii) that the market increase was due to "responsible parties" noticing PRES's work. (*See* Trial Tr. 874:1-17, 881:8-23.) Both justifications fail.

63. *Refusal to Sell*. On the first issue, Dr. Tang testified that PRES provided value by refusing to sell the securities when directed to do so by PIMCO and that "[t]he proceeds the Triaxx CDOs received from those sales were significantly greater—$725 million higher—than the amount the Triaxx CDOs would have received had the Collateral Manager sold the same securities in 2011 and 2012, when PIMCO and others first demanded they do so." (Tang Decl. ¶ 19). But Judge Pauley, the Second Circuit, and Judge Nathan held that this decision to retain the Three-Year Defaulted Securities violated the Indentures. *See U.S. Bank Nat'l Ass'n,* , 2016 WL 3552272, at *3-6; *U.S. Bank Nat'l Ass'n*, 687 F. App'x at 9-10; *see also Prior Interpleader*, 2019 WL 9511402, at *16. Indeed, Dr. Tang's rationale that PRES held onto the securities to benefit "all noteholders" as opposed to Senior Noteholders, was explicitly rejected by Judge Pauley and the Second Circuit, because Senior Noteholders receive lower interest rates in exchange for the proceeds of a sale of deteriorated assets. *U.S. Bank Nat'l Ass'n*, 687 F. App'x at 9-10. To hold otherwise would subvert the Priority of Payments waterfall and effectively rewrite the Indentures.

64. PRES's assertion that it should be paid for retaining the Three-Year Defaulted Securities is therefore contrary to New York law. The principle that "a wrongdoer should not profit from his own misconduct is so strong in New York that the New York State Court of Appeals has said the defense applies even in difficult cases and should not be 'weakened by exceptions.'" *In re Ridgemour Meyer Properties, LLC*, 791 F. App'x 279, 280 (2d Cir. 2020) (quoting *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010) (alterations omitted)). This "fundamental equitable principle" has been applied widely, including disallowing vesting rights for building permits

because the work done violated a restrictive covenant and refusing enforcement of illegal contracts. *See Campbell v. Thomas*, 897 N.Y.S.2d 460, 470 (2d Dep't 2010).

65. Dr. Tang also did not calculate the difference in value between when the securities became Three-Year Defaulted and the date of sale. (Tr. Ex. 3137; Trial Tr. 901:2-4.) Instead, he calculated the difference between March 25, 2011 and the date of sale. (Trial Tr. 819:11-14.)

66. *Market Increase Due to Holding Parties "Responsible".* During trial, Dr. Tang seemed to advocate an entirely different theory, that the recovery was not based on PRES's refusal to sell the securities but because PRES's activist litigation strategy was making "the responsible parties behave in a responsible way" and the resulting "market perception" of Triaxx's strategies. (Trial Tr. 874:1-11; 903:19-25.) While Dr. Tang made vague allusions to increasing the servicing of the loans, he could not name who these "responsible parties" were or who their contact at PRES was and the Noteholders are not aware of any evidence to support Dr. Tang's assertions. (Trial Tr. 905:3-16.) Indeed, Dr. Tang could not be certain of these purported benefits and he never calculated or quantified the effect on the "responsible parties." (Trial Tr. 900:4-16.) Further, by the time of the sale of the Three-Year Defaulted Securities, courts began to rule that the Issuers (or their purported agents) lacked standing. *See supra* ¶¶ 27, 49-50. Thus, by 2016 and 2017 when the RMBS were sold, the "responsible parties" would have known that the TAM Parties, acting purportedly on behalf of the Issuers, were unable to bring claims on the Collateral.

