N4HKUSB1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

U.S. BANK NATIONAL
ASSOCIATION,

      Interpleader Plaintiff,

         v.                          18 CV 04044 (BCM)

TRIAXX ASSET MANAGEMENT, LLC,
et al.,

                               Bench Trial

      Interpleader Defendants.

------------------------------x
                           New York, N.Y.
                           April 17, 2023
                           9:35 a.m.
Before:
                HON. BARBARA C. MOSES,

                           U.S. Magistrate Judge

                   APPEARANCES

ALSTON & BIRD
     Attorneys for Interpleader Plaintiff
BY:  ALEXANDER LORENZO
     ELIZABETH A. BUCKEL

FRIEDMAN KAPLAN SEILER & ADELMAN
     Attorneys for Interpleader Defendants Triaxx and Phoenix
Real Estate
BY:  ANNE E. BEAUMONT
     PRIYANKA WITYK
     ANIL K. VASSANJI
     GEOFFREY CAJIGAS

NORTON ROSE FULBRIGHT
     Attorneys for Interpleader Defendant PIMCO
BY:  SANDEEP SAVLA
     ANTHONY LAURIELLO
     BRANDT VERNON

N4HKUSB1

1                              APPEARANCES (Continued)

2    DAVIS POLK & WARDWELL LLP
          Attorneys for Interested Party Citigroup Global Markets
3    BY:  ADAM GREENE
          ELLIOT MOSKOWITZ
4
     WOLLMUTH MAHER & DEUTSCH
5         Attorneys for Interpleader Defendant Triaxx Prime CDOs
     BY:  RANDALL RAINER
6
     THE DEPOSITORY TRUST AND CLEARING CORPORATION
7         Attorneys for Interpleader Defendant Cede & Co.
     BY:  AIMEE BANDLER
8

9    Also Present:

10   JASON BERLAND, One Zero Capital

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N4HKUSB1

1              (In open court)

2              (Case called)

3              MR. LORENZO:  Good morning, your Honor.  Alex Lorenzo,

4       from Alston & Bird, for U.S. Bank National Association.

5              THE COURT:  Mr. Lorenzo.

6              MS. BUCKEL:  Good morning, your Honor.  Elizabeth

7       Buckel, also from Alston & Bird, for U.S. Bank National

8       Association.

9              THE COURT:  Ms. Buckel.

10             MR. SAVLA:  Good morning, your Honor.  Sundeep Savla,

11      of Norton Rose Fulbright, for PIMCO.

12             THE COURT:  Mr. Savla.

13             MR. LAURIELLO:  Anthony Lauriello, also of Norton Rose

14      Fulbright, and also for PIMCO.

15             THE COURT:  Mr. Lauriello.

16             MR. GREENE:  Good morning, your Honor.  Adam Greene,

17      of Davis Polk & Wardwell, on behalf of Citigroup Global

18      Markets, Inc.

19             THE COURT:  Mr. Greene.

20             MR. MOSKOWITZ:  Good morning, your Honor.  Elliot

21      Moskowitz, of Davis Polk, representing Citi.

22             THE COURT:  Mr. Moskowitz, we rescued you from the

23      security line, did we?

24             MR. MOSKOWITZ:  All is well that ends well, your

25      Honor.

N4HKUSB1

1          MS. BEAUMONT:  Good morning, your Honor.  Anne

2     Beaumont, from Friedman Kaplan Seiler Adelman & Robbins, for

3     Triaxx Asset Management LLC and Phoenix Real Estate Solutions

4     Ltd.

5          THE COURT:  Ms. Beaumont.

6          MS. WITYK:  Good morning, your Honor.  Priyanka Wityk,

7     also of Friedman Kaplan, for Phoenix Real Estate Solutions and

8     Triaxx Asset Management.

9          THE COURT:  Ms. Wityk.

10         MR. VASSANJI:  Good morning, your Honor.  Anil

11    Vassanji, also of Friedman Kaplan, on behalf of Phoenix Real

12    Estate Solutions and Triaxx Asset Management.

13         THE COURT:  Mr. Vassanji.

14         MR. RAINER:  Good morning, your Honor.  Randall

15    Rainer, of Wolmuth Maher & Deutsch, on behalf of Triaxx Prime

16    CDO 2006-1, Triaxx Prime CDO 2006-2, and Triaxx Prime CDO

17    2007-1, referred to as the issuers.

18         THE COURT:  Good morning.

19         MR. RAINER:  Good morning.

20         MS. BANDLER:  Good morning, your Honor.  Aimee

21    Bandler, for Cede & Co.

22         THE COURT:  Ms. Bandler.

23         And I think that's everyone, yes?

24         I believe our first order of business this morning is

25    some agreed-upon exhibits.  Who wants to say the magic words?

N4HKUSB1

1          MR. LORENZO:  Seeing no one else standing, your Honor,

2     I will get up, and as discussed at last Tuesday's pretrial

3     conference, our understanding is the agreed-to exhibits that

4     were provided last night, the parties are all in agreement on

5     the admissibility of those exhibits.  So we'd ask your Honor's

6     permission to move those exhibits in.

7          THE COURT:  All right.  All of the exhibits on the

8     list that was emailed to chambers last night are hereby

9     admitted.

10          As a housekeeping matter — and remind me of this at

11     the end of the day if I forget — I am going to ask counsel —

12     and I appoint you, Mr. Lorenzo, because you're the most recent

13     lawyer on his feet — to put on ECF, with some appropriate

14     caption, that list, indicating that all of those exhibits have

15     been admitted, because I'm not going to read them all into the

16     trial transcript.

17          The next order of business, I believe, is opening

18     statements.

19          You are held to 20 minutes apiece.  My law clerk --

20     where is my law clerk?  Ms. Almonte is going to give you a

21     five-minute warning when you have used 15 minutes, unless

22     you're very speedy and are done by then.

23          Have you worked out the order of statements amongst

24     yourselves?

25          MR. LORENZO:  Your Honor, I'm not sure if there's been

 1    discussion.  I assumed the trustee would go first, but if

 2    others feel differently...

 3         MS. BEAUMONT:  I think if the trustee and the

 4    noteholders would like to start, and then we'll follow

 5    afterwards.

 6         THE COURT:  So we take trustees, then noteholders,

 7    then TAM, then issuers.

 8         Everybody happy with that?

 9         Mr. Lorenzo, who will be presenting for the trustee?

10    You will?

11         MR. LORENZO:  I will, your Honor.

12         THE COURT:  You may proceed.

13         MR. LORENZO:  Thank you, your Honor.

14         Good morning, your Honor.  As you know, my name is

15    Alex Lorenzo, and I represent U.S. Bank in this action.  I know

16    your Honor is very familiar with the parties and the issues in

17    this case.  So I want to take the time this morning to set out

18    the trustee's perspective on why we are here.

19         As your Honor knows, the trustee filed this

20    interpleader because it received noteholder objections and

21    conflicting directions with regard to the collateral manager's

22    request for payment of certain Phoenix invoices through the

23    priority of payments waterfall.

24         Yet after it filed this case, the trustee learned that

25    even though the collateral manager had previously submitted

1    several Phoenix invoices to the trustee for payment through the

2    waterfall, Phoenix had also received payments directly from

3    litigation recoveries and settlements outside of the waterfall.

4    Indeed, discovery has revealed that Phoenix, as well as law

5    firms and service providers, were improperly paid more than

6    38 million outside of the priority of payments waterfall even

7    after their expenses were also submitted as administrative

8    expenses through the waterfall.

9            Discovery has also revealed that Phoenix is an entity

10   owned and controlled by Mr. Garg, the same individual that owns

11   and controls the collateral manager, such that payments to

12   Phoenix indirectly benefit the collateral manager.

13           As a result of those facts, the trustee brings four

14   claims on behalf of the Triaxx CDOs:

15           First, we have a breach of contract claim against TAM.

16   The evidence will show that TAM breached the indentures and the

17   collateral management agreements when it directed that money be

18   paid outside the waterfall to various parties instead of being

19   deposited with the trustee in the CDO accounts.

20           Second, we bring an unjust enrichment claim against

21   Phoenix.  Phoenix received more than 22 million outside the

22   priority of payments waterfall that rightfully belonged to the

23   Triaxx CDOs.

24           Third, and for the same reasons, the trustee also

25   brings a money had and received claim against TAM.

1          Fourth, the trustee brings a declaratory judgment

2     claim asking that your Honor declare that no disbursements from

3     the litigation recoveries should be made to any third party,

4     including Phoenix, unless the third party is paid through the

5     priority of payments waterfall after those litigation

6     recoveries have been delivered to the trustee.

7          Finally, as your Honor may recall, there is an

8     Article 77 proceeding related to the 061 CDO and whether the

9     outcome of this trial with regard to 062 and 071 CDOs will also

10    apply to 061.  Candidly, we think it's a legal question, but by

11    agreement, that question is also part of the trial this week.

12         When deciding these claims, there is one common

13    question your Honor must answer — whether Phoenix and other

14    third parties may be paid directly from litigation recoveries

15    and settlement amounts rather than through the priority of

16    payments waterfall.

17         The good news is your Honor has already answered that

18    question.  In your Honor's ruling on the parties' motion for

19    judgment on the pleadings, your Honor reviewed the key deal

20    documents in this case and held:  One, litigation recoveries

21    and settlement proceeds are collateral under the indentures;

22         Two, they must be promptly disclosed and delivered to

23    the trustee for deposit into the appropriate accounts rather

24    than held by the collateral manager or its agents;

25         And, three, no party may pay Phoenix's fees directly

1    from the recoveries outside of the priority of payments

2    waterfall.

3         The TAM parties admit they did make payments outside

4    of the waterfall.  In their responses to the trustee's first

5    set of interrogatories, TAM admits that it paid over 22 million

6    to Phoenix outside the priority of payments waterfall and an

7    additional 17 million to other third parties.

8         Now, why does this matter?  Well, one, as your Honor

9    held, the contracts don't allow it;

10        Two, this isn't a no harm/no foul type of situation.

11   The evidence will show that the reason this money was paid

12   outside the priority of payments waterfall was because they

13   knew they could not get this money through the deals because of

14   the administrative expense caps in each of the three CDOs;

15        Three, this money really belongs to the noteholders,

16   and if they had gone into the deals, it would have flowed to

17   the noteholders;

18        Four, all of this is borne from self-interested

19   transactions.  This was not a situation where there was an

20   arm's-length negotiation.  In fact, we learned through

21   discovery that at the time the Phoenix engagement was

22   negotiated, the collateral manager, who at this point was

23   Mr. Priore, also negotiated a deal where Priore's controlled

24   entity would receive 25 percent of the fees paid to Phoenix,

25   and at the same time, the collateral manager sold the right to

N4HKUSB1                    Opening – Mr. Lorenzo

1   all of the collateral manager's fee entitlements under the

2   indenture to Phoenix for a sum of 4.5 million.

3           So what this trial is really about is the TAM parties'

4   defenses.  Despite this Court's holdings and their own

5   admissions, the TAM parties seek to avoid liability by claiming

6   a number of things.  But the two we want to focus on this

7   morning are:  One, that the TAM parties' actions are excused

8   because they allegedly relied on the advice of counsel, and

9   two, that the trustee waived any potential challenges or

10  otherwise ratified the TAM parties' conduct.

11          The evidence will show that both of these defenses

12  fail.  To fully understand why, I want to first provide some

13  color by looking at a breakdown of the priority of payments

14  waterfall.

15          As your Honor knows, when the collateral generates

16  proceeds that are payable, the indenture provides the priority

17  of how that money is paid out.  Under the first step, taxes and

18  fees owed by the issuers are paid, and the trustee receives a

19  fee.  Under the second step, administrative expenses are paid.

20  For each of the CDOs, the admin expenses are capped.  In 061,

21  that cap is $175,000 per payment period, which is effectively

22  monthly, and for 062 and 071, the expenses are capped at

23  200,000 per payment period.  The third step pays certain

24  amounts under a hedge treatment.  The fourth step, the

25  noteholders receive distribution of interest and principal due

1    under the notes.  And, finally, the collateral manager receives

2    its fees at the last step of the waterfall.

3            Now, that last step is important because in 2011, when

4    Phoenix was engaged, there was insufficient money coming into

5    the deals because of problems with the collateral, such that

6    there was not enough money to make it to that fifth step, and

7    the collateral manager was not receiving any management fees at

8    that time.

9            But with the Phoenix engagement, as reflected in the

10   engagement agreements, the shift -- now, to be clear, the

11   trustee takes no position with respect to the validity of the

12   engagement agreements.  I believe the other parties have

13   positions on that.

14           THE COURT:  Either the 2011 or the 2014?

15           MR. LORENZO:  Well, so when I'm referring to the

16   engagement agreements, just the 2011.  We do take a position on

17   what we're calling the clarification letters in 2014.

18           THE COURT:  Okay.

19           MR. LORENZO:  There are a few things I wanted to point

20   out that are relevant to the trustees claims about the original

21   2011 engagement agreements.

22           So first is, as I alluded to earlier, the engagement

23   agreements were not the only agreements entered into between

24   companies controlled by Priore, who represented the collateral

25   manager, on the one hand, and Garg, who represented Phoenix, on

N4HKUSB1                         Opening – Mr. Lorenzo

1     the other.

2              We will hear testimony about those agreements in this

3     case, but I want to highlight two in particular.

4              On the same date of the engagement agreements, Priore

5     and Garg's companies entered into an agreement whereby Priore's

6     company would assist Phoenix in entering into consulting and

7     advisory agreements with third parties that hold the securities

8     of the Triaxx CDOs in exchange for a 25 percent cut of the net

9     cash flow generated by the securities and from the contracts.

10             Interestingly enough, this agreement included the

11    engagement agreements.  The fact is, this means that ICP, who

12    is not receiving collateral management fees because it was last

13    in the priority payments waterfall, engaged Phoenix, which

14    receives payments as administrative expenses, the second step

15    in the waterfall, which then turned around and shared these

16    payments with an entity controlled by the person who was

17    running ICP.

18             THE COURT:  And not to get too far ahead of you, but

19    I'm sure you've done the arithmetic, and I haven't, was this

20    sufficient to make up for the collateral manager fee?

21             MR. LORENZO:  Well, at that point, the collateral

22    management fee was zero, and so this was all sort of bonus,

23    right?  There was no prospect of getting payment as a realistic

24    matter because of the collateral problems.  So this was a way

25    to sort of circumvent the protective measures in the indenture

1    to get fees.

2              THE COURT:  All right.

3              MR. LORENZO:  In short, ICP and Phoenix worked

4    together to jump the line in the priority of payments

5    waterfall, skipping over and cutting out the noteholders, but

6    that wasn't everything that was agreed to on that day.  At the

7    same time, the collateral manager engaged Phoenix, it also sold

8    the rights to its future fees from the CDOs to Phoenix for

9    4.5 million.  Thus, before this series of transactions, the

10   collateral manager had no prospect of having its fees paid from

11   the CDOs.  After these simultaneous agreements, the collateral

12   manager ended up with 4.5 million from Phoenix, Phoenix had a

13   guaranteed stream of fees from the CDOs, a quarter of which

14   were then owed to an entity controlled by the principal of the

15   collateral manager.

16             The second thing I want to point out is that it's

17   unclear what work Phoenix did under these agreements.

18   Throughout the case, there have been assertions of privilege

19   over the work product Phoenix created, and discovery has not

20   uncovered what work Phoenix actually did.

21             Third, Phoenix got paid a tremendous amount of money

22   and seeks to be paid even more.  It appears — and this is

23   self-interest as a lawyer — it appears they were paid even more

24   than the lawyers who were litigating the cases.

25             Fourth, Phoenix had never had employees.  On the date

 1    it signed the engagement agreements, it signed a back-to-back

 2    agreement with another Garg company to actually perform the

 3    work at a much lower rate.  Over the years, there were several

 4    contracts -- several subcontract agreements, one of which Garg

 5    negotiated and signed on behalf of both Phoenix and the

 6    subcontractor.  In fact, to get investors to buy into

 7    Phoenix Holdco, the offshore Cayman corporate parent of

 8    Phoenix, Garg allegedly asserted to those investors that it

 9    could expect an eight times return on their investment within

10    just a handful of years.

11            And, finally, the engagement agreements unequivocally

12    state that the payment of all amounts to which Phoenix is

13    entitled pursuant to the agreements shall be made as an

14    administrative expense subject to the priority of payments as

15    described in the indenture.

16            THE COURT:  And in your view of life, did the 2011

17    engagement agreement say that because the folks who negotiated

18    them didn't have a crystal ball and didn't realize that this

19    was not going to work out for them a few years down the line?

20            MR. LORENZO:  That may have been the case, your Honor,

21    but we understood that the engagement agreements say that

22    because the indentures require that language.

23            THE COURT:  Okay.

24            MR. LORENZO:  So, let's turn to the two defenses that

25    I highlighted, starting with an advice of counsel.

1    Essentially, TAM claims that despite the clear

2 language of the engagement agreements and the indentures, on

3 three separate occasions, the collateral manager received

4 advice from counsel that it could pay Phoenix and other third

5 parties outside the priority of payments waterfall.  In support

6 of this defense, TAM invoked Section 7 of the collateral

7 management agreement, which provides:  "The collateral manager

8 shall be fully protected and without liability to the extent it

9 relies reasonably and in good faith upon legal opinions or

10 advice as to the matters arising hereunder provided by counsel

11 for the issuer, the trustee, or the collateral manager."

12    So to prevail on this defense, TAM must show that it

13 honestly and in good faith sought the advice of counsel, that

14 it fully and honestly laid out all facts before such counsel,

15 and that in good faith, it honestly filed counsel's advice,

16 believing it to be correct and intending this act be lawful.

17    There's also a reasonableness element to any purported

18 reliance.

19    Now, we believe as a matter of law — this is what I

20 alluded to — that there is no interpretation of the indentures

21 in the engagement agreement that would allow these outside the

22 waterfall payments, and certainly not on these facts.

23    So let's talk about each of these three pieces of

24 advice.

25    So, in 2014, the first advice that they point to came

1    more than three years after the engagement agreements were

2    signed and after three years of Phoenix receiving payments

3    through the waterfall.  At that time, Phoenix and others

4    expected large recoveries and settlement amounts from a case

5    litigated on behalf of the Triaxx CDOs, and Phoenix believed it

6    was owed a large fee as a result.  But this time, Mr. Calamari

7    had joined Phoenix as general counsel.  According to his

8    testimony, he, Mr. Garg, Mr. Priore, and Mr. Nissenbaum at

9    Schulte, the issuers' counsel, got together and discussed that

10   Phoenix's large fees should come directly from the litigation

11   recoveries instead of being paid through the priority of

12   payments waterfall.

13        Calamari allegedly memorialized such discussions by

14   drafting the clarification letters and addressing them to

15   Mr. Nissenbaum.  Calamari signed them on behalf of Phoenix as

16   its general counsel.  Now, if we examine the clarification

17   letters, we see there are several things wrong.

18        First, the clarification letters are not

19   countersigned, so there's no documentary evidence that anyone

20   other than Mr. Calamari agreed to the content of these letters.

21        THE COURT:  I understand there's going to be testimony

22   that Mr. Nissenbaum orally agreed.  Is that what I'm to expect?

23        MR. LORENZO:  We don't know, your Honor.

24   Mr. Nissenbaum was not deposed.  He will be a witness, we have

25   subpoenaed him, and so we are interested to see his testimony.

1          THE COURT:  Okay.

2          MR. LORENZO:  Second, the clarification letters were

3     not sent to the trustee, the entity that is responsible for

4     distributing any proceeds on the collateral.

5          Third, the clarification letters directly contradict

6     three other relevant documents.  They contradict the

7     indentures, which provide that all collateral must be turned

8     over to the trustee; they contradict the collateral management

9     agreements, which provide that the collateral manager must

10    abide by the terms of the indentures; and they contradict the

11    engagement agreements, which provide the payments of all

12    amounts owed to Phoenix, quote, "shall be an administrative

13    expense subject to the priority of payments as described in the

14    indenture."

15         Ultimately, the collateral manager knew how to pay

16    Phoenix's fees.  It's just when large amounts started to come

17    in, they knew the administrative expense caps would prevent

18    these payments through the waterfall on the time frame that

19    they hoped for.

20         THE COURT:  Would they prevent the payments

21    altogether, or would they just hold them up like a bottleneck?

22         MR. LORENZO:  We now, through the benefit of

23    hindsight, know that, functionally, the payments would be

24    prevented altogether, and that is because consistently the cap

25    was hit by the expenses that were submitted inside the

1    waterfall, so there was no slack to pay these multimillion

2    dollar payments.

3          THE COURT:  Even through today?

4          MR. LORENZO:  Even through today.  And today, but for

5    one deal, effectively through the sale — this goes to the other

6    two interpleaders — through the sale of defaulted securities,

7    there's effectively de minimis collateral that is bringing in

8    almost no money at this point.

9          THE COURT:  Does that mean that what some parties have

10   been calling the retained Phoenix fees are in limbo forever and

11   will never be paid?

12         MR. LORENZO:  As a practical matter, potentially, yes,

13   your Honor.

14         THE COURT:  Okay.

15         I'm giving you an extra 60 seconds because of my

16   questions.

17         MR. LORENZO:  This is like soccer, your Honor.

18         According to Mr. Calamari, Mr. Nissenbaum did not

19   confirm the letters by signing them, but as your Honor alluded

20   to, instead by approving a packet of invoices forwarded to him

21   by Mr. Moon, outside litigation counsel for the CDOs.

22         Now, the totality of Mr. Nissenbaum's comments on this

23   packet of invoices from Mr. Moon was this version looks false.

24   Mr. Nissenbaum did not mention the clarification letters.  He

25   did not mention the payments outside the waterfall.  And, in

N4HKUSB1                      Opening – Mr. Lorenzo

1   fact, we know from the timestamps on the email, he spent no

2   more than two hours on this, and the cover email transmitting

3   the packet of invoices to him suggested that this was a quick

4   task, that it should not, quote-unquote, take more than

5   five minutes.

6          Moreover, Mr. Nissenbaum was conflicted when he

7   provided this email because in this one-line email, he was also

8   approving a $25,000 payment to his firm outside the waterfall.

9          So let's fast-forward to 2015, when Mr. Calamari

10  claims the collateral management received another instance of

11  legal advice.  Again, Mr. Calamari testified that this advice

12  came from Mr. Nissenbaum's approval of another Moon packet of

13  invoices.  Again, Mr. Nissenbaum typed four words.  The

14  totality of Mr. Nissenbaum's comment on that package was:  I

15  have no comment.  All the same problems from the 2014 purported

16  advice are present here.  And, again, Mr. Nissenbaum was

17  conflicted because he was approving another $25,000 payment to

18  his firm outside of the priority of payments waterfall.

19         Considering all of these facts, these one-line emails

20  do not meet the standard for an advice of counsel.

21         THE COURT:  Mr. Moon's firm was also paid through the

22  waterfall, correct?

23         MR. LORENZO:  Sometimes they were paid through the

24  waterfall; sometimes they were paid outside the waterfall.

25  It's a topic that we plan to explore with Mr. Moon when he

1    testifies.

2            So now the Schulte memo, the final instance that

3    Mr. Calamari claims the collateral manager received legal

4    advice, which allegedly occurred in 2017.

5            But in 2017, the horse was out of the barn.  Millions

6    of dollars had already been paid to Phoenix and other third

7    parties.

8            THE COURT:  About 30 million?

9            MR. LORENZO:  I think it's about 30 million at that

10   point, yes.

11           And, most remarkably, this advice would not apply to

12   Phoenix's fees.  And how do we know that?  We have Mr. Stein's

13   testimony.  So, TAM sought the advice of Craig Stein, an

14   attorney at Schulte, on the propriety of paying legal fees and

15   expenses from the litigation recoveries being held outside the

16   waterfall.  Mr. Stein wrote a memo concluding that the

17   recoveries could be used to pay legals fees and expenses.  But

18   despite Mr. Stein's directions, TAM paid not only legal fees

19   and expenses, but also continued to pay its affiliate, Phoenix.

20           THE COURT:  Were the legal fees and expenses paid

21   pursuant to a contingency type engagement agreement?

22           MR. LORENZO:  We're not aware of the engagement

23   agreement.  It appears, from the way the bills have come in,

24   that they were hourly agreements, but we haven't been provided

25   with all the agreements from underlying counsel.

1          THE COURT:  Thank you.

2          MR. LORENZO:  For several reasons, this alleged advice

3     of counsel does not excuse the TAM parties' breach.

4          First, and we alluded to this, at the time the TAM

5     parties sought this advice, $30 million had already been

6     disbursed outside of the waterfall.  TAM can't claim that it

7     relied in good faith and sought advice on a course of action it

8     had already been undertaking.

9          Second, Calamari told Mr. Stein exactly what he

10    wanted.  Mr. Calamari wrote an email stating the directors —

11    here the directors are the issuers — I'd like to hear it's

12    reasonable for the escrowed funds to be used to pay legal bills

13    for existing litigation that is expected to bring in additional

14    recoveries for the funds.  That is exactly what Mr. Stein

15    wrote.

16         Third, Mr. Stein's memo only addressed legal fees and

17    expenses.  Mr. Stein unequivocally testified that this would

18    not include payments to Phoenix.

19         Fourth, TAM did not follow the legal advice.  It paid

20    not only legal fees and expenses, but also paid its affiliate,

21    Phoenix.

22         And, finally, the draft version of the memo did not

23    reference in any detail the indenture or other documents.  In

24    fact, it was the issuers who suggested to add a reference to

25    the indenture in the subsequent draft, such that it made it

1    into the final version of the memo.  And Mr. Stein testified

2    that this memo was not, in fact, an official Schulte legal

3    opinion.

4            Again, considering all those facts, the only

5    conclusion is that this falls well short of establishing an

6    advice-of-counsel defense.

7            I think I'm getting very close to the time limit, your

8    Honor.

9            THE COURT:  So you want to take your 60 seconds to

10   talk about ratification by the trustee?

11           MR. LORENZO:  Sure.

12           THE COURT:  I understand you got some emails, you got

13   some memos.  Maybe you knew more than you say you knew.

14           MR. LORENZO:  So, there are some emails, some memos,

15   right, but to support a waiver ratification theory, the TAM

16   parties must demonstrate that the trustee had full knowledge

17   and sufficient notice of all material facts, a standard they

18   simply can't meet.  Among other things, the trustee did not

19   understand that a portion of the recoveries were being held in

20   accounts other than those established in the indentures,

21   understand that payments were being distributed directly out of

22   recoveries not pursuant to any court order or any other

23   direction, understand the recoveries from one litigation were

24   being used to fund other litigation, understand all of the

25   conflicts and overlapping interests with the Phoenix

1    engagement, receive a copy of any agreement related to

2    Phoenix's engagement or work for the Triaxx CDOs until this

3    litigation commenced, receive a copy of the clarification

4    letters until after this litigation commenced.

5            And, yes, there are some emails we're going to, I'm

6    sure, hear a lot about — some emails, some documents — but even

7    setting aside the fact that the indenture cannot be amended

8    without the consent of the noteholders, these emails, these

9    documents, that they claim in hindsight reveal everything

10   simply does not meet the standard for waiver or ratification.

11           THE COURT:  I think you're about done, Mr. Lorenzo.

12           Is he done?

13           MR. LORENZO:  Thank you very much.

14           THE COURT:  Thank you very much.

15           Who's next?

16           Mr. Savla.

17           (Pause)

18           THE COURT:  Are we having technical difficulties?

19           (Pause)

20           THE COURT:  Is this a gizmo where I'm supposed to be

21   able to see exhibits electronically, this black screen over

22   here that has no pictures on it?

23           THE DEPUTY CLERK:  Yes.

24           THE COURT:  Okay.  Let's go off the record for a

25   minute and fix our technical problem.

1          (Pause)

2          THE COURT:  Let's go back on the record.

3          Mr. Savla.

4          MR. SAVLA:  Your Honor, as you'll see, we have an

5     opening that contains some visuals consisting of designated

6     testimony and premarked exhibits.  Some of these, the parties

7     have objected to, and we'll note those objections as we go

8     along.

9          They're also noted in our visual presentation.

10          THE COURT:  All right.  To the extent that an

11     objected-to exhibit is used in an opening statement, it is not

12     admitted.  I will reserve decision on that.

13          MR. SAVLA:  Your Honor, this is a case about the TAM

14     parties taking significant amounts of money under the pretense

15     of valid contracts.  There are three key issues for this Court

16     to consider:

17          First, whether the engagement agreements are valid;

18          Second, whether disclosure was factually and legally

19     adequate;

20          And, third, whether the TAM parties can meet that

21     burden to prove that they are entitled to their fees.

22          THE COURT:  Whether disclosure of what was adequate?

23          MR. SAVLA:  Whether the disclosure of the Phoenix

24     arrangement.

25          THE COURT:  All right.

1          MR. SAVLA:  The answer to all these questions is no,

2     and, therefore, we submit the noteholders should win.

3          Now, on the first issue, there is no evidence that the

4     issuers entered into the engagement agreements.

5          If we look at the joint statement of facts, which is

6     up on our screen, it is undisputed that the engagement letters

7     were reviewed by Thomas Priore, the founder, CEO, and president

8     of the collateral manager.

9          Looking at paragraph 15 of the joint statements of

10    fact, it is also undisputed that Vishal Garg and, to a lesser

11    extent, Rajav Wissasoren negotiated the engagement agreements

12    for Phoenix.  And looking at paragraph 52, the highlighted

13    section, it is undisputed that Priore executed the engagement

14    agreements for the collateral manager and that Garg executed

15    them for Phoenix.

16         So, what did the issuers have to say?

17         Here, we have testimony from Mr. Brunekreef, the

18    issuers' designee, and he's asked:  Did the issuers provide,

19    whether in writing or orally, their acceptance of the

20    agreement?

21         And he says:  I have no knowledge of that.

22         And, of course, let's look at the engagement

23    agreements themselves.  They're signed by Mr. Priore, they're

24    signed by Mr. Garg, and then they're sent care of the

25    collateral manager to the attention of Tom Priore.

1          So, in short, there is no evidence of any

2     authorization by the issuers of the engagement agreements.

3          THE COURT:  By the issuers, you mean one of the actual

4     directors of the issuer or by an attorney engaged directly by

5     the directors?

6          MR. SAVLA:  Correct.

7          THE COURT:  Okay.

8          MR. SAVLA:  So, lacking any authorization, TAM points

9     to a supposed contract delegation.  And if we look at TAM's

10    answer, it says, in paragraph 168, that the collateral manager

11    has delegated authority through the governing agreements.  And

12    specifically, it says:  Through this delegation, the collateral

13    manager has engaged with Phoenix as the issuer's agent pursuant

14    to Section 2(a) of the CMAs for more than seven years.  CMAs

15    being the collateral management agreements.

16         Now, this argument, however, ignores the granting

17    clause in the indentures.  The granting clauses state:  The

18    issuer hereby grants to the trustee, for the benefit and

19    security of the secured parties, all of its right, title, and

20    interest in the collateral.

21         And let's see what Mr. Brunekreef of the issuers has

22    to say about that.  This is objected to.  He's asked:  Did the

23    granting clause grant the issuers any power to enter into the

24    agreements?

25         And he answers:  We have given the grants to the

N4HKUSB1                          Opening - Mr. Savla

1   trustee.

2            Now --

3            THE COURT:  You're going to spend some of your time

4   talking about the waiver/ratification issue vis-a-vis the

5   noteholders, correct?

6            MR. SAVLA:  We are, yes.

7            THE COURT:  Because whether or not the noteholders

8   were aware of all of the details and what was going on behind

9   the scenes, you clearly -- everything that you've covered so

10  far, what the contracts say and what they don't say, and the

11  fact that Phoenix was, in fact, engaged and that money was

12  being sent to it through the waterfall, that, you knew?

