N4JKUSB1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   U.S. BANK NATIONAL
     ASSOCIATION,
 4
             Interpleader Plaintiff,
 5
                  v.                      18 CV 04044 (BCM)
 6
     TRIAXX ASSET MANAGEMENT, LLC,
 7   et al.,
                                          Bench Trial
 8
             Interpleader Defendants.
 9
     ------------------------------x
10                                        New York, N.Y.
                                          April 19, 2023
11                                        9:30 a.m.
     Before:
12                       HON. BARBARA C. MOSES,

13                                        U.S. Magistrate Judge

14                            APPEARANCES

15   ALSTON & BIRD
          Attorneys for Interpleader Plaintiff
16   BY:  ALEXANDER LORENZO
          ELIZABETH A. BUCKEL
17
     FRIEDMAN KAPLAN SEILER & ADELMAN
18        Attorneys for Interpleader Defendants Triaxx and Phoenix
     Real Estate
19   BY:  ANNE E. BEAUMONT
          PRIYANKA WITYK
20        ANIL K. VASSANJI

21   NORTON ROSE FULBRIGHT
          Attorneys for Interpleader Defendant PIMCO
22   BY:  SANDEEP SAVLA
          ANTHONY LAURIELLO
23        BRANDT VERNON

24

25
```

N4JKUSB1

1                       APPEARANCES (Continued)

2   DAVIS POLK & WARDWELL LLP
         Attorneys for Interested Party Citigroup Global Markets
3   BY:  ADAM GREENE
         ISAAC GELBFISH
4
    WOLLMUTH MAHER & DEUTSCH
5        Attorneys for Interpleader Defendant Triaxx Prime CDOs
    BY:  RANDALL RAINER
6

7
    Also Present:
8   JASON BERLAND, One Zero Capital

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N4JKUSB1

| | |
|---|---|
| 1 | (In open court; trial resumed; case called) |
| 2 | THE DEPUTY CLERK:  Counsel, please make your |
| 3 | appearances for the record. |
| 4 | MR. LORENZO:  Good morning, your Honor.  Alex Lorenzo, |
| 5 | from Alston & Bird, for U.S. Bank National Association.  Again, |
| 6 | I'm joined today by my colleague, Ms. Buckel. |
| 7 | THE COURT:  Mr. Lorenzo and Ms. Buckel, good morning. |
| 8 | MR. SAVLA:  Your Honor, Sundeep Savla, of Norton Rose |
| 9 | Fulbright US LLP, for PIMCO.  I'm joined by my colleague, |
| 10 | Anthony Lauriello.  I'm also joined by Davis Polk team, for |
| 11 | Citi, consisting of Adam Greene and Isaac Gelbfish. |
| 12 | THE COURT:  Mr. Savla, Mr. Lauriello, Mr. Greene, and |
| 13 | Mr. Gelbfish today. |
| 14 | MS. BEAUMONT:  Good morning, your Honor.  Anne |
| 15 | Beaumont, from Friedman Kaplan Seiler & Adelman, for Triaxx |
| 16 | Asset Management, LLC, and Phoenix Real Estate Solutions Ltd. |
| 17 | And with me are my colleagues, Pryanka Wityk and Anil Vassanji. |
| 18 | THE COURT:  Ms. Beaumont, Ms. Wityk, and Mr. Vassanji. |
| 19 | MR. RAINER:  Good morning, your Honor.  Randall |
| 20 | Rainer, from Wollmuth Maher & Deutsch, for Triaxx Prime CDOs. |
| 21 | THE COURT:  Mr. Rainer. |
| 22 | And we excused Ms. Bandler yesterday, so we are not |
| 23 | expecting her here today. |
| 24 | Ms. Beaumont, is your witness ready? |
| 25 | MS. BEAUMONT:  Yes. |

1    VISHAL GARG,

2         called as a witness by the Defendants,

3         having been duly sworn, testified as follows:

4              THE WITNESS:  Vishal Garg, V-i-s-h-a-l, Garg, G-a-r-g.

5              THE COURT:  Ms. Beaumont, you may proceed.

6              MS. BEAUMONT:  May I approach the witness with the

7    declaration?

8              THE COURT:  You may.

9    VISHAL GARG,

10   DIRECT EXAMINATION

11   BY MS. BEAUMONT:

12   Q.  Good morning, Mr. Garg.  I just have given you a document

13   titled "Trial Declaration of Vishal Garg."

14        Do you have that?

15   A.  I do.  Thank you.

16   Q.  Is that your direct testimony in this case?

17   A.  It is.

18   Q.  And are there any clarifications or corrections you'd like

19   to make to that?

20   A.  I want to clarify that there was a mistake in here in that

21   there is a calculation of due diligence fees, and the due

22   diligence fees have a mistake in that the amounts are off

23   because, in our calculation, we assumed they're the same across

24   all three CDOs when, actually, they're different across the

25   three different CDOs.

1   Q.  And that's the material in paragraph 27 of the declaration?

2   A.  Yes, ma'am.

3            MS. BEAUMONT:  We would move the admission of

4   Mr. Garg's direct testimony in this case.

5            THE COURT:  Hold on one second.

6            (Pause)

7            THE COURT:  If you wish, before cross-examination, you

8   may elicit from the witness what his corrected testimony would

9   be with respect to paragraph 27.

10            MS. BEAUMONT:  Thank you, Judge.

11   BY MS. BEAUMONT:

12   Q.  Mr. Garg, in paragraph 27, you state, "In addition, PRES

13   was to receive a monthly diligence fee for each of the three

14   Triaxx CDOs, the amount of which started at $50,000 per month

15   and declined to $25,000 per month."

16            Is that correct as to all three CDOs?

17   A.  - and I'm trying to remember.  I think for one of the CDOs,

18   it was $40,000, and it declined to $20,000, and another one, it

19   was $30,000 and it declined to $15,000.

20   Q.  And the exact information is set forth in the engagement

21   letters?

22   A.  That's correct.

23            THE COURT:  Is that the extent of the clarification?

24            MS. BEAUMONT:  It is.

25            THE COURT:  All right.  Thank you very much.

1              Cross-examination?

2              MR. SAVLA:  Your Honor, if I may approach with the two

3    binders?

4              THE COURT:  You may approach.

5              THE WITNESS:  Thank you.

6              THE COURT:  Thank you.

7              Mr. Savla, you may proceed.

8              MR. SAVLA:  Thank you.

9    CROSS-EXAMINATION

10   BY MR. SAVLA:

11   Q.  Mr. Garg, I'm Sandeep Savla, and I represent PIMCO, and I

12   am going to have some questions for you.  I'd like to start

13   with the lead-up to the engagement letters.

14             It's fair to say that you saw a business opportunity

15   in residential mortgage-backed securities in 2010, correct?

16   A.  That would be fair to say.

17   Q.  You created Phoenix Real Estate Solutions to seize on that

18   opportunity?

19   A.  That's correct.

20   Q.  And you're familiar with an entity called Phoenix Real

21   Estate Solutions, correct?

22   A.  I am familiar.

23   Q.  I'm going to refer to Phoenix Real Estate Solutions as

24   Phoenix or Phoenix RES.

25             Is that okay with you?

1    A.  I would prefer if you refer to it as PRES, if that's okay,

2    because there are so many Phoenix entities.

3    Q.  Very well.  PRES, it is.

4           And you were a director and officer of PRES, correct?

5    A.  That's correct.

6    Q.  And Mr. Visweswaran was also a director and officer of

7    PRES, correct?

8    A.  That's correct.

9    Q.  Mr. Visweswaran's job was more to help manage the

10   administrative side of things at PRES, correct?

11   A.  Sure.

12   Q.  And PRES is owned by a company called Phoenix Holdco L.P.,

13   correct?

14   A.  That's correct.

15   Q.  And you were a limited partner in Phoenix Holdco L.P.?

16   A.  That's correct.

17   Q.  I'd like to show you what's already been admitted in

18   evidence as Exhibit 2059, which you will see in tab 3 of your

19   binder.  If you go to the second page of that, it's got the

20   Bates stamp ending in 445.

21          Just let me know when you're there.

22   A.  I'm there.

23   Q.  If we look at the middle column or the second column, that

24   shows the Phoenix RES parent companies, correct?

25   A.  That is correct.

N4JKUSB1                          Garg – Cross

1   Q.  There's Phoenix Holdco, which owns a hundred percent of

2   Phoenix RES, correct?

3   A.  That is correct.

4   Q.  And then you were an 11 percent limited partner of Phoenix

5   Holdco?

6   A.  That's correct.

7   Q.  And then Phoenix Cayman Ltd. is the general partner?

8   A.  That's correct.

9   Q.  And then Asian Castle, in turn, owns Phoenix Cayman Ltd.?

10  A.  That's correct.

11  Q.  And you were one of four shareholders in Asian Castle Ltd.,

12  correct?

13  A.  That's correct.

14  Q.  Mr. Visweswaran is also a shareholder in Asian Castle,

15  correct?

16  A.  That's correct.

17  Q.  I'd like to show you another document, and this is Trial

18  Exhibit 2041, which is already admitted in evidence.  It's

19  tab 4 of your binder.

20  A.  Yep.

21  Q.  And this is an email.  If we go to the second email in the

22  chain, which is up on your screen, it's from you to Mr. Lehman,

23  Mr. Visweswaran, Mr. Greg Smith, and Mike Balboa, correct?

24  A.  That's what it states, yes.

25  Q.  And at this time, Mr. Visweswaran was one of the principals

1    at ARAM Global, correct?

2    A.   Yes.

3    Q.   Mr. Balboa was the other principal at ARAM Global?

4    A.   Yes.

5    Q.   And you were a business partner to Mr. Balboa and

6    Mr. Visweswaran?

7    A.   That's correct.

8    Q.   And you were at ARAM ABS?

9    A.   Yes.

10   Q.   And you owned 25 percent of ARAM ABS, correct?

11   A.   That's correct.

12   Q.   And ARAM Global owned 50 percent of ARAM ABS, correct?

13   A.   That's correct.

14   Q.   Now, I'll direct you to some language in the email.  It

15   begins, "I have read the full offering memo and the indenture,"

16   and the re line of the email is "Triaxx."  It goes on to say,

17   "I am now familiar with the ins and outs of events of default,

18   removal of collateral manager, et cetera, et cetera."

19           Have I read that right?

20   A.   That's correct.

21   Q.   And so is it fair to say that as of April 2010, that you

22   had read the offering memo?

23   A.   Yes.

24   Q.   You had read the indenture?

25   A.   Yes.

1   Q.  And one of the things you were looking at is potential

2   removal of the collateral manager, correct?

3   A.  That's correct.

4   Q.  And the collateral manager at the time was ICP?

5   A.  That's correct.

6   Q.  The email goes on to say, "I think we could do many things

7   (some of which sound counterintuitive, but would be very

8   effective) if we took over the ICP vehicle, which is the

9   collateral manager."

10          Correct?

11  A.  That's correct.

12  Q.  So one of the things you were looking at in April of 2010

13  is taking over the ICP collateral manager, correct?

14  A.  We were looking at potentially purchasing ICP.

15  Q.  If we go to the paragraph that begins, "The fee is 5bps per

16  annum" -- am I right that that's basis points?

17  A.  Five basis points, yes.

18  Q.  Five basis points per annum.

19          -- "which, on 9 billion of Triaxx, is still

20  4.5 million per year."

21          Have I read that right?

22  A.  That's correct.

23  Q.  One of the things you were looking at in April 2010 was the

24  amount of fees you could obtain by acquiring the collateral

25  manager, correct?

1    A.  No, that's not correct.

2    Q.  Is it fair to say that as of April 2010, you were looking

3    into ICP's fees?

4    A.  We were looking into the revenue streams that ICP was

5    earning.

6    Q.  Then you go on to say in the email, "And that's before we

7    start active management," correct?

8    A.  That's correct.

9    Q.  So, again, is it fair to say that one of the things you

10   were looking at in April 2010 is active management of ICP?

11   A.  We weren't looking at active management of ICP.  We were

12   looking at a potential to actively manage the positions in the

13   CDOs.

14   Q.  So now -- and you can stop looking at this document now.

15            So you were introduced to ICP in 2010, correct?

16   A.  That's, yeah, about right.

17   Q.  When I say ICP, you understand me to refer to ICP Asset

18   Management, correct?

19   A.  ICP Asset Management as well as the broader ICP group.

20   Q.  And your first conversations in 2010 with ICP were with one

21   of Thomas Priore's deputies, correct?

22   A.  Yes.  It was with Carlos Mendez.

23   Q.  Those conversations with Mr. Mendez did not go anywhere?

24   A.  No, they didn't go anywhere.

25   Q.  But then later you heard talk in the market that ICP wanted

1   to sell itself?

2   A.  I read an article in Bloomberg or the Wall Street Journal

3   that ICP was for sale.

4   Q.  When you learned that ICP was for sale, you asked

5   Mr. Lehman and ARAM to engage with ICP?

6   A.  I asked him to reintroduce us, yes.

7   Q.  And then you started negotiating with Mr. Priore, correct?

8   A.  Yes.

9   Q.  Now let's go to another document.  This is Exhibit 2109,

10  which is in evidence, and it's tab 5 in your binder.

11  A.  I'm sorry, which tab is it in?

12  Q.  Tab 5.

13  A.  Yes.

14  Q.  Now, is it fair to say that as of 2010, Mr. Jonsson is

15  evaluating the potential acquisition of ICP?

16  A.  Yes.  Mr. Jonsson was asked to look at whether it made

17  sense or not.

18  Q.  And Mr. Jonsson, we see here, emails you at the top of the

19  email, and he says, "I forgot to include this file in the last

20  email.  Here you can find the key points of the collateral

21  manager agreement bookmarked and highlighted," correct?

22  A.  That's correct.

23  Q.  So, is it fair to say that in August of 2010, one of the

24  things you're looking at is the collateral management

25  agreement?

N4JKUSB1                         Garg - Cross

1   A.   Yes.

2   Q.   If we go to the next tab, tab 8 -- I'm sorry, tab 5, which

3   is Exhibit 2109, already in evidence, and if you turn to

4   page 12 of the document, the one that is Bates stamped

5   KHAN 18160 --

6               THE COURT:  I think you are on 2110 now, tab 6?

7               MR. SAVLA:  Yes.  Thank you, your Honor.

8   BY MR. SAVLA:

9   Q.   So now, this is section --

10              THE COURT:  2110 is in evidence?

11              MR. SAVLA:  It is in evidence, yes.

12  Q.   This is section 8(b) of the collateral management agreement

13  that Mr. Jonsson highlighted, correct?

14  A.   Yes.

15  Q.   So one of the things -- and this section 8(b) deals with

16  the compensation of the collateral manager, correct?

17  A.   Uh-huh.

18  Q.   So fair to say that in August 2010, one of the things

19  you're looking at is the compensation of the collateral manager

20  under the collateral management agreement?

21  A.   Yes, we were looking at that.

22  Q.   And one of the provisions you were looking at is

23  section 8(b) of the collateral management agreement, correct?

24  A.   That's correct.

25  Q.   I'm going to show you another document, and this is

N4JKUSB1                        Garg - Cross

1    Exhibit 2030, which is tab 7, and that is objected to.

2              This is a letter of intent to acquire ICP, correct?

3    A.  That's correct.

4    Q.  And if we go to the second page, this is signed by you,

5    correct?

6    A.  That's correct.

7              MR. SAVLA:  Your Honor, we move to admit Exhibit 2030

8    into evidence.

9              THE COURT:  Any objection?

10             Exhibit 2030 is admitted.

11             (Trial Exhibit 2030 received in evidence)

12   BY MR. SAVLA:

13   Q.  So, as of September 2010, is it fair to say that ARAM was

14   looking to acquire ICP Asset Management?

15   A.  Yes, we were considering it.

16   Q.  And this letter of intent was part of a due diligence

17   phase, correct?

18   A.  The letter of intent was meant to help us enter due

19   diligence.

20   Q.  ARAM's purchase of ICP did not go forward, correct?

21   A.  That's correct.

22   Q.  And you were involved in that decision not to go forward

23   with the planned acquisition?

24   A.  I was involved, yes.

25   Q.  In 2010, ICP was subject to an SEC investigation, correct?

1  A.  Yes, I think it was 2010.

2  Q.  And it's likely that ARAM chose not to acquire ICP because

3  of the SEC investigation, correct?

4  A.  That is correct.

5  Q.  And that's because ARAM didn't want to take on ICP's

6  liabilities?

7  A.  That's partially correct.

8  Q.  But the transaction took a different form later on,

9  correct?

10  A.  It was a different transaction.

11  Q.  So let's discuss one of the transaction documents.

12          This is Exhibit 12, which is in evidence, which is

13  tab 8 of your binder.

14  A.  Uh-huh.

15  Q.  This is a document that we are alternately calling the

16  engagement letters or the engagement agreements.

17          So will you understand what I mean when I refer to

18  those phrases?

19  A.  No.  Which documents are you --

20  Q.  So I'm referring to Exhibit 12.

21  A.  In my binder, on Exhibit 12, it says, the option to

22  purchase agreement.

23  Q.  In tab 8?

24  A.  Oh, sorry, tab 8?

25          Yes, tab 8, that's the engagement agreement.

1    Q.   This is in evidence.

2              THE COURT:  You have all three of them in here,

3    Mr. Savla?

4              MR. SAVLA:  I believe we only have the 2007 one, but

5    I'll represent they are all materially identical.

6              THE COURT:  Thank you.

7    BY MR. SAVLA:

8    Q.   So this is the collateral manager's agreement with ARAM

9    Phoenix, correct?

10   A.   I believe it's the CDOs' agreement with ARAM Phoenix.

11   Q.   If we go to page 9, the document with the Bates stamp 183,

12   it's signed by you, correct?

13   A.   That's correct.

14   Q.   If you go to the next page, it's countersigned by

15   Mr. Priore?

16   A.   That's correct.

17   Q.   And you represented PRES in the negotiation of these

18   engagement letters, correct?

19   A.   That's correct.

20   Q.   Mr. Visweswaran was also involved, to a lesser degree?

21   A.   That's correct.

22   Q.   And various people at ARAM Global may also have reviewed

23   the engagement letters, correct?

24   A.   It was a long time ago, but I assume so, yes.

25   Q.   And Mr. Priore was on the other side of the negotiations,

1   correct?

2   A.   That's correct.

3   Q.   And PRES had counsel in connection with the negotiation of

4   these engagement letters?

5   A.   Yes; Kramer Levin.

6   Q.   And ICP also had counsel, correct?

7   A.   Yes; Schulte Roth.

8   Q.   You signed the engagement letter on behalf of Phoenix?

9   A.   That's correct.

10  Q.   Or, rather, PRES?

11  A.   Good catch.

12  Q.   So now, if we go to the engagement letter, at page 8 -- and

13  that's the Bates stamp ending 4182 — if you look at

14  paragraph 19, romanette i, it says, "This agreement constitutes

15  the entire agreement and understanding among the parties hereto

16  and supersedes any and all prior agreements and understandings,

17  oral or written, relating to the subject matter hereof."

18          Do you see that?

19  A.   Yes.

20  Q.   And you were aware of this provision when you signed the

21  engagement letter, correct?

22  A.   I don't remember this provision directly, but I must have

23  been.

24  Q.   I want to talk to you about some other contracts that were

25  entered into on the same day.  The day we're talking about is

N4JKUSB1                          Garg - Cross

1    March 22nd, 2011.

2              Now, through an affiliate of Phoenix, you bought ICP

3    Asset Management's economic interest in the Triaxx CDOs,

4    correct?

5    A.   I'm sorry, could you repeat the question?

6    Q.   Through an affiliate of PRES, you bought ICP's economic

7    interest in the Triaxx CDOs?

8    A.   By economic interest, do you mean the residuals?

9    Q.   Well, let's look at the actual agreements.  That's

10   Exhibit 2034 and 2035.  And let's start with 2034, which is

11   tab 10 of your binder, and that's in evidence.

12             So this is the sale and repurchase agreement, correct?

13   A.   Yes.

14   Q.   And it's between ARAM Phoenix Investments Ltd. and

15   Institutional Credit Partners LLC, correct?

16   A.   That's correct.

17   Q.   And ARAM Phoenix Investments Ltd. is a subsidiary of

18   Phoenix Holdco L.P., correct?

19   A.   That's correct.

20   Q.   ARAM Phoenix Investments Ltd. is an affiliate of PRES,

21   correct?

22   A.   That's correct.

23   Q.   If we go to page 8 of the exhibit, the Bates ending 682,

24   that is your signature, correct?

25   A.   Yes, that is.

N4JKUSB1                          Garg – Cross

1  Q.  If we go to the next page, that is Mr. Priore's signature,

2  correct?

3  A.  That's correct.

4  Q.  Let's go to the next document, which is Exhibit 2035.

5          THE COURT:  Tab?

6          MR. SAVLA:  I'm sorry, tab 11.  And this is also in

7  evidence.

8  BY MR. SAVLA:

9  Q.  This is basically the same agreement as the one we saw

10 before in Exhibit 2034, the only difference being that this is

11 for the 2007-1 CDO, correct?

12 A.  Yes, that's correct.

13 Q.  Let's look at the first page, and paragraph 4 on the first

14 page, which is the Bates ending 685.

15         This refers to fee entitlements, correct?

16 A.  That's correct.

17 Q.  And it refers to the seller's right, title, and interest to

18 and under the fee entitlements and rights relating thereto,

19 correct?

20 A.  Yes.

21 Q.  So this agreement is a purchase agreement for ICP's fee

22 entitlements, correct?

23 A.  That's correct.

24 Q.  Between these two agreements we've looked at, the

25 Exhibit 2034 and 2035, ARAM Phoenix Investments paid

N4JKUSB1                          Garg - Cross

1    $4.5 million for ICP's fee entitlements, correct?

2    A.  That's correct.

3    Q.  If we look at page 7 of Exhibit 2035, the agreement is

4    signed by you, correct, on behalf of ARAM Phoenix Investments?

5    A.  Yes.

6    Q.  If we go to the page before, it's -- actually, the page

7    after, it's signed by Thomas Priore, correct?

8    A.  Yes.

9    Q.  These two repurchase agreements, they're signed on the same

10   day as the engagement agreements, correct?

11   A.  Yes.

12   Q.  Did you have counsel for these repurchase agreements?

13   A.  Yes.

14   Q.  And the counsel was Kramer Levin for Phoenix?

15   A.  Yes.

16   Q.  Phoenix Investments?

17   A.  Yes.

18   Q.  And it was Schulte Roth for ICP, correct?

19   A.  I think so, yes.

20   Q.  Let's go to another document.  This is Exhibit 2029.

21   A.  Yep.

22       Which tab is that?

23   Q.  I'm actually trying to find that myself.

24       THE COURT:  Tab 12.

25       MR. SAVLA:  Thank you, your Honor.

1              THE WITNESS:  Thank you.

2              THE COURT:  And this is in evidence?

3              MR. SAVLA:  This is in evidence.

4    BY MR. SAVLA:

5    Q.  So this is an option to purchase agreement, correct?

6    A.  Yes.

7    Q.  And it's entered into between ICP Institutional Credit

8    Partners LLC and ARAM Phoenix Investments Ltd.?

9    A.  That's correct.

10   Q.  If we go to page 4, it's signed by Thomas Priore, correct?

11   A.  That's correct.

12   Q.  If we go to the next page, it's signed by you, correct?

13   A.  That's correct.

14   Q.  If we go back to the first page, with the Bates ending in

15   418, and we look at paragraph 1(b), the purchase price under

16   this agreement is one dollar, correct?

17   A.  That's correct.

18   Q.  So it's accurate to say that this option agreement gives

19   ARAM Phoenix Investments Ltd. the option to buy ICP for one

20   dollar, correct?

21   A.  No, that's not correct.

22   Q.  Well, let's just look at the agreement.

23              The next paragraph says, "ICPAM rights," correct?

24   A.  Uh-huh.

25   Q.  It means all of seller's rights to direct the day-to-day

N4JKUSB1                      Garg - Cross

1   management of ICPAM by seller, correct?

2   A.  Yes.

3   Q.  So is that what's being bought under this option agreement?

4   A.  It's the -- what's being bought is the right to manage

5   ICPAM.  What's not being bought is ICPAM itself.

6   Q.  So it's the option to manage ICPAM, correct?

7   A.  That's correct.

8   Q.  Now let's look at your deposition testimony.  Actually,

9   strike that.

10          This option to purchase was negotiated by Kramer

11  Levin, correct?

12  A.  That's correct.

13  Q.  Kramer Levin for Phoenix Investments?

14  A.  That's correct.

15  Q.  And Schulte Roth for ICP?

16  A.  I believe so.

17  Q.  And this option agreement was also signed on March 22nd,

18  2011, correct?

19  A.  That's correct.

20  Q.  And it's signed the same day as the engagement agreements,

21  correct?

22  A.  Yes.

23  Q.  If you look at the whereas clause, the second one, it says,

24  "Whereas seller wishes to sell and purchaser wishes to have the

25  option to purchase the ICPAM rights," correct?

N4JKUSB1                          Garg - Cross

1   A.  Yeah, that's what it says.

2   Q.  So this is an option to purchase ICPAM rights?

3   A.  That's correct.

4   Q.  Now we're going to look at another document, another

5   agreement.  This is Exhibit 2033, which is tab 13.

6          If we look at this agreement — this is not in evidence

7   yet — this is an agreement as of March 22nd, 2011, between PSD

8   Partners Ltd., ARAM Phoenix Holdco L.P., and ARAM Phoenix

9   Investments Ltd. and ARAM Phoenix Real Estate Solutions Ltd.,

10  correct?

11  A.  That's correct.

12  Q.  Let's go to page 11.

13         So you're signing on behalf of the various Phoenix

14  entities, correct?

15  A.  Yes.

16         MR. SAVLA:  Your Honor, we move to admit this into

17  evidence.

18         THE COURT:  Any objection?

19         Exhibit 2033 is admitted.

20         (Trial Exhibit 2033 received in evidence)

21  BY MR. SAVLA:

22  Q.  So this is an agreement with an entity called PSD Partners,

23  correct?

24  A.  Yes.

25  Q.  And it's entered into on March 22nd, 2011?

1   A.  Yes.

2   Q.  The same day as the engagement agreements, correct?

3   A.  Yes.

4   Q.  On page 12, if we turn to that, it's signed by Lori Priore,

5   correct?

6   A.  Yes.

7   Q.  Lori Priore is Thomas Priore's wife, correct?

8   A.  I believe so.

9   Q.  And this agreement is to hire PSD Partners Consulting

10  Services, correct?

11  A.  Correct.

12  Q.  And Mr. Priore was also involved with PSD Partners,

13  correct?

14  A.  Yes.

15  Q.  He was a member of PSD Partners, correct?

16  A.  I believe so.

17  Q.  Let's go to the bottom of page 2.  If we look at

18  paragraph 4, it says, "For its services hereunder, provider

19  shall be entitled to 25 percent of the net cash flow generated

20  by the targeted securities acquired by Investco," correct?

21  A.  Yes, that's what it says.

22  Q.  "And from third-party advisory contracts entered into

23  Opco"?

24  A.  That's correct.

25  Q.  Would it be fair to say that under paragraph 4, PSD

N4JKUSB1                           Garg – Cross

1   Partners is entitled to 25 percent of the net cash flow

2   generated by the targeted securities acquired by ARAM Phoenix

3   Investments Ltd.?

4   A.  Yes, subject to all of the initial investment capital

5   having been paid back, which is, I think, set forth later on.

6   Q.  So PSD Partners received payments pursuant to this

7   agreement, correct?

8   A.  They did.

9   Q.  ARAM Phoenix Investments was the entity that generally made

10  these payments to PSD Partners?

11  A.  That's correct.

12  Q.  PSD Partners was paid several million dollars under this

13  agreement, correct?

14  A.  Yes.

15  Q.  And the PSD -- this agreement we're looking at was

16  negotiated by Kramer Levin for the Phoenix entities?

17  A.  I believe so.

18  Q.  And Schulte Roth represented PSD Partners, correct?

19  A.  I don't know.

20  Q.  Let's look at your deposition testimony.  I'm going to

21  refer you to page 115.

22          THE COURT:  Do we have a paper copy of the deposition?

23          MR. SAVLA:  It's in tab 1.

24          THE COURT:  Thank you.

25          THE WITNESS:  What page number?

1    BY MR. SAVLA:

2    Q.  We're looking at page 115, 2 to 7.

3          You see there, we're discussing the agreement, the PSD

4    agreement.

5          And then I'm going to refer you to page 122 --

6    A.  Uh-huh.

7    Q.  -- at lines 9 to 12.

8          (Video playback as follows:)

9    "Q.  Was this agreement also negotiated using Kramer Levin on

10   one hand and Schulte on the other hand?

11   "A.  Yes."

12   Q.  Does that refresh your recollection as to whether Schulte

13   represented PSD Partners?

14   A.  Yes, I believe they did.

15   Q.  So we've looked at several agreements signed on March 22nd,

16   2011, correct?

17   A.  Yes.

18   Q.  We've looked at the repurchase agreements, we've looked at

19   the option to purchase agreement, correct, and we've looked at

20   the PSD Partners agreement.

21          And all of these were being negotiated at the same

22   time, correct?

23   A.  That's correct.

24   Q.  And they were all part of one package, correct?

25   A.  I don't know if I could say that, but, yes, they are all

1  negotiated at the same time.

2  Q.  They're part of one structure; would it be fair to say

3  that?

4  A.  Yes.

5  Q.  I'm now going to go through some subcontracts with you.

6  Let's start with an entity called Activist.

7          First, let me ask you:  PRES, as of 2011, did not have

8  any employees, correct?

9  A.  That's correct.

10  Q.  And, in fact, PRES has never had any employees, correct?

11  A.  That's correct.

12  Q.  So the plan, when PRES entered into the engagement

13  agreements, was for it to subcontract with another entity,

14  correct?

15  A.  That's correct.

16  Q.  And that entity initially was Activist Special Advisory

17  Services, correct?

18  A.  That's correct.

19  Q.  So let's look at that agreement.  That is tab 14,

20  Exhibit 2037.

21          This is a subcontract between PRES and Activist

22  Special Advisory Services, correct?

23  A.  That's correct.

24  Q.  Entered into on March 22nd, 2011?

25  A.  That's correct.

1    Q.  If we go to the page with Bates stamp 654, this is your

2    signature for PRES, correct?

3    A.  That's correct.

4    Q.  It's also your signature for Activist Special Advisory

5    Services?

6    A.  That's correct.

7              MR. SAVLA:  Your Honor, we move this into evidence.

8              THE COURT:  Any objection?

9              2037 is admitted.

10             (Trial Exhibit 2037 received in evidence)

11             MR. SAVLA:  Thank you.

12   BY MR. SAVLA:

13   Q.  So just to go back to that page, the signature page, you're

14   signing for PRES and for Activist Special Advisory, correct?

15   A.  That's correct.

16   Q.  And it's cosigned by Raja Visweswaran, correct?

17   A.  That's correct.

18   Q.  And this Activist Special Advisory Services company, you're

19   an indirect owner of that, correct?

20   A.  That's correct.

21   Q.  And you're one of two indirect owners of Activist?

22   A.  That's correct.

23   Q.  If we look at paragraph 3(a) of the agreement, on the first

24   page, with the Bates stamp ending 650, this sets forth

