n4k3usb1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

U.S. BANK NATIONAL
ASSOCIATION,

     Interpleader Plaintiff,

        v.                                18 CV 04044 (BCM)

TRIAXX ASSET MANAGEMENT, LLC,
et al.,

                       Bench Trial

     Interpleader Defendants.

------------------------------x

                     New York, N.Y.
                     April 20, 2023
                     9:30 a.m.

Before:

            HON. BARBARA C. MOSES,

                     U.S. Magistrate Judge

                APPEARANCES

ALSTON & BIRD
     Attorneys for Interpleader Plaintiff
BY:  ALEXANDER LORENZO
     ELIZABETH A. BUCKEL
     SAMANTHA BUI

FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS
     Attorneys for Interpleader Defendants Triaxx and Phoenix
Real Estate
BY:  ANNE E. BEAUMONT
     PRIYANKA WITYK
     ANIL K. VASSANJI

NORTON ROSE FULBRIGHT
     Attorneys for Interpleader Defendant PIMCO
BY:  SANDEEP SAVLA
     ANTHONY LAURIELLO
     BRANDT VERNON

n4k3usb1

1                              APPEARANCES (Continued)

2    DAVIS POLK & WARDWELL LLP
          Attorneys for Interested Party Citigroup Global Markets
3    BY:   ADAM GREENE
          ISAAC GELBFISH
4
     WOLLMUTH MAHER & DEUTSCH
5         Attorneys for Interpleader Defendant Triaxx Prime CDOs
     BY:   MICHAEL LEDLEY
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

n4k3usb1

1            (Trial resumed; case called)

2            MR. LORENZO:  Good morning, your Honor.  Alex Lorenzo

3    from Alston & Bird for U.S. Bank National Association as

4    trustee.  This morning I'm joined by Ms. Buckel and my

5    colleague Ms. Bui, who will be cross-examining a witness today.

6            THE COURT:  Ms. Bui, is there room for you at counsel

7    table?

8            MR. LORENZO:  We were going to rotate through the day.

9    So I may be back there at one point, your Honor.

10            THE COURT:  Well, if we have some extra chairs, I

11    think there is one over there, you can pull it up.

12            So that's Mr. Lorenzo, Ms. Buckel, and Ms. Bui for the

13    trustee.

14            MR. SAVLA:  Good morning, your Honor.  Sandeep Savla

15    of Norton Rose Fulbright U.S. for PIMCO.  I'm joined by my

16    colleague Anthony Lauriello.  Later on today a colleague of

17    ours from Dallas, Texas, will be moving some exhibits into

18    evidence I believe.

19            THE COURT:  Okay.

20            MR. SAVLA:  His name is Brandt Vernon.  To my left I

21    have the Davis Polk team, Adam Greene and Isaac Gelbfish.

22            THE COURT:  Mr. Savla, Mr. Lauriello, Mr. Greene, and

23    Mr. Gelbfish before me this morning, but Mr. Vernon making a

24    late appearance later today.

25            MS. BEAUMONT:  Good morning, your Honor.  Anne

n4k3usb1

1   Beaumont, Friedman Kaplan Seiler Adelman & Robbins for Triaxx

2   Asset Management LLC and Phoenix Real Estate Solutions Ltd.

3   With me are my colleagues Priyanka Wityk and Anil Vassanji.

4              MR. LEDLEY:  Michael Ledley, Wollmuth Maher & Deutsch

5   for the issuers, and I appear by myself.

6              THE COURT:  You are sufficient unto yourself,

7   Mr. Ledley, and that I believe is it for today.

8              So, Mr. Calamari was not yet done when we broke

9   yesterday afternoon.  Is there any business that we need to

10  cover before we invite him back in?

11             MR. LORENZO:  So, just further to the discussion at

12  the end of the day yesterday, your Honor.  Everyone spoke, and

13  if your Honor's schedule allows, I think the parties were

14  looking at Thursday, I believe it is Thursday, May 25.  And I

15  know your Honor mentioned you had some availability, I don't

16  know if there is a particular time.

17             THE COURT:  So your preference is to come back and

18  argue in a month on May 25, by which time you will have

19  submitted proposed post-trial findings.

20             MR. LORENZO:  Yes, your Honor.  The parties were

21  thinking, if it works with your Honor's schedule, that the

22  deadline would be the Friday before, the 19th of May.

23             THE COURT:  So, rather than hold things up this

24  morning, let me make a note of that and we'll check our

25  calendar at the lunch break and let you know if that's going to

1   work.

2           MR. LORENZO:  Good.  Thank you.

3           THE COURT:  So, where is Mr. Calamari?

4           MS. BEAUMONT:  I will go get him.

5           THE COURT:  You may step forward, Mr. Calamari.  You

6   don't have to be sworn in again.  You can take the stand.

7           THE WITNESS:  Thank you, your Honor.

8           THE COURT:  Mr. Calamari, I will remind you that you

9   are still under oath.

10          Mr. Lorenzo, you may proceed.

11   NICHOLAS CALAMARI,

12       called as a witness by the Defendant,

13       having been previously sworn, testified as follows:

14   CROSS-EXAMINATION

15   BY MR. LORENZO:

16   Q.  Good morning, Mr. Calamari.  So, before I get started with

17   my questioning, I just wanted to cover two logistical matters.

18          MR. LORENZO:  With the Court's permission, I was going

19   to approach.  And I know I mentioned we had an inadvertent

20   error and didn't have the signed copy of Exhibit 40, so we have

21   a replacement for tab 5 and an additional tab 17 for your

22   binder.

23          THE COURT:  Let me take the tabs.  You've distributed

24   them to the other counsel?

25          MR. LORENZO:  Yes, your Honor.

1             THE COURT:  Okay.

2             MR. LORENZO:  One is tab 5 and then there is a tab 17.

3             THE COURT:  Let me see what I have.  So, the new tab 5

4    is marked Exhibit 40 as the old tab 5 was, but is a different

5    version of Exhibit 40.

6             MR. LORENZO:  It is a version of Exhibit 40 with

7    Mr. Calamari's signature and there had been a correction on the

8    docket, so the version that was in the binder was the original

9    version that had been submitted, and then there was a

10   correction on the docket when we realized in fact it was the

11   signed version.

12            THE COURT:  That you intended all along.  What version

13   do I have in those binders down there?  And by "those binders

14   down there" I mean the ones you delivered last week.

15            MR. LORENZO:  I had that thought, your Honor.  I'm

16   fingers crossed hopeful you have the corrected version, but I

17   would be happy to check the a break.

18            THE COURT:  Well, so let us make a note to ourselves,

19   Ms. Kay and Ms. Almonte, that the version of Exhibit 40, which

20   was admitted jointly, correct?

21            MR. LORENZO:  Yes.

22            THE COURT:  The version of Exhibit 40 that we should

23   be looking at is the one we were handed this morning.  If our

24   electronic and prior paper copy is different, I guess we'll

25   take care of that on our end.

1          Exhibit 17 is new to the binder but not new to the

2     case, is that right?

3          MR. LORENZO:  Not new to the case, though I believe as

4     a technical matter this exhibit, which is a Phoenix invoice,

5     has not yet been admitted so I will --

6          THE COURT:  It was premarked?

7          MR. LORENZO:  It was premarked, yes, your Honor.

8          THE COURT:  That's fine.  I think I'm caught up

9     logistically.

10         MR. LORENZO:  Thank you, your Honor.

11    Q.  So, Mr. Calamari, just as a housekeeping matter, if you

12    will look at the new version of Exhibit 40, which again is tab

13    5 in the binder.  If you could just flip to the very last page

14    of that document, which has a number 9 at the bottom.  I think

15    Tom might not have the newest version.

16         Do you see that heading about halfway down the page

17    that says verification?

18    A.  Yes.

19    Q.  Below that there is a signature block with your name

20    printed.  Do you see that?

21    A.  Yes.

22    Q.  Is that your signature?

23    A.  Yes.

24    Q.  So, let's pick up where we left off yesterday and I think I

25    had mentioned I was going to move to a new topic.  And that

1   topic is the testimony in your declaration about getting legal

2   advice from Mr. Stein.

3            So, when you refer to getting legal advice from

4   Mr. Stein, and again I think this is paragraph 39 of your

5   direct testimony, it's correct that the time frame is early

6   2017, correct?

7   A.  Yes.

8   Q.  As of early 2017, had any of PRES' monthly fees been paid

9   outside the waterfall?

10  A.  I'm not sure specifically off the top of my head, but I

11  believe yes.

12  Q.  So, let's look at that.  Hopefully you might have open tab

13  5, Exhibit 40 still, but if you could turn to tab 5 and

14  specifically page 4 which is a chart we had looked at yesterday

15  which has a number of entries that I believe you had testified

16  are outside the waterfall payments.

17  A.  I'm there.

18  Q.  So, if we look about halfway way through the chart, there

19  is a series of entries on October 26, 2015.  Do you see that?

20  A.  Yes.

21  Q.  And the last of those entries, the payee is Phoenix Real

22  Estate Solutions.  Do you see that?

23  A.  Yes.

24  Q.  The amount is $1,167,994.84.  Do you see that?

25  A.  Yes.

1   Q.  And this is an amount that was disbursed from an account

2   controlled by Miller & Wrubel, correct?

3   A.  Yes.

4   Q.  So, when you mentioned just a moment ago that you thought

5   that monthly fees may have been paid outside the waterfall, was

6   this the payment you were referring to?

7   A.  I don't know I was referring to it specifically, but

8   generally it makes sense.

9   Q.  So, let's flip the page –- let's flip to tab 6 which is a

10  document that has been marked as Exhibit 3493 which is already

11  in evidence.  Have you seen this document before?

12  A.  Yes.

13  Q.  What is this document?

14  A.  This appears to be one of the letters from Mr. Moon to

15  Ms. Martin at Wilmer Hale.

16  Q.  This document, this letter from Mr. Moon, this is one of

17  the instructions and the detailed recommendations about

18  payments outside the waterfall?

19  A.  I don't know if it was an instruction.  But it was a letter

20  to Ms. Martin about payments outside the waterfall, yes.

21  Q.  So, let's flip the page, and on page 2 of this letter,

22  there are a series of bullet point items.  And just before I

23  get to that, I'll represent to you, in your declaration,

24  paragraph 29, I believe you referred to Exhibit 3052 which is a

25  draft version of this letter.  But our understanding, if you

1   look to the third page, is this is the final version.

2   A.  I understand.

3   Q.  So as we look on page 2 of the letter, the second from the

4   bottom bullet point, Mr. Moon writes:  "At September 15, 2015,

5   Phoenix RES had a receivable of $1,167,994.84 for litigation

6   support services to Triaxx."

7           Do you see that?

8   A.  Yes.

9   Q.  That number lines up exactly with the payment that we were

10  looking at just a moment ago in the previous exhibit, correct?

11  A.  Yes.

12  Q.  I'm happy to have you flip back and forth if you like.

13  A.  If you'd like me to, I can.

14  Q.  Okay.

15  A.  Yes, the numbers are identical.

16  Q.  Then Mr. Moon continues:  "The statement of receivables is

17  attached.  See attachment B."  And then he writes:  "The

18  underlying contracts have already been supplied to the

19  directors."  And the next sentence:  "The outstanding fees are

20  comprised of a monthly diligence fee and a monthly activist

21  implementation fee per CUSIP of RMBS that Phoenix RES analyzed

22  in furtherance of Triaxx's recovery efforts."

23          Do you see that?

24  A.  Yes.

25  Q.  So, in fact, this one million -- I won't repeat the whole

1    number, slightly more than a million dollars that was paid out

2    on October 15 was for Phoenix's monthly fees; is that correct?

3    A.  I mean, I would just repeat what was written here.

4    Q.  But you have no reason to believe it wasn't Phoenix's

5    monthly fees, correct?

6    A.  No, I think it says monthly fees here.

7    Q.  So you are in agreement then?

8    A.  Yes.

9    Q.  If we flip to Bates stamp page, still within this exhibit,

10   22435.  That's attachment B which is referenced in that

11   paragraph.

12   A.  What number?

13   Q.  Sure.  22435 is the Bates stamp.

14   A.  22435 is attachment B.

15   Q.  That was referenced in that paragraph that we just read; is

16   that correct?

17   A.  Yes.

18   Q.  If we flip it over, it appears there is a three page

19   spreadsheet of what we understand to be outstanding amounts

20   due.  Do you see that?

21   A.  Yes.

22   Q.  So, if we look, just taking the first page of this

23   spreadsheet ending in 436, so if we look at the first line, the

24   vendor is PRES, correct?

25   A.  Yes.

N4k3usb1                         Calamari - Cross

1    Q.  The date is 6/15 -- it is 215, but I think it's supposed to

2    be 2015, is that correct?

3    A.  If you look at the next column, it confirms that.

4    Q.  And this appears to be an invoice from PRES.  Is that your

5    understanding?

6    A.  Yes.

7    Q.  And then --

8    A.  I'm sorry.  This looks like a breakdown of the -- not the

9    invoice itself.  This looks more similar to what would be

10   provided to me by the trustee in their monthly invoicing

11   reports, because it has the amounts of paid and due.  So I

12   don't think it is an invoice.

13   Q.  Understood.  You corrected me because my question wasn't

14   precise.  But this is a reference to an invoice, correct?

15   A.  Yes.

16   Q.  So, you had already gotten ahead of me, but the original

17   amount, your understanding that's the original amount of the

18   invoice, right?

19   A.  Column B, yes.

20   Q.  Yes.  As we look at column F, which is listed as paid, that

21   number there is your understanding, that's the amount that has

22   been paid on that invoice to date?

23   A.  Yes.

24   Q.  Would that payment have come from inside the waterfall

25   payments?

N4k3usb1                         Calamari - Cross

1    A.  Most likely.

2    Q.  And then if we look at column G, due, is it your

3    understanding that's the amount outstanding, subtracting the

4    original amount, minus the amount that has been paid?

5    A.  Yes.

6    Q.  So, as of Mr. Moon's letter, which is dated October 26,

7    2015, just looking at that first line, it appears there was

8    still an amount outstanding as reflected in column G of this

9    spreadsheet; is that correct?

10   A.  Yes.

11   Q.  That's the same as we go through the spreadsheet.  It looks

12   like for a number of entries that appear to be invoices, there

13   are amounts outstanding; is that correct?

14   A.  Yes.

15   Q.  Now, you had mentioned the instruction, so I just want to

16   flip a couple of pages further in this exhibit to Bates stamp

17   2243, which is attachment E.

18   A.  2243 what?

19   Q.  Bates stamp 22443.  Apologies.

20   A.  Yes, I am at the attachment.

21   Q.  If you flip it over, is this what you were referring to

22   when you mentioned an instruction?

23   A.  I think you referenced an instruction.  But, I was

24   referencing that the prior letter was not an instruction, but I

25   would agree this is.

N4k3usb1                          Calamari - Cross

1  Q.  If we look at the second page of this document, ending in

2  445, there is a signature block with your name.  Do you see

3  that?

4  A.  Yes.

5  Q.  Is that your signature?

6  A.  Yes.

7  Q.  So, is it your understanding, as we flip back to the

8  spreadsheet at attachment B, which starts on 22436, that the

9  outstanding amounts in column G are Phoenix's monthly invoices

10  were being paid outside the waterfall pursuant to this

11  instruction?

12 A.  I'm sorry.  I'm a little confused because the instruction

13 is for August 19, 2015, but this letter is October 26, 2015.

14 So can you repeat the question?

15 Q.  Sure.  Let's look and I'll flip back to the instruction,

16 Bates stamp 22444.  It looks like the date you signed it is

17 10/26/2015.

18 A.  Oh, yes.  Okay.  Thank you.

19 Q.  If we look on your signature -- the page with your

20 signature, right at the top of that chart, that same 1,167,994

21 figure is right there, right?

22 A.  Yes.

23 Q.  So is it your understanding that, pursuant to this

24 instruction, the outstanding amounts that are listed in

25 attachment B of Phoenix's monthly invoices were paid?

1    A.  I think this was the final step of a long process that,

2    yes, after the directors had approved the payments, this was

3    the instruction to Miller Wrubel to carry that out.

4    Q.  So, and this is, again, this is October of 2015, correct?

5    A.  Yes.

6    Q.  So then, shifting time periods, I had initially started

7    this line of questioning asking you about the reference in your

8    declaration to the 2017 time period and reaching out to

9    Mr. Stein.  Do you remember that?

10   A.  Yes.

11   Q.  So as of early 2017, PRES' monthly fees had already been

12   paid outside the waterfall, correct?

13   A.  Yes.

14   Q.  Now let's look, and I think you still have it up in front

15   of you, a copy of your declaration.  Hopefully you have that

16   binder.

17   A.  Yes.

18   Q.  So, let's turn to paragraph 41 of your declaration.

19   A.  Yes.

20   Q.  In that paragraph, you testified that Mr. Brunekreef asked

21   for written legal advice about the payment of legal fees

22   outside the waterfall, correct?

23   A.  Yes.

24   Q.  But in your mind, there was not a need for written legal

25   advice because PRES' monthly fees had already been paid outside

1   the waterfall, correct?

2   A.   There was a need for written legal advice, because

3   Mr. Brunekreef asked me to do that.

4   Q.   Right, but you didn't personally feel that you needed legal

5   advice, right?

6   A.   No, I felt like we had already received written legal

7   advice.

8   Q.   At the time of Mr. Brunekreef's request, you were also

9   trying to get PRES' monthly invoices paid, correct?

10   A.   Yes.

11   Q.   And the same with the legal expenses that Mr. Brunekreef

12   was just referencing?

13   A.   Yes.

14   Q.   Have you worked on other CDO transactions?

15   A.   What do you mean by transactions?  In the course of my

16   litigation career, I definitely litigated over CDOs.  I did not

17   work on them from a business side perspective.

18   Q.   What I am trying to get to is whether you have familiarity

19   with CDOs, other than the Triaxx CDOs?

20   A.   At one point I would have.  Sitting here today, not with

21   any specifics.

22   Q.   So, you're familiar that administrative expense caps are

23   quite typical in CDO transactions, correct?

24   A.   Yes.

25   Q.   But here, in this time period of early 2017, you felt there

1  was a need to get around those expense caps, correct?

2  A.  I don't know that I would use the term "get around."  And I

3  don't know about me.  There was an overall feeling that

4  invoices should be paid.  And we were looking to the available

5  funds to be able to do that.

6  Q.  That was the justification for payments outside the

7  waterfall?

8  A.  I think the justification for payments outside of the

9  waterfall involved that as well as the seeking advice from all

10  of the appropriate parties.

11  Q.  So, still in this early 2017 time frame that you are

12  talking about in paragraph 41 of your direct testimony,

13  Mr. Brunekreef wants written legal advice.  But you don't think

14  it's necessary, correct?

15  A.  Again, I don't know that I didn't think it was necessary.

16  Mr. Brunekreef asked me to do something, and I did it.

17  Q.  Right.  But for Mr. Brunekreef's request, you didn't think

18  you needed written legal advice, correct?

19  A.  Mr. Brunekreef initiated the request for legal advice, not

20  me.  I agree with that.

21  Q.  And then you initially sought advice from a specific

22  attorney at Arnold & Porter; is that correct?

23  A.  I don't know if I sought advice, but I reached out to

24  Arnold & Porter to ask.

25  Q.  Who was the attorney that you reached out to at Arnold &

1   Porter?

2   A.  I don't recall the attorney that would have specifically

3   been responsive to this question.  My relationship partner

4   there was a gentleman named Henry Morriello.

5   Q.  Our understanding from the documents is that the person

6   that you reached out to at Arnold & Porter wasn't available due

7   to some sort of hospitalization; is that correct?

8   A.  Yes.

9   Q.  So, you then went to Schulte Roth; is that correct?

10  A.  Yes.

11  Q.  You said that you had a relationship contact at Arnold &

12  Porter.  How was Arnold & Porter involved with TAM at that

13  time?

14  A.  They were the general corporate counsel to TAM.

15  Q.  Were they also serving as TAM's litigation counsel?

16  A.  They became its litigation counsel at some point.  I don't

17  remember the exact date.

18  Q.  Do you think it was around this 2017 time period?

19  A.  I believe it would have been whenever the first

20  interpleader was started.

21  Q.  So before you went to Schulte, did you try to reach out to

22  anyone else at Arnold & Porter, given their relationship at the

23  time with TAM?

24  A.  No.

25  Q.  Just for clarity of the record, did Arnold & Porter merge

N4k3usb1                         Calamari - Cross

1    with a firm called Kaye Scholer?

2    A.  That's my understanding.

3    Q.  So when you reached out to Schulte, you reached out to a

4    lawyer named Craig Stein, correct?

5    A.  Yes.

6    Q.  Why did you go to Mr. Stein?

7    A.  Because I was aware that Mr. Stein had a very high level of

8    familiarity with the documents, because I understood him to

9    have drafted them.

10   Q.  At the time, Schulte wasn't representing TAM, correct?

11   A.  I don't recall specifically.  Schulte Roth had a

12   longstanding engagement with both the CDOs and the collateral

13   manager.  I don't ever recall them sending me a termination of

14   engagement.  So they likely could have still be representing us

15   at the time.  But by that time I moved most of the corporate

16   work to Arnold & Porter.

17   Q.  When you say the CDOs, are you referring to the issuers?

18   A.  Yes.

19   Q.  Mr. Brunekreef was a director of the issuers, correct?

20   A.  Yes.

21   Q.  So, couldn't Mr. Brunekreef had reached out to his counsel

22   at Schulte if he wanted this legal advice?

23   A.  I suppose he could have.  However, it also seemed rather

24   natural for me to do it.  I was a little more of the person

25   doing things than the directors.  They directed me to do

1    things.

2    Q.  So, looking at your direct testimony, I believe you

3    testified in paragraph 44 that you discussed with Mr. Stein the

4    need for his advice on paying the bills of both attorneys and

5    service providers; is that correct?

6    A.  Yes.

7    Q.  So let's look at your e-mail to Mr. Stein about that

8    conversation.  If you flip to tab 7 of your binder, this is

9    Exhibit 1154, an exhibit that has already been admitted in the

10   case.

11   A.  My binder is lettered.  I think is that G?

12   Q.  I had switched back to the numbered binder.

13   A.  Okay.  Tab 7, yes.

14   Q.  Tab 7 is Exhibit 1154.  Do you see that?

15   A.  Yes.

16   Q.  So, this is an e-mail chain between you and Mr. Stein, is

17   that correct?

18   A.  Yes.

19   Q.  So, if we flip to the second page of this document, Bates

20   stamped 543 are the last three digits.

21   A.  Yes.

22   Q.  Do you see there is an e-mail, I guess the header of that

23   e-mail is on the previous page.  An e-mail from you to

24   Mr. Stein, dated March 20, 2017.

25   A.  Yes.

N4k3usb1                          Calamari - Cross

1   Q.  Do you recall this e-mail?

2   A.  Not specifically, but, yes, I generally remember the

3   contents.

4   Q.  So you write in this e-mail we are looking at:  "Hi, Craig.

5   Nice speaking with you on Friday.  As discussed, the directors

6   would like to hear it is reasonable for the escrowed funds to

7   be used to pay legal bills for existing litigation that is

8   expected to bring in additional recoveries for the funds."

9           Do you see that?

10  A.  Yes.

11  Q.  In your e-mail, you only mention legal bills for existing

12  litigation, correct?

13  A.  That's what the words say here, yes.

14  Q.  In your mind, the payment of PRES' fees were pretty

15  important, correct?

16  A.  I don't know about important, but it was something we were

17  trying to accomplish.

18  Q.  But you didn't mention PRES or PRES' fees in this e-mail,

19  correct?

20  A.  No.

21  Q.  Then you go on to write in the e-mail:  "Without the use of

22  these funds, the CDOs are in danger of abandoning legitimate

23  claims that are expected to bring in multiples of those legal

24  expenses."

25          You see that?

1   A.  Yes.

2   Q.  By that you mean, that if not paid, law firms might stop

3   working, is that right?

4   A.  Law firms and others, yes.

5   Q.  You said others, but you only referenced legal bills there,

6   right?

7   A.  In this e-mail, yes.

8   Q.  But, it's your understanding that you were concerned that

9   PRES might stop working if their fees weren't paid?

10  A.  Yes.

11  Q.  And who at PRES would make the decision to stop working?

12  A.  I believe I had conversations with both Mr. Garg and

13  Mr. Visweswaran to that effect.

14  Q.  And they had indicated to you they were considering

15  stopping working?

16  A.  Stopping working and commencing litigation.

17  Q.  When you say commencing litigation, what do you mean by

18  that?

19  A.  If they weren't paid, that they would sue over it.

20  Q.  When you say they would sue, who were they contemplating

21  suing?

22  A.  I don't know that it was that level of detail, but

23  presumably the people that owed them the money, so the CDOs.

24  Q.  So, PRES was thinking about suing the CDOs, right?

25  A.  If they were not -- there was a conversation in which they

1   indicated that they wanted to be paid.  And again, it was not

2   with both of them on the phone at one point.  I believe both of

3   them expressed similar things to me.

4   Q.  So let's go back to Exhibit 1154, tab 7 in your binder that

5   we've been looking at.  As we flip to the first page sort of

6   going up the e-mail chain, Mr. Stein on March 23 sent you a

7   draft of the memorandum, is that correct?

8   A.  Yes.

9   Q.  As we go up the chain, it looks like Mr. Priore then

10  forwarded that memo to Mr. Garg, is that right?

11  A.  Yes.

12  Q.  And this draft memo you forwarded this on to the issuers,

13  is that correct?

14  A.  Yes.

15  Q.  So let's go now --

16  A.  To the directors of the issuers, yes.

17  Q.  To the directors of the issuers.

18          Let's go now to tab 8 of your binder.  This is Exhibit

19  1156, which has already been admitted into evidence.  If you

20  flip to the second page ending in the last three digits 595,

21  this is an e-mail exchange with you and Mr. Brunekreef copying

22  Daniel Rewalt.  Do you see that?

23  A.  Yes.

24  Q.  Do you recall this e-mail exchange?

25  A.  Generally.

N4k3usb1                    Calamari - Cross

1    Q.  So looking at your e-mail sort of in the middle of the

2    page, to Mr. Rewalt and Mr. Brunekreef on the 28th of March,

3    2017, do you see that?

4    A.  Yes.

5    Q.  In that e-mail, you asked the directors of the issuers to

6    please look at the memo and let you know if you could proceed

7    to pay the 120 plus bills John Moon previously sent.  Do you

8    see that?

9    A.  Yes.

10   Q.  Then you indicated that you were getting a lot of pushback

11   from Kobre, as some of those bills are six month aged.  Is that

12   correct?

13   A.  Yes.

14   Q.  Now, these 120 plus bills, it's possible that some of them,

15   or potentially all of them, had been listed as invoices to be

16   paid inside the waterfall, correct?

17   A.  That's possible.  I'm not sure I know one way or the other.

18   Q.  So then looking sort of to the top e-mail in the chain,

19   this is from Mr. Brunekreef on Friday, March 31, 2017.

20   Mr. Brunekreef returns the draft to you with some markups,

21   right?

22   A.  Yes.

23   Q.  And then makes a request to pass -- I think there are some

24   typos in here, but effectively to pass the markups on to SRZ

25   and ask if they can include language along these lines.  Do you

1   see that?

2   A.   Yes.

3   Q.   So did you send these markups from the issuers back to

4   Mr. Stein?

5   A.   I believe that I did.

6   Q.   Mr. Stein made some adjustments to the memo as a result of

7   those comments, correct?

8   A.   Yes.

9   Q.   Did you also review the draft memorandum that Mr. Stein had

10   sent?

11   A.   Yes.

12   Q.   Did you provide any comments or markups to Mr. Stein's

13   draft memo?