67. Dr. Tang's theory also contradicts Mr. Garg's testimony that "we didn't earn more fees just because the market price of the bonds and the CDO deals went up." (Trial Tr. 503:24-504:15.) Indeed, Dr. Tang's spreadsheet in no way calculated how much of any increase in value was due to the improvement in housing conditions in the market from March 2011 to 2018. (Trial Tr. 900:2-901:7.) Further, the only significant recovery in which PRES was involved was the

separate *Countrywide* settlement, which was deposited in the Miller & Wrubel account in October 2014. Yet, Dr. Tang's spreadsheet treated the securities, without any explanation, as though any improvement in value from 2011, including after 2014, was due to PRES's efforts. And, to the extent that the Engagement Letters allow the Collateral Manager to accept any rationale for PRES's recovery in "its sole discretion," such a decision would violate the CMAs' requirement that the Collateral Manager shall "exercise reasonable care" and perform its duties "in a commercially reasonable manner." (Tr. Ex. 5 at 2; Tr. Ex. 6 at 2.)

**B. The Other Fees Claimed by the TAM Parties are Not Enforceable**

68. In addition to the $17,841,423.13 of incentive fees claimed by the TAM Parties, the TAM Parties also seek an additional $1,230,000 in Due Diligence Fees and $4,420,000 in Activist Implementation Fees. (*See* Tr. Ex. 49; App. 2.) But there has been no meaningful litigation recovery since the *Countrywide* case in 2014, and courts have in fact determined that the TAM Parties lack standing for future actions. Even if PRES had a legitimate right to fees for its work in that time period, which it does not, there is no reason why the TAM Parties are entitled to invoiced fees after May 2018 when there is no explanation of what work is to be done or what potential value could flow to the CDOs. Obtaining these fees for essentially no work violates the CMA's requirements regarding "reasonable care." (*See* Tr. Ex. 5 at 2; Tr. Ex. 6 at 2.)

69. Further, the TAM Parties have overcharged the CDOs for Due Diligence fees. (Trial Tr. 472:6-475:25.) The total amount of these overcharges is $3,535,00 and the TAM Parties themselves concede that their claims should be reduced by this amount. (*See* Dkt. 545-2; App. 3.) Combined with the $17,841,423.13 of invalid incentive fees, the TAM Parties' claim to the *res* must be reduced by $21,376,423.13, leaving a balance of $2,093,964.48.

70. Finally, if the Trustee prevails on the outside the waterfall claims (breach of contract, unjust enrichment, money had and received), but the Noteholders fail to do so on their

claim to the *res*, the TAM Parties' claims should be subject to the doctrines of setoff and recoupment. The doctrine of recoupment provides for "a deduction from a money claim through a process whereby cross demands arising out of the same transaction are allowed to compensate one another and the balance only to be recovered." *In re McMahon*, 129 F.3d 93, 96 (2d Cir. 1997). The related doctrine of setoff applies to entities owing each other mutual debts and prevents the "absurdity of making A pay B when B owes A." *In re Malinowski*, 156 F.3d 131, 133 (2d Cir. 1998) (internal quotation marks omitted). In order to avoid this exact scenario of distributing Triaxx CDO proceeds to the TAM Parties when the TAM Parties owes the Triaxx CDOs, the Court should reconcile the Trustee's $64,004,953.02 judgment against the TAM Parties with the TAM Parties' $23,470,387.61 claim to the *res*. (Dkt. 470 at 9-10).

## III. The TAM Parties And Issuers Are Not Entitled to Their Legal Fees

71. In the Second and Third Interpleader Disputes, the TAM Parties and Issuers seek payment of their legal fees out of Collateral, regardless of whether they prevail in this action. (Tr. Ex. 23 ¶¶ 63, 72.) Their claims fail based on well-established New York law.

72. The "general rule in New York" is that "attorneys' fees . . . may not be awarded to the prevailing party unless authorized by agreement between the parties, statute, or court rule." *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 199-200 (2d Cir. 2003). New York law requires indemnity provisions to "unequivocally indicate that the parties intended to indemnify attorneys' fees in lawsuits between themselves" or the indemnity provision will "not support a claim for indemnity in suits between the parties." *In re Refco Sec. Litig.,* 890 F. Supp. 2d 332, 343 (S.D.N.Y. 2012); *see also Hollander*, 337 F.3d at 199-200.