13           MR. SAVLA:  Well, we know to some extent, and we're

14  going to get into that.  But let me finish this first part with

15  your Honor's indulgence, and then we'll definitely get into the

16  disclosure part, which is the second leg of our presentation.

17           THE COURT:  Okay.

18           MR. SAVLA:  So, numerous courts have already addressed

19  the Triaxx CDOs, including, for example, Judge Buchwald, who

20  has held that the provisions in Section 2 of the CMAs on which

21  plaintiffs rely are expressly subject to the indenture, which

22  assigned all right, title, and interest in the issuers'

23  property to the CDO indenture trustee.

24           In short, the issuers could not have granted the

25  collateral manager -- could not have given them contractual

1   authority as the agent to enter into these engagement

2   agreements because the issuers had already granted any rights

3   to enter into the agreements to the trustee.

4           THE COURT:  So, in your book, the issuers couldn't

5   have done it directly either, even if a director of the issuer

6   had signed that engagement letter?

7           MR. SAVLA:  That's exactly correct.

8           THE COURT:  All right.

9           MR. SAVLA:  So then we get to, in this situation, the

10  CMA is clear that under Section 8(b) of the CMA, the collateral

11  manager must bear its own expenses.  We see Section 8(b) says:

12  The collateral manager should be responsible for all expenses

13  incurred by it in the performance of its obligations under this

14  agreement.  And as the engagement agreements seek to pay

15  expenses out of CDO collateral, they are in direct conflict

16  with the CMA.

17          This goes to your Honor's question.  Even if the

18  issuers were somehow a contract party despite the granting

19  clauses, multiple indenture provisions prohibit the issuers

20  from entering into the engagement agreements.  And here are

21  just two examples.  Section 7.12 states:  The issuer shall not

22  engage in any business or activity other than issuing and

23  selling the notes pursuant to this indenture.  The activist

24  litigation strategy contemplated in the engagement agreements

25  is exactly this type of other business that is expressly

1    prohibited by the indenture.

2                Let's look at another indenture provision, and we're

3    just taking two examples.  Here we have Section 7.7 of the

4    indentures, which require that prior written consent of a

5    majority of the controlling class in order to contract with

6    other persons.

7                And here we have, on this side --

8                THE COURT:  And you were -- PIMCO was the majority of

9    the controlling class in two of the three CDOs at the time?

10               MR. SAVLA:  It was a majority of the controlling class

11   in the 2006-2 and 2007-1 CDOs at the time.

12               THE COURT:  Okay.  Not a right that PIMCO insisted on

13   at the time?

14               MR. SAVLA:  Well --

15               THE COURT:  I know, you're going to get to the

16   ratification issue.

17               MR. SAVLA:  Yes.

18               And so here we have an RFA response from Tam in which

19   it admits that a majority of the controlling class never

20   provided prior written consent for TAM or TAM as the agent of

21   the issuers to enter into the engagement agreements.

22               So we submit that any way the Court decides to look at

23   these engagement agreements, the noteholders win.  They win as

24   a matter of fact, but they also win as a matter of law.

25               And so now we get to the second leg, which is

1   disclosure.  And there's no evidence that the noteholders

2   received proper disclosure, and certainly none that would fit

3   within the TAM parties' affirmative defenses.

4           Now, the TAM parties will likely point to calls with

5   Giang Bui at PIMCO that purportedly provided notice.  There are

6   no notes of these calls, and no one who spoke to Ms. Bui seems

7   to recall these calls with any detail.

8           Mr. Garg, in his deposition testimony, says that his

9   memory is fuzzy and that he does not fully remember the calls

10  with Ms. Bui.

11          THE COURT:  What about the valuation reports?

12          MR. SAVLA:  Well, the valuation reports, they do list

13  Phoenix fees as fees of the collateral manager.  There is a

14  line item where it says fees of the collateral manager.  It

15  does not list them as fees of the issuer.

16          Now, their thesis, of course, is --

17          THE COURT:  What about the notices that went out to

18  the noteholders saying Phoenix was engaged?

19          MR. SAVLA:  Well, those notices mention -- first of

20  all, are not sufficient because they don't actually describe

21  the terms of the engagement letter, they don't describe how

22  Phoenix is being paid, but, importantly, they don't even

23  mention Phoenix Real Estate Solutions.  They mention ARAM

24  Global, they mention Phoenix Advisors and Managers, but they

25  don't actually mention the one entity we're dealing with in

1    this case.

2               So, let me get to Mr. Priore's testimony.

3               In May of 2014, did you discuss anything with PIMCO

4    other than the sale of defaulted assets?

5               You know, not that I recall.

6               And as we've noted, the TAM parties have objected to

7    this piece of testimony as well.

8               And we get to, then, Mr. Calamari's testimony, in

9    which he says that he could not remember the specifics of any

10   call and that he can't remember discussing anything other than

11   potentially the defaulted collateral.

12              Now, the TAM parties --

13              THE COURT:  If I can just interrupt.  These

14   conversations about the defaulted collateral, is that the

15   collateral that was at issue in the prior interpleader?

16              MR. SAVLA:  Exactly.

17              THE COURT:  Thank you.

18              MR. SAVLA:  The TAM parties will likely point to a New

19   York Times article that does not even mention Phoenix.  As your

20   Honor said, there are the note valuation reports that timely

21   disclosed Phoenix's fees as being those of the collateral

22   manager rather than of the issuer.  And they point to sporadic

23   letters, as your Honor also alluded to, referencing entities

24   such as ARAM Phoenix and Phoenix Advisors and Managers rather

25   than Phoenix PRES.

1        But here are at least five material facts that the TAM

2   parties did not disclose to the noteholders.

3        TAM RFA response No. 9.  They admit that TAM (or TAM,

4   as agent of the issuers) never provided the trustee or the

5   noteholders with the engagement agreements until they were

6   submitted as exhibits in this action.

7        And here we have the second thing that they did not

8   provide notice about.  And this comes from the court-ordered

9   deposition of Phoenix's designee and the talking points that

10  were adopted by the designee where he says:  TAM and Phoenix

11  are each unaware of any notice provided to the noteholders

12  relating to the clarification letters.

13       And then there are three agreements entered into on

14  the same day as the engagement agreements that were not

15  disclosed to the noteholders.

16       The first agreement is a second resale and repurchase

17  agreement.  The TAM parties did not disclose that on

18  March 22nd, 2011, the same day as the engagement agreements,

19  Garg and Priore executed repurchase agreements.  Under these

20  repurchase agreements, a Phoenix affiliate, ARAM Phoenix

21  Investments, purchased the rights to the collateral manager's

22  fees.

23       The fourth thing they did not disclose --

24       THE COURT:  Fees which, if I understand correctly,

25  were running at zero at that time?

1          MR. SAVLA:  Well, they were running at zero, but the

2     analysis that was done, at least according to the evidence, is

3     that Mr. Garg analyzed the fees over time as being worth

4     4.5 million, and that is the amount that's paid under this

5     repurchase agreement.  So, yes, with the benefit of

6     hindsight --

7          THE COURT:  So he was purchasing future fees?

8          MR. SAVLA:  He was purchasing future fees.

9          THE COURT:  I think that's your five-minute warning.

10          MR. SAVLA:  Okay.

11          There's an option to purchase agreement that's also

12     entered into on the same day where Phoenix's affiliate gets the

13     right to purchase ICP for a single dollar.  And then there's

14     another agreement, a consulting agreement, again entered into

15     on the same day as the engagement agreements, and under this

16     agreement, Garg and Priore's wife, Lori Priore, enter into a

17     consulting agreement where PSD Partners, an entity controlled

18     by Priore and his wife, would receive 25 percent of the net

19     cash flows of the Phoenix entities.

20          Priore was at the time also the CEO of the collateral

21     manager.  And I understand that the TAM parties have objected

22     to the use of this exhibit on relevance grounds.

23          So we submit these additional agreements reflect the

24     lack of disclosure to the noteholders.

25          Now, I will say this goes to our view that the

1    disclosures were not legally sufficient.  Ratification can only

2    be proved that the TAM parties first admit that the indentures

3    were amended.  Estoppel requires a promise, and there is no

4    evidence of a promise.  And waiver cannot be proved because the

5    indenture has a no-waiver provision that requires express

6    written waiver.

7            And with that, I'm going to turn over to Mr. Lauriello

8    to address the third point, about value.

9            MR. LAURIELLO:  Good morning, your Honor.  The third

10   issue is whether the TAM parties can meet their burden to

11   justify their fees.  You will hear from the TAM parties'

12   witnesses, such as Mr. Garg, that Phoenix should be compared to

13   the likes of asset managers like BlackRock for its, quote,

14   unique and valuable work.  Here are just four problems with

15   this thesis:

16           First, as the TAM parties themselves admitted in the

17   letter to the Court dated January 30th of this year, Phoenix is

18   a provider of, quote, "litigation support services."  And I

19   understand this exhibit is objected to.

20           Second, Mr. Calamari, former general counsel of both

21   Phoenix and TAM, has also testified that, quote, "TAM's primary

22   business was litigating and filing lawsuits."

23           Third, the only supposed work product that the TAM

24   parties can point to to justify their fees is a privilege log,

25   as evidenced by Dr. Tang's declaration.  There is no evidence

1    about the specific number of hours that Phoenix worked, how

2    much cost they incurred, or the like.

3            Fourth, the TAM parties argue that Phoenix added value

4    to the CDOs by advising TAM to retain residential

5    mortgage-backed securities for the benefit of all noteholders.

6            THE COURT:  And this is how, if I understand it — and

7    I'm sure I'll hear more about this from TAM — TAM values

8    Phoenix's work at 725 million instead of 105 million?

9            MR. LAURIELLO:  That is correct, your Honor.

10            THE COURT:  Okay.

11            MR. LAURIELLO:  As Dr. Tang puts it in his

12    declaration, in March 2011, PIMCO demanded that the collateral

13    manager sell certain residential mortgage-backed securities,

14    but TAM refused because that sale, quote, "would have benefited

15    only or primarily the senior noteholder, which would have

16    received the bulk of the proceeds while walking in the then

17    current losses in value of the collateral to the significant

18    detriment of more junior noteholders," and that, quote,

19    "Phoenix Real Estate Solutions and the collateral manager

20    believed that the best course for all Triaxx CDO noteholders

21    was for the CDOs not to sell those mortgage-backed securities."

22            But this argument has already been rejected by

23    Judge Pauley, the Second Circuit, and Judge Nathan.  As the

24    Second Circuit held, the mandatory timing of the sale is

25    designed to protect the most senior noteholders, who received

1  lower interest payments, and who will be paid first under its

2  waterfall payment scheme.  Triaxx's argument that the CMA

3  requires it always to act in a "commercially reasonable manner"

4  to the benefit of all noteholders undermines the terms of the

5  contract, as well as the waterfall payment scheme that the

6  parties agreed to.

7          The TAM parties cannot argue that they are entitled to

8  fees for actions that multiple courts have held were violations

9  of the indentures.  And the TAM parties certainly cannot argue

10  that they are entitled to an equitable remedy, such as quantum

11  meruit.  As Judge Nathan has held, TAM did not act in good

12  faith when it refused to sell residential mortgage-backed

13  securities that it had deemed credit improved.

14          THE COURT:  But are you saying those are the same

15  securities that TAM is taking credit for not selling here, or

16  different securities?

17          MR. LAURIELLO:  Those are the same securities, your

18  Honor.  The credit-improved securities, I'm not sure if the

19  19 credit-improved securities that were decided at the trial in

20  Triaxx I are listed in Dr. Tang's exhibit, but if you look, and

21  the evidence will show, that these securities used to justify

22  those 725 million were the securities at issue in the case

23  before Judge Pauley and Judge Nathan.

24          THE COURT:  Thank you.

25          I think your time is up.

1              MR. LAURIELLO:  Thank you, your Honor.

2              THE COURT:  Triaxx?

3              Or Ms. Beaumont?

4              MS. BEAUMONT:  Good morning, your Honor.

5              The Court has just heard a version of the events in

6    this case that has, by dint of repetition, come to be accepted,

7    but my clients have not had the opportunity to tell their

8    story.  And in the course of the coming week, we will show the

9    context and facts that have been missing from this case for the

10   five years it's been pending.

11             The trustee and the noteholders will, as we've heard,

12   try to complicate this story with tales of supposed conflicts

13   of interest, complaints about my clients' corporate structure,

14   and innuendo about my clients' motives.

15             But what happened here is ultimately quite simple.

16   PRES did unique valuable work which was fully known to the

17   trustee of the noteholders and produced recoveries of hundreds

18   of millions of dollars for them for which PRES properly was

19   paid and for which it was more than $23 million.  Once the

20   Court has the full picture, PRES's work will, we submit, be

21   demonstrated to have been a very good bargain for the Triaxx

22   CEOs and their noteholders.  All my clients ask is for the CEOs

23   and noteholders to keep that part of the bargain that was

24   supposed to be good for PRES too.

25             So let's start at the beginning.  How did PRES come to

1    be retained by the Triaxx CDOs?  We begin with Vishal Garg,

2    whose name we've heard already this morning.  In the years

3    right after the financial crisis, he was working at a firm he

4    cofounded called EIFC, where he was working on student loans,

5    and he was known as the loan doctor for his exceptional talent

6    for analyzing student loan securitizations and figuring out

7    ways to make them perform better.  And along the way, Mr. Garg

8    got to know Mingsung Tang and Ziggy Jonsson, who worked at a

9    firm called ARAM Global and had extensive deep experience with

10   mortgage loans and securitizations, and together they realized

11   that what Mr. Garg was doing with student loans was directly

12   relevant to mortgage loans and securitizations.

13           And at the time they got together, RMBS collateral

14   were performing poorly all across the market, and many CDOs

15   were giving into pressure from noteholders to sell their

16   collateral.  But Mr. Garg, Dr. Tang, and Mr. Jonsson believed

17   they could solve the basic problem for RMBS investors who had

18   only --

19           THE COURT:  You need to slow down just a touch.

20           MS. BEAUMONT:  I'm struggling with the 20-minute

21   limit.

22           THE COURT:  But I need to understand your words.

23           MS. BEAUMONT:  Understood, understood.

24           An RMBS holder normally has access to only high-level

25   anonymous information about the loans underlying the

N4HKUSB1                        Opening – Ms. Beaumont

1    securities, and they don't have any of the information that's

2    really necessary to analyze those securities, like the name of

3    the borrower and the property's address.

4           And Mr. Garg, Dr. Tang, and Mr. Jonsson came up with a

5    way to mine publicly available data to find out or at least

6    reliably infer that type of information.  This was something

7    Mr. Garg had done with student loans, but only manually and one

8    by one.

9           Mr. Garg, Dr. Tang, and Mr. Jonsson were going to do

10   the same thing for mortgages, but in an automated way and with

11   scale.  With that type of information, an RMBS investor would

12   be in a position to do something about the root cases of poor

13   performance, and instead of selling into a down market, locking

14   in losses, they could be activists.

15          So, Mr. Garg, Dr. Tang, and Mr. Jonsson formed a joint

16   venture, which they called ARAM ABS, and they started pitching

17   their services to banks and collateral managers of CDOs.  And

18   one such collateral manager was Tom Priore at ICP.

19          He was the collateral manager of the Triaxx CDOs,

20   which were different and special.  Most CDOs own small pieces

21   of tranches at various levels in an RMBS's capital structure,

22   but the Triaxx CDOs owned only so-called supersenior RMBS

23   tranches.  And such a holder would be hard for originators,

24   trustees, and servicers to ignore, and that made them ideal for

25   an activist strategy.

1              So --

2              THE COURT:  You mean when they threatened to sue, the

3    sponsors and the originators and so forth would have to sit up

4    and take notice?

5              MS. BEAUMONT:  Exactly.  And sometimes more gentle

6    tactics, not always litigation.

7              So the ARAM ABS folks analyzed the Triaxx CDOs and

8    pitched Mr. Priore, who was impressed and decided to engage

9    them for the Triaxx CDOs, and they formed PRES to provide those

10   services to the CDOs.  And there were months of negotiations

11   with ICP represented by Schulte Roth, which had drafted the

12   Triaxx CDOs indentures, and PRES represented by Kramer Levin.

13   And each of the Triaxx CDOs executed an engagement agreement

14   with PRES, and the letters are signed by Mr. Garg, on behalf of

15   PRES, and they are addressed to the CDOs, and they're

16   countersigned on behalf of the CDOs by Mr. Priore.

17             THE COURT:  And will there be evidence that somebody

18   in the Cayman Islands knew and approved of these engagement

19   letters?

20             MS. BEAUMONT:  Our understanding is that the evidence

21   will show that they were aware that Mr. Priore was keeping them

22   in the loop.  I don't think we know exactly what Mr. Priore

23   told them.  Keep in mind that Mr. Brunekreef was not one of the

24   directors at the time this was going on.

25             An ICP as collateral manager was permitted to cause

1     the CDOs to engage PRES pursuant to specific sections of the

2     governing documents.

3             Now, the noteholders argue, as we've heard, this is a

4     fiction and that it was really ICP that engaged PRES, but

5     that's not what the engagement agreements say.

6             So, Mr. Priore drove a hard bargain, and they agreed

7     to various types of compensation for PRES, which were designed

8     to align PRES's interests with those of the noteholders.  If

9     the CDOs did better, PRES did better.

10            Now, I should note an aside here.  In their proposed

11    findings and conclusions, the noteholders have brought to our

12    attention an error in the calculation of one of the step-down

13    and the diligence fees, and we're going to correct that in our

14    damages request at the end of the trial --

15            THE COURT:  You told me it dropped to 45,000 a month,

16    I think?

17            MS. BEAUMONT:  I think that's right, yes.  It was

18    supposed to step down over the years, and, for whatever reason,

19    that was not done, but we will make good on that.

20            THE COURT:  It began at about a million two a year

21    across the three CDOs, correct?

22            MS. BEAUMONT:  You've now exceeded my --

23            THE COURT:  You wrote it.

24            MS. BEAUMONT:  Yes, I don't have --

25            THE COURT:  I just read it.

1          MS. BEAUMONT:  Okay.  I apologize.

2          So the Court has heard from the noteholders about what

3    they call a suite of contracts that were entered into at the

4    same time as the engagement agreements.  And contrary to the

5    noteholders' insinuation, there's nothing sinister about those,

6    and there's going to be no evidence of their nefarious

7    intentions; there's only going to be insinuations.  Mr. Garg

8    was simply trying to protect the investment that ARAM ABS was

9    going to be making in the Triaxx CDOs.  And ICP didn't keep

10   PRES's engagement a secret.  Right after the engagement

11   agreements were signed, a notice went out from the trustee to

12   the noteholders, and that got through in emails, as the Court

13   has acknowledged --

14         THE COURT:  Were the noteholders or the trustee

15   informed that 25 percent of Phoenix's recoveries were going

16   back to the collateral manager?

17         MS. BEAUMONT:  That agreement was not discussed with

18   them, but I'm not sure that that's the case, but we can talk

19   about that at the appropriate point.

20         THE COURT:  Okay.

21         MS. BEAUMONT:  But emails and other documents

22   demonstrate that the noteholders, as well as the trustee, knew

23   from the outset that PRES had been engaged and the CDOs were

24   engaged in activist litigation.

25         So it's March 2011, PRES gets to work, it acquires

1    massive volumes of data at substantial expense, begins

2    building, refining testing algorithms.  And keep in mind that

3    nobody else was doing this at this time.  There wasn't an

4    off-the-shelf way to do it.  And so PRES constructs and

5    analyzes a massive dataset of loan level information for the

6    Triaxx CDOs, RMBS, and the Court will hear about this work from

7    the architects of that work, Dr. Tang and Mr. Jonsson.

8             Ultimately --

9             THE COURT:  That dataset, was that proprietary to

10   Triaxx, or were they able to monetize it on the broader market?

11            MS. BEAUMONT:  The one they built was proprietary to

12   Triaxx because it was about the collateral that Triaxx CDOs

13   held.

14            THE COURT:  And the methodology, was that marketable?

15   Because certainly a lot of people out there were suing a lot of

16   other people with regard --

17            MS. BEAUMONT:  It was.

18            THE COURT:  -- to the RMBS securities trying to do

19   much the same thing.

20            MS. BEAUMONT:  Yes, it was marketable.

21            THE COURT:  Was it marketed?

22            MS. BEAUMONT:  Not through PRES specifically, but

23   through sister companies.

24            THE COURT:  Thank you.

25            MS. BEAUMONT:  So that brings us to the second quarter

1    of 2014.  And Mr. Calamari, as we've heard, has just joined One

2    Zero Capital, and he provides legal services to a number of

3    Mr. Garg's founded companies.  And one thing that he worked on

4    related to some incentive fee payments that were about to come

5    in from the settlement of a large RMBS class action against an

6    originator.  And when --

7              THE COURT:  Are we allowed to identify which

8    litigation this was?

9              MS. BEAUMONT:  I'm going to be careful about this

10   because of the settlement agreements, but the Court will hear

11   from people who are testifying pursuant to subpoena who can

12   name names and give dollar amounts, and it will, I think,

13   become crystal clear who I'm talking about.

14             THE COURT:  Okay.

15             MS. BEAUMONT:  So PRES sort of had two roles here.

16   One was improving the performance of the loans within the RMBS

17   and the other was supporting activist litigation.

18             And the Court will hear from John Moon, who was

19   selected and retained by Mr. Priore to be the CDOs' lead

20   activist litigation counsel, and he will explain how the Triaxx

21   CDOs heard about this proposed settlement and presented the

22   mortgage originator with PRES's voluminous analysis, which

23   demonstrated that the proposed settlement wasn't fair or

24   adequate, and, ultimately, the originator agreed to make a

25   substantial payment to the Triaxx CDOs.  And like litigation

1    settlement payments commonly do, that went to a law firm trust

2    account.

3              Now, the PRES engagement letters didn't say --

4              THE COURT:  That was Mr. Moon's law firm's trust

5    account?

6              MS. BEAUMONT:  It was a trust account set up --

7    because of the size of the recovery, it was set up by two law

8    firms.  It was Keller Rohrback and, I'm sorry, I'm blanking on

9    the name of his prior firm.  It wasn't Olshan, it was Miller &

10   Wrubel.  I apologize.

11             THE COURT:  So Mr. Moon's firm plus another firm?

12             MS. BEAUMONT:  Correct.

13             THE COURT:  And was the other firm cocounsel in the

14   underlying litigation?

15             MS. BEAUMONT:  Correct.

16             THE COURT:  Thank you.

17             MS. BEAUMONT:  The PRES engagement letters didn't say

18   how PRES should be paid in connection with this kind of

19   recoveries where the benefits were not coming in through

20   improvements in the loans within the RMBS within the CDOs.  And

21   so even before --

22             THE COURT:  You don't read the 2011 engagement letters

23   as saying that payment was to be exclusively paid through the

24   waterfall?

25             MS. BEAUMONT:  Let me explain.

N4HKUSB1                          Opening - Ms. Beaumont

1          So, even before the settlement payment came in, there

2     were conversations about that and about what to do with this

3     money, and those involved Mr. Moon for the CDOs, Mr. Priore for

4     the collateral manager, David Nissenbaum from Schulte Roth,

5     Mr. Garg for PRES, and Mr. Calamari for PRES, and they all

6     spoke about how PRES should be treated.

7          What Mr. Calamari found in the course of those

8     conversations — and this was not a matter of advice of counsel,

9     this was talking to a counterparty, because at this point, PRES

10    is a third party to the situation — what he found was that

11    there was agreement that PRES was entitled to incentive fees

12    from that settlement, and that they should be paid from the

13    trustee account before they were distributed to the CDOs.  That

14    is outside the waterfall.  Everybody agreed on that.

15         Now, there was also agreement that the provisions in

16    the engagement agreement stating PRES was to be paid through

17    the waterfall did not foreclose this.  The point of that

18    provision was to make sure that PRES got paid, not to be sort

19    of a gotcha for this type of situation to prevent them getting

20    paid.

21         And Mr. Calamari was looking out for PRES and wanted

22    to make sure that everything was documented and aboveboard, so

23    he wrote those three letters known as the clarification

24    letters.

25         THE COURT:  If everything was to be documented and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   aboveboard, why didn't he send them to the trustee?

2            MS. BEAUMONT:  Because it didn't require any action by

3   the trustee.  And, furthermore, remember, Mr. Calamari was at

4   PRES.  His relationship was not with the trustee; his

5   relationship was with the CDOs and the collateral manager.

6            So he was not in a position to write to the trustee.

7   Perhaps, in retrospect, maybe that could have been done, but he

8   was not the person to do it.  He was working for PRES.

9            And just as important, he was not in the position to

10  carry out what he described in his letters.  He was not the

11  person who controlled the attorney trust account.  That was

12  controlled by Mr. Moon, Mr. Priore.

13            THE COURT:  At the direction of the collateral

14  manager?

15            MS. BEAUMONT:  Correct, which at the time was

16  Mr. Priore's firm, ICP.

17            THE COURT:  But just barely, right?  I mean, it was

18  just barely still ICP?

19            MS. BEAUMONT:  I think the Court will find that the

20  SEC saw it otherwise when they approved the sale of ICP to

21  Triaxx Holdco the following year.  They did not view this as --

22  they viewed that as a momentous change.  They certainly did not

23  view PRES as the collateral manager.

24            So, after the payment of PRES's fees and others, tens

25  of millions of dollars flowed to the trustee, which distributed

1     them to the CDOs, and they flowed to the noteholders.  And

2     those payments showed up on the monthly note valuation reports.

3     And when they did, the trustee and the noteholders didn't ask

4     questions.  They simply accepted the fruits of PRES's hard work

5     and brainpower.

6                 And now --

7                 THE COURT:  How many tens of millions of dollars

8     actually flowed?

9                 MS. BEAUMONT:  On the first payment, it was

10    35 million.

11                THE COURT:  Okay.

12                MS. BEAUMONT:  And now the trustee and noteholders

13    want to take back PRES's compensation for that result, but,

14    make no mistake, they have no intention of giving up any of the

15    fruits that they received.  But PRES kept its part of the

16    bargain, and the CDOs should, too.

17                So let's talk briefly about how ICP became Triaxx

18    Asset Management.

19                So, in 2014, around the time the settlement payment

20    came in, Mr. Priore had some issues with the SEC, which has

21    nothing to do with what's going on in this case, but the SEC

22    wanted to replace ICP as the collateral manager.  And if ICP

23    went away, PRES's work might have to end just as it was

24    beginning to bear substantial fruit.

25                So, Mr. Garg had obtained an option to purchase ICP --

1            THE COURT:  Back in 2011?

2            MS. BEAUMONT:  Correct.

3            THE COURT:  Anticipating, perhaps, just such a turn of

4    events?

5            MS. BEAUMONT:  Exactly.  Protecting his investment.

6            And Mr. Garg and Mr. Calamari formed Triaxx Holdco,

7    and they decided that since Mr. Calamari had done RMBS

8    litigation at Quinn Emanuel, he would be the perfect person to

9    be the general counsel and chief compliance officer.  He didn't

10   get a salary, he got 45 percent of the company.  And as the

11   Court will see, that that has turned out to be not at all

12   lucrative for Mr. Calamari.  And even though Mr. Garg had the

13   right to buy --

14           THE COURT:  I think that's your five-minute warning.

15           MS. BEAUMONT:  Zoom through this.

16           So, Mr. Garg got a 55 percent interest in Triaxx

17   Holdco, and in January 2015, Triaxx Holdco purchased ICP Asset

18   Management, and its name was changed to Triaxx Asset

19   Management, and that name change was disclosed to the

20   noteholders at the time.  Mr. Garg's ownership interest in

21   Triaxx Holdco was disclosed to the noteholders in the same

22   notice, and the name of the collateral manager also changed in

23   the monthly reports.  And this relationship is also disclosed

24   annually in the Form ADV for Triaxx Asset Management.

25           So after -- I'm just trying to figure out what I can

1    cut through so I can get to the end here.

2            You will hear from John Moon about the process

3    thereafter for handling payments resulting from activist

4    litigation.  And the payments to PRES and others outside the

5    waterfall did not occur in secret.  They occurred with lots of

6    eyes on them, including multiple sophisticated law firms.  And

7    the process was used 11 times with PRES receiving payments on

8    only four of those occasions.

9            And, moreover, the emails will show that the trustee

10   knew long before filing this case in 2018 that the CDOs'

11   lawyers and service providers, including PRES, were receiving

12   payments outside the waterfall.

13           THE COURT:  With respect to the attorneys who were

14   receiving payments outside of the waterfall, how were those

15   payments -- what underlying contracts existed?  Did they have

16   contingency agreements?  Were they approved by the hour?  Who

17   decided how much to pay them?

18           MS. BEAUMONT:  I want to be careful because I want to

19   limit myself to what I know is going to be in evidence, and I

20   don't think that that information is going to be in evidence in

21   a comprehensive way.

22           THE COURT:  Well, if Mr. Moon knows the answer, it can

23   be in evidence.

24           MS. BEAUMONT:  It certainly can.  We don't have all

25   the engagement agreements, for example, so those will not be in

N4HKUSB1                        Opening - Ms. Beaumont

1    evidence.

2              THE COURT:  Okay.

3              MS. BEAUMONT:  So moving -- let me just say a brief

4    word about the advice-of-counsel defense.

5              So, there was a point at which there were a number of

6    unpaid invoices that were piling up, primarily because the

7    trustee's counsel, Alston & Bird, was at the head of the line

8    in receiving legal fees, and there were insufficient funds to

9    pay other administrative expenses as a result.  And Mr. Garg

10   makes clear to Mr. Calamari that PRES can't keep working

11   without getting paid.

12             So as he's done before, Mr. Moon prepared a package of

13   invoices for payment; he sends them to Mr. Brunekreef.  And

14   Mr. Brunekreef tells Mr. Calamari that he would like to get

15   some legal advice to make sure what he's about to do is

16   permissible.  He's done this before, but Mr. Calamari sets out

17   to get him what he needs, and --

18             THE COURT:  Why are they worried now if they weren't

19   worried before?

20             MS. BEAUMONT:  I don't know that we know about that.

21             But Mr. Calamari contacts Schulte Roth, which has for

22   many years represented the collateral manager and the CDOs, and

23   Craig Stein prepares a memo which sets forth his legal advice.

24   Now, the Court, as we have already heard, will hear from the

25   noteholders that in Mr. Stein's deposition in this case

N4HKUSB1                    Opening - Ms. Beaumont

1    five years after the fact, he testified that there were

2    limitations on that advice.  But those limitations aren't set

3    forth in his memo, and no one understood it that way because,

4    on the contrary, after receiving his legal advice,

5    Mr. Brunekreef approved the CDOs' payment of all the

6    outstanding invoices in Mr. Moon's package, including PRES's.

7            I'll just briefly touch on PRES's recommendation not

8    to sell the securities.  You're going to hear from Dr. Fang how

9    unorthodox and momentous that recommendation was.  It seems

10   kind of obvious in the rearview mirror, it's like telling

11   someone to buy Amazon stock, but that's not the case.

12           But just as PRES had foreseen, when those securities

13   were sold in 2017, their prices increased substantially more

14   than $700 million, and under the engagement agreements, PRES is

15   entitled to an incentive fee for that increase.

16           And the incentive fees on those invoices, by the way,

17   amount to less than 3 percent of the increase for which PRES is

18   responsible, and those are the invoices that brought us here

19   today.