25   Activist's fees and expenses, correct?

N4JKUSB1                           Garg – Cross

1  A.   That's correct.

2  Q.   And so under this agreement, Activist is entitled to

3  7-1/2 -- costs plus 7-1/2 percent, correct?

4  A.   Yes.

5  Q.   And Activist did not have any clients in addition to --

6  other than Phoenix?

7  A.   Activist, as its own entity, didn't have any other clients,

8  no.

9  Q.   And Mr. Jonsson and Dr. Tang were contracted through

10 Activist to work on the engagement agreements?

11 A.   That's correct.  For a period of time.

12 Q.   For his work for Activist, Mr. Jonsson received bonuses

13 directly from PRES, correct?

14 A.   I don't fully remember.  He may have.

15 Q.   So let's look at -- well, let me ask about Dr. Tang.

16         Did Dr. Tang receive bonuses directly from PRES?

17 A.   Yes.  But I'm not sure, in your last question, you had said

18 on behalf of the work that they did for Activist, so that's

19 where I'm confused.  So I don't have perfect memory in that

20 regard.

21 Q.   Okay.  So let's look at your deposition testimony.  And

22 let's turn to page 103.

23         (Video playback as follows:)

24 "Q.   And then you also mentioned Dr. Tang and Mr. Jonsson,

25 correct?

N4JKUSB1                          Garg - Cross

1    "A.  Yes.

2    "Q.  And were they separately contracted, or were they part of

3    the transaction with Activist?

4    "A.  They were -- they were contracted through Activist, and

5    they also received bonuses from PRES directly."

6    Q.  Does that refresh your recollection as to whether they

7    received bonuses from PRES directly?

8    A.  Yes, that's helpful.  Thank you.

9    Q.  And the bonuses to Mr. Jonsson and Dr. Tang, they were

10   determined by you in your discretion, correct?

11   A.  By myself and Mr. Visweswaran.

12   Q.  By the two of you, in your discretion, correct?

13   A.  That's correct.

14   Q.  Now, this subcontract was later amended, correct?

15   A.  That's correct.

16   Q.  Let's look at Exhibit 2038, which is tab 15 in your binder,

17   not in evidence.  Let's go to the page ending in 649.

18            So this is signed by you, yes?

19   A.  That's correct.

20   Q.  And countersigned by Mr. Visweswaran?

21   A.  Yes.

22            MR. SAVLA:  Your Honor, we move Exhibit 2038 into

23   evidence.

24            THE COURT:  Any objection?

25            2038 is admitted.

N4JKUSB1                           Garg - Cross

1            (Trial Exhibit 2038 received in evidence)

2    BY MR. SAVLA:

3    Q.  Now, this is an amendment to the subcontract we just saw,

4    correct?

5    A.  Yes.

6    Q.  You negotiated this amendment with Mr. Visweswaran?

7    A.  That's correct.

8    Q.  And this amendment is dated as of May 7, 2012?

9    A.  Yes, that's correct.

10   Q.  Let's look at another subcontract.  Now we're going to go

11   to Exhibit 2039, which is tab 16.

12            THE COURT:  Not yet in evidence?

13            MR. SAVLA:  Not yet in evidence.

14            THE COURT:  Thank you.

15   BY MR. SAVLA:

16   Q.  So this is an agreement as of July 1, 2013, between PRES

17   and Phoenix Advisors and Managers Ltd., correct?

18   A.  Yes.

19   Q.  Let's go to page 6, which is the Bates ending 524.

20            And this is Mr. Visweswaran's signature, correct?

21   A.  Yes.

22   Q.  And someone by the name of Govind Rathi?

23   A.  Yes.

24   Q.  You have seen this agreement before, correct?

25   A.  I have.

N4JKUSB1                        Garg – Cross

1              MR. SAVLA:  Your Honor, we move to admit this into

2     evidence.

3              THE COURT:  Any objection?

4              Exhibit 2039 is admitted.

5              (Trial Exhibit 2039 received in evidence)

6     BY MR. SAVLA:

7     Q.  So when this contract we're looking at, this July 2013

8     contract we're looking at, by this time, the Activist

9     subcontract is terminated, correct?

10    A.  That's correct.

11    Q.  And this contract takes its place?

12    A.  That's correct.

13    Q.  And the new subcontractor now for the engagement agreements

14    is Phoenix Advisors and Managers Ltd.?

15    A.  That's correct.

16    Q.  And Phoenix Advisors and Managers Ltd. was a new entity

17    created so that it could contract with PRES?

18    A.  That's correct.

19    Q.  And PRES is still subcontracting with Phoenix Advisors and

20    Managers Ltd., correct?

21    A.  That's correct.

22    Q.  And you created Phoenix Advisors and Managers Ltd.,

23    correct?

24    A.  That's correct.

25    Q.  Phoenix Advisors and Managers is a subsidiary of

1    1/0 Capital Ltd.?

2    A.   Yes.

3    Q.   Let's look at Exhibit 2059, which is tab 3.  And this

4    document is in evidence.

5         If we go to the second page, the page ending Bates

6    stamp 445, on the right-hand side, we see the 1/0 Capital Ltd.,

7    correct?

8    A.   Yes.

9    Q.   And you are one of the owners of 1/0 Capital Ltd.?

10   A.   Yes.

11   Q.   Mr. Calamari is another owner of 1/0 Capital Ltd.?

12   A.   Yes.

13   Q.   And 1/0 Capital Ltd. owns 100 percent of Phoenix Advisors

14   and Managers Ltd.?

15   A.   That's correct.

16   Q.   Phoenix Advisors and Managers Ltd. never had any employees,

17   correct?

18   A.   That's correct.

19   Q.   So another entity performed work for Phoenix Advisors and

20   Managers Ltd., correct?

21   A.   That's correct.

22   Q.   And the people who performed work for Phoenix Advisors and

23   Managers Ltd. did so as part of their duties as partners of

24   1/0 Capital, correct?

25   A.   Yes.

1  Q.  Dr. Tang was one of the partners at 1/0 Capital, correct?

2  A.  Yes.

3  Q.  And he performed work for Phoenix Advisors and Managers

4  Ltd.; yes?

5  A.  Yes.

6  Q.  Mr. Jonsson was one of the partners at 1/0 Capital,

7  correct?

8  A.  Yes.

9  Q.  And Mr. Jonsson performed work for Phoenix Advisors and

10 Managers Ltd.?

11 A.  Yes.

12 Q.  And Mr. Savino was one of the partners at 1/0 Capital,

13 correct?

14 A.  Yes.

15 Q.  And Mr. Savino performed work for Phoenix Advisors and

16 Managers?

17 A.  Yes.

18 Q.  So Phoenix Advisors and Managers Ltd. has a contract for

19 services with another Phoenix entity, correct?

20 A.  Yes.  They have a subcontract.

21 Q.  Let's turn to that.  That's tab 17 of your binder, not in

22 evidence.

23       So this is a contract we're looking at dated as of

24 August 1, 2015, correct?

25 A.  Yes.

N4JKUSB1                         Garg - Cross

1   Q.  If we turn to page with the Bates stamp ending KAHN 444.

2          So this is signed by you on behalf of Phoenix Advisors

3   and Managers Ltd., correct?

4   A.  Yes.

5   Q.  And countersigned by Mr. Calamari as general counsel of

6   Phoenix Advisors and Managers USA LLC?

7   A.  That's correct.

8          MR. SAVLA:  Your Honor, we move to admit this into

9   evidence, Exhibit 2043.

10          THE COURT:  No objection being heard, 2043 is

11   admitted.

12          (Trial Exhibit 2043 received in evidence)

13   BY MR. SAVLA:

14   Q.  Now, you see the name Mr. Calamari there, and he's signed

15   this agreement.

16          Mr. Calamari has been the general counsel to a number

17   of other entities related to you, correct?

18   A.  That's correct.

19   Q.  He has been the general counsel for PRES, correct?

20   A.  I believe he's acted in that capacity.

21   Q.  He has been the general counsel for a host of 1/0 Capital

22   companies, correct?

23   A.  That's correct.

24   Q.  And he's been your personal counsel, correct?

25   A.  That's correct.

N4JKUSB1                          Garg - Cross

1    Q.  And you were a founding partner of 1/0 Capital LLC,
2    correct?
3    A.  That's correct.
4    Q.  And Mr. Calamari was the general counsel for 1/0 Capital,
5    correct?
6    A.  That's correct.
7    Q.  Mr. Calamari is also a partner at 1/0 Capital, correct?
8    A.  Yes, that's correct.
9    Q.  This entity, Phoenix Advisors and Managers USA LLC, that
10   does have employees, correct?
11   A.  Yes; many.
12   Q.  And Mr. Jonsson works for Phoenix Advisors and Managers
13   USA?
14   A.  He did work for them.
15   Q.  Dr. Tang works for Phoenix Advisors and Managers USA?
16   A.  Yes.
17   Q.  Mr. Savino works for Phoenix Advisors and Managers USA?
18   A.  Yes.
19   Q.  I'd like to ask some questions about Triaxx Asset
20   Management's purchase of ICP.
21   A.  Okay.
22   Q.  There came a time when you were involved in the purchase of
23   ICP, the collateral manager, correct?
24        THE COURT:  Let me interrupt you, Mr. Savla.  It's
25   2043 in evidence?

1        MR. SAVLA:  I believe we've moved it into evidence.

2   If not, I ask to move it into evidence.

3        THE COURT:  It either is in or it is admitted.

4        MR. SAVLA:  Thank you, your Honor.

5   BY MR. SAVLA:

6   Q.  So I think my last question was:  You were involved in the

7   purchase of the collateral manager, correct?

8   A.  Of ICP Asset Management?

9   Q.  Yes.

10       Of ICP Asset Management, correct?

11  A.  Yes.

12  Q.  And you were involved in that decision to purchase?

13  A.  Yes.

14  Q.  ICP was for sale at the time because of a settlement

15  between Mr. Priore and the SEC, correct?

16  A.  That's correct.

17  Q.  And you understood that as part of that settlement with the

18  SEC, the SEC did not want Mr. Priore to be managing ICP going

19  forward, correct?

20  A.  That's correct.  That was my understanding.

21  Q.  And at this time, we saw the option -- the purchase option,

22  the one-dollar purchase option earlier today.

23       Do you remember that?

24  A.  Yes.

25  Q.  So at this time, when ICP was going up for sale, ARAM

N4JKUSB1                          Garg - Cross

1   Phoenix Investments had a one-dollar purchase option, correct?

2   A.   That's correct.

3   Q.   But you did not purchase ICP for one dollar; is that right?

4   A.   Yes.   That was not possible for -- Phoenix -- ARAM Phoenix

5   Investments was not able to purchase ICP.

6   Q.   And the reason it was not able to purchase ICP for one

7   dollar is because the SEC would not approve the one-dollar

8   purchase, correct?

9   A.   The SEC -- I was told that the SEC was not going to approve

10  the purchase by ARAM Phoenix Investments Ltd.   I wasn't given a

11  reason, whether it was the one-dollar price or anything else.

12  Q.   Again, let's look at your deposition testimony.   I'm going

13  to flip back to tab 1, at page 190 at line 22 to 191 at line 2.

14             (Video playback as follows:)

15  "Q.   So when you talked about coming up with a price, what do

16  you mean by that?

17  "A.   Well, the SEC didn't want us to buy it for one dollar.

18  They said they wouldn't approve it."

19  Q.   So, is that your understanding, that the SEC --

20             MS. BEAUMONT:   Can we have the whole answer?

21             MR. SAVLA:   Okay.   Let's turn to the actual

22  transcript.

23             THE COURT:   Can you put that transcript page up on the

24  screen, Mr. Savla?

25             MR. SAVLA:   I'm sure the capable Mr. Gibson can.

N4JKUSB1                          Garg - Cross

BY MR. SAVLA:

Q.  So let's go to page 190, line 15:

"Q.  And I think we had looked at it before, and you referenced

the option to purchase ICP, right?

"A.  Yes.

"Q.  And wasn't that option to purchase for one dollar?

"A.  Yes.

"Q.  So when you talk about coming up with a price, what do you

mean by that?

"A.  Well, the SEC didn't want us to buy it for one dollar.

They said they wouldn't approve it.  They wanted us to make

some payment that was in excess of one dollar."

Q.  Have I read that right?

A.  I think that that's right.  I think there's context missing

there.  So, there was two reasons why ARAM Phoenix Investments

couldn't buy ICP Asset Management.  The first reason was that

the SEC did want more than one dollar, but the second reason

was that there was a gentleman named Michael Balboa that had

been involved with the initial creation of ARAM Global and ARAM

Phoenix, and the SEC did not want anyone -- want any entity

where he had an association, past or present, involved in the

purchase of the collateral manager.

Q.  Okay.

A.  So that's the fuller explanation.

Q.  So the second reason is Mr. Balboa, whose name we saw

1    before in connection with ARAM, they didn't want Mr. Balboa

2    involved?

3    A.  Yes, they didn't want -- yeah, even if in a passive way.

4    Q.  So you created an entity to purchase the collateral

5    manager, correct?

6    A.  I did, yes.

7    Q.  Sorry, I didn't hear your answer.

8    A.  I did, yes.

9    Q.  You did.

10          And the entity that you created to purchase the

11   collateral manager is Triaxx Holdco, correct?

12   A.  That's correct.

13   Q.  And you own 55 percent of Triaxx Holdco?

14   A.  That's correct.

15   Q.  And Mr. Calamari owns the other 45 percent, correct?

16   A.  Yes, that's correct.

17   Q.  After the acquisition, the collateral manager was renamed

18   Triaxx Asset Management, correct?

19   A.  That's correct.

20   Q.  And once Triaxx Holdco took over the collateral manager,

21   Mr. Calamari and Ms. Saddiq ran the day-to-day operations,

22   correct?

23   A.  That's correct.

24   Q.  And Ms. Saddiq is a paralegal at 1/0 Capital, correct?

25   A.  Was, yeah.

N4JKUSB1                          Garg - Cross

1    Q.  Was a paralegal at 1/0 Capital?

2    A.  Uh-huh.

3    Q.  And the purchase and sale agreement for ICP, if we turn to

4    tab 18, this is the purchase and sale agreement, correct?

5    A.  Okay.

6    Q.  Is that right?

7    A.  That's what it looks like, yeah.

8    Q.  If we go to the Bates stamp ending in hundreds, it's such a

9    long document, it's 160100.

10   A.  Okay.

11   Q.  And you're signing this agreement, correct?

12   A.  Yes.

13           MS. BEAUMONT:  Objection.  I think this is the

14   guarantee; it's not the agreement itself.

15           THE COURT:  Ms. Beaumont is correct.  You've gone too

16   far, Mr. Savla.

17           MR. SAVLA:  Okay.  This is why I'm not a corporate

18   lawyer.

19           THE COURT:  I mean, you've gone too far in the

20   document.

21           MR. SAVLA:  I understand.

22           So I believe it's actually page 905.

23           THE WITNESS:  Yeah.

24           MR. LAURIELLO:  I believe it's ending in 45.

25           MR. SAVLA:  The page ending in 45, that is --

1       THE COURT:  The one that says signature page to

2   purchase and sale agreement on the bottom?

3       MR. SAVLA:  Correct.

4   BY MR. SAVLA:

5   Q.  So this is signed by Mr. Priore, correct?

6   A.  Yes.

7   Q.  And the next page, it's signed by you, correct?

8   A.  Yes.

9   Q.  Let's go on to another subject.

10      THE COURT:  Is this document in evidence, Mr. Savla?

11      MR. SAVLA:  It is in evidence, yes.

12      THE COURT:  Thank you.

13  BY MR. SAVLA:

14  Q.  Now I'd like to discuss phone calls with PIMCO.

15  A.  Okay.

16  Q.  You say that you spoke to an employee at PIMCO, correct?

17  A.  I did.

18  Q.  And you spoke about the Triaxx CDOs, correct?

19  A.  I did.

20  Q.  And that employee at PIMCO was someone called Giang Bui,

21  correct?

22  A.  I think it was Giang Bui, G-a-n-g B-u-i.

23  Q.  And last name B-u-i?

24  A.  Yes.

25  Q.  And you think you had two calls with Ms. Bui, correct?

1   A.  It may have been more than two, but I think at least two.

2   Q.  And you did not keep notes of your calls with Ms. Bui,

3   correct?

4   A.  I think I sent an email, like, maybe both times, but at

5   least one time.

6   Q.  So it's fair to say that we would expect to see emails of

7   your calls with Ms. Bui?

8   A.  Yeah, I think I sent an email saying the call went well, or

9   something like that.

10  Q.  Did the emails describe what you had discussed with

11  Ms. Bui?

12  A.  I don't think so.

13  Q.  So, is it fair to say that there's no notes of the

14  substance of your calls with Ms. Bui?

15  A.  No, probably not.  I mean, none that I have in my

16  possession.

17  Q.  So just for the clarity of the record, you don't have notes

18  of the substance of your calls with Ms. Bui?

19  A.  I don't think so, no.

20  Q.  In your declaration, you say that you recall two calls with

21  Ms. Bui?

22          Let's turn to paragraph 60 of your declaration.

23  A.  That's tab 2?

24  Q.  That's tab 2.  Thank you.

25  A.  Yeah, two calls.

N4JKUSB1                          Garg - Cross

1   Q.  But now you think there may have been more than two calls;

2   is that correct?

3   A.  I recall at least two calls.  There may have been more.

4   Q.  Is it fair to say that your memory of when the calls took

5   place is fuzzy?

6   A.  No.

7   Q.  So you have a clear memory of these calls, correct?

8   A.  I don't know the exact date, I don't remember the date.  If

9   you ask me the date, I don't remember it, but I remember around

10  when the calls took place and what the content of the calls

11  were.

12  Q.  Do you know if -- you don't remember the exact date,

13  correct?

14  A.  No.

15  Q.  Do you know if there were two separate instances that

16  warranted a call?

17  A.  Yes.

18  Q.  You remember that clearly, that there were two separate

19  instances --

20  A.  Yes.

21  Q.  -- that warranted a call, correct?

22          Let's go to your deposition testimony again.  We're

23  going to pull up page 283 at line 22.

24          (Video playback as follows:)

25  Q.  "Okay.  So let's take that bit by bit.

1          "So, the first call was when we did the deal."

2          "What do you mean by 'when we did the deal'?

3   "A.  I think it was around when Phoenix got the mandate from

4   ICP to pursue the Activist strategy.

5   "Q.  Okay.  And --

6   "A.  It might have been a little later.  I mean, my memory is

7   fuzzy.  And so I think there might have been two separate

8   instances that warranted a call.  I don't fully remember."

9   Q.  You said that, right?

10  A.  Yes.

11         MS. BEAUMONT:  I'm sorry, that excised the middle of

12  the answer.  I think it's not fair to excerpt it that way.

13         MR. SAVLA:  Okay.  Well --

14         THE COURT:  Perhaps we can put the page of the

15  transcript up, 283?

16         MR. SAVLA:  So let's go through and see if there's

17  more context.

18  BY MR. SAVLA:

19  Q.  Let's start at 283 at line 22.  And I see there:

20  "Q.  Okay.  So let's take that bit by bit.

21         "So the first call was" -- and I think that's you

22  speaking.  "So the first call was when we did the deal."

23         I say --

24  A.  I'm sorry if we're starting on the subject matter.  If you

25  start at the top of page 283, it goes through the context --

N4JKUSB1                          Garg - Cross

1    Q.  Okay.

2    A.  -- about the first call.

3    Q.  I am happy to go through a large chunk of the deposition

4    testimony.

5           "So, what did you discuss with Ms. Bui?"  You see I

6    asked that at line 3?

7    A.  Yes.

8    Q.  And you say, "The first call was, I think, in the beginning

9    when we did the deal.  And it was what are you doing, what was

10   your plan.  Maybe we did the deal or a little bit afterwards, I

11   think, yeah.  What were we doing?  What was the plan?  I don't

12   remember at the time exactly.  And then, like, how were you

13   paid?  And we went through that.

14          "Then nothing happened after that.  I remember trying

15   to pitch that, you know, we could do the same on these deals

16   for her other deals that she owned.  And then there was another

17   call about what was the methodology that was going on to be

18   employed by the CDO manager to determine whether or not -- you

19   know, what to do with the defaulted securities.  I think there

20   were two calls."

21          So let me just pause there.

22          You discussed defaulted securities with Ms. Bui as

23   well, correct?

24   A.  I did.

25          THE COURT:  Can we just get the full deposition --

1          MR. SAVLA:  Of course.

2          THE COURT:  -- testimony into the record, and then you

3     can go back and ask questions?

4          MR. SAVLA:  Of course.

5     BY MR. SAVLA:

6     Q.  And then it goes on:

7     "Q.  Okay.  So let's take that bit by bit.

8          So the first call when we did the deal."

9          What do you mean by 'did the deal'?

10         THE COURT:  I think that's you speaking, Mr. Savla.

11         MR. SAVLA:  It is.

12    "A.  I think it was around when Phoenix got the mandate from

13    ICP to pursue the Activist strategy.

14    "Q.  Okay.  And --

15    "A.  It might have been a little later.  I mean, my memory is

16    fuzzy because I think PIMCO bought the 07-1 deal from one of

17    the Maiden Lane vehicles, or already owned the 07-1 deal.  I

18    don't remember.  Somehow, I remember that there was something

19    where PIMCO bought the Maiden Lane -- bought the 07-1 deal from

20    Maiden Lane, and then they also bought the 06-2 senior notes

21    from Cerberus.  And so I think there may have been two separate

22    instances that warranted a call.  I don't fully remember."

23         Did I read that correctly?

24    A.  You read that correctly.

25    Q.  Is it fair to say that there was a call with PIMCO about

1   defaulted securities?

2   A.   There was.

3   Q.   And one of the calls you're mentioning here related to

4   defaulted securities, correct?

5   A.   Yes.

6   Q.   Now, when you talked to Ms. Bui, you did not discuss the

7   engagement agreements, correct?

8   A.   The first time, I did.  We didn't name them by name, but

9   she asked about what were we going to do -- what were we going

10  to do about repurchases, what were we going to do about

11  servicing issues, and then she asked how we got paid.

12  Q.   But you did not discuss the Phoenix engagement letter with

13  Ms. Bui, correct?

14  A.   I discussed the content of the letter.  I didn't discuss

15  the actual letter itself, no.

16  Q.   So let's go to your deposition testimony at page 286,

17  line 21.

18           (Video playback as follows:)

19  "Q.   Did you discuss the Phoenix engagement letter with

20  Ms. Bui?

21  "A.   No."

22  Q.   And you said that, correct?

23  A.   Yeah, that's consistent.

24  Q.   When you talked to Ms. Bui, did you discuss the fact that

25  certain recoveries would be kept outside the CDO waterfall?

N4JKUSB1                          Garg - Cross

1   A.  No.  At that point in time, we didn't know how the

2   recoveries were going to come through.

3   Q.  When you talked to Ms. Bui, did you mention the one-dollar

4   purchase option?

5   A.  When I first spoke to her?  No.

6   Q.  When you spoke to Ms. Bui, did you mention the repurchase

7   agreements?

8   A.  I don't think so.

9   Q.  When you spoke to Ms. Bui, did you discuss the fact that

10  you were considering purchasing ICP?

11  A.  Oh, at that time, in 2011, I was not considering purchasing

12  ICP, so, no.

13  Q.  Was there any discussion with Ms. Bui about Phoenix

14  Advisors and Managers Ltd.?

15  A.  No, because Phoenix Advisors and Managers Ltd. didn't exist

16  at that time.

17  Q.  Has there ever been discussion with Ms. Bui about Phoenix

18  Advisors and Managers Ltd.?

19  A.  I don't think so.

20  Q.  Has there been discussion with Ms. Bui about Phoenix

21  Advisors and Managers USA?

22  A.  I don't think so.

23  Q.  Did you discuss 1/0 Capital with Ms. Bui?

24  A.  No.

25  Q.  It's correct that you had no discussion with Ms. Bui about

1    discretionary bonuses that could be paid to Mr. Jonsson,

2    correct?

3    A.   Nope.

4    Q.   No discussion with Ms. Bui about discretionary bonuses that

5    could be paid to Mr. Tang, correct?

6    A.   No.

7    Q.   Now let's discuss Phoenix's fees in the engagement letters

8    for a minute.

9    A.   Okay.

10           THE COURT:  Mr. Savla, I want to remind you of the

11   time.  It's almost 11:00 o'clock, when we would normally take

12   our break.  Is this a good time to take it?

13           MR. SAVLA:  I think this would be a good time to take

14   it.

15           THE COURT:  All right, ladies and gentlemen.  Let's

16   try to keep it to ten minutes and reconvene at 11:10.

17           You may step down.  Let me warn you, Mr. Garg, you

18   will remain under oath when you return, and during the break,

19   you are not to discuss your testimony or the underlying facts

20   about which you are testifying with your counsel or with

21   others.

22           THE WITNESS:  Okay.

23           (Recess)

24

25

1              (In open court; case called)

2              THE COURT:  Mr. Garg, you may be seated.

3              Mr. Savla, if you would indulge me for a moment,

4     before you move on to the purchase and sale agreement.  Before

5     the break, you asked Mr. Garg whether he had discussed various

6     contracts with Ms. Bui.  Would you ask the witness, please,

7     whether he discussed the PSD partners contract with Ms. Bui.

8              MR. SAVLA:  Of course.

9     BY MR. SAVLA:

10    Q.  Mr. Garg, you did not discuss the PSD agreement with

11    Ms. Bui, correct?

12    A.  I didn't.

13    Q.  So now let's talk about the fees within the waterfall for a

14    moment.

15             Phoenix sent invoices to the collateral manager and

16    the trustee based on the engagement letters, correct?

17    A.  Yes.

18    Q.  And under those invoices, the trustee would make payments

19    to PRES, correct?

20    A.  That's correct.

21    Q.  And between 2011 and 2018, PRES received $30 million in

22    fees under those invoices, correct?

23    A.  I don't recall the exact number.  But, it received fees

24    under those invoices.

25    Q.  And those payments to PRES would come as part of the

1   monthly distributions within the waterfall of the CDOs,

2   correct?

3   A.  That's correct.

4   Q.  And Phoenix invoices included various fees under the

5   engagement agreements, correct?

6   A.  That's correct.

7   Q.  One of those fees were monthly diligence fees, correct?

8   A.  That's correct.

9   Q.  So let's go to Exhibit 12, which is tab 8 in the binder.

10  And this is the engagement agreement for the 2007-1 CDO,

11  correct?

12  A.  Yes.

13  Q.  So let's go to page 12, actually page 11, which is at the

14  bottom there it says ARAM shall be entitled to a diligence fee.

15  You see that?

16  A.  Yes.

17  Q.  We go to page 15, which is the Bates ending 190.  Annex II.

18  A.  Yup.

19  Q.  So, these are the diligence fees, correct?

20  A.  That's correct.

21  Q.  And they're charged on a monthly basis?

22  A.  That's correct.

23  Q.  They're charged in the CDO waterfall, correct?

24  A.  No, they're just charged and they're paid out --

25  Q.  They're paid out of the CDO waterfall?

N4J3USB2                          Garg - Cross

1    A.  Yeah.

2    Q.  And for this deal in years 1 and 2, it is a monthly fee of

3    20,000, correct?

4    A.  That's correct.

5    Q.  Then years 3 and 4, it's 10,000.

6    A.  Hmm-hmm.

7    Q.  And 5 and 6 and thereafter, 5,000, correct?

8    A.  That's correct.

9    Q.  So, let's go to Exhibit 3297, which is tab 21 of the

10   binder.  It's in evidence.  So the engagement agreement is

11   entered into in 2011, correct?

12   A.  Yup.

13   Q.  So 3297 is year 4 of the contract, because it's an invoice

14   from 2015, correct?

15   A.  Correct.

16   Q.  So, in year 4, we just saw the diligence fee should be

17   10,000, correct, for this deal for 2007-1?

18   A.  That's correct.

19   Q.  And the diligence fee here is 20,000, correct?

20   A.  Yes.

21   Q.  So, is it fair to say that the 07-1 deal is being

22   overcharged for the diligence fees?

23   A.  It looks like there was an error.

24   Q.  And that error has gone on for some time, correct?

25   A.  I don't know whether it was this invoice or whether it was

N4J3USB2                              Garg – Cross

1    all of the invoices, but I acknowledge that this invoice that

2    there is an error.

3    Q.  So let's look at Exhibit 2098.

4           THE COURT:  Before we do that, Mr. Savla, my deputy

5    tells me 3297 was not admitted by stipulation.  Is my deputy

6    right, counsel?

7           MR. SAVLA:  I have a notation that it was admitted.

8           THE COURT:  She's usually right.

9           MS. BEAUMONT:  My records show it was not.

10           MR. SAVLA:  In that case, let's look at Exhibit 3297.

11   Q.  Is this a PRES invoice?

12   A.  It looks like it.

13   Q.  And it's created in the ordinary course of business,

14   correct?

15   A.  Seems like it.

16   Q.  It's maintained in the ordinary course of business?

17   A.  Yes.

18           MR. SAVLA:  Your Honor, I move to admit Exhibit 3297.

19           MS. BEAUMONT:  No objection.

20           THE COURT:  3297 is admitted.

21           (Joint Exhibit 3297 received in evidence)

22   Q.  So let's go to Exhibit 2098, which is tab 22 in your

23   binder.  And as far as I know, this is in evidence.

24           So, this is an e-mail from Mr. Jonsson to Kenneth

25   Sliwa at U.S. Bank and Xin Rong?

1   A.  That's what it looks like, yes.

2   Q.  It's copying Mr. Calamari and yourself, correct?

3   A.  That's correct.

4   Q.  And you're copied on the ARAM Phoenix e-mail domain?

5   A.  Yes, that's correct.

6   Q.  Let's turn to the attachment which is the next page, it is

7   an invoice.  And here this is an invoice for 06-1, correct?

8   A.  Yup.

9   Q.  And the due diligence fee for this invoice is $30,000,

10  correct?

11  A.  Correct.

12  Q.  Do you know if this is an overcharge?

13  A.  It looks like it is an error as well.  Because the same

14  logic would apply to the other deals.

15  Q.  So now do you remember this morning you corrected your

16  declaration?

17  A.  Yes.

18  Q.  And you said that your declaration was wrong, because PRES

19  had charged the same diligence fee across all three CDOs,

20  correct?

21  A.  No, my declaration said it charged the same across the

22  three CDOs, and that was incorrect.

23  Q.  That was incorrect?

24  A.  Yeah.

25  Q.  Because, according to your declaration, the three CDOs

1   should have been charged different amounts, correct?

2   A.  That's correct, yeah.

3   Q.  And the diligence fees were wrong, simply because all three

4   CDOs were being charged the same after a period of time?

5           MS. BEAUMONT:  Objection.

6           THE COURT:  I didn't understand that question.

7   A.  I'm sorry.

8   Q.  Let me ask it another way.

9           Why were the due diligence fees wrong?

10  A.  In my declaration or in this invoice?

11  Q.  In your declaration.

12  A.  In my declaration, the diligence fees, what I wrote was

13  that they were $50,000 a month, and that was not the case.

14  They were $50,000 a month for 06-2, and they were a smaller