14   A.   I don't recall doing that.

15   Q.   So after Mr. Stein got these comments from the issuers, he

16   generated a final version of the memo dated April 4, 2017, is

17   that right?

18   A.   I'd have to look at the document about the date.  But yes.

19   Q.   Mr. Stein didn't mention PRES in his memo, correct?

20   A.   No.

21   Q.   And you did not go back and ask him to include a reference

22   to PRES in his memo, correct?

23   A.   No.

24   Q.   Let's talk now a little bit about the purchase of ICP.

25             You testified in your direct testimony that in

N4k3usb1                    Calamari - Cross

1   January 2015, Triaxx Holdco LLC acquired ICP, correct?

2   A.  Yes.

3   Q.  Let's flip now to tab 10 of your binder.  This is Exhibit

4   1067, an exhibit that has not yet been admitted in this case.

5   Have you seen this document before?

6   A.  Not recently, no.

7   Q.  Do you know what this document is?

8   A.  It appears to be an e-mail from me to Mr. Garg.

9   Q.  Just looking at the "from" field, when you say it's from

10  you, that's your e-mail address NCalamari@Triaxxholdco?

11  A.  Yes.

12  Q.  The e-mail's dated 3/17/2015?

13  A.  Yes.

14  Q.  This e-mail is sent to Mr. Garg, correct?

15  A.  Yes.

16  Q.  His e-mail is VGarg@Triaxxholdco.com?

17  A.  Yes.

18          MR. LORENZO:  We'd ask the Court to move Exhibit 1067

19  into evidence.

20          MS. BEAUMONT:  No objection.

21          THE COURT:  1067 is admitted.

22          (Joint Exhibit 1067 received in evidence)

23  Q.  So as we're looking at the time of this e-mail in March of

24  2015, this is about two months after the acquisition of ICP,

25  correct?

N4k3usb1                    Calamari - Cross

1   A.   Yes.

2   Q.   The subject of this e-mail is Tom's consulting fees.   Do

3   you see that?

4   A.   Yes.

5   Q.   And do you have an understanding that Tom referenced there

6   is Mr. Priore?

7   A.   Yes.

8   Q.   Do you know if Mr. Priore is owed consulting fees from the

9   collateral manager?

10   A.   I don't know.

11   Q.   Do you know if Mr. Priore's owed consulting fees from

12   Phoenix?

13   A.   I don't know that.

14   Q.   But the e-mail says "he," and that's a reference to

15   Mr. Priore, right?

16   A.   Yes.

17   Q.   "Is pushing to get paid them and asked me if our account

18   was set up.  He says he is owed approx 100K for consulting

19   fees, that he needs to fight for the indemnity claim with

20   Triaxx."

21           Do you see that?

22   A.   Yes.

23   Q.   So we talked briefly about the acquisition, but it's

24   accurate that Triaxx Holdco ultimately acquired ICP in

25   January 2015, correct?

N4k3usb1                         Calamari - Cross

1    A.   Yes.

2    Q.   After the acquisition of ICP, its name was changed to

3    Triaxx Asset Management, correct?

4    A.   Yes.

5    Q.   You became the general counsel of TAM, correct?

6    A.   Yes.

7    Q.   After the acquisition, you were also the general counsel of

8    Triaxx Holdco, correct?

9    A.   Yes.

10   Q.   Was there a formal written engagement letter or other

11   agreement that reflected these two positions?

12   A.   No.

13   Q.   How did you come to be the general counsel of Triaxx

14   Holdco?

15   A.   After we acquired -- well, of Triaxx Holdco, when we sent

16   up the entity, I would say I appointed myself with no objection

17   from Mr. Garg.  It was my practice at the time for sort of the

18   entities that we owned to generally take general counsel roles,

19   as opposed to entities that I did not have any equity interest

20   in, in which case I would do it through engagement letters.

21   Q.   Was that same structure, appointing yourself without any

22   objection from Mr. Garg, the same way you became the general

23   counsel of TAM?

24   A.   Yes.

25   Q.   Overall, your roles and responsibilities at Triaxx Holdco

1    generally tracked the roles and responsibilities at TAM, is

2    that correct?

3    A.   No.  But I mean, to save you some time, there is not a

4    material difference.  Triaxx Holdco is a holding company, there

5    is not a lot of operations there.  But I would describe my

6    duties there as much more corporate, making sure that the

7    things with Delaware Secretary of State were filed.  Things

8    like that.  My duties at TAM were much more extensive.

9    Q.   Let's put up your deposition video if we have it,

10   Mr. Gibson.  Page 99, lines 14 through 20.

11              (Video playing)

12   "Q.  Now stepping back and looking at your roles and

13   responsibilities at Triaxx Holdco, so starting from formation

14   until the present, did you have any role or responsibility at

15   Triaxx Holdco?

16   "A.  I would say they generally tracked the roles and

17   responsibilities at TAM."

18   Q.   Once you started working for TAM, did you submit a letter

19   of resignation at PRES?

20   A.   No.

21   Q.   Did anyone take over your role at PRES?

22   A.   Not to my knowledge.

23   Q.   Just to be clear, for the record, at the time you became

24   general counsel of Triaxx Holdco and TAM, you had also been

25   general counsel at PRES, right?

N4k3usb1                          Calamari - Cross

1    A.  Yes, I was the outside general counsel in connection with

2    an arbitration and certain one-off matters.

3    Q.  But, in your role as general counsel at PRES, you had sent

4    the clarification letters we talked about yesterday, right?

5    A.  Yes.

6    Q.  Did anyone take over your role at PAM as it related to the

7    PRES engagement?

8    A.  I'm sorry, with which entity?

9    Q.  PAM.

10   A.  Oh PAM?  No.

11   Q.  So once the acquisition of ICP occurred, you did not

12   immediately transition from PRES to working for the collateral

13   manager, correct?

14   A.  I would say after we acquired ICP, I no longer took on new

15   responsibilities for PRES.  Certainly there were

16   responsibilities related to the arbitration that continued on.

17   Q.  But there was still, I think in your words, a lot of work

18   that had to get done and get done quickly at PRES, right?

19   A.  Depending on what circumstance, possibly.

20   Q.  So you continued to work at PRES, right?

21   A.  I continued to work on the arbitration matter to the extent

22   there was work to be done, yes.

23   Q.  If you were at TAM and you wanted to communicate with PRES,

24   who would you communicate with?

25   A.  I would communicate with Mr. Garg or Mr. Visweswaran.

N4k3usb1                          Calamari - Cross

1   Q.  If you were at TAM and you wanted to communicate with

2   PAM -- sorry for all these short three letter acronyms -- who

3   would you typically communicate with then?

4   A.  Dr. Tang or Mr. Jonsson.

5   Q.  Now, once TAM -- strike that.

6            Once you took on your role at TAM, you were

7   responsible for reviewing invoices from PRES, correct?

8   A.  It was something that I did, yes.

9   Q.  You were responsible for not only reviewing them, but also

10  submitting them to the trustee, correct?

11  A.  I don't know that I was responsible for doing that.

12  Sometimes the invoices would go directly from PRES to the

13  trustee.

14  Q.  Maybe if we look at --

15  A.  But other times I would transmit them, yes.

16  Q.  If we look at paragraph 59 of your declaration.  Right at

17  the first line of 59, you testify, "In my role on behalf of

18  TAM, I also was responsible for reviewing and submitting for

19  payment the invoices that PRES submitted to the Triaxx CDOs,"

20  correct?

21  A.  Yes.

22  Q.  Did those PRES invoices list which CUSIPs PRES had worked

23  on in a particular month?

24  A.  I don't believe so.

25  Q.  Let's look at one of the invoices, and this is tab 17, the

1    last tab, the new one we added to your binder.  So tab 17 is a

2    document marked as Exhibit 3203 that has not yet been admitted

3    into evidence.

4              Do you recognize this document?

5    A.  Yes.

6    Q.  What is it?

7    A.  It looks like an invoice from PRES to the CDO 06-2.

8    Q.  Is the invoice date in the European style January 15, 2016?

9    A.  Yes.

10             MR. LORENZO:  We ask the Court to move Exhibit 3203

11   into evidence.

12             MS. BEAUMONT:  No objection.

13             THE COURT:  3203 is admitted.

14             (Joint Exhibit 3203 received in evidence)

15   Q.  So let's take a look at this invoice.  Does it list the

16   CUSIPs worked on during this particular period to generate this

17   invoice?

18   A.  No.

19   Q.  So, simply by reviewing the invoices, you couldn't

20   determine what specific CUSIPs PRES worked on in a given

21   period, correct?

22   A.  Correct.

23   Q.  So you just had to rely on PRES to accurately sort of

24   invoice the CDOs for the CUSIPs that it worked on?

25   A.  Yes.

1    Q.  Would you characterize it as kind of like an honor system?

2    A.  No, I would also, I was working with them on a daily or

3    almost daily basis, so I was very aware of the work that they

4    were doing.

5    Q.  When you say you were working on them with them on a daily

6    basis, in fact, you had been intimately involved with PRES in

7    your role as general counsel, right?

8    A.  No.  I was intimately involved with PAM.

9    Q.  And PAM, just so the record is clear, PAM was not involved

10   in the invoices that PRES sent out?

11   A.  PAM was involved in the invoices that PRES sent out.  I

12   think I just testified that at times Mr. Jonsson, who was at

13   PAM, would send the invoices directly to the trustee.

14   Q.  So, was PAM the entity that was tracking the CUSIPs that

15   PRES was then invoicing for?

16   A.  Yes.

17   Q.  Let's flip now to tab 13 of your binder.  It's an exhibit

18   that's been marked as 1126 that has not yet been admitted.  And

19   if you flip, there is a sort of cover page, but if you flip the

20   page, there is the e-mail.  Let me know if you see that.  Bates

21   stamp ending in 228.

22   A.  Yes.

23   Q.  This is an e-mail from Mr. Brunekreef to you, correct?

24   A.  Yes.

25   Q.  And it is dated Friday, August 12, 2016?

N4k3usb1                        Calamari - Cross

```
 1   A.  Yes.

 2   Q.  Do you recall receiving this e-mail?

 3   A.  Not specifically.

 4   Q.  Do you have any reason to doubt that you received this

 5   e-mail?

 6   A.  No.

 7           MR. LORENZO:  We ask the Court to move Exhibit 1126

 8   into evidence.

 9           MS. BEAUMONT:  No objection.

10           THE COURT:  1126 is admitted.

11           (Joint Exhibit 1126 received in evidence)

12   Q.  This e-mail Mr. Brunekreef writes:  "Nick, I'm passing on

13   for your review and discussion draft language prepared by

14   Wilmer Hale to support the idea of a notice to all noteholders

15   on the current status of the Triaxx funds."

16           Do you see that?

17   A.  Yes.

18   Q.  It goes on to say that "The draft highlights a lot of

19   topics, which may or may not be open to share.  Further, in

20   view of questions raised by noteholders, we are aiming to

21   disclose reserved funds."

22           Do you see that?

23   A.  Yes.

24   Q.  So it's your understanding that the directors of the

25   issuers wanted to provide notice to the noteholders of the
```

N4k3usb1                        Calamari - Cross

1  settlements?

2  A.  Generally we were discussing that topic, yes.  I don't know

3  exactly what they wanted, because even in here, they're

4  indicating that some of it may be able to -- or may or may not

5  be open to share.

6  Q.  In addition to settlements, the directors of the issuers

7  wanted to provide notice to the noteholders of reserved funds.

8  Is that your understanding?

9  A.  Yes.

10  Q.  If we look at the next page of this document, starting with

11  Bates stamp ending in 229, this is the draft notice that

12  Mr. Brunekreef referenced in his e-mail, correct?

13  A.  Yes.

14  Q.  This notice was not sent to the trustee to distribute to

15  the noteholders, correct?

16  A.  I don't recall one way or the other.

17  Q.  So is it your recollection that, in fact, the amounts held

18  in reserve were disclosed via notice to the noteholders?

19  A.  I mean, at this point, I mean, I believe they were

20  certainly disclosed in connection with litigation at one point.

21  I don't recall, I don't recall this letter going out.

22  Q.  Right.  And do you recall any notice going out to the

23  noteholders disclosing the amount of reserved funds outside the

24  waterfall?

25  A.  No.

N4k3usb1                    Calamari - Cross

```
 1    Q.  Let's now turn to tab 14 of your binder.  This is an

 2    exhibit marked 1130, and this exhibit has also not yet been

 3    admitted in this case.

 4          So as you look at this e-mail chain, this appears to

 5    be a continuation of the e-mail chain or I guess e-mail we were

 6    looking at in the previous exhibit, correct?

 7    A.  I haven't seen this, so give me one minute, please.

 8    Q.  Sure.

 9    A.  Can you repeat your question?

10    Q.  Sure.  This e-mail chain in Exhibit 1130 is a continuation

11    of the e-mail that we just looked at in the previous exhibit,

12    correct?

13    A.  Yes.

14    Q.  Do you recall receiving this e-mail?

15    A.  Not specifically.

16    Q.  But you're copied on this e-mail chain, correct?

17    A.  Yes.

18    Q.  Do you have any reason to doubt that you received this

19    e-mail?

20    A.  No.

21          MR. LORENZO:  We'd ask the Court to move into evidence

22    Exhibit 1130.

23          MS. BEAUMONT:  No objection.

24          THE COURT:  1130 is admitted.

25          (Joint Exhibit 1130 received in evidence)
```

Q.  So, looking at your e-mail, on the bottom of the first page
of 1130, ending in 701, you note some issues in your view with
the draft of the notice to the noteholders, right?

A.  I'm sorry.  Can you repeat that?

Q.  Sure.  In your e-mail at the bottom of this first page of
Exhibit 1130, you write to Mr. Brunekreef, right?

A.  Yes.

Q.  And in your e-mail, you note some issues in your view with
the draft of the notice to the noteholders, right?

A.  Yes.

Q.  And then Mr. Brunekreef responds and says, "The main
purpose of a notice is to give an update on current affairs
litigations."

        Do you see that?

A.  Yes.

Q.  Then he says, "Secondly, noteholders are pressing for
information regarding reserved funds i.e. use of reserved
funds."

        Do you see that?

A.  Yes.

Q.  So it's your understanding that the noteholders wanted more
disclosure about the litigation recoveries, correct?

A.  Yes.

Q.  And the noteholders also wanted more disclosure about the
reserved funds, correct?

1    A.   Yes.

2    Q.   But the collateral manager had concerns about providing

3    some of that information, correct?

4    A.   I think I had concerns about violating confidentiality

5    provisions and settlement agreements and our ability to

6    negotiate settlements in the future.

7    Q.   That concerns about confidentiality in your mind applied to

8    not only the settlement amounts, but also the reserved funds?

9    A.   I don't recall specifically.

10   Q.   So it's possible there weren't any confidentiality concerns

11   with the amount of the reserved funds; is that correct?

12   A.   I don't recall that specifically one way or the other.

13   Q.   Let's look now at Exhibit 1162, which is in tab 15 of your

14   binder.  And again, 1162 is another exhibit that has not yet

15   been admitted.  And like a couple of these previous ones, there

16   appears to be a cover page, but the e-mail is on the next page

17   with the last three digits 551.  And this is an e-mail from

18   Mr. Brunekreef to you, correct?

19   A.   Yes.

20   Q.   It's dated Friday, June 23, 2017?

21   A.   Yes.

22   Q.   Do you recall receiving this e-mail?

23   A.   Not specifically.

24   Q.   Do you have any reason to doubt that you received this

25   e-mail?

N4k3usb1                        Calamari - Cross

1    A.  No.

2              MR. LORENZO:  We'd ask the Court to move into evidence

3    Exhibit 1162.

4              MS. BEAUMONT:  No objection.

5              THE COURT:  1162 is admitted.

6              (Joint Exhibit 1162 received in evidence)

7    Q.  So in his e-mail to you, Mr. Brunekreef writes:  "Hi, Nick.

8    I have copied you in on a request addressed to John Moon to

9    provide us with an updated summary of the reserved funds.  On

10   the basis of continuing correspondence from noteholders, we

11   wish to publish a notice of the volume of funds withheld."

12             You see that?

13   A.  Yes.

14   Q.  Then he asks you for a view -- strike that.

15             Then he asks you for your view on how the net cash

16   balance would be split between those funds, correct?

17   A.  Yes.

18             MR. LORENZO:  Your Honor, at this time we have no

19   further questions for Mr. Calamari.

20             THE COURT:  Thank you.

21             Counsel, I know normally we would break at about 11.

22   I'd like to take our break now, if that is reasonably

23   convenient to counsel.  And if we find ourselves going too

24   long, then before lunch we can work in another short break at

25   an appropriate time.  So, we'll be in recess for 10 minutes.

N4k3usb1                          Calamari – Cross

1            I don't think you're done yet, Mr. Calamari, so you

2      will remain under oath, and you will not discuss your testimony

3      with the facts underlying the testimony with counsel or

4      otherwise during the break.  We'll be in recess.

5            (Recess)

6            (In open court)

7            THE COURT:  Thank you for your patience.  I see that

8      Mr. Calamari is back on the stand.  He remains under oath.  And

9      who will be examining Mr. Calamari now?

10            MR. SAVLA:  I believe it's me.

11            THE COURT:  Mr. Savla.

12            MR. SAVLA:  Yes.  And your Honor, we will be handing

13      out our binders, but I actually have some questions from the

14      trustee's binders.

15            THE COURT:  Let's stick with the existing binders as

16      long as we can.

17            MR. SAVLA:  Yes.

18            (Continued on next page)

19

20

21

22

23

24

25

N4KKUSB2                        Calamari - Cross

1    BY MR. SAVLA:

2    Q.  So, Mr. Calamari, as you may know, my name is Sandeep

3    Savla.  I represent PIMCO in this case, and I will have some

4    questions for you as well.

5            I'd like to begin with what we've been terming the

6    engagement letters or engagement agreements.  It's tab 3 of the

7    binder you have.

8            This is the engagement letter.  It's Exhibit 10, which

9    is already in evidence.  This is the engagement letter for the

10   2006-1 CDO.

11           Do you see that?

12   A.  Yes.

13   Q.  All the engagement letters are materially identical,

14   correct?

15   A.  Yes.

16   Q.  So if we turn to page 12 of the engagement letter, and we

17   look at paragraph 2 --

18           MR. SAVLA:  Actually, Mr. Gibson, the one above.

19   Q.  Actually, we'll start with the first paragraph.

20           The first paragraph has, "ARAM shall be entitled to an

21   Activist implementation fee equal to $10,000 per month per

22   security, for which ARAM is engaged by the CDO."

23           Do you see that?

24   A.  Yes.

25   Q.  So that's a monthly fee of $10,000 per month per security,

N4KKUSB2                         Calamari - Cross

1    correct?

2    A.  Yes.

3    Q.  And then in the next paragraph, there's a further

4    description.  It says, "In respect of a security, the Activist

5    implementation fee shall be," and then it goes on to the rest

6    of the paragraph.

7              Do you see that?

8    A.  Yes.

9    Q.  I'd like to focus on the language beginning with "provided

10   that."

11             It says, "Provided that the value is determined by the

12   CDO in its sole discretion or the collateral manager on its

13   behalf of funds or assets recovered by the CDO relating to a

14   security exceeds 500,000, the CDO shall pay to ARAM an

15   aggregate amount of Activist implementation fees in respect of

16   such security."

17             Do you see that?

18   A.  Yes.

19   Q.  And it goes on to say, in a parenthetical, "(taking into

20   account any Activist implementation fees paid by the CDO to

21   ARAM on or prior to such date of determination)."

22             Do you see that?

23   A.  Yes.

24   Q.  And it says, "equal to 250,000."

25             So would it be fair to say that the aggregate amount

N4KKUSB2                     Calamari - Cross

1   of the Activist implementation fee is 250,000?

2   A.  My understanding is that a $250,000 incentive fee was

3   earned when the assets recovered by the CDO exceeded 500,000.

4   Q.  Do you see the language, "taking into account any Activist

5   implementation fees"?

6   A.  Yes.

7   Q.  Do you read that as saying that Activist implementation

8   fees received to date have to be deducted from that amount?

9   A.  No.

10  Q.  So the language, "taking into account any Activist

11  implementation fees," what does that mean?

12  A.  I'm not quite sure, sitting here, taking this by itself.

13  My understanding of the agreement between the parties is

14  informed by sort of all of my experiences at the time.

15  Q.  So, when reading this language, you would bring to bear

16  your experience, correct?

17  A.  No.  I would take into account what the people that wrote

18  this and were doing understood it to be.

19  Q.  So you would take into account what the people who wrote

20  this took it to be?

21  A.  Yes.

22  Q.  And who wrote the engagement letter?

23  A.  I don't know specifically, but I understood the engagement

24  letter to have been the product of negotiations between PRES

25  and the collateral manager on behalf of the CDOs.

N4KKUSB2                          Calamari - Cross

1   Q.  So you would take into account what the person writing the

2   engagement letter thought, but you don't know who wrote the

3   engagement letter?

4   A.  I don't know who specifically put pen to paper, but my

5   understanding, from the people that were knowledgeable and

6   around at the time, is that the $250,000 incentive fee was

7   earned when the funds recovered exceeded $500,000.

8   Q.  Now, let's turn to the next tab, which is tab 4,

9   Exhibit 13, already in evidence.  This is what we've been

10  terming the clarification letter.

11          That's your signature, correct?

12  A.  Yes.

13  Q.  You write in the first paragraph -- and you're writing to

14  Mr. Nissenbaum, correct?

15  A.  Yes.

16  Q.  You write, "We write to confirm the understanding between

17  the parties related to the due diligence and Activist

18  implementation agreement."

19          So that's the engagement letter we just saw, correct?

20  A.  Yes.

21  Q.  And then there's a second paragraph that says, "Please

22  confirm that as per the intent of the parties at the time the

23  agreement was negotiated and executed," and it goes on from

24  there, correct?

25  A.  Yes.

1   Q.  And then there's a bit dealing with Activist implementation

2   fee, and that's romanette iii, and romanette iii says, "The

3   Activist implementation fee was intended to provide that

4   Phoenix is entitled to a payment of 250,000 per security, in

5   addition to the 10,000 per month per security."

6        Do you see that?

7   A.  Yes.

8   Q.  And now, the taking into account language there has

9   disappeared, correct?

10  A.  I don't know about disappeared, but it does not exist here.

11  Q.  It does not exist here, correct?

12  A.  Correct.

13  Q.  Why is it that the taking into account language doesn't

14  exist there?

15  A.  Here, I was attempting to write down and record the

16  conversations that I was hearing at the time.  And, so, in

17  romanette iii was sort of my understanding of what the parties

18  were discussing.

19  Q.  When you say you were trying to memorialize the

20  conversations you were hearing at the time, what conversations

21  were you hearing at the time?

22  A.  There were a number of conversations between Mr. Garg,

23  Mr. Nissenbaum, and Mr. Priore, and myself.

24  Q.  So, these were based on conversations between

25  Mr. Nissenbaum, Mr. Priore, Mr. Garg, and yourself, and it was

1    based on these conversations that you memorialized this

2    romanette iii, correct?

3    A.  Yes.

4    Q.  I'd like to turn to -- since I have the benefit of the

5    trustee's binder, I'm going to turn to tab 14, which

6    Mr. Lorenzo showed you, and that's Exhibit 1130, that's already

7    in evidence.

8    A.  Yes.

9    Q.  Do you recall Mr. Lorenzo asked you about this document?

10   A.  Yes.

11   Q.  And he directed you to language in the bottom email where

12   it says, "An initial point, as you note, is that disclosing the

13   exact amounts of the settlements will violate the

14   confidentiality settlements and cause problems with BOA/CW and

15   JPM."

16           Do you see that?

17   A.  Yes.

18   Q.  Now, would disclosing the aggregate amounts of the

19   settlements violate confidentiality settlements?

20   A.  Potentially, but certainly the exact amounts would be more

21   likely to, yes.

22   Q.  So, even the aggregate amount of the settlement may violate

23   a confidentiality settlement; is that right?

24   A.  That's a very general question.  I'd have to know more

25   specifics to really answer it.  Potentially.  If there were

N4KKUSB2                        Calamari - Cross

1   enough information, for instance, to be able to back into what

2   the settlement amounts were or -- it's a relatively general

3   question.

4   Q.  At the time of this email, August 2016, did you consider

5   whether people could back into settlements?

6   A.  I don't recall sitting here today.  I probably would have

7   thought about that, though.

8   Q.  But you don't know one way or the other; is that fair?

9   A.  Sitting here today, I don't have a specific memory of that.

10  Q.  Is it fair to say, then, that the noteholders did not know

11  the aggregate amount of the settlements?

12  A.  I don't believe so, no.

13           MR. SAVLA:  So now I'm going to hand out our binder.

14           Your Honor, may I approach?

15           THE COURT:  You may.

16  BY MR. SAVLA:

17  Q.  So now, I'm going to ask you to turn to tab 3 in the binder

18  I just handed you.

19           THE COURT:  May the Court make a binder production

20  request of counsel?  For ease of finding exhibits within

21  binders, and also for ease of keeping track where exhibits

22  are — and I know it's late in the day, it's Thursday — the most

23  useful way of organizing these binders is to put the exhibit

24  numbers on the tabs rather than separate tab numbers.  That

25  way, there's only one number, which is both the exhibit number

N4KKUSB2                      Calamari - Cross

1   and the tab number, and we never lose our place.  It's just a

2   thought, if you haven't made tomorrow's binders yet.

3              Proceed, Mr. Savla.

4   BY MR. SAVLA:

5   Q.  So, this is Trial Exhibit 2060, which is already in

6   evidence.  Just take a moment to read this email.

7              (Pause)

8   A.  I've read it.

9   Q.  Now, in this email, we see that Mr. Brunekreef is saying,

10  in October 2015, that he talked to you briefly about the

11  Phoenix engagement, correct?

12  A.  Yes.

13  Q.  And he says he forgot to ask you if you can send a copy of

14  the contract and can you pass this on, correct?

15  A.  Yes.

16  Q.  In the last paragraph, he appears to be talking about

17  defaulted assets as well, correct?

18  A.  Yes.

19  Q.  So let's go to the next tab.  This is Exhibit 2061, already

20  in evidence.  And you see in the bottom email, Mr. Brunekreef,

21  in November then, sends you an email:  "Just a reminder about

22  the contracts for the Triaxx funds you promised."

23              Do you see that?

24  A.  Yes.

25  Q.  And in the email above, you say, "Thanks for the reminder.

N4KKUSB2                        Calamari - Cross

1   Attached are the contracts.  They are confidential.  Please do

2   not distribute beyond Intertrust."

3         Do you see that?

4   A.  Yes.

5   Q.  So, these are the engagement letters that you sent

6   Mr. Brunekreef in November of '15, correct?

7   A.  Yes.

8   Q.  You didn't send him the clarification letters, correct?

9   A.  No.

10  Q.  In order to understand the intent of the parties, you need

11  to read both the clarification letters and the engagement

12  letters, correct?

13  A.  I think that would be helpful.

14  Q.  The noteholders did not have the engagement letters,

15  correct, before this litigation began?

16  A.  I'm not sure one way or the other.  Not to my knowledge.

17  Q.  And the noteholders did not have the clarification letters

18  before this litigation began, correct?

19  A.  Correct.

20  Q.  I'd like to ask you about communications with PIMCO.

21         And you believe you had conversations with Ms. Bui at

22  PIMCO, correct?

23  A.  Yes.

24  Q.  But you don't recall what the specific content of those

25  conversations were, correct?

1    A.  Not the specific content, no.

2    Q.  You believe that in one of those conversations, Ms. Bui

3    asked you about the sale of defaulted collateral, correct?

4    A.  Generally, yes.

5    Q.  And you can't remember speaking to Ms. Bui about anything

6    else; is that right?