73. *The TAM Parties' Interpleader Legal Fees*. Citing Section 10(b) of the CMAs, TAM seeks the legal fees for the present counsel in this action, and for Arnold & Porter Kaye Scholer LLP ("Arnold & Porter") for its representation in this action and apparently in the Prior

Interpleader. (Dkt. 499 at 18-19.) But Section 10(b) nowhere provides indemnification for suits between the Issuer and the Collateral Manager, and therefore only covers suits from third parties. *Refco Sec. Litig.,* 890 F. Supp. 2d at 343. Section 10(b) also provides that the Collateral Manager "will not be indemnified for any such Liabilities . . . constituting a Collateral Manager Breach," which is defined as "bad faith, willful misconduct or gross negligence in the performance, or reckless disregard, of the obligations of the Collateral Manager." (Tr. Ex. 5 at 14; Tr. Ex. 6 at 14.) TAM has committed multiple Collateral Manager Breaches, including: (i) entering into the Engagement Letters and violating the Indentures by using Collateral to pay its own fees (*see supra* ¶¶ 12-18); (ii) approving PRES's outside the waterfall payments (*see supra* ¶ 29(A)); (iii) charging "incentive fees" on top of Activist Implementation Fees (*see supra* ¶¶ 29(A)-29(B)); (iv) failing to disclose material facts to the Noteholders and the Trustee (*see supra* ¶¶ 22-23); (v) approving invoices for "incentive fees" for the sale of Three-Year Defaulted securities (*see supra* ¶ 34); and (vi) approving erroneous overcharges (*see supra* ¶¶ 29(B)-29(F)).

74. To the extent the TAM Parties seek fees for Arnold & Porter for the Prior Interpleader, those fees are also barred by Judge Nathan's finding of a lack of good faith. *See Prior Interpleader*, 2019 WL 9511402 at, *16. Further, the Trustee has represented to this Court that it requires a "reconciliation" to understand the "most fundamental facts" regarding Arnold & Porter's fees including monies received outside the waterfall. The Noteholders are unaware of any such reconciliation. (Dkt. 154 at 20:18-23:2.) The redacted Arnold & Porter invoices do not resolve these issues, and their payment would be premature until the Trustee represents to the Court that the issues have been resolved. (*See* Trial Tr. 943:1-9; Tr. Exs. 3172-3183, 3187-3189.)

75. *PRES's Interpleader Legal Fees*. PRES, pointing to Section 8 of the Engagement Letters, demands to be indemnified by the TAM Parties. (Dkt. 499 at 22.) For the Engagement

Letters to be valid, the Issuers would need to be a party, but then Section 8's indemnity would not apply because there is no indication that Section 8 should apply to suits *between* purported parties. *Refco Sec. Litig.,* 890 F. Supp. 2d at 343. Lastly, Section 8 excludes indemnification for "[l]iabilities aris[ing] from the fraud, willful misconduct, gross negligence or reckless disregard of [PRES or its officers]." (See, *e.g.*, Tr. Ex. 12 at 4-5.) For the same reasons TAM cannot be indemnified due to its Collateral Manager breaches, these exclusions apply here. Finally, even if PRES were entitled to legal fees, the Engagement Agreements cap "all third-party expenses (including legal . . . expenses)" to "$75,000 per annum." (*See, e.g.*, Tr. Ex. 11 at 14.)

76. *The Issuers' Interpleader Legal Fees*. The Issuers argue that they are entitled to legal fees because Administrative Expenses is defined to include "the Independent accountants, agents and counsel of the Issuer for reasonable fees and expenses (including amounts payable in connection with the preparation of tax forms on behalf of the Co-Issuers)," because Administrative Expenses other than Trustee Expenses are "Other Administrative Expenses and because those Other Administrative Expenses are specified as being paid in the Priority of Payments waterfall. (Tr. Ex. 25 ¶ 11; Dkt. 500 ¶ 10.) This argument fails, because under New York law, "[p]romises to indemnify must be strictly construed . . . because the general American rule requires parties to bear their own litigation expenses." *Abakan Inc. v. Uptick Cap. LLC*, 943 F. Supp. 2d 410, 415 (S.D.N.Y. 2013). There is no explicit indemnification for legal fees in the Indentures, and the language of the contract suggests that "reasonable fees and expenses" of counsel refers to actions such as the "preparation of tax forms," not litigation. This is especially so as the Indentures specified that the Issuers would engage in no conduct beyond the issuing and sale of Collateral Debt Securities. (*See* Tr. Ex. 3 §§ 7.12(a) at 132, 7.8(a)(ii) at 127, 7.8(a)(iv) at 127, 7.8(b) at 128).