20           THE COURT:  Let me ask you one more question, and I

21   will give you an extra couple of minutes --

22           MS. BEAUMONT:  I'd like 30 seconds.

23           THE COURT:  -- to tack on.

24           We heard a suggestion a moment ago that the

25   725 million that PRES is taking credit for making or saving for

1     the CDOs included retention transactions that were later deemed

2     violative of the indenture by judges in this court.

3             Is that correct?

4             MS. BEAUMONT:  For some of them, yes.  But let's be

5     clear — PRES's incentive fees are capped at $250,000, so to the

6     extent that those are --

7             THE COURT:  Per security.

8             MS. BEAUMONT:  Per security.

9             To the extent the securities were held onto and

10    continued to increase in value, which they did, every dollar

11    that increase above 250,000 went to the noteholders.  None of

12    that went to PRES.

13            THE COURT:  But if the securities had been sold, as a

14    judge of this court determined that they should have been, then

15    PRES would not have earned that fee?

16            MS. BEAUMONT:  I'm not sure we've reverse-engineered

17    it.  I think for some of them, they might --

18            THE COURT:  For some, they might have already earned

19    it?

20            MS. BEAUMONT:  No, there would have been an increase

21    at the time they were sold if they were sold when the judge

22    said they should have been sold.  I don't think we know that.

23            THE COURT:  Thank you.

24            MS. BEAUMONT:  So, as the Court will see, the CDOs

25    made a bargain back in 2011 that has turned out extremely well

1    for the CDOs and their noteholders.  And having received the

2    benefits of that bargain, the CDOs should keep the part that

3    was intended to benefit my clients, too.

4              And with that, we thank the Court for its time and

5    attention to this important case.

6              THE COURT:  Thank you very much.

7              MS. BEAUMONT:  I apologize to the court reporter.

8              THE COURT:  Mr. Court Reporter, can you go another

9    20 minutes for our last opening before our delayed morning

10   break?

11             (Pause)

12             THE COURT:  Mr. Rainer.

13             MR. RAINER:  Just one moment, your Honor.

14             (Pause)

15             MR. RAINER:  Good morning, your Honor.  As you know,

16   we are proud to represent the issuers in this case, the Triaxx

17   Prime CDOs 2006-1, 2006-2, and 2006-7.

18             The issuers have a small, very limited unique role in

19   this lawsuit.  The issuers are not asserting any claims for

20   damages or recovery against any other party, and no other party

21   is asserting any claim for damages or recovery against the

22   issuers.  Indeed, in your Honor's March 31, 2021 opinion and

23   order, the Court struck the trustee's attempts to bring a

24   damage claim, three of them, again the issuers because the

25   issuers are nonrecourse entities that cannot have personal

1    liability.

2           The real economic dispute in this trial is between, on

3    the one hand, TAM and Phoenix, or PRES, and, on the other hand,

4    the noteholders, PIMCO and Citi, aligned with the trustee.

5           So, why are the issuers here as parties in a five-day

6    trial amidst all of these attorneys?  As you will read in the

7    record, and as you will hear, there are three reasons.

8           As the issuer of the Triaxx notes and the principals

9    for which the collateral manager acts, the CDOs' interests will

10   be affected by the outcome of this case.  And going forward,

11   U.S. Bank wants the issuers to be bound by the Court's rulings.

12   Thus, the issuers are classic necessary parties.

13          Secondly, the issuers are here to demonstrate their

14   absolute contractual right under the indenture to have CDO

15   assets be used in part to pay the legal fees and expenses that

16   the issuers are incurring as we speak for participating in this

17   case, not because the issuers chose to participate, but because

18   the issuers are necessary parties.

19          In the noteholders' third round of objections lodged

20   with U.S. Bank, they have challenged this basic right.  And the

21   third reason we find ourselves here is that in making the

22   foregoing legal fees argument, the trustee and the noteholders

23   have made sweeping assertions about the issuers' directors

24   allegedly participating as virtual coconspirators with TAM and

25   Phoenix to allegedly abscond with the noteholders' money,

1    allegedly breaching various provisions of the indenture along

2    the way.  You just heard a preview of that narrative from the

3    noteholders' counsel, but we respectfully submit that the

4    evidence you will hear and the evidence you will read does not

5    support those contentions.

6              Your Honor has heard the trustee and noteholders speak

7    at length throughout this case about the issuers.  So what

8    exactly are the issuers?  And who are the directors of the

9    issuers?  The parties have stipulated to the following:  The

10   issuers are three special purpose vehicles incorporated in the

11   Cayman Islands in 2006 and in 2007 in connection with the

12   formation of these transactions.  The issuers have no

13   employees — never have, never will.  Each CDO shares with the

14   other two CDOs the same two common directors, and they have

15   since the inception of the deals.

16             THE COURT:  These two directors, which have been

17   changed out a few times, these two directors — just indulge me,

18   if you would — in my mind, when I hear about special purpose

19   Cayman Island entities, I am imagining — tell me whether I

20   should stop imagining this or not — that the two directors who

21   serve as the directors of the Triaxx issuers may well serve as

22   directors of numerous other special purpose entities; is that

23   correct?

24             MR. RAINER:  That is correct, that is correct.

25             THE COURT:  Okay.

1        MR. RAINER:  So the initial directors —

2   initial-initial directors, but for the relevant period of time,

3   let's start in 2009 — from 2009 until late 2009, so after the

4   engagement agreements were signed, after the clarification

5   letters were sent, and after the initial payments were made for

6   Mr. Moon's escrow account from a portion of the Countrywide

7   settlement recoveries, after all of that, so the period of time

8   from '09 through those events, the directors were Karen Ellerbe

9   and Mora Goddard of Walkers Global Services.  Along the way,

10  Intertrust acquired Walkers, and Ms. Ellerbe and Ms. Goddard

11  remained as directors.

12        From December of 2014 forward, there were different

13  directors, the directors who were in the positions through the

14  relevant events in this case.  Daniel Rewalt became a director

15  in December of 2014, and Evert Brunekreef became a director in

16  March of 2015.

17        THE COURT:  I've been wondering all week how his last

18  name is actually pronounced.  Do it again for me, would you?

19        MS. BEAUMONT:  Brunekreef, notwithstanding the double

20  E.

21        THE COURT:  Thank you.

22        MS. BEAUMONT:  Neither Mr. Rewalt, nor Mr. Brunekreef

23  was involved with the Triaxx CDOs prior to those dates.  Now,

24  you have heard --

25        THE COURT:  You have one set of directors on watch

1    while the engagement letters and the clarification letters were

2    being signed and another set on watch while much of the

3    objected-to cash flow was taking place?

4              MR. RAINER:  That is correct, your Honor.

5              THE COURT:  All right.

6              MR. RAINER:  You will read testimony, hear testimony,

7    from Mr. Brunekreef as the 30(b)(6) representative witness

8    testifying on behalf of the issuers for the full period of time

9    to the best of his abilities, and you will hear from other

10   witnesses talk about their interactions with Mr. Brunekreef.

11             Back to the issuers.  The CDOs issued notes to

12   investors like PIMCO and Citi.  The proceeds of that were used

13   to buy debt securities, which, in this case, were principally

14   RMBS, and the income stream that spun off of those securities

15   was used to pay the noteholders and the expenses of the

16   transaction.

17             THE COURT:  And then everything was turned over to the

18   trustee under the granting clause?

19             MR. RAINER:  Not everything.

20             THE COURT:  Not everything?

21             MR. RAINER:  Not everything, your Honor.  The issuers

22   continued to have obligations, and their granting clause

23   specifically carves out obligations as part of the grant.  And

24   I will get to the grant in a moment.

25             You will hear from Mr. Brunekreef's testimony that CDO

1    directors are mainly responsible for ensuring that the CDOs

2    comply with local Cayman law, registration filings, annual fee

3    filings, making sure that CDOs remain in good standing and

4    tax-exempt.  That's why they have Cayman vehicles through which

5    these investments are issued.

6         Under normal circumstances, to your earlier point, the

7    Cayman director, as described by Mr. Brunekreef, works from

8    several transactions, and he testified in a normal transaction

9    that doesn't require inordinate amounts of his time, he spends

10   up to 15 hours a year on the director responsibilities --

11        THE COURT:  For any one CDO?

12        MR. RAINER:  For one CDO.

13        Now, beyond that, he testified he spends additional

14   time on CDOs as needed on an ad hoc basis to address issues

15   that come up, and he's testified that certainly the Triaxx CDOs

16   are examples of that.

17        You will also read that Mr. Brunekreef described that

18   as entities with no employees, the CDOs entered into agreements

19   with the collateral manager to fully delegate or, as he called

20   it, outsource the day-to-day management of the collateral.

21   Those agreements are the collateral management agreements, or

22   the CMAs.  You will also learn that in the CMAs, the issuers

23   gave the collateral manager a power of attorney, a power of

24   attorney to carry out those daily duties in the name of the

25   issuer.  The CMAs' power of attorney provisions specifically

1    states that those powers include the right to sign and execute

2    agreements the collateral manager believes are in furtherance

3    of his general obligations as the collateral manager.

4            So to the earlier question about the engagement

5    letters that were signed by the collateral manager, Mr. Priore,

6    on behalf of the issuers, noteholders have mentioned

7    notwithstanding that, did the issuers ever express their

8    acceptance of the engagement letters, signed in 2011,

9    Mr. Brunekreef's testimony you were shown, I have no knowledge

10   of that.

11           I don't want to get into argument, but, your Honor,

12   the power of attorney makes it a red herring.  There was no

13   requirement of follow-up acceptance or ratification by the

14   directors for agreements signed pursuant to a power of attorney

15   by the collateral manager in the name of the issuer.

16           THE COURT:  Let me just make sure that I understand

17   what your position is with regard to, for example, the 2011

18   engagement letters.

19           I think you are telling me that since the management

20   of the collateral was, as your witness put it, outsourced to

21   the collateral manager, coupled with a power of attorney, that

22   the collateral manager could retain third parties on behalf of

23   the issuers, even if the issuers didn't know that that was

24   happening?

25           MR. RAINER:  Correct, correct.

1          Now, there are other requirements around those

2   agreements.  They need to comport with certain requirements.

3   On the technical issue of whether it could be executed and the

4   issuer could be bound by it, that's absolutely correct.  They

5   did not need to approve it in advance.

6          Now, it's not like it happened in a vacuum, and the

7   issuers and the directors didn't know about it.  They did, and

8   I will come to that in a moment.

9          THE COURT:  So ICP, and later TAM, could have, in your

10   view, entered into five times, ten times, fifteen times, paid

11   five times, ten times, fifteen times the fees that they did

12   agree to pay in the issuer's name and on the issuer's behalf

13   without any actual issuer director knowing about it or

14   approving it?

15          MR. RAINER:  As you framed the question, your Honor,

16   it raises the question of would ten or fifteen such agreements

17   comport with the collateral manager's obligations as collateral

18   manager under the CMAs.

19          THE COURT:  I am looking for the limiting principle

20   here, yes.

21          MR. RAINER:  I'm looking at the provision right here.

22   The power of attorney extends to the signature and execution

23   authority for any and all documents which the collateral

24   manager reasonably deems necessary or appropriate in connection

25   with its investment manager duties under this agreement — this

1    agreement, the CMA.

2              THE COURT:  So if the collateral manager steps over

3    the line, that's their problem, not your problem?

4              MR. RAINER:  Potentially, your Honor, yes.

5              THE COURT:  Okay.

6              MR. RAINER:  There's another affected delegation, if

7    you will, under -- rather duties under the agreement -- under

8    the indenture, which are day to day in nature and not the

9    responsibility of the issuers for these CDOs, and that's the

10   day-to-day function to use CDO funds to pay noteholders and to

11   pay CDO expenses and to issue monthly reports to noteholders.

12   Those responsibilities are outsourced to the trustee under the

13   indenture, under numerous provisions.

14             So to wind this up about who the issuers are and who

15   the directors are vis-a-vis the trustee and the collateral

16   management, the evidence will demonstrate that when it comes to

17   the relevant day-to-day activities of the issuers, matters

18   concerning the issuer's RMBS collateral and the administration

19   of payments of CDO funds, the issuers and directors, by design

20   under these agreements, had a very limited role.  Not an

21   uninvolved role, but a limited role.

22             THE COURT:  This may be in the pretrial materials I

23   received; I apologize if it was:  How much, and through what

24   mechanism, were the issuers paid for what, in a normal CDO,

25   might be 15 hours, a year's labor?

1          MR. RAINER:  They are paid in that priority of

2     payments waterfall that Mr. Lorenzo described, either at what

3     he called the second step or maybe even senior to that, but

4     high in the waterfall --

5          THE COURT:  I think in the first step, if I recall.

6          MR. RAINER:  There may be some steps we skipped.

7     Number 1 is to pay the taxes that are due.

8          THE COURT:  Right, always.

9          MR. RAINER:  But the issuer's fees under their

10    administration agreement, which also exist, are to be paid as

11    administrative expenses through the waterfall.

12         THE COURT:  How were those fees calculated?  How much

13    was paid?

14         MR. RAINER:  They are based -- I don't know offhand,

15    your Honor.  I think they are modest in amount, and they are a

16    function -- it's the same amount from period to period.  I

17    don't think it's a function of value of the collateral or

18    things of that nature.

19         THE COURT:  It's a fixed fee?

20         MR. RAINER:  I honestly don't know.

21         THE COURT:  Okay.

22         All right.  I distracted you from your presentation.

23         Give him a couple of extra minutes, please,

24    Ms. Almonte.

25         MR. RAINER:  As I said a moment ago, it's not as

1    though the engagement agreement happened without the issuers

2    knowing about it or some of these other events occurred without

3    the issuers knowing about it.  They didn't abdicate oversight

4    responsibility or keep their head in the sand.  They carried

5    out their duties and kept abreast of what's been termed the

6    activist litigation activities, as a general matter, by relying

7    upon the expertise of outside legal counsel.  To be precise,

8    outside U.S. legal counsel.  You will read testimony from

9    Mr. Brunekreef that he did not go to law school, and he is not

10   a layer, and he is certainly not familiar with U.S. law.

11           So when the CDOs encountered developments that gave

12   rise to unique circumstances, like those related to the onset

13   of the financial crisis and the demise of the RMBS collateral

14   in the transaction, the directors relied on the advice of U.S.

15   counsel to guide them.  There were at least four law firms

16   involved.  You'll hear from John Moon of Miller & Wrubel,

17   subsequently Olshan From.

18           Mr. Moon was litigation counsel to the issuers in the

19   activist litigations, engaged by the collateral manager on

20   behalf of the issuer.  Although there's an objection to it, we

21   will offer the engagement letter with Mr. Moon.  In August of

22   2011, Mr. Moon was retained to advise the issuers with respect

23   to what was then the Countrywide/Bank of America Article 77

24   proceeding, and this engagement covered subsequent litigations

25   that became what we call the activist litigations.

1           The evidence will show Mr. Brunekreef periodically

2      spoke with Mr. Moon, the collateral manager, to be kept

3      generally informed about those litigations.

4           THE COURT:  So he had no contractual or fiduciary

5      obligation to keep abreast of what the collateral manager was

6      doing in the issuer's name, but he did anyway?

7           MR. RAINER:  He did anyway.  Because I think you'll

8      hear testimony that Mr. Brunekreef asked a lot of questions and

9      wanted answers at times before he was comfortable that things

10     go forward.  And so, yes, the answer is yes.  I can't speak

11     completely to what Cayman law required of him as a Cayman

12     director, but those fiduciary-like qualities were certainly

13     demonstrated by him.  I would say, more importantly, I think

14     the evidence will show.

15          THE COURT:  You were telling me about four law firms.

16          MR. RAINER:  Sidley Austin.  Sidley Austin, you'll

17     hear testimony, was engaged to advise the directors in 2017

18     regarding the engagement of Phoenix.  They performed due

19     diligence on Phoenix and advised on the proposal that the

20     collateral manager enter into the agreement on behalf of the

21     issuers.

22          THE COURT:  Were they aware of all of the contracts

23     entered into in 2011?

24          MR. RAINER:  I do not think they were, your Honor.

25     I've seen nothing to suggest -- you mean the agreements; that

1    have been described between Mr. Garg and others?

2              THE COURT:  And Priore and the Priore entities.

3              MR. RAINER:  I don't think any evidence is going to

4    suggest they were aware of that.

5              THE COURT:  Thank you.

6              MR. RAINER:  Schulte Roth, the drafter and negotiator

7    of the indentures themselves and of the collateral management

8    agreements themselves, they advised both the issuers and the

9    collateral manager.  In 2014, they advised the issuers and the

10   collateral manager on the question of whether to use the

11   Countrywide settlement funds in John Moon's escrow account to

12   pay litigation support to providers, including Phoenix.

13             THE COURT:  So, in your view of life, Phoenix was just

14   a litigation support firm, like the guys who ran the ELMOs and

15   the outside e-discovery vendors and so forth?

16             MR. RAINER:  No, that's not what I meant to suggest at

17   all, your Honor.

18             They also gave advice in 2017 that we've already

19   talked about and your Honor's familiar with which culminated in

20   the Craig Stein memo of April 4, 2017.

21             In addition, Wilmer Hale advised the directors.  You

22   will hear the name Lori Martin, I suspect.  Lori Martin was the

23   partner at Wilmer Hale who had advised the directors beginning

24   in at least 2014.  First, independent advice to the directors

25   on whether monies in John Moon's trust account from the

1      litigation recoveries may be used to pay litigation expenses.

2      Thereafter, Ms. Martin received letters from John Moon

3      notifying Wilmer Hale that the collateral manager was about to

4      issue instructions for payments of various fees and expenses as

5      to which Ms. Martin consulted with and advised the directors.

6              In 2016 and '17, Wilmer Hale advised the directors on

7      the continued use of the Miller & Wrubel trust fund for

8      litigation purposes.

9              THE COURT:  Did Ms. Martin have a copy of Mr. Stein's

10     legal advice memo?

11             MR. RAINER:  Yes.

12             THE COURT:  Thank you.

13             MR. RAINER:  So the evidence will show that for the

14     decisions related to funding these litigation-related

15     activities, the issuers and the directors sought and obtained

16     the benefit of outside legal counsel.  You will hear that the

17     perception of Mr. Brunekreef is that he was careful, and he was

18     prudent, and he asked a lot of questions.

19             THE COURT:  Even though he didn't have to do any of

20     those things in your view of the world?

21             MR. RAINER:  Unless -- I think it's entirely possible,

22     your Honor, that under Cayman law, as a fiduciary for the

23     vehicles, that may have required him to do so.

24             THE COURT:  Okay.

25             MR. RAINER:  What I want to just wrap up quickly with

1   are two points which I won't belabor.

2           What I just described was the extent of the activity,

3   roughly, that you will see evidence of the issuers and the

4   directors involved.  Through that activity, the noteholders

5   have asserted a growing list of textual arguments from the

6   indenture and the collateral management agreement, why they

7   think along the way that these agreements were breached, new

8   theories that surfaced as recently as the proposed findings and

9   conclusions filed with your Honor three weeks ago.  I won't

10  object -- try to address all of them — we'll try to in due

11  course — but I'd like to give you an example of one such

12  argument.

13          THE COURT:  I'm going to probably have to limit you to

14  the one example.

15          MR. RAINER:  Very well.

16          THE COURT:  And then we'll take our morning break.

17          MR. RAINER:  The issuers are alleged to have breached

18  Indenture 7.7(a), and I think the broader proposition is that

19  the engagement agreements, initial engagement agreements, of

20  2011 with Phoenix are invalid because before the collateral

21  manager could sign those agreements on behalf of the issuers, I

22  understand the argument, the prior written consent of the

23  majority of the controlling class was required under 7.7(a).

24  And I believe it was slide 11 of the noteholders' counsel's

25  slide deck they showed you, where they simply excerpted

1  language from 7.7(a), but I certainly noticed that they cut off

2  the bottom of the paragraph, and I'd like to show you the whole

3  paragraph, if I could just briefly.

4          THE COURT:  You have to turn your machine on if you're

5  going to do that.

6          MR. RAINER:  Yes.

7          I think counsel was using Exhibit 3.  This is

8  Exhibit 1, another one of these substantially similar

9  indentures.

10          THE COURT:  Okay.

11          MR. RAINER:  There's the provision, 7.7(a),

12  performance of obligations.

13          Mr. Savla showed you this first part that says:  The

14  issuer or the coissuer may, with the prior written consent of a

15  majority of the controlling class and the hedge counterparties,

16  contract with other persons, et cetera.

17          What wasn't brought to your attention, your Honor — I

18  don't remember it in the slide — is this language right here:

19  The only agreements of the issuer that 7.7(a) requires receive

20  prior written approval of the majority of the controlling class

21  is an agreement with the third party for the performance of

22  actions and obligations to be performed by the issuer or the

23  coissuer hereunder.

24          In other words, if the issuer is responsible,

25  explicitly responsible, for something under the indenture, and

1    they want to offload that responsibility to a third party, so

2    that what the issuer is supposed to perform, the third party

3    will then perform, this provision requires prior written

4    consent of the majority of the controlling class.

5            THE COURT:  Well, if this was not -- if the work that

6    Phoenix did was not the performance of actions and obligations

7    to be performed by the issuer, then what was it?  Was it the

8    performance of actions and obligations to be performed by the

9    collateral manager?  In this case, you may get out of trouble,

10   but TAM gets into trouble.

11           MR. RAINER:  Our position, your Honor, is those -- is

12   effectively the latter.  The collateral management agreement

13   provided certain authorizations, a long list of them — among

14   them are Section 2(d) romanette xi — that gave the collateral

15   manager certain authorities to take actions it thought was in

16   the best interests of the noteholders.  And this is with

17   respect to the collateral.  Our view is that the activist

18   litigations seeking to either rehabilitate the collateral or

19   recover losses suffered on RMBS collateral were within the

20   ambit of that agreement.

21           So, therefore -- but, to be sure, to the point raised

22   by the noteholders about the validity or alleged invalidity, I

23   should say, of the agreement between the issuers and Phoenix,

24   this provision does not -- in our view, we don't think the

25   evidence shows that that agreement divests from the issuer

1     something it was supposed to be doing but for that agreement.

2           THE COURT:  Because in the noteholders' tandem

3     argument, as I understand it, is that if these engagement

4     letters contracted with Phoenix for the performance of actions

5     and obligations that would otherwise have been performed by the

6     collateral manager, then the collateral manager had to pay for

7     Phoenix out of its own pocket, which was empty at the time

8     because there were no fees coming into the collateral manager?

9           MR. RAINER:  I can't speak -- I think that's TAM's

10    argument, but I can't speak --

11          THE COURT:  No, I think that's PIMCO's argument.

12          MR. RAINER:  Yes.  I don't represent them either.

13          THE COURT:  Okay.

14          MR. RAINER:  Lastly, your Honor, I want to address the

15    legal fees argument, but, of course --

16          THE COURT:  You have 60 seconds on the legal fees.

17          MR. RAINER:  Okay.

18          THE COURT:  If I understand it from your pretrial

19    submissions, your view of life is that you're entitled to be

20    paid, in the first instance, out of the collateral, and if and

21    to the extent TAM is determined to have breached its various

22    fiduciary and/or contractual obligations, and therefore has an

23    indemnification obligation, basically it has to indemnify the

24    CDOs, but you will have already been paid?

25          MR. RAINER:  Correct.

1          THE COURT:  Am I getting that right?

2          MR. RAINER:  Yes, it says we shall be paid in the

3   first instance, and then --

4          THE COURT:  Well, it doesn't actually have those words

5   in it.

6          MR. RAINER:  Well, the indemnity they invoke is a

7   reimbursement provision, and there's case law --

8          THE COURT:  Normally read as reimbursing someone who

9   has had to pay their lawyers out of pocket?

10         MR. RAINER:  Correct.

11         Now, when the CDOs' assets are used to pay legal

12   counsel — my firm, for example — through the waterfall, that is

13   the use of the issuer's funds, it's CDO funds.  They've been

14   assigned to the trustee for security of all the noteholders,

15   but that effectively is going out of the issuer's pocket to pay

16   its law firm.  The argument made by the noteholders is that, in

17   the first instance, the funds have to come from the collateral

18   manager.  I will tell you that the grant assigns to the trustee

19   the issuer's powers under the collateral management agreement,

20   its rights and powers under the collateral management

21   agreement, so the assertion of that indemnity right, which we

22   don't submit even applies, is something the trustee has to

23   bring against TAM to recover the indemnity on our behalf.

24   We're nowhere near that.

25         THE COURT:  I think you're out of time.

1          MR. RAINER:  Thank you, your Honor.

2          THE COURT:  Thank you, all, very much.

3          Let us take a short late morning break.  I had hoped

4   it would be a midmorning break, but it is a late morning break.

5   Can we reconvene at 11:30 and get an hour of testimony in

6   before the lunch break.

7          Thank you, all, very much.  We will stand in recess.

8          (Recess)

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE DEPUTY CLERK:  We are now back on the record in

3     the matter of U.S. Bank National Association v. Triaxx Asset

4     Management, LLC, et al.  Case number 18 Civ. 4044.

5          THE COURT:  Mr. Lorenzo, do you have a witness?

6          MR. LORENZO:  My colleague Ms. Buckel.

7          THE COURT:  Ms. Buckel, do you have a witness?

8          MS. BUCKEL:  Your Honor, we would like to call

9     Mr. Kenneth Sliwa to the stand.

10         THE COURT:  Mr. Sliwa, please step forward.  Come up a

11    few more paces and stop so we can get you sworn in.

12         (Witness sworn)

13         THE DEPUTY CLERK:  Please state and spell your name

14    for the record.

15         THE WITNESS:  My name is Kenneth Sliwa.  K-E-N-N-E-T-H

16    S-L-I-W-A.

17     KENNETH SLIWA,

18        called as a witness by the Plaintiff,

19        having been duly sworn, testified as follows:

20    DIRECT EXAMINATION

21    BY MS. BUCKEL:

22    Q.  Mr. Sliwa, I am going to hand you --

23         Good morning, Mr. Sliwa.  Have you seen this document

24    in front of you?

25    A.  I have.

1    Q.  Is it a document that's entitled direct testimony of

2    Kenneth Sliwa?

3    A.  Yes.

4    Q.  Turning to the last page of the document on page 22.  Is

5    that your signature at the end?

6    A.  It is, yes.

7    Q.  It is dated March 9, 2023?

8    A.  That's correct.

9    Q.  Does this declaration constitute your direct testimony in

10   this action?

11   A.  It does.

12          MS. BUCKEL:  I move to introduce the direct testimony

13   of Kenneth Sliwa signed on March 9, 2023, into evidence.

14          THE COURT:  Mr. Sliwa's -- is it an affidavit or

15   declaration -- declaration will be accepted as his direct

16   testimony.  I will remind you to put on it on the docket at the

17   end of the day today.  Remember we decided to do that?

18          MS. BUCKEL:  Yes, your Honor.

19          THE COURT:  Thank you very much.  Is there

20   cross-examination?

21          MS. WITYK:  Permission to approach the witness?

22          THE COURT:  You may approach.

23          These very thick binders I see you passing around are

24   the exhibits you think you will use with Mr. Sliwa?

25          MS. WITYK:  It is an over-inclusive set, your Honor.

N4h3usb2                          Sliwa – Cross

1          THE COURT:  I don't think I have quite enough binders
2     up here.
3          I have of course Mr. Sliwa's direct testimony
4     declaration, and I now have your binder.  So, I think we're
5     ready to go.
6          MS. WITYK:  Great.  Thank you, your Honor.
7          THE COURT:  Give me a time estimate, if you would.
8          MS. WITYK:  I think I'll definitely be going through
9     lunch.  We'll have questioning after lunch as well.
10         THE COURT:  I've give you 50 minutes until 12:30 or
11    sometime near 12:30 where it is a good time to break, and then
12    I'll ask you again.
13         MS. WITYK:  Thank you, your Honor.
14         THE COURT:  Proceed.
15    CROSS-EXAMINATION
16    BY MS. WITYK:
17    Q.  Good morning, Mr. Sliwa.
18         You are employed at U.S. Bank, correct?
19    A.  Correct.
20    Q.  Your current title is a relationship manager?
21    A.  Correct.
22    Q.  You've been a relationship manager since 2010?
23    A.  Correct.
24    Q.  In that role, you develop and oversee the company's
25    relationship with collateral managers and other transaction

N4h3usb2                           Sliwa - Cross

1   parties and also oversee final monthly and quarterly reports?

2   A.  Correct.

3   Q.  You work on three collateralized debt obligations called

4   Triaxx Prime CDO 2006-1, Triaxx Prime CDO 2006-2, and Triaxx

5   Prime CDO 2007-1; is that right?

6   A.  Correct.

7   Q.  Throughout today I'll be referring to these as the Triaxx

8   CDOs or the CDOs.  Do you understand?

9   A.  Yes.

10  Q.  I may refer to them individually as 2006-1, 2006-2 and so

11  on.

12          And you've been the relationship manager for the CDOs

13  since 2010; is that right?

14  A.  I believe so.

15  Q.  You are familiar with an entity called Phoenix Real Estate

16  Solutions?

17  A.  I am familiar.

18  Q.  Sometimes Phoenix Real Estate Solutions have been called

19  ARAM Phoenix Real Estate Solutions?

20  A.  I believe so, yes.

21  Q.  I'll refer to this entity as PRES or Phoenix going forward.

22  Do you understand?

23  A.  Yes.

24  Q.  PRES performed work for the Triaxx CDOs?

25  A.  That's correct, yes.

N4h3usb2                         Sliwa - Cross

 1   Q.   PRES was engaged on behalf of each of the CDOs?

 2   A.   I don't know about the engagement or how it was determined.

 3             THE COURT:  I am having a little trouble understanding

 4   you.

 5             THE WITNESS:  I am not aware of how they were engaged.

 6   Q.   Mr. Sliwa, do you recall that your deposition was taken in

 7   this matter?

 8   A.   I'm sorry, what is the question?

 9   Q.   Do you recall that your deposition was taken?

10   A.   Yes.

11   Q.   Could you please open up the binder in front of you.  The

12   first tab is labeled May 5, 2022, Kenneth Sliwa transcript.

13   Can you go to that document.

14   A.   Yes.

15   Q.   Is this a copy of the deposition transcript from your

16   deposition?

17   A.   I believe so.

18   Q.   Could you please go to page 19.

19             MS. BUCKEL:  Is this the May 3rd or May 4th?

20             MS. WITYK:  The May 3.

21             THE COURT:  Is this page 19 of the transcript or page

22   19 of the printout?

23             MS. WITYK:  Page 19 of the transcript, your Honor.

24   Q.   Starting at line 19, do you see that I asked you:  Okay,

25   and Phoenix was engaged on behalf of each of the CDOs?  And

N4h3usb2                          Sliwa - Cross

1   then you answered:  I believe that is the case.

2   A.  Sorry.  Which 19?

3   Q.  Sure.

4   A.  I'm sorry.  Page 19 you said of this little box?

5   Q.  Yes, of the little boxes.

6   A.  Yeah, sorry.  Now I'm there.

7   Q.  I'll ask it again.  So do you see on page 19, starting at

8   line 19, I asked you:  Okay, and Phoenix was engaged on behalf

9   of each of the CDOs?  And you responded:  I believe that is the

10  case.

11  A.  We later found that out, that they were engaged, yes.

12  Q.  You knew about PRES' engagement by the Triaxx CDOs as early

13  as 2012?

14  A.  I do not recall when exactly we learned about them.

15  Q.  Could you please open your binder to the document marked

16  Trial Exhibit 3065, please.

17          THE COURT:  3065?

18          MS. WITYK:  Yes.

19          THE COURT:  Two-thirds of the way through.

20          THE WITNESS:  Got it.

21  Q.  Mr. Sliwa, do you recognize this as an e-mail thread from

22  October 8, 2012, on which you are included?

23          THE COURT:  When you use an exhibit other than a

24  deposition transcript, can you let me know whether it's on the

25  list that was previously admitted.