15  amount for 06-1 and 07-1.  That's where my initial declaration

16  was incorrect, and that's why I wanted to correct that.

17  Q.  So, let's go to Exhibit 11, which I don't have in my binder

18  but I'll ask to bring up on the screen.

19          THE COURT:  This is the engagement letter for 2006-2,

20  which is in evidence.

21          MR. SAVLA:  It is in evidence.

22  Q.  First of all, this is the engagement letter for 2006-2,

23  correct?

24  A.  That's correct.

25  Q.  Let's go to page 16 which shows another diligence fee

N4J3USB2                          Garg - Cross

1    chart.

2    A.  Yup.

3    Q.  And here we have another chart showing the different

4    diligence fees over time, correct?

5    A.  That's correct.

6    Q.  And it shows for years 1 and 2, it's 50,000.  Then it goes

7    down in years 3 and 4 to 35,000.  Correct?

8    A.  Yup.

9    Q.  5 and 6 to 25,000.  And thereafter, 25,000, correct?

10   A.  Yup.

11   Q.  Let's look at Exhibit 2098.

12   A.  Which tab is that, sir?

13   Q.  That is tab 22.

14   A.  Okay.

15   Q.  This is showing a diligence fee of 30,000, correct?

16   A.  Yup.

17   Q.  And this is seven years after the engagement letters were

18   signed, correct?

19           THE COURT:  This is a different -- this is a different

20   CDO, Mr. Savla.

21           MR. SAVLA:  Oh right.  I apologize.

22           THE WITNESS:  It is the page after.

23           THE COURT:  Mr. Garg is correct.  The second page of

24   the exhibit is 2006-2.

25           MR. SAVLA:  Thank you.

1    Q.   Let's look at the due diligence fee there.  It is 50,000,

2    correct?

3    A.   Hmm-hmm.

4    Q.   That diligence fee is incorrect, correct?

5    A.   You're right.  It's incorrect.

6    Q.   That's an overcharge to the 06-2 noteholders, correct?

7    A.   To the deal, yes.

8    Q.   Let's look at Exhibit 10 for the 06-1 engagement letter.

9    And it's not in the binder, but it is in evidence.  Let's go to

10   page 16.  And this shows the same diligence fees for the 06-1

11   deal, correct?

12   A.   Yes.

13   Q.   And it shows a cascading set of figures, correct?

14   A.   It does.

15   Q.   Let's go back to Exhibit 2098, which is the tab we were

16   looking at before, tab 22.

17   A.   Hmm-hmm.

18   Q.   This is an invoice from 2018?

19   A.   Yes.

20   Q.   And the due diligence fee is for 30,000, correct?

21   A.   Yup.

22   Q.   So that's an overcharge to the deal as well, correct?

23   A.   You are right.

24   Q.   Will the deal be made whole for these overcharges?

25   A.   I think the -- they should be.

1           THE COURT:  Don't keep me in suspense, Mr. Savla.

2     Have you added up the numbers I trust?

3           MR. SAVLA:  We actually haven't, but we will.

4           THE COURT:  Thank you.

5     Q.  As well as the due diligence fees, the engagement

6     agreements also call for an activist implementation fee,

7     correct?

8     A.  Yup.

9     Q.  Just pulling up the engagement agreement again.  Let's go

10    to Exhibit 12.  If we go to --

11    A.  I'm sorry.  What tab is that?

12    Q.  It's tab 8.  If we go to page 12, with the Bates ending

13    4187, there is an activist implementation fee as well, correct?

14    A.  That's correct.

15    Q.  And the activist implementation fee is equal to $10,000 a

16    month.

17    A.  That's correct.

18    Q.  And if we go down to the next paragraph, it is a long

19    paragraph that says -- just to back up.

20           That's 10,000 per month per security, correct?

21    A.  Per security.

22    Q.  So, in the next paragraph we're looking at, it says, "In

23    respect of such security, the activist implementation fee shall

24    be payable on each distribution date following the date on

25    which ARAM is engaged by the CDO in writing to provide activist

1    implementation services in respect of such security until the

2    earlier of" and then it goes on part "(a) the distribution date

3    on which the aggregate implementation fee paid by the CDO in

4    respect of such security exceeds 250,000."

5            Do you see that?

6    A.  Yes.

7    Q.  So, if a monthly activist implementation fee per security

8    is 10,000, and PRES charges 250,000 for those monthly fees over

9    time, am I right that under (a) it's capped at 250,000?

10   A.  Outside of the recovery fees, yes, it's capped at 250,000.

11   Q.  Outside of the recovery fees?

12   A.  Yeah.

13   Q.  (b) goes on to say, "The date of recovery determined by CDO

14   in its sole discretion or the collateral manager on its behalf

15   on which the CDO has completed the recovery of funds."

16           So, it is a $250,000 cap until the earlier of monthly

17   distribution dates are reached or there is a recovery, correct?

18   A.  That's correct.  The CDO manager -- in practice, the CDO

19   manager would tell us to stop working on a deal.

20   Q.  It goes on to say, "Provided the value as determined by the

21   CDO in its sole discretion or the collateral manager on its

22   behalf of funds or assets recovered by the CDO relating to a

23   security exceeds 500,000, the CDO shall pay to ARAM an

24   aggregate amount of activist implementation fees in respect of

25   such security, taking into account any activist implementation

1    fees paid by the CDO to ARAM on or prior to such date of

2    determination, equal to 250,000, irrespective of when the date

3    of recovery may occur."

4    A.  Yes, it says that.

5    Q.  Now, is the aggregate cap here 250,000?

6    A.  For the activist fee, and 250,000 for the incentive fee.

7    Q.  So you read this paragraph as referring to an incentive fee

8    and an aggregate monthly -- and a monthly activist

9    implementation fee, two separate fees?

10   A.  Yeah, I think there was two, two separate fees.  There

11   was -- hold on.

12            Yeah, I read it as two separate.

13   Q.  And does the paragraph, the paragraph doesn't mention

14   incentive fees, correct?

15   A.  No.  The business agreement, and I think there was some

16   documentation that corrected this later on, was that we would

17   run activist fees for up to 250K, so about 25 months of

18   activist work, and then we would get a recovery fee of a

19   similar amount.

20   Q.  So am I right that subsequently this paragraph had to be

21   corrected?

22   A.  It did have to be corrected, yes.  Or it had to be

23   explained.

24   Q.  Because as written, there is an aggregate cap of 250,000,

25   correct?

1    A.   Yeah, the aggregate cap should be 500,000.

2    Q.   It should be.  But as written, it's 250,000, correct?

3    A.   Look, I'm not a lawyer.  But my understanding from a

4    businessperson's perspective is the aggregate cap was $500,000.

5    Q.   When the agreement here says the CDO shall pay to ARAM an

6    aggregate amount of activist implementation fees equal to

7    250,000, that's an aggregate cap, is it not?

8    A.   No, because it says that when there is assets recovered.

9    So, I think if you were to separate the two concepts, there is

10   an asset recovery concept and then there is a do the work on

11   the -- on the activist strategy concept.

12   Q.   So you read this paragraph as giving the right to two

13   separate fees of 250,000, correct?

14   A.   That was the business intention.

15   Q.   So, that was the business intention?

16   A.   That's correct.

17   Q.   And that's how you read this paragraph, correct?

18   A.   I think the paragraph is poorly worded.

19   Q.   And it's poorly worded because it says an aggregate fee of

20   250,000, correct?

21   A.   That's correct.

22   Q.   So, going back to the month -- just focusing on the monthly

23   activist implementation fee.  If PRES works on a CUSIP for 25

24   months?

25   A.   Yup.

N4J3USB2                         Garg - Cross

1   Q.  It then cannot get any more monthly activist implementation

2   fee for that CUSIP, correct?

3   A.  That's correct.

4   Q.  So, Phoenix had a system in place to track the CUSIPs,

5   correct?

6   A.  That's correct.

7   Q.  When I say Phoenix, I mean PRES.  You understand that?

8   A.  Yeah.

9   Q.  The person at PRES that tracked the CUSIPs was Dr. Tang,

10  correct?

11  A.  Yeah, and Ziggy did some of that too.

12  Q.  Let's look at Exhibit 2045 which is in evidence, and that

13  is tab 23.

14  A.  Okay.

15  Q.  Let's go -- first of all, this is an e-mail chain that

16  begins on the third page, which is the Bates ending Khan381.

17  A.  Okay.

18  Q.  And you see that this is an e-mail from Mr. Priore to Edel

19  Downey, and you are copied on the e-mail.  Do you see that?

20  A.  Yes.

21  Q.  It is an e-mail written on August 16, 2013.  Mr. Priore

22  writes, "Edel, prior submission can you please confirm with

23  Ming Sing and Vishal, both the present due diligence fee rate

24  under the contract, and the bonds that remain in the two year

25  due diligence period.  The due diligence fee for each security

1   has a cap that is reached in approximately two years and we

2   need to confirm which have reached that cap."

3           Do you see that?

4   A.  Yup.

5   Q.  Mr. Priore is referring to that activist implementation cap

6   we just discussed, correct?

7   A.  Well, a little bit because I don't know for sure, is he

8   referring to the due diligence fee which was the two years and

9   then it came down for another two years, came down to another

10  two years, or is he referring to the activist implementation

11  fee.  Because I don't see activist implementation fee here.

12  Q.  So let's go on with the e-mail.  And up the chain

13  Ms. Downey says to you, August 16, 2013, "Would you be able to

14  look at the below query and advise."

15          Do you see that?

16  A.  Yes.

17  Q.  Just to go back to the due diligence fee.  That due

18  diligence fee was not per CUSIP, was it?

19  A.  No.

20  Q.  It was only the activist implementation fee that was based

21  on CUSIPs?

22  A.  Yes, but he is talking about per deal.  So the due

23  diligence fee was per deal.

24  Q.  So --

25  A.  So the e-mail is confusing.

1  Q.  But my question to you is, the activist implementation fee

2  is per CUSIP, correct?

3  A.  That's correct.

4  Q.  The diligence fee is not per CUSIP?

5  A.  It's per deal.

6  Q.  So, and after two years, the activist implementation fee

7  reaches that cap per CUSIP, correct?

8  A.  After 25 months.

9  Q.  After 25 months, thank you.  So two years and one month.

10  So let's keep reading up the chain.

11         Dr. Tang writes to you, "Vishal, do you have an

12  electronic copy of the monthly invoices going back?  17 of the

13  30 currently active positions have and approval date prior to

14  June 2011.  There are nine RAST positions that we can rotate

15  to.  And I need to identify eight new positions.  In addition,

16  seven of the 30 current positions have an approval date of

17  August 2011.  We need to find replacement for them as well for

18  next month's invoice."

19         Do you see that?

20  A.  Yes.

21  Q.  So now, and RAST is a reference to a CUSIP, correct?

22  A.  RAST is a shelf.  So, there's many CUSIPs under that shelf.

23  Q.  So it is a reference to a shelf that has many CUSIPs under

24  it?

25  A.  Yeah.

1   Q.  So, we keep going up the chain.  And you write to Dr. Tang

2   August 20, 2013, "Please send a summary removing the 17

3   positions and putting on the nine new RAST positions."

4             Do you see that?

5   A.  Yes.

6   Q.  Then we keep going up the chain.  It says, "Vishal, here is

7   the new list with the following changes:  17 expired positions

8   removed.  10 suspended positions added back.  Seven RAST

9   positions added.  Let me know if you want to reconfigure the

10  logic."

11            You see that?

12  A.  Yup.

13  Q.  We'll go up the chain.  You write to Dr. Tang, again,

14  August 23, 2013, "Please send an e-mail to me for Tom outlining

15  the changes, and then a separate e-mail with recommendations

16  for RAST and to turn on the positions on hold."

17            Correct?

18  A.  Yup.

19  Q.  Go up the chain.  Dr. Tang now writes to you, "Vishal, let

20  me know if the below narrative works for Tom's e-mail.

21            "Dear Tom, please be advised that 17 of the 30

22  activist positions have reached the two year cap.  We are

23  removing them from the list of actively serviced positions.  In

24  their place we are adding back 10 suspended active positions as

25  of January 2013, in light of the increased workload on

1    Countrywide related positions.  These 10 positions were

2    approved in September 2012.  Separately, we are adding seven

3    positions from the RAST shelf that Triaxx collectively has a

4    high percentage of ownership of the RMBS trusts.  These seven

5    positions are also expected to have one of the highest

6    potential loss severity.  Both factors lend strong support for

7    the recommendation of adding them to the activist list.

8    Attached is a summary of the active positions we propose.

9    Historical active positions are also included for your

10   reference.  Any questions or comments, please do get in touch."

11             Do you see that?

12   A.  Yes.

13   Q.  Now, when Dr. Tang refers to the two year cap for activist

14   positions in the first sentence or the second sentence, an

15   activist position, that refers to a security, correct?

16   A.  Yes.

17   Q.  So, the two year cap there refers to the activist

18   implementation fee, correct?

19   A.  In this case, yes.

20   Q.  So now, let's go back to Dr. Tang's e-mail on the second

21   page, August 20, at 8:34 in the morning.  And he says in the

22   second sentence I already read to you, "There are nine RAST

23   positions that we can rotate to, and I need to find eight new

24   positions."

25             This e-mail shows that PRES was rotating positions

1   when it reached the activist implementation cap, correct?

2   A.   What do you mean by rotating positions?

3   Q.   Well, you see the e-mail from Dr. Tang to you, correct, and

4   it says "There are nine RAST positions that we can rotate to."

5        You see that, correct?

6   A.   Right.

7   Q.   Now, in the e-mail above, you say, "Please send a summary

8   removing the 17 positions and putting on the nine new RAST

9   positions."

10        Do you see that?

11   A.   Yes.

12   Q.   And you didn't write to Dr. Tang at the time, "I don't

13   understand what you mean by rotate to," correct?

14   A.   No, I was asking you what you -- but, anyway.  I didn't ask

15   him that, no.  I didn't ask him that.

16   Q.   Back to my question.  Was PRES rotating securities when the

17   activist implementation cap had been reached?

18   A.   No, we were rotating the focus of our efforts.  The way the

19   actual -- aside from the legal agreement, the way things

20   actually worked is we actually had to work on almost all of

21   them, and we were working with law firms and those law firms

22   would have demands.  So if we were doing activist work, for

23   instance, on a RAST deal, we would, you know, the contractual

24   framework contemplated this clear delineation.  But if a lawyer

25   then asked us, you know, in month 26 of a deal that we had

1    worked on an activist implementation, that hey, Ziggy,

2    Mingsung, can you run this analysis for me, I need the analysis

3    on what the servicing damages are, we're not going to say no,

4    we are not doing that for you because we are no longer being

5    paid to do that work.  We would do the work and move it along.

6              So, when they were in the activist phase, that was

7    when we were doing, you know, we were rotating our efforts to

8    them.  But the way the actual work and the contract actually

9    worked in real life was we were working on a lot of deals, even

10   after their activist implementation phase had ended.

11   Q.  So, in real life, even if the cap had been reached, but a

12   law firm needed analysis on that position, you would continue

13   with that activist phase, correct?

14   A.  Yes.  We continued to do the work.  Partially because we

15   were going to earn an incentive fee as well.

16   Q.  Let's discuss another subject, Phoenix Holdco.  So, Phoenix

17   Holdco L.P. is the parent of Phoenix, correct?

18   A.  Hmm-hmm.

19   Q.  Of PRES?

20   A.  Yes.

21   Q.  And when money comes into PRES, PRES would first use that

22   money to pay its expenses, correct?

23   A.  That's correct.

24   Q.  And, for example, one expense would be its subcontractors,

25   correct?

1    A.  That's correct.

2    Q.  And Phoenix would also use the money that came in or PRES

3    would use the money that came in to pay discretionary bonuses,

4    correct?

5    A.  That's correct.

6    Q.  It would pay discretionary bonuses to the people who

7    performed work for PRES, correct?

8    A.  That's correct.

9    Q.  So it would pay discretionary bonuses to Dr. Tang?

10   A.  Correct.

11   Q.  To Mr. Jonsson?

12   A.  That's correct.

13   Q.  To Mr. Savino, correct?

14   A.  That's correct.

15   Q.  And then if Phoenix had a surplus of money, you would

16   determine whether that was dividended up to Phoenix Holdco,

17   correct?

18   A.  Myself and Raja.

19   Q.  That's Mr. Visweswaran?

20   A.  Yes.

21   Q.  You would determine whether that money went up to Phoenix

22   Holdco, correct?

23   A.  That's correct.

24   Q.  And if it was a Phoenix Holdco, that money would then go to

25   the limited partners, correct?

N4J3USB2                          Garg - Cross

1   A.  Yes, up to the point that they had been fully repaid.

2   Q.  And you were one of the limited partners, correct?

3   A.  I was one of the limited partners indirectly, yes.

4   Q.  And the limited partners, as you said, get their investment

5   back first, correct?

6   A.  That's correct.

7   Q.  And they also get an 8 percent preferred return, correct?

8   A.  That's correct.

9   Q.  And then after that, the limited partners also get

10  25 percent of the money that comes into Phoenix Holdco.

11  A.  Of any excess profits, yes.

12  Q.  And then the general partner gets 75 percent of the money,

13  correct?

14  A.  Yes.

15  Q.  So then, that would go up that money would go up to Phoenix

16  Cayman Limited, correct?

17  A.  The distribution to the general partner would, yes.

18  Q.  The distribution to the general partner would go to Phoenix

19  Cayman?

20  A.  Yes.

21  Q.  And then from there, that money would go to Asian Castle,

22  correct?

23  A.  If there was any distribution decided at Phoenix Cayman.

24  Q.  You were also an owner of Asian Castle, correct?

25  A.  I am.

N4J3USB2                          Garg - Cross

1   Q.  And Phoenix Cayman could also make distributions, correct?

2   A.  It had expenses and it could make distributions.

3   Q.  And you and Mr. Visweswaran would decide what distributions

4   Phoenix Cayman made, correct?

5   A.  That's correct.

6          THE COURT:  May I make a request, Mr. Savla?

7          MR. SAVLA:  Of course.

8          THE COURT:  Mr. Garg previously testified I believe

9   that there were four shareholders in Asian capital of which he

10  was one.  Could you ask him the percentages?

11         MR. SAVLA:  Of course.

12  Q.  So, I believe the entity is Asian Castle.

13  A.  That's correct.

14  Q.  What are the percentages of interests that the partners

15  have in Asian Castle?

16  A.  25 percent each, with respect to the economic interests.

17  Q.  Let's go to Exhibit 40, which is tab 24.  And this is

18  Triaxx's interrogatory responses which are in evidence.  And

19  I'd like to direct you to page four of the responses.

20         First of all, you've seen these, this interrogatory

21  response before, correct?

22  A.  I believe so.

23  Q.  So now, let's look at this 11/25/14 entry for ARAM Phoenix

24  Real Estate Solutions limited.  And that's for 11.75 million.

25  A.  Hmm-hmm.

1   Q.  And bonus payments were made out of this -- first of all,

2   these are amounts that were disbursed from accounts held or

3   controlled by the Miller & Wrubel law firm.  Do you see that at

4   the top?

5   A.  Yeah, they were paid by Miller Wrubel.

6   Q.  When we go to the 11.75 million, bonus payments were made

7   paid out of that 11.75 million, correct?

8   A.  That's correct.

9   Q.  They were paid to Mr. Jonsson?

10  A.  I believe so, yes.

11  Q.  Dr. Tang?

12  A.  Yes.

13  Q.  And Mr. Visweswaran, correct?

14  A.  I don't remember specifically, but I believe that that's

15  correct.

16  Q.  And these bonus payments from the 11.75 million, they were

17  made by the PRES or Phoenix Advisors & Managers U.S.A.,

18  correct?

19  A.  That's correct.

20  Q.  And we've discussed the flow of funds from PRES to Phoenix

21  Holdco.  Would it be fair to say that the 11.75 million

22  followed that flow of funds?

23  A.  Not exactly.  Because at that moment in time, HSBC had shut

24  down their operations in the Cayman Islands, so, therefore, the

25  money had to be kept in escrow accounts until Phoenix could

1  open up accounts at CIBC.  So the flow of funds you referred to

2  in principle flowed that way, and that was the economic goal.

3  But in practice, there were escrow accounts in the middle.

4  Q.  Then, we see other payments on this chart to PRES.  So if

5  you go down a few rows, you see a payment on 10/26/15?

6  A.  Yup.

7  Q.  So, bonus payments were made out of that sum, correct?

8  A.  I don't recall.

9  Q.  Is it fair to say that Phoenix Holdco has given 12 million

10  or more in distributions to its limited partners?

11  A.  That number sounds right.

12  Q.  Again, you were one of the limited partners of Phoenix

13  holding?

14  A.  Indirectly, yes.

15          MR. SAVLA:  Thank you.  I don't have any other

16  questions.

17          THE COURT:  Thank you very much.  We have about

18  another half an hour before our lunch break.  Who will be

19  examining the witness next?

20          MS. BUCKEL:  I believe I will, your Honor.

21          THE COURT:  Are you ready to go?

22          MS. BUCKEL:  If I could have a second or so.

23          THE COURT:  I will give you several seconds, and

24  Ms. Buckel, you may proceed when you're ready.

25          Shall we set aside the prior witness binder?

1           MS. BUCKEL:  For the most part, yes.

2           THE COURT:  Don't set it too far aside, Mr. Garg.

3           MS. BUCKEL:  Permission to approach the bench and the

4    witness with exhibit binders.

5           THE COURT:  You may step forward.

6    CROSS-EXAMINATION

7    BY MS. BUCKEL:

8    Q.  Good morning, Mr. Garg.  My name is Elizabeth Buckel and I

9    represent the Trustee U.S. Bank National Association in this

10   matter.  I'm going to ask you some additional questions.

11   Please bear with me if any of them are a bit repetitive of the

12   previous questions you have been asked, but I promise I have a

13   point, and there will be some different questions in there as

14   well.

15          Can you please turn to tab 1 which is Exhibit 1145

16   that is not yet admitted into evidence.  You'll see this is an

17   e-mail from Mr. Calamari to Ms. Siddiq?

18   A.  Hmm-hmm.

19   Q.  2017, there is two attachments to this e-mail.  One is a

20   2017 TAM annual holdings report, and the TAM annual holdings

21   report in 2016.  Is that correct?

22   A.  Yeah.

23   Q.  If you turn the page, we are going to focus on the

24   January 17 annual holdings report.

25          Do you recognize this, Mr. Garg?

1   A.  I believe I've seen some version of it in the past.

2   Q.  You were involved in the preparation of this document,

3   correct?

4   A.  No, I wasn't involved in making the document.

5   Q.  Let's look at your deposition testimony.

6           Tom, can you please play Mr. Garg's deposition at page

7   24, lines 3 to 5.  We can also look at it if we want more

8   context.

9           Mr. Garg, do you see we are discussing this document

10  in the first heading Vishal Garg Equity Holdings.  Does that

11  look like we are discussing same document in your deposition?

12  A.  Yes.

13  Q.  If you go down to page 24, at line 3, you were asked:

14  "Q.  Why you involved in the preparation of this document?"

15          Is that correct?

16  A.  Probably yes.

17  Q.  Your answer was "probably, yes."  Does that refresh your

18  recollection?

19  A.  Yes.  But if you keep going, you'll see the rest of the

20  context in line 6 through 16.  So I wasn't involved in the

21  direct creation of this document, which is the question you

22  asked me.  But there is a spreadsheet that I have that I try

23  to, like, look at, which has got all my shareholdings and all

24  these different things.  So I try when I invest in the next

25  thing or something like that, then we try to keep that updated.

N4J3USB2                          Garg - Cross

1    Q.  Fair enough.  Let me ask you another question.  Do you have
2    any reason to doubt the accuracy of this document?
3    A.  On the as of date, no.
4              THE COURT:  "This document," Ms. Buckel, meaning
5    Exhibit 1145?
6              MS. BUCKEL:  Correct, yes.
7              THE COURT:  Thank you.
8    A.  Yeah, no.
9              MS. BUCKEL:  Your Honor, I would like to move Exhibit
10   1145 into evidence.
11             THE COURT:  Any objection?
12             MS. BEAUMONT:  We would object.  It is hearsay and a
13   number of witnesses testified it was not actually totally
14   accurate.  And we don't have a witness who was involved in
15   actually preparing it or there is no business records.
16   Foundation.
17             THE COURT:  Objection overruled.  The exhibit is
18   admitted.
19             (Joint Exhibit 1145 received in evidence)
20   Q.  So Mr. Garg, this document shows the equity holdings of
21   various individuals, including yourself and Mr. Calamari.  Is
22   that correct?
23   A.  Yes.
24   Q.  Looking at this list, do you personally believe that this
25   listing was accurate as of the date listed here, January 2017?

1   A.  Probably so, yes.

2   Q.  And the first list is your direct ownership and indirect

3   ownership, correct?

4   A.  Hmm-hmm.

5   Q.  And in your direct -- according to this document, you

6   directly owned 99 percent of 1/0 Capital LLC?

7   A.  Yes.

8   Q.  65 percent of 1/0 Holdco LLC.  80 percent of 1/0 Holdco II

9   LLC.  And 65 percent of 1/0 Capital Limited?

10  A.  Yes, that's correct.

11  Q.  Here it shows you directly own 37 percent of Asian Castle,

12  correct?

13  A.  That's what it says, yes.

14  Q.  But you previously testified that you believed this amount

15  was closer to 25 percent?

16  A.  I think so.

17  Q.  Is that current, 25 percent?

18  A.  I think it was 25 percent for the period that Mr. Savla was

19  asking the question.  I think it went up afterwards, because I

20  purchased certain economic interests in Asian Castle.

21  Q.  Do you know how much you own in Asian Castle today?

22  A.  Honestly, ma'am, I think the number is -- of the economic

23  interests, not of the actual shareholding, which may be part of

24  the thing, because there are two classes of shares in Asian

25  Castle.  There is a class A share and a class B share.  But of

1   the economic interest, I believe I own 50 percent.

2   Q.  Isn't it true that Mike Balboa, who you spoke of earlier,

3   used to be a holder of equity in Asian Castle but you purchased

4   his stake in 2019?

5   A.  That's correct.

6   Q.  Looking back to this exhibit.  You have a 55 percent share

7   of Triaxx Holdco, correct?

8   A.  That's correct.

9   Q.  Do you have a number of indirect holdings, including in

10  Better Mortgage, Phoenix Advisors & Managers U.S.A. LLC, and

11  The Number LLC, correct?

12  A.  That's correct.

13  Q.  I'd like to direct you to tab 2 which is Exhibit 1185.  And

14  I'll represent this is just a different exhibit of the same

15  document you have looked at previously.

16        MS. BUCKEL:  Your Honor, this is already admitted into

17  evidence.

18  A.  Hmm-hmm.

19  Q.  Mr. Garg, do you find this 1/0 Holdco organizational chart

20  on the back of the Triaxx PRES and 1/0 Capital organizational

21  charts to be generally accurate?

22  A.  Yes.

23  Q.  Let's start actually on first page with 1/0 Holdco LLC

24  which is up top.  Pursuant to this chart, 1/0 Holdco LLC owns

25  62 percent of The Number, correct?

1   A.  That's correct.

2   Q.  And you are an indirect holder of The Number?

3   A.  Through 1/0 Holdco LLC.

4   Q.  What is The Number LLC?

5   A.  The Number is a data analytics company.

6   Q.  Was it used by Phoenix -- we'll call it PRES.  Was it used

7   by PRES?

8   A.  It was used by PRES.

9   Q.  And The Number LLC is the parent of Phoenix Advisors &

10  Managers U.S.A. LLC?

11  A.  That's correct.

12  Q.  There is just a typo on this chart.  It should be Phoenix

13  Advisors & Managers U.S.A. LLC?

14  A.  That's correct, yes.

15  Q.  You are an indirect holder of Phoenix Advisors & Managers

16  U.S.A. LLC?

17  A.  That's correct.

18  Q.  I think we went through this before.  But for the record,

19  what is Phoenix Advisors & Managers U.S.A. LLC?

20  A.  A data analytics and consulting company that focuses on

21  providing data analytics, consulting, expert witness services

22  to many of the largest hedge funds and asset managers in the

23  world.  Mostly its primary business was around mortgage backed

24  securities analysis.

25  Q.  You previously testified that Phoenix Advisors & Managers

1   Limited contracted with Phoenix Advisors & Managers U.S.A. LLC

2   for data analytics, correct?

3   A.  That's correct.

4   Q.  Let's turn to that second page which is titled Triaxx PRES

5   and 1/0 Capital organizational charts, which I believe we saw

6   before.  And I hope your copy is in color.

7           If you look at the chart on the right, which is in

8   green.  At the top it says 1/0 Capital Limited, correct?

9   A.  That's correct.

10  Q.  And it shows that it is owned by yourself and Nicholas

11  Calamari and 11 others, right?

12  A.  That's correct.

13  Q.  And you previously testified that you have a 65 percent

14  stake in 1/0 Capital Limited, correct?

15  A.  Yeah, at the time.  It might be lower now.

16  Q.  And then we see here again, we went through this, but just

17  for the record, Asian capital is listed at the top of the

18  purple chart, correct?

19  A.  That's correct.

20  Q.  And yourself, Raza Khan, Raja Visweswaran, and one other

21  was the owner of Asian Castle, correct?

22  A.  Of the economic interests.

23  Q.  Was that one other Mr. Balboa?

24  A.  Yes.

25  Q.  Now it's just you three?

N4J3USB2                          Garg - Cross