7    A.  That's correct.

8    Q.  In your declaration, at paragraph 32, you say, "The

9    noteholders of the Triaxx CDOs knew of and supported the

10   Activist litigations"?

11   A.  Correct.

12   Q.  You say, "For example, on November 20, 2015, I received a

13   letter from Lisa Cohen, of Schindler Cohen & Hochman, on behalf

14   of Goldman, the noteholder of 2006-1"?

15   A.  Yes.

16   Q.  And then you attach a copy of her letter?

17   A.  Yes.

18   Q.  That's Trial Exhibit H, correct, the 3506?

19   A.  Yes.

20   Q.  And Ms. Cohen, in her letter, she doesn't mention Phoenix,

21   does she?

22   A.  No.

23   Q.  Let's turn to tab 5 of your binder.  And you will see this

24   is Exhibit 27, already in evidence.  This is Goldman's answer

25   to the third amended complaint and claims to the RES in this

N4KKUSB2                         Calamari - Cross

1  case.

2          Do you see that?

3  A.  Yes.

4  Q.  So Goldman is taking an opposite position to Triaxx Asset

5  Management in this case.

6          Do you see that?

7  A.  I have not read this recently.  Where are you referring to

8  specifically?

9  Q.  If we just look at the caption, and you see it's

10 Interpleader Defendant Goldman Sachs' answer to the third

11 amended complaint and claims to the RES.

12 A.  Yes.

13 Q.  If you go to the last page, page 40 of that exhibit --

14 A.  Yes.

15 Q.  -- you see that that's signed by Goldman and by Lisa Cohen,

16 right?

17 A.  Yes.

18 Q.  Let's go to paragraph 3 of the affirmative claim to the

19 RES, and that's on page 20.

20          You see Ms. Cohen writes, on behalf of Goldman,

21 "GS&co. asserts affirmative claims to the RES based on:  (i)

22 millions of dollars of so-called incentive fees improperly

23 sought by Triaxx Asset Management."

24          Do you see that?

25 A.  Yes.

N4KKUSB2                        Calamari - Cross

1    Q.  And she says they're improperly sought by Triaxx on behalf

2    of its affiliate and agent, Phoenix Real Estate Solutions.

3            Do you see that?

4    A.  Yes.

5    Q.  And she says she also seeks, or Goldman also seeks, funds

6    that TAM, Phoenix, and the issuers seek to pay for their legal

7    fees and expenses?

8    A.  Yes.

9    Q.  And then let's go to paragraph 4.  In this, Ms. Cohen

10   writes, "In violation of clear contractual provisions requiring

11   TAM to bear the expenses of its affiliates and agents, TAM has

12   engaged in flagrant self-dealings to enrich its owners at the

13   expense of the CDO's noteholders."

14           Do you see that?

15   A.  Yes.

16   Q.  So, let's look at some of the recoveries and payments,

17   which Mr. Lorenzo also went through with you, but I'd like to

18   do it in a slightly different way.  So that's, in our binder,

19   tab 6, Exhibit 40, and it is the version with your signature.

20           So, can we agree that you signed these interrogatory

21   responses?

22   A.  Yes.

23   Q.  So, in your declaration, at paragraph 37, on page 9, do you

24   see it says, "All told, there have been more than 105 million

25   in gross recoveries"?

1             Do you see that?

2    A.  Yes.

3    Q.  You say that's because of as a result of the activist work

4    of Triaxx CDOs' litigation counsel using PRES's unique,

5    valuable services and work product, correct?

6    A.  Yes.

7    Q.  And then you say, "Of that amount, after payment of

8    professional and other fees, more than 64 million has been

9    disbursed to the Triaxx CDOs and paid out to noteholders

10   through the CDO waterfalls."

11            Do you see that?

12   A.  Yes.

13   Q.  So, let's now turn to the interrogatory response, which is

14   tab 6.  If we go to page 3, under (a), it lists out the various

15   recoveries, correct?

16   A.  Yes.

17   Q.  And it has a total figure of 105 million, approximately?

18   A.  Yes.

19   Q.  That matches up with your declaration, correct?

20   A.  Yes.

21   Q.  And then there's an asterisk there, saying, in the fifth

22   line item -- do you see?

23   A.  I actually don't.

24            Oh, yes.

25   Q.  At the bottom, it says, "These funds were paid to the

1  trustee, and Triaxx understands the trustee disbursed them, but

2  has no further information about their treatment."

3           Do you see that?

4  A.  Yes.

5  Q.  So it's fair to say that 34 million of these recoveries

6  were paid to the trustee for disbursement through the

7  waterfall, correct?

8  A.  Yes.

9  Q.  And, then, if we go to the next page, there's a further

10 listing, and it says, "(b) the following amounts have been

11 disbursed to the Triaxx CDOs from an account held or controlled

12 by the law firm of Miller & Wrubel."

13          So that's another 29 million, right?

14 A.  29 and change, 400,000, yes.

15 Q.  So that's approximately 63 million that has gone into the

16 CDOs, correct?

17 A.  Well, from those two numbers, yeah, 63-1/2.

18 Q.  63-1/2, okay.

19          Now, the collateral managers also directed the trustee

20 to pay 30 million to Phoenix through the priority of payments

21 waterfall, correct?

22 A.  Where am I looking?

23 Q.  This is just a question to you.  It's not on the document.

24 A.  I don't recall the exact amount, but it was significant.

25 Q.  So, let me read you a joint fact stipulation.  "Between

N4KKUSB2                         Calamari - Cross

 1    2011 and May 2018, the collateral manager directed the trustee
 2    to pay approximately 30 million to Phoenix through the priority
 3    of payments waterfall."
 4              Do you see that?
 5              Well, you don't see that --
 6    A.  I don't see --
 7    Q.  -- but will you agree with that?
 8    A.  I have no reason to dispute that.  It sounds right to me.
 9    Q.  We were looking at a number of 63-1/2, and, of that,
10    30 million has then been invoiced by Triaxx Asset Management
11    for Phoenix, correct?
12    A.  Yes.
13    Q.  And now, if we look at this chart that goes, "The following
14    amounts have been disbursed from accounts held or controlled by
15    the law firm Miller & Wrubel," it goes from page 4, 5 --
16              THE COURT:  On the interrogatory responses?
17              MR. SAVLA:  On the interrogatory response.
18    Q.  So it goes page 4, 5, and then we go into 6, and there's
19    40 million -- 40.7 million, right?
20    A.  Yes.
21    Q.  So if we add the 40 million that's been disbursed outside
22    the waterfall, and we add the 30 million that Phoenix has
23    invoiced inside the waterfall, am I right that that comes to
24    approximately 70 million that Phoenix has sought or received?
25    A.  40 plus 30 is 70, but I don't know about the rest of that.

N4KKUSB2                          Calamari - Cross

1    Q.  It's 40 -- okay, 70 million, correct?

2    A.  40 million plus 30 million is 70 million.

3    Q.  So it's 40 million from outside the waterfall, correct?

4    A.  I'm not trying to dispute; I just don't recall the exact

5    numbers you just gave me.  You represented one from the

6    statement of facts.  If that was 40, I agree with it.

7              THE COURT:  That was 30.

8    Q.  Let me take it step by step.  From inside the waterfall,

9    it's 30 million, okay?  And I will represent that to you, that

10   that's an agreed fact.

11   A.  Okay.

12   Q.  If we look at this chart — and this chart deals with

13   outside the waterfall, right — that's another 40.7 million,

14   correct?

15   A.  Those are amounts disbursed from the accounts held by

16   Miller Wrubel, yes.

17   Q.  So that's outside the waterfall, correct?

18   A.  Yes.

19   Q.  So, in total, if we look at inside the waterfall,

20   30 million, and outside the waterfall, 40 million, am I correct

21   that that comes to 70 million?

22   A.  It does.  Those numbers add up, yes.

23   Q.  In this case, if we go back to your declaration, which is

24   tab 2, and we go to paragraph 64, you're claiming -- or,

25   rather, PRES is claiming 23.4 million, correct?

1   A.  Yes.

2   Q.  So that would take it to 93.4 million, correct?

3   A.  70 plus 23 would be 93 million.

4   Q.  So that's -- in total, we're looking at 93 million out of

5   the 105 million recoveries; is that correct?

6   A.  That's what the numbers add up to.

7   Q.  On top of that, TAM and PRES's lawyers are also seeking

8   legal fees in this action, correct?

9   A.  Yes.

10   Q.  So, in fact, it would be higher even than that 93 number,

11   correct?

12   A.  Yes.

13   Q.  Do you still maintain, after seeing those numbers, that

14   these litigations have been of benefit to noteholders?

15   A.  Yes.  My understanding is that there are significant

16   amounts of money that were put down the waterfall that would

17   not have come in without the activist litigations.

18   Q.  Now, you mentioned, I believe you called it, the first

19   interpleader earlier today.

20          Do you remember that?

21   A.  The which entity?

22   Q.  The first interpleader.

23          Do you remember --

24   A.  First interpleader, yes.

25   Q.  Was that an interpleader before Judge Pauley?

1   A.  Yes.

2   Q.  And that had to do with the sale of three-year defaulted

3   securities, correct?

4   A.  Yes.

5   Q.  That case was litigated by John Pickhardt at Quinn Emanuel,

6   correct?

7   A.  Among many others.

8             THE COURT:  On behalf of who, Mr. Savla?

9             MR. SAVLA:  I'm sorry.

10  Q.  On behalf of South Tryon; is that correct?

11  A.  Yes.

12  Q.  If you look at tab 8 of your binder, do you see that this

13  is a memorandum and order?

14  A.  Yes.

15  Q.  And it's the memorandum and order in the first

16  interpleader, correct?

17  A.  Yes.

18  Q.  If you go to page 4 of the memorandum and order, and you go

19  to the bottom, you see it says -- the paragraph begins, "None

20  of the aged defaulted securities have been sold by the

21  collateral manager"?

22            MS. BEAUMONT:  Objection.  I'm not sure what we're

23  doing with this document, which is not in evidence.

24            THE COURT:  Are we going to move the document?

25            MR. SAVLA:  We are going to move it into evidence.

1            THE COURT:  When are we going to do that?

2            MR. SAVLA:  I was just going to authenticate that his

3    affidavit was referenced, and then we would enter it into

4    evidence.

5            THE COURT:  All right.  I'll give you a couple of

6    questions.

7            MR. SAVLA:  Okay.

8    BY MR. SAVLA:

9    Q.  If you look at the bottom here, it says, "However, the

10   collateral manager asserts that its ongoing litigation on

11   behalf of Triaxx 2006-1 has and will recover tens of millions

12   of dollars for its investors."  And then it cites the Calamari

13   affidavit.

14           This is your affidavit, correct?

15   A.  Yes.

16           MR. SAVLA:  Your Honor, we move this into evidence.

17           THE COURT:  I don't know that a decision by a judge of

18   this court, which is a public document, is actually evidence in

19   this case.  So I will not admit Judge Pauley's memorandum into

20   evidence.  I'm not prohibiting you from referencing it; I just

21   don't think it's an exhibit.

22           MR. SAVLA:  Okay.  Well, maybe we can discuss that.

23           THE COURT:  We can discuss that at the next break.

24   BY MR. SAVLA:

25   Q.  Well, let me direct you to the next tab.  This is a

N4KKUSB2                         Calamari - Cross

1   declaration of Jonathan Pickhardt in support of South Tryon's

2   motion for summary judgment.

3            Do you see that?

4   A.  Yes.

5   Q.  If you go to page 6 of 8 — on the top of the document, you

6   see the page numbers — you see an appendix of three-year

7   defaulted securities.

8            Do you see that?

9            MS. BEAUMONT:  Objection.

10            THE COURT:  I'll give him a couple of questions and

11   see where he's going.

12            THE WITNESS:  Yes.

13   BY MR. SAVLA:

14   Q.  Do you see that?

15            Now, as of the date of this declaration, which is

16   February 2, 2016, is this a listing of three-year defaulted

17   securities?

18            MS. BEAUMONT:  Objection; hearsay, and also not in

19   evidence.

20            THE COURT:  Yes, you've got about two questions left,

21   Mr. Savla, to lay a foundation and let me know where you're

22   going with this.

23   BY MR. SAVLA:

24   Q.  Is this a listing of three-year defaulted securities?

25   A.  This says, "Appendix A — three-year defaulted securities."

N4KKUSB2                           Calamari - Cross

Q.  Were those three-year defaulted securities at issue in the

Pauley case?

A.  Looking at them, I don't know, but I have no reason to

doubt Mr. Pickhardt's affidavit.

          MR. SAVLA:  Your Honor, I ask to move this into

evidence.

          THE COURT:  I don't think you've laid any foundation

for moving this declaration of a witness, who is not before us,

which was submitted in a different litigation, into evidence in

this case.

          Denied.

          MR. SAVLA:  Okay.

BY MR. SAVLA:

Q.  Now, in the first interpleader case, the one before

Judge Pauley, was there eventually an order requiring Triaxx

Asset Management to sell three-year defaulted securities?

A.  Yes.

Q.  And Triaxx Asset Management appealed to the Second Circuit,

correct?

A.  Yes.

Q.  And Triaxx Asset Management also moved for a stay pending

appeal, correct?

A.  Yes.

Q.  And that stay was denied, correct?

A.  This is going way back in time for me.  I believe there was

1    an interim stay that was granted and then maybe another stay

2    that was denied, but I would have to go back and check the

3    docket to be sure.

4    Q.  So let me see if I can refresh your recollection.

5           If we look at tab 10, and if you go to the second

6    page --

7    A.  Yes.

8    Q.  -- does this refresh your recollection that a stay was

9    denied?

10   A.  Again, I know that, ultimately, the stay was denied.

11   Whether or not there was an interim stay, I can't tell you by

12   looking at this piece of paper.

13   Q.  But does it refresh your recollection that a stay was

14   denied in August of 2016?

15   A.  Yes.

16   Q.  And as a result of this denial of stay, did Triaxx Asset

17   Management sell defaulted securities?

18   A.  Yes.

19   Q.  And it sold them shortly after this August 2016 time

20   period, correct?

21   A.  Yes.

22   Q.  Or, rather, shortly after this denial of stay?

23   A.  It sold them shortly after we received the order from

24   Judge Pauley to sell them.

25   Q.  And shortly after the Second Circuit denial of the stay?

N4KKUSB2                        Calamari - Cross

1   A.  Yes.

2   Q.  Do you remember there was also a second interpleader

3   involving PIMCO?

4   A.  Yes.

5   Q.  That was the case before Judge Nathan, correct?

6   A.  Yes.

7   Q.  And Judge Nathan issued a decision in July of 2017

8   requiring the sale of certain defaulted securities, correct?

9   A.  Yes.

10  Q.  After that order, in July 2017, Triaxx Asset Management

11  also sold defaulted securities, correct?

12  A.  Yes.

13  Q.  And those were three-year defaulted securities, correct?

14  A.  Yes.

15  Q.  Do you know -- the sale took place shortly after that July

16  order, correct?

17  A.  I would presume, yes.  We followed the instructions of the

18  court.

19  Q.  And Triaxx Asset Management's attorney in the Nathan action

20  was Arnold & Porter Kaye Scholer, correct?

21  A.  Yes.

22  Q.  It was Eric Whitney at Arnold & Porter Kaye Scholer?

23  A.  Among others, yes.

24  Q.  And, then, let me see if you can turn to tab 14.  I'm just

25  going to refresh your recollection.  If we look at the letter

N4KKUSB2                        Calamari - Cross

1   dated --

2              MS. BEAUMONT:  Objection.  I'm not sure that the

3   witness had no recollection.

4              THE COURT:  I didn't hear you, Ms. Beaumont.

5              MS. BEAUMONT:  I'm not sure the witness said he didn't

6   recall anything.  I'm not sure that his recollection is being

7   refreshed --

8              THE COURT:  I don't understand Mr. Savla to be

9   refreshing his recollection.  I'm going to give him some leeway

10  to figure out what he's trying to do with this document.  And

11  then you can object again.

12             MS. BEAUMONT:  Okay.

13             MR. SAVLA:  So, my understanding is that the witness

14  didn't remember the exact date on which Triaxx Asset Management

15  sold --

16             THE COURT:  Hold on one second.

17             Your last question was:  "It was Eric Whitney at

18  Arnold & Porter Kaye Scholer?

19             "Among others, yes."

20             And then you asked him to turn to this tab.

21             MR. SAVLA:  It was a few questions before that.

22             THE COURT:  I see.

23  "Q.  The sale took place shortly after that July order,

24  correct?

25  "A.  I would presume, yes.  We followed the instructions of the

N4KKUSB2                          Calamari - Cross

1   court."

2                  MR. SAVLA:  Let me see if he has a recollection, then.

3                  THE COURT:  Let's see if he has a recollection.

4   BY MR. SAVLA:

5   Q.  Do you remember the date on which Triaxx Asset

6   Management -- date or dates on which Triaxx Asset Management

7   sold the defaulted securities?

8   A.  Not specifically.  There was -- in the case in front of

9   Judge Nathan, I believe there was an appeal.  We obviously

10  ended up selling the securities at some point, most likely

11  after the appeal.

12  Q.  Let me see if this refreshes your recollection.  So, if you

13  turn to the letter that's before you, and you turn to page 2,

14  and you see, just above the point 2, a brief explanation of why

15  jurisdiction and venue lie in the court, the sentence above

16  that, "In accordance with the court's order, Triaxx conducted

17  auctions for the sale of three-year defaulted securities on

18  August 10, 16, and 17, 2017."

19                  Does that refresh your recollection of when Triaxx

20  conducted auctions of the three-year defaulted securities?

21  A.  Not specifically, but I have no reason to dispute this.

22  Q.  Would it be correct that Triaxx conducted auctions on those

23  days?

24  A.  Yes.

25  Q.  Now I'm going to just show you some documents just so that

N4KKUSB2                         Calamari - Cross

1    we can move them into evidence.  I'm not going to ask you

2    questions about the contents.

3           Let me show you first tab 16 of your binder.  This is

4    an email from you to Mr. Rewalt, with a cc to Mr. Brunekreef,

5    correct?

6    A.  Yes.

7    Q.  And Mr. Rewalt is one of the directors of the issuers?

8    A.  Yes, he is.

9    Q.  This is your email address at the top?

10   A.  Yes, it is.

11   Q.  And this email -- this document was created and maintained

12   in the regular course of business, correct?

13   A.  I mean, it's an email.

14          MR. SAVLA:  Your Honor, I move to admit Trial

15   Exhibit 2150.

16          MS. BEAUMONT:  We would just object on grounds of

17   relevance, your Honor.

18          THE COURT:  I'll admit it.

19          2150 is admitted.

20          (Trial Exhibit 2150 received in evidence)

21   BY MR. SAVLA:

22   Q.  The next document is -- the next tab in your binder is a

23   letter dated October 2, 2015, on Triaxx Asset Management

24   letterhead.

25          Is that your signature on the bottom?

N4KKUSB2                        Calamari - Cross

1    A.   If you could just give me a minute to review the document?

2    Q.   Sure.

3              (Pause)

4    A.   Yes.

5    Q.   So that's your signature.

6              This is Triaxx Asset Management letterhead, correct?

7    A.   Yes.

8              MR. SAVLA:  Your Honor, we move this into evidence as

9    Trial Exhibit 2151.

10             MS. BEAUMONT:  No objection.

11             THE COURT:  2151 is admitted.

12             (Trial Exhibit 2151 received in evidence)

13             MR. SAVLA:  The next tab, 2152.  Ms. Beaumont, any

14   objection?

15             MS. BEAUMONT:  I am going to object on grounds of

16   relevance.

17             THE COURT:  Let me read it.

18             (Pause)

19             THE COURT:  Objection overruled.  2152 is admitted.

20             (Trial Exhibit 2152 received in evidence)

21             MR. SAVLA:  And, again, the attachment to that is

22   2153.  We ask that that be moved into evidence as well.

23             THE COURT:  That's behind tab 21?

24             MR. SAVLA:  Yes.

25             THE COURT:  19, sorry.  Behind tab 19?

N4KKUSB2                         Calamari - Cross

1           MR. SAVLA:  Behind tab 19, yes.

2           THE COURT:  Let me read it.

3           Any objection?

4           MS. BEAUMONT:  No objection.

5           THE COURT:  2153 is admitted.

6           (Trial Exhibit 2153 received in evidence)

7           MR. SAVLA:  Also the next tab, tab 20, 2154.

8           THE COURT:  Any objection?

9           MS. BEAUMONT:  No objection.

10          THE COURT:  2154 is admitted.

11          (Trial Exhibit 2154 received in evidence)

12          MR. SAVLA:  The final document, the next tab, tab 22,

13   we ask that 21 --

14          THE COURT:  My binder only goes to 21.

15          I think we just did 20, didn't we?  Why don't you just

16   give me the exhibit number.

17          MR. SAVLA:  It's 2155.

18          THE COURT:  All right.

19          Any objection to 2155?

20          MS. BEAUMONT:  No, your Honor.

21          THE COURT:  2155 is admitted.

22          (Trial Exhibit 2155 received in evidence)

23          MR. SAVLA:  Thank you.  I have no further questions.

24          THE COURT:  All right.

25          Mr. Ledley, you told me yesterday you would have

1  questions for this witness.

2            MR. LEDLEY:  Just a few minutes, your Honor.

3            THE COURT:  That's fine.

4  CROSS-EXAMINATION

5  BY MR. LEDLEY:

6  Q.  Hi, Mr. Calamari.

7            THE COURT:  You go to the podium with no binder; is

8  that correct?

9            MR. LEDLEY:  No binder, your Honor.

10           THE COURT:  Do I need to keep any of the recent

11 binders open before me?

12           MR. LEDLEY:  I do not believe so.

13           THE COURT:  All right.  We just want to be prepared

14 here.

15           Go ahead, Mr. Ledley.

16 BY MR. LEDLEY:

17 Q.  Hi, Mr. Calamari.  Michael Ledley, from Wolmuth Maher &

18 Deutsch, representing the issuers.

19           How are you doing today?

20 A.  Very good.  Thank you, sir.

21 Q.  In paragraph 38 of your direct testimony affidavit, you

22 mentioned the ResCap bankruptcy?

23 A.  Yes.

24 Q.  You can look it up if you want.  That's the reference.

25           Were you involved in directing the litigation efforts

1    on behalf of the issuers in the ResCap bankruptcy?

2    A.  No.

3    Q.  Do you know who was involved in directing those litigation

4    efforts?

5    A.  I believe Mr. Moon was the lawyer who did the case.  I

6    assume, but I do not know, but I assume that Mr. Priore or

7    someone at the collateral manager was directing his actions at

8    the time.

9    Q.  So that predated your role at TAM?

10   A.  Yes.

11         MR. LEDLEY:  No further questions.

12         THE COURT:  Any redirect, Ms. Beaumont?

13         MS. BEAUMONT:  Just some brief questions, your Honor.

14   REDIRECT EXAMINATION

15   BY MS. BEAUMONT:

16   Q.  Good morning, Mr. Calamari.

17   A.  Good morning.

18   Q.  I believe earlier you testified that at the time in 2017,

19   when you sought legal advice from Mr. Stein at the request of

20   Mr. Brunekreef, you had already received written legal advice.

21         Do you recall that testimony?

22   A.  Yes.

23   Q.  What did you mean by that?

24   A.  Well, actually, I think the collateral manager had already

25   received written legal advice.  And I'm referring to the advice

N4KKUSB2                          Calamari - Redirect

1    provided by Mr. Nissenbaum in connection with the packets of

2    information that Mr. Moon provided to Mr. Nissenbaum before

3    sending them along to Ms. Martin and the directors of the

4    issuer for approval.

5    Q.  To your knowledge -- before you contacted Mr. Stein in 2017

6    seeking legal advice at the request of Mr. Brunekreef, do you

7    know whether anyone at Schulte Roth was aware of PRES's having

8    received payments outside the waterfall?

9    A.  Yes.

10   Q.  Did Mr. Stein ever tell you, in writing or otherwise, that

11   his written advice, in response to your request on behalf of

12   Mr. Brunekreef, did not include PRES's fees?

13            MR. LORENZO:  Objection, your Honor; hearsay.

14            THE COURT:  Let me hear the question again.

15   Mr. Court Reporter, can I hear that back?

16            (Record read)

17            THE COURT:  I'll allow the question.

18            THE WITNESS:  No, he never said that to me.

19            MS. BEAUMONT:  Bear with me.  I have to get through

20   all the things I crossed out.

21   BY MS. BEAUMONT:

22   Q.  Do you happen to know whether the engagement letter between

23   Mr. Lorenzo's firm, Alston & Bird, and the trustee has been

24   provided to the noteholders of the Triaxx CDOs?

25   A.  I'm not aware of that happening.

1          MS. BEAUMONT:  I have no further questions.

2          THE COURT:  Anybody want a last question or two?

3          I'm going to ask you just a few questions,

4     Mr. Calamari, because everybody in this room, including you,

5     knows the facts better than I do, so I'm catching up a little

6     bit.

7          You're aware that Mr. Nissenbaum was sitting where

8     you're sitting a couple of days ago and testified in this

9     court?

10          THE WITNESS:  I understand that he testified, yes.

11          THE COURT:  Did anybody tell you or summarize for you

12     any of his testimony?

13          THE WITNESS:  No.

14          THE COURT:  You're a lawyer?

15          THE WITNESS:  Yes.

16          THE COURT:  And you were a litigator before you went

17     in-house, so to speak, correct?

18          THE WITNESS:  Yes.

19          THE COURT:  Did any of your cases, while you were

20     litigating, involve questions of contract interpretation?

21          THE WITNESS:  Yes.

22          THE COURT:  So you know what an integration clause is,

23     right?

24          THE WITNESS:  Yes.

25          THE COURT:  Can you share that understanding with us?

1          THE WITNESS:  I'm sorry, integration, is that the same

2     as a merger clause?

3          THE COURT:  Well, why don't you tell me what you think

4     those two words mean.

5          THE WITNESS:  It's been a long time since I litigated.

6     I don't understand what an integration clause is.  I remember

7     very vaguely a merger clause being a sort of place in a

8     contract where you would say, you know, this contains the

9     thoughts of the parties or this contains the understanding of

10    the parties.

11         THE COURT:  Okay.  Was there a merger clause in the

12    2011 engagement letters that we've seen in this case?

13         THE WITNESS:  I would have to review them.

14         THE COURT:  You don't remember?

15         THE WITNESS:  I don't recall off the top of my head.

16         THE COURT:  When you sent what we've called the

17    clarification letters to -- it was Mr. Nissenbaum, right?

18         THE WITNESS:  Yes.

19         THE COURT:  -- did you go back and look at the

20    engagement letters at that time?

21         THE WITNESS:  Yes.

22         THE COURT:  Did you look to see whether there was an

23    integration clause or a merger clause in there?

24         THE WITNESS:  Sitting here today, I don't recall one

25    way or the other.

N4KKUSB2                        Calamari - Redirect

1          THE COURT:  Okay.

2          In your direct testimony declaration, you say in

3    paragraph 31, "With Mr. Nissenbaum's approval, the

4    distributions were made pursuant to the letter to Ms. Martin."

5          And you're referring to distributions made on or after

6    October the 23rd, 2015, to, among others, PRES outside of the

7    waterfall, correct?

8          THE WITNESS:  Yes.

9          THE COURT:  What exactly did Mr. Nissenbaum approve,

10   as you understand it?

11         THE WITNESS:  My understanding was that Mr. Moon

12   prepared packets of information that contained all of the

13   payments that were to be made outside of the waterfall along

14   with all of the backup, and provided those to Mr. Moon before

15   they were to go to the directors.  So -- I'm sorry, provided

16   them to Mr. Nissenbaum.