## IV. The TAM Parties' Affirmative Defenses and Quasi-Contract Claims Fail

77. The TAM Parties assert both affirmative defenses against the Noteholders and quasi-contract cross-claims against the Issuers. (Dkt. 470 at 6-8.) These defenses and claims, which sound in equity, can be rejected as a threshold matter, because the TAM Parties cannot be said to "come[] to equity . . . with clean hands.'" *PenneCom B.V. v. Merrill Lynch & Co.*, 372 F.3d 488, 493 (2d Cir. 2004) (internal quotation marks omitted). All of the affirmative defenses are inapposite because the Interpleader Claims are prospective while the affirmative defenses go to historical issues. *See Blue Ridge Invs., LLC v. Anderson-Tully Co.,* No. 04 CIV. 3777, 2005 WL 44382, at *7 (S.D.N.Y. Jan. 10, 2005) (finding that alleged waiver of prepayment penalty clause in contract was "withdrawn" following plaintiff's "insistence on compliance").

### A. The Noteholders Cannot Prove their Affirmative Defenses

78. The TAM Parties assert the affirmative defenses of estoppel, waiver, ratification, and laches. The reasons why the TAM Parties fail to meet their burden on the individual elements of each affirmative defense is set forth in the Noteholders' pre-trial submission, (Dkt. 502 ¶¶ 213-222) but, at base, these defenses suffer from two fundamental deficits of proof: (i) they run counter to the Indenture's no-waiver and amendment provisions, which are accorded strong protection under New York law; and (ii) there was inadequate disclosure to the Noteholders.

#### i. <u>The Indentures Have an Enforceable No Waiver Clause</u>

79. Each of the Indentures has a "No-Waiver" clause, precluding any waiver not in writing. Section 5.12, titled "Delay or Omission Not Waiver," states that Senior Noteholders may exercise remedies at any time. (*See, e.g.*, Tr. Ex. 3 at 106.) Section 8.2 requires the consent of each and every noteholder—plus various notification requirements—when the Indentures are modified in a manner that materially impairs or adversely affects the Collateral or modifies the calculation of principal or interest payments of the Notes. (*See, e.g.*, *id.*, at 139-41.) Section

14.2(a) provides that "[a]ny request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Senior Noteholders may be embodied in or evidenced by one or more instruments." (*See, e.g.*, Tr. Ex. 3 at 192-93.) And Section 14.3(k)(ii) provides that "[d]elivery of any request, demand, authorization, direction, notice, consent, waiver or Act of Senior Noteholders or other documents made as [provided or permitted by the Indenture] will be deemed effective . . . if in writing." (*Id.* at 195.) The cumulative effect of these provisions requires *written* consent from the Majority of each Class of Notes for any waiver or alteration to the Indentures.

80. Courts apply such provisions to bar arguments that a defendant's failure to act constituted a waiver as "'[n]o-waiver clauses are valid and enforceable' under New York law." *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 137 (S.D.N.Y. 2016) (finding that even though defendant "reimbursed [plaintiff] for over 200,000 prescriptions . . . without objection," the plaintiff's argument that the defendant waived its right to terminate "fails" because of a no-waiver clause). No-waiver clauses also preclude laches and ratification. *Banco de La Republica de Colombia v. Bank of N.Y. Mellon*, No. 10 CIV. 536 AKH, 2013 WL 3871419, at *10 (S.D.N.Y. July 26, 2013) (concluding no-waiver clause "bars the ratification defense"); *Kingman v. Zmoore Ltd.*, No. 570019/14, 2015 WL 871937, at *1 (1st Dep't 2015) (dismissing waiver and laches defenses as "barred by []clear 'no waiver' provisions"). Since no written waiver exists, the TAM Parties' claims must fail. *See Banco de La Republica de Colombia*, 2013 WL 3871419, at *10 (finding clause requiring waiver in writing barred a ratification defense because "[t]here was no writing here" and finding the ratification and waiver standards to be the same).