N4h3usb2                              Sliwa – Cross

1              MS. WITYK:  To be clear, this has not yet been

2    admitted into evidence.

3              THE COURT:  Thank you.

4    A.  Okay, I see the e-mail.

5    Q.  Your answer is yes, you do recognize this?

6    A.  No.  I don't recall this particular e-mail, but I see it

7    now.

8    Q.  It's an October 8th, 2012, e-mail on which you are

9    included?

10   A.  That appears to be correct, yes.

11             MS. WITYK:  At this time the TAM parties wish to move

12   this exhibit into evidence.

13             THE COURT:  Objection?  3065 is admitted.

14             (Joint Exhibit 3065 received in evidence)

15   Q.  Do you have any reason to doubt that you received this

16   e-mail, Mr. Sliwa?

17   A.  I do not.

18   Q.  The top e-mail in the chain is from Karen Ellerbe, correct?

19   A.  That's correct.

20   Q.  Ms. Ellerbe was a director of the CDOs?

21   A.  I believe so, that's correct.

22   Q.  She writes in that top e-mail, "Kenneth, I had a look back

23   at our files, and as ARAM was engaged as an agent of each of

24   the respective Triaxx entities, its fees are considered to be

25   administrative expenses."

1              Do you see that?

2    A.   I do.

3    Q.   ARAM is referring to PRES, right?

4    A.   Correct.

5    Q.   Mr. Sliwa, you never asked to see the contracts governing

6    PRES' work?

7    A.   That's not my responsibility.

8    Q.   You've never asked to see them; is that right?

9    A.   Not to my recollection.

10   Q.   Mr. Sliwa, you understand that lawsuits were brought on

11   behalf of the CDOs?

12   A.   Yes.

13   Q.   So I am going to refer to these as the activist litigation.

14   Do you understand?

15   A.   Yes.

16   Q.   At some point you learned from Thomas Priore that PRES was

17   doing work for the CDOs?

18   A.   Correct.

19   Q.   And Mr. Priore worked for ICP?

20   A.   I believe so.

21   Q.   And ICP was originally the collateral manager for the

22   Triaxx CDOs?

23   A.   I believe so, yes.

24   Q.   So please go to the document marked as Trial Exhibit 3066

25   which has already been received into evidence.

N4h3usb2                           Sliwa - Cross

1              THE COURT:  Thank you for that.

2    Q.  So, Mr. Sliwa, this is an e-mail exchange between you and

3    Marc Lessner at Angelo Gordon; is that right?

4    A.  I need one moment to read it.

5    Q.  Of course.

6              (Pause)

7    A.  Okay.

8    Q.  Mr. Sliwa, so this is an e-mail exchange between you and

9    Marc Lessner at Angelo Gordon, correct?

10   A.  They are several e-mails in here, but he is a part of this

11   chain.

12   Q.  You don't doubt you sent and received the e-mails in this

13   thread?

14   A.  Correct.

15   Q.  Please go to the page ending in Bates stamp 182.

16   A.  Okay.

17   Q.  And the bottom e-mail on this page is from Mr. Lessner to

18   you.  Do you see that?

19   A.  I do.

20   Q.  He asks what are these charges in Triaxx for ARAM Phoenix

21   invoice 7152014.  Do you see that?

22   A.  I do.

23   Q.  You responded the following day on October 3, 2014, ARAM

24   Phoenix is a service used by the CM to help him recover funds

25   on defaulted assets.

1              Do you see that?

2   A.   I do.

3   Q.   You believed at the time of your response that this

4   response was accurate.   Is that right?

5   A.   I'm sorry.   Repeat the question?

6   Q.   You believed at the time that your response to Mr. Lessner

7   was accurate?

8   A.   I believe so, yeah.

9   Q.   You didn't need to ask anyone who ARAM Phoenix was before

10  responding?

11  A.   I believe by that point, I had probably had discussions

12  with Mr. Priore who explained to me the purpose of the service.

13  Q.   You didn't need to ask anyone before you responded to

14  Mr. Lessner?

15  A.   I told him he could follow up with the CM himself if he has

16  questions.

17  Q.   My question was you didn't need to ask anyone who ARAM

18  Phoenix was before responding to Mr. Lessner?

19  A.   In this context, apparently not.   I don't recall the

20  details.

21  Q.   So is it fair to say at the time you responded to

22  Mr. Lessner, you knew about the work ARAM Phoenix was doing?

23  A.   I believe so.

24  Q.   So, at some point Mr. Priore had e-mailed you with an

25  explanation of what PRES was doing?

N4h3usb2                              Sliwa – Cross

1   A.  Correct.

2   Q.  Please turn to the document marked Trial Exhibit 3056 which

3   is not yet in evidence.

4            THE COURT:  3056?

5            MS. WITYK:  Yes.

6            THE COURT:  Thank you.

7   Q.  This is an e-mail chain on which you are included which is

8   dated September 1st, 2015.  Is that right?

9   A.  I'm sorry.  Give me a moment read it.

10  Q.  Of course.

11           (Pause)

12  A.  Okay.

13  Q.  So Mr. Sliwa, this is an e-mail chain on which you are

14  included, which is dated September 1st, 2015?

15  A.  Correct.

16           MS. WITYK:  At this time the TAM parties ask to move

17  this Exhibit 3056 into evidence.

18           THE COURT:  Any objection?  3056 is admitted.

19           (Joint Exhibit 3056 received in evidence)

20  Q.  Mr. Sliwa, do you have any reason to doubt that you

21  received Exhibit 3056?

22  A.  I do not.

23  Q.  On the first page of Exhibit 3056 near the bottom, please

24  take a look at the e-mail from Mr. Calamari to you where he

25  writes, "Hi, Ken, were you able to have a call with the issuer

N4h3usb2                         Sliwa - Cross

1   on the McKool invoice?  If so, how did it go."

2            Do you see that?

3   A.  I do.

4   Q.  Then you respond asking for "A more detailed description of

5   this expense."

6            Do you see that?

7   A.  I do.

8   Q.  Then Mr. Calamari responds it is the same nature as the

9   Miller Wrubel expenses.  They are law firm expenses that

10  generate multiple returns for funds based on litigation

11  recoveries for losses the trusts have suffered from 2008 to

12  present for breaches of reps and warranties by servicers.

13           Do you see that?

14           MS. BUCKEL:  Objection.  There is a slight

15  mischaracterization of the text quoted.

16           THE COURT:  Do you want to read it again, counsel.

17           MS. WITYK:  Sure.

18  Q.  Mr. Calamari writes:  It is the same nature as the Miller

19  Wrubel expenses.  They are law firm expenses that will generate

20  multiple returns for the funds based on litigation recoveries

21  for losses the trusts have suffered from 2008 to present for

22  breaches of reps and warranties by servicers.

23           THE COURT:  That looks right to me.  What's the

24  question?

25  Q.  I was asking if the witness saw that part of the --

N4h3usb2                          Sliwa – Cross

1    A.  Yes.

2    Q.  You had no reason to doubt Mr. Calamari's explanation.

3    A.  Correct.

4    Q.  Please turn to Trial Exhibit 3067 which is already in

5    evidence.

6             This is an e-mail from you to Steven Illingworth sent

7    on December 18, 2017, with an attachment.  Is that right?

8    A.  That's correct.

9    Q.  Any reason to doubt you sent this e-mail?

10   A.  No.

11   Q.  Mr. Illingworth was your manager at the time of this

12   e-mail?

13   A.  Correct.

14   Q.  You sent Mr. Illingworth a summary concerning 2006-1.

15   A.  Correct.

16   Q.  You were providing Mr. Illingworth with an update about

17   2006-1?

18   A.  Correct.

19   Q.  Now, please go to the page with ending Bates number 62 of

20   this exhibit.

21   A.  Okay.

22   Q.  The second paragraph of your summary includes information

23   about the work of PRES; is that right?

24   A.  Correct.

25   Q.  And at the time that you sent this to Mr. Illingworth, you

1    believed that what you were saying about the PRES engagement in

2    the second paragraph was accurate?

3    A.   Correct.

4    Q.   Staying on the same page of Exhibit 3067, a couple of

5    paragraphs down, you also note, "It is also important to note

6    that the three deals recently received a combined settlement

7    payment in regards to their case against BNY of $28 million

8    with additional settlements on the way."

9           Do you see that?

10   A.   I do.

11   Q.   At the time that you sent this summary to Mr. Illingworth,

12   this was an accurate statement?

13   A.   I believe so.

14   Q.   Mr. Sliwa, in your declaration at paragraph 38, you state

15   that "Prior to the filing of this action, U.S. Bank did not

16   understand that a portion of these recoveries were being held

17   in accounts other than those established under the indentures

18   or the payments were being distributed directly out of

19   recoveries instead of three the priority of payments

20   waterfall."

21           THE COURT:  What paragraph?

22           MS. WITYK:  Paragraph 38, your Honor.

23   A.   I see the paragraph.

24   Q.   Now, please turn in your binder to what's been marked for

25   identification as Trial Exhibit 3078.  It has not been

N4h3usb2                        Sliwa - Cross

1   introduced into evidence.

2           Mr. Sliwa, this is an e-mail and attachment from Lori

3   Martin to you dated December 8, 2014?

4   A.  That's correct.

5           MS. WITYK:  At this time the TAM parties would like to

6   move this Exhibit 3078 into evidence.

7           THE COURT:  Objections?  3078 is admitted.

8           (Joint Exhibit 3078 received in evidence)

9   Q.  Mr. Sliwa, so Ms. Martin was counsel for the CDOs'

10  directors; is that right?

11  A.  I believe so, yes.

12  Q.  Ms. Martin's cover e-mail says to you:  As we discussed

13  earlier today, the attached letter and exhibits detail the

14  disbursement from the $69 million -- sorry -- $69 million

15  litigation recovery.

16          Do you see that?

17  A.  I do.

18  Q.  And it was not typical for you to be communicating with

19  counsel for the CDOs' directors?

20  A.  Typically not.

21  Q.  You state in paragraph 73A of your declaration:  It is my

22  understanding that I was given this document -- referring to

23  Exhibit 3078 -- not to approve or review, but as backup for

24  distribution of recoveries to the CDOs.

25          THE COURT:  78?  What paragraph did you say?

1          MS. WITYK:  73A, your Honor.

2     A.  Correct.  At the time I was given the document not to

3     review it, but to help allocate funds that we received.

4     Q.  But Ms. Martin's cover e-mail does not include this

5     limitation that you are describing in your declaration.

6     A.  No, because she's not aware of what my responsibilities

7     are.

8     Q.  Her cover e-mail doesn't include that limitation, correct?

9     A.  Correct.

10    Q.  You also state in paragraph 73A of your declaration that

11    you do not remember speaking to Ms. Martin.

12    A.  I do not, no.

13    Q.  Let's please look at the attachment which starts on the

14    second page of Exhibit 3078.

15          Do you ordinarily read e-mails sent to you by issuers'

16    counsel?

17    A.  Where are we?

18    Q.  On the second page of the same exhibit.

19    A.  Okay.

20    Q.  Mr. Sliwa, do you ordinarily read e-mails sent to you by

21    issuers' counsel?

22    A.  They are reviewed, typically, yes.

23    Q.  You believe you probably looked at this attachment at the

24    time?

25    A.  I couldn't tell you.

N4h3usb2                         Sliwa - Cross

Q.  Please go to the front of your binder to the first document

which is the deposition transcript from May 3.  Please turn to

page 104 of the transcript.

          Do you see at page 104, starting at line 19 I asked

you:

"Q.  Do you have any reason to doubt that you reviewed it?"

And you responded:  "I can only say I probably looked at it, I

don't know whether I inspected it."

A.  I see that.

Q.  Please look back to Trial Exhibit 3078.  Turning to page 2

of that exhibit.  This is a letter from John Moon to

Ms. Martin; is that right?

A.  It appears to be.

Q.  Mr. Moon wrote in the bullet point on page 1 of his letter,

"On or about October 21, 2014, the sum of $69 million was

transferred into a custodial account at Wells Fargo Bank."

          Do you see that?

A.  I do.

Q.  Then he referred to this $69 million as the first recovery?

A.  Okay.

Q.  And the Wells Fargo custodial account Mr. Moon refers to

here is not an account that was controlled by the trustee.

A.  Correct.

Q.  And you don't recall discussing the Wells Fargo account

with anyone at the time that you received this letter?

N4h3usb2                              Sliwa - Cross

1    A.  I do not.

2    Q.  But you believe you discussed the Wells Fargo account with

3    counsel about a year later?

4    A.  That sounds about right.

5    Q.  So that would be, that would put us at the end of 2015?

6    A.  I believe so, yes.

7    Q.  I'm sorry?

8    A.  I believe so, yes.

9    Q.  Now, on the second page of Mr. Moon's letter, there is a

10   heading titled recommendations.  Do you see that?

11   A.  I do.

12   Q.  Under recommendations, Mr. Moon wrote, "We hereby notify

13   you that the collateral manager will issue the attached

14   instruction to M&W and KR to take the following actions with

15   respect to the first recovery."

16           Do you see that?

17   A.  I do.

18   Q.  Then underneath there is a chart showing that certain

19   amounts will be transferred to each of the three CDOs.  Is that

20   right?

21   A.  Correct.

22   Q.  And on the third page of Mr. Moon's letter, Mr. Moon

23   recommended that $11.75 million be transferred to ARAM Phoenix

24   Real Estate Solutions Ltd.

25           Do you see that?

N4h3usb2                          Sliwa - Cross

1    A.  I do.

2    Q.  He also recommended that certain amounts be transferred to

3    M&W.  Do you see that?

4    A.  I do.

5    Q.  He also recommended that certain amounts be transferred to

6    Warner Partners?

7    A.  I do.

8    Q.  Excuse me.  Werner Partners?

9    A.  Correct, yes.

10   Q.  Also recommended that certain amounts be transferred to

11   Schulte, Roth & Zabel.

12   A.  Correct.

13   Q.  And he's also recommending that approximately $14 million

14   be reserved for the, quote, KR disputed fees?

15   A.  Okay.

16   Q.  And he is also recommending that $13.5 million be reserved

17   for funds restrained at ICP, et al. v. Triaxx.  Do you see

18   that?

19   A.  I do.

20   Q.  Mr. Moon's letter goes on to state, "The collateral manager

21   will issue the attached instruction on November 25, 2014,

22   unless we receive instructions from the directors otherwise."

23   Do you see that?

24   A.  I'm sorry.  I do, yes.

25   Q.  Now could you please go to the instruction which is on the

1    page ending in Bates number 84 of Exhibit 3078.

2    A.  I see it.

3    Q.  So this instruction is unsigned; is that right?

4    A.  That is correct.

5    Q.  Now, the collateral manager did in fact sign the

6    instruction?

7    A.  I'm not certain.

8    Q.  Please go to the document marked as Trial Exhibit 3079

9    which is already in evidence.

10           Mr. Sliwa, this is a signed copy of the instruction we

11   were just reviewing; is that right?

12   A.  It appears so.

13   Q.  This document has a Bates stamp starting with U.S. Bank

14   underscore?

15   A.  Correct.

16   Q.  Please go to the document marked as Trial Exhibit 3080

17   which is already in evidence.

18   A.  Okay.

19   Q.  Now I'll represent to you this is an extract of the

20   metadata produced by U.S. Bank when it produced the document in

21   Exhibit 3079.

22           My question is the metadata lists you as a custodian.

23   Do you see that?

24   A.  I do.

25   Q.  It also shows that the document date is December 9, 2014?

N4h3usb2                         Sliwa - Cross

1   A.  I see that.

2              THE COURT:  The last modified date?

3              MS. WITYK:  There's a doc date which is about five

4   rows down from the top, your Honor.  That's what I was

5   referring to.

6              THE COURT:  Thank you.

7   Q.  Mr. Sliwa, you never told Ms. Martin it was improper for

8   PRES to be paid the $11.75 million from the first recovery.

9   A.  So for the first recovery, again, we were only there to

10  distribute the funds we received.  We are not an auditor.  We

11  are not there to inspect.  This work was done outside of the

12  deals.  We are not part of these arrangements or discussions.

13  What we were given the document for is for the distribution of

14  funds for the individual deals.  So I don't recall if I had

15  further discussions with Ms. Martin or not beyond what we see

16  in these e-mails.

17  Q.  So, my question to you was you never told Ms. Martin it was

18  improper for PRES to be paid the 11.75 million from the first

19  recovery.

20  A.  I don't recall having those discussions with her.

21  Q.  You never told your contacts at the Triaxx CDOs that it was

22  improper for PRES to be paid the 11.75 million from the first

23  recovery?

24  A.  Again, we were there to inspect the instructions.

25  Q.  You never told your contacts at the Triaxx CDOs that it was

N4h3usb2                          Sliwa – Cross

1    improper for PRES to be paid the $11.75 million from the first

2    recovery?

3    A.  I don't recall having said that.

4    Q.  You never told Mr. Moon that it was improper for PRES to be

5    paid the $11.75 million from the first recovery?

6    A.  I don't recall having those discussions.

7    Q.  You did not tell the collateral manager that the $11.75

8    million payment to PRES was improper?

9    A.  I don't recall having discussions.

10   Q.  You never discussed with anyone the payment of any of the

11   other service providers listed in the instructions at Exhibit

12   3079?

13   A.  No, I did not.  Again, they are not asking me to make

14   payments.  So once we heard what they are trying to do, we told

15   them they can't make payments outside the waterfall.  But at

16   this point in time, it was missed what they were doing.

17   Q.  So at the time that you received the instruction, you never

18   discussed with anyone the payment of the other service

19   providers listed in the instruction?

20   A.  I don't believe so.

21   Q.  You never told anyone it was improper for the other service

22   providers to be paid directly from the first recovery?

23   A.  Again, I didn't realize the payments were going out, or,

24   again, there could have been court orders or numerous

25   circumstances that allowed them do that.  But we were not asked

1   to review or provide any comments on what they were doing.

2   Q.  So you never told anyone it was improper for the other

3   service providers to be paid directly from the first recovery?

4   A.  I don't recall, no.

5   Q.  At this time you assumed there were legitimate expenses

6   that were allowing these payments to be made?

7   A.  They were passing expenses through the deals for their

8   work.

9   Q.  I am not sure if you understand my question.  My question

10  is at the time, you assumed that these payments to the service

11  providers were legitimate expenses that were allowed to be

12  paid?

13          THE COURT:  I am not sure I understand the question.

14  Are you getting that phrase "legitimate expenses" from the

15  exhibit?

16          MS. WITYK:  No, I am getting it from Mr. Sliwa's prior

17  testimony which I'm happy to show.

18          THE COURT:  Okay.

19  Q.  Mr. Sliwa, please go to the first tab in the binder which

20  is your deposition transcript from May 3, and please go to page

21  122.

22  A.  Okay.

23  Q.  So, on page 22 starting at line 15, do you see that I asked

24  you:  Did you ever tell anyone it was improper for the other

25  service providers referenced here to be paid from the first

1   recovery?  And you answered:  No, I assumed that this was

2   agreed upon and was legitimate expenses that they were allowed

3   to pay.

4            Do you see that?

5   A.  I do.

6   Q.  This understanding about legitimate expenses was based on

7   your review of Mr. Moon's proposed instructions at Exhibit

8   3078.  Is that right?

9   A.  I'm sorry.  Ask the question again?

10  Q.  Your understanding that these were legitimate expenses were

11  based on your review of Mr. Moon's proposed instructions?

12  A.  Correct.  I assumed the parties were working in the

13  confines of the governing documents, so I assumed that the

14  payments were legitimate.

15  Q.  In late 2015, you sought legal advice about whether it was

16  proper for these other service providers to be paid directly

17  from the first recovery?

18  A.  Say it one more time please?

19  Q.  In late 2015, you sought legal advice about whether it was

20  proper for the other service providers to be paid directly from

21  the first recovery?

22  A.  Do you have that correspondence I could see?

23           THE COURT:  You can just tell her whether you remember

24  it or not.  If you don't, I'm sure she'll help you out.

25  A.  I don't recall that.

N4h3usb2                         Sliwa – Cross

1   Q.  Please go to page 123 of your deposition transcript.  If

2   you read starting at line 13 through 21 to yourself, and I'll

3   ask the question again.

4   A.  Okay.

5   Q.  Did that refresh your recollection, Mr. Sliwa?

6   A.  Yes.

7   Q.  So in late 2015, you sought legal advice about whether it

8   was proper for the other service providers to be paid directly

9   from the first recovery.

10  A.  Correct.

11          THE COURT:  Can I have clarification of the question.

12  You used the phrase "other service providers."  Do you mean

13  Phoenix and the others listed in the exhibit we just looked at

14  or do you mean those other than Phoenix?

15          MS. WITYK:  Other than Phoenix, your Honor.

16          THE COURT:  Thank you.

17  Q.  Mr. Sliwa, please turn to the document marked Trial Exhibit

18  3081 which is already in evidence.

19          Mr. Sliwa, this is an e-mail thread on which you were

20  included dated March 9, 2015.

21  A.  Correct.

22  Q.  Do you have any reason to doubt that you received this?

23  A.  I'm sorry.  I want to read through it.

24  Q.  Okay.

25          Do you have any reason to doubt that you received this

N4h3usb2                          Sliwa – Cross

1     e-mail?

2     A.   No.

3     Q.   Mr. Moon wrote in the first sentence of the e-mail, "We are

4     going to have another substantial recovery come in for the

5     three Triaxx funds."

6               Do you see that?

7     A.   I do.

8     Q.   Then a few sentences down he wrote, "I will propose draft

9     distribution instructions to the directors for approval."

10              Do you see that?

11    A.   I do.

12    Q.   Now you understood distribution instructions to mean

13    instructions for distributing incoming recoveries?

14    A.   Correct.

15    Q.   Mr. Moon then writes, "Therefore, I would ask that when the

16    recovery arrives, please notify me and I will start that

17    process in motion."

18              Do you see that?

19    A.   I do.

20    Q.   You don't recall responding to Mr. Moon's e-mail?

21    A.   I couldn't tell you, no.

22    Q.   You didn't tell Mr. Moon that you disagreed with what he

23    was proposing?

24    A.   I don't remember the specific time frames that I remember

25    discussing with internal counsel about it's best to receive the

1    funds they are offering to provide, and determining how to

2    treat the funds once we received them.

3    Q.  My question was you didn't tell Mr. Moon that you disagreed

4    with what he was proposing?

5    A.  I couldn't tell you.

6    Q.  You couldn't tell me because?

7    A.  I don't remember.

8    Q.  I'm sorry?

9    A.  I don't remember having that conversation.

10   Q.  You didn't tell him what he was proposing was improper?

11   A.  Again, I don't recall having the conversation with him.

12   Q.  You didn't speak to anyone about what Mr. Moon was

13   proposing at this time?

14   A.  He wasn't really proposing much at this time.  Until we

15   receive specific instructions and received funds, he can

16   actually say what he wants.  There is no really follow up with

17   it until there is some actionable details.

18   Q.  You didn't speak to anyone about Mr. Moon's e-mail at the

19   time?

20   A.  I don't recall.

21   Q.  You didn't seek legal advice about this e-mail from

22   Mr. Moon at the time?

23   A.  I don't recall.

24   Q.  Please turn to the document marked Trial Exhibit 3082 which

25   is already in evidence.

1            Mr. Sliwa, the first e-mail in this chain is an e-mail

2    from Mr. Moon sent to you August 5, 2015.  Is that right?

3    A.  I want to read the e-mail.

4    Q.  Of course.

5    A.  I see it.

6    Q.  Any reason to doubt you received this e-mail?

7    A.  No.

8    Q.  Mr. Moon writes, "Thank you for taking the time to discuss

9    recoveries yesterday."

10           Do you see that?

11   A.  I do.

12   Q.  It was unusual for you to be speaking with Mr. Moon; is

13   that right?

14   A.  I believe so.

15   Q.  Then Mr. Moon writes, "Just to recap for the benefit of

16   your team, Triaxx will be receiving three recoveries and

17   perhaps more in the future."

18           Do you see that?

19   A.  I do.

20   Q.  Then two sentences down, he writes, "For each of those

21   recoveries, I will be sending you a written instruction on

22   behalf of Triaxx and its directors allocating moneys among the

23   three Triaxx funds and certain service expenses."

24           Do you see that?

25   A.  I do.

1    Q.  Mr. Sliwa, so you state in paragraph 63 of your declaration

2    that it wasn't clear to you what Mr. Moon meant when he

3    referred to service expenses.

4    A.  I'm sorry, where is that?

5    Q.  In paragraph 63 of your declaration.

6    A.  I see it.

7    Q.  You didn't ask Mr. Moon what service expenses referred to?

8    A.  I do not believe so.

9    Q.  At this time you weren't concerned with what Mr. Moon was

10   writing about the allocation and distribution of funds?

11   A.  I don't remember the exact timing, but internal counsel was

12   involved around this.  At this point in time we decided that it

13   was best to keep the funds or take in the funds so we could

14   allocate it according to the governing documents.  So at this

15   point we were waiting for further instructions as well as the

16   funds to come in to determine how to treat them.

17   Q.  My question was you weren't concerned with what Mr. Moon

18   was writing about the allocation and distribution of funds?

19   A.  There was concern, yes.

20   Q.  There was concern?

21         Please go to your deposition transcript from May 3

22   which is the first document in the binder.

23   A.  Where?

24   Q.  The first document in the binder, your deposition

25   transcript.  When you're there, please go to page 135 of the

1    transcript.

2    A.   Okay.

3    Q.   So beginning at line 8 on page 135, I asked you:

4    "Q.   So then you weren't concerned with the issues that

5    Mr. Moon was writing about with respect to allocation?

6    "A.   I can't say that.  Obviously, I didn't follow up with

7    questions, so I wasn't concerned at the time."

8    A.   I see that.

9    Q.   If we could please go back to Exhibit 3082 that we were

10   just looking at.

11   A.   Okay.

12   Q.   So back to Mr. Moon's e-mail, he wrote, "Until you receive

13   the written instruction, please do not place recovery moneys

14   into the waterfall."

15        Do you see that?

16   A.   I do.

17   Q.   Mr. Sliwa, you didn't immediately tell Mr. Moon this was

18   improper?

19   A.   I do not recall.

20   Q.   You didn't speak to anyone about whether that was improper?

21   A.   Again, timing, I believe I involved internal counsel but

22   I'm not quite clear on the timing.

23   Q.   So is it your testimony that you do believe you spoke to

24   someone about whether it was improper?

25   A.   I believe -- I know we had conversations about this, again,

1    when I got internal and external counsel involved.  I don't

2    recall the specific time frame.

3    Q.  You testified earlier that you discussed with counsel in

4    late 2015.  Is that the conversation you're referring to right

5    now?

6    A.  I'm not sure which reference you are referring to.

7    Q.  Earlier today you testified that after receiving the letter

8    from Ms. Martin, that you discussed with counsel in late 2015.

9    I'm trying to understand if that's the same conversation you

10   are referring to here.

11   A.  I'm not sure.

12   Q.  Please go to your deposition transcript.  Go to page 136,

13   please.

14   A.  Okay.

15   Q.  Now starting at line 6, on page 136 I asked you:

16   "Q.  Did you speak to anyone about whether it was improper to

17   not immediately place recovery moneys into the waterfall?

18   "A.  I do not recall.  No."

19   A.  Okay.

20   Q.  So Mr. Sliwa, you didn't speak to anyone about Mr. Moon's

21   request?

22            MS. BUCKEL:  Objection.  That's a mischaracterization

23   of his testimony.

24            THE COURT:  I think I have the point, Ms. Wityk, that

25   when he received this particular e-mail in August, he can't

1    recall whether he spoke to lawyers, and there is inconsistent

2    testimony about whether he was concerned.

3            MS. WITYK:  I'll move on, your Honor.

4    Q.  Please turn to the document marked as Trial Exhibit 3083

5    which is not yet in evidence.

6            THE COURT:  3028 was already in evidence?  I neglected

7    to make a note.

8            MS. WITYK:  It was already in evidence, your Honor.

9            THE COURT:  Thank you.  And 3083 is not yet in

10   evidence.

11           MS. WITYK:  Correct, your Honor.

12           THE COURT:  Thank you.  I note it's 12:23, so if at

13   some point in the next 10 to 15 minutes you can find a good

14   stopping point, please take that opportunity.

15           MS. WITYK:  Okay.

16   Q.  Mr. Sliwa, this is an October 26, 2015, e-mail from

17   Mr. Brunekreef to you?

18   A.  Correct.

19           MS. WITYK:  The TAM parties would like to move this

20   Exhibit 3083 into evidence.

21           THE COURT:  Objections?  3083 is admitted.

22           (Joint Exhibit 3083 received in evidence)

23   Q.  Mr. Sliwa, you have no reason to doubt that you received

24   this e-mail; is that right?

25   A.  Correct.

1   Q.  Mr. Brunekreef is a director of the issuers?

2   A.  He was, yes.

3   Q.  Now, Mr. Brunekreef wrote in the second sentence of this

4   e-mail "We discussed with the collateral manager to set off

5   potential future expenses against proceeds from litigations

6   where possible."

7   A.  Okay.

8   Q.  And at paragraph 73B of your declaration, you state that at

9   the time you received this e-mail, you "did not fully

10  understand what Mr. Brunekreef meant by set off potential

11  future expense against proceeds from litigations."

12  A.  Correct.

13  Q.  Now, at the time you received this e-mail, you didn't ask

14  Mr. Brunekreef what he meant by this phrase?

15  A.  I don't recall.

16  Q.  I'm sorry?

17  A.  I don't recall follow conversations.

18          MS. WITYK:  I know it's been less than 10 minutes, but

19  this would be a good breaking point if that works.

20          THE COURT:  I think we will all be happy to take our

21  lunch break now.

22          Mr. Sliwa, you are not to discuss your testimony or

23  the facts of this case with counsel or others during the lunch

24  break, and you will still be under oath when you return after

25  lunch.

N4h3usb2                          Sliwa – Cross

1              THE WITNESS:  Yes, your Honor.

2              THE COURT:  So we will be in recess.  Let's give

3    ourselves an extra seven minutes.  We will be in recess until

4    1:30 p.m.  Thank you all very much.

5              (Recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N4HKUSB3

                        AFTERNOON SESSION

                            1:33 PM

1              (In open court; trial resumed)

2              THE COURT:  I see that Mr. Sliwa is back on the

3    witness stand.

4              You are still under oath, as you know.

5              Ms. Wityk, I neglected to get your time estimate

6    before we broke for lunch.  What does it look like?

7              MS. WITYK:  Right now, your Honor, I anticipate going

8    until the next break, which I believe is in 90 minutes, is

9    that?

10             THE COURT:  Roughly.

11             Does that mean we are going to be able to conclude

12   with this witness today?

13             Let me get some cross-exam estimates.  My concern is,

14   as you know, counsel, we have five days, and I have a list of

15   eight live witnesses, so I'm getting a little nervous.  What is

16   the cross-examination estimate, if any, for the noteholders,

17   for Mr. Sliwa.

18             MR. LAURIELLO:  Your Honor, 15 minutes or so.

19             THE COURT:  Okay.  Do the issuers have anything?

20             MR. RAINER:  Not at this time.

21             THE COURT:  So it will just be, Ms. Wityk, 15 minutes,

22   and then any redirect from U.S. Bank, correct?

23             I'm going to hold you to the 90 minutes, though,

N4HKUSB3

                        AFTERNOON SESSION

                            1:33 PM

             (In open court; trial resumed)

             THE COURT:  I see that Mr. Sliwa is back on the

witness stand.

             You are still under oath, as you know.