```
1    A.  Yes.

2    Q.  But you just testified you have a 50 percent interest in

3    Asian Castle now?

4    A.  Yeah, so I bought, as you said, in 2019, I bought

5    Mr. Balboa's economic interest.

6    Q.  Below Asian capital is Phoenix Cayman Limited, and Phoenix

7    Cayman Limited was also created around March 2011; is that

8    right?

9    A.  That's correct.

10   Q.  And Phoenix Cayman limited is the general partner of

11   Phoenix Holdco L.P., correct?

12   A.  Yes.

13   Q.  Can you talk to me to more about what Phoenix Holdco L.P.

14   is?

15   A.  It is a holding company.  And it was a vehicle by which we

16   raised -- it is a partnership amongst myself and I think almost

17   about 10 other limited partners for capital that we used to do

18   RMBS workouts.

19   Q.  Is it correct you raised about $5 million from the limited

20   partners, including yourself?

21   A.  Yes.

22   Q.  Was Phoenix Holdco created on or about the March 2011 time

23   frame?

24   A.  Yeah, I think it was about just a little bit earlier.

25   Q.  In this chart, on the limited partners portion, it says you
```

N4J3USB2                        Garg - Cross

1   own 11 percent of that?

2   A.  Yes, indirectly.

3   Q.  And the other HNWI owns 89 percent?

4   A.  Yes.

5   Q.  And that means high net worth individuals, correct?

6   A.  Yes.

7   Q.  Are those the individuals who contributed the 5 million to

8   help to start Phoenix Holdco?

9   A.  Yes.

10          THE COURT:  Ms. Buckel, excuse me for interrupting.  I

11   just want a little bit of clarity here.  Could you ask the

12   witness whether he personally contributed capital at that

13   limited partner raise or whether only the other high net worth

14   individuals contributed capital?

15          MS. BUCKEL:  Yes, your Honor.

16   Q.  Mr. Garg, at this point in time when you raised $5 million

17   for Phoenix Holdco, did you contribute any capital to that?

18   A.  Yes, I did.

19   Q.  Do you know how much capital you contributed?

20   A.  I think it was 500K.  $500,000, sorry.

21   Q.  Understood.  Looking back at this chart, in the left most

22   at the top we have Triaxx Holdco LLC.  Correct?

23   A.  Yes.

24   Q.  Which owns Triaxx Asset Management LLC?

25   A.  Yes.

1   Q.  And you are a 55 percent owner of Triaxx Holdco LLC?

2   A.  Yes.

3   Q.  And Mr. Calamari is the 45 percent owner, correct?

4   A.  Yes.

5   Q.  Let's turn to tab 3 which is Exhibit 10.  This is another

6   version, I will represent to you, this is another copy of the

7   engagement agreement we've been looking at.

8              THE COURT:  This is the engagement letter for 2006-1.

9              MS. BUCKEL:  Correct, your Honor.

10  Q.  As Mr. Savla said before, there's minor differences, but

11  they are materially identical across the three CDOs; is that

12  your recollection, Mr. Garg?

13  A.  Yes.

14  Q.  Mr. Garg, you previously testified about this engagement

15  agreement, correct?

16  A.  I have.

17  Q.  And PRES was created for the purpose of entering into the

18  engagement agreement with the Triaxx CDOs, correct?

19  A.  That's correct.

20  Q.  So if we turn to page 8 of the engagement agreement which

21  ends with the Bates stamp 4162.

22  A.  Hmm-hmm.

23  Q.  And you look at (iv), it states "This agreement shall be

24  capable of amendment or variation only by agreement in writing

25  between each of the parties hereto."

1      Is that correct?

2  A.  That's correct.

3  Q.  You testified that the engagement agreements set out the

4  fees that PRES would receive for its work, correct?

5  A.  That's correct.

6  Q.  I believe Mr. Savla did a fantastic job going through those

7  fees in detail.  But, I want to talk about the diligence fees.

8  Those diligence fees were intended to cover PRES' out-of-pocket

9  costs like contracts with data vendors; is that correct?

10  A.  I think that wasn't -- that wasn't the sole scope of it,

11  but yes.

12  Q.  Can we put up on the screen paragraph 32 of Mr. Garg's

13  declaration.  In paragraph 32 you state, "The diligence fees

14  were intended to cover PRES' out-of-pocket costs in gearing up

15  to do their work for the Triaxx CDOs."

16      Is that correct?

17  A.  Yes, that's correct.

18  Q.  What are the out-of-pocket costs this is referring to?

19  A.  You have to buy computers, servers, you have to plug into

20  the APIs that various data vendors have.  You have to have

21  legal fees to cover the contracts with the data vendors, you

22  have to create security architecture for consuming all of that

23  consumer data that we were consuming that was used to match the

24  mortgage backed securities with the individuals who were

25  residing in there.  The appraisal data we were buying.  So

1    there was a lot of stuff.

2    Q.  Understood.  And for the non-technologically competent like

3    myself, what does API stand for?

4    A.  Application programming interface.

5    Q.  Thank you.  You also testified in your direct, moving on to

6    the incentive fee, that the incentive fee could be recovered in

7    multiple different ways; is this right?

8    A.  The incentive fee could be earned in --

9    Q.  Earned, yes.

10   A.  Yes.

11   Q.  So first, it could be covered as the Triaxx CDOs recovered

12   directly through litigation with RMBS trustees, originators,

13   servicers, the damages that they had caused the CDOs; is that

14   correct?

15   A.  That's correct.

16   Q.  And you would refer to this as your activist implementation

17   strategy?

18   A.  That wasn't just all of it.  That was a piece of it.

19   Q.  Just a piece of it.  Okay.  But second Phoenix could

20   receive an incentive fee if the RMBS deals held by the Triaxx

21   CDOs themselves recovered moneys in, and those moneys flowed

22   through the CDOs, correct?

23   A.  That's correct.

24   Q.  So even if the RMBS deals recovered moneys because, for

25   example, generally improving market conditions from the depths

1    of the financial crisis to 2016, 2017, rather than Phoenix's

2    work specifically, Phoenix would still be entitled to receive

3    incentive fees; is that correct?

4    A.  No, that's not actually correct.  Because we would have had

5    to do something to have triggered those fees.  So if, for

6    instance, we were pressuring a servicer to improve their

7    servicing standards, or part of a group of investors that were

8    negotiating a new set of servicing standards, and then through

9    the implementation of those servicing standards the actual

10   performance of the deals improved, then that would trigger an

11   incentive fee.

12          In general, market conditions improved during the

13   depths of the credit crisis.  So we didn't earn more fees just

14   because the market price of the bonds and the CDO deals went

15   up.  So that's an example where we didn't --

16   Q.  Can you say that last part again.  You wouldn't recover

17   more fees?

18   A.  So, for instance, there were bonds that were in the CDO

19   deals that when we started working on them, let's say were

20   trading at 40 cents on the dollar.  Then, later on they were

21   liquidated as part of the disposition of the securities, and

22   let's say they were disposed for at 70 cents on the dollar.

23          If we didn't do work on those bonds, we didn't earn --

24   we didn't earn a fee.  And if we did do work and that work

25   didn't improve the performance of those deals, if the

1    performance stayed the same, but just the market price went up,
2    we wouldn't earn those fees.
3    Q.  So, is it your testimony you would only do -- you only
4    earned fees on the work that you did for the specific RMBS
5    security?
6    A.  Right.  Or if we engaged in litigation and we got a broad
7    based settlement against a whole list of RMBS securities.
8    Q.  I may go back to this in a second.  I want to go back to
9    your declaration which you had multiple different ways stated
10   how Phoenix could earn fees.
11          We have litigation over here.  I just asked you about
12   that second part which we'll come back to.
13          But the third part was if Phoenix compelled action at
14   a servicer, and the servicer improved performance and the RMBS
15   deal went up, Phoenix could be entitled to incentive fees,
16   right?
17   A.  That's correct, that's correct.
18   Q.  Is that statement different than what you just described to
19   me?
20   A.  Yes, because one is if you are compelling an action at the
21   servicer level, and then the deal's performance is improving.
22   Versus if the deal's market price is improving.
23   Q.  Phoenix did work to understand how the market price is
24   improving in the second tranche we were just talking about?
25   A.  Yeah, we would track the market prices of the bonds, and we

1   would, in general, we were tracking the market prices of the

2   bonds that were inside the underlying CDO deals.

3   Q.  What I'm trying to understand in this second category, what

4   exactly did Phoenix do and how did Phoenix evidence that its

5   work improved the market price of the bond?

6   A.  No.  When Phoenix didn't -- when the market price of the

7   bond improved and Phoenix didn't do anything, Phoenix didn't

8   get paid a fee is what I am saying.

9        If Phoenix did something, and the deals underlying

10  performance improved, meaning that the people who had the loans

11  in those mortgage backed securities deals, they started paying

12  at a better rate, or they started curing, then Phoenix would be

13  entitled to a payment.

14  Q.  Understood.  And Phoenix tracked all that, correct?

15  A.  We would track that, yes.

16  Q.  Were there any CUSIPs that Phoenix did not work on?

17  A.  I think there were a bunch, yes.

18  Q.  In terms of the -- can we talk percentages of the Triaxx

19  CDOs?

20  A.  Well, you have to understand that the Triaxx CDOs were

21  entirely composed of what were called Alt A.  Prime origination

22  and Alt A was low documentation or no documentation loans.

23  Created during 2005, 6, 7.  So the bulk of the loans in the

24  Triaxx -- the bulk of the loans in the residential mortgage

25  backed securities that were in the Triaxx CDOs were in some

1    way, shape or form faulty or had been originated to poor

2    standards.  So, there were some deals that we didn't do work

3    on.  I think there were some Wells Fargo trusts that we didn't

4    do any work on.  Because Wells Fargo at that time was generally

5    known to have originated good collateral.  So I think there was

6    some -- so I think that is a good example of a set of deals we

7    didn't do work on.

8    Q.  Would it be fair to say you did work on a majority of the

9    deals in the Triaxx?

10   A.  Yes, that would be very fair.

11   Q.  75 percent of the deals in the Triaxx CDOs?

12   A.  I think 75 percent is probably the right number.

13   Q.  Any higher than that?

14   A.  I'm not sure.

15   Q.  It could be higher than that?

16   A.  It could be higher than that.

17   Q.  Understood.

18          I just turned my page and I realize I left out the

19   last category you listed.

20          Phoenix could receive an incentive fee if it was a

21   member of a class of investors who brought an action against

22   issuers or servicers, correct?

23   A.  That's correct.

24          THE COURT:  May I just interject for clarification.

25   Mr. Garg, you said it was fair to say that you worked on more

1   than 75 percent of the deals.

2           THE WITNESS:  I think 75 percent is the right number.

3   It could be more than 75 percent.

4           THE COURT:  That's not what I am focusing on.  I want

5   to be clear when you say the CUSIPs, the RMBS securities?

6           THE WITNESS:  You are totally right.

7           THE COURT:  Thank you.

8   Q.  In this last category, Mr. Garg, is it fair that if the

9   Triaxx CDOs received money as part of a class, in a class

10  action, based on actions of other counsel, and not Phoenix or

11  TAM's counsel, would Phoenix still be entitled to incentive

12  fees?

13  A.  If we didn't do any work on it, that would be different.

14  But if it was -- if we were part of the group or we had moved

15  the group along, provided data analytics to the group or things

16  like that, then it would be fair to earn a fee.

17  Q.  So your testimony is that if the Triaxx CDOs were part of a

18  class action?

19  A.  Yes.

20  Q.  Where counsel for Phoenix or counsel for TAM did absolutely

21  no work in that class action, Phoenix would not be entitled to

22  incentive fees?

23          MS. BEAUMONT:  Objection.

24  A.  If they did no work whatsoever, no.

25          THE COURT:  Let me hear the question back, please.

1             (The record was read)

2             MS. BEAUMONT:  I not sure what they mean counsel for

3    Phoenix and counsel for TAM in that situation.

4             THE COURT:  Okay.

5             MS. BUCKEL:  I'll amend my question.

6             THE COURT:  Rephrase, please.

7    Q.   If there is a class action, and the Triaxx CDOs did not opt

8    out of that class action, and the Triaxx CDOs' counsel or

9    the -- the collateral manager's counsel or the issuer's counsel

10   or Phoenix did not do any work related to that litigation,

11   Phoenix would not be eligible to earn any fee for that action?

12   A.   I would like to say yes, but that's not the practical

13   reality of things.  The practical reality of things were, was

14   that there were these class action suits that were taking

15   place.  And we, in some cases, we were signing up for those

16   class action suits, and in other cases we were opting out of

17   those class action suits.  "We" meaning Triaxx in this case.

18   Triaxx was opting out of those class action suits, because it

19   was saying those class action suits were deficient in the

20   amount of money they were seeking for damages or their

21   allocation methodologies were deficient.

22            So, in the case of Res Cap for instance, we directly

23   challenged the -- we were pro the class action suit, but we

24   directly challenged the methodology.  We got the methodology to

25   change, we got the methodology changed, and that benefited the

1   trusts.  And so, in that instance, we of course deserved to get

2   paid a fee, even if we were not part of the class action.

3   Q.  Mr. Garg, that wasn't my question.  My question is if TAM's

4   counsel, the issuer's counsel, or Phoenix did not do any work

5   related to the class action, Phoenix did not earn incentive

6   fees, correct?

7   A.  Yes.  If we did no work, then we didn't earn incentive

8   fees.

9   Q.  Let's look back at the engagement agreements which I

10  believe we have open in tab 3 on the page that ends in 4167.  I

11  believe we've looked at this paragraph and at the bottom in

12  paragraph D.

13              THE COURT:  We're on Bates number?

14              MS. BUCKEL:  4166.  Or 4167.

15  Q.  In the bottom of that paragraph it says, "Provided that the

16  value as determined by the CDO in its sole discretion or the

17  collateral manager on its behalf of funds or assets recovered

18  by the CDO relating to a security exceeds $500,000, the CDO

19  shall pay to ARAM an aggregate amount of activist

20  implementation fees in respect of such security taking into

21  account any activist implementation fees paid by the CDO to

22  ARAM on or prior to such date of determination equal to

23  $250,000 irrespective of when that date of recovery may occur."

24              Is that correct?

25  A.  This was further clarified later.  But yes.

1   Q.  My focus is in the phrase it says "provided the value as

2   determined by the CDO in its sole discretion or the collateral

3   manager on its behalf."

4        So does this phrase mean that the collateral manager,

5   it's within the collateral manager's sole discretion whether a

6   recovery exceeds $500,000, correct?

7   A.  It is.

8   Q.  So there's no limits on this discretion?

9        MS. BEAUMONT:  Objection.

10  A.  I don't understand --

11       THE COURT:  I'll allow the question.

12  A.  What do you mean by there are no limits?

13  Q.  This paragraph and the rest of this agreement provides no

14  limits on the collateral manager's discretion to determine

15  whether a recovery exceeds $500,000; is that right?

16  A.  Yeah, either the CDO or the collateral manager have the

17  discretion to determine whether they pay us, whether we are

18  owed an activist fee or not.

19  Q.  You testified in your declaration in paragraph 34 that the

20  parties understood that recoveries might be generated in a form

21  that was not expected, and under those circumstances, PRES

22  would still be entitled to be compensated as set forth in the

23  engagement agreements.  Is that correct?

24  A.  That's correct.

25  Q.  So, Phoenix then solely relied on the collateral manager's

1    discretion as to what would constitute whether a recovery

2    exceeds $500,000, correct?

3    A.  Yes.

4    Q.  As you testified before, the engagement letters lay out

5    exactly how Phoenix was to be paid, correct?

6    A.  The engagement letters set out, yeah.

7    Q.  The engagement agreements.

8    A.  Yeah.

9            THE COURT:  I see that it is 12:29.  Let me know when

10   you get to a good stopping point.

11           MS. BUCKEL:  This would be a good stopping point, your

12   Honor.

13           THE COURT:  I have a nagging question.  Will you

14   permit me to interrupt your examination and ask it before we

15   break for lunch?

16           MS. BUCKEL:  Yes, your Honor.

17           THE COURT:  Thank you.

18           Mr. Garg, you previously testified that as you read or

19   as you intended the activist implementation fee provision to be

20   applied, we were just looking at that a moment ago.

21           THE WITNESS:  Hmm-hmm.

22           THE COURT:  On page 12 of Exhibit 10.

23           THE WITNESS:  Yeah.

24           THE COURT:  You testified that you understood there to

25   be in effect two separate $250,000 caps.

1            THE WITNESS:  Yes.

2            THE COURT:  One for the monthly fee portion of the

3    activist implementation fee, which would be hit at 25 months.

4            THE WITNESS:  Yes.

5            THE COURT:  And one for what I think you referred to

6    at one point as the incentive fee.

7            THE WITNESS:  That's correct.

8            THE COURT:  Which was contingent upon the security

9    having increased in value by $500,000 or more.

10            THE WITNESS:  That's correct.

11            THE COURT:  Which, as we just heard, that

12    determination could be made at the sole discretion of the

13    collateral manager on behalf of the CDO, correct?

14            THE WITNESS:  That's correct.

15            THE COURT:  All right.  So if I'm doing the math

16    correctly, it would be possible under the structure you just

17    described for PRES to work on a security for 25 months.

18            THE WITNESS:  Hmm-hmm.

19            THE COURT:  Entitling it to $250,000.  And for that

20    security then to increase in value or be deemed to have

21    increased in value by $501,000, which would entitle PRES to

22    another 250,000, and in that hypothetical, you would be paid

23    $500,000 for a security which had improved in value in the

24    estimation of the collateral manager which was owned by you and

25    Mr. Calamari, 500 out of those $501,000.

N4J3USB2                          Garg - Cross

1          THE WITNESS:  You're right.  In that specific

2     instance, it could be possible for that to be true.

3          THE COURT:  Thank you.

4          We'll take an hour.  We'll try to get back at 1:30.

5     Mr. Garg, you will remain under oath when you return, and you

6     are not to discuss your testimony or the underlying facts with

7     your counsel or with others during the lunch break.  We'll be

8     in recess.

9          (Recess)

10         (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                              1:35 PM

3              (In open court; trial resumed; case called)

4              THE COURT:  Ms. Buckel, you may continue.

5              Mr. Garg, you are still under oath.

6              THE WITNESS:  Thank you.

7    VISHAL GARG,

8    CROSS-EXAMINATION CONTINUED

9    BY MS. BUCKEL:

10   Q.  Good afternoon, Mr. Garg.  Prior to the break, we were

11   talking about the engagement agreements and all the fees owed

12   thereunder.

13              Do you remember that?

14   A.  Yes.

15   Q.  Is it your testimony that the engagement agreements lay out

16   how the fees are to be paid?

17   A.  In most cases, yeah.

18   Q.  What do you mean by "in most cases"?

19   A.  Well, we've identified there have been some errors in some

20   of the engagement agreements and some of the way the wording

21   has come in.

22   Q.  Fair enough.  That's in your previous testimony.

23              And you understand, Mr. Garg, that each of the three

24   Triaxx CDOs has caps in the amount of administrative expenses

25   that can be paid each month; is that correct?

1   A.  There are, yes.

2   Q.  Did you have this understanding in 2011, when the

3   engagement agreements were entered into?

4   A.  I had some understanding of it, yes.

5   Q.  Wasn't it your previous testimony that when Phoenix or

6   PRES, ARAM, was looking to purchase ICP in 2010, that you

7   reviewed the indentures for each of the --

8   A.  I did.

9   Q.  And the indentures lay out the caps and administrative

10  expenses?

11  A.  They do.

12  Q.  So it's fair to say that you had understood that there were

13  caps in the administrative expenses for each of the three CDOs

14  in 2011?

15  A.  Oh, yeah, yeah.  In broad terms, yes.

16  Q.  Is it your understanding that from 2011 to 2018, PRES's

17  fees were paid as an administrative expense under the

18  indenture?

19  A.  Yes.

20  Q.  I believe you testified previously about some subcontracts.

21  I want to briefly go back over those.

22          Just to confirm, PRES did not have any other clients

23  other than the Triaxx CDOs, right?

24  A.  PRES did not.

25  Q.  And PRES subcontracted its work, right?

1    A.  It did.

2    Q.  So around the time of the engagement agreements, PRES had a

3    subcontract lined up with an entity called Activist Special

4    Advisory Services, correct?

5    A.  That's correct.

6    Q.  Let's look at tab 4, which is Exhibit 1048.

7            MS. BUCKEL:  I will represent to the Court that this

8    is not admitted, and there are multiple tabs.  We divided up

9    the agreements and the attachments in this tab.

10           But this is a copy of an agreement that was previously

11   admitted into evidence by Mr. Savla, and I would ask the Court

12   to admit this identical document into evidence.

13           THE COURT:  Hold on.  Now I'm confused.  All of this

14   is 1048, but you've inserted tabs because it has?

15           MS. BUCKEL:  To divide the different agreements to

16   make it easier to reference.

17           THE COURT:  Did I previously admit all of 1048?

18           MS. BUCKEL:  You have admitted the agreements at 1048.

19           THE COURT:  I admitted the agreements.  What about the

20   cover email?

21           MS. BUCKEL:  I believe it's the same one, but I will

22   authenticate that for the witness, just in case it's not.

23           THE COURT:  I don't want you to have to go through the

24   authentication drill if all of this is already in.  I just

25   can't tell as I sit here.

N4JKUSB3                           Garg - Cross

1          MS. BUCKEL:  I will do it, just in case, for the

2     record.

3          THE COURT:  It's a good practice.

4     BY MS. BUCKEL:

5     Q.  Mr. Garg, under tab A, do you see that there is an email?

6     A.  Yes.

7     Q.  And it is from you to multiple different people — Michael

8     Minehane?

9     A.  Yes, Michael Minehane.

10    Q.  And Raja and Suzanna M. at Schindlers.com; is that correct?

11    A.  Yes.

12    Q.  And there are multiple different attachments of the email.

13         Do you see that?

14    A.  Yes.

15    Q.  Do you have any doubt that you sent this email?

16    A.  No.

17         MS. BUCKEL:  I would ask the Court to admit

18    Exhibit 1048 into evidence.

19         THE COURT:  Including the attachments?

20         MS. BUCKEL:  Including the attachments.

21         THE COURT:  Any objections?

22         All right.  1048, including the attachments, is in.  I

23    will note for the record that the tabs, which have been

24    thoughtfully placed in the witness binders by counsel, are not

25    a part of the exhibit itself.

1           (Trial Exhibit 1048 received in evidence)

2    BY MS. BUCKEL:

3    Q.  Under tab -- what entity owned Activist?

4    A.  EIFC.

5    Q.  Is EIFC an acronym for something?

6    A.  Education Investment and Finance Corporation.

7    Q.  Was it your testimony that Activist provided PRES with data

8    analytics to help identify loans that were improperly

9    originated?

10   A.  That was one of the things it did, yes.

11   Q.  And you previously testified that you were one of two

12   indirect owners of EIFC, correct?

13   A.  That's correct.

14   Q.  And you were an officer and director of EIFC, right?

15   A.  That's correct.

16   Q.  You may have said this, but Activist initially was created

17   for the purpose of doing this work for PRES, right?

18   A.  That's correct.

19   Q.  And there was an amendment to the subcontract, right?

20   A.  There was.

21   Q.  If you look under tab B, it states, "The first amendment to

22   subcontract agreement," correct?

23   A.  Yes.

24   Q.  If you look on page 1, which is the Bates number ending in

25   644, it says that the amendment creates minimum monthly payment

1  of $235,000, correct?

2  A.  That's correct.

3  Q.  And this is inclusive of all three CDOs, correct?

4  A.  Yes, for the work across all three CDOs.

5  Q.  Isn't it true that you and Raja Visweswaran agreed on

6  $235,000 because it was a good number that made sense?

7  A.  I'm sorry, are you quoting someone?

8  Q.  Well, let's look at your deposition testimony.

9          MS. BUCKEL:  Tom, can you put up Mr. Garg's

10  deposition, at page 154, line 13, through 155, line 20.

11  Q.  And this preliminary testimony is talking about the

12  subcontract agreement, correct?

13  A.  Uh-huh.

14  Q.  If you look at the next page --

15          MS. BEAUMONT:  I'm sorry, is this impeachment?

16          THE COURT:  So far, the witness has not answered the

17  question.  He's merely asked if you're quoting someone.

18          Why don't you put the question to him first.

19          MS. BUCKEL:  Yes.

20  BY MS. BUCKEL:

21  Q.  Mr. Garg, why did you agree on $235,000 as a minimum

22  payment?

23  A.  It was a close approximation of what it would cost to bear

24  the costs for Activist.

25  Q.  If we look at -- just to be clear, because I think you were

1    a little unclear in your deposition -- at line 25 on page 154,

2    you were asked:

3    "Q.  Can you tell me about those negotiations for this

4    contract?"

5           And your answer was:  "They were relatively

6    straightforward.  The guys that were working on the data side

7    were working really hard.  They were burning the midnight oil.

8    They needed more resources.  They were spending more money,

9    buying more data.  And so we needed the deal recut.  So I

10   talked to Raja about it, and he said, look, what do you think

11   is going to be the number?  Also, it was hard because billing

12   would go up, billing would come down, invoices would be due,

13   all this sort of stuff.  It was just very hard to keep going

14   back and forth every 30 days.  So we just looked at, like, what

15   a good number that would make sense was, and we agreed on

16   $235,000, and that was it."

17          Do you see that?

18          MS. BEAUMONT:  Objection.

19          THE COURT:  Basis?

20          MS. BEAUMONT:  This is not impeachment.

21          THE COURT:  Are you offering this testimony as

22   impeachment, or are you offering it as the testimony of a party

23   opponent?

24          MS. BUCKEL:  I was going to see if Mr. Garg had any

25   better recollection of why $235,000 was the number.

1       THE COURT:  All right.  So, if you're offering it to

2   refresh his recollection, rather than read it into the record,

3   you can simply ask the witness to read it himself.  So make up

4   your mind.

5       MS. BUCKEL:  We'll offer it to have the witness

6   refresh his recollection.

7       THE COURT:  All right.

8       So would you read those lines to yourself, Mr. Garg,

9   and then Ms. Buckel will have a question for you.

10  BY MS. BUCKEL:

11  Q.  Mr. Garg, why did you and Mr. Visweswaran agree on

12  $235,000?

13  A.  We agreed on it because it was a close approximation of

14  what the average amount had been for what -- the expense

15  reimbursement.  So the original Activist economic construct for

16  Activist billing PRES was Activist's actual expenses plus

17  7-1/2 percent.

18      And what would happen is, if they signed a new data

19  source, or if they had to make upfront payments, or other

20  things were necessary, frequently it would -- we wouldn't get

21  all the bills immediately, the bills would need to get paid,

22  and there were cash flow issues that would arise.  So we

23  thought a better number would be, instead of costs plus

24  7-1/2 percent, look at what the average numbers had been for

25  the invoices, create a little bit of a buffer, and then charge

1   that amount, and that's how we came to $235,000.

2   Q.  And that amount stayed consistent over time, correct?

3   A.  That did.

4   Q.  Did you ever reevaluate that number?

5   A.  We evaluated that number as some of the work started coming

6   down and some of the data contracts started becoming less

7   expensive.  And, so, we did reevaluate that number, and that

8   number was -- when we moved the contract from Activist to PAM,

9   that number went down from $235,000 to $185,000.

10  Q.  You testified that PRES also engaged two individuals,

11  Dr. Mingsung Tang and Ziggy Jonsson, correct?

12  A.  That's correct.

13  Q.  They were actually employed by EIFC on behalf of Activist,

14  correct?

15  A.  That's correct.

16  Q.  And in their roles, they created algorithms to match loan

17  level data from the trust with the data from the databases,

18  correct?

19  A.  That's correct.

20  Q.  And your previous testimony was that even though they were

21  employed by EIFC, Dr. Tang and Mr. Jonsson received their

22  bonuses directly from PRES?

23  A.  That's correct.

24  Q.  And the reason that they weren't paid their bonus through

25  their engagement with Activist was because Activist didn't

1    receive any incentive fees or wasn't privy to incentive fees

2    from PRES, correct?

3    A.   It was not in that -- yeah, it was not in their economic

4    construct.

5    Q.   So Activist would not have the money to pay a bonus to

6    Dr. Tang --

7    A.   No.

8    Q.   -- or Mr. Jonsson, only PRES would have that money,

9    correct?

10   A.   That's correct.

11   Q.   And you yourself received bonuses from PRES, correct?

12   A.   I recall receiving a bonus from Phoenix Cayman.  I don't

13   recall receiving a bonus from PRES.

14   Q.   But you may have received profit participation from PRES;

15   is that correct?

16   A.   I don't recall receiving any profit participation from

17   PRES.

18   Q.   But you certainly received director fees; is that right?

19   A.   I did receive director fees from PRES, yes.

20   Q.   Let's turn to tab 16, which is Exhibit 1205.

21            MS. BUCKEL:  And this has yet to be admitted, your

22   Honor.

23            THE COURT:  15, did you say?

24            MS. BUCKEL:  16.

25            THE COURT:  Thank you.

BY MS. BUCKEL:

Q.  Mr. Garg, do you recognize this document?

          THE COURT:  This is Exhibit 1205, correct?

          MS. BUCKEL:  1205, correct.

          THE WITNESS:  I don't recognize the document, ma'am.

Q.  Is the document titled Vishal Garg paid and accrued

director fees from 2015 to 2019?

A.  Yes.

Q.  It lists, from April '15 to April 2018, that you received

just over $800,000 in director fees; is that right?

          MS. BEAUMONT:  Objection.  The document is not in

evidence.

          THE COURT:  The document has not yet been admitted

into evidence yet, Ms. Buckel.

BY MS. BUCKEL:

Q.  Mr. Garg, is there any reason to believe that the numbers

on this document are incorrect?

A.  I know I was getting $20,000 a month.  So, maybe the 40,000

is two months paid at the same time or something like that, but

it seems generally to be in the ballpark.

          MS. BUCKEL:  Your Honor, I'd like to offer

Exhibit 1205 into evidence.

          MS. BEAUMONT:  I don't believe the proper foundation

has been laid.

          THE COURT:  I'll take it subject to the concerns that

1    you've raised.

2              So, 1205 is admitted.

3              (Trial Exhibit 1205 received in evidence)

4    BY MS. BUCKEL:

5    Q.  Mr. Garg, the paid director fees from April 7, 2015, to

6    April 14, 2018, list that you've received just over $800,000 in

7    director fees; is that correct?

8    A.  Yes.

9    Q.  And from May 31, 2018, through December 31, 2019, you

10   accrued director fees at $28,000 per month, correct?

11   A.  Yes.

12   Q.  For a total of $400,000?

13   A.  Right.

14             Those haven't been paid.

15   Q.  Correct.

16             Have you continued to accrue director fees at $20,000

17   per month after December 2019?

18   A.  Ma'am, I couldn't tell you.

19   Q.  Could you tell the Court what work you did in return for

20   these director fees?

21   A.  I was directing the entire strategy of the company,