17         THE COURT:  Mr. Moon provided them to Mr. Nissenbaum?

18         THE WITNESS:  Mr. Moon provided them to

19   Mr. Nissenbaum.

20         And it was Mr. Nissenbaum and Schulte.  Not just

21   Mr. Nissenbaum, Mr. Stein was involved.  Mr. Stein, I think,

22   actually received the packets from Mr. Moon as well.  They;

23   went to both Mr. Nissenbaum and Mr. Stein.  Mr. Nissenbaum was

24   the one that actually responded by email approving them, but my

25   understanding was that their job was to review the entire

1    packet in its entirety.  I mean, they were paid $25,000 for

2    that, so that they could essentially say that it was okay to go

3    to the issuers and that everything was appropriate.

4                THE COURT:  You say that that request -- the draft

5    Moon letter with the detail about the distributions and the

6    packages and so forth, you say that was sent to both Mr. Stein

7    and Mr. Nissenbaum at Schulte?

8                THE WITNESS:  Yes.

9                THE COURT:  And that they were paid, the firm was

10   paid, $25,000 to -- tell me again?

11               THE WITNESS:  To review the packet of information that

12   Mr. Moon provided, as well as the procedure that we were going

13   through, to ensure that everything that we were doing was

14   proper.

15               THE COURT:  How did the firm express that approval to

16   you?

17               THE WITNESS:  My understanding is that was in writing

18   via email.

19               THE COURT:  Do you remember what that email said?

20               THE WITNESS:  I don't think it was to me.  I think it

21   was to Mr. Moon.

22               THE COURT:  Do you remember what it said?

23               THE WITNESS:  Something like, this version looks fine

24   to me.

25               THE COURT:  And is it your understanding that someone

1 other than Mr. Nissenbaum was involved in preparing that

2 approval, or in doing the work that led up to that approval?

3    THE WITNESS:  I don't know that one way or the other.

4    THE COURT:  Did you ever tell Mr. Nissenbaum that the

5 disbursements laid out in that letter from Mr. Moon were being

6 made outside of the waterfall?

7    THE WITNESS:  Yes.

8    THE COURT:  When did you tell him that?

9    THE WITNESS:  I don't know if I -- I don't have a

10 specific memory of telling him that, but that was part and

11 parcel of the entire process.

12    THE COURT:  Tell me, as best you can recall, what

13 makes you think he knew that.

14    THE WITNESS:  Well, starting initially, before I took

15 over the collateral manager, when I was having -- so back when

16 I was representing PRES in connection with the clarification

17 letters, I believe I had an understanding that -- of the

18 process that Mr. Moon was going through, and I believe Mr. Moon

19 explained to me that no payments could be made until

20 Mr. Nissenbaum approved the entire process.  And that process

21 included paying significant amount, millions and millions of

22 dollars, out of the escrow account that was clearly not a part

23 of the regular procedure under the indentures and the waterfall

24 that we had been talking about.

25    So I don't remember that specific conversation, but

N4KKUSB2                        Calamari - Redirect

1   that so central to everything that we were doing.  I mean, it

2   was, I think, essentially part of the point of why

3   Mr. Nissenbaum was reviewing it.  He wasn't reviewing it to add

4   up the invoices or to make sure -- you know what I mean, to

5   press on the invoices.  He was there to make sure that the

6   entire process and everything that was happening was

7   appropriate.

8            THE COURT:  So, his job wasn't to review for accuracy

9   any one invoice or group of invoices, correct?

10           THE WITNESS:  He was not there to, like, tick and tie

11  numbers, no.

12           THE COURT:  No.

13           He was there to approve on a conceptual basis?

14           THE WITNESS:  I understood that he was there to -- on

15  a conceptual basis?

16           THE COURT:  He was there, as you understand it, to

17  give the collateral manager some legal assurance that it was

18  not unlawful to be paying these large sums outside of the

19  waterfall?

20           THE WITNESS:  Yes.

21           THE COURT:  That's your understanding of what the

22  $25,000 was for?

23           THE WITNESS:  Yes.

24           THE COURT:  Can one of the lawyers remind me what

25  exhibit number is the final Schulte memo?  And where I might

1    find it in one of these binders?

2              MS. BEAUMONT:  Are you referring to Mr. Stein's memo?

3              THE COURT:  Correct.

4              MS. BUCKEL:  Your Honor, it's 1158, and we'll put it

5    up on the screen.

6              THE COURT:  Oh, that's great.  Thanks.

7              There we go.

8              Do you have that on your screen, Mr. Calamari?

9              THE WITNESS:  I do.

10             THE COURT:  The lawyers tell me it's Exhibit-- what

11   number again?

12             MS. BUCKEL:  1158.

13             THE COURT:  -- 1158.

14             You looked at this a little earlier in your testimony,

15   correct?

16             THE WITNESS:  I'm not sure if I looked at the final or

17   a copy of it.

18             THE COURT:  Okay.

19             MS. BEAUMONT:  Your Honor, it might help, just to tie

20   everything together, it's Exhibit K to Mr. Calamari's

21   declaration, which is another version, which is Trial

22   Exhibit 349.

23             THE COURT:  So you looked at it when you wrote your

24   declaration?

25             THE WITNESS:  Yes.

1          THE COURT:  Even if you didn't look at it earlier

2    today?

3          THE WITNESS:  I was just saying earlier today, I think

4    I was shown a draft, but, yes, I'm familiar with this.

5          THE COURT:  Do you want a minute to read it?  It's not

6    very long.

7          THE WITNESS:  No.  I'm familiar with it.

8          THE COURT:  Do you know if Mr. Stein did any legal

9    research to prepare this memo?

10         THE WITNESS:  I don't.

11         THE COURT:  Are there any references in the memo to

12   any specific provisions of the indenture, like a paragraph

13   number or something like that?

14         THE WITNESS:  No.

15         THE COURT:  Did you think that was odd?

16         THE WITNESS:  No.

17         THE COURT:  Is there any reference anywhere in the

18   two-page memo to any statute or case or principle of law?

19         THE WITNESS:  No.

20         THE COURT:  Did you think that was odd?

21         THE WITNESS:  I don't recall at the time thinking

22   anything -- that there was anything off about this, no.

23   Mr. Brunekreef had asked Mr. Stein for his opinion on things,

24   and he was providing it.

25         THE COURT:  Okay.  Remind me again, what was the legal

1    bill for the preparation of this memo?

2              THE WITNESS:  I don't recall off the top of my head.

3              THE COURT:  Was the legal bill for the preparation of

4    this memo paid outside of the waterfall?

5              THE WITNESS:  I don't recall.

6              As I say, I believe the previous 25,000 -- each of the

7    $25,000 that was paid to them was paid outside of the

8    waterfall.

9              THE COURT:  Right.  We saw that listed in the

10   interrogatory responses, correct?

11             THE WITNESS:  Yes.

12             THE COURT:  Okay.

13             Those are all of the questions that I have for

14   Mr. Calamari.  Would anyone like to follow up?

15             MR. LORENZO:  Very briefly, your Honor.

16             THE COURT:  Mr. Lorenzo.

17   RECROSS EXAMINATION

18   BY MR. LORENZO:

19   Q.  I apologize for the multiple binders, but if you turn to

20   tab 5 of our binder.  I'm just going to pick up on the point

21   the Judge had asked you about a payment to Schulte in

22   connection with the Schulte memo in April of '17.

23             If you look at tab 5 of the trustee's witness binder

24   for you, Exhibit 40, which, again, is the interrogatory

25   responses that we talked about earlier.

N4KKUSB2

1   A.  I have tab 5 open.

2   Q.  If you flip to page 5, which is this chart, which you

3   previously testified was the outside-the-waterfall payments,

4   correct?

5   A.  Yes.

6   Q.  Do you see, four lines up from the bottom, there is an

7   entry on November 16, 2017?

8   A.  I see there are two entries.

9   Q.  There are several entries on November 16, 2017, but the

10   first one, the payee is Schulte?

11   A.  I must be looking at the wrong thing.  I see something

12   different.

13   Q.  I'm on page -- I'm sorry, I'm on page 5.

14   A.  I'm sorry, I'm on tab 5, which is --

15   Q.  Tab 5, page 5 of tab 5.

16   A.  The first line is analytic focus?

17          I'm sorry, it's up on the screen here.

18   Q.  Yes.

19          Up on the screen is what I'm looking at, and

20   Mr. Gibson has highlighted the entry that I'm looking at.

21   A.  Ah, yes.

22   Q.  So this is on November 16, 2017, right?

23   A.  Yes.

24   Q.  It's a payment to Schulte, correct?

25   A.  Yes.

N4KKUSB2

1   Q.  And it's for $20,219.50?

2   A.  Yes.

3   Q.  And the services are legal services?

4   A.  Yes.

5   Q.  And it's your understanding that this might be the payment

6   for the Schulte memo?

7   A.  It should be, yes.

8           MR. LORENZO:  Nothing further, your Honor.

9           THE COURT:  All right.  We will excuse you,

10  Mr. Calamari.

11          THE WITNESS:  Thank you, your Honor.

12          (Witness excused)

13          THE COURT:  We can have, if it's convenient to all, a

14  half an hour before our lunch break to get started with our

15  next witness.

16          Ms. Beaumont, what's your preference?

17          MS. BEAUMONT:  I believe Mr. Jonsson is here, and I

18  can go get him, and Mr. Vassanji will gear up to do --

19          THE COURT:  So we will get started with Mr. Jonsson.

20          I'm going to put these binders away, yes?  The binders

21  for Mr. Calamari.

22          MR. VASSANJI:  The TAM parties call Sigurgeir Jonsson

23  as their witness.

24          (Witness sworn)

25          THE DEPUTY CLERK:  Please state and spell your name

N4KKUSB2

1     for the record.

2                (Discussion off the record)

3                MR. VASSANJI:  Permission to approach?

4                THE COURT:  Hold on, he needs to state and spell his

5     name first.

6                THE WITNESS:  My name is Sigurgeir Jonsson, but most

7     of the time here in the United States, they call me Ziggy, with

8     a Z.

9                THE COURT:  Can you spell your last name, please.

10               THE WITNESS:  Last name?  J-o-n-s-s-o-n.

11               THE COURT:  Now spell the first name that you wish to

12    use.

13               THE WITNESS:  I will use my legal name,

14    S-i-g-u-r-g-e-i-r.

15               THE COURT:  You normally go by?

16               THE WITNESS:  Ziggy.

17               THE COURT:  Z-i-g-g-y?

18               THE WITNESS:  With a Z, as in zoo, Ziggy.

19               THE COURT:  Okay.

20               MR. VASSANJI:  Permission to approach, your Honor?

21               THE COURT:  Permission granted.

22     SIGURGEIR JONSSON,

23         called as a witness by the TAM parties,

24         having been duly sworn, testified as follows:

25    DIRECT EXAMINATION

1    BY MR. VASSANJI:

2    Q.  Mr. Jonsson, I've just given you a document entitled,

3    "Corrected Declaration of Sigurgeir Jonsson."

4            Do you have that document in front of you?

5    A.  Yes, I do.

6    Q.  Does this document constitute your direct testimony in this

7    case?

8    A.  Yes, it does.

9    Q.  Thank you.

10            MR. VASSANJI:  The TAM parties move to admit Sigurgeir

11   Johnson's declaration into evidence.

12            THE COURT:  We will admit Mr. Jonsson's declaration as

13   his direct testimony.  You will not forget to put it on ECF by

14   the end of the day today.

15            And we will now have cross-examination.

16            MR. VASSANJI:  Thank you, your Honor.

17            MS. BUI:  Your Honor, may I approach?

18            THE COURT:  Ms. Bui.

19            THE WITNESS:  Thank you.

20            THE COURT:  He gets a binder, and I don't.

21            MS. BUI:  I wasn't sure whether I was giving it to

22   Ms. Kay or you, your Honor.

23            THE COURT:  Thank you.

24            You may proceed, Ms. Bui.

25            MS. BUI:  Thank you.

1    CROSS−EXAMINATION

2    BY MS. BUI:

3    Q.  Good morning, Mr. Jonsson.  My name is Samantha Bui, and I

4    am an attorney at Alston & Bird.  I represent the trustee,

5    U.S. Bank, in this action, and I am going to be asking you a

6    few questions today.

7              Have you reviewed any of the publicly available

8    filings in this litigation?

9    A.  I think I've seen a few, a small fraction.

10   Q.  Do you recall which ones?

11   A.  No.  I think it's the first document.  I actually do look

12   at legal documents, I have an account on PACER, and I look at

13   the Southern District Court.

14   Q.  Did you review any of the parties' proposed findings of

15   fact they submitted in connection with this litigation?

16   A.  Not that I can recall, no.

17   Q.  Did you review any direct testimony submitted by other

18   witnesses in this litigation?

19   A.  No.

20   Q.  You began working at ARAM Global in 2009 as a partner,

21   correct?

22   A.  That's correct.

23   Q.  And at the time you started working at ARAM Global, who

24   were your other partners?

25   A.  The key partners I interfaced with were Raja Visweswaran,

1  Mike Balboa, Mingsung Tang, Carl Daniel Berthold.  I also

2  remember Karoline Molberg.  There were a few others, but in the

3  U.S., it was me and Mingsung.

4  Q.  Was Mr. Vishal Garg one of your other partners when you

5  started working at ARAM Global?

6  A.  At ARAM Global, the entity I worked for and was a partner

7  of, I don't believe Vishal Garg was a partner at the time.

8  Q.  As a partner of ARAM Global, did you make any capital

9  contributions?

10 A.  No.

11 Q.  And you remained a partner at ARAM Global until June of

12 2013, correct?

13 A.  I don't know exactly about the partner status, but I

14 stopped receiving payments through ARAM Global around that

15 time.

16 Q.  And in 2013, you worked for AVEX Funding; is that right?

17 A.  That's correct.

18 Q.  And AVEX Funding was a mortgage company in San Francisco;

19 is that right?

20 A.  That's correct.

21 Q.  And you came to work at AVEX Funding through Mr. Vishal

22 Garg, correct?

23 A.  He made the introduction.

24 Q.  The introduction to AVEX Funding?

25 A.  Yeah.

N4KKUSB2                          Jonsson - Cross

1   Q.   What work did you do for AVEX Funding?

2   A.   So most of it was analyzing the loan pipeline, coming up

3   with suggestions, seeing where AVEX could potentially acquire

4   more customers, et cetera.  It's mostly analytics works.

5   Q.   You continued to work for AVEX Funding until early 2014,

6   correct?

7   A.   That's correct.

8   Q.   And you stopped working for AVEX Funding when you received

9   your green card, correct?

10  A.   I don't remember whether I got a visa first and then a

11  green card or just a green card, but, yes.

12  Q.   You joined 1/0 Capital in June 2013 as a senior partner,

13  correct?

14  A.   That's correct.

15  Q.   So you worked for 1/0 Capital and AVEX Funding at the same

16  time, correct?

17  A.   Can I come with one clarification?

18          So, I want to say joint as a partner, I don't know

19  when the actual -- what date the actual documentation of that

20  was done, but I considered myself a partner from June 2013.

21  Q.   Understood.

22          So you worked for 1/0 Capital and AVEX Funding at the

23  same time; is that right?

24  A.   It's interesting, when we started 1/0 Capital, it was -- we

25  were thinking about building and, incubating companies.  I

1  joined 1/0 Capital as a partner.  I didn't view my role

2  necessarily as a salaried position.  This was more like, you

3  know, great minds come together and we build something.

4          So, yeah, I was involved in 1/0, but I was not on the

5  payroll at that time.

6  Q.  Understood.

7          But at the time you were involved in 1/0, even though

8  not on the payroll, you were also still working for AVEX

9  Funding, correct?

10 A.  That's correct.

11 Q.  And AVEX Funding was a subsidiary of 1/0 Capital; is that

12 right?

13 A.  To my understanding at the time, that was not the case.  At

14 the time.

15 Q.  And what is your understanding right now?

16 A.  My understanding is that I wouldn't call it a subsidiary,

17 but One Zero Real Estate, to my understanding, acquired AVEX,

18 and One Zero Real Estate at the time was a subsidiary.  But

19 this is my understanding.  I didn't see the documents

20 necessarily.

21 Q.  Do you have any reason to doubt that your understanding

22 right now is inaccurate?

23         THE COURT:  I'm sorry.

24         MS. BUI:  Sorry.

25         THE COURT:  Too many negatives.

1            MS. BUI:  I'll rephrase.

2     BY MS. BUI:

3     Q.  So you just testified about your understanding of your

4     current understanding about the relationship between AVEX

5     Funding and 1/0 Capital, right?

6     A.  Yes.

7     Q.  You said that that was your understanding right now, but

8     you hadn't reviewed any documents, right?

9     A.  So, to my understanding, I'm a fact witness.  So, when I

10    say, like, what I think, it's my understanding, not necessarily

11    I have seen the acquisition documents or anything.  This is

12    just my understanding.

13    Q.  And how did you come to that understanding?

14    A.  I don't remember.

15    Q.  At 1/0 Capital -- you do work for 1/0 Capital's portfolio

16    companies, as well as other related companies, correct?

17    A.  Yes.

18    Q.  Can you name some of those companies?

19    A.  Are you talking about just all time periods?

20    Q.  We can talk about right now.  What other companies that are

21    1/0 Capital's portfolio companies or related companies do you

22    work for right now?

23    A.  So I'm employed by better.  Better is the mortgage company.

24    So I'm basically a senior vice president of engineering there.

25    I have very little involvement right now in the other portfolio

1    companies.

2    Q.  From 2011 to 2018, you performed work on behalf of Phoenix

3    Real Estate Solutions Ltd., or PRES; is that right?

4    A.  Yes.

5    Q.  You did this work while employed by ARAM Global, AVEX

6    Funding, and 1/0 Capital, correct?

7    A.  That list is not a hundred percent.  I was also employed by

8    a company called The Number during that time period.

9    Q.  So, from the period of 2011 to 2018, when you performed

10   work on behalf of PRES, you were employed by ARAM Global, AVEX

11   Funding, 1/0 Capital, and The Number?

12   A.  Yes, that's correct.

13   Q.  But you were never employed by PRES, correct?

14   A.  No.

15   Q.  You didn't do work full time for PRES; is that right?

16   A.  That is not correct.  It depends on time periods.

17   Q.  So in 2011 to 2014, you also worked for an entity called

18   Activist Special Advisory Services, correct?

19   A.  So there's a complex list of entities and relationships.

20   That's not my expertise.  My expertise is the work that we do.

21   I don't think I've had an employment agreement with that

22   company.

23   Q.  Have you heard of the company before?

24   A.  Say it again, sorry.

25   Q.  Have you heard of the company Activist Special Advisory

1    Services?

2    A.  Yes.

3    Q.  And you did not have a formal employment agreement with the

4    company; is that right?

5    A.  I don't remember having an employment agreement with that

6    entity, no.

7    Q.  But did you do work for that entity at all during the

8    2011-2014 time period?

9    A.  When you say "work for that entity," to my understanding,

10   all the work we did for the Triaxx funds was obviously for the

11   ultimate benefit of the trusts themselves and PRES.  What

12   companies were in the middle was not something I was occupied

13   trying to understand.  My focus was on the work.

14   Q.  You also did work for PRES for the benefit of an entity

15   called Phoenix Advisors and Managers; is that right?

16   A.  I don't think -- I don't think I've done work for PRES for

17   the benefit of Phoenix Advisors and Managers.  I don't

18   understand the question.

19   Q.  Sure.

20          So, Mr. Jonsson, you were deposed in this action on

21   May 26, 2022; is that right?

22   A.  Yes.

23   Q.  In that deposition, you gave your truthful testimony; is

24   that right?

25   A.  To the best of my ability, yes.

1            MS. BUI:  Tom, can you please play 159/17 through 22.

2            MR. VASSANJI:  Objection, your Honor.  I'm not sure --

3            (Video played)

4            THE COURT:  Pause, please.

5            Objection?

6            MR. VASSANJI:  Objection.  The witness hasn't said

7       anything inconsistent, so this doesn't appear to be proper

8       impeachment.

9            THE COURT:  We won't know if it's inconsistent until

10      we hear the clip, will we?  I'll allow it.

11           Now you can play it.

12           (Video played)

13      "Q.  And who was that work for the benefit of?

14      "A.  The work I did was for the benefit of Phoenix Advisors and

15      Managers."

16           THE COURT:  What's the next question, counsel?

17      BY MS. BUI:

18      Q.  So your understanding is that Phoenix Advisors and Managers

19      was a subcontractor for PRES, correct?

20      A.  Sorry, the question you asked is, did I do work for PRES

21      for the benefit of Phoenix Advisors and Managers?  I think the

22      chain was always this one company that I kind of worked for,

23      and then it goes up the chain, ultimately to PRES.

24           Now, the companies along the chain may benefit.  The

25      company I was doing the work at this time, the subcontracting

1    company, was Phoenix Advisors and Managers.

2    Q.  And Phoenix Advisors and Managers received payment for its

3    work as a subcontractor, correct?

4    A.  To my understanding, yes.

5    Q.  You joined Better Holdco in January 2020; is that right?

6    A.  Yeah, that's correct.

7    Q.  And you're still employed by Better Holdco, right?

8    A.  That's correct.

9    Q.  And you're also still a senior partner at 1/0 Capital LLC,

10   correct?

11   A.  That's correct.

12   Q.  So let's talk about your compensation next.

13            From 2011 to 2018, you received a few bonuses from

14   Phoenix Advisors and Managers for the work that you performed

15   for this entity; is that right?

16   A.  Yes.  That's my recollection, yes.

17   Q.  Those bonuses totaled approximately $1 million; is that

18   right?

19   A.  That's my recollection, yes.

20   Q.  But you did not receive any salary from Phoenix Advisors

21   and Managers, correct?

22   A.  Not directly, not that I remember, no.

23   Q.  In 2014, you received a salary from One Zero Real Estate,

24   correct?

25   A.  Sorry, say that again.

N4KKUSB2                          Jonsson – Cross

1    Q.  In 2014, you received a salary from One Zero Real Estate;

2    is that right?

3    A.  That's my understanding, yes.

4            Sorry, from 2014, right?

5    Q.  2014, yes.

6    A.  Yes, yes.

7    Q.  And you continued to receive a salary from One Zero Real

8    Estate until you started on 1/0 Capital's payroll; is that

9    right?

10   A.  That's how I remember it, yes.

11   Q.  From 2015 to 2020, you received a salary from 1/0 Capital,

12   correct?

13   A.  Yes, correct.

14   Q.  But in 2013 and 2014, you did receive salary payments from

15   AVEX Funding, correct?

16   A.  I received –– I think I received a small salary payment in

17   2013, and I did not get any payments from the company in 2014.

18   Q.  So, in 2013, you were paid by AVEX Funding and an entity

19   called EIFC, correct?

20   A.  I was paid by AVEX Funding, and, to my understanding, I was

21   paid by EIFC on behalf of ARAM Global and the arrangements they

22   had.

23   Q.  And EIFC was run by Mr. Garg, correct?

24   A.  It was run by Vishal Garg and Raza Khan, to my

25   understanding.

1    Q.  You stopped receiving compensation from AVEX Funding in

2    2014, when you received your green card, correct?

3    A.  Again, I remember receiving payments in 2013.  I don't

4    remember receiving any payments from AVEX in 2014.

5    Q.  Shifting gears, let's talk about your work for PRES.

6            So you started doing work for PRES in 2011, correct?

7    A.  Yes, that's correct.

8    Q.  Can you describe the nature of that work?

9    A.  Yes.  Initially, when we started working, the initial work

10   was understanding the portfolio and then figuring out the ways

11   how we can understand every single security held by Triaxx in

12   detail, so we can start formulating strategies about either

13   chasing reps and warranty breaches or any other strategies that

14   would basically give value to the trusts for recoveries.

15   Q.  Who asked you to perform work on behalf of PRES?

16   A.  At that time, I was working at ARAM Global, and we had

17   projects that came up one after another.  Some panned out, some

18   didn't.  This is one of them.  I don't remember who

19   specifically asked me to do the work, but this was -- our job

20   at ARAM Global was to help clients.

21   Q.  Even though you performed work on behalf of PRES from 2011

22   to 2018, most of your work was completed between 2011 to 2013;

23   is that right?

24   A.  As far as I'm concerned, yes, that's my recollection.

25   Q.  Because by 2013, in your declaration, you said PRES had

1    identified the most productive points of attack for outside

2    counsel, correct?

3    A.   That was my understanding, yes.

4    Q.   And you would not have agreed to perform work for PRES if

5    you thought there were circumstances in which PRES would not

6    get paid for its work, correct?

7    A.   Sorry, can you repeat the question?

8    Q.   Sure.

9           You would not have agreed to perform work for PRES if

10   you thought that there were circumstances in which PRES would

11   not be paid for it, correct?

12   A.   I'm not a stakeholder in PRES, so I think from my

13   perspective -- I mean, I was working for what's probably a

14   subcontractor in this case, so, obviously, if there's no

15   payment for work, we will never have done it, so...

16   Q.   So, if you thought that there were circumstances in which

17   PRES would not be paid, is it your testimony that you would not

18   have done the work?

19   A.   I would not have done the work.

20   Q.   Before you started doing work for PRES, did you look at the

21   indentures of the Triaxx CDOs?

22   A.   Yes.

23   Q.   And by the time that you started doing work for PRES, ICP

24   was the collateral manager of the CDOs, correct?

25   A.   To my understanding, yes.

1   Q.  Did you ever meet with representatives from ICP?

2   A.  Yes.

3   Q.  Do you recall thinking it was impossible for the collateral

4   manager to receive income through the CDOs' priority of

5   payments waterfall?

6   A.  I remember doing an analysis of the waterfall to the

7   manager and trying to uncover all the red flags, all the things

8   that could come up in terms of, like, the manager's future, and

9   I do remember thinking about concerns, yes.

10  Q.  Please turn to tab 1 in your binder, which is Exhibit 1017.

11  This is already admitted in evidence.

12          So, Mr. Jonsson, this is an email with an attachment

13  that was sent on September 13, 2010, from Mike Balboa to you,

14  Vishal Garg, and Raja Visweswaran, correct?

15  A.  Yes.

16  Q.  Attached to that email is a memo titled, "Triaxx Prime CDO

17  2006-2 Third Draft," correct?  I think that's if you flip to

18  the next page, which ends in 8403.

19  A.  So, there were a few versions of this draft.  I cannot

20  testify to whether this is the exact version with the email,

21  but I will have to trust you on that.

22  Q.  I can represent that this version was attached to this

23  particular email.

24          So you drafted this memo; is that right?

25  A.  That's correct.

1   Q.  On the second page of the memo, under "Expense

2   Reimbursements," on the page ending in 8404, there are comments

3   in blue from Mike Balboa that begin with "MB."

4          Do you see that?

5   A.  Yes.

6   Q.  In point number 2, in blue, he writes, "If costs are not

7   nearly the amount in the expenses, then how does this work?

8   Ziggy thinks it is impossible for ICP to receive any fees, and

9   the expenses are monitored."

10          Do you see that?

11   A.  I see it.

12   Q.  Was ICP the collateral manager of the CDOs at the time of

13   this memo?

14   A.  I think so, yes.

15   Q.  Did you ever communicate to Mr. Balboa that you thought it

16   was impossible for ICP to receive any fees?

17   A.  I don't remember any specific communication, but I think

18   the memo kind of encompasses all my thoughts at the time.

19   Q.  Toward the bottom of the page, in blue, it says, "VG/Z —

20   when you met with ICP, did they explain how the expense

21   reimbursement worked?  It seems this is the only current income

22   they get off these deals?"