ii. <u>Disclosure Was Not Adequate</u>

81. The TAM Parties also cannot meet their burden of showing that they disclosed all material facts regarding the Engagement Letters. *N.Y. State Elec. & Gas Corp. v. Century Indem.*

*Co.*, 767 F. App'x 188, 190 (2d Cir. 2019) ("[W]aiver is an intentional relinquishment of a right and ordinarily must be predicated upon full knowledge of all the facts upon which the existence of the right depends." (internal quotation marks omitted)); *Cammeby's Mgmt. Co., LLC v. Alliant Ins. Servs., Inc.*, 720 F. App'x 18, 22 (2d Cir. 2017) (holding that a ratification defense "requires full knowledge of the material facts relating to the transaction); *Busher v. Barry*, No. 14-CV-4322 (NSR), 2016 WL 2742428, at *2 (S.D.N.Y. May 10, 2016) (discussing that laches are not available when a defendant fails to make obligated disclosures).

82. While the TAM Parties point to communications with PIMCO and the NVRs to show disclosure, the TAM Parties omitted material facts including: (i) never sending the Engagement Letters and Clarification Letters to the Noteholders until this action (Tr. Ex. 45 at 6); (ii) never disclosing the fee structure in the Engagement Letters (Garg Dep. 286:21-23); (iii) never disclosing that, in addition to the Engagement Letters, there were other agreements in the March 22, 2011 "structure," including the P.S.D. Agreement and the inherent conflict of interest of having Mr. Priore receive a 25% interest in the net cash flow to PRES (Trial Tr. 466:9-12, 466:23-467:6); and (iv) never disclosing that the TAM Parties were making payments outside the Priority of Payments waterfall (Trial Tr. 465:24-466:2). The TAM Parties' billing errors and overcharges further evince this lack of disclosure. The Noteholders never had the opportunity to verify the accuracy of PRES's fees because they never knew how and what they were being charged for. Finally, since the affirmative claims to the *res* arise from May 2018, the approximately $30 million paid to PRES before May 2018 are not at issue in this litigation. (Dkt. 502 ¶¶ 145-147.)

### B. The TAM Parties Are Not Entitled to Quasi-Contract Remedies

83. The TAM Parties bring quasi-contract cross claims of promissory estoppel, quantum meruit, and unjust enrichment against the Triaxx CDOs. (Dkt. 209 ¶¶ 186-203; Dkt. 211 ¶ 135.) These claims are only applicable if the Engagement Letters are held to be invalid. If the

Court holds the Engagement Letters are enforceable and the Clarification Letters are not, then these quasi-contract claims "are precluded" because the TAM Parties would, in that instance, have "valid, enforceable contract[s] that govern[] the same subject matter." *CUnet, LLC v. Quad Partners, LLC*, No. 16-CV-6327 (CM), 2017 WL 945937, at *7-8 (S.D.N.Y. Mar. 7, 2017).