             Ms. Wityk, I neglected to get your time estimate

before we broke for lunch.  What does it look like?

             MS. WITYK:  Right now, your Honor, I anticipate going

until the next break, which I believe is in 90 minutes, is

that?

             THE COURT:  Roughly.

             Does that mean we are going to be able to conclude

with this witness today?

             Let me get some cross-exam estimates.  My concern is,

as you know, counsel, we have five days, and I have a list of

eight live witnesses, so I'm getting a little nervous.  What is

the cross-examination estimate, if any, for the noteholders,

for Mr. Sliwa.

             MR. LAURIELLO:  Your Honor, 15 minutes or so.

             THE COURT:  Okay.  Do the issuers have anything?

             MR. RAINER:  Not at this time.

             THE COURT:  So it will just be, Ms. Wityk, 15 minutes,

and then any redirect from U.S. Bank, correct?

             I'm going to hold you to the 90 minutes, though,

N4HKUSB3                          Sliwa – Cross

1   Ms. Wityk.  I think I have to get firm.

2              MS. WITYK:  Understood, your Honor.

3              THE COURT:  So at 3:06, you will be done.

4              MS. WITYK:  Okay, your Honor.

5              THE COURT:  You may proceed.

6              MS. WITYK:  Thank you, your Honor.

7   KENNETH SLIWA,

8   CROSS-EXAMINATION CONTINUED

9   BY MS. WITYK:

10  Q.  Mr. Sliwa, please turn in your binder to the document

11  marked Trial Exhibit 3084, which is already in evidence.

12             THE COURT:  This is in evidence?

13             MS. WITYK:  Yes, your Honor.

14             THE COURT:  Thank you.

15  BY MS. WITYK:

16  Q.  Mr. Sliwa, this is an email thread that includes you; is

17  that right?

18  A.  I'm sorry, I'm just finishing reading it.

19  Q.  Oh, of course.

20             (Pause)

21  A.  Okay.

22  Q.  If you could please look at the first email on the thread,

23  which actually begins on the second page of the exhibit.

24  A.  Yes.

25  Q.  We looked at this first email from August 5, 2015, a little

N4HKUSB3                          Sliwa - Cross

1    earlier.

2              Do you remember that?

3    A.  Yes.

4    Q.  In the next email up, which was sent January 12, 2016,

5    Mr. Moon wrote that $35 million is going to be deposited any

6    minute.  That amount needs to be held so that it can be

7    allocated among the service providers and the trusts.

8              Do you see that?

9    A.  I do.

10   Q.  So, Mr. Moon was telling you not to put the $35 million

11   through the waterfall?

12   A.  I'm not sure what his intention was by the comment.

13   Q.  Okay.  Please go to the first document in your binder,

14   which is your transcript, and then go to page 141 of your

15   deposition transcript.

16             THE COURT:  I have a housekeeping suggestion.  I am

17   going to take your deposition transcript out of my binder and

18   keep it handy.  You might want to do the same because I have a

19   feeling we'll be seeing it a few more times.

20             THE WITNESS:  Yes, your Honor.

21             MS. WITYK:  That makes sense, your Honor.

22             THE WITNESS:  I'm sorry, where?

23   BY MS. WITYK:

24   Q.  That's okay.

25             Page 141 of your deposition transcript.

1           Starting at line 21, I asked you:  All right.  So
2    Mr. Moon was instructing you not to put the $35 million through
3    the waterfall?
4           And you answered:  Okay.
5    A.  I see that.
6    Q.  And Mr. Moon was telling you that the funds had to first be
7    allocated to the service providers and the trusts?
8    A.  I didn't read -- I don't recall reading that, but that's
9    what it says.
10   Q.  Well, feel free to look back at the exhibit.  It's Trial
11   Exhibit 3084.
12          I'll ask the question again.  Mr. Moon was telling you
13   that the funds had to first be allocated to the service
14   providers and the trusts; is that right?
15   A.  It says what it says there.
16   Q.  So later that day, you forwarded Mr. Moon's email to others
17   at U.S. Bank; is that right?
18   A.  Yes.
19   Q.  And you also copied outside counsel for U.S. Bank?
20   A.  Correct.
21   Q.  And outside counsel was Adam Smith of Alston & Bird?
22   A.  That's correct.
23   Q.  In your email to others at U.S. Bank and Alston & Bird, you
24   write, "Please be aware we will be receiving $35 million
25   deposit that will be allocated to the three Triaxx deals.  We

1    will also receive additional instructions once the funds hit

2    the accounts to make required payments to various third

3    parties."

4              Do you see that?

5    A.  I do.

6    Q.  The third parties were the service providers Mr. Moon

7    referred to in his email?

8    A.  I believe so.

9    Q.  You then wrote, "Munkh/Joseph, please let me know when the

10   funds hit the account so I can communicate this to John."

11             Do you see that?

12   A.  I do.

13   Q.  And Munkh was the deal administrator at the time?

14   A.  He was Joseph's manager.

15   Q.  And then who was Joseph?

16   A.  He was the deal administrator working the deal.

17   Q.  At the time of this email, you saw no issue with what

18   Mr. Moon said in his email?

19   A.  I was just waiting to receive the funds to determine how to

20   treat them.

21   Q.  So at the time of this email, you saw no issue with what

22   Mr. Moon said in his email?

23   A.  Again, I was waiting to receive the funds and further

24   instructions.

25   Q.  Please look at your deposition transcript on page 145.

N4HKUSB3                          Sliwa - Cross

1    A.  Okay.

2    Q.  Starting at line 10, I asked you:  And so at that point,

3    you saw no issue with the suggestions that Mr. Moon was making

4    in his original email to you?

5            And you answered:  Not that I can tell from the email.

6    A.  Okay.

7    Q.  Please turn to the document marked Trial Exhibit 3085,

8    which is already in evidence.

9            Mr. Sliwa, this is an email thread forwarded to you on

10   February 5, 2016.

11   A.  One second.  Let me read the email.

12           (Pause)

13   A.  Okay.

14   Q.  So this is an email thread forwarded to you on February 5,

15   2016?

16   A.  That's correct.

17   Q.  Please go to the first email in this thread, which appears

18   on the second page of Exhibit 3085.

19           So this email indicates that you were out of the

20   office between January 15th and February 9th, 2016; is that

21   right?

22   A.  Yes.

23   Q.  And your out-of-office notification advises that people

24   should contact Dikran Terian for immediate requests?

25           (Pause)

1    Q.  I'll ask the question again.

2              Your out-of-office notification advises that people

3    should contact Dikran Terian for immediate requests?

4    A.  Yes.

5    Q.  And Mr. Terian was another relationship manager at the

6    time?

7    A.  Correct.

8    Q.  And Mr. Terian was covering for you while you were out of

9    the office?

10   A.  Correct.

11   Q.  So, staying on the second page of Exhibit 3085, on

12   January 15th, Mr. Moon forwarded your out-of-office

13   notification to Mr. Terian and tells him, "I have been working

14   with Ken on a payment of approximately $35 million that our

15   client, three Triaxx funds, is receiving from BNY Mellon.  It

16   should be arriving anytime.  Please let me know when it is

17   received as the director of the Triaxx will issue an

18   instruction for its distribution.  Pending the action, do not

19   put the funds into the waterfall."

20              Do you see that?

21   A.  I do.

22   Q.  So please go to the first page of Exhibit 3085.

23              Now, Mr. Terian sent Mr. Moon's requests to

24   Mr. Radnaabazar --

25              That's the person you referred to before as Munkh,

1    right?

2    A.  No.  His first name is Jimmy Ron.  Munkh is a separate

3    individual.

4    Q.  Sorry, I'm looking at the email on the bottom of the first

5    page of Trial Exhibit 3085.  It looks like the bottom email

6    says from Dikran Terian, and then it says to John Moon and also

7    the email address munkherdene.radnaabazar.

8             Do you see that?

9             THE COURT:  You better spell that.

10   Q.  The email is M-u-n-k-h-e-r-d-e-n-e.R-a-d-n-a-a-b-a-z-a-r.

11   A.  Yes, like most of them.

12   Q.  So Mr. Terian sent Mr. Moon's request to Mr. Radnaabazar,

13   right?

14   A.  Correct.

15   Q.  And then he writes:  Munkh, can you confirm with John once

16   the funds come into Triaxx Prime 2006-1.

17            Do you see that?

18   A.  I'm sorry, where?

19            THE COURT:  It's at the very bottom of the first page

20   of 3085.

21            THE WITNESS:  I see it.

22   BY MS. WITYK:

23   Q.  So Mr. Terian was complying with Mr. Moon's request?

24   A.  I cannot tell you.

25   Q.  Please look at your deposition transcript on page 147.

N4HKUSB3                          Sliwa - Cross

 1   Starting at line 19, I asked you:  So Mr. Terian appears to be

 2   complying with Mr. Moon's request, correct?

 3          You answered:  It appears so.

 4   A.  Okay.

 5   Q.  On February 5th — I'm going back to Exhibit 3085.  On

 6   February 5th, Mr. Moon wrote to Mr. Terian and others:  "I

 7   understand that the 35 million is getting wired in next week.

 8   Please be on the lookout for it and let me know when it

 9   arrives."

10          Do you see that?

11   A.  I do.

12   Q.  And then Mr. Terian then forwarded that email thread to you

13   on February 5th?

14   A.  Okay.

15   Q.  Do you see that?

16   A.  I do.

17   Q.  After you returned to the office, you didn't speak with

18   Mr. Moon about the email exchange at Exhibit 3085?

19   A.  I do not recall.

20   Q.  And the trustee did not tell Mr. Moon that his suggestion

21   was improper?

22   A.  I do not recall.

23   Q.  And you didn't tell Mr. Moon that you were not complying

24   with his request to hold the funds outside the waterfall?

25   A.  I don't recall.

N4HKUSB3                         Sliwa - Cross

1    Q.  Please turn to the document marked Trial Exhibit 3086,

2    which is not yet in evidence.

3            Now, this is a June 24, 2016 email thread on which you

4    were included?

5    A.  Okay.

6            MS. WITYK:  The TAM parties ask to move Trial

7    Exhibit 3086 into evidence.

8            THE COURT:  Any objection?

9            Exhibit 3086 is admitted.

10           (Trial Exhibit 3086 received in evidence)

11   BY MS. WITYK:

12   Q.  On the first page of Exhibit 3086, in the bottom email,

13   Mr. Moon wrote to you, "Ken, this follows several

14   communications that we have had about payments totaling

15   approximately $36 million, plus or minus, that we expect

16   U.S. Bank will receive this coming Monday.  As we have

17   discussed, it is important that the funds be placed in a

18   suspension account rather than being placed into the waterfall,

19   as Triaxx will provide instructions about disbursement of

20   certain amounts."

21           Do you see that?

22   A.  I do.

23   Q.  And you responded, several hours later, "John, thank you

24   for the heads-up and have a good weekend."

25           Do you see that?

1    A.  I do.

2    Q.  So you don't recall speaking with other members of your

3    team about Mr. Moon's request?

4    A.  I don't recall.  I mean, in February, they were supposed to

5    send the 35 million.  It never happened.  So, again, we wait

6    until we receive the funds and further instructions.

7    Obviously, this conversation has been had a couple of times in

8    the past.  So until we receive the actual funds and proper

9    instructions, we didn't see why to bring it up further.

10   Q.  So you don't recall speaking with other members of your

11   team about Mr. Moon's request?

12   A.  I don't recall.

13   Q.  And you don't recall speaking with your manager about

14   Mr. Moon's request?

15   A.  I may have.  I'm not sure.

16   Q.  Please go to your deposition transcript at page 152.

17              Starting at line 18, I had asked you:  Outside of

18   these emails -- excuse me, outside of those emails, did you

19   have discussions with your manager about the requests?

20              And you responded:  I do not recall.

21   A.  Okay.

22   Q.  Now, at paragraph 65 of your declaration, you stated you,

23   quote, "do not remember discussing this email with Mr. Moon."

24   A.  Okay, I see it.

25   Q.  You also state at paragraph 65 of your declaration that

1   what you do remember -- excuse me, that what you do remember is

2   not understanding what Mr. Moon meant; is that right?

3   A.   That's what it says, yes.

4   Q.   So you didn't tell Mr. Moon that you needed to immediately

5   put the money through the waterfall?

6   A.   I don't recall having that discussion.

7   Q.   You didn't tell Mr. Moon that it was improper to disburse

8   funds before putting them through the waterfall?

9   A.   Again, I don't recall that, having the conversation.

10  Q.   Please turn to the document marked Trial Exhibit 3087,

11  which is already in evidence.

12          This is an email thread from June 27, 2016, on which

13  you are included?

14  A.   I'm just going to read it.

15          Okay.

16  Q.   This is an email thread from June 27, 2016, on which you

17  are included?

18  A.   Correct.

19  Q.   Please go to the first email in the chain, which is on the

20  second page of the exhibit.

21  A.   Okay.

22  Q.   You wrote to Steven Fiorella, "The deal should be receiving

23  a $36 million wire today.  Please let me know when this comes

24  in and send me the exact amount."

25          Do you see that?

N4HKUSB3                          Sliwa - Cross

1    A.  I do.

2    Q.  So, here, you're complying with Mr. Moon's request that you

3    tell him when the funds arrive?

4              MS. BUCKEL:  Objection; mischaracterization.

5              THE COURT:  Please state the question again.

6    BY MS. WITYK:

7    Q.  So you're complying with Mr. Moon's request that you tell

8    him when the funds arrive?

9              THE COURT:  I'll allow it.  You may answer.

10             THE WITNESS:  As far as I can tell, I was just asking

11   to be notified myself as there was no further instruction here

12   of what I was going to do.

13   BY MS. WITYK:

14   Q.  Please take a look at your deposition transcript at

15   page 154.

16   A.  Okay.

17   Q.  Starting at line 4, I asked you:  All right.  So you're

18   complying with Mr. Moon's request to tell him when the funds

19   arrive?

20             And you answered:  It appears so, yes.

21   A.  Okay.

22   Q.  Please turn to the document marked Trial Exhibit 3088,

23   which is already in evidence.

24             This is a June 30, 2016 email from you to Mr. Moon; is

25   that right?

1    A.  One second, please.

2              Okay.  Sorry, what was the question?

3    Q.  This is a June 30, 2016 email from you to Mr. Moon?

4    A.  Correct.

5    Q.  In the email on the first page of this exhibit, you confirm

6    to Mr. Moon that the trustee received these funds that were

7    referenced in Exhibit 3087?

8    A.  Okay.

9    Q.  Is that right?

10   A.  I believe that's the case.

11   Q.  Please turn to the document marked Trial Exhibit 3089,

12   which has not yet been received into evidence.

13             Mr. Sliwa, this is a July 5, 2016 email thread on

14   which you were included along with an attachment; is that

15   correct?

16   A.  Correct.

17             MS. WITYK:  The TAM parties would ask to move Trial

18   Exhibit 3089 into evidence.

19             THE COURT:  Any objection?

20             3089 is admitted.

21             (Trial Exhibit 3089 received in evidence)

22   BY MS. WITYK:

23   Q.  The bottom email on the first page of Exhibit 3089 is from

24   Mr. Moon to you.

25             Do you see that?

1    A.  I do.

2    Q.  So Mr. Moon wrote, "Please find attached instructions from

3    the collateral manager of Triaxx.  Please provide me with wire

4    instructions for the Triaxx account at U.S. Bank so that we may

5    send you $743,693.47 from our client escrow account to be

6    combined with the $34,256,306.53 already in your possession for

7    distribution to Triaxx."

8            Do you see that?

9    A.  I do.

10   Q.  So Mr. Moon references approximately 743,000 in a client

11   escrow account; is that right?

12   A.  Correct.

13   Q.  And at this time, the trustee understood the client escrow

14   account Mr. Moon was referencing was not an account the trustee

15   controlled?

16   A.  That's why the email was forwarded on to internal counsel.

17   Q.  So at this time, the trustee understood the client escrow

18   account Mr. Moon was referencing was not an account the trustee

19   controlled?

20   A.  We didn't know the specifics about the account, but,

21   clearly, something seemed off, so we escalated to internal

22   counsel.

23   Q.  Mr. Sliwa, do you recall being deposed in this matter in

24   your capacity as the 30(b)(6) designee for U.S. Bank?

25   A.  Yes.

N4HKUSB3                          Sliwa - Cross

1    Q.  So the transcript from that deposition is in front of your

2    binder.  I think it is now the first tab because we took out

3    the other transcript.

4    A.  Okay.

5            Sorry, which section?

6    Q.  So this is the transcript from your deposition as a

7    30(b)(6) designee from May 4, 2022; is that right?

8    A.  I believe so.

9    Q.  I didn't hear you.

10   A.  I believe so.

11   Q.  Please go to page 88.

12           Starting at line 6, I asked you:  At this time,

13   U.S. Bank understood that the client escrow account Mr. Moon is

14   referencing was not one that it controlled, correct?

15           And you answered:  I believe that was the case, yes.

16   A.  Okay.

17   Q.  Now, at paragraph 67 of your declaration, you state that

18   you "did not understand what money would be in such account."

19           THE COURT:  Hold on one minute.

20           (Pause)

21           THE COURT:  "Such account" referring to the client

22   escrow account?

23           MS. WITYK:  Correct.

24           THE COURT:  Got it.

25           THE WITNESS:  Yes.

N4HKUSB3                          Sliwa - Cross

1   BY MS. WITYK:

2   Q.  Now, if you could refer back to your May 4th deposition

3   transcript.  That's the one where you were the 30(b)(6)

4   designee.  Starting on page 86, at line 23, I asked you:  Is it

5   correct that U.S. Bank understood these were moneys related to

6   the activist litigations?

7          You answered:  They appeared to be -- they would

8   appear to have been, yes.

9   A.  Okay.

10  Q.  So, the approximately $743,000 were funds belonging to the

11  CDOs?

12  A.  I wasn't sure.

13  Q.  So please go to the -- I'm sorry, this is confusing with

14  two transcripts now, but please go to the May 3rd transcript,

15  when you were deposed in your personal capacity --

16  A.  Okay.

17  Q.  -- at page 156.

18  A.  Got it.

19  Q.  So starting at line 16, I asked you:  And this

20  approximately $743,000 were funds belonging to the CDOs?

21          And you answered:  I believe that's what he's

22  implying, yes.

23  A.  Okay.

24  Q.  So you don't recall telling Mr. Moon it was improper for

25  funds belonging to the CDOs to be kept in what Mr. Moon called

N4HKUSB3                          Sliwa - Cross

1   a, quote, "client escrow account"?

2   A.   I do not recall having that conversation.

3   Q.   So, as you noted, you forwarded this email to outside

4   counsel?

5   A.   Correct.

6   Q.   And, in particular, Adam Smith of Alston & Bird?

7   A.   Correct.

8           THE COURT:  Forwarded the chain at 3089?

9           MS. WITYK:  Yes, your Honor.

10          THE COURT:  Okay.

11  BY MS. WITYK:

12  Q.   So, Mr. Sliwa, after receiving this July 5th, 2016 email at

13  Exhibit 3089, you do not recall anyone for the trustee asking

14  Mr. Moon why these funds were in a client escrow account?

15  A.   I do not recall, no.

16  Q.   Could you please take a look at the instructions that

17  Mr. Moon attached to his email, and that will be on the page

18  with Bates number ending 506.

19  A.   I'm sorry, which exhibit is this?  This right here?

20  Q.   Yes.

21  A.   Okay.

22  Q.   So, in your declaration, you say that you spoke to counsel

23  about this instruction?

24  A.   Correct.

25  Q.   You state at paragraph 68 of your declaration that you and

1   your counsel, quote, "agreed that this was improper under the

2   terms of the indentures"?

3   A.  I believe so, yes.

4   Q.  Your understanding is that at some point, someone told

5   Mr. Moon that U.S. Bank couldn't make these payments to PRES?

6   A.  Well, that we could not -- the funds we received would be

7   distributed through the waterfall.

8   Q.  So my question was:  Your understanding is that at some

9   point, someone told Mr. Moon that U.S. Bank couldn't make these

10  payments to PRES?

11  A.  I guess somebody would have to tell him that, yes.

12  Q.  And you believed that -- what was the reason given for why

13  that payment could not be made?

14  A.  Again, I did not have that discussion with him.  The only

15  discussion that I passed along would be that the funds could

16  not be distributed -- had to be distributed through the

17  waterfall and they could not be held in a suspense account.  So

18  we responded that since payments had to go through the

19  waterfall, they retracted their directions.

20  Q.  I'm sorry, did you convey that message to Mr. Moon?

21  A.  I believe an email was sent out.

22  Q.  By whom?

23  A.  By myself.

24  Q.  Please go to the May 3rd deposition transcript and go to

25  page 162, please.

1   A.   Okay.

2   Q.   So, starting at 162, line 25, I asked you:  Okay.  Do you

3   know of any conversations with the collateral manager about

4   U.S. Bank not being able to distribute these payments to

5   Phoenix?

6           And you answered:  I do not recall if there was a

7   direct -- if I had a direct discussion with him or not.

8   A.   That's referring to the payments to Phoenix, the payments

9   through the waterfall.

10  Q.   I'm sorry, say that again?

11  A.   These are payments to Phoenix.  I was referring to payments

12  through the waterfall.

13  Q.   I'm sorry, I'm not understanding the distinction.  Because

14  we were talking about payments to PRES made outside of the

15  waterfall, I guess I'm not following your answer.

16  A.   It continued my earlier statement, but if you want to speak

17  specifically to whether or not the payments to Phoenix were

18  covered in the discussion, I'm not sure of that specific

19  aspect, but we did tell them they couldn't make -- that

20  payments that we received would have to go through the

21  waterfall.

22  Q.   Okay, I follow what you're saying.

23          And your testimony is that you believe that you

24  reached out to Mr. Moon or the collateral manager?

25  A.   Correct for that.

N4HKUSB3                              Sliwa – Cross

1    Q.  Please turn to the document marked Trial Exhibit 3090,

2    which is already in evidence.

3              This is an email thread between you and Ross Feldman

4    from July 6, 2016; is that right?

5    A.  That is correct.

6    Q.  Mr. Feldman was from Cerberus Capital?

7    A.  Correct.

8    Q.  And he told you that Cerberus was a large holder of bonds

9    in 2016, too?

10   A.  That's correct.

11   Q.  And in his initial email, which appears on the second page

12   of Exhibit 3090, Mr. Feldman was asking you about settlement

13   payments?

14   A.  Correct.

15   Q.  So please go to the first page of Exhibit 3090.

16             On July 6, 2016, in the top email of this chain, you

17   wrote, "Ross, I can't talk about any payments that are not

18   listed in the reports.  However, settlement payments are not

19   treated the same as standard interest or principal

20   distributions on an underlying bond.  There are other

21   considerations that need to be addressed before the funds can

22   be released."

23             Do you see that?

24   A.  I do.

25   Q.  Please turn to the document marked Trial Exhibit 3091,

1   which is already in evidence.

2              This is a July 7, 2016 email from you to Mr. Calamari;

3   is that right?

4   A.  Correct.

5   Q.  You sent this July 7, 2016 email the day after the email

6   exchange with Mr. Feldman that we just saw at Exhibit 3090?

7   A.  That's correct.

8   Q.  You wrote to Mr. Calamari, "We are starting to field a

9   number of calls regarding the settlement payments, so I just

10  wanted to see if we could get on a quick call to discuss what

11  the next steps are."

12             Do you see that?

13  A.  I do.

14  Q.  At this point, noteholders were contacting you about

15  settlement payments?

16  A.  Correct.

17  Q.  And they asked you questions about where your large

18  distributions were coming from?

19  A.  Correct.

20  Q.  You then wrote, "At this point, I will have external legal

21  on as these deals are obviously under the spotlight at this

22  time."

23             Do you see that?

24  A.  I do.

25  Q.  So the deals were "obviously under the spotlight" because

1    you had been receiving calls from noteholders?

2    A.  I assume that's part of it, yes.

3    Q.  And your reference to "external legal" was to Alston &

4    Bird?

5    A.  That's correct.

6    Q.  So at paragraph 70 of your declaration, you state:  So

7    following this email at Exhibit 3091, you, quote, "informed the

8    collateral manager that U.S. Bank could not make the payment to

9    Phoenix as instructed because all payments had to be

10   distributed through the priority payments waterfall"; is that

11   right?

12   A.  I'm sorry, where was that?

13   Q.  I'm sorry.  Paragraph 70 of your declaration.

14   A.  Okay.

15   Q.  And then if you go to the May 3rd deposition transcript, at

16   page 172 --

17              THE COURT:  Is this impeachment, counsel?

18              MS. WITYK:  It is, your Honor.

19   Q.  Page 172, starting at line 4, I asked you:  All right.  Did

20   you end up having a call with Mr. Calamari?

21              You responded:  I do not recall.

22   A.  Correct.

23   Q.  Please turn to the document marked Trial Exhibit 3092,

24   which is already in evidence.

25              Now, this is a July 12, 2016 email from you to

1    Mr. Calamari; is that right?

2    A.  Correct.

3    Q.  Now, in the second sentence of the second paragraph, you

4    wrote, "The report reflects our understanding that you have

5    retracted the instruction letter from July 5th and that all

6    proceeds received in respect of the Countrywide settlement are

7    to be distributed as detailed in the attached reports."

8            Do you see that?

9    A.  I do.

10   Q.  Now, the July 5 instruction refers to the instruction to

11   pay PRES and legal counsel from the settlement recoveries that

12   we looked at in Exhibit 3089; is that right?

13   A.  I don't remember specifics, but...

14   Q.  Feel free to look at 3089.

15   A.  Yes.  So the email is referring to the instructions

16   received from them.

17   Q.  At Exhibit 3089?

18   A.  Correct.

19   Q.  So your email to Mr. Calamari in Exhibit 3092 doesn't say

20   that the July 5 instruction violated the indentures?

21   A.  The email does not say that.

22   Q.  So please turn to Trial Exhibit 1118, which is already in

23   evidence.

24           THE COURT:  Give me a minute.

25           I have it.  I'm not sure Mr. Sliwa has it yet.

1              THE WITNESS:  I have found it.

2              THE COURT:  All right.  We have found it.

3     BY MS. WITYK:

4     Q.  Mr. Sliwa, this is a July 18, 2016 email from you to

5     Mr. Brunekreef; is that right?

6     A.  It is.

7     Q.  And you were sending Mr. Brunekreef a copy of the July 5th

8     instruction?

9     A.  I just need one second.

10    Q.  Sure.

11              (Pause)

12    A.  Okay.  All right.

13    Q.  So you wrote to Mr. Brunekreef, "However, upon further

14    discussion, it was determined that the full $34 million in

15    proceeds was to be distributed under the Triaxx indentures and

16    the instructions were withdrawn."

17              Do you see that?

18    A.  I do.

19    Q.  So you didn't tell Mr. Brunekreef why it was determined

20    that the funds would be distributed this way?

21    A.  I do not recall.

22    Q.  In this email, you are not telling Mr. Brunekreef why it

23    was determined that the funds would be distributed this way?

24    A.  Not in this email.

25    Q.  So at paragraph 38 of your declaration, you state that

1  prior to the filing of this action, the trustee did not

2  understand that a portion of settlement payments were held in

3  accounts other than those established by the indentures.

4          Is that right?

5  A.  I'm sorry, let me read section 38.

6          (Pause)

7  A.  Repeat the question, please.

8  Q.  Sure.

9          At paragraph 38 of your declaration, you state that

10 prior to the filing of this action, the trustee did not

11 understand that a portion of settlement payments were held in

12 accounts other than those established by the indentures?

13 A.  That is correct.

14 Q.  At paragraph 73 of your declaration, you also state, "I now

15 realize that there were a few other times where information was

16 provided to me via email that referred to sums of money

17 improperly held outside of the CDO accounts."

18         Is that right?

19 A.  Where in 73?

20         THE COURT:  This is still in your affidavit.

21         THE WITNESS:  Oh.

22         I apologize.  I'm sorry, referring to this testimony?

23 BY MS. WITYK:

24 Q.  I'm looking at your direct testimony, Mr. Sliwa, at

25 paragraph 73.

1    A.  Okay, yeah.

2            Okay.  Sorry, question again, please?

3    Q.  Sure.

4            My question was:  Is that your testimony?

5    A.  Yes, it is.

6    Q.  So this information was provided to you before the case was

7    filed?

8    A.  Which information?

9    Q.  So at paragraph 73 of your declaration, you said that:  I

10   now realize that there were a few other times where information

11   was provided to me via email, and then it goes on.

12           So my question is:  This information that you're

13   referring to was provided to you before this case was filed,

14   right?

15   A.  Correct.

16   Q.  And that information was provided to you multiple times?

17   A.  There was information provided to me at various points,

18   yes.

19   Q.  So more than once?

20   A.  Not necessarily the same topic, but I'd have to go back and

21   look at specifics.

22   Q.  The information was provided to you multiple times; is that

23   right?

24   A.  Information was provided to me at different points in time.

25   Q.  Multiple times?

N4HKUSB3                              Sliwa - Cross

1    A.  I'm not sure.  I can't confirm it's the same information or

2    not.

3    Q.  Let's take a look at your declaration.

4            In 73(a), you acknowledge that information was emailed

5    to you from Ms. Martin on at least one occasion?

6            THE COURT:  73(a)?

7            MS. WITYK:  73(a).

8            THE COURT:  Okay.

9            THE WITNESS:  Okay.  So section (a) is referring to a

10   single email?  Sure.

11   BY MS. WITYK:

12   Q.  So this information was emailed to you from Ms. Martin on

13   at least one occasion?

14   A.  It appears to be, yes.

15   Q.  And this information was emailed to you from Mr. Brunekreef

16   on at least three occasions?

17           MS. BUCKEL:  Objection.  That's mischaracterizing his

18   testimony here.

19           THE COURT:  I'll allow the question.

20           THE WITNESS:  Without seeing the specific

21   correspondence, I can't confirm that it was the same

22   information.

23           THE COURT:  I think counsel is referring to the emails

24   referenced in subparagraphs (b), (c), and (d) --

25           MS. WITYK:  That's correct, your Honor.

1          THE COURT:  -- of your direct testimony.

2          THE WITNESS:  So since I don't know -- I can't

3  remember the exact content of these particular emails, I can't

4  confirm whether or not it's the same information.

5  BY MS. WITYK:

6  Q.  You're not denying that the emails that you described in

7  subparagraphs (b), (c), and (d) of 73 were provided to you?

8  A.  Correct.

9  Q.  And this information was emailed to you from Mr. Calamari

10  on at least one occasion, as reflected in paragraph 73(e) of

11  your declaration?

12          MS. BUCKEL:  Objection.  It's a mischaracterization.

13          THE COURT:  I'll allow the question.

14          THE WITNESS:  Again, Mr. Calamari had emailed me on

15  March 1st, 2017, but I don't know if the content was the same

16  as the other emails.

17  BY MS. WITYK:

18  Q.  But you do acknowledge getting this email described at

19  paragraph 73(e) of your declaration?

20  A.  I believe I saw it before, yes.

21  Q.  Please turn to the document marked Trial Exhibit 3093,

22  which is already in evidence.

23          This is an email chain forwarded to you by Adam Smith

24  on November 30, 2015; is that right?

25  A.  Sorry, just one second?  I want to read it.

N4HKUSB3                              Sliwa - Cross

1    Q.  Sure.

2              (Pause)

3    A.  All right.

4    Q.  This is an email chain forwarded to you by Adam Smith on

5    November 30, 2015?

6              THE COURT:  So we're going back in time a little bit

7    now?