22   organizing the different vendors, organizing the work product,

23   and, in general, coordinating with investors, coordinating with

24   the Triaxx CDOs themselves and the collateral manager, and,

25   most importantly, with the law firms that were hired by the

1   CDOs to pursue Activist -- to pursue remedies for the

2   improperly originated loans.

3   Q.  Switching gears a little bit back to the subcontracting

4   agreements.

5          You testified that, at some point, the subcontract

6   agreement with Activist was terminated and you entered into a

7   new subcontract agreement with Phoenix Advisors and Managers;

8   is that correct?

9   A.  That's correct.

10  Q.  Can I call it PAM?

11  A.  Yes.

12  Q.  And PAM, like Activist, didn't have any employees; is that

13  right?

14  A.  Yes.

15  Q.  And, at that point, Mr. Jonsson and Dr. Tang stopped being

16  employees of EIFC and became partners at 1/0 Capital, correct?

17  A.  That's correct.

18  Q.  And they performed the same work for Phoenix or for PAM as

19  they did for Activist, correct?

20  A.  Yes.  They were -- and they were also employees of Phoenix

21  Advisors and Managers USA, the subcontractor, for PAM.

22  Q.  Understood.

23          Did they use the same algorithms that they had

24  developed at Activist?

25  A.  No.  They were superior.

1   Q.  They were superior?

2   A.  Yes.

3   Q.  Was that just the general -- let me start over.

4          Did they start with the algorithms that they had come

5   together -- that they had put together at Activist and made

6   them superior at PAM?

7   A.  No.

8   Q.  They were brand new algorithms created from scratch?

9   A.  On new datasets, yes.

10  Q.  Understood.

11         When did Mr. Jonsson and Dr. Tang create these new

12  algorithms from the new datasets?

13  A.  I helped in making them happen.  So, I had started scouting

14  different more sources of data and data vendors to more further

15  refine -- particularly related to servicing challenges -- to

16  find issues and inside the mortgage-backed securities trust, so

17  we moved to two new data vendors.  Activist had primarily used

18  CoreLogic as its dominant data vendor, and then used that to --

19  in conjunction with the assessor records and the recorder

20  records at the county courthouses to figure out what addresses

21  were inside the underlying loans.

22         We did a totally different analysis.  We utilized a

23  different company called MBSData, and then we started --

24         THE COURT:  Slow down, slow down, Mr. Garg.

25         THE WITNESS:  So sorry.

1           THE COURT:  What data?

2           THE WITNESS:  MBSData.

3           THE COURT:  Thank you.

4           THE WITNESS:  And then we started going to the

5    individual courthouses themselves and downloading all of the

6    property transaction data records.

7           We went to MIRS, which is the mortgage electronic

8    recording system, started getting the data from there, and we

9    started using the internet, and specifically sites like Zillow

10   and the like and property transaction data from there, to

11   create a far superior model of identifying the, effectively,

12   history of what happened to a house and the many mortgages that

13   got recorded against that house.

14   BY MS. BUCKEL:

15   Q.  That's wonderful, Mr. Garg, but I asked you when you did

16   this.

17   A.  In 2013 and 2014.

18   Q.  So it took you approximately two years?

19   A.  It took a while.

20   Q.  Mr. Jonsson and Dr. Tang were joined by Mr. Savino at PAM;

21   is that correct?

22   A.  That's correct.

23   Q.  After PAM took over the subcontract, were Dr. Tang,

24   Mr. Jonsson, and now Mr. Savino still eligible for bonuses from

25   PRES?

1    A.  Yes.

2    Q.  And you and Raja would still determine those bonuses,

3    correct?

4    A.  That's correct.

5    Q.  And those bonuses would still come from PRES, correct?

6    A.  I think some of them came from PRES and some of them came

7    from PAM USA directly.

8    Q.  So I would like you to turn to tab 5 in your binder,

9    Exhibit 2034.

10              MS. BUCKEL:  For the Court, this exhibit is already in

11   evidence.

12              THE COURT:  Thank you.

13              MS. BUCKEL:  I know this is a large exhibit, so,

14   again, we have tabbed it to divide up the parent email and the

15   attachments thereto.

16   BY MS. BUCKEL:

17   Q.  Mr. Garg, do you see the email that is in tab A, that ends

18   in the Bates stamp 2327?

19   A.  Yes.

20              MS. BUCKEL:  I'm sorry, I misstated the exhibit

21   number.  The exhibit is 1037, and it's the same as Mr. Savla's

22   Exhibit 2034.  Apologies.

23              THE COURT:  You want me to admit it under this number?

24              MS. BUCKEL:  1037, yes, please.

25              THE COURT:  Any objection?

1                MS. BUCKEL:  I believe it is already in evidence.

2                THE COURT:  Well, then, in that case, I don't need to

3    admit it.  Thank you.

4    BY MS. BUCKEL:

5    Q.  So, Mr. Garg, do you recognize this email?

6                THE COURT:  Are we talking about the cover email?

7                MS. BUCKEL:  Yes, under tab A.

8                THE WITNESS:  I don't have any recollection of it, but

9    it appears to be something addressed to me.

10   BY MS. BUCKEL:

11   Q.  And the subject of the email is ARAM/ICP closing documents;

12   is that correct?

13   A.  Yes.

14   Q.  It lists a bunch of different attachments with just

15   numbers, correct?

16   A.  Yes.

17   Q.  Let's turn to, I believe it is, tab E, which ends in the

18   Bates stamp 387.

19               MS. BUCKEL:  Can you go one next to that, Tom?

20   Q.  Are you at that page, Mr. Garg?

21   A.  Page 8?

22   Q.  Under tab E --

23   A.  Yes.

24   Q.  -- secondary sale and repurchase agreement?

25               You previously testified that this is an agreement

1   between ARAM Phoenix Investments and ICP to buy ICP's economic

2   interests in its fee entitlements in the 07-1 transaction,

3   correct?

4           THE COURT:  Ms. Buckel, I just want to make sure that

5   what's on the screen is the same document that we're looking

6   at.

7           MS. BUCKEL:  It is not.

8           THE COURT:  And it's not.

9           MS. BUCKEL:  We can look at that one first.  I was

10  kind of going in reverse order.

11          Let's look at tab F first.

12          THE COURT:  Just as we --

13          MS. BUCKEL:  Okay, tab E.  I was going to go out of

14  order, but let me do that.

15          THE COURT:  All right.  We're at tab E, which is the

16  secondary sale and repurchase agreement final, correct?

17          MS. BUCKEL:  Correct.

18          THE COURT:  Okay.  Thank you.

19  BY MS. BUCKEL:

20  Q.  So this is the agreement with Triaxx 2007, correct?

21  2007-1?

22  A.  Yes.

23  Q.  And the total amount paid for these fee entitlements was

24  $2.25 million, correct?

25  A.  Yes.

N4JKUSB3                              Garg - Cross

1    Q.  And this was for the entirety of 07-1's subordinate

2    management fee and incentive fees?

3    A.  Yes.

4    Q.  If we turn now to tab F, you testified previously that this

5    is a similar, but not identical document for -- or an agreement

6    between ARAM and Phoenix Investments Ltd. and ICP to buy ICP's

7    economic interests in its fee entitlement for Triaxx 2006-1 and

8    Triaxx 2006-2; is that correct?

9    A.  Yes.

10   Q.  And, again, the fee entitlements here are the subordinate

11   management fee and the incentive management fee, correct?

12   A.  Yes.

13   Q.  And here, you also testified that pursuant to this

14   agreement, Phoenix Investments paid ICP $2.25 million?

15   A.  Yes.

16   Q.  And, to be clear, this included 100 percent of the

17   subordinate management fee in 2006-1 and 2006-2?

18   A.  I believe so.

19   Q.  And this also included 100 percent of the incentive fee in

20   2006-1?

21   A.  I believe so.

22   Q.  And this included 25 percent of the incentive management

23   fee in 2006-2, correct?

24   A.  Yes.

25   Q.  And this was because another entity, Alliance, was entitled

1    to 75 percent of the incentive management fee in 06-2 pursuant

2    to a prior agreement; is that right?

3    A.   They're not entitled to 75 percent; they're entitled to

4    75 percent to the point that they get paid off on a loan that

5    ICP had taken out for them.

6    Q.   So, unfortunately, I haven't seen that agreement, but I

7    understand, from this agreement, that they were entitled to

8    75 percent until the release date of that prior agreement; is

9    that right?

10   A.   That's correct.

11   Q.   And that release date is when they got paid off?

12   A.   Yes.

13   Q.   Do you know when this release date was?

14   A.   They've never been paid off.

15   Q.   They have never been paid off, so Alliance is still

16   entitled to that money?

17   A.   Yes.

18           THE COURT:   Just so I'm following along at home here,

19   Ms. Buckel, you're saying that it was 25 percent of the

20   incentive management fee in 2006-2, but not in the other deals?

21           MS. BUCKEL:   Correct.

22           THE COURT:   Thank you.

23   BY MS. BUCKEL:

24   Q.   Now, Mr. Garg, so these secondary sale and repurchase

25   agreements were with an entity called ARAM Phoenix Investments

1    Ltd.; is that right?

2    A.  Yes.

3    Q.  And if you turn back –– let's first ask this question:

4            What is ARAM Phoenix Investments Ltd. called or

5    referred to now, today?

6    A.  I think it's called Phoenix Structured Credit Investments.

7    Q.  Understood.

8            If you turn back to tab 2, and the chart found in

9    Exhibit 1185, would you point me to where Phoenix Structured

10   Credit Investments Ltd. is on this chart?

11   A.  Oh, it's not on this chart because this is only the 1/0

12   entity.  If you go to the next page, it would be under Phoenix

13   Holdco L.P.  It's not in this diagram.  Just as where Phoenix

14   Real Estate Solutions Ltd. is, there should be another box that

15   has Phoenix Structured Credit Investments Ltd.

16   Q.  So just to be clear for the record, you have Phoenix Holdco

17   as the parent company to be a hundred percent owner of Phoenix

18   Real Estate Solutions Ltd., or PRES, and then also a hundred

19   percent owner of Phoenix Structured Credit Investments Ltd.?

20   A.  That's correct.

21   Q.  And we can call that –– or I believe it's abbreviated as

22   PSCIL?

23   A.  Yes.

24   Q.  Mr. Garg, did PSCIL pay the sum of money –– the sum total

25   of $4.5 million under these two agreements with funds from

1    Phoenix Holdco?

2    A.  It did.

3    Q.  So of that $5 million -- of that $5 million that was raised

4    in Phoenix Holdco, $4.5 million was used for these two

5    agreements?

6    A.  Yes.

7    Q.  And after the execution of these agreements, isn't it true

8    that the collateral manager no longer had any entitlement to

9    fees?

10   A.  I believe that that's correct.

11   Q.  Let's go back to Exhibit 1037, and turn to tab H, which is

12   the option to purchase agreement.  This is the Bates ending in

13   2418.

14           THE COURT:  This is tab 3H, like Harry?

15           MS. BUCKEL:  5H.

16           THE COURT:  5H, like Harry.

17   BY MS. BUCKEL:

18   Q.  And, Mr. Garg, you previously testified that this document

19   evidences Phoenix Investments' option to purchase ICPM's

20   rights; is that correct?

21   A.  To purchase the ICPAM rights.

22   Q.  And the purchaser here, again, was ARAM Phoenix Investments

23   Ltd., which is now known as PSCIL?

24   A.  Yes.

25   Q.  You entered into this agreement so Phoenix Investments

1    would have an ability to intervene if ICP put itself up for
2    sale; is that correct?
3    A.   Not just for sale, but was to enter any kind of -- was to
4    take any action that was detrimental to the value of the
5    residuals.
6    Q.   So, in other words, this was to protect your $4.5 million
7    investment on the fees purchased through the secondary sale and
8    repurchase agreements?
9    A.   Yes.
10   Q.   And there was no additional consideration paid for this
11   agreement?
12   A.   Just the one dollar.  It's an option, yeah, so...
13   Q.   Understood.
14            Is it fair to say that PRES was set up solely to
15   provide the analytical services to ICP while Phoenix
16   Investments or ARAM Phoenix Investments Ltd. was an entity set
17   up to purchase ICP's assets?
18            MS. BEAUMONT:  Objection.
19            THE COURT:  Let me hear the question back, please.
20            Hold on, Mr. Garg.
21            (Record read)
22            THE COURT:  Which of those two entities did you mean
23   in the while clause of your sentence, Ms. Buckel?
24            MS. BUCKEL:  Apologies.  I meant --
25            THE COURT:  Why don't you state the question again,

1    and then I'll see if there's an objection.

2    BY MS. BUCKEL:

3    Q.  Is it fair to say that PRES was set up solely to provide

4    the analytical services to ICP, while ARAM Phoenix Investments

5    Ltd. was an entity set up to purchase ICP's assets?

6               MS. BEAUMONT:  Objection.

7               THE COURT:  Hold off, Mr. Garg.

8               Basis?

9               MS. BEAUMONT:  I don't believe that PRES was retained

10   to provide analytical services to ICP.

11              THE COURT:  That's not an objection.

12              MS. BEAUMONT:  It's a misstatement --

13              THE COURT:  I'll allow the question.

14              THE WITNESS:  No, that's not correct.

15   BY MS. BUCKEL:

16   Q.  Let me take it in turn.

17              Was PRES set up to provide the analytical services to

18   ICP?

19   A.  No.

20   Q.  What was PRES set up to do?

21   A.  PRES was set up to provide analytical services to Triaxx

22   CDOs.

23   Q.  Is it fair to say that PRES was set up to provide the

24   analytical services to the Triaxx CDOs, while ARAM Phoenix

25   Investments Ltd. was an entity set up to purchase ICP's assets?

1   A.  No.

2   Q.  So is it fair to say that ARAM Phoenix Investments Ltd. was

3   an entity set up to purchase ICP's assets?

4   A.  No.

5   Q.  What was ARAM Phoenix Investments Ltd. set up as an entity

6   to do?

7   A.  It was set up to buy CDO residuals from a range of CDO

8   managers that we would encounter, of which ICP was just the

9   first one.

10  Q.  So ARAM Phoenix Investments Ltd. purchased CDO residuals

11  from other CDOs as well?

12  A.  It attempted to, but it didn't consummate those

13  transactions.

14  Q.  Understood.

15          So is it fair to say, then, that PRES was set up

16  solely to provide the analytical services to the Triaxx CDOs,

17  while ARAM Phoenix Investments Ltd. was an entity that

18  purchased ICP's assets?

19          THE COURT:  Maybe you meant to say residuals; maybe

20  you didn't.

21          THE WITNESS:  It was not set up to buy ICP's assets.

22          MS. BUCKEL:  I'll do that.  That was my second

23  question.

24  BY MS. BUCKEL:

25  Q.  Is it fair to say that PRES was set up to provide the

1  analytical services to the Triaxx CDOs, while ARAM Phoenix

2  Investments Ltd. was an entity that purchased the CDOs'

3  residuals?

4  A.  Yes.

5  Q.  All right.  Let's move to the next agreement.

6        Let's go to the consulting agreement with PSD

7  Partners, which I believe is in tab G, and it ends with the

8  Bates 2406.

9        THE COURT:  This is the PSD Partners contract?

10        MS. BUCKEL:  That is correct.

11  Q.  Now, Mr. Garg, excuse me if I am repeating the testimony

12  previously elicited, but I want to go back to those first three

13  lines.

14        So this agreement was dated as of March 22nd, 2011;

15  that's correct?

16  A.  That's correct.

17  Q.  And PSD Partners LLC was defined as the provider?

18  A.  That's correct.

19  Q.  And ARAM Phoenix Holdco L.P. was defined as Holdco?

20  A.  That's correct.

21  Q.  And ARAM Phoenix Investments Ltd. was defined as Investco?

22  A.  That's correct.

23  Q.  And ARAM Phoenix Real Estate Solutions Ltd. was defined as

24  Opco?

25  A.  That's correct.

1    Q.  And down further on the page -- or, sorry, on page 2, it

2    states -- paragraph 4, it states that:  "For its services

3    hereunder, provider shall be entitled to receive 25 percent of

4    the net cash flow generated by the targeted securities acquired

5    by Investco and from third-party advisory contracts entered

6    into by Opco"; is that correct?

7    A.  That's correct.

8    Q.  And, again, Opco is defined as ARAM Phoenix Real Estate

9    Solutions Ltd., or what we now refer to as PRES; is that

10   correct?

11   A.  That's correct.

12   Q.  So does this provision in this agreement, which is

13   highlighted here, entitle PSD Partners to 25 percent of the

14   revenue from PRES's contract with the Triaxx CDOs, otherwise

15   known as the engagement agreements?

16   A.  No.

17   Q.  Why is that?

18   A.  Because it only entitles it to 25 percent of the net cash

19   flow generated by any securities that Investco buys that are

20   targeted securities, so the other junior notes and other

21   mortgage-backed securities.  So, going back to what I was

22   saying earlier, the Investco vehicle was really meant to buy

23   residuals of the Triaxx CDOs, other CDOs, and then other RMBS

24   deals.  So, if we were -- if we used the consultant services to

25   go and do those, then once we got -- once Phoenix Structured

1   Credit Investments got its money back, and then whatever would

2   be profit, minus any expenses, then PSD advisors would get

3   25 percent of that.

4   Q.  To be fair, I'm a little confused because there's this word

5   "and" in the sentence.

6           I believe you were just discussing 25 percent of the

7   net cash flow generated by the targeted securities acquired by

8   Investco; is that correct?

9   A.  Yes.

10  Q.  And then there's the word "and" from third-party advisory

11  contracts entered into by Opco.

12  A.  Yes.  So, for the third-party advisory contracts.  So let's

13  assume PSD was helpful in generating an advisory contract, then

14  whatever was the profit generated from that advisory contract —

15  not the revenue, but the profit — after the investors in

16  Investco and Opco and Holdco got all their money back, then PSD

17  would be entitled to 25 percent of that.

18          THE COURT:  Can I hear that again, please?

19          And we're talking about the second clause in the

20  sentence, correct?

21          THE WITNESS:  Uh-huh.

22          THE COURT:  The 25 percent of the net -- as I read it,

23  25 percent of the net cash flow from third-party advisory

24  contracts entered into by Opco, i.e., PRES; that's what you're

25  defining for us?

1              THE WITNESS:  Yeah.  And then if you keep reading on

2      the rest of the page, it then has the construct of only after

3      the investors get all their money back.

4              THE COURT:  At the top of the next page?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.  Thank you.

7      BY MS. BUCKEL:

8      Q.  Help me understand this a little bit more.  You said after

9      the investors get all their money back.  That was investors in

10     Holdco; is that correct?

11     A.  Yes.

12     Q.  When did that occur?

13     A.  When did the investors in Holdco get all their money back?

14     Q.  Yes.

15     A.  I think we were able to distribute enough to the holders in

16     Holdco by the end of 2014.  I think it was like December 2014

17     or January 2015 that they had received their initial investment

18     back.

19     Q.  Okay.  So, help me understand, going back to what you just

20     said.  After that occurred, so after the end of 2014/early

21     2015, then provider, which is PSD Partners, would be entitled

22     to receive 25 percent of the net cash flow from the engagement

23     agreements between --

24     A.  Yeah, from either the engagement agreements or from any

25     profits from the residuals that were invested in.

1   Q.   So the profits from the residuals, would that be in the

2   secondary sale and repurchase agreements?

3   A.   Yes.

4   Q.   So would PSD Partners send Phoenix, PRES, or Phoenix

5   Investments any invoices for payment?

6   A.   No.

7   Q.   Did they send any written requests?

8   A.   Not that I remember.  It was on the Phoenix entities' -- it

9   was the obligation of the Phoenix entities to tell PSD that

10  they had generated a profit, and then that this was PSD's share

11  of the profit.

12  Q.   And the Phoenix entities would evidence that in some

13  written writing?

14  A.   Generally, yes.

15  Q.   So, Mr. Garg, we've spoken a bunch about the fees owed to

16  Phoenix under the engagement agreements, and I want to talk

17  specifically more about that incentive fee owed to Phoenix.

18          Previously, you've agreed that the engagement

19  agreements stated that the fees were to be paid as

20  administrative expenses pursuant to the Triaxx CDOs' priority

21  of payments waterfall, as outlined in the indentures; is that

22  correct?

23  A.   Yeah, the administrative expenses allocation is what would

24  pay for the regular fees.

25  Q.   But isn't it true that the incentive fees were sometimes

1  paid out of these monthly distributions, but other times they

2  were paid out of recoveries from the Activist litigation

3  strategy?

4           THE COURT:  When you say "monthly distributions," you

5  mean monthly administrative expense distributions through the

6  trustee?

7           MS. BUCKEL:  Yes, your Honor.

8           THE COURT:  Thank you.

9           THE WITNESS:  Yes.  And sometimes the monthly fees

10  would be actually paid out of the recoveries that were in the

11  trust account.  So, if you remember, there was something where

12  there was the accounting from Miller Wrubel earlier in the day.

13  That had both fees that were, like, monthly fees that were paid

14  out of that account, as well as incentive fees.

15  BY MS. BUCKEL:

16  Q.  So if the incentive fee was a small number and could be

17  added to an invoice, it was paid out of the waterfall, correct?

18  A.  Yes.

19  Q.  But if it was a larger invoice, it was paid out of the

20  recoveries?

21  A.  And vice versa.

22  Q.  So, was there any rule as to when the fees for Phoenix were

23  paid inside the waterfall versus outside the waterfall?

24  A.  No, because what would happen is, Phoenix was frequently

25  paid less than what it was owed by the Triaxx CDOs because the

1    administrative expense cap would be hit.  And, so, Phoenix did

2    the work, but if there were other expenses, like lawyers' fees,

3    trustee fees, other fees like that, that would be part of the

4    administrative expenses.  Then sometimes those took priority,

5    and so Phoenix didn't get paid its full invoice amount, and

6    then that invoice amount would roll over and roll over.  And

7    then let's say there was a recovery, then if there was a

8    recovery, and there was surplus funds, then the outstanding

9    amounts could be cleared.

10   Q.  Who made the decisions as to when the amounts were paid

11   inside the waterfall versus outside of the waterfall?

12   A.  The collateral manager, Tom Priore.

13   Q.  And after PAM purchased the collateral manager, who would

14   make those decisions?

15   A.  Nick Calamari.

16   Q.  How would the attorneys who distributed the funds from the

17   escrow accounts know how much to pay to Phoenix?

18   A.  They would have the invoices that were approved because we

19   would send the invoices to U.S. Bank, and then U.S. Bank would

20   register those invoices as due and payable, and then they would

21   know that these are the amounts that are payable, so the

22   attorneys would know that these are the amounts that are

23   outstanding to pay to Phoenix, that these are the amounts

24   outstanding to pay some of the other law firms, so on and so

25   forth.  I think there was -- I don't remember who it was, but

1    it was either, like, Ken Sliwa, as the trustee, or Ranchan

2    Arahm, at the collateral manager, that would manage those

3    things, that had the accounting for those things.

4    Q.  To be clear, this is fees paid inside the waterfall,

5    correct?

6    A.  I'm sorry, I'm not able -- what do you mean by that?

7    Q.  So, my original question was how did -- for the funds that

8    were in the attorneys' escrow account --

9    A.  Yeah.

10   Q.  -- how did the attorney who managed that escrow account

11   know who and how much to pay?

12   A.  I don't know what -- I wasn't involved in that level of

13   detail, I'm sorry.

14          THE COURT:  So the answer that you just gave us,

15   Mr. Garg, had to do with invoices that were sent to the trustee

16   for processing as administrative expenses through the

17   waterfall?

18          THE WITNESS:  Yes.

19          THE COURT:  Thank you.

20          THE WITNESS:  And the trustee also got all the

21   invoices for the incentive fees, too.  So the trustee got all

22   the invoices.  So, like when Countrywide -- the Countrywide

23   recovery took place, the trustee got all of the invoices for

24   that as well.

25

N4JKUSB3                          Garg - Cross

1    BY MS. BUCKEL:

2    Q.  So it's your testimony that the trustee was sent all of the

3    invoices for the incentive fees even though they were not paid

4    out of the waterfall?

5    A.  Yes.

6    Q.  Do you have any evidence to back up that assertion?

7    A.  I remember that John Moon at Miller Wrubel put together a

8    whole packet of, this has been the recovery that's taken place,

9    this has been -- these are, you know, who's -- these are who

10   needs to get paid.  And that, I think, was sent to the trustee,

11   the issuer, and then we also even sent a note to the

12   bondholders.  I think Triaxx/ICP Asset Management at that time

13   sent a note to the bondholders saying that they had had a

14   recovery.

15          So, I specifically remember like a packet that was put

16   together.

17   Q.  And you remember that packet being sent to the trustee?

18   A.  I remember that packet was addressed to the trustee, the

19   issuer, yeah.

20   Q.  So the letters from Mr. Moon were addressed to the trustee?

21   A.  Yeah.  Or the trustee or the issuer, I don't remember which

22   of the two, but they were all on it.

23   Q.  All of the entities involved?

24   A.  Yeah.

25   Q.  So --

1   A.  Everyone who was sort of a governing entity that governed

2   the trust, whether it was the collateral manager, the

3   collateral manager and John Moon on behalf of the CDOs, sent

4   this packet to the trustee and the issuer.

5   Q.  But, to be fair, you did not send that packet to the

6   trustee?

7   A.  Oh, it wasn't my place, no.

8   Q.  Did the collateral manager send that packet to the trustee?

9   A.  Probably, yeah.  The collateral manager or John Moon at

10  Miller Wrubel, one of the two of them.

11  Q.  So for every single fee that was paid outside the

12  waterfall, the trustee got notice from Mr. Moon or the

13  collateral manager?

14  A.  It's my understanding that, yes, they were all coordinated.

15          Look, I was just doing the work, so my job is, I do

16  the work, there's a person on my team who submits an invoice,

17  we would submit the invoice to whoever the collateral manager

18  told us to submit it to.  Most of the time -- I would say

19  almost all the invoices were sent to Tom Priore, Raj ram at the

20  collateral manager, and Ken Sliwa and the people that work for

21  Ken Sliwa at the trustee.

22          I mean, I remember times that the invoices were sent

23  by my team late, and Ken Sliwa would call us and say, hey,

24  don't you guys have invoices for this month.

25          So, I think everyone was in the loop.

1   Q.  And by your team, who do you mean?

2   A.  Ziggy, Mingsung.

3   Q.  So they sent all the incentive fee invoices to the trustee

4   every single time?

5   A.  No, no.  My team wouldn't send -- my team may or may not

6   have sent the incentive fee invoices, but I know that John Moon

7   certainly did.

8   Q.  How do you know that?

9   A.  Because I remember the packet that was compiled, and it was

10  sent to everyone, because I had to, like -- we had to write it

11  up.

12  Q.  Who was "we"?

13  A.  The Phoenix team had to write up what was the methodology

14  for the calculation for the incentive fee.

15  Q.  Understood.

16          So, the Phoenix team decided the incentive fee, and

17  they sent that to who?

18  A.  It was sent for approval.

19  Q.  Sent it to who?

20  A.  To ICP and to the trust -- to John Moon, who then sent it

21  to the trustee and the issuer.

22  Q.  And you are sure that Mr. John Moon sent that to the

23  trustee and the issuer?

24  A.  I am pretty sure.  I mean, I'm not -- I'm not 100 percent

25  certain, no, ma'am.

N4JKUSB3                         Garg - Cross

1    Q.  Understood.

2              I had a couple of questions about Phoenix Holdco, but

3    I think they've already been covered, but I do want to have you

4    turn to tab 14 in your binder.

5    A.  Yep.

6    Q.  And this is Exhibit 1036.  It has not yet been admitted

7    into evidence.  And it is titled, "The Amended and Restated

8    Exempted Limited Partnership Agreement of ARAM Phoenix Holdco."

9              Do you see that, Mr. Garg?

10   A.  Uh-huh.

11   Q.  Do you recognize this document?

12   A.  Yes.

13   Q.  And this is the amended and restated exempted limited

14   partnership of ARAM Phoenix Holdco?

15   A.  Yes.

16             MS. BUCKEL:  Your Honor, I'd like to move Exhibit 1036

17   into evidence.

18             MS. BEAUMONT:  No objection.

19             THE COURT:  Exhibit 1036 is admitted.

20             (Trial Exhibit 1036 received in evidence)

21   BY MS. BUCKEL:

22   Q.  And related to this agreement, just as a general question,

23   you had previously testified that Phoenix Holdco would make --

24   from time to time, Phoenix Holdco would make a distribution to

25   its limited partners; is that correct?

N4JKUSB3                          Garg - Cross

1   A.   Yes.

2   Q.   You previously testified that the limited partners were

3   paid off in 2014/2015, that time period?

4   A.   Yeah, December 2014/January 2015.

5   Q.   How would it be determined what went to the limited

6   partners and what went to the general partner?

7   A.   Oh, there was a strict formula that nothing went to the

8   general partner until the limited partners received all their

9   money back plus their preferred return of 8 percent.  And then,

10  after that, each marginal dollar would be sent 25 percent of

11  the limited partners -- each marginal dollar of profit would be

12  sent 25 percent to the limited partners and 75 percent to the

13  general partner.

14  Q.   And this is --

15          THE COURT:  Ms. Buckel, point of clarification, again,

16  to make sure I'm following along here at home:  The entity

17  called ARAM Phoenix Holdco in Exhibit 1036, this is the entity

18  now called Phoenix Holdco L.P.?

19          MS. BUCKEL:  I believe so.

20          But can the witness confirm?

21          THE WITNESS:  Yes.

22          THE COURT:  Thank you.

23  BY MS. BUCKEL:

24  Q.   What you were just talking about, Mr. Garg, that's all laid

25  out in this agreement, correct?

1  A.  Yes.

2  Q.  Now, isn't it true that certain limited partners of Phoenix

3  Holdco L.P. are suing yourself and others, including Phoenix

4  Cayman Ltd., Nicholas Calamari, Triaxx Holdco LLC, and 1/0

5  Capital LLC in New York State court?

6          THE COURT:  Hold off, Mr. Garg.

7          MS. BEAUMONT:  Objection; relevance.

8          THE COURT:  Well, I need to hear it before I can

9  determine whether it's relevant.  Then you may move to strike

10  if you still have the objection.

11          You may answer the question, Mr. Garg.

12          THE WITNESS:  They are.

13  BY MS. BUCKEL:

14  Q.  And part of this lawsuit is that you are not following the

15  provisions laid out in this agreement?

16          MS. BEAUMONT:  Objection; relevance.

17          THE COURT:  I'm going to hear the whole thing, and you

18  can have a continuing objection.

19          Ms. Buckel.

20          THE WITNESS:  They have many grievances.  I'm not sure

21  if that is one of them or not.

22  BY MS. BUCKEL:

23  Q.  Is it true that they are alleging — I'm not -- they are

24  alleging in this lawsuit that you misappropriated the funds of

25  the ARAM Phoenix Holdco L.P. partnership?

 1    A.  I believe that is one of their allegations, yes.

 2    Q.  And just to confirm, this exempted limited partnership

 3    agreement is dated March 22nd, 2011?

 4    A.  That's correct.

 5    Q.  And the name of the litigation, just for the record, is

 6    entitled Black v. Phoenix, et al.?

 7    A.  I believe so.

 8              THE COURT:  Ms. Buckel, are you going to link this up

 9    to anything later on, or was that it?

10              MS. BUCKEL:  I will, your Honor.

11              THE COURT:  You will?

12              MS. BUCKEL:  Yes.

13              THE COURT:  All right.

14              Then Ms. Beaumont will hold her fire as well.

15              MS. BUCKEL:  I expected as much.

16    BY MS. BUCKEL:

17    Q.  Mr. Garg, you had previously testified that when the money

18    went to the general partners, it would then be sent up the

19    corporate chain to Asian Castle or given out as bonuses to

20    Phoenix Cayman?

21    A.  I said it could be.  There were never any distributions

22    made to Asian Castle.  There were only bonuses paid out of

23    Phoenix Cayman Ltd.

24    Q.  What were the total amount of distributions made?

25    A.  To whom?

N4JKUSB3                          Garg - Cross