23          Do you see that?

24   A.  I see that.

25   Q.  And does Z refer to Ziggy?

N4KKUSB2                          Jonsson - Cross

```
 1   A.  I would assume so, but I did not write this.

 2   Q.  Was the only way for the collateral manager to get income

 3   from the Triaxx CDOs through expense reimbursement?

 4   A.  That -- I don't think that was my understanding.

 5   Q.  So can you explain what your understanding was?

 6   A.  Again -- so I don't remember every conversation from this

 7   time, but I do remember that one of the reasons why I did this

 8   memo at this point in time was to kind of put all my thoughts

 9   together after reading the docs.  And my understanding, I

10   think, just looking at cash flow analysis, it's clear that

11   there's forecasted income coming to the manager which is not

12   expense reimbursement.  So I don't know exactly what Mike is

13   talking about there.

14   Q.  Let's move on from -- can you confirm that this memo

15   contains your current understanding regarding how the CDOs

16   would get paid?

17            THE COURT:  Current --

18            MS. BUI:  Sorry, let me rephrase that.

19   Q.  Can you confirm this memo contains your contemporaneous

20   understanding?

21   A.  What does that mean?

22   Q.  So if you look at this memo, as you look at it today, does

23   it confirm your understanding of the Triaxx Prime CDO 2006-2

24   management fees and expense reimbursement at the time that you

25   wrote this memo?
```

1   A.  So, at this time -- and, again, this was very preliminary.

2   And, you know, this happens time and time again when projects

3   come up with some ideas, is we get our thoughts together, we do

4   our due diligence, and this was very, very preliminary, I think

5   mostly based on public or semipublic documents about the trust.

6   So, yes, I do think this was kind of my initial analysis on

7   this.

8        Now, I may be wrong, I don't know, but this was kind

9   of my understanding at the time.

10  Q.  Understood.

11       Let's move on to a different topic.  Before you

12  started doing work for PRES, did you look at the engagement

13  agreements between PRES and the Triaxx CDOs?

14  A.  I do remember seeing that.  I don't know whether it was

15  right before or around or after I started the work, but I do

16  remember seeing it.

17  Q.  You reviewed and helped prepare invoices that PRES

18  submitted to the Triaxx CDOs for its services, correct?

19  A.  I was involved in the sending invoices, yes.

20  Q.  And you were working for PRES in this capacity?

21  A.  I was performing this on behalf of PRES.

22  Q.  You testified that each month, PRES sent its invoices

23  either directly to the trustee or to the collateral manager,

24  correct?

25  A.  Yes.

N4KKUSB2                         Jonsson - Cross

1    Q.  And you took the lead in sending invoices out in 2013 to

2    2016, correct?

3    A.  That's correct.

4    Q.  And so you have knowledge regarding how these invoices are

5    prepared?

6    A.  Yes.  However, I want to point out specifically that during

7    prep for this trial, when I was reviewing the invoices, and I

8    realized that the base fee had continued being the same,

9    whereas the contract specified a stepdown, I think, after year

10   two.  This is something that I was not aware of when the

11   invoices were being prepared.

12            In preparing those invoices, the focus was on the

13   actual work, the CUSIP fee, making sure we are doing work, and,

14   obviously, the ultimate goal is incentive fees.  That's the

15   only reason why we worked on this engagement, is to get our

16   clients in this case, the trusts, the massive success in

17   everything we were working on, and, through that, we would

18   benefit.  That was the whole reason why we were doing this.

19   Q.  Okay.  So let's take a look at one of the memos or one of

20   the invoices.  Can you turn to tab 3 in your binder.  It's

21   Exhibit 3170, and this is not yet in evidence.

22            This is one of the invoices that you helped prepare,

23   correct?

24   A.  Yes.

25            MS. BUI:  Your Honor, I'd like to move 3170 into

1    evidence.

2              THE COURT:  Any objection?

3              MS. BEAUMONT:  No, your Honor.

4              THE COURT:  3170 is admitted.

5              (Trial Exhibit 3170 received in evidence)

6    BY MS. BUI:

7    Q.  So there are a few fees and expenses on this invoice.

8              Do you see that?

9    A.  Yes.

10   Q.  So one is the due diligence fee.  Can you talk to me about

11   how you came to this number?

12   A.  I was not part of the negotiation for the contract itself,

13   but I think this was defined in the contract.  However, as I

14   mentioned, if this is 2014, this number probably should have

15   been lower.

16   Q.  Okay.  Let's go to the activist implementation fee next.

17             You testified in your declaration that PRES was

18   entitled to a monthly activist implementation fee of $10,000

19   for each RMBS trust, up to a $250,000 cap, on which it was

20   conducting its analysis on each of the Triaxx CDOs, correct?

21   A.  That's correct.

22   Q.  What CUSIPs is this invoice related to?

23   A.  I don't remember, but we kept track of the CUSIPs we were

24   working on.  Like, I don't remember, for this particular

25   invoice, which CUSIPs we were working on at the time.

N4KKUSB2                         Jonsson – Cross

1   Q.  So you can't tell, from the face of the invoice, which

2   CUSIPs it's related to; is that right?

3   A.  I don't see the list of the CUSIPs there, no.

4   Q.  Was there any overlap between the RMBS trusts held by the

5   CDOs?

6   A.  Sorry, say that again.

7   Q.  Was there any overlap between the RMBS trusts held by the

8   CDOs?

9               THE COURT:  You mean --

10              MS. BUI:  The CUSIPs.

11              THE COURT:  -- did two different CDOs own part of the

12  same CUSIP?

13              MS. BUI:  Correct.

14              THE COURT:  Thank you.

15              THE WITNESS:  I think there was some overlap, but I

16  don't remember.  I mean, that's public or semipublic, but I

17  don't remember the extent of it, no.

18  BY MS. BUI:

19  Q.  So, in the event that each of the three Triaxx CDOs held

20  the same RMBS trust, does that mean that the cap was $750,000?

21  A.  I don't -- I mean, there's a contract behind the fees.  I

22  don't remember exactly what the contract stated.

23              THE COURT:  So, Ms. Bui, I see it's a couple of

24  minutes past 12:30.  I'm not going to stop you this minute, but

25  as soon as you get to a good stopping place, we're going to

1    break for lunch.

2            MS. BUI:  Understood, your Honor.  I think I can

3    finish in a few minutes --

4            THE COURT:  Okay.

5            MS. BUI:  -- if that's okay.

6    BY MS. BUI:

7    Q.  In the event that the Triaxx CDOs held the same RMBS trust,

8    you wouldn't do more analysis for that trust if it was held by

9    more than one CDO, correct?

10   A.  So, I would say when it's the same CUSIP, but different

11   trust, there may be some trust-specific things about the

12   waterfall.  So, like, we were analyzing the CUSIP, but in the

13   context of the, you know, individual CDOs who are individual

14   entities.

15   Q.  Do you recall how many individual CUSIPs you provided

16   analysis on?

17   A.  No, I don't remember the number.  It is a lot.

18           MS. BUI:  Your Honor, I think I reached a good

19   stopping point, but not completely finished.

20           THE COURT:  So we'll break for lunch, and then you'll

21   have additional questions for this witness?

22           MS. BUI:  Correct.

23           THE COURT:  So we will excuse you briefly, for lunch,

24   Mr. Jonsson.  During the break, you are not to discuss your

25   testimony or the facts underlying your testimony with counsel

1  or others, and you will remain under oath when you return.

2            You may step down.

3            Are there any items of business that counsel wish to

4  bring up with me before we break for lunch?

5            All right.  We will be in recess.

6            Mr. Savla?

7            MR. SAVLA:  I do have, but perhaps we should excuse

8  the witness first.

9            THE COURT:  Mr. Jonsson, you're off duty for now.

10           THE WITNESS:  Thank you.

11           (Witness not present)

12           MR. SAVLA:  So the first matter is a housekeeping

13  matter, I believe, which is we're moving individual invoices

14  into evidence.  I spoke to Ms. Beaumont and Mr. Lorenzo this

15  morning, and I believe we have agreement that we can move the

16  various exhibits into evidence, and we will provide a list of

17  numbers --

18           THE COURT:  And do it much as we did on the first day.

19           MR. SAVLA:  And do it much as we did on the first day,

20  exactly.

21           THE COURT:  Ms. Kay would appreciate that.

22           MR. SAVLA:  That's the first thing.

23           THE COURT:  And somebody else is going to add up for

24  me -- I think I see where this is going.  Is somebody going to

25  add up for me all of the allegedly overcharged fees and all of

1  the double- or triple-billing, if indeed that's where this is

2  going?

3          MR. SAVLA:  So we did hear your Honor's request.  We

4  are working on that as we speak.

5          THE COURT:  Okay.

6          MR. SAVLA:  The other thing I wanted to raise is,

7  obviously, I was showing the witness, Mr. Calamari, various

8  orders.  There is a reason for that.  You heard that in the

9  opening and heard questions about that, which is the 104

10  securities that are listed in Dr. Tang's declaration.  We are

11  of the view that they were sold pursuant to court orders.  And

12  while I understand that --

13          THE COURT:  And, therefore?  Tie it up for me.

14          MR. SAVLA:  And, therefore, it was not a question of

15  the PRES and the collateral manager deciding to exercise their

16  discretion.  Courts have held that they were required to sell

17  those securities.  And when they held onto the securities,

18  courts have held — Judge Pauley, Judge Nathan, and the Second

19  Circuit — that that was a violation of the indenture.  In our

20  submission, they cannot hold onto securities that courts have

21  said were required to be sold and then claim the increased

22  value as an incentive fee.

23          THE COURT:  Because they weren't supposed to be

24  holding onto them in the first place?

25          MR. SAVLA:  Because they weren't supposed to be

N4KKUSB2                        Jonsson - Cross

1    holding onto them in the first place.

2          THE COURT:  Okay.  That's a legal argument.  Look,

3    you're not going to have trouble persuading me.  What

4    Judge Pauley said is what Judge Pauley said and when

5    Judge Pauley said it.  I can take initial notice of that.  You

6    don't need to get it in through a witness.

7          MR. SAVLA:  I think a couple of days ago, I raised --

8    your Honor said, why don't we try getting it in via witnesses,

9    otherwise I can make a motion for judicial notice.

10         THE COURT:  Did I say that?  I'm sorry, then I led you

11   astray.

12         But seeing your trying to get it in through a witness

13   turned out not to be that helpful, I'm sorry.

14         MR. SAVLA:  Well, I can assure you, we struggled with

15   how to do that last night as well.

16         THE COURT:  I apologize for leading you astray.

17         MR. SAVLA:  So, with that in mind, for the sake of

18   good order, we do have a motion ready, and we'll put that on

19   the docket.

20         THE COURT:  I'm trying to keep this simple.  You're

21   going to submit to me posttrial submissions, right?  They're

22   going to have findings of fact and conclusions of law.  And at

23   some point, you're going to cite to the Pauley opinion, and

24   you're going to put a footnote in there that says, your Honor,

25   you can take judicial notice of this.  Do we really need to do

1    more than that?

2             Ms. Beaumont?

3             MS. BEAUMONT:  Your Honor, you'll be unsurprised to

4    hear we don't agree with --

5             THE COURT:  I'm sure you don't agree with his

6    analysis --

7             MS. BEAUMONT:  No.

8             THE COURT:  -- but just in terms of getting the

9    elements of his argument before me?

10            MS. BEAUMONT:  I think the process that the Court has

11   outlined makes sense.

12            THE COURT:  All right.  Let's keep this simple.

13            Ms. Beaumont — when you put that footnote in or that

14   citation in, or you attach the Pauley opinion or the Nathan

15   opinion to your posttrial papers — she's going to have various

16   arguments about why what you say doesn't make sense, but she's

17   not going to claim I can't read my colleague's opinions, okay?

18            MR. SAVLA:  Well, that's fine, your Honor, and that

19   certainly seems like a very practical approach.

20            I will say that reading the opinions, it is the case

21   that the opinion, in turn, refers to Mr. Pickhardt's affidavit

22   or my affidavit, and, so, in order to understand the orders,

23   it's also necessary to look at these affidavits.

24            THE COURT:  Well, they are on the publicly available

25   docket of this court.  The usual rule is I can take judicial

N4KKUSB2                          Jonsson - Cross

1    notice for the contents --

2              MR. SAVLA:  Right.

3              THE COURT:  -- not necessarily for the truth of the

4    contents --

5              MR. SAVLA:  Correct.

6              THE COURT:  -- of documents on file, to the extent

7    relevant and so forth.

8              So I think that should cover you.

9              MR. SAVLA:  Yes, I think that seems like a very

10   practical approach.

11             THE COURT:  Can we all have lunch now?

12             So we will be in recess until 1:40, 1-4-0.  Thank you,

13   all, very much.

14             (Luncheon recess)

15

16

17

18

19

20

21

22

23

24

25

AFTERNOON SESSION

1:40 p.m.

(In open court)

THE COURT:  Good afternoon.  You may be seated.  You do not need to reintroduce yourselves to me unless there has been a cast change for any of the parties since we broke for lunch.

Before we call our witness back, a scheduling matter. You requested May 25 for oral arguments.  I cannot give you May 25 for oral arguments.  May 25 is fully booked by other lawyers in other cases.  I can give you the following dates. We have looked all around May 25.

I can give you a time of your choice on Monday, May 22 or on Tuesday, May 23, I have a clear calendar on both of those days.  I might not have a clear calendar by tomorrow, but today I do.

I can give you the morning of Friday, May 26.  I warn you that's the Friday before Memorial Day.  I normally don't hear argument on Fridays, but I figure we'll all be trying to take the afternoon off anyway, so I'll make an exception if that suits you.  Monday is Memorial Day.  I can give you the afternoon of Tuesday the 30th or the afternoon of Wednesday the 31st.  My mornings are spoken for those days.

So at the next break or overnight, chat amongst yourselves and see what you agree on, and again, the small

1    print disclaimer here is that these dates are believed to be

2    reliable at the time the information is being conveyed, but may

3    not be by tomorrow.

4              Anything else before we call Mr. Jonsson back?

5              MR. LEDLEY:  Can I just inquire how much time would

6    the Court like between receiving post-trial submissions and the

7    hearing argument?

8              THE COURT:  That's a good question.  I was offered a

9    week when we spoke earlier.  That seems to me like a good

10   period of time.  I wouldn't like it to be much shorter than

11   that because I think you will want me to have read them, so you

12   have to give me time to do this.

13             And I'm still contemplating capping each party at 45

14   minutes, each party or constellation of parties at 45 minutes,

15   which is why I need sort of a half a day to allow each of you

16   to say what you want to say.

17             Anything further?

18             MS. BEAUMONT:  I am not sure if this is premature, but

19   should we talk about the page limits on the post-trial briefs?

20   Sorry to bring it up, but I figure it would come up at some

21   point anyway.

22             THE COURT:  I have been here all week, you know.  I

23   have been listening.  These are not summary judgment motions.

24   What I'm looking for is, as you know, a post-trial proposed

25   findings of fact and conclusions of law.  I should think that

N4k3usb3                          Jonsson - Cross

1   much of what will end up be being the first few pages of my

2   written opinion you can kind of skip, because that's already in

3   your stipulated facts.  I held you to -- I can't remember if I

4   held you to 25 pages or you held yourselves, except for

5   Mr. Savla who did not hold himself to 25 pages pretrial.

6            What are you thinking amongst yourselves?

7            MS. BEAUMONT:  I'm not sure we've thought it through.

8            THE COURT:  Why don't you think about that amongst

9   yourselves while you are thinking about the date range, and

10  I'll think about it some more as well.

11           I'm struggling, as always, between wanting you to keep

12  it short, because I have to stay awake while I read the entire

13  thing, and not wanting to deprive you of the opportunity to get

14  something important in.  And I'm just not sure where that

15  balance is.

16           Mr. Jonsson.  I am assuming there is more examination

17  for this witness?  And that will be you, Ms. Bui?

18           MS. BUI:  Yes, your Honor.

19           THE COURT:  You can sit down once again on the stand.

20  And I will remind you, sir, that you are still under oath.  So,

21  continued cross-examination by Ms. Bui.

22           MS. BUI:  Thank you, your Honor.

23  BY MS. BUI:

24  Q.  Mr. Jonsson, before the break, we were talking about

25  invoices.  Do you remember that?

1    A.  Yes.

2    Q.  If you could turn to tab 4 in your binder.  That's Exhibit

3    3171, and it is not yet in evidence.

4          So Mr. Jonsson, you reviewed and helped prepare this

5    invoice, correct?

6    A.  I do believe that is the case.

7    Q.  This is an example --

8          MS. BUI:  Your Honor, I would like to move Exhibit

9    3171 into evidence.

10         MR. VASSANJI:  No objection.

11         THE COURT:  3171 is admitted.

12         (Joint Exhibit 3171 received in evidence)

13   Q.  This is an example of an invoice with an incentive fee,

14   correct?

15   A.  Yes.

16   Q.  And how did you determine if PRES was entitled to an

17   incentive fee?

18   A.  It was -- so, I don't, I don't think I did the

19   determination myself.  I do remember working on the invoice,

20   but the determination was the value generation to the Triaxx

21   trusts according to the contract.

22   Q.  Do you have any knowledge regarding how the value -- or how

23   was it determined whether the recovered value to the CDOs was a

24   result of PRES' work?

25   A.  To my recollection, there was a very thorough exercise in

N4k3usb3

1    terms of CUSIPs that were sold at a lot higher prices than they

2    would have otherwise been if it wasn't for our efforts, and

3    that calculation, I think the cap was taken into account as a

4    basis for those payments.

5    Q.   Do you know who made that calculation?

6    A.   I think Mingsung did them, but I'm not sure.

7             MS. BUI:  No further questions.

8             THE COURT:  Who's next?  Mr. Savla, you have questions

9    for this witness?

10             MR. SAVLA:  No questions.

11             THE COURT:  The noteholders have no question for this

12   witness.  Issuers?

13             MR. LEDLEY:  No questions.

14             THE COURT:  Any redirect?

15             MR. VASSANJI:  No redirect.

16             THE COURT:  You are excused.

17             (Witness excused)

18             THE COURT:  Is Dr. Tang available?

19             MR. VASSANJI:  Yes.  Ms. Beaumont is grabbing him.

20             MR. SAVLA:  While we wait for the witness, I'll just

21   foreshadow that Mr. Lauriello and I are going to split the

22   questioning.

23             THE COURT:  You want two lawyers from the same firm

24   representing the same client to split the cross-examination of

25   a single witness?

N4k3usb3

1             MR. SAVLA:  On different subjects.

2             THE COURT:  Normally I would say no to that.

3             MR. SAVLA:  Your Honor, we have an exhibit with 900

4    pages with voluminous data.

5             THE COURT:  Hold on one minute.

6             Ms. Beaumont, could you and your witness just hold

7    outside for one more moment, please, thank you.

8             MS. BEAUMONT:  Absolutely.

9             MR. SAVLA:  This is my request, your Honor.

10            THE COURT:  And the justification again is what?

11            MR. SAVLA:  It is that there is some very complicated

12   data over multiple pages.  One of the exhibits is 900 pages.

13   So we've split the work and we would like to split the

14   questioning.  We don't think it will prejudice the witness.

15            THE COURT:  What's your estimation of the total

16   examination time on behalf of the noteholders?

17            MR. SAVLA:  I would estimate three hours.

18            THE COURT:  You want to split it between two lawyers?

19            MR. SAVLA:  Yes.

20            THE COURT:  What's the estimate for the trustee?

21            MS. BUCKEL:  Subject to the questioning of the

22   noteholders, I would probably have at most 45 minutes, but more

23   likely 20 to 30 minutes, your Honor.

24            THE COURT:  With one lawyer, right?

25            MS. BUCKEL:  Yes, your Honor.

N4k3usb3

1        THE COURT:  Issuer?

2        MR. LEDLEY:  We are unlikely to have any questions but

3   we reserve the right.

4        THE COURT:  Any objection to the noteholders splitting

5   the time of cross-examination between two different attorneys?

6        MR. VASSANJI:  I will note that the exhibit referenced

7   by counsel for PIMCO, it was represented to me that second tab

8   of 900 pages is actually not even going to be presented to the

9   witness.

10        THE COURT:  Is actually not?

11        MR. VASSANJI:  Not going to be presented to the

12   witness but that was if --

13        THE COURT:  Not going to be presented.  What does that

14   mean?

15        MR. VASSANJI:  Perhaps Mr. Lauriello would like to

16   clarify.

17        THE COURT:  Whether it will be presented to him on

18   cross-examination is not up to you, Mr. Vassanji.

19        MR. VASSANJI:  I'm just the messenger.

20        THE COURT:  This is a bench trial.  There is no jury

21   to be confused.  I agree the witness can probably handle it.

22   I'll allow it.

23        But in future, ladies and gentlemen, not like there is

24   a lot of future in this particular trial, just a little bit of

25   future.  Don't gang up on Ms. Beaumont that way, and in your

1  future life as lawyers, if you wish to split a witness, you

2  should bring that up a lot earlier than when the witness is

3  being called from the hallway.

4          MR. SAVLA:  Understood.  My apologies.

5          MS. BEAUMONT:  Did I miss anything?

6          THE COURT:  You missed a lot of excitement.

7          We're ready for Dr. Tang.

8          MR. VASSANJI:  The TAM parties call Dr. Mingsung Tang

9  as a witness.

10          THE COURT:  Dr. Tang, you can step right up and stop

11  before you pass Ms. Kay.  No, come a little further.

12          (Witness sworn)

13          THE COURT:  Thank you, Dr. Tang.

14          Will someone collect the binders, please.

15          MR. VASSANJI:  Permission to approach with the witness

16  declaration?

17          THE COURT:  Go ahead.

18   MINGSUNG TANG,

19       called as a witness by the Defendant,

20       having been duly sworn, testified as follows:

21  DIRECT EXAMINATION

22  BY MR. VASSANJI:

23  Q.  Dr. Tang, I've just given you a document entitled trial

24  declaration of Mingsung Tang.

25          Do you have that in front of you?

1    A.   Yes.

2    Q.   Does this document constitute your direct testimony in this

3    case?

4    A.   Yes.

5                MR. VASSANJI:   The TAM parties move to admit

6    Dr. Mingsung Tang's declaration into evidence.

7                THE COURT:   It is accepted as his direct testimony.

8    We'll look for it on the docket later today.

9                Noteholders, do you wish to cross-examine?

10               MR. SAVLA:   Yes, your Honor.   Thank you.

11   CROSS-EXAMINATION

12   BY MR. SAVLA:

13   Q.   Hello, Dr. Tang.   My name is Sandeep Savla.   I represent

14   PIMCO and I will have some questions for you.

15               In your declaration, you state from 2011 to 2018, you

16   performed work on behalf of Phoenix Real Estate Solutions,

17   correct?

18   A.   Yes.

19   Q.   In the declaration you submitted to the Court, you refer to

20   Phoenix Real Estate Solutions as PRES, right?

21   A.   Yes.

22   Q.   And you know about PRES and its engagement with the three

23   CDOs, correct?

24   A.   Yes.

25   Q.   And in your declaration, you described how PRES invoiced

1    fees for the work it did.

2    A.  Correct.

3    Q.  And you describe how it invoiced fees from 2011 to 2018,

4    correct?

5    A.  Yes.

6    Q.  And you describe the expertise of PRES, correct?

7    A.  Yes.

8    Q.  And PRES used the expertise of yourself, correct?

9    A.  Yes.

10   Q.  And your testimony today is accurate; yes?

11   A.  Yes.

12   Q.  It's thorough?

13   A.  Yes.

14   Q.  It's complete?

15   A.  Yes.

16   Q.  And you testified in a deposition in 2018 in a prior

17   action, correct?

18   A.  Yes.

19   Q.  And you were under oath in that deposition just like you

20   are here today?

21   A.  Yes.

22   Q.  And you had a chance to review the deposition transcript in

23   the 2018 action, correct?

24   A.  Yes.

25   Q.  And you even put in a correction sheet in that case,

1   correct?

2   A.  Yes.

3   Q.  Let me ask you to turn to tab 2.

4           THE COURT:  Tab 2 of what?

5           MR. LAURIELLO:  Permission to approach the witness

6   with these very large binders.

7           THE COURT:  Yes, and one for me, please.

8           MR. LAURIELLO:  Two for you, your Honor.

9           THE COURT:  One for my staff and one for myself.

10  They're both for me.

11          Where do I start, Mr. Savla, volume 1 or volume 2?

12          MR. SAVLA:  Volume 1, tab 2.

13  Q.  I'll ask you to go to tab 2, page 6, at line 5.

14          MR. VASSANJI:  Objection, your Honor.  This document

15  is not in evidence and it is not in their exhibit list either.

16          THE COURT:  I'm not sure what Mr. Savla is doing here,

17  whether he's impeaching, whether he's refreshing recollection,

18  which would be odd since the witness hasn't testified that he

19  can't recall anything.

20          What are you doing here, Mr. Savla?

21          MR. SAVLA:  I'm impeaching, your Honor.

22          THE COURT:  Let's hear it.

23  Q.  So, I am going to read to you lines 5 to 22.

24  "Q.  What's Phoenix Real Estate Solutions?

25  "A.  I don't exactly know the legal entity, either purpose or

1   who are the personnel in it.  I just heard of the name before

2   in passing without knowing the legal ramifications or

3   significance of that entity.

4   "Q.  When did you hear the name in passing?

5   "A.  That's in conversations.

6   "Q.  When did the conversation take place?

7   "A.  I don't have a clear memory.  But I certainly heard of the

8   word Phoenix Real Estate Solutions before.  I don't recall the

9   time nor the circumstances I heard it."

10              Did I read that correctly?

11              MR. VASSANJI:  Objection.  This isn't exactly

12   impeachment.  There is no contrary testimony to be impeached

13   here.

14              THE COURT:  Give me a minute.

15              I'll allow it.

16              Do you need to hear the question again, Dr. Tang?

17              THE WITNESS:  I'm reading this.

18   Q.  I read it correctly; yes?

19   A.  Yes.

20   Q.  You said this, correct?

21   A.  I did.

22   Q.  Let me read you another section of your -- let me ask you

23   first.  Your testimony today is you have an understanding of

24   what PRES does, correct?

25   A.  Yes.

N4k3usb3                         Tang - Cross

1   Q.  Let me read you another section, and this is page 68, line

2   23, to page 69 at line 7.

3   "Q.  What's your understanding of what Phoenix Real Estate

4   does?

5   "A.  I don't know.

6   "Q.  Is Phoenix Real Estate Solutions part of the 110 Capital?

7   "A.  1/0.

8   "Q.  1/0 Capital group of companies?

9   "A.  I don't know."

10           You said that, right?

11  A.  Correct.

12  Q.  Now, turning back to your testimony today.  You said that

13  Phoenix created invoices for its work, correct?

14  A.  Yes.

15  Q.  And you state in your declaration, "From 2011 to 2018, I

16  performed work on behalf of PRES."  Correct?

17  A.  Yes.

18  Q.  And you say you did that pursuant to its engagement with

19  three collateral debt obligations, and that's the three Triaxx

20  issuers, correct?

21  A.  Correct.

22  Q.  And you say that you reviewed and helped prepare invoices

23  and supporting charts, correct?

24  A.  Correct.

25  Q.  And then, you further state that Trial Exhibit 3497 are

1    examples of those invoices from September 2014, correct?

2    A.   Correct.

3    Q.   So let's turn to 3497, which is tab 3 of your binder.

4    A.   Which binder?

5           THE COURT:  My tab 3 is a meeting agenda.

6           MR. SAVLA:  I noticed that too.  So I'm just --

7           THE COURT:  Maybe tab 4?

8           MR. SAVLA:  It is tab 4, which is actually Exhibit

9    3306.

10   Q.   So, this is an example of the type of invoice you reviewed,

11   correct?

12   A.   Are you referring to 3497?

13   Q.   No, it's 3306.  If Mr. Gibson can bring that up on the

14   screen.  And it's also tab 4 of your binder.