84. The TAM Parties also cannot meet their burden of proving these quasi-contract claims. Under New York law, promissory estoppel requires "a clear and unambiguous promise" and a showing of "detrimental reliance." *Joshi v. Trs. of Columbia Univ*., 515 F. Supp. 3d 200, 222-23 (S.D.N.Y. 2021). As any promissory estoppel claim would be contingent on the Engagement Letters not being enforceable, the TAM Parties have no "clear and unambiguous promise" to argue that they relied upon, especially as the TAM Parties at times have described the Engagement Letters as "poorly worded." (Trial Tr. 477:13-479:21.) Further, the TAM Parties have put forth no evidence about costs they incurred in their purported work for the Triaxx CDOs, and they therefore cannot show any "detrimental reliance," especially any reliance damages above the roughly $30 million PRES received through inside the waterfall payments. *See Joshi*, 515 F. Supp. 3d at 222-23 ("[T]he plaintiff's promissory estoppel cause of action independently fails because there is no cognizable injury. . . . The fact that [plaintiff] did not get as much funding . . . as he would have liked does not suffice to show that he was injured as a result of a promise . . . .").

85. Likewise, the TAM Parties cannot meet their burden for quantum meruit and unjust enrichment, which may be analyzed together "as a single claim for unjust enrichment." *Learning Annex Holdings, LLC v. Rich Glob., LLC*, 860 F. Supp. 2d 237, 250-51 (S.D.N.Y. 2012). Quantum meruit damages "are based on the value of services rendered by the plaintiff" and are "generally given based on an hourly rate, except for limited exceptions where there is a clear and accepted marketplace convention establishing compensation on a percentage basis." *Id.* at 242.

86. PRES is a litigation services provider. While the TAM Parties sometimes refer to PRES as "actively managing" the Triaxx CDOs, all this means in practice is that PRES was supporting litigation activities. (Trial Tr. 907:23-908:17, 909:4-21.) The only other engagement of PRES that Dr. Tang could recall was supporting litigation for Quinn Emanuel, not managing funds. (Trial Tr. 914:11-915:15.) As recently as January 30, 2023, the TAM Parties represented to the Court that "PRES is a provider of litigation support services." (Dkt. 451 at 1.)

87. The TAM Parties have put forth no evidence showing a practice to pay litigation service providers on a percentage basis. When pressed by the Court, Dr. Tang admitted he did not know how litigation support consultants were paid. (Trial Tr. 911:3-12.) As the TAM parties have not shown the "hours purportedly spent" by the TAM Parties or "any reasonable basis for calculating the value of [] purported services," their quantum meruit claim must be dismissed. *Hindsight Sols., LLC v. Citigroup Inc.*, 53 F. Supp. 3d 747, 777 (S.D.N.Y. 2014).

88. The evidence also shows that PRES has received overly generous compensation and seeks monies greater than it recovered. PRES has already received what is in effect an approximately 75% contingency fee for the litigation recoveries it purportedly recovered (App. 6 at 2), fees it received while double and triple charging CUSIPs for the same work, inflating PRES's compensation. (*See, e.g.*, Trial Tr. 802:9-806:12.)

89. If the TAM Parties were to prevail on their claims, they will receive nearly $77 million or around a 108% contingency fee, resulting in a loss for the Triaxx CDOs of around $7 million. If the law firms and other entities paid outside the waterfall are considered, the TAM Parties and these entities will receive $107 million, an approximately $37 million loss to the Triaxx CDOs and around a 151% contingency fee. (App. 6 at 3.)

Dated: New York, New York
May 22, 2023

Respectfully submitted,

**NORTON ROSE FULBRIGHT US LLP**

By: */s/ Sandeep Savla*
Sandeep Savla
Anthony Lauriello

1301 Avenue of the Americas
New York, NY 10019-6022
(212) 318-3253
sandeep.savla@nortonrosefulbright.com
anthony.lauriello@nortonrosefulbright.com

Brandt Vernon
2200 Ross Ave., Ste. 3600
Dallas, TX 75201-7932
brandt.vernon@nortonrosefulbright.com
(admitted *pro hac vice*)

*Attorneys for Pacific Investment Management Company LLC*

**DAVIS POLK & WARDWELL LLP**

By: */s/ Elliot Moskowitz*
Elliot Moskowitz
Isaac Gelbfish
Adam Greene
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
elliot.moskowitz@davispolk.com
isaac.gelbfish@davispolk.com
adam.greene@davispolk.com

*Attorneys for Citigroup Global Markets Inc.*