8              MS. WITYK:  Yes.

9              THE COURT:  All right.

10             THE WITNESS:  Okay, yes.

11   BY MS. WITYK:

12   Q.  Do you have any reason to doubt that you received it?

13   A.  No.

14   Q.  And Mr. Smith is an attorney at Alston & Bird, correct?

15   A.  Correct.

16   Q.  And Alston & Bird represents U.S. Bank at this time?

17   A.  Correct.

18   Q.  In this email thread, Mr. Smith was corresponding with Jon

19   Pickhardt; is that right?

20   A.  Correct.

21   Q.  And Mr. Pickhardt was counsel to South Tryon?

22   A.  I believe so.

23   Q.  And South Tryon at the time was a noteholder of one of the

24   Triaxx CDOs?

25   A.  Correct.

1   Q.  Please go to the second page of Exhibit 3093.

2   Mr. Pickhardt wrote in the second paragraph of that page, "In

3   addition, we would like to have a discussion with the trustee

4   regarding the potential escrowing of distributions to certain

5   vendors associated with the Triaxx 061 deal on the upcoming

6   payment date."

7           Do you see that?

8   A.  Yes.

9   Q.  Please turn to the document marked Trial Exhibit 3094,

10  which is already in evidence.

11          This is an email thread from July 22nd, 2016, on which

12  you are included?

13  A.  You're going -- I need a moment to read this.

14          (Pause)

15  A.  Okay.

16  Q.  My question was:  Is this an email thread from July 22nd,

17  2016, on which you are included?

18  A.  Yes.

19  Q.  And do you have any reason to doubt that you received this?

20  A.  No.

21  Q.  This is correspondence with the same Mr. Feldman from

22  Exhibit 3090?

23  A.  Yes, I believe so.

24  Q.  On the second page of this document, Mr. Feldman wrote, "We

25  have heard that 13.5 million from the $69 million settlement,"

1   and then it goes on, "was attempted by the CM to be put in a

2   reserve for the manager's indemnification case against the

3   three Triaxx trusts."

4           Do you see that?

5   A.  I do.

6   Q.  So, then, Mr. Feldman asks a couple of questions; is that

7   right?

8   A.  Yes.

9   Q.  And one of them is:  What account is the money sitting in;

10  is that right?

11  A.  Correct.

12  Q.  So, on the first page, you respond, "In respect of your

13  second set of questions, we are not aware of receiving the

14  13.5 million payment referenced in your email.  As a result,

15  this amount is not on deposit in an account with U.S. Bank and

16  has not been reported in the monthly reports.  We suggest that

17  you contact the collateral manager directly if you have

18  questions regarding this amount or the reserve thereof."

19          Is that right?

20  A.  Correct.

21  Q.  You didn't ask the collateral manager about the

22  13.5 million?

23  A.  I do not recall.

24  Q.  And you didn't ask Mr. Moon about the 13.5 million?

25  A.  I do not recall.

N4HKUSB3                        Sliwa – Cross

1    Q.  You didn't ask Ms. Martin about the 13.5 million?

2    A.  I do not recall.

3    Q.  And you didn't seek legal advice after receiving

4    Mr. Feldman's email?

5    A.  I'm not sure about that.  Again, counsel was engaged.  The

6    time frame, I'm not certain.

7    Q.  So the trustee took no action to try to find out where the

8    money was being held?

9    A.  It would have been discussed internally with internal and

10   external counsel to determine how to proceed.

11   Q.  Please look at your deposition transcript from May 4th,

12   2016 -- I'm sorry, 2022, at page 121.

13   A.  All right.

14   Q.  Now, starting at line 25 of page 121, I asked you:  Is it

15   correct that U.S. Bank took no action to try to ascertain where

16   that money was held?

17        You responded:  Not at that time.  I do not think so.

18   A.  Okay.

19   Q.  So you didn't think it was the trustee's responsibility to

20   determine why funds were held in an account not controlled by

21   it?

22   A.  Again, we're not part of those discussions.  So, they have

23   arrangements outside the deal.  Our responsibility is to take;

24   in the money, the funds, and distribute them.

25   Q.  So you don't think it's the trustee's responsibility to

1    determine why funds were held in an account not controlled by

2    the trustee?

3    A.   We're not the auditor.  We do not -- we're not responsible

4    for locating and identifying what the collateral manager is

5    doing outside of the deal.

6    Q.   So you didn't think it was improper at this time that the

7    13.5 million was in an account not controlled by U.S. Bank?

8    A.   And, again, at this point in time, I think counsel is

9    engaged.  I don't recall discussions or how we decided to

10   proceed, but I don't recall having follow-up with him on this

11   particular point.

12   Q.   So at this time, you didn't think it was improper that the

13   13.5 million was in an account not controlled by U.S. Bank?

14             MS. BUCKEL:  Objection; asked and answered.

15             THE COURT:  I'll allow it.

16             THE WITNESS:  Again, counsel would have been involved

17   and would have had discussions internally with internal and

18   external counsel.  I don't recall those discussions at this

19   point.

20   BY MS. WITYK:

21   Q.   So with the input of counsel, you believe there was nothing

22   improper about the 13.5 million being held in an account not

23   controlled by U.S. Bank?

24   A.   I'd say probably something was -- we -- I don't recall what

25   we determined at that point in time.  There was obviously

1    questions about it.  Whether it was proper or not had been

2    determined at the time, it's possible.

3    Q.  Can you go to page 183 of your deposition from May 3rd.

4    A.  Which one?  Sorry, the May 3rd?

5    Q.  May 3rd.

6    A.  What was the number?

7    Q.  Page 183.

8           So, starting at line 13, I asked you:  Okay.  Whether

9    or not you understood what it was, did it strike you as

10   improper that $13.5 million was sitting outside of an account

11   controlled by U.S. Bank?

12          And you answered:  If could have been there for

13   legitimate reasons.  I just wasn't aware what it was for and

14   the details around it.

15          MR. SAVLA:  Your Honor, I am going to object as

16   improper impeachment.

17          THE COURT:  Why is it improper impeachment?

18          MR. SAVLA:  Because he hasn't said anything

19   contradictory.

20          THE COURT:  I think there's been some inconsistency.

21   I'll permit it.

22          THE WITNESS:  I'm sorry, what was the question again?

23   BY MS. WITYK:

24   Q.  Sure.

25          Starting at page 183, line 13, I asked you:  Okay.

1    Whether or not you understood what it was, did it strike you as

2    improper that $13.5 million was sitting outside of an account

3    controlled by U.S. Bank?

4            And you answered:  It could have been there for

5    legitimate reasons.  I just wasn't aware what it was for, nor

6    the details around it.

7    A.  Okay.

8    Q.  Please turn to the document marked Trial Exhibit 3095,

9    which is already in evidence.

10           This is an email thread from July 2016 on which you

11   are included.

12   A.  One second.

13           (Pause)

14   A.  Okay.

15   Q.  You have no reason to doubt that you received this email?

16   A.  Correct.

17   Q.  Now, in the bottom email on the first page of this exhibit,

18   Mr. Brunekreef writes, "Regarding the Article 77 proceeds, it

19   looks like an amount of $743,693 is left in the account of

20   Miller & Wrubel, being the guaranteed amount," and then it goes

21   on, "up to $35 million."

22           Do you see that?

23   A.  I do.

24   Q.  And so then you forwarded this email to outside counsel at

25   Alston & Bird, right?

1    A.   Correct.

2    Q.   Specifically to Brad Johnson and Adam Smith?

3    A.   Correct.

4    Q.   You also forwarded it to in-house counsel at U.S. Bank?

5    A.   Correct.

6    Q.   And that's Mr. Cheesebrough?

7    A.   Correct.

8    Q.   Did you respond to Mr. Brunekreef that the approximately

9    $743,000 needed to be handed over to the trustee?

10   A.   I do not recall.

11   Q.   And then Mr. Brunekreef goes on to write, "Further, it

12   looks like the Phoenix performance fee invoices, which

13   originally were meant to be deducted from the 34.2 million, now

14   were taken from reserve funds held with Miller Wrubel from the

15   previous of the million settlement."

16           Do you see that?

17   A.   I do.

18   Q.   Now, in paragraph 73(b) of your declaration, you state that

19   you, quote, did not fully understand what Mr. Brunekreef's

20   statement about reserve funds meant.

21   A.   Okay.

22   Q.   But then, at your deposition as U.S. Bank's 30(b)(6)

23   designee, you stated that you believed that -- sorry, let me

24   start over.

25           So this might be easier.  Could you please go to your

1   May 4th transcript.

2             At page 129, at line 12, I asked you:  All right.  So

3   U.S. Bank believes that it said something through counsel about

4   Phoenix's payment through settlement funds, but you personally

5   don't know what was said?

6             And you answered:  Correct.

7   A.  Okay.

8   Q.  Please turn to the document marked Trial Exhibit 3096,

9   which has not yet been admitted into evidence.

10            This is a September 15, 2016, email thread on which

11  you are included; is that right?

12  A.  That's correct.

13  Q.  You don't doubt that you sent and received the emails in

14  this thread?

15  A.  Correct.

16            MS. WITYK:  The TAM parties would like to move

17  Exhibit 3096 into evidence.

18            THE COURT:  Objections?

19            3096 is admitted.

20            (Trial Exhibit 3096 received in evidence)

21  Q.  Please go to the first email of this thread, at the bottom

22  of the first page.  It's from Mr. Brunekreef, who wrote to you,

23  "We are in discussion with, amongst others, the collateral

24  manager about additional disclosure and the investor report

25  regarding funds in thrust" — I think that's a typo — "with

1    Miller Wrubel.  What would be your deadline to have additional

2    language included in the upcoming September report for the

3    Triaxx funds?"

4            Do you see that?

5    A.  I do.

6    Q.  You responded later that same day:  "Evert, I would need it

7    by the 28th to get it incorporated into the reports."

8            Do you see that?

9    A.  I do.

10   Q.  In your declaration, you stated that — and I'm looking at

11   73(d) of your declaration — you stated, quote, you wanted to

12   wait until you saw the disclosure or had additional information

13   before asking Mr. Brunekreef to explain what he meant by funds

14   in thrust with Miller Wrubel.

15   A.  Okay.

16   Q.  So this was the second time in two months that you had

17   heard about money in an account with Miller Wrubel; is that

18   right?

19   A.  I believe so.

20   Q.  In the hours that passed between when Mr. Brunekreef sent

21   the email and you responded, you didn't speak to anyone about

22   the Miller Wrubel account?

23   A.  I don't know; by this point, we just had the discussions

24   internally with counsel.

25   Q.  So you think that you spoke with counsel during this time?

1    A.  Yes.

2    Q.  But you didn't ask Mr. Brunekreef why the funds were in

3    trust?

4    A.  Again, he was about to provide further details.

5    Q.  So you didn't ask him at this time why they were in trust?

6    A.  No, I was just waiting for him to respond.

7    Q.  You didn't tell Mr. Brunekreef that it was a violation of

8    the indentures for funds to be kept in an account with Miller

9    Wrubel?

10   A.  Not that I can recall at this time.

11   Q.  Now, at your deposition you testified that you didn't tell

12   Mr. Brunekreef in this particular email that holding funds in

13   the Miller Wrubel account violated the indentures?

14   A.  Again, I was waiting for him to provide additional details,

15   as it may have been a legitimate reason that we just weren't

16   aware of.

17   Q.  My question to you was:  Do you believe that you told

18   Mr. Brunekreef in another email that holding funds in the

19   Miller Wrubel account violated the indentures?

20   A.  I don't recall.

21   Q.  Please go to the document marked Trial Exhibit 3097.

22           This is an email and attachment you received from

23   Mr. Rong on March 1, 2017.

24   A.  Correct.

25           MS. WITYK:  This exhibit is not yet in evidence.  The

1   TAM parties would like to move it into evidence, your Honor.

2           THE COURT:  Any objection?

3           3097 is admitted.

4           MS. BUCKEL:  We object to the extent that the Excel

5   spreadsheets were not a part of the exhibit, but to the extent

6   there's any question about those...

7           THE COURT:  Which Excel spreadsheets?

8           MS. BUCKEL:  On the bottom of the first page there's

9   four attachments.

10           THE COURT:  Oh, I see, the little icons.

11           You're objecting because they're not part of the

12   exhibit?

13           MS. BUCKEL:  To the extent there's any questions about

14   the attachments not attached to the exhibit.

15           THE COURT:  Well, you can offer the attachments if

16   they become relevant.

17           3097 is admitted.

18           (Trial Exhibit 3097 received in evidence)

19           MS. WITYK:  Thank you.

20   BY MS. WITYK:

21   Q.  So one of the attachments to this email that is included as

22   part of the exhibit is a letter from Mr. Moon, of Miller

23   Wrubel, to Mr. Brunekreef and Mr. Rewalt; is that right?

24   A.  I'm sorry, say that again, please.

25   Q.  Sure.  I'll try it this way.  Page 2 of Exhibit 3097 is the

1    attachment to this email; is that right?

2    A.  Correct.

3    Q.  And it's a letter from Mr. Moon of Miller Wrubel to

4    Mr. Brunekreef and Mr. Rewalt?

5    A.  Correct.

6    Q.  Now, you'll see that under the heading "Present Status" on

7    the first page of this letter, Mr. Moon writes, "The balances

8    in our client escrow account on behalf of Triaxx, where the

9    first through fourth recoveries are," and then he includes a

10   chart; is that right?

11   A.  It is.

12   Q.  And if you go to the next page of the letter, in the middle

13   of the page, Mr. Moon writes, "The collateral manager

14   recommends that funds be disbursed from reserves as set forth

15   below," and then there's another chart.

16   A.  Yes.

17   Q.  And the chart shows proposed payments to Kobre & Kim?

18   A.  Yes.

19   Q.  And Miller Wrubel?

20   A.  Correct.

21   Q.  And Edison?

22   A.  Correct.

23   Q.  You don't recall speaking to anyone about this letter from

24   Mr. Moon?

25   A.  I would assume I brought this up to both internal and

1   external counsel when it occurred.

2   Q.  Could you please go to the May 3rd transcript at page 198,

3   starting at line 4.

4         I asked you:  Did you speak to anyone about this

5   letter from Mr. Moon?

6         And you answered:  I do not recall.

7   A.  Okay.

8   Q.  Is it your testimony that you sought legal advice about

9   whether Kobre & Kim, Miller Wrubel, and Edison could be paid?

10  A.  From what I recall about this correspondence, this was

11  given to me strictly for those two invoices, not for reviewing

12  the other attachments.  So I don't specifically recall -- all I

13  remember from this is the two invoices that were to be paid

14  out.

15  Q.  Did you seek legal advice about those two invoices?

16  A.  I don't recall specifics.

17  Q.  Please look at Trial Exhibits 3098 and 3099, neither of

18  which are in evidence at this point.

19        THE COURT:  What were the numbers?

20        MS. WITYK:  3098 and 3099.

21  Q.  So this is an email and attachment that you sent to

22  Mr. Brunekreef on March 1, 2017; is that correct?

23  A.  Yes.

24        MS. WITYK:  Your Honor, the TAM parties would like to

25  move Exhibits 3098 and 3099 into evidence.

1       THE COURT:  Have we had 3099 authenticated?

2   BY MS. WITYK:

3   Q.  Mr. Sliwa, do you recognize 3099 as the attachment to

4   Exhibit 3098?

5   A.  I do not know.

6   Q.  So how about we take a look at the email at 3098.

7       Do you see the file name of the attachment under the

8   attachment line?

9   A.  I do.

10  Q.  And is this the same file name as the attachment at 3097?

11      THE COURT:  3097?  Now I'm confused.  You're saying

12  that the same December 27th letter that was sent to Mr. Sliwa

13  on March the 1st, 2017, was then forwarded by him to

14  Mr. Brunekreef?

15      MS. WITYK:  That's what I'm getting at, your Honor,

16  yes.

17      THE COURT:  Okay.

18  A.  It appears that way.

19  Q.  So is the document at Trial Exhibit 3099 the attachment to

20  the email at Trial Exhibit 3098?

21  A.  I can only assume.

22      MS. WITYK:  Your Honor --

23      THE COURT:  I will admit 3098 and 99.

24      MS. WITYK:  Thank you.

25      (Trial Exhibit 3098 and 3099 received in evidence)

1  Q.  And you have no reason to doubt that you sent this,

2  Mr. Sliwa?

3  A.  Correct.

4  Q.  And you ask Evert, "Please let me know if you have any

5  concerns paying out the attached Edison and Kobre invoices

6  attached."

7  A.  Correct.

8  Q.  And then you attach the letter that we looked at from

9  Mr. Moon a little while at Exhibit 3097; is that right?

10 A.  I'm sorry, what was the question?

11 Q.  Sorry.  And then you attached the December 27, 2016, letter

12 from Mr. Moon?

13 A.  I assume so, yes.

14 Q.  You didn't ask Mr. Brunekreef anything about the reserve

15 funds described in Mr. Moon's letter?

16 A.  Not in this email.

17 Q.  Mr. Sliwa, what is a note valuation report?

18 A.  It's a report in which we provide the underlying collateral

19 held by the deal.  It shows the payments, expense details and

20 other characteristics of those assets.

21 Q.  And they're made monthly?

22 A.  There's monthly and quarterly NDRs, which are the payment

23 reports.  Triaxx pays on a monthly basis, so each report was a

24 payment report.

25 Q.  Made monthly?

1    A.  Correct.

2    Q.  And these reports are made available to all noteholders?

3    A.  Correct.

4    Q.  They're made available to noteholders through the trust's

5    investor reporting site?

6    A.  That's correct.

7    Q.  And this is a website maintained by U.S. Bank?

8    A.  Correct.

9    Q.  And your team is responsible for generating note valuation

10   reports for the Triaxx CDOs; is that right?

11   A.  Correct.

12   Q.  And you review the monthly note valuation reports for

13   accuracy?

14   A.  Correct.

15   Q.  And you review those note valuation reports to ensure that

16   payments made by the CDOs to vendors are accurately reflected?

17   A.  Per the governing documents, yes.

18   Q.  And monthly payments by the Triaxx CDOs to PRES were

19   disclosed as early as 2011; is that right?

20   A.  I believe so.

21   Q.  And the monthly payments to PRES were disclosed in the

22   Triaxx CDOs note valuation reports through May 2018; is that

23   right.

24   A.  I believe so.

25   Q.  And PRES's monthly fees were treated as administrative

1    expenses?

2    A.   That's correct.

3    Q.   And you didn't disagree with their classification as

4    administrative expenses?

5    A.   It wasn't my determination.  So the collateral manager

6    passed off the expense, told us it was an administrative

7    expense, and we included them in the reports.

8    Q.   But you didn't disagree with their classification as

9    administrative expenses?

10   A.   I do not recall having conversations with the CMI.

11   Q.   If you could look at your May 3rd deposition transcript.

12            Starting at page 39, line 16, I asked you:  Who

13   classifies them as administrative expenses?

14            And you answered --

15   A.   I'm sorry, one second.

16   Q.   I'm sorry.

17   A.   39?

18   Q.   Yes.

19   A.   I'm sorry, continue.

20   Q.   Sure.  I asked you, starting at 39/16:  Who classifies them

21   as administrative expenses?

22            And you answered:  I believe actually in the earlier

23   email you showed me from the issuer, they classified them as

24   admin expenses.

25            I asked you:  And you didn't disagree with that

1    information?

2              You answered:  No, I took the -- no, I did not.

3    A.  Okay.

4    Q.  Mr. Sliwa, there was never an instance between 2012 and

5    May 2018 that the trustee refused to pay PRES's monthly

6    invoices for work performed with respect to the CDOs; is that

7    right?

8    A.  Not that I recall.

9    Q.  During this same time period, you do not recall any

10   instance when a noteholder objected to the payments of PRES's

11   monthly fees?

12   A.  If the noteholders had questions, they got forwarded on

13   to -- I passed on the contact of the CM so the noteholders can

14   reach out, they can contact the -- sorry, I passed on the

15   contact details of the collateral manager to the noteholders if

16   they had any further questions.

17   Q.  But during that same time period, you do not recall any

18   instance when a noteholder objected to the payments of PRES's

19   monthly fees?

20             THE COURT:  Do you mean a written objection?

21             MS. WITYK:  Correct, your Honor.

22             THE COURT:  Thank you.

23   A.  To me?  I do not recall.

24   Q.  And between 2012 and 2018, you had no reason to doubt that

25   PRES was performing the work for which it was seeking payment?

1  A.  I'm sorry, say that again, please.

2  Q.  Sure.  Between 2012 and 2018, you had no reason to doubt

3  that PRES was performing the work for which it was seeking

4  payment?

5  A.  We were just given the expenses to add to the report.  So

6  we added it to the report.

7  Q.  My question was whether you had a reason to doubt that PRES

8  was performing the work for which it was seeking payment.

9  A.  And, again, we received invoices, and we passed them

10  through the report.

11  Q.  Please look at page 65 of your May 3rd deposition

12  transcript.

13          Starting at line 17, I asked you:  Between 2012

14  through 2018, did you, Mr. Sliwa, have any reason to doubt that

15  Phoenix was performing the work for which it was seeking

16  payment?

17          You responded:  I had no reason to believe otherwise.

18  A.  Okay.

19  Q.  Mr. Sliwa, you understand that law firms were retained to

20  conduct the activist litigations that we've been discussing

21  today, right?

22  A.  Yes.

23  Q.  And they were paid through the CDOs?

24  A.  Yes, they were.

25  Q.  During the period from 2012 to May 2018, you were not aware

N4HKUSB3                         Sliwa - Cross

1   of any instance in which the trustee refused to pay a law firm

2   for fees incurred in connection with the activist litigations?

3   A.  Not that I recall.

4   Q.  Now, as part of U.S. Bank's role as trustee, it causes

5   notice to be disseminated to noteholders; is that right?

6   A.  Notices or the note valuation?

7   Q.  Notices.

8   A.  Yes.

9   Q.  In paragraph 22 of your declaration, you state, "The

10  trustee does not review these notices."

11  A.  If we receive a notice from a collateral manager, they ask

12  us to post the notice, so we post the notice.

13  Q.  So your testimony is, the trustee does not review the

14  notices?

15  A.  Not for accuracy.  So if the notice is passed on to us,

16  obviously something that we will look over, but, again, if the

17  collateral manager wants the notice posted, we pass it on and

18  post it.

19  Q.  So does the trustee review the notices?

20  A.  It is looked over.

21  Q.  Please go to your May 3rd deposition transcript.

22          At page 46, line 16, I asked you:  Okay.  Do you

23  review the notices as they come to you?

24          And you answered:  I do, yes.

25  A.  Okay.

1   Q.  Now, notices are sent to noteholders -- sorry, let me start

2   again.

3            Notices that are sent to noteholders are saved

4   electronically on U.S. Bank's systems; is that right?

5   A.  Most of the time usually the case.

6   Q.  The notices were made accessible even after you send them

7   out?

8   A.  What do you mean?

9   Q.  Meaning, after a notice is posted, you could still go on to

10  your computer and pull up an old notice?

11  A.  One that I saved?

12  Q.  Correct.

13  A.  Yes.

14  Q.  And notices can also be sent to DTCs you posted?

15  A.  Correct.

16  Q.  And notices can be posted on the Trust Investor Reporting

17  website?

18  A.  Correct.

19            THE COURT:  Back up just a moment.  DTC?  Depository

20  Trust Corporation?

21            MS. WITYK:  I believe that's what he was referencing,

22  your Honor, yes.

23            THE WITNESS:  That's correct.

24            THE COURT:  Thank you.

25  Q.  So as long as an investor provided an ownership form, they

1    can access the Trust Investor Reporting site?

2    A.  That's correct.

3    Q.  And notices remain on the Trust Investor Reporting site

4    until a CDO is terminated?

5    A.  That is correct.

6    Q.  Please turn to the document marked Trial Exhibit 3057,

7    which is not yet in evidence.

8            This is an email and an attachment that you sent to

9    Nicholas Calamari on April 5, 2016; is that right?

10   A.  Correct.

11   Q.  At this time, Mr. Calamari was employed by Triaxx Asset

12   Management?

13   A.  I don't remember the specific company at that time.

14   Q.  Do you see in the middle of the page his email address is

15   listed as NCalamari@TriaxxHoldCo.com?

16   A.  Yes.

17   Q.  Do you believe he was working for the Triaxx Asset

18   Management at this time?

19   A.  Based on the email address, yes.

20           MS. WITYK:  Your Honor, the TAM parties ask that Trial

21   Exhibit 3057 be moved into evidence.

22           THE COURT:  Any objection?

23           3057 is admitted.

24           (Trial Exhibit 3057 received in evidence)

25           MS. WITYK:  Thank you.

1   Q.  You have no reason to doubt you sent this email, Mr. Sliwa?

2   A.  Correct.

3   Q.  And the attachment is a notice to the Triaxx CDOs?

4   A.  Yes, appears so.

5   Q.  So please take a look at the notice itself, starting on the

6   page ending in 51.

7         THE COURT:  You said, counsel, a notice to the Triaxx

8   CDOs.  Did you mean notice to the CDO investors or the

9   noteholders?

10        MS. WITYK:  I apologize, your Honor.  What I meant to

11  say was, this was a notice to the investors of Triaxx prime CDO

12  2006-2.

13        THE COURT:  Thank you.

14  Q.  Mr. Sliwa, are you at page with the Bates ending in 51?

15  A.  I am.

16  Q.  So the first sentence, saying, "I am writing to inform you

17  of recent steps that have been taken to enforce the rights and

18  pursue restitution strategies for RMBS securities held by

19  Triaxx Prime CDO 2006-2."

20        Do you see that?

21  A.  I do.

22  Q.  This letter is from Mr. Priore?

23  A.  It is.

24  Q.  In the middle of the page, Mr. Priore writes, "Working with

25  transaction counsel at Schulte Roth & Zabel, we have taken

1   steps, along with other RMBS investors, to retain Talcott

2   Franklin PC and Kobre & Kim LLP as legal counsel and ARAM

3   Global as activist agents on behalf of Triaxx under a capped

4   expense structure that rewards those parties for net recoveries

5   to the fund."

6           Do you see that?

7           THE COURT:  What page are you on now?

8           MS. WITYK:  I'm sorry, your Honor.  The page ending in

9   52.

10          THE COURT:  I am with you.  Sorry.

11  A.  Okay.

12  Q.  So this notice was distributed to noteholders on

13  April 11th, 2011; is that right?

14  A.  I'm not certain.

15  Q.  Let's please look at the document marked Trial

16  Exhibit 3068, which is already in evidence.

17          Do you recognize this as a different iteration of the

18  email thread at Exhibit 3057?

19  A.  Yes.

20  Q.  And Mr. Calamari asks you when the notice was sent out?

21  A.  Yes.

22  Q.  And you told him you were showing 4/11/11 as the delivery

23  date?

24  A.  Yes.

25  Q.  So April 11, 2011?

1    A.   Correct.

2    Q.   Please turn to the document marked Trial Exhibit 3058,

3    which is not yet in evidence.

4              THE COURT:  You have about 15 minutes.

5              MS. WITYK:  Understood, your Honor.  I'll pick it up.

6    Q.   Mr. Sliwa, this is another iteration of the email thread we

7    just saw.

8              THE COURT:  We're looking at 3058.

9              MS. WITYK:  Yes, your Honor.

10   A.   It appears so, yes.

11             MS. WITYK:  The TAM parties ask that Trial

12   Exhibit 3058 be moved into evidence.

13             THE COURT:  Any objection?

14             3058 is in.

15             MS. WITYK:  Thank you.

16             (Trial Exhibit 3058 received in evidence)

17   Q.   Please turn to the document marked Trial Exhibit 3069,

18   which is not yet in evidence.

19             Do you see that?

20   A.   I do.

21   Q.   This is another iteration of the email thread we had just

22   seen at 3058, along with multiple attachments?

23   A.   It appears so.

24   Q.   And these are additional notices that went out for the

25   Triaxx deals; is that correct?

1    A.  It looks like it, yes.

2    Q.  Now, please turn to the document --

3              THE COURT:  Are you going to admit 3069?

4              MS. WITYK:  Yes, your Honor.

5              THE COURT:  Any objection?

6              3069 is admitted.

7              (Trial Exhibit 3069 received in evidence)

8    Q.  Please turn to the document marked Trial Exhibit 3491,

9    which is not yet in evidence.

10             THE COURT:  The back of the binder.  Maybe that's a

11   good sign.

12   Q.  And, Mr. Sliwa, this is another notice sent by the trustee

13   to noteholders?

14   A.  Let me just read it real fast.

15             (Pause)

16   A.  Okay.

17   Q.  I'm sorry, what was your --

18   A.  I see it, I read it.

19   Q.  So this is another notice sent by the trustee to

20   noteholders?

21   A.  Correct.

22             MS. WITYK:  Your Honor, the TAM parties would like to

23   move Exhibit 3491 into evidence.

24             THE COURT:  Any objection?

25             3491 is admitted.

1            (Trial Exhibit 3491 received in evidence)

2   Q.   Mr. Sliwa, you state in paragraph 45 of your declaration,

3   "Prior to 2018, U.S. Bank did not understand that the

4   collateral manager, TAM, and Phoenix were related parties or

5   that Phoenix has a contractual relationship with Mr. Priore";

6   is that right?

7   A.   I'm sorry, section?

8   Q.   Paragraph 45.

9            (Pause)

10  A.   Okay.

11  Q.   So please turn to Trial Exhibit 3489, which has not yet

12  been introduced into evidence.

13           And this is a notice sent to noteholders of 2006-1?

14  A.   Yes.

15           MS. WITYK:   Your Honor, the TAM parties ask to move

16  Exhibit 3489 into evidence.

17           THE COURT:   Any objection?

18           3489 is admitted.

19           (Trial Exhibit 3489 received in evidence)

20  Q.   And, Mr. Sliwa, you'll see that the last full paragraph on

21  the first page has the heading "Sale of ICP Asset Management."

22           Do you see that?

23  A.   I do.

24  Q.   And the last full sentence on the page, Mr. Priore, who

25  sent this notice, wrote, "Institutional Credit Partners LLC,

1   the owner of the collateral manager which I own, has sold the

2   collateral manager to Triaxx Holdco LLC."

3           Do you see that?

4   A.   I do.

5   Q.   And then starting on the next page, Mr. Priore wrote,

6   "Triaxx Holdco is owned by Mr. Vishal Garg and his associates,"

7   and then the sentence goes on.

8           Do you see that?

9   A.   I do.

10  Q.   The third line down on the second page of Exhibit 3489,

11  Mr. Priore wrote, "I will remain involved as the consultant to

12  help navigate the ongoing activist strategies," and then the

13  sentence goes on from there.

14          Do you see that?

15  A.   Okay.

16  Q.   Mr. Sliwa, the CDOs received tens of millions of dollars in

17  recoveries as a result of the activist litigations; is that

18  right?

19  A.   I believe, yes, they received tens of millions of dollars

20  through the activist litigations.

21  Q.   Mr. Sliwa, you understand the trustee is currently holding

22  certain amounts that PRES claims that it's owed?

23  A.   Correct.

24  Q.   And there is no scenario under which those funds would

25  actually go to U.S. Bank?

N4HKUSB3                        Sliwa - Cross

1   A.   Correct.  Not that I'm aware of.

2   Q.   And we discussed that there were certain funds paid outside

3   of the Triaxx CDOs' waterfall to service providers like law

4   firms and PRES; is that right?

5            THE COURT:  Do you mean paid directly from law firm

6   trust accounts — i.e., never came through an account controlled

7   by the trustee — or do you mean that came into a trustee

8   account and was paid outside of the waterfall?  Because I don't

9   think the latter happened, unless I'm missing something.

10           MS. WITYK:  What I was referring to, your Honor, is

11  specifically the funds that were paid from the Miller Wrubel

12  account to service providers like law firms --

13           THE COURT:  So funds that were paid outside of the

14  waterfall by third parties?