```
 1   Q.  You just testified that it went up to Phoenix Cayman,
 2   correct?
 3   A.  Uh-huh.
 4   Q.  You previously testified that yourself and Raja Visweswaran
 5   would determine how much would be divided up to Phoenix Cayman,
 6   correct?
 7   A.  Uh-huh -- no, no, I'm sorry.  We would determine what
 8   was -- it was a formula as to what went to Phoenix Cayman Ltd.
 9   versus what was distributed to the limited partners after the
10   initial amount was paid off -- after the initial investment
11   plus the preferred return was paid to the L.P.s.
12          So, we didn't have discretion over that.  We -- that
13   was a formulaic.
14   Q.  That was formulaic?
15          THE COURT:  Are you saying, Mr. Garg, that monies from
16   the PRES engagement got up the chain as far as the limited and
17   the general partners of Phoenix Holdco, but were not further
18   divided up from Phoenix Cayman to Asian Castle?
19          THE WITNESS:  That is something -- yeah, that is one
20   statement I have made.  I think what I was telling her was that
21   the formula for dividing money between the limited partners and
22   the general partner was formulaic.  We didn't have discretion
23   over it.
24          THE COURT:  And I assume that's in the limited
25   partnership agreement?
```

1              THE WITNESS:  That's correct.

2              THE COURT:  But you're saying when the money --

3    whatever portion of the money was due to Phoenix Cayman, it

4    stayed there?

5              THE WITNESS:  Yes.

6              THE COURT:  And it didn't go further up the chain?

7              THE WITNESS:  Yes.  Or it was paid out in bonuses,

8    yes.

9              THE COURT:  Paid out in bonuses to the individuals we

10   previously discussed?

11             THE WITNESS:  Yes, yes.

12             THE COURT:  Thank you.

13   BY MS. BUCKEL:

14   Q.  So, correct me if I am wrong, but I believe you previously

15   testified that the amount of these distributions was

16   $12 million?

17             THE COURT:  Which distributions?

18             THE WITNESS:  No, I affirmed an estimate that it was

19   approximately $12 million, that I believe whoever was -- I

20   think it was either you or Mr. Savla said that.

21             THE COURT:  Are we talking about bonuses now?

22             MS. BUCKEL:  The distributions made to Phoenix Cayman.

23             THE WITNESS:  No, the distributions made to Phoenix

24   Cayman would not be $12 million.  If the amount paid to the

25   limited partners was $12 million, the amount -- right, so they

N4JKUSB3                         Garg - Cross

1    invested 5 million, they got their 5 million back, they made a

2    $7 million profit, that's the limited partners.  The amount

3    that was given to the general partner, Phoenix Cayman Ltd., I

4    don't remember the exact number, but I don't think it was

5    $12 million.  I think it was a much smaller number.

6              MS. BUCKEL:  I'm going to introduce tab 6.  This is

7    Exhibit 1198, and it is not yet admitted into evidence.

8    BY MS. BUCKEL:

9    Q.  Mr. Garg, do you recognize this document?

10   A.  I don't recognize this document, but I think I know where

11   it's coming from.

12   Q.  I'm going to represent to you that this was a document that

13   was attached to Mr. Alexander Litt's affirmation in opposition

14   to defendants' motion to dismiss in the Black v. Phoenix

15   litigation.

16             I'm also going to represent to you that Mr. Litt

17   stated that this was Exhibit 13, and Exhibit 13 was a

18   spreadsheet provided by defendants showing the transfer of

19   partnership funds to defendants and defendants' nonparty

20   entities.

21             You previously just testified that you were a

22   defendant in this action; is that correct?

23   A.  Yes.

24             THE COURT:  Mr. Litt, I take it, is one of the

25   plaintiff's lawyers in that case?

1           MS. BUCKEL:  He is.  Mr. Litt is an attorney with

2    Moritt Hock & Hamroff LLP, who was counsel for Plaintiffs

3    Andrew Black, and Erik Molberg, Celestino Amore, and Dr. Henry

4    Balboa.

5    BY MS. BUCKEL:

6    Q.  Does this refresh your recollection about this document?

7           MS. BEAUMONT:  Objection.

8           THE COURT:  Hold on.

9           THE WITNESS:  I mean, I don't know who Alexander Litt

10   is, and I don't know what he used to make this document.  But I

11   have not seen this document before.

12          MS. BUCKEL:  I would like just to state for the record

13   that --

14          THE COURT:  Are you moving the document into evidence?

15          MS. BUCKEL:  I would like to, but I would like to

16   confirm that it's a spreadsheet provided by defendants, of

17   which Mr. Garg is one.  I would like to move the exhibit into

18   evidence.

19          THE WITNESS:  I have never seen this before.

20          THE COURT:  Hold on.

21          THE WITNESS:  Sorry, sorry.

22          THE COURT:  If you're trying to get this witness to

23   authenticate the document, you need to get testimony from this

24   witness that authenticates the document rather than making

25   representations to me about what it is.

1          MS. BUCKEL:  Understood.  I was trying to refresh his

2     recollection to try --

3          THE COURT:  All right.  Do you want to make another

4     run at it?  Or are you moving it in on your present record?

5     BY MS. BUCKEL:

6     Q.  Mr. Garg, did you, as a defendant in the Black v. Phoenix

7     litigation, compile this document and provide it to your

8     attorneys?

9     A.  I don't remember.

10    Q.  Do you have any doubt that your attorneys provided this

11    document to -- or produced this document in that litigation?

12    A.  That litigation is a nuisance litigation funded by a

13    litigation funder.  I cannot attest to any document that the

14    person representing those defendants created.  And I certainly

15    did not collate this document myself.

16         THE COURT:  So we are going to take a break now,

17    because you've been going an hour after lunch.  But before we

18    take the break, we're going to excuse the witness, and we're

19    going to have a chat about exhibits.

20         So we're going to excuse you for at least 15 minutes,

21    Mr. Garg.

22         THE WITNESS:  Okay.

23         THE COURT:  The same rules apply.

24         Lawyers, stay put for just a minute, please.

25         You are excused temporarily.

1              THE WITNESS:  Thank you.

2              (Witness temporarily excused)

3              THE COURT:  It's so much easier when you can just

4    excuse the witness as opposed to having to turn on the white

5    sound machine and have the lawyers all come up to the bench to

6    huddle.

7              I don't know that you're going to be able to get this

8    document in because your witness says he doesn't know what it

9    is, but my larger question is:  What's the point here?  I

10   already understand that the money flowing from the Phoenix

11   engagement, both through the waterfall and outside of the

12   waterfall, was going in many different routes and through many

13   different corporate chains, into the pocket largely, not

14   entirely, of Mr. Garg.

15             How much more detail do I really need here?

16             MS. BUCKEL:  Your Honor, understood.  And because I

17   understood this was put together by Mr. -- or, at least,

18   Mr. Garg is a codefendant in that litigation --

19             THE COURT:  So Mr. Litt was a defense lawyer in that

20   case, not a plaintiffs' lawyer in that case?  Because I thought

21   you told me that the Litt declaration was a document put in

22   to --

23             MS. BUCKEL:  It was an affirmation in opposition to

24   defendants' motion to dismiss.  So, Mr. Litt is an attorney for

25   plaintiffs in that case, and this document was produced in that

1   litigation by defendants, of which Mr. Garg is one.

2           THE COURT:  So you're representing to me that this is

3   a document that was produced by defendants, so somebody at one

4   of Mr. Garg's organizations could authenticate it.  But he may

5   not be the guy who can do that.

6           MS. BUCKEL:  Look, I thought he may be able to, and I

7   was certainly wanting to try.  I understand your Honor's point

8   that you understand a lot of the distributions of money, but

9   one of the things that I thought was interesting was Mr. Garg's

10  testimony about the PSD Partners and the 25 percent that would

11  go to Mr. Priore.  I was going to use this document to show the

12  flow of funds after an incentive payment was made to Phoenix

13  outside the priority of payments waterfall.

14          THE COURT:  I think you're going to have to find

15  another way to do it.

16          MS. BUCKEL:  Okay.

17          THE COURT:  So if there's nothing further on this

18  exhibit or the state court lawsuit, we will take — all of us

19  now — ten minutes.  It's a little earlier than I had originally

20  planned, but it's never a bad time to take a ten-minute break.

21          So we'll be back at about ten minutes to 3:00, and we

22  will now be in recess.

23          MS. BEAUMONT:  Your Honor, we have Mr. Calamari on

24  deck.

25          THE COURT:  I know that.  Thank you for reminding me.

1           I think -- I'm not going to say you promised me,

2     Ms. Buckel, but you estimated that you had an hour and a half

3     of cross, and I think you've pretty much used up that hour and

4     a half.  How much more do you have?

5               MS. BUCKEL:  A little bit, but I'll try to trim.

6               THE COURT:  What's a little bit?

7               MS. BUCKEL:  Say 15 to 30 minutes.

8               THE COURT:  I'm going to give you 20, and then I'm

9     going to cut you off, when we come back from break.

10              (Recess)

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (In open court; case called)

2            THE COURT:  Sorry to have kept you waiting.

3  Ms. Buckel, 20 minutes.

4            MS. BUCKEL:  Thank you, your Honor.

5  BY MS. BUCKEL:

6  Q.  Mr. Garg, can you please turn to tab 8 which is Exhibit 13,

7  and I will represent to the Court this has already been

8  admitted into evidence.

9            Mr. Garg, is this the clarification letter we were

10  looking at earlier?

11  A.  Yes.

12  Q.  Were you involved in the drafting of this letter?

13  A.  No.

14  Q.  Is it your understanding that Mr. Nicholas Calamari drafted

15  the letter?

16  A.  Yes.

17  Q.  But you told him you didn't think it was needed because you

18  thought the engagement agreements were clear, correct?

19  A.  I did.

20  Q.  And you felt that the engagement agreements reflected the

21  business agreement that was reached, correct?

22  A.  I'm sorry.  Could you restate the question?

23  Q.  You felt that the engagement agreements as drafted, as

24  signed, as executed, reflected the business agreement that was

25  reached between the deal parties, correct?

1   A.  That was my earlier understanding, and then I realized over

2   the course of time that it was wording that could have

3   benefited from clarification.

4   Q.  But you told Mr. Calamari that you thought the engagement

5   agreements were clear.  Is that correct?

6   A.  I told him that I thought that the business agreement that

7   there would be $250,000 of activist implementation fees, and

8   then depending on what the recovery amount ended up being,

9   another $250,000 of incentive was clear.

10  Q.  Did you tell -- did you ask Mr. Calamari that why he needed

11  the letter?

12  A.  I don't remember asking him why he needed the letter.

13  Because he explained it to me that the wording was unclear, and

14  it was prudent for us to have the letter, considering we had

15  done the work and we had nothing to hide.

16  Q.  But the agreement was clear.

17  A.  My read of the agreement was that the agreement was clear.

18  And but I understand that other people may read it a different

19  way, and so therefore it was helpful to have the clarification.

20  Q.  Understood.  But you told Mr. Calamari you didn't think,

21  you personally did not think it was needed?

22  A.  I personally did not think it was needed.

23  Q.  Up until the point where the clarification letters were

24  drafted, had there been any issue with PRES getting paid its

25  fees it was owed?