15   A.   I'm seeing on the screen.  Thank you.

16          THE COURT:  Now we're caught up with ourselves.

17          THE WITNESS:  Yeah, I'm looking at the screen.

18   Q.   So, this is an example of the type of invoice you would

19   review at PRES, correct?

20   A.   Yes.

21   Q.   And it is the sort of invoice you would help prepare?

22   A.   Preparing invoice is very, very occasional, based on my

23   role in the group.  So, when the task of other people are too

24   busy to deal with, I may occasionally help out.  So, this is

25   not my part of the regular workflow.

1   Q.  Okay.  So let's turn to paragraph 63 of your declaration.

2   A.  Is it on the screen?

3   Q.  We can bring it up on the screen.  Paragraph 63.  And

4   before we get to that, this declaration, let me ask a question

5   before we read paragraph 63.

6        This declaration is accurate, right?

7   A.  I was referring to the preparation of figures.  I was

8   always responsible for generating any quantification and

9   numbers, so preparing what I'm -- when I say I prepared

10  invoices and supporting charts, I'm referring to that process.

11  Q.  So, I guess you presaged my question, because I was going

12  to say in the first sentence there you say "I have reviewed and

13  helped prepare these invoices," correct?

14  A.  Yes.

15  Q.  And then you say "and I helped prepare these invoices and

16  supporting charts."

17  A.  Correct.

18  Q.  And you say "that was a regular part of my role working on

19  behalf of PRES."

20  A.  Correct.  But I wasn't referring to generating the invoice

21  itself.

22  Q.  But then, the next sentence in your declaration goes on to

23  say, "These invoices and supporting charts were created at or

24  near the time of the events they record by, or from information

25  transmitted by, persons with knowledge of the information they

1    record."  Correct?

2    A.  Yes.

3    Q.  So, is it your testimony today that you did not help

4    prepare these invoices?

5    A.  So there are two different things.  One is the information

6    on the invoices, and the other is the actual process of

7    producing invoices.  Those are two different things.

8            I was referring to the quantification side, not the

9    preparation of the piece of paper that will go out to certain

10   people and get paid.  That's a separate process other people

11   were doing.

12   Q.  So reading the first sentence of paragraph 63, would you

13   agree that saying that "I have reviewed and helped prepare

14   these invoices" is inaccurate?

15   A.  From my perspective, when I'm relating those words, I have

16   a certain image in my head that may or may not be the same way

17   you're reading it.  Because I was in the trenches doing the

18   work and preparing the numbers.  But, it can be interpreted

19   different ways.

20   Q.  So it is an interpretation question, yes?

21   A.  I would agree.

22   Q.  So the sentence "I helped prepare these invoices," that's

23   open to different interpretations, correct?

24   A.  Possible.

25   Q.  So now we were looking at the invoice in tab 4 which is

1   3306.  Exhibit 3306 not yet in evidence.  And is this the type

2   of invoice you've seen before?

3   A.  I have seen it, yes.

4   Q.  So, and these are the sort of invoices that are created in

5   the regular course of PRES' business, correct?

6   A.  Yes.

7            MR. SAVLA:  Your Honor, we move to admit Exhibit 3306.

8            THE COURT:  Any objection?

9            MR. VASSANJI:  No.

10            THE COURT:  3306 is admitted.

11   Q.  So now, looking at this, it is an invoice dated

12   February 15, 2018, correct?

13   A.  Yes.

14   Q.  And the client is Triaxx 2007-1?

15   A.  Correct.

16   Q.  And if you go down to the bottom left-hand side, it says

17   due diligence fee, correct?

18   A.  Yes.

19   Q.  And it also says activist implementation fee?

20   A.  Yes.

21   Q.  And it also has a line item for incentive fee, correct?

22   A.  Yes.

23   Q.  And it is your testimony, is it not, that you understand

24   what a due diligence fee is?

25   A.  I understand the rules, but the legal definition I'm less

1    clear.

2    Q.  So you understand the rules of what a due diligence fee is,

3    but you don't understand the legal definition?

4    A.  I'm not 100 percent in the terms of what the legal

5    definition.

6    Q.  Do you understand the definition of activist implementation

7    fee?

8    A.  Yes.

9    Q.  So, you understand what an activist implementation fee is.

10   And do you have an understanding of what a due diligence fee

11   is?

12   A.  Again, it is a loosely understanding, because I learned the

13   rules from people who are operating and producing those

14   invoices, and they have read the legal agreement among the

15   different parties.

16   Q.  So, let's go back to your declaration and this is paragraph

17   58.  Let me know when you're there.  I'm going to read you a

18   section before you say anything.  The second sentence there

19   says, "According to my understanding of the Triaxx CDOs'

20   engagement of PRES," so let's pause there.

21        You have an understanding of the Triaxx CDOs'

22   engagement of PRES, correct?

23   A.  Yes.

24   Q.  You go on to say "PRES was entitled to a monthly due

25   diligence fee for each of the three CDOs."  Correct?

1  A.  Yes.

2  Q.  So, going back to that invoice, do you have an

3  understanding of what a monthly due diligence fee is?

4  A.  Again, I understand there is a due diligence fee item on

5  that invoice, and I help prepared the invoice in terms of the

6  numbers.  I'm just going by what I understood without having

7  the legal knowledge of what the actual engagement was or what

8  legal entities paying which legal entity.  That's what I'm

9  referring to.

10 Q.  So let's go back to paragraph 58.  And it is up on the

11 screen, and this is from your declaration.  It says, "PRES is

12 also entitled to an activist implementation fee for each RMBS

13 trust."  Correct?

14 A.  Yes.

15 Q.  And you have an understanding of what an activist

16 implementation fee is, correct?

17 A.  Again, it's a loose understanding.  My understanding stops

18 at being able to run calculations on a spreadsheet.

19 Q.  So, okay.  So now, I am going to ask Mr. Gibson to

20 highlight a different piece.  Now, the sentence beginning "this

21 latter fee."  And that's referring to the activist

22 implementation fee, right?

23        And you say "The latter fee was comprised of two

24 components, a monthly fee and an incentive fee."

25        So you understand that, correct?

N4k3usb3                          Tang - Cross

1    A.  Yes.

2    Q.  You understand that from PRES' engagement letter, correct?

3    A.  Yes.

4    Q.  And you have reviewed PRES' engagement letter, correct?

5    A.  Not the exact legal agreement in itself.  I got the

6    information secondhand from meetings and conversations with

7    other members of the team.

8    Q.  Okay.  So, you haven't actually reviewed the actual legal

9    document.  Is that right?

10   A.  Not at that point yet, but in the last few years, I may

11   have come across.

12   Q.  So, you may have come across the legal engagement letter,

13   correct?

14   A.  Yes.

15   Q.  But you're not sure?

16   A.  I'm not 100 percent sure.

17   Q.  But in the earlier years, you did not see the legal

18   document; is that right?

19   A.  That's correct.

20   Q.  You were reviewing and preparing invoices from 2011 to

21   2018?

22   A.  Based on my understanding from communicating to other team

23   members.

24   Q.  And is it fair to say a lot of your understanding about the

25   legal document, the engagement letter, comes from other people?

1   A.  Correct.

2   Q.  So, do you know when the engagement letter was entered

3   into?

4   A.  Can you repeat your question?

5   Q.  When was the engagement letter entered into?

6   A.  My recollection is early 2011 time period.

7   Q.  But you didn't see it until many years later, correct?

8   A.  Correct.

9   Q.  But at some stage you came to an understanding of what a

10  monthly fee and what an incentive fee are?

11  A.  I learned of those concepts from conversations with other

12  team members from many years ago, from 2011, without actually

13  seeing the legal document itself.

14  Q.  So, initially you learned from other team members, correct?

15  A.  That I trust, yes.

16  Q.  You learned from other team members that you trust.

17  A.  Correct.

18  Q.  And then later on, you came to see, you think you may have

19  come to see the engagement letters themselves?

20  A.  Yes.

21  Q.  But you are not sure?

22  A.  I'm not 100 percent sure.

23  Q.  Okay.  So, and the team members who you trust, that is

24  Mr. Calamari, correct?

25  A.  Mr. Calamari came to this project later.  The people I was

1    referring to was Vishal Garg and Ziggy Jonsson and John Moon.

2    Q.  So you came to learn of this from Mr. Garg, Ziggy Jonsson,

3    and John Moon.

4    A.  Possibly.  There may possibly be other people, but those

5    are three main source of information from my vantage point,

6    yes.

7    Q.  And you came to learn of this when you were employed at 1/0

8    Capital, correct?

9    A.  I was never employed by 1/0 Capital.  I was a partner of

10   1/0 Capital.  The engagement that I have come to learn between

11   PRES and Triaxx, that was entered into 2011, at that time, I

12   was a part of ARAM Global.  That's a small consulting company.

13   Q.  So you came to learn of the engagement letter when you were

14   at ARAM Global?

15   A.  Correct.

16   Q.  And at the same time, you were a partner at 1/0 Capital?

17   A.  1/0 Capital didn't happen to me until 2013.

18   Q.  So you became a partner at 1/0 Capital in 2013?

19   A.  Correct.

20   Q.  So you learned from others about the contents of the

21   engagement letter while you were at ARAM Global?

22   A.  Correct.

23   Q.  But now at least as of the date of your -- at least as of

24   2018, because the time period for your invoices is 2011 to

25   2018, right?

1    A.  Correct.

2    Q.  So, at least as of 2018, is it fair to say you have an

3    understanding of what an activist implementation fee is?

4    A.  Yes.

5    Q.  You have an understanding of what an incentive fee is?

6    A.  Yes.

7    Q.  And you have an understanding of what a monthly diligence

8    fee is?

9    A.  Yes.

10   Q.  You may not know the legal definition, but you have an

11   understanding of it?

12   A.  Correct.

13   Q.  And that understanding is gained either from other people,

14   correct?

15   A.  Yes.

16   Q.  Or from working at PRES?

17   A.  Yes.

18   Q.  So now, let's turn to your deposition and before we do,

19   let's just -- let's turn to your deposition then.

20            MS. BEAUMONT:  Is this in this case or in another

21   case?

22            THE COURT:  That's a fair question.  Which deposition?

23            MS. BEAUMONT:  Never mind.  I got confused.  He wasn't

24   deposed in this case.

25            THE COURT:  So when you say the deposition, you mean

1    the deposition in the 2018 case.

2                   MR. SAVLA:  Correct.

3                   THE COURT:  Thank you.

4    Q.  So let's turn to your deposition at page 113.  And before I

5    read you the section.  That deposition took place in 2018,

6    correct?

7    A.  Yes.

8    Q.  So I am going to read you page 113, line 14, to 114 at line

9    25.

10   "Q.  You see that Phoenix Real Estate Solutions is in February

11   issuing an invoice for due diligence and activist strategy.  Do

12   you know what work this invoice related to?

13   "A.  I don't know.

14   "Q.  What work did Phoenix do for Triaxx 2007-1 in February of

15   2018?

16   "A.  Again, my knowledge on this is purely by reading it now.

17   On surface, I understand what the English words mean from work

18   that I do related to Triaxx.  From the perspective Phoenix

19   delivering certain services is we do periodic monitoring and

20   on-demand analysis, whatever the project might entail.

21   "Q.  Do you do work at Phoenix connected to cases where Triaxx

22   Asset Management is a plaintiff?

23   "A.  I don't know.

24   "Q.  What's your guess as to what due diligence and activist

25   strategy means?"

1              And Mr. Whitney interposes an objection.  And you ask

2    I can answer, and Mr. Whitney says, well, I'd prefer you not

3    guess, but if you have actual knowledge.  And you say:

4    "A.   I don't have actual knowledge, so I don't know the

5    relevance of my guess.  Purely looking at English language, not

6    from a legal perspective, due diligence means you are looking

7    at data and arrive at certain conclusions regarding all sorts

8    of matters related to Triaxx CDO."

9              You said that, right?

10   A.   I did.

11             THE COURT:  Do you have an objection?  And the nature

12   of the objection is?

13             MR. VASSANJI:  The last two sentences of Dr. Tang's

14   answer were not read into the record.

15             THE COURT:  You want to hear the complete answer?

16             MR. VASSANJI:  Yes.

17             THE COURT:  Let's hear the complete answer.

18             MR. SAVLA:  Counsel, would you tell me which lines you

19   want me to read?

20             MR. VASSANJI:  I believe you finished reading at the

21   Triaxx CDO.  And then there is an additional sentence beginning

22   "and communicate that" which you did nod read.

23   Q.   "And communicate that and potentially leading to decisions

24   someone may be using the information for."

25             Did I read that correctly?

1    A.   Yes.

2    Q.   You said those sentences, right?  Those answers?

3    A.   Yes.

4    Q.   So now let me read you some more from your deposition.

5    Turn to page 129, at lines 14 through 16.

6              THE COURT:  Are you still impeaching with respect to

7    the testimony we just heard?

8              MR. SAVLA:  I am, yes.  Actually, let's turn to pages

9    132, 5 to 19.

10   "Q.   Do you know how much Phoenix is to be paid under the

11   contractual agreement?

12   "A.   I don't know the details.

13   "Q.   Do you have an understanding of what the contract states?

14   "A.   I don't know.

15   "Q.   Do you know whether Phoenix invoices Triaxx, the asset

16   manager, the collateral manager, on a monthly basis?

17   "A.   I'm seeing this piece of paper has certain numbers on it,

18   but this is not part of my responsibility.  And I don't deal

19   with this.  I never have.  I don't anticipate I will in the

20   future."

21              And you said those responses as well, correct?

22   A.   Correct.

23   Q.   So now I want to ask you about some of the different

24   entities that you've worked for, and I think you said you

25   became a partner at 1/0 Capital.  You had worked at ARAM

 1   Global, correct?

 2   A.  Yes.

 3   Q.  And you've also worked at Phoenix Advisors & Managers,

 4   correct?

 5   A.  Not directly.

 6   Q.  So, what do you mean by that, not directly?

 7   A.  I believe Phoenix Advisors were paying for my salary

 8   through a third-party payroll provider.  But I don't believe I

 9   have an employment engagement with Phoenix.

10   Q.  So, you were being paid by Phoenix Advisors & Managers, but

11   you were a partner at 1/0 Capital.  Have I stated that

12   correctly?

13   A.  Yes.

14   Q.  And when you were a partner at 1/0 Capital, until 2018,

15   your offices were at 459 Broadway, correct?

16   A.  They had changed over time.

17   Q.  But was there a point in time when you were at 459

18   Broadway?

19   A.  Yes.

20   Q.  What period of time was that?

21   A.  I have to go back and check my records.  I don't have a --

22   because the office has changed so many times.  They started

23   with somewhere at Union Square, and they moved down to -- even

24   before Union Square we were in Stamford, Connecticut.  Union

25   Square and then 1700 Broadway, then 450 Park Avenue, then 459

1   Broadway, then 3 WTC.

2              There are so many offices, I have to go back and check

3   before I can give you a precise answer.

4   Q.  But you worked in the same office as Mr. Calamari, correct?

5   A.  Not always.

6   Q.  Not always.  Okay.  In 2018, were you at 459 Broadway?

7   A.  I could.  Again, I can't confirm until I see all my

8   records.

9   Q.  So, let me see if I can refresh your recollection.  If you

10  turn to your deposition transcript, and that's at tab 2, I am

11  going to read you some lines to see if I can refresh your

12  recollection.  And page 18, line 12.

13  "You mentioned that your offices are at 415 Broadway.  Is that

14  right?"  And you correct me and say 459 Broadway.

15  "Q.  459 Broadway.  Is Mr. Calamari in the same office?

16  "A.  Yes."

17  Q.  Does that refresh your recollection?

18  A.  Yes.  I'm seeing that I said that.  So it must be true

19  then, 459 Broadway.

20  Q.  Then it's correct that when you were at 459 Broadway, you

21  are in the same office space as Mr. Calamari, correct?

22  A.  Yes.

23  Q.  And you sat very close to him.

24  A.  That I don't have a clear memory.

25  Q.  And then Mr. Garg was in the same office at 459 Broadway,

1  correct?

2  A.  I believe so.

3  Q.  Is it fair to say in your day-to-day work, you don't draw a

4  distinction between 1/0 Capital and the work you do for Phoenix

5  Advisors?

6  A.  That's correct.

7  Q.  And in your day-to-day work, you in fact do not consider

8  whether you are working for 1/0 Capital or Phoenix Advisors &

9  Managers?

10  A.  Correct.

11  Q.  And I think you mentioned that at Phoenix Advisors &

12  Managers, you get a salary; is that correct?  You get paid by

13  them?

14  A.  I get paid by a third-party payroll provider, and they were

15  paying my salary on behalf of Phoenix.

16  Q.  And this payroll provider pays you for work that you do at

17  Phoenix Advisors & Managers, correct?

18  A.  I believe so.

19  Q.  And that's a salary of some type, correct?

20  A.  Yes.

21  Q.  And you also get ownership distributions from 1/0 Capital,

22  correct?

23  A.  Yes.

24  Q.  There was a settlement with Countrywide in 2014, correct?

25  A.  Yes.

1   Q.  And right after, you received a bonus of 250,000, correct?

2   A.  Correct.

3   Q.  So now, in your declaration, you say that -- and let's turn

4   to it at paragraph 56.  You say: "The documents and analyses

5   reflecting PRES' specific work for each of these litigations

6   were prepared at the direction of counsel in connection with

7   those litigations.  Exhibit A is a true and correct copy of the

8   privilege log which I understand was prepared by counsel for

9   PRES and TAM in this case."

10          And then in the next paragraph, paragraph 57, you say:

11  "Categories 1-3, 5-9, 11-12, 14-15 and 17-18, and appendix A,

12  reflect work that PRES, including myself, performed on behalf

13  of the Triaxx CDOs at the request of the Triaxx CDOs' counsel

14  in the listed litigations."

15          Correct?

16  A.  Correct.

17  Q.  So, these categories that you reference at the beginning of

18  paragraph 57, what are they?

19  A.  Those were just listings of different tasks.

20  Q.  Do you have this front of you?

21  A.  Yeah, I have it in front of me.

22          MR. SAVLA:  I am going to ask Mr. Gibson to please put

23  it up on the screen if you can.  It's Mr. Dr. Tang's

24  declaration, Exhibit A.  Joint Trial Exhibit 71.  And then if

25  we go to appendix A, and if we go to the various categories

N4k3usb3                         Tang - Cross

1    that we -- can you keep scrolling down, I think we'll find the

2    categories.

3              So, we'll come back to that once we locate the

4    documents.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Are we done with Joint Exhibit 71?

2          MR. SAVLA:  We are because I can't locate the document

3    myself.

4          I'll come back to it.

5    BY MR. SAVLA:

6    Q.  Now, let me switch to another topic.  We can come back to

7    that document after a break.

8          The three Triaxx CDOs have expense caps, correct?

9    A.  Can you repeat the question?

10   Q.  The three Triaxx CDOs, they have expense caps, correct?

11   A.  I don't understand your question.  They have what?

12   Q.  Expense caps.

13   A.  Expense caps?

14   Q.  Do you know what I'm talking about?

15   A.  Yeah.  It's a maximum amount of expense they can pay out.

16   Q.  Exactly.

17         And so for the Triaxx 2006-1 CDO, the expense cap is

18   175,000, correct?

19   A.  I believe so, yes.

20   Q.  And for Triaxx 2006-2, it is 200,000, correct?

21   A.  Yes.

22   Q.  And for Triaxx 2007-1, it is 200,000 as well, correct?

23   A.  Yeah.

24   Q.  Now, in your declaration, you reference a monthly due

25   diligence fee, and we've discussed that, correct?

N4KKUSB4                          Tang - Cross

1    A.  Yes.

2           MR. SAVLA:  Let's see if we can bring up the

3    engagement letter, which, if memory serves, is Exhibit 12.  I

4    don't have it in my binder, but I'll ask for it to be brought

5    up on the screen.

6           Actually, let's look at Exhibit 11, instead.

7    Q.  So, this is the 2006-2 engagement letter, correct?

8    A.  That's what it says, yes.

9    Q.  Then if we go to page 16 of Exhibit 11 — the page before —

10   these are the monthly diligence fees, correct?

11   A.  Yes.

12   Q.  And you see for the first two years, it's 50,000, correct?

13   A.  Yes.

14   Q.  And then, after that, it goes down, but for the first

15   two years, it's 50,000, correct?

16   A.  Yes.

17   Q.  Now let's turn to Exhibit 185, which is already in

18   evidence.  And that's tab 9, so that's in the second binder.

19           If we turn to page 8, with the Bates stamp 6809.

20           This is a note valuation report, right?

21   A.  Yes.

22   Q.  So, if we look at the administrative expense detail, this

23   page shows the various administrative expenses, correct?

24   A.  Yes.

25   Q.  Do you understand that administrative expenses means that

1   they are paid under the priority of payments scheme under the

2   CDO waterfall?

3   A.  Can you repeat your question?

4   Q.  So, when it refers to administrative expenses, that's paid,

5   what's in the parlance known as, within the waterfall.

6           Do you understand that?

7   A.  Yes.

8   Q.  So these are all invoices that are being submitted to the

9   CDO, correct?

10  A.  Yes.

11  Q.  And so do you see there that it has administrative expenses

12  of 85 and 60 thousand for ARAM Phoenix?

13  A.  Yes.

14  Q.  And that comes out to 145,000, correct?

15  A.  Yes.

16  Q.  Let's go back to the exhibit we were looking at before,

17  Exhibit 11.  If we go back to the prior page, which was

18  page 16, these are diligence fees that are paid every month,

19  correct?

20  A.  Yes.

21  Q.  So if 50,000 is charged in monthly diligence fees, only

22  150,000 is available for other fees in the waterfall, correct?

23  A.  Yes.

24  Q.  For the monthly -- for the activist fee, that was charged

25  per CUSIP, correct?

1   A.  Yes.

2   Q.  And so that meant that only -- you would only be able to

3   charge the CDO per security?

4   A.  Yes.

5   Q.  At Phoenix, was there a system in place for tracking which

6   CUSIPs PRES worked on?

7   A.  There was a tracking sheet, yes.

8   Q.  And, in fact, you were the person responsible for that

9   tracking sheet, correct?

10  A.  It's a shared responsibility, but I was involved.

11  Q.  You were one of the people who dealt with the tracking

12  sheet?

13  A.  Yes.

14  Q.  So now let's go to Exhibit 2045.

15          MS. BEAUMONT:  Is there a tab?

16          MR. SAVLA:  It's tab 10.

17  Q.  Let's read from the bottom.

18          Here we have Ms. Downey writing to Mr. Garg, "Hi

19  Vishal.  Would you be able to look at the bill of query and

20  advise?"

21  A.  Where are you reading?

22  Q.  At the very bottom of the email, of Exhibit 2045.

23          Actually, I'm, sorry, it's the bottom of page 3.  So

24  it's actually, "Hi Barbara-Ann.  I hope all is well.  Please

25  find the attached invoices for this month."

1          Do you see that?

2   A.  Yes.

3   Q.  And then up the chain, it says, "Edel," and this is an

4   email from Tom Priore to Edel Downey, "Edel, prior to

5   submission, can you please confirm with" -- that should be

6   Mingsung -- "and Vishal both the present due diligence fee rate

7   under the contract and the bonds that remain in the two-year

8   diligence period."

9          Do you see that?

10  A.  Yes.

11  Q.  And the due diligence fee -- it goes on to say, "The due

12  diligence fee for each security has a cap that is reached in

13  approximately two years, and we need to confirm which have

14  reached that cap."

15         Do you see that?

16  A.  Yes.

17  Q.  And then the email goes on:  Hi Vishal.  Would you be able

18  to look at the below query and advise."

19         And then you're on the bit further up the chain.  You

20  write, "Vishal, do you have an electronic copy of the monthly

21  invoices going back?  17 of the 30 currently" -- "17 of the 30

22  currently active positions have an 'approval date' prior to

23  June 2011.  There are 9 RAST positions that we can rotate to,

24  and I need to identify 8 new positions.  In addition, seven of

25  the 30 current positions have an approval date of August 2011.

N4KKUSB4                          Tang - Cross

1   We will need to find a replacement for them as well as for next

2   month's invoice."

3            Do you see that?

4   A.  Yes.

5   Q.  And so where the email says "There are 9 RAST positions

6   that we can rotate to," that's a reference to finding new RAST

7   shelves; is that correct?

8   A.  Correct.

9   Q.  And that's because PRES wanted to analyze new securities,

10  correct?

11  A.  Correct.

12  Q.  The reference to rotating to securities means you're

13  rotating to analyzing new securities, correct?

14  A.  Yes.

15  Q.  So let's go up the chain.

16           Here you write, "Vishal:  Here is the new list with

17  the following changes:  17 expired positions removed, 10

18  suspended positions added back, and 7 RAST positions added."

19           MS. BEAUMONT:  What's on the screen is what you're

20  reading.

21  Q.  Now, the expired positions, that means that the securities

22  are no longer subject to the monthly activist fee, correct?

23  A.  Yes.

24  Q.  The reason that there are — let's see here, 17 plus 7 — 24

25  securities at issue is because the CDO waterfall has an expense

1    cap, correct?

2    A.  Yes.

3    Q.  And so it doesn't make sense to review a lot of securities

4    because of the CDOs' expense cap, correct?

5    A.  This part is confusing to me because, as I expressed

6    earlier, I never seen the legal document itself for many years.

7    I may have seen it more recent years.  So, I was just

8    discussing all this arrangements with team members, and, in my

9    mind, the work has always been ongoing, has been done, and this

10   is really just part of how to realign the work that's being

11   done and how the payment is going to come through.  That's all

12   there's to it.

13          So, I don't exactly know what question coming out of

14   this you want to ask me.

15   Q.  Let me ask my question again.

16          We saw before, when I asked you about the expense caps

17   for the CDO -- do you remember that?

18   A.  Yes.

19   Q.  -- that there's a 200,000 cap for the 2007-1 CDO, for

20   example, correct?

21   A.  Yes.

22   Q.  And then for the due diligence fee, that's a monthly fee,

23   correct?

24   A.  Yes.

25   Q.  And the activist, the monthly activist fee, that also has a

1    monthly component, correct?

2    A.  Yes.

3    Q.  That's per CUSIP?

4    A.  Yes.

5    Q.  So if you analyze too many CUSIPs, you will hit the cap,

6    wouldn't you?

7    A.  I assume, yes.

8    Q.  So, again, the reason you were rotating the securities is

9    so that PRES would not hit the cap, correct?

10   A.  That's what it appears, look like.

11   Q.  Now let's go to paragraph 68 of your declaration.

12           You say, "In March 2011, some of Triaxx CDOs' senior

13   noteholders, including PIMCO, demanded the collateral manager

14   sell some of the RMBS in the Triaxx CDOs' portfolios," correct?

15   A.  Yes.

16   Q.  What did PIMCO say to the collateral manager in March 2011?

17   A.  This is from conversations we had at the time, that PIMCO,

18   as a senior holder of the CDOs, recommended that Triaxx sell

19   positions that are in default, as defined by the CDO documents.

20   Q.  Okay.  So this is based on your understanding from

21   others --

22   A.  Yes.

23   Q.  -- that PIMCO asked for a sale at that time?

24   A.  Yes.

25   Q.  And it asked for a sale because securities making up the

1    collateral pool of the CDOs were in default?

2    A.  According to the document of the CDO trust.

3    Q.  According to the document of the CDO trust.

4           And then, according to the document of the CDO trust,

5    after three years, the collateral manager was required to sell

6    those securities, correct?

7    A.  I think the language was not crystal clear.  I was

8    reviewing the language.  I couldn't determine whether it's

9    100 percent required or not.

10   Q.  So you reviewed the CDO indenture language?

11   A.  Yes.

12   Q.  And it wasn't a hundred percent clear whether the

13   collateral manager had to sell the three-year -- can we call

14   them three-year defaulted securities?