15           MS. WITYK:  Correct.

16           THE COURT:  Thank you.

17  Q.   So those funds, Mr. Sliwa, would not have gone to the

18  trustee; is that right?

19  A.   I have no idea what they did with the funds that were

20  outside of the waterfall.

21  Q.   But my question to you is:  Are you saying the trustee was

22  entitled to those funds that were paid to law firms?

23           THE COURT:  She is confirming that the trustee

24  wouldn't have been able to put that money in the trustee's

25  pocket.

1          Correct?

2          MS. WITYK:  That's correct, your Honor.

3  A.  The funds would have gone through the waterfall.

4  Q.  And not to the trustee?

5  A.  Not that I know.

6  Q.  Mr. Sliwa, is it correct that U.S. Bank has not suffered

7  any harm as a result of any conduct by PRES?

8          MS. BUCKEL:  Objection; that's a legal conclusion.

9          THE COURT:  Sustained.  Rephrase.

10  Q.  Mr. Sliwa, do you know of any injury caused by PRES?

11          MS. BUCKEL:  Objection; that's also a legal

12  conclusion.

13          THE COURT:  If you could put that in a little less

14  legalese --

15          MS. WITYK:  Sure, sure.

16          THE COURT:  -- I'll allow it then.

17          MS. WITYK:  All right.  I'll try one more time.

18  BY MS. WITYK:

19  Q.  Mr. Sliwa, how has anything PRES has done injured

20  U.S. Bank?

21  A.  Time and resources.

22  Q.  And how has anything done by Triaxx Asset Management harmed

23  U.S. Bank?

24  A.  Again, time and resources.

25  Q.  And U.S. Bank is entitled to monthly fees for serving as

1    the trustee of the Triaxx CDOs; is that right?

2    A.   That's correct.

3    Q.   At the time of your deposition, there were no outstanding

4    fees owed to the trustee by the Triaxx CDOs; is that right?

5    A.   I believe that was the case.

6          MS. WITYK:  Your Honor, I have no more questions at

7    this time.

8          THE COURT:  Excellent.  Shall we take our afternoon

9    break until 3:10 or shall I be very generous and give us until

10   3:15?  Let's try for 3:10.  That's time enough to make a phone

11   call or use the restroom.

12          And you will remain under oath when you get back, so,

13   again, please do not discuss your testimony or the facts of

14   this case with counsel or with anyone else during the break.

15          THE WITNESS:  Yes, your Honor.

16          THE COURT:  We will be in recess.

17          (Recess)

18          (Continued on next page)

19

20

21

22

23

24

25

1         (In open court)

2         THE DEPUTY CLERK:  Back on the record in the matter of

3   U.S. Bank National Association v. Triaxx Asset Management LLC,

4   et al.  Case number 18 Civ. 4044.

5         THE COURT:  I see that Mr. Sliwa is back on the stand.

6   You are still under oath as I am sure you recall.

7         Noteholders, you have questions for Mr. Sliwa?

8         MR. LAURIELLO:  Yes, your Honor.  For the record, my

9   name is Anthony Lauriello on behalf of PIMCO.  Permission to

10  approach the witness and bench with binders?

11        THE COURT:  Yes, sir.  Are you going to be using the

12  TAM party's binder?

13        MR. LAURIELLO:  Mr. Sliwa, I am happy to say you can

14  remove that binder.

15        THE WITNESS:  Thank you.

16        THE COURT:  Are we still going to need the direct

17  testimony affidavit?

18        MR. LAURIELLO:  I believe it is in here as tab 1.

19        THE COURT:  Okay.

20  CROSS-EXAMINATION

21  BY MR. LAURIELLO:

22  Q.  Mr. Sliwa, I'd like to ask that you go to tab 2 in your

23  binder, which is Exhibit 530, which has already been received

24  in evidence.

25  A.  I got it.

1   Q.  This is a note valuation report for Triaxx 2007-1 dated

2   January 25, 2023, right?

3   A.  Correct.

4   Q.  U.S. Bank prepares the draft of note valuation reports,

5   correct?

6   A.  That's correct.

7   Q.  The collateral manager is responsible for ensuring the

8   accuracy of the valuation?

9           MS. WITYK:  Objection.  Mr. Lauriello is leading the

10  witness and he's not an adverse witness.

11          MR. LAURIELLO:  This is a cross-examination, so we are

12  under the impression we would be able to ask leading questions.

13          THE COURT:  Why is this not cross-examination,

14  Ms. Wityk?  You got to lead.

15          MS. WITYK:  Because Mr. Sliwa is adverse to the TAM

16  party.

17          THE COURT:  He's not Mr. Lauriello's witness.  And I'm

18  not sure that he is, strictly speaking, either adverse or

19  supportive.

20          Let me put it this way.  I am not going to prohibit

21  you from leading, Mr. Lauriello.  But as we all learned in law

22  school, if you want to make an impact on the finder of fact,

23  you need to let the witness speak for himself.

24          MR. LAURIELLO:  Thank you, your Honor.

25  Q.  Is the collateral manager responsible for ensuring the

1  accuracy of note valuation reports?

2  A.  Yes, they are responsible for viewing and approving reports

3  and payments.

4  Q.  You state in your direct testimony in paragraphs 81-82 that

5  based off the notes valuation reports, there is not enough

6  collateral to satisfy the payment obligations to the

7  noteholders.  Is that correct?

8  A.  That is correct.

9  Q.  Please turn to page 5 of Exhibit 530.  Do you see it lists

10  asset positions in the bottom left corner?

11  A.  I do, yes.

12  Q.  Are the asset positions the total amount of collateral that

13  the transaction has of July 25 of -- January 25, 2023?

14  A.  That is correct.

15  Q.  Please turn to page 6.

16          THE COURT:  You couldn't have blown this up on a big

17  screen for me so I could read it?

18          Hold on.  What do you want me to read on this page?

19          MR. LAURIELLO:  I believe it is on the screen, your

20  Honor.

21          THE COURT:  It is on the screen.  Thank you very much.

22  Q.  So, just to make sure we are all on the same page

23  literally.  I think we are on page 6 of Exhibit 530.  Do you

24  see where it says closing balance?

25  A.  Yes.

N4H3USB4                        Sliwa - Cross

1   Q.  Isn't closing balance the outstanding amount that remains

2   to be paid to each class of notes?

3   A.  That's correct.

4   Q.  So, if there are total assets of $3.7 million, there are

5   not enough assets to pay even the most senior class?

6   A.  That is correct.

7   Q.  Can we please turn to page 4 of Exhibit 530.  Do you see in

8   the top-left-hand corner it refers to investment advisor and

9   lists Triaxx Asset Manager Investment Advisor?

10  A.  Yes.

11  Q.  And that means the collateral manager?

12  A.  Yes.

13  Q.  There is not a separate investment advisor, other than the

14  collateral manager?

15  A.  No.

16  Q.  Can you please turn to Exhibit 282, which is tab 3 in your

17  binder.

18  A.  Okay.

19  Q.  Exhibit 282 has already been received in evidence.

20          THE COURT:  Thank you.

21  Q.  Is Exhibit 282 an NDR for Triaxx 2007-1 dated April 23,

22  2016?

23  A.  I believe so.

24  Q.  Please turn to page 4 of Exhibit 282.

25  A.  Okay.

1   Q.  Do you see that Phoenix Advisors and Managers U.S.A. LLC is

2   listed as investment advisor?

3   A.  Yes.

4   Q.  As you previously testified, investment advisor refers to

5   the collateral manager?

6   A.  Correct.

7   Q.  Please turn to page 7 under distribution detail.  Do you

8   see it says on the right side accrued and unpaid other

9   administrative expenses, and then below states of the

10  collateral manager?

11  A.  Sorry.  Yes, I do.

12  Q.  Those are the accrued and unpaid other administrative

13  expenses of the collateral manager?

14  A.  No.  In this particular page we are listing out what was

15  actually paid.  We do not list out the unpaid portions of the

16  invoices.

17  Q.  Those amount to $264,576.04?

18  A.  That's correct.

19  Q.  On the left side do you see there is a $35,423.96 expense

20  for independent accounts, agents, and counsel of the collateral

21  manager?

22  A.  Yes.

23  Q.  Please turn to page 10.  Do you see there are two payments

24  to Phoenix Real Estate invoice with one for $70,955.75 and one

25  for $122,642.40?

1    A.  Yes, I do.

2    Q.  Do you see that there is also an invoice to Intex for

3    around $6,000?

4    A.  Correct.

5    Q.  Do you see at the bottom of the page, those invoices add up

6    to $200,000?

7    A.  That is correct.

8    Q.  Did you state in your direct testimony that in 2016, you

9    received a letter from the collateral manager directing the

10   trustee to assign to the issuers the trustees' right to pursue

11   litigation?

12   A.  Yes, I believe that's correct.

13   Q.  You understood Lori Martin at Wilmer Hale to be acting for

14   the issuers?

15   A.  Yes, that's correct.

16   Q.  Did you understand John Moon to be acting as counsel for

17   the collateral manager?

18   A.  I believe so, yes.

19   Q.  Did you understand PIMCO to represent the majority of the

20   controlling class in the 2007-1 transaction?

21   A.  Yes.

22   Q.  Have you ever seen Phoenix's work product?

23   A.  Not that I recall.

24   Q.  The cap for administrative expenses for Triaxx 2007-1 is

25   $200,000, correct?

1  A.  That's correct.

2  Q.  Is that the same amount we saw for the total distributions

3  in Exhibit 282?

4  A.  It is.

5  Q.  That $200,000 cap is the same for Triaxx 2006-2?

6  A.  Correct.

7  Q.  If there are funds in excess of the $200,000 cap, the

8  overflow funds then go to the waterfall, right?

9  A.  Correct.

10 Q.  So you don't hold any funds in excess of the cap from

11 distribution?

12 A.  Correct.

13 Q.  Are you aware of various class actions lawsuits that have

14 provided recoveries to the Triaxx CEOs?

15 A.  I don't know specific ones, but I know there are some class

16 actions.

17 Q.  For some of these litigations, the collateral manager opted

18 out of the class actions?

19 A.  That is correct.

20         MS. WITYK:  Objection.  He said he didn't really

21 understand the specifics.

22         THE COURT:  You can inquire if you wish, but

23 apparently he understands a little bit.

24         THE WITNESS:  I know they opted out of some.  I don't

25 know the specific class action suits.

N4H3USB4                      Sliwa – Redirect

1   Q.  For some of the litigations they did not opt out; is that

2   right?

3   A.  I believe that's correct.

4   Q.  Can the trustee determine one way or another if the

5   collateral manager opting out provided value to the CDOs?

6   A.  No, they do not.

7              MR. LAURIELLO:  Thank you for your time.

8              THE COURT:  Is there redirect?

9              MS. BUCKEL:  Yes, your Honor.

10             THE COURT:  The issuer said they had nothing, but just

11   in case you changed your mind.

12             MR. RAINIER:  Holding our position, your Honor.

13             THE COURT:  All right.  Then we'll have redirect,

14   Ms. Buckel.  What's your time estimate?

15             MS. BUCKEL:  Hopefully less than five minutes.

16             THE COURT:  I will warn counsel that the bench may

17   have a few questions for this witness.

18   REDIRECT EXAMINATION

19   BY MS. BUCKEL:

20   Q.  Thank you, Mr. Sliwa.  You just previously testified that

21   you knew about the work that Phoenix was doing.  Is that

22   correct?

23   A.  Yes, it is.

24   Q.  How did you learn about the work that Phoenix was doing?

25   A.  Initially was a phone call with Mr. Priore.

1   Q.  Mr. Priore was who?

2   A.  He was a collateral manager.

3   Q.  If you turn back to that big binder from the TAM parties to

4   Trial Exhibit 3067.

5              THE COURT:  Give us all a moment.

6              MS. BUCKEL:  This is the only exhibit from that

7   binder.

8   A.  Yes, I have it.

9   Q.  On the second page of that exhibit which ends in Bates

10  stamp 48562, four paragraphs down, it starts with it is also

11  important.  Do you see that?

12  A.  I do.

13  Q.  And you wrote, you testified that you wrote "It is also

14  important to note that the three deals recently received a

15  combined settlement payment in regards to their case against

16  BoNY of 28 million with additional settlements on the way."

17  A.  Yes.

18  Q.  Where did this understanding about the settlements come

19  from?

20  A.  It would have been from Mr. Priore or the law firm that

21  he's working with.

22  Q.  Were you ever involved in the settlement negotiations or

23  discussions related to these litigations?

24  A.  I was not.

25  Q.  You previously testified that you didn't disagree with the

1    collateral manager about the classification of the Phoenix

2    invoices as administrative expenses, correct?

3    A.  Correct.

4    Q.  Does the trustee have discretion under the governing

5    documents to disagree with the classification of administrative

6    expenses?

7    A.  No.

8    Q.  Does the trustee have discretion under the governing

9    documents absent court order to refuse to make payments that

10   the collateral manager has directed?

11   A.  No.

12   Q.  You also testified that there is a lot of correspondence in

13   the 2015, 2016 time period with Mr. Moon about payments that

14   were going to come into the deal and what you were to do with

15   those payments.  Is that correct?

16   A.  Correct.

17   Q.  You testified that there was one specific time that

18   Mr. Moon provided instructions to make a payment outside of the

19   priority of payments waterfall, correct?

20   A.  Correct.

21   Q.  What did you do after you received that instruction?

22   A.  So, it was received, discussed internal with legal, and

23   then responded to them letting them know we could not make the

24   payments outside of the waterfall.

25   Q.  Did the collateral manager provide any pushback after you

1  made that communication?

2  A.  No, not that I recall.

3  Q.  You testified that the collateral manager actually

4  retracted that instruction, correct?

5  A.  Correct.

6  Q.  Did the trustee direct the collateral manager to retract

7  that instruction?

8  A.  We did not, no.

9  Q.  Lastly, does U.S. Bank as trustee act on behalf of the

10  noteholders?

11  A.  Yes.

12          MS. BUCKEL:  No further questions.  Thank you,

13  Mr. Sliwa.

14          THE COURT:  I do have a few questions, but let me make

15  sure that there is no brief recross.

16          Ms. Wityk?

17          MS. WITYK:  Nothing from the TAM parties, your Honor.

18          THE COURT:  Noteholders?

19          MR. LAURIELLO:  Nothing from the noteholders, your

20  Honor.

21          THE COURT:  All right.  Mr. Sliwa, everybody in the

22  courtroom knows more about these transactions than I do, so

23  please bear with me if my questions seem basic.

24          You testified just a few moments ago that in your

25  view, the trustee does not have discretion, absent a court

1    order, to say no to a collateral manager direction regarding

2    distribution of funds.

3              Is that a fair assessment of your view?

4              THE WITNESS:  Correct.

5              THE COURT:  So, when Mr. Moon asked you, asked the

6    trustee to hold certain settlement funds outside of the

7    waterfall and/or to pay certain settlement funds that were

8    going to be coming into the trustee, but to hold them and pay

9    them outside of the waterfall, what made you think on that

10   occasion, if indeed you did think on that occasion, that you

11   could say no to the collateral manager?

12             THE WITNESS:  So, we received a lot of instructions

13   from them over the years.  So, when we receive something or an

14   e-mail, we actually wait for the final product to arrive to

15   determine how to act.  So, as you probably see in the number of

16   e-mails where they said money was coming but didn't.

17             THE COURT:  No, I understand it was coming this week,

18   and then it was coming next month, and it finally was really

19   coming several months later.  But as I understand your

20   testimony, at that point, you effectively said no, we don't

21   think we can do this.

22             THE WITNESS:  So, we don't have discretion.  So we

23   follow the governing documents.  So if the documents state the

24   money need to be treated this way, then that's how we treat the

25   money.  If they are asking us to work outside those parameters,

1    then we have to -- it's not our choice to say no.  It is the

2    governing documents are telling us you can't do it that way.

3              THE COURT:  So you can say no if you believe that the

4    instructions you are getting from the collateral manager

5    violate the indenture.  Is that fair?

6              THE WITNESS:  Correct, yes.

7              THE COURT:  All right.  Let me look at my notes for a

8    moment.

9              THE WITNESS:  Sure.

10             THE COURT:  Could you take another look at Trial

11   Exhibit 3081 which I think is in Ms. Wityk's binder.  This is

12   the March 9, 2015, e-mail to you from Mr. Moon, one of the

13   earlier e-mails in the long series of e-mails about how the

14   second set of funds were going to come in.

15             Are you placed in time now?

16             THE WITNESS:  I am, yes.

17             THE COURT:  In this e-mail, Mr. Moon states, "I would

18   ask that when the recovery arrives, please notify me and I will

19   start that process in motion."  That process meaning preparing

20   distribution instructions.

21             Are you with me?

22             THE WITNESS:  Yes, I am.

23             THE COURT:  Am I correctly understanding this e-mail,

24   and that's a bad question.

25             Did you understand this e-mail to be advising you that

1   this money, these recoveries, were going to come directly to

2   the trustee from whoever was paying the settlement, and not go

3   through an attorney, an outside attorney trust account?

4          THE WITNESS:  Correct.  Again, at this point in time,

5   at this point in time we thought the fund would come to the

6   deal to be distributed, and they would provide instructions how

7   they wanted it to be treated.

8          THE COURT:  So, unlike the first settlement whereby

9   this time, tell me if this is fair, you understood that the

10  first settlement funds from the first settlement, recoveries

11  from the first settlement had gone through attorney escrow

12  accounts.

13         THE WITNESS:  I think it was --

14         THE COURT:  It was your understanding, was it, in

15  March of 2015 that the funds from this second settlement were

16  going to come direct to the deal, rather than through an

17  attorney escrow?

18         THE WITNESS:  I think when the first payment happened,

19  we didn't really look at the -- we were looking at the funds

20  coming in.  We weren't paying close attention to how other

21  funds were being handled outside of the deal.  Because at that

22  point in time, the thought was that they were working in good

23  faith in the parameters of the deal.  I think there might have

24  been settlements or some other explanations.  So when we

25  received this e-mail, the thought is, okay, we'll wait until we

1    receive the funds to determine how they should be treated.

2                 THE COURT:  I am not asking the question that you

3    think I'm asking.  I am sure that means I'm not asking it very

4    well.

5                 Who did you understand was going to be sending you

6    these substantial recoveries, the funds referenced in

7    Mr. Moon's March 9, 2015, e-mail?

8                 THE WITNESS:  I thought it would have been the class

9    action come directly from the class action settlement, I guess,

10   account or law firm, whoever was sending out the funds for the

11   class action.

12                THE COURT:  So in a class action, typically you have a

13   settlement administrator.  Through that mechanism?

14                THE WITNESS:  Correct.

15                THE COURT:  Looking ahead to Trial Exhibit 3090, where

16   this is a later e-mail discussing the same 35 or maybe by now

17   36 million, I don't know, maybe interest had accrued, I'm not

18   sure.  But in 3090, Mr. Feldman of Cerberus Capital writes to

19   you at the bottom of page 1 of the exhibit and says, "I agree

20   that it came through as principal."  What does that mean that

21   it came through as principal?  Because you had told him that.

22                THE WITNESS:  One second.

23                THE COURT:  Really I should have referred you to the

24   top of page 2, your July 6, 2016 e-mail, where you say it is my

25   understanding that Bloomberg is showing the Countrywide class

1   action settlement distributions as principal repayments.  And

2   instead you say the money should be classified as principal.

3           Explain to me what you mean by that.

4           THE WITNESS:  Certainly.  So, for class action

5   settlements when we receive the payments, they're classified as

6   principal to be distributed through the waterfall.  However, it

7   is not your traditional principal payment which would typically

8   go to pay down the balance of the asset.  So these situations,

9   the principal balance of the asset remains the same, but we

10  receive a distribution of funds that we classify as principal.

11          THE COURT:  When you say the principal balance of the

12  asset, the asset meaning the RMBS?

13          THE WITNESS:  Correct.

14          THE COURT:  So it's kind of like extra money that

15  doesn't affect the value of the asset?

16          THE WITNESS:  A recovery of, yeah, so the asset may

17  have been written down at one point because of a loss of value.

18  Then the settlement -- so the class action will be a settlement

19  of funds, proceeds that were allocated to that asset.  But

20  maybe it was already written down to zero or had lost some

21  value.

22          THE COURT:  Okay.  Does anything else that comes

23  through your accounts get classified as principal but not used

24  to pay off the notional value of the assets, or is this the

25  only kind of dollars that are treated that way?

1          THE WITNESS:  No.  The indenture has a fairly lengthy

2     description of what classification of principal proceeds.  So

3     it will provide you as what -- the details of what transactions

4     and which amounts should be classified as principal to be paid

5     down the waterfall.

6          THE COURT:  Thank you, Mr. Sliwa.

7          If I've made a hash of anything and any of you feel

8     you need to clarify, put your hands up, please.  All right.

9     You are excused, Mr. Sliwa.

10          THE WITNESS:  Thank you.

11          (Witness excused)

12          THE COURT:  Now we have about 45 minutes left in our

13     trial day.  Is Mr. Moon ready to begin?

14          MS. WITYK:  Your Honor, I understand Ms. Beaumont is

15     going to get Mr. Moon.

16          THE COURT:  Okay.

17          Should we put these binders away?  Does anyone want to

18     distribute any other binders.

19          MS. WITYK:  In terms of order, I know that both U.S.

20     Bank and the TAM parties subpoenaed Mr. Moon.  We're happy to

21     have U.S. Bank go first today because they're plaintiff.

22          THE COURT:  My notes tell me, my notes tell me that

23     U.S. Bank was planning to conduct an adverse examination of

24     Mr. Moon, which indicates that they wouldn't want to go first.

25     The TAM parties will conduct what's technically a cross exam,

N4H3USB4

1    but in this instance I will not permit leading questions.

2              MS. WITYK:  Understood.

3              THE COURT:  Because he truly is aligned with your

4    client, Ms. Wityk.

5              Mr. Lorenzo.

6              MR. LORENZO:  We understood from Tuesday that the TAM

7    parties also subpoenaed Mr. Moon, and that he effectively is

8    party affiliated.  And I think we had referred on Tuesday, I

9    remember Ms. Beaumont saying they were effectively going to do

10   Mr. Moon's direct.  And you asked whether they were going to do

11   a declaration in lieu of a direct and they said no, we are

12   going to do a direct.  So we think for sort of consistency

13   sake, so we are not going and coming back up after effectively

14   a direct, it makes more sense for them to conduct their

15   examination and we would conduct our cross-examination.

16             THE COURT:  Ms. Wityk?

17             MS. WITYK:  That's fine with us, your Honor.

18             THE COURT:  Okay.  Let's do it the traditional way

19   then.  And the TAM parties can call Mr. Moon, and present his

20   direct testimony.  And then we'll go around the room and you

21   can all have at him gently and politely on cross-examination.

22             TAM parties, do you have a witness?

23             MS. WITYK:  We call Mr. John Moon.

24             THE COURT:  Mr. Moon, step forward and just stop

25   before you get to the court reporter, please.  Thank you.

1    Right there is good.

2              (Witness sworn)

3              THE DEPUTY CLERK:  Please state your name and spell it

4    for the record.

5              THE WITNESS:  My name is John, J-O-H-N, middle initial

6    G, last name Moon, M-O-O-N.

7              THE COURT:  I've been handed a John Moon witness

8    binder.  Has Mr. Moon been handed his binder?

9              THE WITNESS:  I have, your Honor.

10             THE COURT:  Has everybody else been given a John Moon

11   witness binder?  We'll see how far we can get in approximately

12   45 minutes.  If you're still on direct at that point, when we

13   get to approximately 4:30, find a good stopping place, please,

14   and we will break for the day.  If you need a break before

15   that, Mr. Moon, you let me know.

16             Ms. Wityk, you may proceed.

17             MS. WITYK:  Thank you, your Honor.

18    JOHN G. MOON,

19        called as a witness by the Defendant,

20        having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MS. WITYK:

23   Q.  Good afternoon.  Please state your name for the record.

24   A.  John Moon.

25   Q.  Where do you currently work, Mr. Moon?

1  A.  I work at Olshan Frome Wolosky.

2  Q.  What do you do?

3  A.  I'm a lawyer.

4  Q.  Where did you work before that?

5  A.  Before that I worked at the law firm of Miller & Wrubel.

6  Q.  From what time period were you at Miller & Wrubel?

7  A.  From approximately 2009 until approximately five years ago.

8  Q.  Where did you work before you joined Miller & Wrubel?

9  A.  I was at UBS Investment Bank.

10  Q.  Approximately how long were you at UBS?

11  A.  Approximately seven years.

12  Q.  Prior to that, where did you work?

13  A.  I worked at Morgan Lewis & Bockius and Chadbourne & Parke.

14         THE COURT:  Hopefully not at the same time.

15         THE WITNESS:  Not at the same time, your Honor.

16  Q.  Mr. Moon, have you ever held a position in government?

17  A.  I have.

18  Q.  Can you describe that position or those positions.

19  A.  Yes.  After law school I became an enforcement attorney

20  with the U.S. Securities and Exchange Commission.  I was

21  elevated to branch chief.  Subsequent to that I became a

22  federal prosecutor of financial crimes for the U.S. Department

23  of Justice.

24  Q.  How long were you branch chief at the division of

25  enforcement of the SEC?

1    A.  I was enforcement attorney and a branch chief for all in

2    probably five years.

3    Q.  While you were serving at the U.S. attorney's office, did

4    you receive any sort of recognitions or wards?

5    A.  I didn't.  So I served out of Main Justice, not out of a

6    U.S. attorney's office.  I did my trials out of various U.S.

7    attorney's offices, but I did receive a special achievement

8    award from the attorney general during my time there.

9    Q.  So I want to go through a couple of definitions just to

10   make this go a little more smoothly.  So I'll be referring to

11   Triaxx Prime CDO 2006-1, Triaxx Prime CDO 2006-2, and Triaxx

12   Prime CDO 2007-1 together as either the issuers or the Triaxx

13   CDOs.

14   A.  I understand, yes.

15   Q.  Sometimes I'll refer to them individually as 2006-1 and so

16   forth.

17   A.  I understand, yes.

18   Q.  Mr. Moon, how did you first become familiar with the Triaxx

19   CDOs?

20   A.  Probably at the tail end of the 2007, 2008 financial

21   crisis, I was at Miller & Wrubel, I was approached by the law

22   firm of Williams & Connolly, who was litigating a case against

23   the U.S. Securities and Exchange Commission before Judge

24   Kaplan, and they asked me to come in and be a conflicts counsel

25   to depose an audit partner at Ernst & Young.  The matter

1   involved what was then called institutional credit partners,

2   and it was in its capacity as collateral manager for the Triaxx

3   entities.

4   Q.  Did there come a time when you were retained by the Triaxx

5   CDOs?

6   A.  Yes, there was.

7   Q.  I am going to refer you to a document in your witness

8   binder, Exhibit 3482 which is not yet in evidence.

9   A.  Yes, I see it.

10  Q.  What is this document, Mr. Moon?

11  A.  This is the engagement letter between my former law firm

12  Miller & Wrubel and the Triaxx CDOs.

13          MS. WITYK:  Your Honor, the TAM parties request that

14  Trial Exhibit 3482 be moved into evidence.

15          THE COURT:  Any objection?  3482 is admitted.

16          (Joint Exhibit 3482 received in evidence)

17  Q.  Mr. Moon, when were you retained by the Triaxx CDOs?

18  A.  It says here that I was retained in 2011, and that

19  refreshes my recollection.  The litigation before Judge Kaplan

20  was probably later, it's probably about 2010 or so when I first

21  met Triaxx.

22  Q.  So how was it that you came to be retained?

23  A.  I believe I did a good job taking the deposition of the

24  Ernst & Young partner, and at that time the Williams & Connolly

25  trial team, I don't believe they had any former SEC staff

1    members.  I had some experience with some of the regulatory

2    provisions, like section 206(4) of the Investment Advisors Act

3    of 1940.  So I was asked to join the trial team or at least

4    advise them on securities law matters.  And I guess I did a

5    good enough job that I was asked to take on this bank of New

6    York Mellon case.

7    Q.  Who did you speak to in connection with getting engaged by

8    the Triaxx CDOs?

9    A.  That was Tom Priore.

10   Q.  Anybody else?

11   A.  Sitting here right now, not that I recall.

12   Q.  What was the purpose of this engagement with the Triaxx

13   CDOs?

14   A.  Sure.  So, let me just again clarify my last answer.

15   Q.  That's okay.

16   A.  I spoke directly with Mr. Priore.  In many of the

17   communications, he was a go-between with the directors of the

18   Triaxx funds at the time.  So it wasn't solely Mr. Priore.  It

19   was two different directors and the present directors.  So

20   sorry about that.

21           In answer to your last question.  This was a case

22   involving Countrywide issued residential backed mortgage

23   securities.  A settlement was put together whereby Bank of

24   America, which had purchased Countrywide, would put forward $8

25   billion to be distributed to investors to compensate them for

1   their losses.

2         The people at ICP and Triaxx thought that the

3   settlement was fundamentally unfair, and so they retained me to

4   object to the settlement, and other types of work that were

5   similar to that.

6   Q.  I am going to take a step back to your earlier

7   clarification.  You said that Mr. Priore was a go-between

8   between the directors and the issuers at the time.  Do you

9   remember who those directors were?

10  A.  One of the director's names if I recall was Karen Ellerbe,

11  and I don't recall the other director's name at the time.

12  Q.  Going back to what you -- I believe you testified

13  essentially there was this Countrywide settlement, and then you

14  referenced other types of litigation.  So what are those other

15  litigations?

16        THE COURT:  I don't recall him referencing other types

17  of litigation.  Maybe he's about to.

18        THE WITNESS:  There were similar matters, your Honor,

19  that were either about to go to litigation or were in

20  litigation.

21  A.  So, other large financial institutions, like the Bank of

22  New York Mellon were starting to oppose similar settlements.

23  There was also a great deal of litigation regarding RMBS at the

24  time.  Because that was Triaxx's business, the engagement

25  envisioned I would be working on those cases as well.

1   Q.  Why was it that the Triaxx CDOs were objecting to these

2   settlements?

3   A.  Well, for one thing, there was no opt-out provision.  It

4   wasn't like a class action.  They felt that the settlement

5   offers were fundamentally unfair, because investors would get

6   compensated on the amount of loss, not on the breaches of reps

7   and warranties that were in the foundational documents of the

8   RMBS.

9            So, it was their feeling that the proponents of the

10  settlement were three large institutions that had bought a

11  large amount of RMBS at the height of the financial crisis,

12  those three institutions would receive a great windfall.  And

13  in contrast to Triaxx, which invested prudently, before the

14  financial crisis, would not receive its fair share of the $8

15  billion.

16  Q.  Can you explain a little bit to me why it was that

17  compensating based on the amount of loss rather than on reps

18  and warranties somehow would give these certain investors a

19  windfall and be unfair to the Triaxx CDOs?

20  A.  Sure.  So, you need to get compensated.  You need a

21  violation of a contract or of law.  And the reps and warrants

22  involved with -- I'm sorry.  The reps and warrants, rep and

23  warrant provisions of the RMBS that these three large

24  institutional investors purchased were far less strict than the

25  reps and warrant provisions of this RMBS that Triaxx purchased.

1      For example, Triaxx purchased only very high top end,

2  top tier RMBS.  Whereas these investors invested in, you know,

3  subprime RMBS, the subprime mortgages or Alt-A mortgages or

4  floating rate mortgages, which had much looser reps and

5  warranties.  So if you're going to have a settlement, it needs

6  to be based on a violation of law.  That should be the

7  principle.  Whereas in this case it was based on loss, which

8  any investor can lose money.  It doesn't mean it's cognizable.