```
 1   A.  No, only in that sometimes the administrative cap came into
 2   being, and then PRES was paid at a later time than it would
 3   have traditionally been paid.
 4   Q.  Was there any concern that PRES would not get paid its fees
 5   in the future?
 6   A.  No.
 7   Q.  Mr. Calamari signed the clarification letters; is that
 8   correct?
 9   A.  He did.
10   Q.  He signed them as general counsel of PRES, correct?
11   A.  He did.
12   Q.  Was Mr. Calamari employed by PRES at the time?
13   A.  He was not an employee of PRES at the time.
14   Q.  Whom was he employed by?
15   A.  He was employed by 1/0 Capital.
16   Q.  You testified earlier that Mr. Calamari was general counsel
17   for a variety of different 1/0 Capital companies, is that
18   correct?
19   A.  That's correct.
20   Q.  Mr. Calamari just acted at your direction, correct?
21   A.  No, Mr. Calamari had a lot of discretion as to how he
22   acted.
23   Q.  But in terms of which entity he was the general counsel
24   for, you dictated that; is that correct?
25   A.  I didn't dictate anything to Mr. Calamari.
```

1    Q.   How did Mr. Calamari know he was the general counsel of

2    PRES?

3    A.   So 1/0 Capital was set up as an investment company and as

4    an incubator of various internet businesses.  And so in

5    general, Mr. Calamari was 1/0 Capital's lawyer and would

6    function in a legal capacity for any number of the businesses

7    that we would set up.

8    Q.   So you didn't need to direct him to be general counsel of

9    PRES; he was just the general counsel of these companies?

10   A.   Yes.

11   Q.   Let's talk a little bit more about the purchase of ICP.

12   You testified earlier that you explored purchasing ICP in 2010,

13   is that correct?

14   A.   Originally in 2010, yes.

15   Q.   Let's turn to tab 9, which is Exhibit 1017.  I'll represent

16   to the Court that this exhibit is already in evidence.

17           Mr. Garg, do you recognize this e-mail?

18   A.   I do.

19   Q.   This is an e-mail from Mr. Balboa that attaches a

20   memorandum that contains various considerations about a

21   potential purchase of ICP.  Is that correct?

22   A.   That's correct.

23   Q.   And it seems that Mr. Ziggy Jonsson wrote the memo, the

24   first stab at the memo before comments were added; is that

25   correct?

1    A.  Yes, yes.

2    Q.  You previously testified that Mr. Jonsson looked at various

3    considerations, whether or not the deal with ICP made sense or

4    not; is that correct?

5    A.  He did.

6    Q.  These considerations include the collateral manager's

7    management fees, and expense reimbursement, is that correct?

8    A.  Yes.

9    Q.  One of the headings on this memo which is found at Bates

10   28403 is expense reimbursements with a subheading of annual

11   income stream or not question mark.  Is that right?  It's at

12   the bottom.

13              THE COURT:  Which page?

14              MS. BUCKEL:  At the bottom of page 1 of the memo which

15   ends in Bates number 28043.

16              THE COURT:  Thank you.

17   A.  Yes.

18   Q.  Was it your understanding that the collateral manager at

19   that time was ICP was receiving payment each month for the set

20   up of services such as Intex and other data services?

21   A.  They were getting reimbursed their expenses for that.

22   Q.  On the Bates that ends in 28409, which is a couple of pages

23   in, there are a few comments.  And do you believe your comments

24   are in the red?

25   A.  My comments are in the red.

1    Q.  And you write:  We are only buying if there is truly the

2    ability to get expense reimbursements equivalent to our

3    purchase price by the end of year five.  Correct?

4    A.  I do write that.

5    Q.  You view expense reimbursements as an income stream?

6    A.  I don't view it as an income stream.

7    Q.  But at this point, all the other cash flows to ICP such as

8    the subordinate management fees and incentive fees were paused,

9    correct?

10   A.  I don't remember if the administrative fees had been paused

11   yet or not by that time.  But, they may have been.

12   Q.  If not at that time of 2010, do you believe it was shortly

13   thereafter?

14   A.  Yes.

15   Q.  You testified earlier that Phoenix Structured Credit

16   Investments bought all the credit receivables in the Triaxx

17   CDOs, correct?

18   A.  That's correct.

19   Q.  Mr. Garg, doesn't this mean that after the execution of the

20   secondary sell and repurchase agreements in 2011, that there

21   were no fees for the collateral manager?

22   A.  Yes, but this is a memo from 2010.

23   Q.  Apologies.  I am asking kind of a future question.

24             THE COURT:  Ask the question again.

25   A.  In 2010 I wouldn't have known that.

N4J3USB4                         Garg - Cross

1    Q.  After?

2    A.  In 2011 --

3            THE COURT:  Let her ask the question.

4    Q.  So this was the memorandum of your thoughts and

5    Mr. Jonsson's thoughts in 2010.  Correct?

6    A.  Yes.

7    Q.  You didn't end up by buying ICP at that time?

8    A.  Yes.

9    Q.  You instead entered into engagement agreements such as the

10   secondary sell and repurchase agreements?

11   A.  Correct.

12   Q.  Those secondary sell and repurchase agreements included all

13   of ICP's fees that they were entitled to under the collateral

14   manager agreements, correct, of the Triaxx CDOs?

15   A.  Yes.

16   Q.  So, you did, however, buy ICP in 2015, correct?

17   A.  Yes.

18   Q.  That was in January?

19   A.  Yes.

20   Q.  And the final purchase price was somewhere around $1.3

21   million?

22   A.  Yes.

23   Q.  And it was yourself and Mr. Calamari who are owners of

24   Triaxx Holdco, correct?

25   A.  Yes.

1   Q.   From 2010 to 2015, did any entity, including Phoenix

2   Structured Credit Investments, ICP, or otherwise, receive

3   subordinate management fees or incentive fees from the Triaxx

4   CDOs?

5   A.   I don't believe so.

6   Q.   This was because there was not money in the deal, correct?

7   A.   No, there was plenty of money in the deal.  The deal was

8   cash flowing like $50 million a month.  It was because the

9   ratings test had been triggered, and the ratings test, which

10  simply was the average of all the ratings of the bonds in the

11  deal, determined whether the subordinate management fee was to

12  be paid or not.  So the ratings test or the OC trigger or the

13  ratings trigger were triggered, then there were no subordinate

14  management fees to be paid.

15  Q.   Got it.  So there were no subordinate management fees to be

16  paid from 2010 to 2015, and this was the case even though

17  Phoenix had provided these activist implementation services

18  since 2011, correct?

19  A.   Yes, because it relied on a test that would take a very

20  long time -- the rating agencies had downgraded CDOs en masse.

21  So, when they did that, and specifically they withdrew their

22  ratings, so the likelihood of the rating agency test to ever

23  being able to be cured was close to zero.  Because the rating

24  agencies had stopped covering the deals.  So, yeah, there

25  wasn't any chance of that.

1   Q.  So there was a very remote chance of getting the fees.  Is

2   that your testimony?

3   A.  There was a remote chance of getting them from turning

4   the -- from fixing the triggers.  There was a strong chance of

5   getting them from you mentioned the deal paying off.  Because

6   as we were doing all the activist work and as we were getting

7   additional recoveries and as the housing market was turning and

8   as we were fixing servicing in these deals, all of that meant

9   that loss severities were coming down.  And that the Triaxx

10  CDOs, their RMBS positions were likely to actually be able to

11  pay the full amount due.  Which is also why none of the

12  bondholders in the Triaxx CDOs to date from my understanding

13  have suffered any losses.  They've gotten their principal and

14  interest in full.

15  Q.  I believe some people would object to that.

16          But, I guess my question for you is that even if all

17  this stuff happened, right.  Cash flows flowing, these triggers

18  aren't triggered anymore.  We're getting down to these fees.

19  What is the entity that would receive these fees?

20  A.  Phoenix Structured Credit Investments.

21  Q.  Not TAM?

22  A.  No.

23  Q.  So, my question for you is, or despite the remote chance of

24  getting these fees ever, you found value in the fact that the

25  collateral manager had the ability to direct the course of the

1   activist litigations to determine whether to settle those

2   litigations, correct?

3   A.  Yes.

4   Q.  Just for the record, from 2015 to 2018, did TAM or Phoenix

5   Structured Credit receive any subordinate management or

6   incentive fees?

7   A.  I don't think so.

8   Q.  This was the case even though Phoenix had been providing

9   services to the Triaxx CDOs since 2011?

10  A.  That's correct.

11  Q.  Are you aware that two of the three of the Triaxx CDOs are

12  in default?

13  A.  Is it a payment default or a technical default?

14  Q.  Event of default under the indenture.

15  A.  What kind of event of default?

16  Q.  I was asking if you were aware.

17  A.  No, I'm not aware.

18          MS. BUCKEL:  That's all the questions I have.

19          THE COURT:  Thank you very much.

20          Do the issuers have any questions for Mr. Garg?

21          MR. RAINIER:  We do not, your Honor.

22          THE COURT:  You do not.

23          Any redirect, Ms. Beaumont?

24          MS. BEAUMONT:  I do.

25          THE COURT:  Give me a time estimate if you would.

1            MS. BEAUMONT:  I think it should be less than 10

2     minutes.

3            THE COURT:  Thank you.

4            MS. BEAUMONT:  First I would like to renew my

5     objection to the testimony regarding the case in New York State

6     Supreme Court brought by Mr. Black, and I would move to strike

7     that testimony.

8            THE COURT:  The exhibit didn't come in, and as far as

9     the testimony got, to the best of my recollection, is that

10    there was a case filed in State Supreme Court by the limited

11    partners that this witness thinks is a nuisance case.  Does

12    that harm you?

13           MS. BEAUMONT:  I can live with that.

14           THE COURT:  You can live with that.  Let's move on.

15    REDIRECT EXAMINATION

16    BY MS. BEAUMONT:

17    Q.  Good afternoon, Mr. Garg.

18    A.  Good afternoon.

19    Q.  Is it true that any profits from the engagement of PRES by

20    the Triaxx CDOs have flowed primarily to you?

21    A.  No.

22    Q.  Can you explain.

23    A.  So, in order for me to have received a bonus from Phoenix

24    Cayman, the general partner, the Triaxx CDOs would have to have

25    generated recoveries.  Those recoveries would have had to have

1    been substantial enough to generate an incentive fee pay.  That

2    incentive fee payment would have had to have been substantial

3    enough to pay off all the expenses for the work that was done.

4    The work that was -- any profit from that would then have to go

5    up to the limited partners of Phoenix Holdco.  They would have

6    to get paid first plus their economic rate of return.  Then

7    after all that, then we would have, me and my partners, would

8    have the ability to enjoy some profit recovery.

9    Q.  Do you also have an ownership interest in Triaxx Holdco,

10   correct?

11              THE COURT:  Can we pause there.  Mr. Garg, you meant

12   with you and your partners at what entity?

13              THE WITNESS:  At Phoenix Cayman Limited.

14              THE COURT:  Okay.

15   Q.  Mr. Garg, you've you have an ownership interest in Triaxx

16   Holdco, correct?

17   A.  I do.

18   Q.  Can you please explain what would have to happen for you

19   personally to receive a penny through your ownership interest

20   in Triaxx Holdco?

21   A.  All of the noteholders and all of the Triaxx deals would

22   likely have to get paid their full principal and interest, and

23   then whatever moneys were outstanding would flow into the

24   accrued but unpaid subordinate management fees, and then from

25   there, those -- the bulk of those accrued and subordinate

1  management fees would go and be paid to the investors in PSCIL,

2  with the small remainder left for Triaxx Holdco.

3  Q.  We've heard today about a number of agreements entered into

4  in March of 2011.  Do you recall that?

5  A.  I do.

6  Q.  And you put some money into the execution of those various

7  agreements?

8  A.  I did.

9  Q.  About how much?

10  A.  Our legal fees were about $400,000.

11  Q.  Did you make any investments in capital investments in

12  those?

13  A.  I personally invested $500,000.

14          THE COURT:  The $400,000 in legal fees was with

15  respect to the various 2011 deal documents?

16          THE WITNESS:  Yes.

17          THE COURT:  Thank you.

18  Q.  Judge Moses asked you a question regarding a scenario in

19  which one of the CUSIPs improved in value by $501,000.  Do you

20  recall that?

21  A.  I do.

22  Q.  Did that scenario ever materialize?

23  A.  No.  Most of the CUSIPs received recoveries in the millions

24  of dollars.

25  Q.  Do you know if PRES ever received incentive fees for

1    anything to date, other than the Countrywide settlement?

2    A.  It received an incentive fee for a settlement with First

3    Horizon.  It received -- and its own incentive fees for

4    settlements that have yet to fully materialize through the

5    waterfall, but I think it's only received fees for Countrywide

6    and First Horizon.

7    Q.  If you'll turn to tab 22 in the binder Mr. Savla gave you

8    first thing this morning.

9              THE COURT:  If I could pause you for one moment,

10   Ms. Beaumont.  Do we know the Horizon case by some other name?

11             MS. BEAUMONT:  No.  It's First Horizon.

12             THE COURT:  That is not something we discussed with

13   Mr. Moon.

14             MS. BEAUMONT:  I don't think we heard about it from

15   Mr. Moon.  I think it appears in some of the documents that he

16   discussed, but I'm not sure he personally spoke about it.

17             THE COURT:  All right.

18   Q.  So tab 22 in the first binder we looked at this morning.

19             THE COURT:  The first binder.

20             MS. BEAUMONT:  Yes.  So that's Trial Exhibit 2098.

21   Q.  Do you have that there?

22   A.  Yes.

23   Q.  That's a group of invoices from Phoenix from PRES?

24   A.  Yes.

25   Q.  What's the date of those invoices?

1    A.  July 20, 2018.

2    Q.  Do you happen to know if those were dated after the filing

3    of this lawsuit?

4    A.  I don't remember when this lawsuit was filed.

5    Q.  Do you happen to know if PRES has received payment on any

6    of those invoices?

7    A.  Oh, no.  PRES hasn't been paid since 2018.

8    Q.  Who put up the money for Triaxx Holdco to purchase ICP in

9    2015?

10   A.  I did.

11   Q.  Then just two more small things.  One is, you mentioned

12   this morning, there was a reference to the RAST shelf?

13   A.  Yes.

14   Q.  Can you explain what a shelf is.

15   A.  A shelf is a group of mortgage backed securities, so

16   mortgage backed securities, let's say a bank like Wells Fargo

17   would create a shelf, and all the deals in the shelf would have

18   the same legal documents, just that the underlying collateral

19   pool would be different.  So, you would have let's say Wells

20   Fargo 2007 -- WFSBS is the shelf, and you have 2007-1, 2007-2,

21   2007-3, and they would be sequential and the loan pools

22   themselves are different, but the legal documents are all the

23   same.

24   Q.  Thank you.  Then, lastly, there was a mention in some

25   deposition testimony that we heard this morning where you

1   mentioned the fact that you believed that PIMCO had bought some

2   of its Triaxx notes from something called Maiden Lane?

3   A.  Yes.

4   Q.  What was the significance of that?

5   A.  Well, PIMCO purchased Maiden Lane was 1, 2 and 3 were

6   different vehicles created by the government.  Maiden Lane 2

7   and 3 were for the bailout of AIG.  AIG was the original owner

8   of the bonds.

9           THE COURT:  You have to slow down a little bit.

10          THE WITNESS:  So sorry.

11  A.  Then the government took them over and the Maiden Lane

12  vehicle.  And then it's my understanding that PIMCO bought the

13  bonds for something like 70 cents on the dollar.

14          MS. BEAUMONT:  I have no further questions.

15          THE COURT:  Is there any recross?  I'll ask PIMCO

16  first.

17          MR. SAVLA:  Very quick recross.

18          THE COURT:  Go ahead, Mr. Savla.

19  RECROSS EXAMINATION

20  BY MR. SAVLA:

21  Q.  Mr. Garg, Ms. Beaumont asked you if profits flowed to you,

22  correct?

23  A.  Yes.

24  Q.  And you said, as I understood it, you said that profits

25  would have to go first to the L.P.s of Phoenix Holdco?

1   A.  Yes.

2   Q.  And then, you would only receive a bonus from Phoenix

3   Cayman if the Triaxx CDOs generated recoveries, correct?

4   A.  No.  I would receive a bonus from Phoenix Cayman if there

5   was profits that flowed to Phoenix Cayman.

6   Q.  Okay.  And there weren't distributions to Asian Castle,

7   correct?

8   A.  There were no distributions to Asian Castle.

9   Q.  And if I understood your testimony correctly, money did not

10  flow to Asian Castle from PRES?

11  A.  No, it never did.

12  Q.  So let's look at Exhibit 3249 which is not in evidence.

13  And so this is an invoice dated done in the European style, so

14  November 15, 2014, correct?

15  A.  Yes.

16  Q.  And this invoice was kept in the regular course of

17  business, correct?

18  A.  Yes, no.  It's actually not the regular course of business

19  because this is -- I referenced this earlier.  For that period

20  of time when HSBC shut down for two or three months, we had to

21  create an escrow account at HSBC in Hong Kong.  These were

22  escrow accounts that were created for the moneys and the bills

23  to be paid through that.  And so, as you can see, there is an

24  Asian Castle transaction account.

25          THE COURT:  I think, Mr. Garg, you were getting a

1   little ahead of the question you were being asked.

2   Q.  So the document was created in the regular course of

3   business, correct?

4   A.  The document was created.

5   Q.  And maintained in the regular course of business?

6   A.  That's correct.

7           MR. SAVLA:  Your Honor, we move to admit Exhibit 3429.

8           THE COURT:  3429 is admitted.

9           (Joint Exhibit 3429 received in evidence)

10  Q.  And this document shows a wire of funds to Asian Castle,

11  correct?

12  A.  To an escrow account at Asian Castle, yeah.

13  Q.  Let's look at another exhibit, Exhibit 3273.  And this is

14  another invoice, this is for the 2007-1 transaction, and it's

15  December 15, 2014, correct?

16  A.  Hmm-hmm.

17  Q.  This document was created in the regular course of

18  business, correct?

19  A.  It was.

20  Q.  And it was maintained in the regular course of business?

21  A.  It was.

22          MR. SAVLA:  Your Honor, I move to admit this document,

23  Exhibit 3273.

24          MS. BEAUMONT:  No objection.

25          THE COURT:  3273 is admitted.

1                (Joint Exhibit 3273 received in evidence)

2       Q.  And this also shows an invoice asking wire funds to Asian

3       Castle.   Correct?

4       A.  That's correct.

5                MR. SAVLA:  No further questions.

6                THE COURT:  Is there any recross by the trustee?

7                MS. BUCKEL:  Two questions, your Honor.

8                THE COURT:  Two questions.

9       RECROSS EXAMINATION

10      BY MS. BUCKEL:

11      Q.  Mr. Garg, you testified in response to Ms. Beaumont's

12      question that the flow of funds from PRES didn't really go up

13      to you, is that correct?

14               MS. BEAUMONT:  Objection.  Misstates the testimony.

15               THE COURT:  That's a preliminary question to orient

16      the witness as to what the topic is.  I'll permit it.

17      Q.  Mr. Garg, are you aware that over $30 million has been

18      provided to or has been paid to Phoenix inside the priority of

19      payments waterfall?

20      A.  That seems --

21               THE COURT:  She means PRES.

22      Q.  PRES.  Over $20 million has been paid to PRES outside of

23      the priority of payments waterfall?

24      A.  Yes.

25      Q.  And you just testified that PRES has received incentive

1   fees from Countrywide and something called First Horizon?

2   A.  That's correct.

3   Q.  Those are the only invoices for incentive fees that PRES

4   has submitted?

5   A.  I believe so.

6            MS. BEAUMONT:  Objection.

7            THE COURT:  Overruled.

8   Q.  Are you aware that this action involves an interpleader

9   claim concerning $18.25 million in incentive fee invoices from

10  PRES?

11  A.  Yes.

12  Q.  These incentive fee invoices are from what action?

13  A.  I don't have a copy of those invoices, but if you show me

14  the copy, then I could tell you.

15  Q.  If I would show you what action they are coming from.  I am

16  asking you, do you know what these incentive fee invoices are

17  from?

18  A.  I don't know until I see the invoice.

19            MS. BUCKEL:  No further questions.

20            THE COURT:  Anybody else?

21            I have just a couple of questions for you, Mr. Garg.

22  And because I'm the judge, I can't guarantee you that I'll stop

23  at two.  Let's see how we go.

24            You testified earlier today that pursuant to the 2011

25  contract with PSD partners, PSD was paid I think your phrase

1    was several million dollars.  Do you recall that testimony?

2              THE WITNESS:  Yeah.

3              THE COURT:  Can you sharpen that up for me a bit.  Can

4    you recall how many millions?

5              THE WITNESS:  I think it was 2.75 million.

6              THE COURT:  2.75.  And is that agreement, the PSD

7    agreement still in effect?

8              THE WITNESS:  It's never been terminated.  So I would

9    assume it's in effect, yes.

10             THE COURT:  Is there a possibility, depending on how

11   the business goes and possibly how this case turns out, that

12   additional funds will flow to the Priores through the PSD

13   agreement?

14             THE WITNESS:  Not likely.  Only because so much of

15   this is invoices that were due and payable back in 2018, '19,

16   '20, and we did the work on them.  And it's unlikely that,

17   depending on where this all falls out, the costs would be -- it

18   would likely be the costs would be enough that there would be

19   no recovery -- this would be no surplus profit.

20   Historically --

21             THE COURT:  What's the phrase?

22             THE WITNESS:  Net cash flow, yeah.

23             THE COURT:  But you can't do the math in your head so

24   you can't be sure of that.

25             THE WITNESS:  Well, I basically know that we would

N4J3USB4                          Garg

1    have to pay out, if we were to -- if we were to receive the

2    amounts that are owed to us, as Phoenix, then between the legal

3    fees that have been incurred, new bonuses that have been

4    accrued, the costs that have been incurred, that there is no

5    likelihood of payment.

6              THE COURT:  When you say the bonuses that have been

7    accrued, do you mean bonuses within your organization to folks

8    like Mr. Jonsson and Dr. Tang?

9              THE WITNESS:  Yes.

10             THE COURT:  Those you would consider, those would have

11   to be netted out before any money would go under the --

12             THE WITNESS:  Yeah.

13             THE COURT:  What's it called, PSD contract?

14             THE WITNESS:  Yeah.

15             THE COURT:  What are the rough estimate here, what are

16   the accrued bonuses that folks like Dr. Tang and Mr. Jonsson

17   are still hoping one day to receive?

18             THE WITNESS:  The amount is slightly larger than in

19   the past, only because it's highly unlikely there is going to

20   be anything else after that.  If the contracts don't continue,

21   there is no additional recoveries possible, then I think the

22   amount is something like $5 million.

23             THE COURT:  Amongst how many individuals?

24             THE WITNESS:  Five.

25             THE COURT:  And name those individuals for me if you

N4J3USB4                        Garg

 1    would.

 2         THE WITNESS:  Dom Savino, Mingsung Tang, Nick

 3    Calamari, myself, and Ziggy Jonsson.

 4         THE COURT:  So, you named yourself in that group.  Do

 5    you recall the amount of your accrued bonus?

 6         THE WITNESS:  I think mine would be about a million

 7    dollars.

 8         THE COURT:  And did you pay yourself any bonus that

 9    was actually paid and not accrued along the way?

10         THE WITNESS:  The total amount of money I made outside

11    from the directors' fees?

12         THE COURT:  The directors' fees we looked at earlier,

13    it was I think $800,000 for a particular period of years and

14    then there was some that accrued as well.

15         THE WITNESS:  Aside from the director fees, I think

16    the amount that I've gotten is something close to $2 million.

17         THE COURT:  You've gotten that in the form of

18    discretionary bonuses within your organization?

19         THE WITNESS:  Yes, within Phoenix Cayman, yes.

20         THE COURT:  You have another approximately one million

21    in bonuses that are awarded but not paid.

22         THE WITNESS:  They haven't been awarded yet, but would

23    likely be awarded.

24         THE COURT:  Can you explain that for me.

25         THE WITNESS:  If I was to award them, then I would

1    have to pay taxes on them immediately.  So I would be accruing

2    something I don't necessarily know whether I am going to get.

3              THE COURT:  You are not carrying these bonuses on your

4    books.

5              THE WITNESS:  No.

6              THE COURT:  So where does the $5 million figure come

7    from?  Is it what you internally are planning to do if you win

8    this lawsuit?

9              THE WITNESS:  Yes.

10             THE COURT:  One of the things you would do is pay

11   yourself another million dollars roughly.

12             THE WITNESS:  I would.

13             THE COURT:  All right.  And how much to Mr. Calamari?

14             THE WITNESS:  We would likely split it evenly across

15   the board.

16             THE COURT:  So a million apiece.

17             THE WITNESS:  Yes.

18             THE COURT:  That's contingent largely on how this

19   lawsuit comes out at this point.

20             THE WITNESS:  That's correct.

21             THE COURT:  Speaking of taxes, you mentioned taxes a

22   moment ago.  I don't know if taxes are the answer or not.  But

23   one thing I've been wondering throughout the day as we look at

24   these complicated org charts and we see that various

25   individuals have a limited partner ownership here, and a

1    consulting agreement here, and get a bonus from somewhere else,

2    and they are an employee of someone else, and there is a

3    contract and a subcontract and a sub-subcontract.

4           Why do you do that way?  What is the advantage of this

5    extraordinarily complex corporate structure as compared to, for

6    example, simply putting Dr. Tang or Mr. Jonsson on the payroll

7    of PRES, and paying them salary, and, if appropriate, bonus

8    through the organization they actually had the contract to do

9    the work at the Triaxx CDOs?

10          THE WITNESS:  There were two reasons.  The first is --

11   three reasons, actually.  The first reason is the entities were

12   set up as offshore companies to deal with an offshore CDO and

13   offshore investors.  So the bulk of the high net worth

14   investors were offshore individuals, so they didn't want --

15   they wanted the entity that they were receiving distributions

16   from to be an offshore entity.

17          THE COURT:  That's Phoenix Holdco.

18          THE WITNESS:  That's Phoenix Holdco.  So we started

19   with the bulk of the investors in the Phoenix transaction are

20   foreign individuals, so they wanted a foreign entity.  So we

21   started with that.

22          Then from there, we started an additional layer of

23   complication, which is the work has to be done by a U.S.

24   entity.  The reason why the work has to be done by the U.S.

25   entity, is the U.S. entity is entering into contracts with

N4J3USB4                      Garg

1    things like credit bureaus, land registries, title insurance

2    companies, and the like, and those companies will not do

3    business or transport U.S. consumer data to a non-U.S. company.

4           THE COURT:  And Phoenix Real Estate Solutions Limited,

5    PRES, is what?

6           THE WITNESS:  A Cayman Island company.

7           THE COURT:  Is there another reason why it is a Cayman

8    Island company?

9           THE WITNESS:  The original idea was that it would

10   contract with other CDOs as well.  And some of those CDOs were

11   offshore.  And some of those CDOs could contain -- so your

12   Honor, when we were doing this, we were trying to buy basically

13   all the broken vehicles.  So we were trying to buy German

14   banks, Irish subsidiaries, we were trying to buy other CDOs, we

15   were trying to basically buy as much collateral as we could,

16   because when we aggregated the collateral together --

17          THE COURT:  You would have economies of scale.

18          THE WITNESS:  Economies of scale.

19          THE COURT:  But you only got as far as the Triaxx

20   CDOs.

21          THE WITNESS:  Yes, because everybody started fighting.

22          THE COURT:  So you were telling me some of the reasons

23   why I am looking at such a complicated structure here.  You

24   started with the fact that the limited partners are offshore

25   individuals who wanted an offshore vehicle, whereas you say for

1   purposes of acquiring and manipulating U.S. based data, you

2   need a U.S. entity.

3           THE WITNESS:  Yes.

4           THE COURT:  What else?

5           THE WITNESS:  So that's two reasons.  And then the

6   third is basically, in each of these litigations that we were

7   undertaking, like when we were, for instance, pushing very hard

8   against Countrywide, if the entity that controls the

9   intellectual property gets sued by Countrywide back, so we're

10  out there doing all this research, we are saying Countrywide

11  made all these bad loans.  Now there is going to be a

12  counterclaim.  If the -- from Countrywide saying your research

13  is wrong.  You're saying the wrong things.

14          THE COURT:  I am trying to imagine how that could be a

15  counterclaim.

16          THE WITNESS:  Let's say they sue us.  Then we encumber

17  the intellectual property.  We wanted to create a vehicle where

18  the vehicle that does the work and the suing is different than

19  the vehicle that contains the intellectual property.

20          THE COURT:  Just in case somebody sued the company

21  that was doing the suing.

22          THE WITNESS:  That's right.

23          THE COURT:  Did anyone ever sue the company that was

24  doing the suing?

25          THE WITNESS:  We didn't have that happen.

1          THE COURT:  Okay.  Any other reasons?

2          THE WITNESS:  No.

3          THE COURT:  All right.  There was some testimony

4   during the day today about the activist fee which was paid on a

5   per CUSIP basis.  There was a portion of it that was paid

6   monthly up to a 25 month cap.  And there was a portion that was

7   paid as what you sometimes called an incentive fee of $250,000,

8   which you think was stackable, and some other folks in this

9   room think it was not intended to be stackable, on top of the

10  monthly.  But that's not what I am asking you about at the

11  moment.

12          Across the three Triaxx CDOs, how many deals were

13  there, how many CUSIPs?

14          THE WITNESS:  About 200.

15          THE COURT:  About 200.  And in Exhibit 2045, which you

16  don't, I don't think you have to turn to at the moment.  You

17  probably remember it.  This is the e-mail about having 30

18  activist positions and rotating the positions in.

19          THE WITNESS:  Yes.

20          THE COURT:  Is there some reason why you had 30

21  activist positions, 30 CUSIPs, that you were at that time

22  earning monthly fees on?  Was there some limit to how many

23  CUSIPs you could earn the monthly fee on?

24          THE WITNESS:  No.  There was also just a limit to the

25  amount of work we could do.  So, we couldn't really manage more

1    than 30 deals at the same time.

2             THE COURT:  Were you ever charging that monthly fee on

3    more than 30 CUSIPs at a time?

4             THE WITNESS:  I doubt it.

5             THE COURT:  Were you ever charging that monthly fee on

6    less than 30 CUSIPs?

7             THE WITNESS:  In some times, yes.  When the

8    Countrywide deal stopped, when we got the settlement for the

9    Countrywide deal, a bunch of the CUSIPs were Countrywide CUSIPs

10   and we had to get ramped up on other things.  So we were

11   charging less during those times.

12            THE COURT:  Did you ever -- when I say you, I mean

13   PRES -- did you ever charge that $250,000 incentive fee on a

14   security, on a CUSIP, that you did not previously consider an

15   activist position, that is, you did not previously charge a

16   monthly fee on?

17            THE WITNESS:  No.

18            THE COURT:  So if we see an incentive fee of $250,000

19   fee invoiced, that would be on a position that was in the

20   rotation, if I can use that phrase, as an activist --

21            THE WITNESS:  Yes.

22            THE COURT:  -- position.

23            Let me just look at my notes and see if there is

24   anything else I needed you to clear up.  I think that is all of

25   the questions that the Court has.  If I've messed anything up

N4J3USB4

1   for anyone, I'll give you a brief opportunity to clear it up.

2          All right.  So you are excused, Mr. Garg.  Thank you

3   for your testimony.

4          (Witness excused)

5          THE COURT:  It is about 3:37.  Hopefully we'll get

6   started with Mr. Calamari.  Should we take a quick break now as

7   we're changing witnesses?  Let's do that.  10 minutes.

8          (Recess)

9          THE COURT:  Do I understand we have had a change of

10  horses for one of the parties?

11         MR. RAINIER:  Yes, your Honor.  For the issuers, you

12  might recall at the pretrial conference we indicated that

13  Mr. Ledley might sit in.  He's here at counsel's table, and

14  I'll be stepping away.

15         THE COURT:  So, Mr. Rainier is leaving us at least

16  temporarily and Mr. Ledley is joining us.  Thank you both very

17  much.

18         MR. LEDLEY:  Good afternoon, your Honor.

19         THE COURT:  Good afternoon.  You may be seated.

20         All right.  Do we have a witness?

21         MS. BEAUMONT:  I guess the TAM parties -- I am not

22  sure who is calling him.

23         THE COURT:  I think you are calling him.

24         MS. BEAUMONT:  The TAM parties call Nicholas Calamari.

25         (Witness sworn)

1          MS. BEAUMONT:  May I approach the witness?

2          THE COURT:  You may.  Make room for a new binder here.

3    NICHOLAS CALAMARI,

4         called as a witness by the Defendant,

5         having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MS. BEAUMONT:

8    Q.  Mr. Calamari, I've given you a binder that contains a

9    document titled corrected trial declaration of Nicholas J.

10   Calamari.

11         Do you see that?

12   A.  Yes.

13   Q.  Is that your direct testimony in this case?

14   A.  Yes, it is.

15   Q.  I understand you wanted to make a correction to paragraph

16   4.

17   A.  Yes.  In my preparation for trial, I noticed that in the

18   last paragraph, or the last sentence of paragraph 4, it says I

19   served as outside general counsel of PRES from approximately

20   February 2014 to October 2016.  February of 2014 should be

21   February 2015.

22   Q.  It should be --

23   A.  February of 2015.

24         MS. BEAUMONT:  I tender the witness for

25   cross-examination.

1        THE COURT:  So, Mr. Calamari, with that exception, is

2   your corrected trial declaration to your knowledge true and

3   complete?

4        THE WITNESS:  Yes, it is.

5        THE COURT:  Cross-examination.

6        MR. LORENZO:  Before I do that, do we need to enter

7   that?

8        THE COURT:  Well, you know the rules.  Everybody's

9   direct testimony gets filed on the docket at the end of the

10  trial day.  The transcript will reflect the witness's

11  correction which he made after he was placed under oath, so I

12  think we're covered.

13       MS. BEAUMONT:  Your Honor, just to be clear.  The

14  correction that's referred to in the title of the document was

15  the correction that was made to correct the exhibit numbers

16  that we discussed --

17       THE COURT:  I understand this is a new correction.

18       MS. BEAUMONT:  Correct.

19       THE COURT:  So because I have the corrected trial

20  declaration in front of me, and it has a different date in it.

21       MS. BEAUMONT:  That's right.

22       THE COURT:  Everybody is on the same page.  We're all

23  keeping up.

24       Okay, Mr. Lorenzo.

25       MR. LORENZO:  Your Honor, if I have permission to

1    approach with witness binders.

2              THE COURT:  You may.

3    CROSS-EXAMINATION

4    BY MR. LORENZO:

5    Q.  Good afternoon, Mr. Calamari.  My name is Alex Lorenzo.

6    I'm an attorney with Alston & Bird and we represent U.S. Bank

7    National Association as trustee in this litigation.

8              I am going to be asking you some questions this

9    afternoon.  And I am going to start off first with a little bit

10   about your background.

11             You joined 1/0 Capital LLC in 2014, correct?

12   A.  Yes.

13   Q.  And you were general counsel and partner there, correct?

14   A.  Yes.

15   Q.  And eventually became a senior partner there, is that

16   correct?

17   A.  Yes.

18   Q.  And as general counsel, you served as general counsel for a

19   variety of 1/0 Capital subsidiary companies, correct?

20   A.  Yes.

21   Q.  This list of subsidiary companies at 1/0 Capital where you

22   served as general counsel, it includes The Number, and Phoenix

23   Real Estate Solutions or PRES, is that correct?

24   A.  That's not correct.  I wouldn't consider PRES to be part of

25   the 1/0 family of companies.

1   Q.   So, would you consider The Number to be part of the 1/0

2   family of companies?

3   A.   Yes.

4   Q.   And you served as general counsel at The Number?

5   A.   Yes.

6   Q.   Understanding that you don't consider PRES and I guess I

7   should pause there and say does it work to refer to Phoenix

8   Real Estate Solutions as PRES?

9   A.   Yes.

10  Q.   Understanding you don't consider PRES to be part of the 1/0

11  family of companies, did you also serve as general counsel to

12  PRES?

13  A.   Yes.

14  Q.   Did you serve as general counsel of Phoenix Advisors &

15  Managers?

16  A.   Yes.

17  Q.   Do you consider Phoenix Advisors & Managers to be part of

18  the 1/0 Capital family of companies?

19  A.   Yes.

20  Q.   Did you also serve as the general counsel of Triaxx Asset

21  Management?

22  A.   Yes.

23  Q.   Do you consider Triaxx Asset Management to be a part of the

24  1/0 family of companies?

25  A.   No.

1    Q.  For all of these companies that you served as general

2    counsel, your compensation was solely through 1/0 Capital,

3    correct?

4    A.  No, that's not correct.

5    Q.  Were you paid directly by any of the entities for which you

6    served as general counsel?

7    A.  Yes.  Phoenix Real Estate Solutions paid me directly for

8    work that I performed in connection with an arbitration.

9    Q.  Was that a $250,000 payment for responding to an

10   arbitration demand that you are referring to?

11   A.  It was a $250,000 invoice that I believe was paid in two

12   separate payments of $125,000.

13   Q.  Other than those two $125,000 payments, did you receive any

14   compensation for the companies?

15   A.  Did you say two?

16   Q.  So, other than that $250,000 that you just testified to,

17   did you receive any other compensation from any of the

18   companies that we just listed where you served as general

19   counsel?

20   A.  No.

21   Q.  And in fact, all of the other compensation you received in

22   your role as general counsel for these companies, it came

23   through 1/0 Capital, correct?

24   A.  Yes, in terms of cash.

25           Actually to go back and amend my previous answer.

N4J3USB4                    Calamari - Cross

1  Some of the companies I was general counsel for provided me
2  with equity compensation directly in those entities, but not
3  cash.
4  Q.  It's like you are anticipating my next question which
5  related to your ownership interest in some of these companies.
6          So, of the companies that we just went through, and
7  I'll start with The Number, did you have an ownership interest
8  in The Number?
9  A.  Yes.
10 Q.  What was or is that ownership interest?
11 A.  I don't recall sitting here today.  Likely something less
12 than 10 percent.  Probably less than 5.
13 Q.  How about Phoenix Real Estate Solutions, do you currently
14 have an ownership interest in PRES?
15 A.  I have never had an ownership of any kind in PRES.
16 Q.  The same question for Phoenix Advisors & Managers.
17 A.  Yes, sort of it changed a little bit over time.  But, no
18 excuse me.  It did not.  I have no direct equity interest in
19 Phoenix Advisors & Managers.
20 Q.  You clarified that or mentioned direct equity interest.  Do
21 you have an indirect equity interest?
22 A.  Yes.
23 Q.  And how is that indirect equity interest connected to
24 Phoenix Advisors & Managers?
25 A.  Phoenix Advisors & Managers is owned 100 percent by 1/0