15   A.  Yes.  I think, if I recall correctly, there was mentioning

16   of maximizing the benefit of the trust.  So, although there's

17   language in the deal document that says, if a position has been

18   labeled as in default for more than three years, the collateral

19   manager should consider selling them, but I don't remember the

20   exact language.

21   Q.  Okay.  But you looked at that language?

22   A.  I did.

23   Q.  And you determined that it would be in the interests of all

24   noteholders to retain the securities?

25   A.  Correct.

1   Q.   And not to sell them?

2   A.   Correct.

3   Q.   Because you thought that the securities would go up in

4   value?

5   A.   The going up in value is really not the initial idea.   The

6   idea was to be an active investor and pursuing active

7   strategies that will change the outcome of the collateral

8   portfolio so that the trust will benefit from the efforts.

9   Q.   So the idea was, you retained the securities, pursue

10  activist litigation, right, and then the activist litigation

11  would improve the trusts?

12  A.   Correct.

13  Q.   And so you write, "At the time such sales would have

14  benefited only or primarily the senior noteholders," correct?

15  A.   Yes.

16  Q.   "Which would have received the bulk of the proceeds, while

17  locking in the then-current losses in the value of the

18  collateral, to the detriment of more junior noteholders,"

19  correct?

20  A.   Correct.

21  Q.   So the determination of whether to sell, that was the

22  collateral manager's, correct?

23  A.   I believe so.

24  Q.   And you were -- in March 2011, you were at ARAM Global,

25  correct?

1    A.  Yes.

2    Q.  So is it at ARAM Global that you decided that it would not

3    be in the interests of all the noteholders to sell?

4    A.  There was an engagement between Triaxx Asset Management and

5    Phoenix.  Although I wasn't clear about all this legal entities

6    at the time, but my understanding at the time was, although I

7    was someone at ARAM Global, but I was involved in helping the

8    situation and trying to make the best of the circumstances.  I

9    wasn't acting as a collateral manager then, not now, not ever.

10   We were just trying to help.

11   Q.  Is it your understanding that Phoenix is doing work that

12   was previously done at Triaxx, the collateral manager?

13   A.  I don't know what Triaxx Asset Managers were doing prior to

14   that.  I'm just guessing.

15   Q.  But is Phoenix doing work that previously would have been

16   done at Triaxx, the asset manager?

17   A.  I don't think so.

18   Q.  Now let's look at your deposition testimony.  We'll look at

19   page 131, line 3, and we'll go into page 132 at line 4.

20   "Q.  Is it your understanding that Phoenix is doing work that

21   was previously done by personnel at Triaxx?

22   "A.  I don't know for sure.

23   "Q.  Is that your understanding?

24   "A.  It is my understanding.

25   "Q.  And by Triaxx, I'm referring to Triaxx, the collateral

N4KKUSB4                          Tang - Cross

1    manager.

2              Do you understand that?

3    "A.  Yes.  I was aware that Triaxx, at the peak --

4              MS. BEAUMONT:  I'm not sure.

5              MR. VASSANJI:  Page 132 on the screen.  I think you

6    cited --

7              THE COURT:  The page is out of sync.

8              MR. SAVLA:  It is page 131, yes.

9    BY MR. SAVLA:

10   Q.  I think I was up to line 12.

11   "A.  Yes.  I was aware that Triaxx, at the peak, has many, many

12   employees, is an asset manager specializing in RMBS CDOs.  That

13   was the knowledge I had at the time.  Other than that, I don't

14   know anything else with respect to who are the key personnel

15   within the firm, at what stage they were in.  I knew that they

16   needed help from ARAM Global, and I was happy to provide it.

17   "Q.  So just for the clarity of the record, is it fair to say

18   that it's your understanding that Phoenix is doing the work

19   that previously was done by personnel at Triaxx, the asset

20   manager?

21   "A.  I believe that's a safe assumption."

22   Q.  So those were your responses, correct?

23   A.  Correct.

24   Q.  So now I'll ask my question again:  Is it fair to say that

25   Phoenix is doing work that was previously done by Triaxx Asset

1    Management?

2    A.   The understanding has evolved.  When I made a statement

3    back then, I was thinking out loud in terms of Triaxx Asset

4    Management used a lot employees, and they're no longer there,

5    so Phoenix was naturally stepping in the shoes of managing the

6    collateral.  But upon hearing your question today, whether

7    Phoenix would be doing the same kind of work as Triaxx, after

8    learning all the stuff over the years, the answer is different.

9    Although it can be consistent with the statement here in the

10   deposition in the sense that Phoenix was doing all the work on

11   behalf of Triaxx Asset Management, where most of the employees

12   has left; however, the nature of the work would have been

13   180 degrees different because Phoenix was doing activist work

14   and was never carried out by any CDO managers, including Triaxx

15   CDOs.  That's what I meant.

16   Q.   So Phoenix is acting -- is managing the collateral,

17   correct?

18   A.   Helping to manage the collateral.

19   Q.   Helping to manage the collateral?

20   A.   And paid for it.

21   Q.   And paid for it.

22   A.   Yeah, paid for it from Triaxx, yes.

23   Q.   And paid for it by Triaxx Asset Management?

24   A.   I don't know where the engagement was.  I was only aware

25   that Phoenix was doing work and getting paid because of this

1   engagement.

2   Q.  And Phoenix, I think you used the word, is stepping into

3   the shoes of the collateral manager; is that correct?

4   A.  Back in the day, that's what my understanding was, but not

5   my understanding today, because looking back, the type of work

6   carried out by a generic CDO manager and Phoenix was totally

7   different.

8   Q.  So by virtue of Phoenix's help, the collateral manager has

9   changed into a different collateral manager; is that correct?

10  A.  I'm the wrong person to ask about collateral manager

11  because I don't live in that world.  I live in my trenches

12  doing analysis, looking at numbers.

13  Q.  I thought I heard you said the nature of the collateral

14  managers changed; is that correct?

15  A.  Only as far as speaking from a nonlegal perspective.

16  Q.  So from a nonlegal perspective, the nature of the

17  collateral managers changed?

18  A.  What I said was the generic CDO collateral manager's job

19  perhaps never changed, but with the knowledge that I have

20  accumulated over many years, is that today, looking back, I

21  realize that Phoenix was doing active work that's totally

22  unheard of in the CDO collateral managers world.

23  Q.  And because of that, that the nature of the collateral

24  managers changed, correct?

25  A.  I don't understand your statement.

1    Q.   It's because of Phoenix's work that Triaxx is acting in a

2    different way?

3    A.   The entity, Triaxx Asset Management, doesn't register in my

4    mind.  I don't understand the context you are asking me the

5    questions against.

6    Q.   The entity, Triaxx Asset Management, doesn't exist in your

7    head because, for you, it's the work at Phoenix that's

8    important, correct?

9    A.   Phoenix is where I do most of my work related to Triaxx

10   CDOs, yes.

11   Q.   For you, it doesn't matter whether it's Triaxx, the CDO

12   issuer, or Triaxx, the asset manager, it's just the Phoenix

13   work that's important?

14   A.   To me, Phoenix is doing work trying to make matters better

15   for the Triaxx CDOs.

16   Q.   I think we were at paragraph 68 of your declaration.

17              THE COURT:  Mr. Savla, we've been going about an hour

18   and a half.  If you find a good stopping place in the next

19   ten minutes, you'll let us know.

20              MR. SAVLA:  This would actually be a fine time.

21              THE COURT:  All right, then.

22              Let us take our afternoon break.  Let's be back at

23   approximately 3:20.

24              Dr. Tang, you will remain under oath --

25              THE WITNESS:  Yes.

N44KUSB4

1      THE COURT:  -- when you get back, and during the

2  break, you are not to discuss your testimony or the facts

3  underlying your testimony with counsel or others.

4      We'll be in recess.

5      (Recess)

6      THE COURT:  You may be seated.  I see that Dr. Tang is

7  back with us.

8      Mr. Savla, you may continue.

9  BY MR. SAVLA:

10  Q.  Now, we were looking at, or I was attempting to find

11  before, the privilege log, and I believe Mr. Gibson -- it was

12  taken out of my binder, but Mr. Gibson has found it.

13      These are the categories that you were relying on to

14  show PRES's work, correct?

15  A.  Yes.

16  Q.  Now let's go to a different --

17      THE COURT:  We're looking at Joint Exhibit 71,

18  correct?

19      MR. SAVLA:  We are looking at Joint Exhibit 71.

20      THE COURT:  The privilege log?

21      MR. SAVLA:  The privilege log.

22      THE COURT:  Okay.

23      MS. BEAUMONT:  I'm not sure this is in evidence.

24      MR. SAVLA:  I will move this Joint Exhibit 71 into

25  evidence.

1              THE COURT:  Any objection?

2              MS. BEAUMONT:  No objection.

3              THE COURT:  71 is admitted.

4              (Joint Exhibit 71 received in evidence)

5    BY MR. SAVLA:

6    Q.  Just to be clear, it's Exhibit 71 that you're relying on to

7    show the work that PRES did, correct?

8    A.  Yes.

9    Q.  So now let's go to Exhibit 3137, which is a multipage,

10   hundred-page, paper document, but we're bringing it up on the

11   screen.

12             MR. VASSANJI:  Sorry, your Honor.  We took the liberty

13   of making a larger printout because we know your Honor is a fan

14   of paper, so I'm not sure that the version in the binders is

15   particularly legible.  We're happy to distribute these --

16             THE COURT:  Hold off.  Let's let Mr. Savla tell us

17   what this is, because, obviously, a native format Excel

18   spreadsheet is not in native format on paper in my binder, and

19   then we'll figure out whether we want big copies.

20   BY MR. SAVLA:

21   Q.  So this is a screen representation of, I believe, what's

22   been produced in paperwork --

23             MR. SAVLA:  Am I right, Mr. Vassanji?

24             MR. VASSANJI:  Well, this has been produced.  It's

25   been attached to Dr. Tang's declaration in paperwork, yes.

N44KUSB4

1              MR. SAVLA:  Okay.

2              THE COURT:  Okay.

3         So this is what exhibit to Dr. Tang's declaration?

4              MR. SAVLA:  It is Exhibit 3137.

5              MR. VASSANJI:  Exhibit B, your Honor, to the Tang

6    declaration.

7              THE COURT:  Exhibit B to the Tang declaration, which

8    is also Trial Exhibit what?

9              MR. SAVLA:  3137.

10             THE COURT:  3137.

11        And it's in the binder in paper form, it's on the

12   screen in Excel form, and Mr. Vassanji is offering it to us on

13   paper that we can actually read.  I'm going to accept that

14   offer.

15        And is 3137 in evidence other than through the

16   witness' direct testimony?

17             MR. SAVLA:  My understanding is that it is in

18   evidence.

19             MR. VASSANJI:  I don't think it's in evidence, your

20   Honor.

21             MR. LAURIELLO:  Your Honor, permission to approach the

22   bench?

23             THE COURT:  Please.

24        So is this an exemplar page so we can all read what's

25   in the column?

1          MR. LAURIELLO:  This is the first page of the

2     document, and then the rest of the document, I think it's fair

3     to say, are supporting pages.

4          MR. VASSANJI:  Yes, this is the second tab.

5          THE COURT:  All right.  I have been handed a blown-up

6     copy, in color, of what I am told is the first two pages of

7     Exhibit 3137.

8          And Dr. Tang has been given the same thing.

9          MR. SAVLA:  And I understand it is not in evidence, in

10    fact.  So, with the consent of the parties, I move it into

11    evidence, your Honor.

12         MR. VASSANJI:  No objection.

13         THE COURT:  3137 is in evidence.

14         (Trial Exhibit 3137 received in evidence)

15    BY MR. SAVLA:

16    Q.  So, now, Dr. Tang, this is an incentive fee calculation,

17    correct?

18    A.  Correct.

19    Q.  And you made this calculation in 2018?

20    A.  Maybe 2017 -- '18, yes.

21    Q.  Okay.  So, looking at the column, the first column, it

22    lists out the CDO, correct?

23    A.  Column C is the listing of the name of the CDO, yes.

24    Q.  And then column D is the individualized CUSIP?

25    A.  Correct.

N44KUSB4

1   Q.   Then we have the trust and the class, correct?

2   A.   Correct.

3   Q.   And then it has a column "Default Date," correct?

4   A.   Correct.

5   Q.   And def date means default date, correct?

6   A.   Correct.

7   Q.   And so that's the date that each of these CUSIPs first

8   became designated as defaulted, correct?

9   A.   Yes.

10   Q.   And they were designated as defaulted by rating agencies?

11   A.   Yes.

12   Q.   And a designation of defaulted by rating agencies meant

13   that they would never pay off their principal, according to the

14   rating agencies, correct?

15   A.   Incorrect.

16   Q.   The definition of defaulted, as you understand it, what

17   does it mean?

18   A.   In the three Triaxx CDOs, the definition of being in

19   default means the rating agencies have lowered the rating from

20   its original rating to below triple C.

21   Q.   Below triple C?

22   A.   Yes.

23   Q.   And the reason they lowered it to below triple C is it has

24   lower credit quality, correct?

25   A.   Triple C would have lower quality than triple B, than

N44KUSB4

1   triple A, yes.

2   Q.  And that's lower credit quality, correct?

3   A.  Correct.

4   Q.  And lower credit quality means it's less likely to pay off

5   its principal, correct, in their estimation?

6   A.  In their estimation, it's a relative label to when it is

7   started as an instrument, meaning in 2006/2007, when the CUSIP

8   was constructed, it could have been triple A or double A, but

9   over time, the rating agencies keep monitoring the instrument,

10  and they will update the rating as time go on.

11          THE COURT:  Dr. Tang, I'm going to suggest that you

12  move your microphone a little further away from your mouth, and

13  I think we'll get better sound quality that way.  Point it at

14  you, but not that close.

15          Thank you.

16          THE WITNESS:  Got it.

17  BY MR. SAVLA:

18  Q.  So, as of 2018, this is showing the date the various CUSIPs

19  first became defaulted, correct?

20  A.  Yes.

21  Q.  And, according to the rating agencies, they remained

22  defaulted as of the date you created this document, correct?

23  A.  Yes.

24  Q.  And you created this document in approximately 2018?

25  A.  Yes.

N44KUSB4

1   Q.  If we go along, there's a column that says "Actual

2   Liquidation Date," correct?

3   A.  Column X.

4   Q.  Column X is "Actual Liquidation Date," correct?

5   A.  Yes.

6   Q.  And that's the date that these securities were sold,

7   correct?

8   A.  Yes.

9   Q.  And so we see in CUSIPs 1 through 49, they were all sold on

10   the same date, correct?

11   A.  Yes.

12   Q.  And they were sold on the date of September 8, 2016,

13   correct?

14          THE COURT:  Only through 35.

15          THE WITNESS:  Yes.

16          MR. SAVLA:  Oh, only through 35, thank you.

17          MR. LAURIELLO:  Your Honor, if I may, the second page

18   continues the list of CUSIPs to 104.

19          THE COURT:  Okay.

20   BY MR. SAVLA:

21   Q.  So, through 35, they were sold on 9/8/16, correct?

22   A.  Yes.

23   Q.  And then a number of others --

24          MR. VASSANJI:  Sorry, I think, actually, the date is

25   9/14/16 beginning on --

1          THE COURT:  No, I think we're ahead of you,

2     Mr. Vassanji.

3          MR. VASSANJI:  Thank you.

4     BY MR. SAVLA:

5     Q.  So at a certain point, it becomes 9/14/16, correct?

6     A.  Yes.

7     Q.  Then we have -- then it looks like that stops approximately

8     at line 58?

9     A.  Yes.

10    Q.  And those sales were pursuant to a court order, correct?

11    A.  Yes.

12    Q.  And that was the court order from Judge Pauley, correct?

13    A.  Yes.

14    Q.  Then we look at page 47 -- I'm sorry, excuse me, we look at

15    another range of CUSIPs, and we see sales taking place in

16    August of 2017, correct?

17    A.  Yes.

18    Q.  And they go from approximately, it looks like, line 62, and

19    it goes through to line 104.

20          Do you see that?

21    A.  Yes.

22    Q.  And there are various dates in August, correct?

23    A.  Yes.

24    Q.  And those securities were also sold pursuant to a court

25    order, correct?

N44KUSB4

1    A.   Yes.

2    Q.   And that court order was from Judge Nathan, correct?

3    A.   Yes.

4    Q.   So, all these securities we've discussed, on these various

5    lines, they were sold pursuant to a court order, correct?

6    A.   Yes.

7    Q.   And they were sold because the court determined that the

8    securities had been defaulted for more than three years,

9    correct?

10    A.   Yes.

11    Q.   And the court determined that, in that situation, the legal

12    documents required the collateral manager to sell?

13    A.   Yes.

14    Q.   Now, this is an incentive fee calculation, correct?

15    A.   Yes.

16    Q.   And you did that incentive fee calculation in 2018?

17    A.   Approximately.

18    Q.   And so in 2018, you knew what an incentive fee was,

19    correct?

20    A.   Yes.

21    Q.   So now let's go to your deposition, and let's go to

22    page 148.  I'm going to read 148, lines 4 through 10.

23    "Q.  Now, do you see, on the left-hand side, the incentive fee,

24    a reference to the incentive fee?

25    "A.  Yes.

N44KUSB4

1    "Q.  Do you know what the incentive fee there referred to?

2    "A.  I don't know."

3           MR. VASSANJI:  Objection, your Honor.  It's entirely

4    unclear, from this cited testimony, what he's referring to or

5    how this is impeachment.

6           THE COURT:  I, too, was wondering.  The left side of

7    what?

8           MR. SAVLA:  Okay.

9    BY MR. SAVLA:

10   Q.  So let's go to the prior page, 147.  And you see at lines 9

11   through 13, I'm referring you to an invoice.

12          Do you see that?

13          And then below that, I say, at lines 14 to 20:  For

14   the sake of the record, this is a Phoenix invoice and payment

15   instruction, an invoice date of November 30, 2017, with the

16   Bates stamp USBANK 1550.

17   A.  Do you have the actual invoice?

18   Q.  I'm sure we can have that pulled up.

19          THE COURT:  Are you able to put your hands on it,

20   Mr. Savla?

21          MR. SAVLA:  It is document Bates stamp USBANK 1550.

22          THE COURT:  Bates stamped, I take it, in the 2018

23   litigation, not here?

24          MR. SAVLA:  Correct.  But those documents have been

25   produced in this action.

N44KUSB4

|   |   |
|---|---|
| 1 | THE COURT:  I don't doubt that.  We just have to |
| 2 | figure out which ones. |
| 3 | MR. SAVLA:  Would the Court indulge me with a |
| 4 | one-minute break so we can find the document? |
| 5 | THE COURT:  Okay. |
| 6 | MR. SAVLA:  Thank you. |
| 7 | THE COURT:  But I'm going to sit here and glower at |
| 8 | you while you're looking for it. |
| 9 | (Pause) |
| 10 | MR. SAVLA:  So, apparently, we're not able to get the |
| 11 | document easily, so -- |
| 12 | THE COURT:  So you'll move on? |
| 13 | MR. SAVLA:  -- we'll move on. |
| 14 | BY MR. SAVLA: |
| 15 | Q.  Let me read to you other lines.  148, line 19: |
| 16 | "Q.  Do you know how the incentive fee is calculated? |
| 17 | "A.  I don't know." |
| 18 | And you said that, right? |
| 19 | A.  Yes.  Again, I don't know what the context was. |
| 20 | MR. SAVLA:  Okay.  Thank you. |
| 21 | I'm going to, with thanks to the Court, turn it over |
| 22 | to Mr. Lauriello for the remainder of the questioning. |
| 23 | THE COURT: All right.  Thank you, Mr. Savla. |
| 24 | Mr. Lauriello, you may examine. |
| 25 | MR. LAURIELLO:  Thank you, your Honor. |

1    CROSS-EXAMINATION

2    BY MR. LAURIELLO:

3    Q.   Good afternoon, Dr. Tang.  My name is Anthony Lauriello,

4    and I also represent PIMCO.

5    A.   Good afternoon.

6    Q.   You testified, in paragraph 32 of your declaration, that on

7    September 15, 2014, PRES submitted invoices for 11.75 million,

8    correct?

9    A.   Can I see it on the screen?

10   Q.   Yes.

11            Please go to paragraph 32 of your declaration.

12            MR. LAURIELLO:  And, Mr. Gibson, can you please pull

13   that up?

14            It's the wrong paragraph number.  One second.

15   Q.   Please turn to paragraph 62.

16            (Pause)

17   A.   Yes.

18   Q.   And you reference Trial Exhibit 3497 in this paragraph,

19   correct?

20   A.   Yes.

21   Q.   Please turn to tab 3 in Volume I of your binder.

22            MR. LAURIELLO:  And, Mr. Gibson, can you please put

23   Exhibit 3497 on the screen.

24            I believe that's Exhibit 3297.  Can you please put

25   Exhibit 3497 on the screen.

1   Q.  Is this the trial exhibit referenced in your declaration,

2   Dr. Tang?

3   A.  Is there more to this?  I'm only seeing one page.

4   Q.  We'll get to that, but if you see the sticker in the top

5   right-hand corner, do you see this is Trial Exhibit 3497?

6   A.  Yes.

7   Q.  That is the exhibit referenced in paragraph 62 of your

8   declaration?

9   A.  Yes.

10          THE COURT:  Let him cross-check with the binder to

11   make sure that's what he meant to reference.

12          It's behind tab 3 of your first binder, Volume I.

13          (Pause)

14          THE WITNESS:  I don't see the 3497 in the binder.  Is

15   it missing?

16          THE COURT:  Would you like to approach, Mr. Lauriello?

17          MR. LAURIELLO:  Yes, your Honor.

18          (Pause)

19          THE COURT:  Ah, wrong binder.

20          THE WITNESS:  I see it.

21   BY MR. LAURIELLO:

22   Q.  And, Dr. Tang, is this the exhibit referenced in your

23   declaration?

24   A.  Yes.

25          MR. LAURIELLO:  Your Honor, I'd like to move this into

1    evidence.

2              MR. VASSANJI:  No objection.

3              THE COURT:  3497 is in evidence.

4              (Trial Exhibit 3497 received in evidence)

5    BY MR. LAURIELLO:

6    Q.  Please turn to the page with the Bates stamp -- Dr. Tang,

7    do you see that there is a Bates stamp in the bottom right-hand

8    corner of this document, starting in TRI?

9    A.  0091650?

10   Q.  Yes.  That's what lawyers call a Bates stamp.

11             Can you please turn to the page Bates stamped 91661.

12             MR. LAURIELLO:  This is a rather large document, so,

13   Mr. Gibson, please put that page on the screen.

14   Q.  If we go back for just one second to your declaration, in

15   paragraph 62, you testified that true and correct copies of

16   charts supporting the invoices on September 15, 2014, can be

17   found at Triaxx 0091656 through 661.

18             Do you see that?

19   A.  Yes.

20             MR. LAURIELLO:  Can we please go back to Triaxx the

21   Bates stamp ending in 661.

22   Q.  And this is one of those pages, correct, Dr. Tang?

23   A.  Yes.

24   Q.  Do you see this list -- the title of this chart is

25   "Estimated Benefit from Private Negotiations — Triaxx 2007-1"?

1    A.  Yes.

2    Q.  If we turn to the page ending in this document to Bates

3    stamp 91658, do you see that it defines the private

4    negotiation?

5    A.  Yes.

6    Q.  Do you see the private negotiation is defined as Triaxx

7    successful negotiation of a payout of $69 million?

8    A.  Yes.

9    Q.  Please turn back to 91661.

10           This chart lists 11 securities, correct?

11   A.  Yes.

12   Q.  And do you see there's a column that says "Estimated

13   Benefit"?

14   A.  Yes.

15   Q.  Is the estimated benefit what Phoenix calculated for each

16   of these securities, the benefit it received from that

17   $69 million payment?

18   A.  This was a long time ago.  I believe so.

19   Q.  And it's prorated per security?

20   A.  I believe it's by the notional amount.

21   Q.  Can you please turn to paragraph 61 of your declaration.

22           Do you see that you testified, "To determine whether

23   PRES was entitled to an incentive fee, PRES prorated the

24   recovery amount over the number of the Triaxx CDOs' RMBS trusts

25   at issue in the action"?

N4KKKUSB4                              Tang - Cross

1   A.  Yes, I see it.

2   Q.  Does that refresh your recollection that the estimated

3   benefit is the prorated benefit for each of the residential

4   mortgage-backed securities?

5   A.  Yes.

6   Q.  Please turn back to 91661.

7        Do you see below the chart, it says, "Number of

8   positions with more than $500,000 benefit"?

9   A.  Yes.

10  Q.  And do you see that there are eight that are incentive

11  fee-eligible?

12  A.  Yes.

13  Q.  So that means 8 of these 11 securities could be charged the

14  incentive fee?

15  A.  That's my understanding.

16  Q.  Does that mean 8 of these 11 securities were charged the

17  incentive fee?

18  A.  I assume, yes.

19  Q.  And that totals to $2 million in aggregate, correct?

20  A.  Yes.

21  Q.  Do you see the sixth listed security, with the CUSIP

22  0219HAM2?

23  A.  Yes.

24  Q.  Do you see there is an estimated benefit of $568,193?

25  A.  I do.

1   Q.  For that CUSIP, Phoenix earned an incentive fee of

2   $250,000, right?

3   A.  Correct.

4   Q.  And it was also able to charge a monthly activist

5   implementation fee of up to $250,000, correct?

6   A.  Yes.

7   Q.  So for this CUSIP that had a credit improvement of

8   $568,193, Phoenix charged $500,000?

9   A.  From this narrow angle, yes, but this is a hundred

10  percent -- a thousand percent misleading because the CUSIP was

11  a $25 million issue.  This benefit of 568,000 is a tiny

12  fraction of all the benefits that accrued to Triaxx CDO

13  investors.  It's a tiny fraction.

14  Q.  And do you see the tenth security with the CUSIP 12544CAT8

15  was improved by $564,931?

16  A.  Yes.

17  Q.  Please turn to the previous page, which ends in the Bates

18  stamp 660.

19          Do you see that this is substantially the same type of

20  chart, but for the Triaxx 2006-2 CDO?

21  A.  Yes.

22  Q.  Do you see there are 19 positions listed with a more than

23  $500,000 benefit?

24  A.  Yes.

25  Q.  And that entitled Phoenix to an incentive fee of

1   $4.75 million, correct?

2   A.   Yes.

3   Q.   And please go to the previous page, which ends in 659.

4        Do you see that's the chart for 2006-1?

5   A.   Yes.

6   Q.   And there are 18 positions listed with more than $500,000

7   benefit, right?

8   A.   Yes.

9   Q.   That entitled Phoenix to an incentive fee of $4.5 million,

10  correct?

11  A.   Yes.

12  Q.   Please turn to paragraph 64 of your declaration.

13       Do you see in the last sentence, consistent with what

14  we just saw, that Phoenix was entitled to fees of 4.5 and

15  4.75 million for 2006-1 and 2006-2 respectively?

16  A.   Yes.

17  Q.   But do you see also in paragraph 64 that you state that

18  Phoenix actually invoiced the 2006-1 CDO for 4.75 million and

19  the 2006-2 CDO for 5 million?

20  A.   Yes.

21  Q.   You do not know why that discrepancy exists, correct?

22  A.   I do not know.

23  Q.   Did Phoenix ever refund $250,000 each to both Triaxx 2006-1

24  and 2006-2?

25  A.   I do not know.

N4KKKUSB4                        Tang - Cross

1    Q.  Please go to paragraph 62 of your declaration again.

2            You state that PRES charged a total of 11.75 million

3    on September 15, 2014, correct?

4    A.  Yes.

5    Q.  That was comprised of a $4.75 million to 2006-1, the

6    $5 million charged to 2006-2, and the $2 million charged to

7    2007-1, right?