9  Q.  Understood.  And who are the three large investors that

10 you're referring to?

11 A.  If memory serves, they were BlackRock, PIMCO, and Goldman

12 Sachs Asset Manager.

13 Q.  So, and that's a reference to one particular lawsuit that

14 you're talking about?

15 A.  So, certainly those three institutions were the proponents

16 of the Countrywide settlement that's referenced in Exhibit

17 3482.  But there were a number of other settlements that were

18 proposed, for example, one by HSBC.  Various financial

19 institutions that were trustees would have similar

20 cookie-cutter type proposals as well as Residential Capital,

21 which had proposed a settlement, I was retained to object to

22 that one as well.

23     THE COURT:  Ms. Wityk, forgive me for interrupting a

24 direct examination.

25     MS. WITYK:  That's okay.

1      THE COURT:  I know it's bad form.  But I need to be

2  able to follow along at home here.

3      Mr. Moon is referring to the case for which his firm

4  was first engaged on August 23, 2001, as the Countrywide case.

5  It appears to be titled application of BNY Mellon v. AIG.

6  These are one and the same?

7      THE WITNESS:  Yes, your Honor.

8      THE COURT:  So you're referring to a case that has

9  nothing to do with the parties listed in the action.

10      THE WITNESS:  Yeah, pardon me.  So the vernacular was

11  that it was the Countrywide settlement because the --

12      THE COURT:  They were paying all the money.

13      THE WITNESS:  They were paying the money because --

14  BoFA was paying all the money, had purchased Countrywide that

15  issued all the RMBS.  So it was an interpleader action, and

16  that's why it's entitled Bank of New York Mellon, who was the

17  trustee of these 500-odd RMBS trusts.

18      THE COURT:  Thank you.  That's helpful.  Go ahead.

19  Q.  So Mr. Moon, you mentioned these instances of objecting to

20  settlements.  Did the Triaxx CDOs also engage you for any other

21  types of litigation?

22  A.  I would say there were other matters that weren't

23  necessarily litigation.  Legal advice maybe about litigation or

24  coordinating litigation for them.  But, as I recall, just in

25  terms of litigation, I believe they were objecting to

1   settlements.  That's my recollection.

2   Q.  Did the Triaxx CDOs engage you to bring lawsuits against

3   certain parties?

4   A.  Oh, right.  Yes.  Yes, they did, yes.

5   Q.  What were those litigations involving?

6   A.  This particular action involving U.S. Bank is the one that

7   immediately comes to mind.  There was also a litigation, I was

8   hired to bring a case against JPMorgan.  And there was -- I was

9   hired to do a case against HSBC Investment Bank.

10  Q.  What was JPMorgan's role I guess in the context of that

11  litigation?

12  A.  You know, I'm sorry.  I just don't recall.  I don't believe

13  JPMorgan was a trustee.  I don't recall to be honest.

14  Q.  That's okay.

15          Do you recall HSBC's role?

16  A.  HSBC would have been a trustee litigation.

17          THE COURT:  Trustee litigation meaning that HSBC was

18  being sued for violating its obligations that its trustee had

19  in the RMBS?

20          THE WITNESS:  That's correct, your Honor.

21  Q.  Were you involved in bringing lawsuits against servicers?

22  A.  I coordinated some of that litigation.  I did not bring

23  litigation against servicers.  Triaxx hired another law firm to

24  do that.

25  Q.  What was that other law firm?

1   A.   I believe it was the McKool law firm.

2   Q.   So you just mentioned McKool.  Were there any other law

3   firms that the Triaxx CDOs engaged to pursue these strategies?

4   A.   Sure.  Sorry.  Pardon me.

5   Q.   That's okay.  Go ahead.  My question was, were there any

6   other law firms that the Triaxx CDOs engaged?

7   A.   The answer is yes.  I don't recall their names right now.

8   Q.   Okay.  Were you involved in the decision to retain those

9   other law firms?

10  A.   They would have asked me my advice about what I thought

11  about those law firms.

12  Q.   "They" meaning the issuers?

13  A.   The issuers through Mr. Priore, yes.

14        If I may, Ms. Wityk.  One of the other law firms was a

15  Seattle law firm called Keller Rohrback which was more of a

16  class action specialist.  They brought an action on behalf of

17  the Triaxx funds against financial institutions that were

18  alleged to have manipulated LIBOR.

19  Q.   Mr. Moon, are you familiar with an entity referred to as

20  Phoenix Real Estate Solutions?

21  A.   I am.

22  Q.   So I'll be referring to them as PRES or Phoenix.  How did

23  you come to know about them?

24  A.   Shortly after I was retained in the matter that's referred

25  to in 3482, Mr. Priore notified me that Triaxx had also hired a

1    consulting firm with some extraordinary IT capabilities that

2    could assist me in the litigation.

3    Q.  So you mentioned these extraordinary IT capabilities.  What

4    do you mean by that?

5    A.  So, RMBS, one issuance of RMBS is usually between 900

6    million and 1.1 billion notional.  It is comprised of hundreds

7    or thousands of residential loans.  So, there is a great deal

8    of incredible amount of evidence to try to understand what went

9    wrong with the RMBS, because it has so many subcomponents.

10           Phoenix was able, using proprietary databases, to

11   reach into the RMBS and find bad loans, find bad servicing,

12   find instances where the trustee did not keep its fiduciary

13   duties, and it took a lot of computing power to do things like

14   that.  Otherwise, the litigator is left with having to sample a

15   statistically significant number of loans.  So you are

16   expending extraordinary resources looking at evidence that

17   doesn't advance your case.  And Phoenix was able to do that,

18   and also do quite a bit of analysis of the RMBS to help a

19   litigator understand where the problems were, where the

20   unlawful conduct took place.

21   Q.  And I guess did Phoenix's work help you understand as a

22   litigator where the problems were you just said?

23   A.  Absolutely.

24   Q.  Can you tell me how it assisted you?

25   A.  Sure.  The first two instances that come to mind are this

litigation, the Countrywide litigation, Phoenix was -- so, Bank

of America put up 8 billion to settle.  The settlement would

have modified numerous of what's called the PSAs or purchase

and sale agreements which govern the RMBS.

        In I believe 49 of the 500-odd trusts at issue, they

had a provision in the PSAs that if there is a modification to

the PSA, the issuer, which was Countrywide and now Bank of

America, would be obligated to repurchase all the loans in that

trust.

        So, Phoenix was able to calculate how, although Bank

of America had put up 8 billion, those 49 trusts would require

Bank of America to put up another I believe 11.5 billion to

repurchase the loans.  That gave us extraordinary leverage in

settlement negotiations.

Q.  So, were you able to provide this analysis to Bank of

America in the settlement negotiations?

A.  So what I did was, toward the end of trial, in state

supreme court, I filed what's called a 4401 motion under the

CPLR, which is basically a judgment for a verdict.  And I used

all of -- not all -- much of Phoenix's analysis to show

graphically how Countrywide would -- I'm sorry -- Bank of

America would have to pay this additional 11.5 billion, and we

settled.  Justice Kapnick at the time found my motion to be

meritorious and held in our favor.  And Bank of America settled

with us shortly after that.

N4H3USB4                         Moon - Direct

1    Q.   Would it have been possible to achieve this settlement

2    without the analysis provided by Phoenix?

3    A.   It would not have.

4                MS. BUCKEL:   Objection for speculation.

5                THE COURT:   He can give his opinion categorized as

6    such.   Ask him for his opinion.

7    Q.   Mr. Moon, is it your opinion that --

8                THE COURT:   Ask him in a non-leading way.

9                MS. WITYK:   I apologize, your Honor.

10   Q.   Mr. Moon, do you have an opinion as to whether the

11   settlement could have been reached without Phoenix's work?

12   A.   I do.

13   Q.   What is your opinion?

14   A.   My opinion is that we would not have been able to do the

15   settlement without either Phoenix or an entity with the

16   capabilities of Phoenix.

17               And just to make the record clear, you know, that case

18   involved 500 RMBS trusts.   Each of those trusts has

19   documentation as complicated and as lengthy as the Triaxx

20   foundational documents.   It would have been extremely difficult

21   to go through all those documents to isolate the provisions, to

22   calculate the losses, to do all the things that Phoenix did for

23   me without -- there may be a couple institutions around that

24   can do it.   I have never found another institution that had

25   that capability.

1   Q.  Do you have an opinion about the quality of PRES' work?

2   A.  Yes, I do.

3   Q.  What is that opinion?

4   A.  I thought it was very high.

5   Q.  Did PRES provide you with work product in the course of

6   working on these activity litigations with you?

7   A.  Yes, they did.

8   Q.  What did that output look like?

9   A.  The output took several forms.  Sometimes it would be large

10  amounts of tabular data that would serve to maybe prove a fact

11  in dispute, such as trust company X, Y, Z didn't fulfill its

12  obligations, or servicer X, Y, Z didn't fulfill its

13  obligations.

14       Another example of their work product would be very

15  graphic visuals that would synthesize all this data.  So for

16  example, the 11.5 billion they were able to show in very

17  graphic detail that I could attach to an affidavit how this

18  $11.5 billion  would be owed in a repurchase obligation.

19       And one final thing.  One of the aspects of these

20  litigations that I brought, you know, also involved particular

21  mortgages.  So, again, they were able to show that a particular

22  mortgage in a pool of loans of hundreds or thousands of loans

23  should have been foreclosed upon by the trustee but was not.

24  They were able to download a picture of the house, who lived

25  there, what the taxes were.  Extraordinary detail.

1        And those, again, were the sorts of things that I

2   could add as a summary exhibit to an affidavit that I believe

3   would be persuasive to a court.

4   Q.  Who did you work with at PRES?

5   A.  For most part, I worked with Dr. Mingsung Tang.  He would

6   be my lead liaison.

7   Q.  Anybody else?

8   A.  Yes.  To a limited extent toward the beginning, Mr. Vishal

9   Garg, and another analyst, his name -- he's known as Ziggy

10  Jonsson.  And those would be my lead contacts.

11  Q.  How was it decided what work PRES would do?

12  A.  I would look at the evidentiary needs of the case.  I would

13  then speak to Mr. Priore, whoever was leading the collateral

14  manager at the time, and say, look, I need tabular data on, for

15  example, the repurchase obligation of Bank of America.  And we

16  would talk about it, and he would then see if PRES could do it.

17  And many, many of the times PRES could do whatever analysis I

18  needed.

19  Q.  Did PRES ever offer ideas for work they could perform?

20  A.  Yes.

21  Q.  Can you give examples of that?

22  A.  You know, I think a simple example would be calculating

23  damages on various mortgages or various types of mortgages, and

24  how those mortgages did or did not appear to be in violation of

25  a rep and warranty in the PSA.

1    Q.  So in the course of working with PRES, having them give you

2    work product, did you discuss the work product with them?

3    A.  Yes.

4    Q.  Was it an iterative process?

5    A.  Yes.  Many times it would be almost a daily process during

6    some of these litigations that I would be speaking with PRES.

7    Q.  To your knowledge, did PRES assist any of the other law

8    firms engaged by the Triaxx CDOs in their respective

9    litigations?

10   A.  I believe they did, yes.

11   Q.  Do you have any knowledge of the assistance that was given

12   to those other firms?

13   A.  Not that I recall sitting here.

14   Q.  Mr. Moon, could you please turn to Exhibit 3497.

15   A.  I see it.

16   Q.  Do you recognize Exhibit 3497?

17              THE COURT:  Is this in or not yet in?

18              MS. WITYK:  It is not yet in evidence.

19              THE COURT:  Thank you.

20   A.  Yes, I do recognize it.

21   Q.  What is it?

22   A.  This is a meeting agenda with attachments for the Triaxx

23   directors.

24              MS. WITYK:  The TAM parties would like to offer

25   Exhibit 3497 into evidence.

1           THE COURT:  Objection?  Exhibit 3497 is admitted.

2           (Joint Exhibit 3497 received in evidence)

3    Q.  Mr. Moon, please go to the page ending in Bates stamp 675.

4           THE COURT:  Long agenda.

5    A.  Yes, I see it.

6    Q.  Do you recognize this document?

7    A.  I do.

8    Q.  What is it?

9    A.  This is a settlement agreement reached between Triaxx and

10   the bank -- you know, what I'll call the Bank of America

11   parties in the Countrywide litigation that I referenced in the

12   engagement letter with Triaxx.

13   Q.  What were the economic terms of the settlement?

14   A.  My recollection is that the Bank of America paid us 97

15   million upfront, and at that time, the settlement had not been

16   approved by Justice Kapnick in the litigation.  So they

17   guaranteed us an additional 35 million on a date certain, and

18   that -- that 35 million was an estimate of what Triaxx was

19   expected to receive if the settlement went through.

20   Q.  Let me just turn your attention to the page ending in 80,

21   and then just take a look --

22   A.  Oh, sorry.  69 million.

23   Q.  That was my question.

24   A.  Yeah, sorry.

25   Q.  How much was the first payment?

N4H3USB4                        Moon - Direct

1    A.  69.

2    Q.  69 million.  Then you mentioned --

3            THE COURT:  Wait.  Hold on.  69 as opposed to 97?

4            THE WITNESS:  Yes, your Honor.  Pardon me.

5            THE COURT:  You misspoke?

6            THE WITNESS:  I misspoke, your Honor.

7            THE COURT:  Thank you.

8    Q.  Then Mr. Moon, I believe you mentioned a second payment

9    down the line.  Is that right?

10   A.  Yes, that's on the next page I believe, Subsection B

11   Romanette (i) and (ii) speak about the 35 million.

12   Q.  And so how did the second payment work exactly?

13           THE COURT:  That's a little vague, counsel.  Can you

14   sharpen that question.

15           MS. WITYK:  Sure, your Honor.

16   Q.  Under what conditions could the Triaxx CDOs obtain the

17   second payment?

18           THE COURT:  Better.  Thank you.

19   A.  Okay.  Yes, now it's coming to me.

20           So, there was a cutoff date in section 3A of June 1st,

21   2016.  And if Triaxx had not received at least $35 million by

22   that date, Bank of America -- in the settlement, Bank of

23   America would pay that 35 million.  And if then Triaxx received

24   more than 35 million in the settlement -- boy.  It was

25   basically a guarantee that Triaxx would get at least 35 million

1    from the settlement, if the settlement went through or not.

2    That was my understanding.

3    Q.  All right.  And did Triaxx receive that second settlement

4    payment?

5    A.  Yes.

6    Q.  And how much was that second payment?

7    A.  I believe it was approximately -- I believe what happened

8    was Triaxx received approximately 700,000 -- $750,000 more than

9    the settlement.  And Triaxx was then obligated to give back the

10   35 million that it had received from Bank of America, so it

11   wasn't double dipping so to speak.

12          THE COURT:  I am a little confused.  They got 700,000

13   so they had to pay back 35 million?

14          THE WITNESS:  No, your Honor.  I'm being imprecise

15   because this is a long time ago.  Pardon me.

16          The idea was Triaxx was given a guarantee.  Bank of

17   America guaranteed that Triaxx would receive at least 35

18   million at a certain cutoff date.  Bank of America made good on

19   its representation.  They paid us the 35 million.

20          At some point later, days, months or weeks later, the

21   settlement went through and Triaxx received 35,750,000, so we

22   received more than the 35 million.  And so we were obligated to

23   give back the 35 million so we weren't getting two recoveries.

24          THE COURT:  But you were allowed to keep the 700,000.

25          THE WITNESS:  We kept the extra 750, yes.

1           THE COURT:  I'm with you.

2           THE WITNESS:  Pardon me, your Honor.  I am being

3   vague.

4   Q.  So Mr. Moon, how much did the Triaxx CDOs recover in total

5   from the Countrywide settlement?

6   A.  It would be the 69 million, plus the 35 million roughly

7   $750,000.

8   Q.  Mr. Moon, please go to --

9           THE COURT:  This is the $105 million then?

10          MS. WITYK:  That's what we're talking about.

11          THE COURT:  Do we add up to 105 in round numbers?

12          THE WITNESS:  Yes, your Honor.

13          THE COURT:  Thank you.

14  Q.  Mr. Moon, please go to Exhibit 3483 which is not in

15  evidence.

16          THE COURT:  That number?

17          MS. WITYK:  3483, your Honor.

18          THE COURT:  Thank you.  I'll try to keep up.

19  A.  I see it.

20  Q.  Do you recognize this document, Mr. Moon?

21  A.  Yes.  This was my recommendation to settle, to enter into

22  the settlement agreement that we just discussed.  And I am

23  copying, importantly I'm copying Lori Martin, Esquire, who was

24  a partner at Wilmer Hale who was advising the directors.

25          MS. WITYK:  The TAM parties would request that Trial

1     Exhibit 3483 be moved into evidence.

2              THE COURT:  Any objection?  3483 is admitted.

3              (Joint Exhibit 3483 received in evidence)

4     Q.  Mr. Moon, do you recall when the $69 million were wired,

5     where they were wired to?

6     A.  Yes, I do.

7     Q.  Where were they wired to?

8     A.  They were wired into a bank account that was jointly

9     administered by Miller & Wrubel as well as Keller Rohrback, one

10    of the other law firms I mentioned.

11    Q.  Now, could you please go to Exhibit 3485, please, which is

12    not yet in evidence.

13    A.  Yes, I see it.

14    Q.  Do you recognize this document?

15    A.  I do.

16    Q.  What is it?

17    A.  This is a followup to the agenda for the director's meeting

18    that we just discussed.  It is probably my second communication

19    to the directors on settlement, the first being that board

20    meeting agenda, and the second one being this particular

21    document, number 3485.

22             MS. WITYK:  The TAM parties would request that Trial

23    Exhibit 3485 be moved into evidence.

24             THE COURT:  Hearing no objection, 3485 is admitted.

25             (Joint Exhibit 3485 received in evidence)

1    Q.  Mr. Moon, I think you might have stated this before, but

2    who was Ms. Martin?

3    A.  Ms. Martin is a partner at the law firm Wilmer Hale, and

4    she was retained by the directors of Triaxx to give them legal

5    advice on these matters.

6    Q.  Why did you draft this letter to Ms. Martin?

7    A.  Well, she was their lawyer, so it would have been I think

8    not very professional to send a letter directly to a

9    represented person.

10   Q.  All right.  And I guess I was asking a more general level,

11   why you were drafting the letter, not necessarily why it was

12   sent to Ms. Martin.

13   A.  As I recall, there was something about the -- I don't

14   recall what.  There was something about that board agenda that

15   I had previously sent, the directors wanted it in a different

16   format.  And so this is what -- as I recall, this is what they

17   wanted.

18   Q.  Okay.  So, in your letter, you referred to this $69 million

19   payment as the first recovery.  Do you see that on the first

20   page?

21   A.  Yes.

22   Q.  And does this letter reflect your recommendations with

23   respect to how funds should be distributed?

24   A.  Yes, it does.

25   Q.  Just generally speaking, what were your recommendations?

1   A.  So, the first recommendation was to send -- Triaxx 2006-1

2   approximately 10 million, and 2006-2 16 million, and 2007-1 3

3   million.  And then the remaining recommendations had to do with

4   paying some of the service providers.  I see my law firm

5   received the princely sum of $50,000.  There was a $28,000 fee

6   for the appellate record for the appellate division of the

7   state supreme court.  There was a transfer to Schulte Roth &

8   Zabel for 25,000 which was to pay them for vetting this

9   transaction or this proposed transaction.  Also at the time we

10  reserved 14 million because there was a fee dispute with the

11  law firm Keller Rohrback.  And to reserve some funds in the

12  amount of 13,500,000.

13  Q.  I'm sorry.  Did you also recommend that PRES be paid?

14  A.  Yes.  That PRES be paid.  Yes, that PRES be paid

15  11,750,000.

16  Q.  Why did you recommend that counsel and these other service

17  providers, including PRES, be paid from the first recovery,

18  rather than allowing payments to them to float through the

19  waterfall?

20  A.  I mean, that was the -- that was I guess the agreement of

21  the collateral manager and the directors.

22  Q.  Do you have an understanding of what the rationale was for

23  structuring the payment this way?

24  A.  Yes.  My recollection is that at that time, the

25  understanding was that we had had a very good victory in court,

1    and that that victory was scalable for Triaxx CDOs.  In other

2    words, if we reserved some funds, we could then hire more

3    professionals and get more recoveries for the Triaxx entities.

4    Q.  How much did you recommend that PRES be paid at this time?

5    A.  I didn't really recommend.  I believe these were largely

6    the recommendations of the collateral manager that I would then

7    collect and synthesize.  And it wasn't a recommendation.  I

8    mean, my recollection is that PRES was owed 11,750,000 as per

9    their engagement agreement, and I believe in this letter I'm

10   referring to Exhibits D and E, which show the backup for that

11   amount.

12   Q.  Exhibits D and E to what, Mr. Moon?

13   A.  I believe it was probably, well, so, it's Exhibits D and E

14   to the submission, and the submission is a defined term.  On

15   the first page of the letter, I define submission as the

16   proposed agenda for the meeting of the boards which we had

17   previously discussed.

18   Q.  Did you do anything to confirm that this 11.75 million fee

19   was proper?

20   A.  Yeah, yes.  I would have reviewed the contracts, and I

21   believe there were maybe a computation done.  It was not a

22   straight contingency fee.

23   Q.  Do you have a view about how this I guess success fee or

24   incentive fee for PRES compared to law firm contingency fees,

25   for example?

1   A.  My understanding is it was a better deal than a typical law

2   firm contingency fee.  My recollection, typically a law firm

3   contingency fee is 30 percent or 33 percent.  My recollection

4   of the PRES engagement letters, there was a provision that

5   certain trusts had to be topped off, their losses had to be

6   fixed, and after that, after those payments were made, and

7   those trusts were made whole, then PRES would take a

8   contingency.  And I don't recall the percentage of the

9   contingency.

10  Q.  Now, in Trial Exhibit 3458 with the page ending in Bates

11  stamp 12, you write that "The collateral manager will issue the

12  attached instruction on November 25, 2014, unless we receive

13  instructions from the directors otherwise."

14         Do you see that?

15  A.  I do.

16  Q.  At this point in time in 2014, do you recall what the name

17  of the collateral manager was?

18  A.  I believe it was Mr. Priore.

19  Q.  Did you receive -- excuse me.  Did the directors give you

20  instructions otherwise other than what was in this letter?

21  A.  They did not.

22  Q.  Did Ms. Martin object to anything in this letter?

23  A.  She did not.

24         MS. WITYK:  I'm mindful of the time, and this is a

25  good stopping point for me.

N4H3USB4

1     THE COURT:  All right.  So, we will break for the day.

2     Mr. Moon, we start up at 9:30 in the morning.  You are not to

3     discuss your testimony or the facts underlying this lawsuit

4     with counsel or others overnight, please.  And you will still

5     be under oath at 9:30 tomorrow morning.  Let's excuse,

6     Mr. Moon.  Let's keep the lawyers and talk logistics for just a

7     minute.

8          (Witness temporarily excused)

9          THE COURT:  We are amazingly not terribly behind

10    schedule yet.  On the other hand, we didn't block our schedule

11    out very carefully beyond the first two witnesses so let's chat

12    for a moment about tomorrow.

13         Ms. Wityk, how much longer on direct do you think you

14    have with Mr. Moon?

15         MS. WITYK:  I still have a fair bit to go through with

16    Mr. Moon.  I would say probably another hour and a half or so.

17         THE COURT:  So that would take us to our morning break

18    tomorrow.  And then who is going to be up first on cross exam?

19         MR. LORENZO:  I believe we will be, your Honor.

20         THE COURT:  About how much time, if you can give me a

21    preliminary estimate?

22         MR. LORENZO:  I would imagine maybe slightly more than

23    90 minutes.

24         THE COURT:  That will take the rest of the morning,

25    and that's assuming people hold true to their estimates which

N4H3USB4

1   is 50-50 at best.

2              Noteholders or who is going to be next with Mr. Moon?

3              MR. SAVLA:  Yes.  We assume we won't have much, if

4   any, questions.

5              THE COURT:  You won't have much?

6              MR. SAVLA:  Not much.

7              THE COURT:  Mr. Rainier, how about you?

8              MR. RAINIER:  I would say about 30 minutes right now.

9              THE COURT:  So, it's possible that Mr. Moon could be

10  done by lunch, but more likely he'll go a bit into the

11  afternoon.

12             Will Mr. Nissenbaum be ready?

13             MR. LORENZO:  Yes, your Honor.  Our understanding is

14  Mr. Nissenbaum is available all day, and his counsel is going

15  to be bringing him in the morning.

16             THE COURT:  And who is his counsel for this purpose?

17             MR. LORENZO:  So I believe it is Pete White at Schulte

18  Roth & Zabel.

19             THE COURT:  Who will be calling him?

20             MR. LORENZO:  We will be calling him, your Honor.

21             THE COURT:  Adverse?

22             MR. LORENZO:  Yes.

23             THE COURT:  Okay.  So Mr. Nissenbaum will come with

24  his own counsel, will be called as an adverse witness by the

25  trustee, and then who will be up next with Mr. Nissenbaum?

N4H3USB4

1          MS. BEAUMONT:  Your Honor, I guess that would be us.

2          THE COURT:  Okay.  Adverse by trustee.  Is this true

3    cross or not true cross?

4          MS. BEAUMONT:  Probably not true cross.

5          THE COURT:  Then we will have cross in quotation marks

6    by TAM.

7          Noteholders, anything from for Mr. Nissenbaum?

8          MR. SAVLA:  Probably limited as well.

9          THE COURT:  Limited.  And what about the issuers?

10         MR. RAINIER:  Perhaps very little.

11         THE COURT:  Well, I wonder whether we should then make

12   arrangements to make sure that Mr. Garg or Mr. Calamari is

13   available towards the end of the day tomorrow, if necessary.

14         MS. BEAUMONT:  That was our intention, your Honor.

15         THE COURT:  That will be Mr. Garg first, is that

16   right?

17         MS. BEAUMONT:  Yes, that's correct.

18         THE COURT:  Okay.  Well, I think we're good through

19   tomorrow.  Does anybody have anything they need to tell me

20   about the witness line up for the rest of the week or shall we

21   address that at the end of the day tomorrow?

22         All right.  Hearing nothing.  Let's see.  Ah.  I spoke

23   too soon.

24         MR. RAINIER:  I want to put something very briefly on

25   the record related to issuer's opening.  It came to my

N4H3USB4

1    attention I misspoke in one regard I wanted to clarify for the

2    record.

3           THE COURT:  What did you say that was not 100 percent

4    accurate?

5           MR. RAINIER:  I stated that none of the other parties

6    have any claims for damage against the issuers.  I have

7    overlooked the cross claim by TAM and PRES.

8           THE COURT:  I think they want about $38 million from

9    you plus interest.

10          MR. RAINIER:  From the CDO collateral for sure.

11          THE COURT:  That's how you look at it I know.

12          MR. RAINIER:  We do, yes.

13          THE COURT:  The issue is adequately posted.

14          All right.  So let me see.  At the end of the trial

15   day, do we recess or do we adjourn.  We should probably recess.

16          MR. LORENZO:  One more logistical thing.  For the list

17   that Ms. Buckel had sent around at the end of the night

18   yesterday which is the unobjected to exhibits, we'll provide a

19   list with a caption.  We will then --

20          THE COURT:  It will say something like attached is the

21   list of exhibits that were admitted without objection on Monday

22   morning.  That's fine.

23          The purpose of this is just so that when you write

24   your posttrial submissions, if you are going to write posttrial

25   submissions, or if there is a later proceeding on appeal,

N4H3USB4

1   nobody is confused about what was in and what was out.

2          MR. LORENZO:  Understood, your Honor.  Then the second

3   thing we will put up is Mr. Sliwa's declaration which will be

4   posted in full on the docket.

5          THE COURT:  That's right.  Because it is his direct

6   testimony.

7          MR. LORENZO:  And then the third, and I think you had

8   indicated that exhibits would be treated separately for

9   declarations, and I didn't know.  Would you also like a list of

10  the exhibits referenced in Mr. Sliwa's declaration?

11         THE COURT:  That's an interesting point.  So, there

12  are three types I guess of exhibits.  There is the exhibits

13  that were admitted en masse at the beginning, and we've dealt

14  with those.  Exhibits that are admitted one by one, we don't

15  need any further documentation because the transcript will

16  provide the adequate documentation.

17         So you raise the question what about exhibits that are

18  referenced in direct testimony affidavits but that may not have

19  been admitted en masse or as we go along.  I haven't been

20  keeping track of those.  So what's your suggestion?

21         MR. LORENZO:  So, we can tonight double check.  And

22  admittedly, as I stand here, I don't know what was admitted en

23  masse and what might have come in today, if there is a category

24  that is exhibits that weren't covered by either those two

25  things.  And then if there are, I guess we can deal with it

N4H3USB4

1    tomorrow morning.  But we can see if there are any objections

2    to those other exhibits.

3           THE COURT:  That's one way to do it.  The morning

4    after any witness with an affidavit is done, you can come to me

5    and say we forgot to get X and Y admitted.  Or alternatively,

6    we could hold all those odds and ends until all of the

7    witnesses have testified, because exhibits will be trickling in

8    throughout the week.  And perhaps counsel can meet and confer

9    during lunch even on Friday, you might be a little busy during

10   lunch on Friday, but at some point, and figure out what odds

11   and ends need to be moved into evidence and do it at that

12   point.  That's probably a better idea.

13          MR. LORENZO:  That works, your Honor.

14          THE COURT:  Any objection?  So stray -- that's the

15   wrong word.  Exhibits which are referenced in direct testimony

16   affidavits but which have not been admitted during the course

17   of the week, you can make a list of those, meet and confer

18   about them, and if appropriate, make a motion to get them

19   admitted at the close of all of the testimony.

20          MR. LORENZO:  Thank you.

21          THE COURT:  Now we will in fact be in recess until

22   9 o'clock tomorrow morning.

23          (Adjourned until March 18, 2023, at 9:30 a.m.)

24

25

```
 1                          INDEX OF EXAMINATION

 2    Examination of:                              Page

 3     KENNETH SLIWA

 4    Direct By Ms. Buckel . . . . . . . . . . . .74

 5    Cross By Ms. Wityk . . . . . . . . . . . . .76

 6    KENNETH SLIWA

 7    Cross By Mr. Lauriello . . . . . . . . . . 169

 8    Redirect By Ms. Buckel . . . . . . . . . . 176

 9     JOHN G. MOON

10    Direct By Ms. Wityk  . . . . . . . . . . . 187

11                           JOINT EXHIBITS

12    Exhibit No.                              Received

13     3065    . . . . . . . . . . . . . . . . . .80

14     3056    . . . . . . . . . . . . . . . . . .84

15     3078    . . . . . . . . . . . . . . . . . .88

16     3083    . . . . . . . . . . . . . . . . . 105

17     3482    . . . . . . . . . . . . . . . . . 190

18     3497    . . . . . . . . . . . . . . . . . 204

19     3483    . . . . . . . . . . . . . . . . . 208

20     3485    . . . . . . . . . . . . . . . . . 208

21     3086    . . . . . . . . . . . . . . . . . 117

22     3089    . . . . . . . . . . . . . . . . . 121

23     3096    . . . . . . . . . . . . . . . . . 145

24     3097    . . . . . . . . . . . . . . . . . 148

25     3098 and 3099  . . . . . . . . . . . . . . 151
```

3057 . . . . . . . . . . . . . . . . . . . 159

3058 . . . . . . . . . . . . . . . . . . . 162

3069 . . . . . . . . . . . . . . . . . . . 163

3491 . . . . . . . . . . . . . . . . . . . 164

3489 . . . . . . . . . . . . . . . . . . . 164