```
 1   Holdco.  Although I think at one point it might have
 2   transferred, put underneath The Number.  But either way, my
 3   equity ownership in 1/0 Holdco would provide me with an
 4   indirect ownership interest in Phoenix Advisors & Managers.
 5   Q.  Then, the same question about your equity ownership
 6   interest for Triaxx Asset Management.  Do you have an equity
 7   ownership in Triaxx Asset Management?
 8   A.  Not directly in TAM, but indirectly, yes.
 9   Q.  Can you explain what you mean by indirectly?
10   A.  Yes.  Triaxx Advisors & Managers is owned 100 percent by a
11   entity called Triaxx Holdco, and I am a 45 percent owner of
12   Triaxx Holdco.
13   Q.  Did you pay anything for that ownership interest?
14   A.  No.
15   Q.  That ownership interest was compensation for your work as
16   general counsel of TAM?
17   A.  Yes, general counsel, chief compliance officer; all the
18   duties I performed there.
19   Q.  So you just mentioned when you were the general counsel of
20   TAM, you were also the chief compliance officer.  Is that
21   correct?
22   A.  Yes.
23   Q.  Was one of your responsibilities as chief compliance
24   officer to file what's referred to as the form ADV?
25   A.  Yes.
```

1    Q.   And what is the form ADV?

2    A.   The form ADV is a document that is filed with the SEC and

3    subsequently publicly available on the internet.

4    Q.   So, the form ADV is going to be the first exhibit that we

5    look at, so if you open up your binder to tab 2.  It is a

6    document that has been marked as Exhibit 1099, and it has

7    already been admitted into evidence.

8            This is a copy of a form ADV that Triaxx Asset

9    Management submitted, correct?

10   A.   Yes, it appears to be.

11   Q.   And this document is dated March 30, 2016, correct?

12   A.   Yes.

13   Q.   And the form ADV includes a disclosure of TAM of conflicts

14   of interest, correct?

15   A.   Yes.

16   Q.   So let's turn to page 10 which has the Bates number ending

17   in 824.

18   A.   Yes.

19   Q.   And on page 10, rather, it notes that PAM is an entity

20   indirectly owned by the controlling member of Triaxx, and that

21   PAM receives a fee from PRES; is that correct?

22   A.   I don't know specifically, but that sounds right.

23   Q.   If we look just at the first full paragraph sort of a

24   little bit down the page, and Mr. Gibson has highlighted that

25   for us.

1   A.  Yes.

2   Q.  And then a little bit farther down, in I guess the third

3   full paragraph, it says:  "The revenues and fees earned by PRES

4   and PAM indirectly benefit the controlling member of Triaxx."

5   Do you see that?

6   A.  Yes.

7   Q.  And the controlling member of Triaxx, is that Mr. Garg?

8   A.  I'm not sure if it is Mr. Garg or Triaxx Holdco, but it

9   would be one of those two.

10  Q.  And Triaxx Holdco is owned jointly by you and Mr. Garg,

11  correct?

12  A.  Yes.

13  Q.  So, the fees earned by PAM, is it fair to say they

14  indirectly benefited both you and Mr. Garg?

15  A.  Yes.

16  Q.  Keeping at the same place, just looking at the next

17  sentence, it reads:  "Such indirect benefits relating to PRES

18  and PAM could result in potential conflicts of interest."

19          Do you see that?

20  A.  Yes.

21  Q.  And would it be fair to say an example of potential

22  conflict of interest is if the collateral manager agreed to

23  increase the amount of fees that PRES was entitled to?

24  A.  Yes.

25  Q.  As we continue there, same paragraph, just going on to the

1   next sentence.  The document says:  "In order to mitigate such

2   potential conflicts of interest, TAM has established a code of

3   ethics that requires it and its supervised persons to always

4   act in the best interests of its clients, including in entering

5   into agreements for services to be rendered by third parties,

6   to TAM and its current clients."

7           Do you see that?

8   A.  Yes.

9   Q.  You understand TAM's clients to be the Triaxx CDOs,

10  correct?

11  A.  Yes.

12  Q.  So, this code of ethics referenced herein require that TAM

13  always acted in the best interests of the CDOs, correct?

14  A.  Yes.

15  Q.  And is it fair to say acting in best interests of the CDOs

16  means acting pursuant to the terms set out in the indentures of

17  the CDOs?

18  A.  I think I would need to know the specifics of the situation

19  that we're talking about.

20  Q.  Well, I am trying to understand, this document says that

21  the code of ethics requires TAM to act in the best interests of

22  the CDOs, right?

23  A.  Yes.

24  Q.  So I'm trying to understand what that means.  Do you have

25  an understanding of what that means?

1    A.   Generally, yes.  You would act in their best interest and

2    not do anything that was contrary to their interests.

3    Q.   Right.  So I am saying, when you talk about acting in the

4    best interests of an entity like a CDO, right.  Does that mean

5    acting in accordance with the terms of the governing documents

6    for the CDOs, including the indentures?

7    A.   Presumably, unless those documents were telling you to do

8    something that would be harmful to the CDOs somehow.  It is a

9    little bit abstract.  But generally, yes, I would want to

10   follow the indentures.  But the specifics of the situation

11   would be helpful to flesh that out.

12   Q.   Let's go now to tab 11 in your binder.  It is a document

13   that has been marked Exhibit 1069 and has not yet been

14   admitted.  Do you recognize this document?

15   A.   Yes.

16   Q.   What is it?

17   A.   It appears to be the code of ethics and policies procedures

18   for ICP Asset Management LLC.

19   Q.   This document is dated effective April 20, 2015, correct?

20   A.   Yes.

21            MR. LORENZO:  We ask the Court to move Exhibit 1069

22   into evidence.

23            MS. BEAUMONT:  No objection.

24            THE COURT:  1069 is admitted.

25            (Joint Exhibit 1069 received in evidence)

1   Q.  If you flip now to tab 12 of your binder, and this has been

2   marked as Exhibit 1200.  Another exhibit that has not yet been

3   admitted into evidence.  If you see the first page says

4   privilege withheld.  That's in relation to the production.  But

5   if you flip it over, the title of the document is code of

6   ethics.  Do you see that on page ending in Bates stamp 048?

7   A.  Yes.

8   Q.  Do you recognize this document?

9   A.  Not specifically.  But, give me a second.

10          This looks familiar to me.  The reason why I'm pausing

11  is just because I only see references to the firm and clients

12  and nothing that specifically ties it back to Triaxx or ICP.

13  But, this document's familiar to me.

14  Q.  And when you say this document is familiar to you.  Do you

15  have an understanding of what that document is?

16  A.  I mean, I believe it is the code of ethics we've been

17  referring to previously.  But, again, I don't see a date on

18  this document.  So it is a little difficult to place.

19          MR. LORENZO:  We request that the Court move into

20  evidence Exhibit 1200.

21          MS. BEAUMONT:  No objection.

22          THE COURT:  1200 is admitted.

23          (Joint Exhibit 1200 received in evidence)

24  Q.  Let's talk a little bit now about PRES' work for the Triaxx

25  CDOs.  Is it your understanding that the Triaxx CDOs had a

1    relationship with PRES?

2    A.   Yes.

3    Q.   That relationship was memorialized in what we've been

4    referring to here as the engagement agreements.  Is that

5    correct?

6    A.   Yes.

7    Q.   Did PRES have any other clients, other than the Triaxx

8    CDOs?

9    A.   I don't believe so.

10   Q.   And initially when PRES was engaged by the Triaxx CDOs, it

11   subcontracted the work that it was contracted to do to an

12   entity called Activist, is that correct?

13   A.   Yes.

14   Q.   Subsequently PRES subcontracted the work for Triaxx CDOs to

15   Phoenix Advisors & Managers or PAM, is that correct?

16   A.   Yes.

17   Q.   And then PAM on behalf of PRES generated work product

18   related to the PRES engagement with the Triaxx CDOs?

19   A.   Yes.

20   Q.   Is it your belief that the work product that was generated

21   by PAM on behalf of PRES is protected by some sort of

22   privilege?

23   A.   Yes.

24   Q.   Do you have an understanding of the dividing line between

25   privileged work product from PRES or PAM and non-privileged

1    work product?

2    A.   Generally.

3    Q.   What is that distinction?

4    A.   I would say that under -- I mean, under the law there are a

5    number of different privileges.  The one that would be most

6    applicable here would be the attorney-client privilege.

7    Q.   When you refer to the attorney-client privilege appearing

8    to work from -- does it work to say PRES and that encompasses

9    PAM, or would you like me to break out PRES and PAM separately?

10   A.   It might depend upon the question.

11   Q.   When you are talking about a litigation work product for --

12   let's start with PAM's work.  What litigation are you referring

13   to that might apply and create a privilege?

14   A.   The Triaxx CDOs were engaged in a number of activist

15   litigations.  PRES and PAM supported them in this effort.  And

16   so, that's the first thing that comes to mind.  It would be in

17   connection with the work that they did in connection with those

18   activist litigations.

19   Q.   Is it your understanding that any work that PAM or PRES did

20   in connection with the activist litigations would be privileged

21   such that it couldn't be disclosed in this litigation?

22   A.   Yes.

23   Q.   Let's talk a little bit about the Phoenix engagement

24   agreements, and if I could ask you to flip to tab 3 in your

25   binder which is Exhibit 10, an exhibit that has been admitted

1   in this trial.

2           Are you familiar with this document?

3   A.  Yes.

4   Q.  When was this document executed?

5   A.  March 22, 2011.

6   Q.  That was before you joined 1/0 Capital and started working

7   with PRES, correct?

8   A.  Yes.

9   Q.  So I'll represent that in addition to this agreement, which

10  appears from the upper-right-hand corner to be for 06-1 that

11  there were substantially identical agreements for 06-2 and

12  07-1.  Is that your understanding as well?

13  A.  Yes.

14  Q.  So, when I refer to the engagement agreements in the

15  plural, does it work to refer to all three of these agreements?

16  A.  Yes.

17  Q.  So you were not involved in the negotiation of the

18  engagement agreements, correct?

19  A.  No.

20  Q.  It is your understanding --

21          THE COURT:  Hold on.  No, you were not involved, not,

22  no, he's not correct.

23          THE WITNESS:  No, I was not involved.

24          THE COURT:  Thank you.

25          MR. LORENZO:  Thank you, your Honor.

1   Q.  It is your understanding that these engagement agreements

2   were entered into in connection with the collateral manager's

3   activist implementation strategy, correct?

4   A.  Yes.

5   Q.  When you came on board in January of 2015, as the

6   collateral manager, was this strategy already in place?

7   A.  Yes.

8   Q.  These engagement agreements, they set out what compensation

9   PRES would receive for its work, correct?

10  A.  Yes.

11  Q.  There would be two types of fees.  An activist

12  implementation fee and a diligence fee, and then an incentive

13  fee?

14  A.  Yes.  I think there is also a provision for expenses.

15  Q.  So, let's break that down.  So, the activist implementation

16  fee consisted of two subparts; is that correct?

17  A.  Yes.

18  Q.  So, it's your understanding that first, there was 10,000

19  per month up to a maximum of 250,000 per RMBS CUSIP, is that

20  correct?

21  A.  Yes.

22  Q.  And then it's your position that you have referred to

23  something as the incentive fee, which was an additional

24  $250,000 from any recoveries generated that were more than

25  500,000?

1    A.  Yes.

2    Q.  So let's look at page 4 of Exhibit 10.  That's the Bates

3    stamp ending in 158.  There is a section here, section 6,

4    entitled fees and expenses.  Do you see that?

5    A.  Yes.

6    Q.  And according to this section, it says that ARAM Phoenix's

7    fees shall be paid as administrative expenses under the

8    indenture, correct?

9    A.  Yes.

10   Q.  Is it your understanding that from 2011 to 2014, PRES' fees

11   were paid as an administrative expense under the indenture?

12   A.  Yes.

13   Q.  Now would you refer to these payments to Phoenix as within

14   the waterfall?

15   A.  Yes, that makes sense to me.  I understand what that means.

16   Q.  When we say within the waterfall, we mean paid pursuant to

17   the terms of the priority of payments waterfall in the

18   indentures.  Does that work?

19   A.  Yes.

20   Q.  In talking about these fees from 2011 to 2014, were these

21   payments to Phoenix within the waterfall for incentive fees,

22   monthly fees, or some combination?

23   A.  I believe those were the monthly fees.  I would assume the

24   diligence fees as well, but that predates me.

25   Q.  So, moving to sort of around the time you joined and I

1  understand you joined PRES in 2015.  Is that correct?

2  A.  That's when I would say sort of official date was.  I

3  believe that's when the engagement agreement was.  I certainly

4  would have provided advice before that earlier.  I don't

5  remember exactly when the outside general counsel would have

6  attached.  So that's when the engagement agreement was signed.

7  But I believe I was probably providing legal advice to them

8  prior to that.

9  Q.  How did you become outside general counsel of PRES?

10  A.  In my memory, what sort of sparked this was in my duties at

11  1/0, I was going through some mail, and I discovered an

12  arbitration demand that had been sitting for a long time.  I

13  don't remember how long.  But it was seemed like it had been

14  unattended to.  So, we realized or I realized at that point

15  after discussions with Mr. Garg that no one had been handling

16  this matter.  So, he asked me if I could help out with it and I

17  agreed to.

18  Q.  So, after helping out with this arbitration demand, at some

19  point you became the general counsel of PRES?

20  A.  Yes, I don't know that it was such that we set forth like

21  an offer letter, you are to become the general counsel.  It was

22  more of, there was arbitration appearances and things happening

23  and so, therefore, I was not appearing as sort of an arguing

24  lawyer, but I was very present to help facilitate things.  That

25  was the title that made the most sense.

1    Q.  Who made the decision to give you the title of general

2    counsel at PRES?

3    A.  I don't recall, but I assume it must have been in

4    connection with conversations with Mr. Garg and/or

5    Mr. Visweswaran.

6    Q.  So, is it fair to say in 2014, PRES believed it was owed an

7    incentive fee?

8    A.  Yes.

9    Q.  And this goes to the questions that I was just asking you,

10   but at this point, when PRES believed it was owed an incentive

11   fee, were you employed by PRES as general counsel?

12   A.  When you say employed by, I don't know I was ever employed

13   by them.  I was not a W-2 employee of them.

14           Can you repeat the question?

15   Q.  Sure.  I'm happy to rephrase.  At this point when PRES

16   comes to believe it's owed an incentive fee, were you PRES'

17   general counsel?

18   A.  Yes.

19   Q.  And to try and understand the basis of PRES' belief it was

20   owed an incentive fee.  Was there a record that showed that a

21   particular CUSIPs had a recovery in excess of 500,000 such that

22   PRES would be entitled to an incentive fee?

23   A.  Are you asking me if there was a record of that?  Yes.

24   Q.  And who maintained this record?

25   A.  I don't recall specifically.  It would have been someone at

1   either PRES or PAM.

2   Q.  Do you recall how this record was maintained?

3   A.  I believe it was in a spreadsheet.

4   Q.  Did you ever see this spreadsheet?

5   A.  Yes.

6   Q.  When did you see it?

7   A.  I'm not exactly sure if it was a singular spreadsheet or a

8   number of spreadsheets, but I would have seen it numerous times

9   during my work with both PRES and my work with TAM.

10  Q.  What information was reflected on the spreadsheet?

11  A.  CUSIP numbers and work being -- and references to work

12  being done.

13  Q.  As we talk about this belief by Phoenix that it's entitled

14  to a recovery fee.  Is Phoenix entitled to an incentive fee

15  after recovery in excess of a certain amount, or is the measure

16  of when Phoenix is entitled to an incentive fee after the

17  trusts were made whole on any losses associated with a

18  particular CUSIP?

19  A.  I believe it was recoveries of a certain amount.

20  Q.  Do you recall what these certain amounts, the threshold

21  that had been had to be met?

22  A.  It was $500,000.

23  Q.  So at this point PRES believed it had earned an incentive

24  fee, and you testified in your direct there were discussions

25  about how PRES' incentive fee would be paid, is that correct?

1    A.   Yes.

2    Q.   Were you involved in those discussions?

3    A.   Can you repeat the question?

4    Q.   Sure.  Were you involved in those discussions?

5    A.   Yes.

6    Q.   Were you involved as counsel to PRES?

7    A.   Yes.

8    Q.   As counsel to PRES, you were representing PRES' interests,

9    correct?

10   A.   Yes.

11   Q.   So your goal in these discussions was to make sure that

12   PRES got paid, correct?

13   A.   That was one of the goals, yes.

14   Q.   When you were having these discussions, were there any

15   discussions of payments outside of the waterfall that had been

16   made as of August 2014?

17   A.   That -- are you asking if they were referencing payments

18   that had previously been made outside of the waterfall?

19   Q.   Yes.

20   A.   No.

21   Q.   I'll let you answer.  I want to make sure the record is

22   clear.

23   A.   I don't believe any payments had been made outside of the

24   waterfall prior to that, no.

25   Q.   So, if no payments had been made outside of the priority of

1    payments waterfall as of August 2014, what was the concern with

2    continuing to pay PRES under the priority of payments

3    waterfall?

4    A.  I don't know that there was a concern about continuing to

5    pay it out under there.  There was a belief that it should come

6    out of litigation recoveries.

7    Q.  And where did that belief come from?

8    A.  It was something that was being said by all of the parties

9    involved at the time.  Those parties being PRES on the one

10   hand, and both TAM, and by that point it would have been TAM

11   and both ICP, and the ICP's counsel, Schulte Roth at the time.

12   Q.  So what was the basis for PRES' belief that payments should

13   be made outside the waterfall?

14   A.  I don't know about the basis of its belief.  But, wished to

15   be paid out of the recoveries because those funds were

16   available, and it wished to be paid.

17   Q.  When you say those funds were available, what do you mean

18   by that?

19   A.  It means there was a large recovery that had come in, and a

20   large amount of fees that were due as a result of that.  And so

21   PRES wanted to be paid out of those available fees.

22   Q.  When you say that ICP was involved in the discussions, was

23   this Mr. Priore at ICP?

24   A.  Yes.

25   Q.  Did he share PRES' belief that PRES should be paid from

1   this large recovery?

2   A.  Yes.

3   Q.  And Mr. Priore believed that the payments should be outside

4   the waterfall?

5   A.  Yes.

6   Q.  Let's talk about now what we've been calling the

7   clarification letters in this litigation.  If you could turn to

8   tab 4 of your binder.  That's a document marked Exhibit 13

9   which is already been entered into evidence.

10           Have you seen this document before?

11  A.  Yes.

12  Q.  What is this document?

13  A.  This is a letter that I wrote to Mr. Nissenbaum at Schulte

14  Roth.

15  Q.  And you drafted this letter, correct?

16  A.  Yes.

17  Q.  We see here in I guess the first line of the recipient

18  field just below the date, this refers to 06-1, right?

19  A.  Yes.

20  Q.  Is it your understanding there are substantially identical

21  letters for 06-2 and 07-1?

22  A.  Yes.

23  Q.  Is it okay when I refer to the letters in plural to refer

24  to all three letters?

25  A.  Yes.

1  Q.  If we look down at the signature block, you signed this

2  letter as general counsel of PRES, correct?

3  A.  Yes.

4  Q.  And you in fact had drafted this letter, right?

5  A.  Yes.

6  Q.  Are the clarification letters countersigned by any party?

7  A.  No.

8  Q.  Did you send the clarification letters to the trustee?

9  A.  No.

10  Q.  In connection with the discussions that we had just talked

11  about, about the payment of PRES' large incentive fee, it's

12  true you went back and reviewed the engagement letter between

13  PRES and the collateral manager, correct?

14  A.  Yes.

15  Q.  Did you review any other documents entered into by

16  Mr. Priore in or around the date of the engagement agreements?

17  A.  Not that I can recall.

18  Q.  So, as we look at the clarification letter, if we look down

19  at the second paragraph, the first line, the letter references

20  the intent of the parties at the time the agreement was

21  negotiated and executed.  Do you see that?

22  A.  Yes.

23  Q.  And the reference to the capital A agreement, that's to the

24  engagement agreement?

25  A.  Yes.

 1   Q.  In fact, you weren't present when the engagement agreement

 2   was negotiated and executed, correct?

 3   A.  No.

 4   Q.  Let's look at the fees that have been paid outside of the

 5   waterfall.  If you could turn to tab 5 of your binder.  This is

 6   Exhibit 40 which is already in evidence in this trial.  Have

 7   you seen this document before?

 8   A.  Yes.

 9   Q.  What is this document?

10   A.  This is the response to a set of interrogatories.

11   Q.  Were you involved with preparing this response to the

12   interrogatories?

13   A.  Yes.

14            THE COURT:  This particular copy seems to have some

15   highlighting on it.  I take it that was not part of the

16   interrogatory answers as served.

17            MS. BEAUMONT:  Your Honor, I believe that that

18   redaction was put on there because --

19            THE COURT:  That's a redaction.

20            MS. BEAUMONT:  Yes.

21            THE COURT:  Not a highlight.

22            MS. BEAUMONT:  It was proposed redactions.  I believe,

23   if I recall correctly, and someone can correct me if I get this

24   wrong, one of the parties wanted to be able to show the

25   responses to a person who was not within the attorneys' eyes

1    only identification.

2              THE COURT:  What I took to be highlighting, which was

3    not on the original interrogatory answers, is on there for the

4    purpose of honoring the attorneys' eyes only designation.

5              MR. LORENZO:  And your Honor, candidly, what I thought

6    you were going to point to, if you flip to page 9, for some

7    reason this version with the redactions didn't have a signature

8    but as I see we are --

9              THE COURT:  Hadn't gotten that far yet.

10             MR. LORENZO:  We will have tomorrow morning the signed

11   version which is also I believe an exhibit that's been

12   admitted.

13             THE COURT:  That's fine.

14   Q.  So as we flip through the interrogatories, and if we look

15   to pages 4, 5 and 6, do you see there a chart on those pages

16   that is introduced by the following amounts have been disbursed

17   from accounts held or controlled by the law firm Miller &

18   Wrubel P.C.?

19   A.  Yes.

20   Q.  Then above that, there is a chart that is introduced by the

21   following amounts have been disbursed to the Triaxx CDOs by the

22   account held or control by the law firm Miller & Wrubel P.C.

23   There are three entries there, one for each of the CDOs?

24   A.  Yes.

25   Q.  Is it your understanding that the amounts in the charts are

1    the amounts of the recoveries that were obtained from the

2    activist implementation strategy on February 25, 2019?

3    A.  I believe those are the amounts that were disbursed to the

4    Triaxx CDOs.

5    Q.  I am looking at I guess all of the information in the two

6    charts on page 4, and then the chart that continues on to 5 and

7    6.  So, this reflects all disbursements of recoveries outside

8    the waterfall from the activist implementation strategy as of

9    the date of this document, which I believe is February 25,

10   2019?

11              THE COURT:  As of the date of the interrogatories

12   response you mean?

13              MR. LORENZO:  Yes.

14   A.  That's my understanding.

15   Q.  So, flipping to page 3, this chart on page 3, is it your

16   understanding that these are the amounts of the recoveries?

17   A.  As of this date, yes.

18   Q.  And the first entry in this chart on page 3 is for

19   October 21, 2014, correct?

20   A.  Yes.

21   Q.  And are you aware of any recoveries before that date?

22   A.  No.

23   Q.  So then as we flip back to page 4, and looking at the

24   second chart starting about a third of the way down on page 4.

25   I'll direct your attention to the third entry in that chart,

1    which is dated 11/25/14.  And the payee is identified as ARAM

2    Phoenix Real Estate Solutions Limited.  That's PRES, correct?

3    A.  Yes.

4    Q.  And that payment to PRES was $11,750,000?

5    A.  Yes.

6    Q.  Are you aware of any payments to PRES outside of the

7    waterfall before this date?

8    A.  No.

9    Q.  So it's safe to say there in fact hadn't been any payments

10   to Phoenix outside of the waterfall prior to August 2014, is

11   that correct?

12   A.  Yes.

13   Q.  So as we flip back to the clarification letters, the

14   purported clarification in those letters regarding PRES'

15   incentive fees, that was not based on past conduct, correct?

16   A.  I'm still flipping.

17   Q.  Flipping to Exhibit 13, which is tab 4.

18   A.  Can you repeat your question.

19   Q.  Sure.  Is it your understanding that the clarification

20   letters purport to indicate that PRES' incentive fees could be

21   paid outside of the waterfall?

22   A.  Yes.

23   Q.  And what I was trying to get to is that purported

24   clarification is not based on past conduct, because no payments

25   had been made to PRES outside of the waterfall as of August 8,

1   2014, correct?

2   A.  It was not based on any prior payments outside the

3   waterfall.

4   Q.  Similarly, it wasn't based on others being aware there had

5   been payments outside the waterfall, correct?

6   A.  Who are the others?

7   Q.  I think you had testified you had had discussions with

8   others about the payment of Phoenix's fees outside of the

9   waterfall?

10  A.  In connection with these clarification letters?  That would

11  have been Mr. Garg, Mr. Priore, and Mr. Nissenbaum.

12  Q.  Those individuals did not have an understanding that

13  Phoenix or PRES had been paid outside of the waterfall prior to

14  August 8th, 2014, correct?

15  A.  Correct.

16          MR. LORENZO:  Your Honor, mindful of the time as I

17  flip through my outline and go to a new section, I didn't know

18  if now would be a good time to break.

19          THE COURT:  Now would be a fine time to break.  It is

20  4:30 exactly.  So we will excuse Mr. Calamari.

21          Mr. Calamari, you are due back here at 9:30 tomorrow

22  morning.  You will remain under oath.  And between now and

23  then, you are not to discuss your testimony or facts underlying

24  your testimony with your counsel or with others.

25          THE WITNESS:  I understand.

N4J3USB4

1          THE COURT:  You may be excused.  Lawyers stay behind

2     for a moment, please, and we'll talk scheduling.

3          (Witness temporarily excused)

4          THE COURT:  You'll have to tell me.  What's your

5     estimate, Mr. Lorenzo, for your cross?

6          MR. LORENZO:  So, I think we have maybe an hour and 20

7     minutes left, your Honor.

8          THE COURT:  All right.  And who will be up after you?

9          MR. SAVLA:  I think it will be PIMCO and I am going to

10     estimate about an hour.

11          THE COURT:  Okay.  Issuers?

12          MR. LEDLEY:  Your Honor, I anticipate five to 10

13     minutes, but it may be that shrinks down to zero depending on

14     the other questioning.

15          THE COURT:  So we're at roughly an hour and a half.

16     And Ms. Beaumont, I expect you'll have at least some limited

17     redirect.

18          MS. BEAUMONT:  I imagine there might be a question or

19     two.

20          THE COURT:  Okay.  So, it looks like --

21          MR. LORENZO:  Your Honor, I just -- I don't know if

22     you heard.  As I was two and a half hours.  I imagine that I

23     would have an hour and 20 left.

24          THE COURT:  You're right.  It's too late in the day

25     for me to do math.  So we are at two and a half hours, which is

1    going to be most of the morning.  Perhaps we can get our next

2    witness started before lunch.  But, we'll have to see how it

3    goes.

4         I can't recall who is next.  Is it Dr. Tang or is it

5    Mr. Jonsson?

6         MS. BEAUMONT:  I believe it's Mr. Jonsson, your Honor.

7         THE COURT:  Okay.  So, Ms. Beaumont, you'll have him

8    ready in the late morning.

9         MS. BEAUMONT:  Yes, we will.

10        THE COURT:  Okay.  Now, how does it look for getting

11   through both Mr. Jonsson and Dr. Tang essentially in the

12   afternoon tomorrow?  Sounds like that might be a little tight.

13   Have you talked with each other about what you think the

14   aggregate time on the stand is likely to be for these two

15   witnesses?  I understand they are going to cover much of the

16   same ground, right?  Or could conceivably cover much of the

17   same ground, I don't know what you plan to do with them.

18        I am trying to figure out whether we are going to get

19   Ms. Beaumont on and off the stand Friday morning so we can have

20   closing arguments Friday afternoon.

21        MR. LORENZO:  Working backwards, so your Honor had

22   directed the parties to discuss --

23        THE COURT:  I did.

24        MR. LORENZO:  -- the possibility of having closings at

25   a later date.  And everybody can jump in but I think people are

1    open to that idea, especially given sort of the volume of data

2    or volume of testimony that is coming in through designations

3    of depositions.  And so aggregating all that data or

4    testimony -- I'm sorry, it's late in the day for me as well,

5    your Honor.  But obviously that's subject to your Honor's

6    preference, but also your Honor's schedule.

7            And I guess the one other issue that was discussed was

8    whether your Honor would prefer to have post-hearing briefing,

9    if any, so that sort of everything can be laid out and we would

10   come back and have argument.

11           THE COURT:  So my original thought, as you know, was

12   that it would benefit me and quite possibly you as well to have

13   closing arguments at the close of the trial on Friday

14   afternoon.  I understand you would do that without benefit of

15   formal post-trial materials, and I would give you an

16   opportunity to put those in later.

17           In fact, let me just preview that and say I'd like

18   those in the form of proposed findings of fact and conclusions

19   of law.  Some of you put your pretrial materials in in that

20   fashion, and I would ask you to simply update them with actual

21   trial testimony and so forth.  Those of you who wrote

22   statements of the elements, I imagine you won't have too much

23   trouble turning that into a proposed finding of fact and

24   conclusion of law.

25           If we put off closing arguments, we are necessarily

1    going to have to put them off for at least a week, because of

2    my schedule the following week.  So, it occurs to me if we are

3    going to put off closing arguments, we might want to put them

4    off for long enough so you do everything at once, your written

5    post-trial materials and your oral presentations.

6           Would that be the consensus here?  And if so, how long

7    would you need to be ready both to submit the written materials

8    and to come back and argue to me?  Keeping in mind, this is a

9    serious caution that I'm giving you.  I have 300 cases on my

10   docket.  The longer we go between Friday afternoon and when you

11   come back to argue to me and submit your written materials, the

12   more I will have forgotten about the live testimony this week.

13   So you're sort of running that risk.

14          That said, is there a consensus among the agreement

15   here as how you would like to proceed?

16          MS. BEAUMONT:  I think it might make sense for us to

17   caucus one more time overnight.

18          THE COURT:  Right.  You can caucus one more time

19   overnight.  Let me give you some sense of my calendar.  The

20   earliest I could have you back for non-contiguous oral argument

21   would likely be the week of May 1st, possibly the afternoon of

22   the 3rd, the 4th is out.  No, the 4th may not be out.  Possibly

23   during day on the 4th or the week of May 8th where I have a

24   number of half day openings.

25          Now, if we do that, my guess is that's not going to be

 1   time for you to turn around written materials because it's just

 2   going to take you longer than that to digest the trial

 3   testimony.  So if you wanted to put off the oral argument for

 4   long enough to have assembled your written materials, I'm

 5   thinking we should probably go out at least two weeks from

 6   Friday, probably as much as a month from Friday.  If we were to

 7   go out a month from Friday, roughly, that would put us into the

 8   last week of May, where I have a fair amount of availability

 9   the week of May 22.  I'd like for it not to go beyond the

10   Memorial Day weekend.  Again, because I don't want to forget

11   what I've heard.

12           So why don't you all talk amongst yourselves,

13   overnight tonight, and appoint a spokesman if you will or a

14   spokeswoman, and tell me if there is a consensus tomorrow

15   morning, what that consensus is and I'll try to work with you

16   on that.

17           Anything further for this evening?  All right.  We

18   will be in recess until 9:30 tomorrow morning.

19           (Adjourned until April 20, 2023, at 9:30 a.m.)

20

21

22

23

24

25

<pre>
 1                      INDEX OF EXAMINATION

 2   Examination of:                          Page

 3   VISHAL GARG

 4   Direct By Ms. Beaumont . . . . . . . . . . . 421

 5   Cross By Mr. Savla . . . . . . . . . . . . . 423

 6   Cross By Ms. Buckel  . . . . . . . . . . . . 492

 7   Redirect By Ms. Beaumont . . . . . . . . . . 573

 8   Recross By Mr. Savla . . . . . . . . . . . . 578

 9   Recross By Ms. Buckel  . . . . . . . . . . . 581

10    NICHOLAS CALAMARI

11   Direct By Ms. Beaumont . . . . . . . . . . . 593

12   Cross By Mr. Lorenzo . . . . . . . . . . . . 595

13                       JOINT EXHIBITS

14   Exhibit No.                            Received

15    3297    . . . . . . . . . . . . . . . . . 471

16    1145    . . . . . . . . . . . . . . . . . 494

17    3429    . . . . . . . . . . . . . . . . . 580

18    3273    . . . . . . . . . . . . . . . . . 581

19    1069    . . . . . . . . . . . . . . . . . 603

20    1200    . . . . . . . . . . . . . . . . . 604

21    2030    . . . . . . . . . . . . . . . . . 431

22    2033    . . . . . . . . . . . . . . . . . 440

23    2037    . . . . . . . . . . . . . . . . . 445

24    2038    . . . . . . . . . . . . . . . . . 448

25    2039    . . . . . . . . . . . . . . . . . 449
</pre>

1    2043    . . . . . . . . . . . . . . . . . . . 452

2    1048    . . . . . . . . . . . . . . . . . . . 519

3    1205    . . . . . . . . . . . . . . . . . . . 526

4    1036    . . . . . . . . . . . . . . . . . . . 551

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25