8    A.  Yes.

9    Q.  You testified earlier today that you were in the trenches

10   doing the work for Phoenix, correct?

11   A.  Yes.

12   Q.  From that perspective, all the Triaxx CDOs meant the same

13   to you, correct?

14   A.  It's not an important distinction in my mind, correct, when

15   I'm doing the work.

16   Q.  So when you're analyzing the loans of a given CUSIP, it

17   doesn't matter which Triaxx CDO is invested in that CUSIP,

18   correct?

19   A.  Correct.

20   Q.  And the work is the same?

21   A.  It is the same.

22   Q.  Please turn back to Exhibit 3497.  And please go to the

23   page ending in 91657.

24           Do you see this is a chart that shows the estimated

25   benefit from the previous negotiations with Bank of America

1   across all three Triaxx CDOs?

2   A.  It's a part of it.

3   Q.  Do you see for some of the RMBS CUSIPs, more than one

4   Triaxx was an investor?

5   A.  Yes.

6   Q.  For example, please look at line 35, which is the CUSIP

7   12544AAT2.

8           Do you see that?

9   A.  Yes.

10  Q.  There is an estimated benefit of more than $500,000 for

11  each of the three CDOs on this one CUSIP, correct?

12  A.  Yes.

13  Q.  Please go to the page ending in Bates 1659.

14          This is the chart for 2006-1, correct?

15  A.  Yes.

16  Q.  Do you see that CUSIP 12544AAT2 is listed on line 18?

17  A.  Yes.

18  Q.  And do you see it as having an estimated benefit of over

19  around $1.2 million?

20  A.  Yes.

21  Q.  So PRES charged Triaxx 2006-1 a $250,000 incentive fee for

22  this CUSIP, correct?

23  A.  Yes.

24  Q.  And PRES was also able to charge Triaxx 2006-1 up to

25  $250,000 in monthly activist implementation fees, correct?

1   A.  Yes.

2   Q.  Please turn to the next page, with Bates stamp 1660.

3           Do you see that this is the same chart for 2006-2?

4   A.  Yes.

5   Q.  If we look at line 20, we see CUSIP 12544AAT2, correct?

6   A.  Yes.

7   Q.  That is the same CUSIP we looked at before, right?

8   A.  Correct.

9   Q.  And we see that it has a benefit of around 2.3 million,

10  correct?

11  A.  Correct.

12  Q.  So PRES charged Triaxx 2006-2 a $250,000 incentive fee for

13  this CUSIP, correct?

14  A.  Yes.

15  Q.  And PRES was also able to charge Triaxx 2006-2 up to

16  $250,000 in monthly activist implementation fees, right?

17  A.  Yes.

18  Q.  Please turn to the next page, ending in Bates stamp 1661.

19          You see this is the chart for Triaxx 2007-1?

20  A.  Yes.

21  Q.  Do you see that CUSIP 12544AAT2 is on line 9?

22  A.  Yes.

23  Q.  And that is identical to the CUSIP we saw for the 2006-2

24  and 2006-1?

25  A.  Yes.

1    Q.  And PRES was able to charge Triaxx 2007-1 up to a $250,000

2    incentive fee for this CUSIP, correct?

3    A.  Correct.

4    Q.  And it was also able to charge Triaxx 2007-1 up to $250,000

5    in monthly activist implementation fees, right?

6    A.  Correct.

7    Q.  So across all three CDOs, Phoenix was able to charge

8    $500,000 each for reviewing the loans in CUSIP 12544AAT2,

9    right?

10   A.  Correct.

11   Q.  And that's an aggregate amount of $1.5 million, correct?

12   A.  Yes.

13   Q.  So it's fair to say that when more than one of the Triaxx

14   CDOs invested in a single CUSIP, that Phoenix would bill each

15   CDO separately, right?

16   A.  Yes.

17   Q.  Please turn back to the page ending in 091657.

18        Do you see that Phoenix billed more than one CDO for

19   the CUSIP on line 4?

20   A.  Can you repeat your question?

21   Q.  Can you see that Phoenix billed more than one CDO for the

22   CUSIP listed on line 4?

23   A.  Yes.

24   Q.  And the same is true for line 5?

25   A.  Yes.

N4KKKUSB4                          Tang – Cross

1    Q.  And line 7?

2    A.  Yes.

3    Q.  And line 11?

4    A.  Yes.

5    Q.  And line 18?

6    A.  Yes.

7    Q.  And line 22?

8    A.  Yes.

9    Q.  And line 32?

10   A.  Yes.

11   Q.  And line 34?

12   A.  Yes.

13   Q.  On line 37 and 38 as well?

14   A.  Yes.

15   Q.  Please go back to your declaration --

16            MR. VASSANJI:  I don't think line 37 reflects what

17   Mr. Lauriello is saying.  Line 37 appears --

18            THE COURT:  Line 37 appears to be a double dip, not a

19   triple dip.

20            MR. VASSANJI:  Actually, I believe, your Honor, it's

21   total benefit, and then the total benefit is triple, to just

22   07 --

23            THE COURT:  I'm sorry, 37?

24            MR. VASSANJI:  37.

25            MR. LAURIELLO:  Mr. Vassanji has me on that one.

1    Line 37 is only billed once.

2                MR. VASSANJI:  As well, I should note that line 38,

3    the number is less than 500,000, so it does not appear eligible

4    for what Mr. Lauriello is suggesting.

5                THE COURT:  All right.  I'm following.

6                MR. VASSANJI:  32 as well, your Honor, I think there

7    are a few of the highlights on the page that are incorrect.

8                THE COURT:  I got it.  Thanks.

9                MR. LAURIELLO:  I apologize for missing some of those

10   highlights.

11               THE COURT:  I will go by the underlying evidence and

12   not the highlighting supplied by counsel.

13               MR. LAURIELLO:  Thank you.

14   BY MR. LAURIELLO:

15   Q.  Please go to paragraph 65 in your declaration.

16               You testified that PRES made an incentive fee payment

17   of $6.25 million on June 30, 2016, resulting out of litigation

18   recoveries, right?

19   A.  Yes.

20   Q.  And you state that the true and correct copies of the

21   invoices are found in Trial Exhibit 3487, correct?

22   A.  Yes.

23               MR. LAURIELLO:  And with apologies to the Court, Trial

24   Exhibit 3487 is not in the binder, but I'll ask Mr. Gibson to

25   please pull it up.

N4KKKUSB4                          Tang - Cross

1    Q.  Dr. Tang, is this the Exhibit 3487 referenced in your

2    declaration?

3           THE WITNESS:  Can you flip a couple of more pages so

4    that I can see?

5           (Pause)

6           THE WITNESS:  Yes.

7           MR. LAURIELLO:  And I understand there's not an

8    exhibit stamp — I apologize on that — but I'll represent this

9    is Exhibit 3487, and when I'm asking to move Exhibit 3487 into

10   evidence, I am asking to move the actual exhibit-stamped

11   document.

12          THE COURT:  This one has not been admitted so far?

13          MR. LAURIELLO:  It has not, but I would like to move

14   it into evidence, your Honor.

15          THE COURT:  Ms. Almonte, could you fetch for me a

16   paper copy of 3487.

17          MR. LAURIELLO:  I'm informed by the TAM parties that

18   this is, in fact, already in evidence.

19          THE COURT:  Ah, that makes things easier.

20          All right.  So you don't need to fetch me a paper

21   copy, Ms. Almonte.

22          You may proceed.

23   BY MR. LAURIELLO:

24   Q.  Can you please to turn page 2 of Exhibit 3487.

25          THE COURT:  Well, he can't really turn to it, can he?

1          MR. LAURIELLO:  Mr. Gibson, can you please --

2          THE COURT:  Can we supply a paper copy to the witness?

3          MR. LAURIELLO:  Unfortunately, your Honor, I don't

4     have a paper copy.

5          THE COURT:  Somebody in this room full of lawyers has

6     a paper copy, I'm sure, of 3487.

7          MS. BEAUMONT:  We have one in our anteroom.

8          THE COURT:  That would be great.

9          My clerk is giving me a paper copy as well.  I'm sort

10    of a paper person.

11         MR. LAURIELLO:  I understand, your Honor.  And we

12    apologize, there were some issues printing this binder, as you

13    may have gathered.

14         THE COURT:  It's late in the week.

15         (Pause)

16         THE COURT:  While we're waiting for Exhibit 3487 to

17    appear — and I don't think we need to excuse Dr. Tang for

18    this — do you have an estimate for how much longer you have,

19    Mr. Lauriello?

20         MR. LAURIELLO:  As an estimate, I'd say around

21    30 minutes.

22         THE COURT:  All right.  So we'll get through you

23    today, I think, and that means we're going to have to ask

24    Dr. Tang to come back tomorrow.

25         MS. WITYK:  Your Honor, may I approach with a copy of

1    3487?

2              THE COURT:  You promise it's really 3487?

3              MS. WITYK:  It's stamped and everything.

4              THE COURT:  You may approach.

5              All right.  The witness and the Court have each been

6    furnished with a paper copy of Trial Exhibit 3487, which has

7    been previously admitted into evidence and which is a multipage

8    document.

9              MR. LAURIELLO:  My thanks to Ms. Almonte and

10   Ms. Wityk.

11   BY MR. LAURIELLO:

12   Q.  Please now turn to page 2 of Trial Exhibit 3487.

13             Do you see, in the second paragraph, the exhibit

14   states, Triaxx received an initial payment of $69 million (the

15   first recovery), and, in addition, Triaxx was able to receive

16   an additional $35 million if Triaxx had not received a

17   distribution from the Article 77 proceeding.

18             THE COURT:  I think you meant to say was eligible to

19   receive, not was able to receive.

20             MR. LAURIELLO:  Thank you, your Honor.

21             THE WITNESS:  Yes.

22   Q.  Then it states, "On June 31, 2016, Triaxx had not received

23   any distribution payment pursuant to the Article 77

24   proceeding," right?

25   A.  Yes.

1    Q.  And, therefore -- it then goes on to say Triaxx then

2    invoked its rights to receive $35 million from Bank of America?

3           Do you see that?

4    A.  Yes.

5    Q.  Do you see, later on it says, Triaxx eventually received

6    around $34 million from the Article 77 proceeding?

7    A.  Yes.

8    Q.  And then Triaxx had to reimburse that around $34 million

9    amount of the $35 million amount from Bank of America, correct?

10   A.  Yes.

11   Q.  Please go down to the portion of this letter that says,

12   "The Fourth Recovery."

13           Do you see it states that on or about June 30, 2016,

14   Triaxx received a $34 million recovery?

15   A.  Yes.

16   Q.  If you go to the next page, please, do you see that there

17   are recommended wire transfers to Phoenix coming out of that

18   $34 million recovery?

19   A.  Yes.

20   Q.  Do those amounts aggregate to $6.25 million?

21   A.  Yes.

22   Q.  So is this the $6.25 million referred to in your

23   declaration?

24   A.  Yes.

25   Q.  Please go to paragraph 66 of your declaration.

1            Do you see that you stated that Triaxx 0014404 of

2    Trial Exhibit 3487 shows the incentive fee calculation for the

3    $6.25 million payment?

4    A.  Yes.

5    Q.  Please turn to that page, with the Bates stamp 14404.

6            THE COURT:  It's towards the back.

7            MR. VASSANJI:  Is that going to be shown on the screen

8    for the benefit of the rest of us?

9            MR. LAURIELLO:  I'd ask Mr. Gibson -- this is the same

10   exhibit, Exhibit 3487, with the Bates stamp 14404.  And I will

11   just wait until everyone's on the same page.

12           Thank you, Mr. Gibson, and apologies for being hard to

13   follow.

14           He doesn't have the one with attachments?

15           Your Honor --

16           THE COURT:  We're going to the ELMO, are we?

17           MR. LAURIELLO:  Yes.

18           THE COURT:  Things must be desperate.

19           MR. LAURIELLO:  Today is not my day for documents.

20           Your Honor, because I do not have a paper copy of this

21   exhibit, may I ask, unfortunately, to take yours or the

22   witness' so I can show it on the ELMO?

23           THE COURT:  You can't mine because I've scribbled on

24   it.

25           MR. LAURIELLO:  Okay.

1              THE COURT:  And I hesitate to ask the witness to give

2     up his paper copy.  It looks like somebody thinks they can get

3     us another paper copy.

4              MS. WITYK:  We'll search for another one, your Honor.

5              THE COURT:  All right.

6              (Pause)

7              MS. WITYK:  I must thank opposing counsel again.

8              THE COURT:  Ms. Wityk has come to the rescue.

9              MS. WITYK:  The credit should go to Mr. Philbin.

10             THE COURT:  I think credit goes to the whole team.

11             MR. LAURIELLO:  Let's try again.

12    BY MR. LAURIELLO:

13    Q.  Do you see that this is a page Bates stamped TRI 14404?

14    A.  Yes.

15    Q.  Do you see it is titled "Estimated Benefit from Private

16    Negotiations with Bank of America"?

17    A.  Yes.

18             MR. LAURIELLO:  And, Mr. Gibson, can you please put on

19    the screen Exhibit 3487, which I know we do have, with the page

20    ending in 1658 for just a moment.  3487.

21             1658.

22             THE COURT:  Triaxx estimated benefits from the

23    8.5 billion?  To make sure I'm on the right page.

24             MR. LAURIELLO:  I believe so.  I believe we have

25    previously looked at this.  If we can just go back to the ELMO,

N4KKKUSB4                          Tang - Cross

1    please.

2    Q.  Do you see Triaxx Trial Exhibit 3487 defines, as we've

3    looked before, the private negotiation as the amount that

4    Triaxx successfully negotiated as a payment of $69 million?

5    A.  Yes.

6    Q.  Do you see under there it states "Settlement Payment"?

7    A.  Where?

8    Q.  In the next paragraph.  It says "Settlement Payment" on the

9    same page.

10   A.  Yes.

11   Q.  The exhibit states, "Under the terms of the settlement

12   agreement, Triaxx has been guaranteed a minimum of $35 million

13   in recoveries from the allocation of the $8.5 billion Article

14   77 proceeding."

15           Do you see that?

16   A.  Yes.

17   Q.  Was Phoenix involved in the Article 77 proceeding?

18   A.  I believe so.

19   Q.  Do you know who John Moon is?

20   A.  Yes.

21   Q.  If Mr. Moon were to testify that Phoenix was not involved

22   in the Article 77 proceeding, would you believe him?

23           MR. VASSANJI:  Objection.

24           THE COURT:  I'll allow it.

25   A.  I would trust whatever John Moon says, but when I answer

the question whether Triaxx was involved with the Article 77

proceeding, I don't know the context you're asking him the

question.  The reason I answer yes is because I know exactly

what the Article 77 proceeding was, and I am aware of Bank of

America paid Triaxx money out of the Article 77 proceeding and

with Phoenix help, Triaxx was objecting to the 8.5 billion

global settlement.

         So, from my understanding of those facts, I made the

statement that Triaxx was involved.  That could be different

definition than John Moon's.

Q.  Understood.

         Let's turn back to Exhibit 3487, page 14404, which is

shown on the ELMO.

         Do you see, as before, that some CUSIPs have more than

one CDO investing in them?

A.  Yes.

Q.  And some of these CUSIPs have multiple CDOs receiving a

benefit of more than $500,000, right?

A.  Yes.

Q.  And that includes line 5, correct?

A.  Yes.

Q.  And line 8?

A.  Yes.

Q.  For those CUSIPs, multiple CDOs were paid $250,000

incentive fees, right?

1    A.   Correct.

2    Q.   Please look at paragraph 71 of your declaration.

3         And I will ask Mr. Gibson to bring that on the screen.

4    Thank you.

5         You testified that you calculated in 2018 that there

6    was a total benefit of $725 million from the sale of securities

7    in 2016 and 2017, correct?

8    A.   Yes.

9    Q.   And those were the court-ordered sales that Mr. Savla was

10   discussing with you before, correct?

11   A.   Yes.

12   Q.   And you calculated that PRES was owed $18.25 million in

13   incentive fees for those sales?

14   A.   Yes.

15   Q.   And you testified that this calculation can be seen in

16   Exhibit 3137, correct?

17   A.   Yes.

18        MR. LAURIELLO:  Can we please turn to Exhibit 3337.

19   This is the Excel, and I'm going to ask Mr. Gibson to put it on

20   the screen, and we're going to be interacting with the native

21   Excel, so apologies for those who prefer paper.

22   Q.   As you testified earlier today, columns B through F

23   identify the CUSIP, correct?

24   A.   Yes.

25   Q.   And the trust and the class and the default date?

1   A.  Yes.

2   Q.  Please move to the section of the chart titled "Liquidation

3   Proceeds If Sold In March 2011."

4           Do you see in the highlighted column V that it lists

5   liquidation proceeds if sold on March 25th or 3/25/11?

6   A.  Yes.

7   Q.  This is an estimate of what the CUSIP would have been sold

8   at if it had been liquidated on March 25, 2011, right?

9   A.  Yes.

10  Q.  When these residential mortgage-backed securities are sold,

11  there is typically an auction, correct?

12  A.  Yes.

13  Q.  So the actual price on March 25, 2011, could have been

14  higher, correct?

15  A.  It could have been a lot lower, as well, because we have

16  been very conservative in terms of giving it the benefit of the

17  doubt when the pricing happened in 2011.

18  Q.  But it's fair to say you couldn't know for certain what the

19  price would have been if it was liquidated on March 25, 2011,

20  right?

21  A.  I was pretty certain 1142 will be a cap but not a floor.

22  Q.  But that is still your best estimate, correct?

23  A.  Correct.

24  Q.  Do you see column X is actual liquidation date?

25  A.  Yes.

N4KKKUSB4                          Tang - Cross

1   Q.  That is the date that the residential mortgage-backed

2   security is actually sold, right?

3   A.  Correct.

4   Q.  And then in column AA, do you see total principal

5   collections?

6   A.  Yes.

7   Q.  Is that the total principal received on each respective

8   residential mortgage-backed security from March 25, 2011, to

9   the actual liquidation date?

10  A.  Yes.

11  Q.  And then the next column is actual liquidation proceeds?

12  A.  Yes.

13  Q.  And that is the amount the residential mortgage-backed

14  securities sold for on the actual liquidation date, right?

15  A.  Yes.

16  Q.  And the last column is total principal proceeds.

17          If Mr. Gibson could click, for the first CUSIP we see,

18  which is line 10 of the Excel, in the column "Total Principal

19  Proceeds," we can see that this is a formula for the sum of the

20  total principal collections and the actual liquidation

21  proceeds, right?

22  A.  Yes.

23  Q.  And so this column represents the value for the residential

24  mortgage-backed security you calculated on the liquidation

25  date, right?

1   A.  Yes.

2   Q.  Please move to the next section of the Excel, titled

3   "Position Level Benefits."

4           Do you see that column AE is "Principal Gained from

5   Delayed LQDTN"?

6   A.  Yes.

7   Q.  And that is short for liquidation, correct?

8   A.  Yes.

9           MR. LAURIELLO:  If Mr. Gibson again could click on the

10  for the first CUSIP in line 10 to see the formula.

11  Q.  Do you see that the principal gain from delayed liquidation

12  is taken by simply subtracting the total principal proceeds and

13  netting out the liquidation proceeds if sold on March 25, 2011?

14  A.  Yes.

15  Q.  Do you see in row 5 that there is a number $725 million?

16  A.  Yes.

17  Q.  Is that the sum of the principal gain from delayed

18  liquidation?

19  A.  Yes.

20  Q.  Does that correspond to the $725 million in your

21  declaration?

22  A.  Yes.

23  Q.  So that is the sum of the total principal proceeds simply

24  netted out -- let me try again.

25          The $725 million is the sum of for every RMBS of the

1    net of the total principal proceeds for the actual liquidation

2    date minus the liquidation proceeds if sold on March 25, 2011?

3    A.  Yes.

4    Q.  Do you see the next column is "Position With Over

5    $500,000"?

6    A.  Yes.

7          MR. LAURIELLO:  If Mr. Gibson can click for the first

8    CUSIP on that, to see the formula.

9    Q.  Do you see this is a simple Excel formula where it is 1 if

10   the principal gained from delayed liquidation is over $500,000?

11   A.  Yes.

12         THE COURT:  I'm sorry, where am I seeing the formula?

13         MR. LAURIELLO:  The formula is located on the Excel

14   above all of the columns.

15         THE COURT:  Equal 1F, et cetera?

16         MR. LAURIELLO:  Yes.

17         THE COURT:  Thank you.

18   Q.  If we move on to column AH, do you see that's B of A

19   incentive paid?

20   A.  Yes.

21   Q.  Do you see those numbers are hard-coded?

22   A.  Yes.

23   Q.  Did you put in a 1 for each of the securities that had

24   already been paid an incentive fee for that CDO from the Bank

25   of America litigation?

1    A.  It's from the fourth recovery, 25, I believe.  The

2    6.25 million.

3    Q.  But to back up, the purpose of this column is to identify

4    which residential mortgage-backed securities already had an

5    incentive fee, correct?

6    A.  Yes.

7    Q.  When I say that it's to see if the residential

8    mortgage-backed security already had an incentive fee, it's for

9    a specific CDO, correct?

10   A.  Yes.

11             MR. LAURIELLO:  Can we please click on the next

12   column, AI, which is position 250K eligible.  And if we can

13   click for row 10, to see the formula.

14   Q.  And I admit I am not very good at Excel, but my best

15   understanding of this formula, Dr. Tang, is that if the

16   position with over $500,000 is 1, and the Bank of America

17   incentive paid is zero, then this column will show a 1,

18   correct?

19   A.  Yes.

20   Q.  Or, in other words, if a security has over $500,000 in

21   principal gained from delayed liquidation and has not already

22   had a Bank of America incentive fee paid, there will be a 1 in

23   this column?

24   A.  Correct.

25   Q.  Can you please move on to the next column, titled "The

1    Number," column AJ, and can we please see the formula for that.

2              Do you see that formula simply multiplies the position

3    250K eligible times 250,000?

4    A.  Yes.

5    Q.  So if there is a 1 in the position 250,000 eligible, then

6    the number will be $250,000 in this column?

7    A.  Yes.

8    Q.  Do you see that there is a sum for this column on line 5?

9    A.  Where am I looking?

10   Q.  We're in column AJ, row 5.

11   A.  Yes.

12   Q.  And that sum is $18.25 million?

13   A.  Yes.

14   Q.  And that is the $18.25 million that you billed for

15   incentive fees for these sales?

16   A.  Yes.

17   Q.  Can you please go to line 54 in this Excel.  And I will ask

18   Mr. Gibson to please scroll left so we can see the CUSIP

19   information.

20             Sorry, can we please go to line 63 of this Excel,

21   which is the 54th CUSIP listed.  So just so everyone's on the

22   same page, we're on line 63 of the Excel, which is the 54th

23   CUSIP listed in this exhibit.

24             Do you see that, Dr. Tang?

25   A.  Yes.

1   Q.  And do you see the CUSIP is 40431HAC1?

2   A.  Yes.

3   Q.  Do you see that Triaxx 2006-2 held a 25 percent position?

4   A.  Yes.

5   Q.  And do you see that it was liquidated on August 10, 2017?

6   A.  Correct.

7   Q.  So Triaxx 2006-2 earned a $250,000 incentive fee on this

8   CUSIP, right?

9   A.  Yes.

10  Q.  Can we please now look at line 73 and the 64th CUSIP

11  listed.

12          Do you see this is also CUSIP 40431HAC1?

13  A.  Yes.

14  Q.  Do you see that Triaxx 2007-1 holds a 75 percent position

15  in this CUSIP?

16  A.  Yes.

17  Q.  It was liquidated on August 10, 2017?

18  A.  Yes.

19  Q.  So both Triaxx 2006-2 and Triaxx 2007-1 were invoiced at

20  $250,000 incentive fee for the liquidation of this CUSIP on

21  August 10, 2017, right?

22  A.  Yes.

23  Q.  Dr. Tang, today we have seen charts showing the CUSIPs that

24  underlay the fees Phoenix charged for incentive fees, right?

25  A.  Yes.

1   Q.  Earlier today, you testified that there was a CUSIP

2   tracking chart that similarly showed the CUSIPs charged for due

3   diligence, the monthly due diligence fee -- strike that, the

4   monthly activist implementation fees, correct?

5   A.  Yes.

6   Q.  And those are the fees of $10,000 per month per security,

7   right?

8   A.  Yes.

9   Q.  That are capped at $250,000?

10  A.  Yes.

11  Q.  And I would need that chart to see which of those

12  securities were charged by multiple CDOs, right?

13  A.  I assume.

14  Q.  And I would need that chart to see what the estimated

15  benefit is for each of those CDOs -- for each of those

16  residential mortgage-backed securities, correct?

17  A.  Correct.

18          MR. LAURIELLO:  Thank you.  I have no further

19  questions.

20          THE COURT:  It is now 4:31.  Your timing was very

21  good.

22          Will there be more questions for Dr. Tang tomorrow

23  morning?

24          MS. BUCKEL:  Yes, your Honor.

25          THE COURT:  All right.

N4KKKUSB4                         Tang - Cross

1            So, Dr. Tang, we will excuse you for the evening.  We

2    will see you back here at 9:30 tomorrow morning.

3            You will remain under oath.  Please do not discuss

4    your testimony or the underlying facts with counsel or anyone

5    else until you're back on the stand.

6            You may be excused.

7            THE WITNESS:  Thank you.

8            (Witness temporarily excused)

9            THE COURT:  Counsel, stay behind for a moment.

10           (Pause)

11           THE COURT:  Do we have any further business, counsel?

12           I will see you all at 9:30 tomorrow.

13           (Adjourned to April 21, 2023 at 9:30 a.m.)

14                                 *  *  *

```
 1                     INDEX OF EXAMINATION

 2   Examination  of:                              Page

 3    NICHOLAS CALAMARI

 4   Cross By Mr. Lorenzo . . . . . . . . . . . . 633

 5   Cross By Mr. Ledley  . . . . . . . . . . . . 697

 6   Redirect By Ms. Beaumont . . . . . . . . . . 698

 7   Recross By Mr. Lorenzo . . . . . . . . . . . 708

 8    SIGURGEIR JONSSON

 9   Direct By Mr. Vassanji . . . . . . . . . . . 712

10   Cross By Ms. Bui . . . . . . . . . . . . . . 713

11    MINGSUNG TANG

12   Direct By Mr. Vassanji . . . . . . . . . . . 745

13   Cross By Mr. Savla . . . . . . . . . . . . . 746

14   Cross By Mr. Lauriello . . . . . . . . . . . 795

15                     PLAINTIFF EXHIBITS

16   Exhibit No.                                Received

17    3137  . . . . . . . . . . . . . . . . . . . 787

18                       JOINT EXHIBITS

19   Exhibit No.                                Received

20    1067  . . . . . . . . . . . . . . . . . . . 654

21    3203  . . . . . . . . . . . . . . . . . . . 660

22    1126  . . . . . . . . . . . . . . . . . . . 662

23    1130  . . . . . . . . . . . . . . . . . . . 664

24    1162  . . . . . . . . . . . . . . . . . . . 667

25    3171  . . . . . . . . . . . . . . . . . . . 741
```

71                                                  785

TRIAL EXHIBITS

Exhibit No.                                        Received

2150    . . . . . . . . . . . . . . . . . . 694

2151    . . . . . . . . . . . . . . . . . . 695

2152    . . . . . . . . . . . . . . . . . . 695

2153    . . . . . . . . . . . . . . . . . . 696

2154    . . . . . . . . . . . . . . . . . . 696

2155    . . . . . . . . . . . . . . . . . . 696

3170    . . . . . . . . . . . . . . . . . . 730

3497    . . . . . . . . . . . . . . . . . . 797