N4LKUSB1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

U.S. BANK NATIONAL
ASSOCIATION,

          Interpleader Plaintiff,

               v.                        18 CV 04044 (BCM)

TRIAXX ASSET MANAGEMENT, LLC,
et al.,
                                         Bench Trial

          Interpleader Defendants.

------------------------------x
                                         New York, N.Y.
                                         April 21, 2023
                                         9:30 a.m.
Before:
                    HON. BARBARA C. MOSES,

                                         U.S. Magistrate Judge

                         APPEARANCES

ALSTON & BIRD
     Attorneys for Interpleader Plaintiff
BY:  ALEXANDER LORENZO
     ELIZABETH A. BUCKEL

FRIEDMAN KAPLAN SEILER & ADELMAN
     Attorneys for Interpleader Defendants Triaxx and Phoenix
Real Estate
BY:  ANNE E. BEAUMONT
     PRIYANKA WITYK
     ANIL K. VASSANJI

NORTON ROSE FULBRIGHT
     Attorneys for Interpleader Defendant PIMCO
BY:  SANDEEP SAVLA
     ANTHONY LAURIELLO

N4LKUSB1

APPEARANCES (Continued)

DAVIS POLK & WARDWELL LLP
     Attorneys for Interested Party Citigroup Global Markets
BY:  ADAM GREENE
     ISAAC GELBFISH

WOLLMUTH MAHER & DEUTSCH
     Attorneys for Interpleader Defendant Triaxx Prime CDOs
BY:  RANDALL RAINER


Also Present:

JASON BERLAND, One Zero Capital

N4LKUSB1

| | |
|---|---|
| 1 | (In open court; trial resumed; case called) |
| 2 | MR. LORENZO:  Good morning, your Honor.  Alex Lorenzo, |
| 3 | from Alston & Bird, for U.S. Bank National Association, as |
| 4 | trustee, and I am joined today at the table by my colleague, |
| 5 | Ms. Buckel. |
| 6 | THE COURT:  Good morning, Ms. Buckel, Mr. Lorenzo. |
| 7 | MR. SAVLA:  Good morning, your Honor.  Sundeep Savla, |
| 8 | of Norton Rose Fulbright U.S. LLP, for PIMCO.  I'm joined by my |
| 9 | colleague, Anthony Lauriello, and to my left, Davis Polk, Adam |
| 10 | Greene, and Isaac Gelbfish. |
| 11 | THE COURT:  Mr. Gelbfish, Mr. Greene, Mr. Lauriello, |
| 12 | and Mr. Savla. |
| 13 | MS. BEAUMONT:  Good morning, your Honor.  Ann |
| 14 | Beaumont, from Friedman Kaplan Seiler & Adelman Robbins, for |
| 15 | Triaxx Asset Management and Phoenix Real Estate Solutions, and |
| 16 | with me are my colleagues, Anil Vassanji and Priyanka Wityk. |
| 17 | THE COURT:  Good morning, Mr. Vassanji, Ms. Wityk, and |
| 18 | Ms. Beaumont. |
| 19 | MR. RAINER:  Good morning, your Honor.  Randall |
| 20 | Rainer, of Wolmuth Maher & Deutsch, on behalf of the issuers. |
| 21 | THE COURT:  You're back? |
| 22 | MR. RAINER:  I'm back. |
| 23 | THE COURT:  That's everyone for today. |
| 24 | Do we have any housekeeping matters before Dr. Tang |
| 25 | rejoins us? |

N4LKUSB1

1          MR. LORENZO:  Your Honor, just a couple of matters.

2          First, we received an email from chambers about Joint

3     Exhibit 71.

4          THE COURT:  We wanted to make sure we all knew what it

5     was supposed to be.

6          MR. LORENZO:  Apologies.  I think it was a

7     technological error on our part.  There was an appendix that we

8     had meant to get in, but that meant that the entire log didn't

9     get in.  So, we have conferred with the other parties and have

10    the corrected version of Exhibit 71 in hard copy, if you would

11    like me to pass it up to Ms. Kay?

12         THE COURT:  Well, we've already admitted Exhibit 71 on

13    the record, correct?  Was it on the original list, or did it

14    get admitted during testimony?

15         MR. LORENZO:  I think it was on the original list of

16    agreed-to exhibits because it was a joint exhibit.

17         THE COURT:  Ms. Kay, can you just double-check that?

18         THE DEPUTY CLERK:  No, it wasn't on the --

19         MR. LORENZO:  It wasn't on.  So, perhaps we have to go

20    on the record:  The log portion of 71, I think, was admitted

21    yesterday.

22         MS. BUCKEL:  Yes.

23         MR. LORENZO:  And then I guess the appendix portion of

24    71 is yet to be admitted.

25         THE COURT:  All right.

1          So, is there a joint request that the whole thing be

2   admitted now?

3          MR. LORENZO:  I believe so.

4          Ms. Beaumont?

5          MS. BEAUMONT:  Yes, your Honor.

6          THE COURT:  All right.

7          So new, revised, complete, updated Exhibit 71 is

8   admitted.  You can hand that to Ms. Kay.  And, Ms. Almonte, do

9   we need them to send an electronic copy as well?

10         At the end of the trial day today, counsel, if

11  somebody would email an electronic copy.

12         Joint Exhibit 71 is admitted in its full glory.

13         (Joint Exhibit 71 received in evidence)

14         MR. LORENZO:  The second housekeeping matter:  So, per

15  your Honor's direction at, I can't remember, the middle of the

16  day yesterday, the parties conferred regarding scheduling.

17         THE COURT:  Right.

18         MR. LORENZO:  If your Honor is still available on

19  Wednesday, the 31st of May, I believe it was in the afternoon,

20  the parties are all available that day.

21         THE COURT:  Ms. Kay, could you check and make sure my

22  other law clerk didn't schedule something for the 31st while we

23  were not paying attention?

24         THE DEPUTY CLERK:  Sure, your Honor.

25         We currently have a 10:00 o'clock and an

11:00 o'clock.

THE COURT:  Great.

1:30?

MR. LORENZO:  1:30.

THE COURT:  So we'll start at 1:30 on May the 31st for closing arguments.

Now, I assume you're going to have charts and graphs and screens and things like that.  Ms. Kay, let's see if we can be back in this courtroom for the afternoon of May the 31st, and they can come and set up in the morning.

We'll let you know, when we get closer to the date, whether we will be here or across the hall, but we'll shoot for courtroom 20C.

MR. LORENZO:  And then, relatedly, would it work for your Honor to have the parties' submissions the week before, which I believe is Wednesday the 24th?

THE COURT:  That's fine in terms of dates, May the 24th, so I can have an enjoyable Memorial Day weekend.

MR. LORENZO:  We can get them to you a day or two earlier, if that would make -- the goal is not to take your Honor's weekend away.

THE COURT:  Well, in that case, see if you can get them to me by -- what's the Monday of that week?  Is that the 21st?

MS. BUCKEL:  22nd.

N4LKUSB1

1     THE COURT:  See if you can get them to me by May the

2     22nd, posttrial submissions.

3         Now, we have not been precise, I have not been

4     precise, about both the form and the length of these

5     submissions.

6         I would like them to be in the form of findings of

7     fact and conclusions of law, with numbered paragraphs and so

8     forth.  And when you submit them on ECF, you should also email

9     a Word copy to my chambers.

10        Have the parties met and conferred as to how much

11     length you all think you need?

12        MR. LORENZO:  So, Ms. Beaumont and I were talking this

13     morning about this.  I don't think there is a disagreement as

14     far as length.  I think part of it is understanding your

15     Honor's expectations, simply because the findings of fact could

16     potentially be relatively long and sort of the default of

17     submissions is often about 25 or 30 pages, and we didn't know

18     if that would sort of work?

19        THE COURT:  I'm guessing that you're wanting more than

20     25.  What I had in my mind was somewhere in the 35 range, which

21     for those of you who -- you are not all similarly situated in

22     terms of how many claims you have either asserted or are

23     defending against.  Some of you may need all of that, some of

24     you may need quite a bit less than that.

25        It also may be — because there's some alignment, at

N4LKUSB1

1     least on issues, if not necessarily on outcomes, among the

2     different parties or groups of parties here — that you may be

3     able to adopt portions of one another's either factual proposed

4     findings of fact or a proposed conclusions of law.  But to keep

5     it simple, because I'm not going to give different limits to

6     different parties, 35 pages apiece?

7             This would be exclusive of any additional charts,

8     graphs, and demonstratives that you may wish to attach, but I

9     don't want you to cheat on that.  In other words, I don't want

10    you to attach something which pretends to be a demonstrative,

11    but really a whole new argument.

12            Mr. Savla looks a little bit unhappy, so I am pausing

13    for a moment.

14            MR. SAVLA:  I'm all for brevity, of course, but we do

15    have disclosure issues that are different as between the

16    noteholders.  So, perhaps a modest —

17            THE COURT:  Disclosure issues in terms of what you

18    knew and when you knew it?

19            MR. SAVLA:  Exactly.

20            And then we —

21            THE COURT:  How about this for a deal:  What if I give

22    PIMCO 35 pages and Citi an extra ten for anything that's

23    different about Citi?

24            MR. GELBFISH:  That works for Citi, your Honor.

25            THE COURT:  All right.

N4LKUSB1

1          MR. LORENZO:  Just to confirm, your Honor, were you

2     envisioning double-spaced for that 35-page submission?

3          THE COURT:  Oh, Mr. Lorenzo, do you have to ask?  Yes,

4     and one-inch margins and 12-point type, please, including the

5     footnotes.  Do not put the footnotes in nine-point type; I

6     won't be able to read them.

7          So 35 pages apiece, except for Citi, which only gets

8     10, but that's because it's an add-on.

9          Double-spaced, numbered paragraphs, one-inch margins,

10    12-point type, including in the footnotes.  You may attach if

11    you have any snappy graphics or similar demonstratives, but you

12    may not, obviously, attach things like declarations, because

13    we're done with evidence, nor may you squeeze legal argument

14    into the form of an attached demonstrative, please.

15         And I will see those on ECF and also in a Word

16    document on May the 22nd.  And I will see you probably here,

17    but we'll confirm, for oral argument on the afternoon of May

18    the 31st, starting at 1:30, 45 minutes per party or affiliated

19    groups of parties.

20         Mr. Savla?

21         MR. SAVLA:  Yes.  On the subject of briefing — and I

22    know your Honor has asked about the amount of the overcharge —

23    Ms. Beaumont and I spoke this morning, and I think we're in the

24    rough same ballpark, but a little bit far apart, a little bit

25    apart.

N4LKUSB1

1      THE COURT:  One of those things is true; they're not

2  both true.

3      MR. SAVLA:  And, so, we agreed on a procedure, at

4  least, that we could, each of us, collate the various invoices

5  and come up with our own calculations in the briefing.

6      THE COURT:  Well, at the risk of taking things a

7  little bit out of order, but, in my mind, I'm thinking we have

8  a little more of a relaxed schedule today because we only have

9  the remainder of Mr. Garg, and then we have Ms. Beaumont, so I

10 don't think we're going to be racing the clock at 4:30 this

11 afternoon:  With regard to what you call the overcharges, I'm

12 not sure which category you're discussing.  What I have taken

13 from the evidence which has been presented to me over the past

14 several days from category number one is that, from time to

15 time, Phoenix, or PRES, as it now seems to be called most of

16 the time, sent an invoice where the monthly fee was incorrect

17 and where they had failed to drop the monthly fee down in year

18 three or at some other step point.  And that's a category of

19 overcharges which has been acknowledged, but hasn't been added

20 up, at least not for me.

21      Second, there are at least a couple of instances where

22 PRES has acknowledged, through one of its witnesses at trial,

23 that an extra 250 somehow snuck in there with respect to one of

24 the incentive fee billings, where it doesn't match the backup.

25 So that's a second category.

N4LKUSB1

1          Then as far as the noteholders are concerned, at

2     least, there's a third category of overcharges consisting of

3     double-dipping or triple-dipping, that is, charging more than

4     one $250,000 incentive fee with respect to the same CUSIP where

5     that CUSIP is owned in part by one CDO and in part by a second

6     and, in some cases, in part by a third CDO.  Those are the

7     three categories of overcharges that I have in my head.

8          Have I missed any?  Ms. Beaumont?

9          MS. BEAUMONT:  No, that's correct.  But I would just

10    note that they are of a slightly different character, and I

11    think the parties have different views on them.  The first

12    two --

13          THE COURT:  I am assuming that the first two

14    categories are acknowledged as errors, at least in concept, by

15    PRES, and although I haven't actually heard it yet, I'm kind of

16    guessing that PRES's position is going to be that there's

17    nothing wrong with the double-dip.

18          MS. BEAUMONT:  That's exactly right, Judge.

19          THE COURT:  Okay.

20          Mr. Savla?

21          MR. SAVLA:  Then there is the third category, where --

22          THE COURT:  We already had three.

23          MR. SAVLA:  The fourth category, of the activist fee,

24    where the parties take different interpreted positions on

25    whether the activist fee has an aggregate cap of 250,000 or

N4LKUSB1

1  500,000.

2              THE COURT:  Well, that's a legal issue.

3              MR. SAVLA:  Right.

4              THE COURT:  But I take your point.  That is certainly

5  an issue in the case.

6              And, if I'm not mistaken, there's another legal issue

7  in the case, which is whether PRES was entitled to charge any

8  incentive fee at all with respect to the — what is it — 104

9  CUSIPs that were sold in '16 and '17 by court order, and that

10 had not previously been the subject of an incentive fee invoice

11 in connection with the Countrywide settlement.

12             MR. SAVLA:  That's right.

13             THE COURT:  Okay.

14             But that's not so much an overcharge.  Certainly, it's

15 not a calculation error; it's a different category of dispute.

16             So who is going to show me what with respect to any of

17 these categories?  Ms. Beaumont?

18             MS. BEAUMONT:  Your Honor, these obviously all go to

19 the damages that we are seeking on our various claims for

20 quantum meruit, breach of contract, and so forth, and we were

21 planning on laying that out in our posttrial brief how

22 exactly --

23             THE COURT:  In your posttrial brief, you will say, for

24 example, we billed you this much, but, on reflection, we should

25 have only billed you that much?

1              MS. BEAUMONT:  Exactly.

2              THE COURT:  Okay.

3              Whereas Mr. Savla, in his posttrial brief, after he

4    gets finished saying that you shouldn't have billed anything at

5    all, will say, and if you were entitled to bill anything, it

6    should have only been this much, not that much?

7              MR. SAVLA:  Correct.  And, therefore, we should get a

8    refund or a setoff.

9              THE COURT:  Got it, okay.

10             Who's up next for Dr. Tang?

11             MR. GREENE:  Your Honor, if I may?

12             THE COURT:  You may.

13             MR. GREENE:  Adam Greene, on behalf of Citi.

14             As with the page limits for briefing, would the Court

15   grant Citi five or so minutes, as well, for oral argument to

16   address any notice issues that may be differently situated

17   between the noteholders?

18             THE COURT:  On top of Mr. Savla's 45 minutes?

19             MR. GREENE:  As with the page limits?

20             THE COURT:  Five, that's what you're asking for?  I

21   can spare you five minutes.

22             MR. GREENE:  Thank you, your Honor.

23             THE COURT:  All right.

24             Now, who's up next with Dr. Tang?

25             MS. BUCKEL:  U.S. Bank, your Honor.

N4LKUSB1                          Tang - Direct

1               THE COURT:  All right.  So if you could get Dr. Tang.

2               MS. BUCKEL:  Your Honor, instead of handing you

3       another binder, I'm going to use what was in the binders you

4       were handed yesterday --

5               THE COURT:  Hold on, I may have put those binders

6       away.

7               MS. BUCKEL:  -- and the Excel spreadsheet.

8               THE COURT:  I have the Excel spreadsheet.  I took it

9       home with me last night in case I had any trouble falling

10      asleep.

11              Good morning, Dr. Tang.  You may be seated.

12              THE WITNESS:  Good morning.

13              THE COURT:  I will remind you that you are still under

14      oath.

15              Let us know when you're ready.

16              THE WITNESS:  Yes, I'm ready.

17      MINGSUNG TANG,

18      DIRECT EXAMINATION

19      BY MS. BUCKEL:

20      Q.  Good morning, Dr. Tang.  My name is Elizabeth Buckel, and I

21      represent the trustee, U.S. Bank National Association, in this

22      action.

23              Have you reviewed any of the publicly available

24      filings in this litigation?

25      A.  There have been a lot of findings.  It was never my job to

1    comprehensively review everything, but I've seen enough

2    documents.  I don't claim that I fully understand everything.

3    Q.  Can you let me know what documents you've seen?

4    A.  I remember there was filings regarding defaulted

5    instruments that need to be liquidated.  And this case, of

6    course, if you'll remind me, I might be able to remember

7    because this is not my part of the day-to-day job

8    responsibilities.

9    Q.  No, I understand.

10            To be sure, did you review any direct testimony

11   submitted by the other witnesses in this action?

12   A.  No.

13   Q.  Dr. Tang, you testified yesterday that during your time at

14   ARAM Global and 1/0 Capital, you performed work on behalf of

15   PRES; is that correct?

16   A.  Yes.

17   Q.  And this was from 2011 to 2018, correct?

18   A.  Yes.

19   Q.  But your work was not directly for PRES, it was for Phoenix

20   Advisors and Managers USA LLC, correct?

21   A.  It's not very clear what the work was for.  Every day there

22   are projects that need to be done.  I was just doing it.

23   Q.  But it's your testimony that you don't know exactly which

24   entity that you did the work for, correct?

25   A.  I don't make the distinction.

N4LKUSB1                         Tang - Direct

1    Q.  With your testimony that you don't make the distinction,

2    did you make any distinction between your work for an entity

3    called Activist Special -- Activist Special Advisory or Phoenix

4    Advisors and Managers?

5    A.  That entity sounds familiar, but I don't know the details

6    of that entity.

7    Q.  Do you have any understanding that PRES had a subcontract

8    with PAM at one point?

9    A.  I know there are a lot of legal entities.  I just don't

10   know the details of them because they are not related to my

11   daily work.

12   Q.  Do you have an understanding that PRES at one point had a

13   subcontract with Activist?

14   A.  I don't know exactly all the details.  I know there are a

15   lot of legal entities, but I don't know any of the details.

16   Q.  Do you have any understanding if your work for a certain

17   entity changed to a different legal entity over time?

18   A.  I mean, it's a complicated process because I was no longer

19   employed by a big corporation, like Bank of America.  My job

20   start -- not job, but my activity is associated with ARAM

21   Global, and then over time, became a partner at 1/0, and, right

22   now, I'm an employee for Better Mortgage.  So they have been

23   changing over time, but a lot of the work, as you correctly

24   described, from 2011 to 2018 period, they're mostly related to

25   RMBS, in particular, I would say, very, very heavily

1  concentrated on the Triaxx CDOs.

2  Q.  Understood, Dr. Tang.

3          This work that you did on behalf of PRES, did this

4  take your full time in your job?

5  A.  It varies over the years.  At least in the earlier years,

6  from 2011 to 2016, I would say the bulk of my full-time duties.

7  Q.  And from 2016 to 2018?

8  A.  It gradually become less and less.  It may still be

9  50 percent of my workday, and it still last piecemeal after

10  2018 to, like, a couple of years ago.

11  Q.  At 1/0 Capital, which would have been the time period after

12  2016, did you work for any other portfolio of 1/0 Capital's

13  portfolio companies?

14  A.  I have projects coming through my desk all the time.  They

15  are for various purposes.  Anything that's related to

16  quantification or analytical modeling-building, it comes

17  through me, and I'll do the work.

18  Q.  Do you have any understanding of what entities you did that

19  work for?

20  A.  I remember there was entity called Ferry Farm Capital,

21  there was an entity called Clime Capital – Clime is C-l-i-m-e.

22  Phoenix, obviously, I know, is related to Triaxx.  There is an

23  entity called The Number.

24  Q.  So is it fair to say that you did work for a lot of

25  different 1/0 Capital portfolio companies?

N4LKUSB1                         Tang - Direct

1    A.  Yes.

2    Q.  And it's your testimony that you were doing random projects

3    and anything that had to do with analytics and financial

4    modeling, correct?

5    A.  Yes.

6    Q.  During this 2011 to '18 time period, did you receive a

7    bonus from any of those entities?

8    A.  I received a one-time $250,000 bonus at the conclusion of

9    the Countrywide-Bank of America settlement.

10   Q.  And that was --

11   A.  It was 2014.

12   Q.  And that was from PRES?

13   A.  I just noticed, there was a wire transfer into my bank

14   account.  I didn't even pay attention where it came from.  I

15   know it's related to the settlement.

16   Q.  And there were no other bonuses during this time?

17   A.  Correct.

18   Q.  Dr. Tang, I assume you received a salary for your work

19   during this time period, correct?

20   A.  Yes, I've been paid.

21   Q.  Do you recall what your salary was — and we can start

22   backwards — in 2018?

23   A.  Around $200,000.  That has been fairly stable over time.

24   Q.  So around 2011, you think it was around that number, maybe

25   a little bit less?

N4LKUSB1                          Tang - Direct

1   A.  Yes, yes.

2   Q.  We'll say 200,000 a year.

3           And, Dr. Tang, you testified yesterday that you

4   understood that the Triaxx CDOs engaged PRES to provide some

5   detail of analysis of the RMBS collateral underlying the three

6   Triaxx CDOs, correct?

7   A.  Yes.

8   Q.  And it is your testimony that you worked with a data vendor

9   and developed algorithms to parse through this data, correct?

10  A.  Yes.

11  Q.  And this was mostly from 2011 to 2013?

12  A.  For all these years, I will say data vendors have been

13  engaged not by myself, but I have access to all this data from

14  third-party vendors, and I have access to algorithms, if you

15  will, and running analysis whenever it's needed throughout the

16  years, even continuing to today.

17  Q.  Understood.  I may be able to be a little more precise.

18          Did you develop these algorithms, Dr. Tang?

19  A.  I didn't write any code.  Ziggy did.

20  Q.  Ziggy wrote the code.

21          And you worked with Ziggy to tweak the code; is that

22  correct?

23  A.  It's the way our complementary members of the team.  Ziggy

24  is more of the technology expert, developing like ChatGPT type

25  of artificial intelligence, whereas I supply the human

1  knowledge, human intelligence, so that he can mimic what I do

2  in a more systematic fashion.

3  Q.  If we turn to your declaration, which is paragraph 40, you

4  stated that, "We actually completed several versions of this

5  algorithm from 2011 to 2013, tweaking and revising it as the

6  work on behalf of the Triaxx CDOs progressed."

7          Is that accurate, Dr. Tang?

8  A.  Yes.

9  Q.  So, it would be accurate to say that you worked with

10  Mr. Jonsson on this algorithm?

11  A.  Yes.  From 2011 to 2013, very extensively, almost like day

12  and night, developing algorithms.  And that effort continues

13  all through that period.  After 2013, as well.  It's an ongoing

14  effort, just not as intensive.

15  Q.  Understood.

16          Did you develop any new algorithms with Mr. Jonsson or

17  anyone else at ARAM Global after 2013?

18  A.  I think so.  There are new things being added to the system

19  all the time.

20  Q.  Were they brand new algorithms, or were they revisions of

21  the algorithms that you and Mr. Jonsson had developed from this

22  2011 to 2013 time period?

23  A.  It's evolving over time.  If there's something that comes

24  up in the work that we do, and then we have to design new

25  things to accomplish the analysis that's needed to uncover

1    truth.

2    Q.   You testified, Dr. Tang, in the next paragraph of your

3    declaration, at paragraph 41, that the cost to develop this

4    algorithm was between 10 million and 20 million dollars; is

5    that correct?

6    A.   Yeah, that's just a rough estimate.

7    Q.   Are you estimating this cost in the period of 2011 to 2013,

8    or does this cost extend through the years?

9    A.   I wasn't thinking about 2011 to 2013, but as I described

10   earlier, that was the most intensive period.

11   Q.   So how did you estimate that cost, Dr. Tang?

12   A.   There are labor costs, and there are data costs.  That's

13   pretty much what it is.

14   Q.   Can you be a bit more specific?  How did you go about

15   coming up with that estimate, other than noting vaguely that

16   there's labor and data costs?  Can you name any other specific

17   data costs?

18   A.   So the $10 million, if you divide it by, say, $200,000,

19   that will be how many people, 50?  So 50 divided by 5 years

20   will be like 10 people, right?  And that's just labor.  If you

21   add the cost acquisition of buying data and licensing, yeah, so

22   10 to 20 would be a, in my mind, fair estimate.

23   Q.   So this is your testimony, that this is a very rough

24   estimate, you didn't go back and look at any records of the

25   costs?

1    A.  That's not my job.  I don't have access to that record

2    myself.  It's an estimate.

3    Q.  Right.

4              What I'm asking is that you are estimating the cost of

5    building the algorithm was between 10 million and 20 million

6    based on a very rough estimate of a $200,000 salary, dividing

7    all these numbers and some other data costs.

8              My question for you is:  When you were coming up with

9    your declaration, did you go back to any financial records and

10   look at the actual cost it took to build this algorithm?

11   A.  No, I did not.

12   Q.  Was the algorithm you built unique to the Triaxx CDOs' RMBS

13   collateral, or could it be used to analyze other RMBS

14   collateral?

15   A.  It can be utilized to analyze any RMBS collateral.

16   Q.  Do you believe the algorithm can be tweaked to analyze

17   other types of loans or other types of financial products?

18   A.  It's primarily residential mortgage loans.  That's the

19   target collateral that the system was designed for.

20   Q.  And it's your testimony that after this intense time period

21   of 2011 to 2013, you edited the algorithm, but did not build a

22   brand new algorithm, correct?

23   A.  It's very hard to differentiate what's new, what's not new,

24   because if something that's dramatically different in 2016 than

25   what we're using, but is based on the same concept that was

1    developed in 2012, for instance, so I can't sort of claim that

2    those two things are the same or they're not the same.

3    Q.  And is it your testimony that the algorithm evolved over

4    time?

5    A.  Yes.

6    Q.  And you don't know which entity owned the intellectual

7    property for the algorithm, correct?

8    A.  I don't know.

9    Q.  And you don't know if this entity changed over time,

10   correct?

11   A.  I don't know.

12   Q.  And, Dr. Tang, you continued, over the 2011 to 2018 time

13   period, to use this algorithm as it evolved on behalf of the

14   Triaxx CDOs, correct?

15   A.  Can you repeat the question?

16   Q.  You continued this entire time -- just to be clear, from

17   2011 to 2018, you've used the original algorithm and as it has

18   evolved over time, correct?

19   A.  Yes.

20   Q.  Did you use any portion of this algorithm to perform work

21   on behalf of any entity other than PRES?

22   A.  The algorithms were used in products that are all set of

23   Triaxx CDO-related work, correct.

24   Q.  Are they still in use today?

25   A.  I haven't personally used it in a while, but I imagine it

N4LKUSB1                         Tang - Direct

1    can still be utilized if there are projects that requires such

2    algorithm.

3    Q.   Switching topics to the Activist litigations.

4            You testified yesterday when you found originator or

5    servicer wrongdoing — or also in your declaration — you worked

6    with Triaxx CDOs' counsel to use that evidence to obtain

7    compensation from the RMBS trustees, originators, and

8    servicers, correct?

9    A.   Yes.

10   Q.   And is that counsel Mr. Moon?

11   A.   Including John Moon, yes.

12   Q.   So you worked directly with Mr. Moon, correct?

13   A.   Yes.

14   Q.   Without telling me anything privileged about your

15   conversations with Mr. Moon, would you be able to describe to

16   me the format of how you presented your work to Mr. Moon?

17   A.   Most of the communication are in conversations face to face

18   or over the telephone.  In terms of format of information, most

19   likely in Excel spreadsheets, Word documents, PDF files,

20   images, things of that nature.

21   Q.   Did you send that work product to Mr. Garg or Mr. Calamari?

22   A.   It depends on the circumstance; could.

23   Q.   From time to time, did you send that work product to

24   Mr. Garg or Mr. Calamari?

25   A.   Occasional; not a regular workflow.

N4LKUSB1                          Tang - Direct

1   Q.  You testified in your declaration that in 2011, you began

2   assisting with litigating against a bank, and in 2014, the bank

3   offered a settlement, correct?

4   A.  Yes.

5   Q.  And that was Bank of America/Countrywide?

6   A.  Yes.

7   Q.  You also testified that because you provided egregious

8   examples of faulty loan origination, the bank settled

9   separately with the Triaxx CDOs for a significantly higher

10  amount than the Triaxx CDOs would have received under a

11  proposed settlement, correct?

12  A.  Yes.

13  Q.  Were you involved in the negotiations between the Triaxx

14  CDOs and the bank?

15  A.  I was never part of any negotiation.

16  Q.  Do you know how much the Triaxx CDOs would have received

17  under the referenced proposed settlement?

18  A.  As of today, I know the amount is roughly 104 million.

19  Q.  But you just testified that the bank settled separately,

20  correct?

21  A.  That's my recollection, yes.

22  Q.  Do you know how much the bank would have received if it did

23  not settle separately?

24  A.  You are asking the bank would have received?

25  Q.  I'm sorry, the Triaxx CDOs would have received if they

1   settled separately with the -- if they did not settle

2   separately with the bank.

3          For the clarity of the record, let me rephrase.

4          Do you know how much the Triaxx CDOs would have

5   received if they did not settle separately with Bank of America

6   and Countrywide?

7   A.  I don't know.  It was never a question, because we knew

8   there was going to be a settlement.

9   Q.  But is your testimony that a significantly higher amount

10  was received by the Triaxx CDOs because they settled

11  separately?

12  A.  Yes.

13  Q.  What is your basis for your statement that the Triaxx CDOs

14  settled for a significantly higher amount?

15  A.  That statement is based on my understanding of the

16  Countrywide/Bank of America global settlement, which is

17  $8.5 billion on about $100 billion of realized losses that 22

18  institutional investors, including PIMCO and others, along with

19  the Texas law firm, negotiated with Bank of America and

20  Countrywide.  Under the agreement, the investors accept that

21  8.5 billion would be enough compensation for the 100 billion or

22  so realized losses that's caused by Countrywide.

23          Our position, when we were objecting to that

24  settlement, was basically Bank of America and Countrywide was

25  responsible for very, very large losses — perhaps 50 billion

1    out of 100 billion is caused by them — and yet they're getting

2    away with paying only 8-1/2.

3            So, on that 8-1/2 billion dollar payment, when it

4    trickles down to Triaxx, it would have been a small amount.

5    That's my estimate, good-faith estimate.  Whether it's

6    5 million or 10 million or 20, I need to do the calculation in

7    order to know, because Triaxx CDOs had probably 70 positions

8    affected by the Countrywide settlement, and combining those 70

9    positions, at the time of settlement, the realized losses on

10   the 70 positions had been fairly minimal.

11           So, it would appear to us it's extremely unfair the

12   settlement amount is being too small, and the benefit trickles

13   down to Triaxx is going to be much, much lower than our

14   settlement would generate.

15   Q.  I understand, Dr. Tang.

16           But my question for you is:  Can you do that

17   calculation to what Triaxx would have received if it did not

18   opt out of that settlement?

19   A.  I don't recall doing the exact, precise estimate, because

20   we knew that it was a settlement that was even.

21   Q.  You personally do not know that the higher amount that the

22   Triaxx CDOs settled for was directly due to Phoenix's analysis

23   rather than, like, a back-and-forth negotiation between

24   counsel, correct?

25   A.  As I said earlier, I didn't participate in the negotiation

1    process.

2    Q.   Thank you.

3         Are you aware of how much PRES has been paid to date

4    by the Triaxx CDOs?

5    A.   I have a rough idea.

6    Q.   What is that idea?

7    A.   Give or take, maybe $30 million of base fee, classified as

8    diligence and active implementation, and another 18, perhaps,

9    on incentive payments.  So, give or take, I'm guessing, 30 plus

10   18, $50 million.  That's my rough guess.

11   Q.   And it's your testimony, Dr. Tang, that every piece of work

12   that you prepared for the ultimate benefit of PRES was prepared

13   at the direction of counsel?

14   A.   Can you repeat the question?

15   Q.   Is it your testimony that every piece of work that you

16   prepared for the ultimate benefit of PRES was prepared at the

17   direction of counsel?

18   A.   Almost entirely, but there may be exceptions.  I mean,

19   right now, I can't recall any of the exceptions.

20   Q.   And it's also your testimony that PRES was entitled to

21   receive incentive fees when the collateral manager sold its

22   collateral, correct?

23   A.   Yes.

24   Q.   You testified yesterday that this was because the RMBS

25   collateral increased in value due to TAM's work, which was used

1   in the Triaxx CDOs' activist activities?

2   A.  Yes.

3          MS. BUCKEL:  Tom, would you please pull up this

4   spreadsheet, which I believe is 3137.  Thank you.

5   Q.  And the spreadsheet we're looking at here, this shows that

6   the sum total of work product shows that the RMBS increased in

7   value due to TAM's work, right?

8   A.  Yes.

9   Q.  Is it your testimony that this work product concerning the

10  increase in value was prepared at the direction of counsel?

11  A.  I don't remember the exact circumstances, but I remember

12  having conversations with John Moon and Nicholas Calamari

13  regarding this incentive calculation.

14  Q.  But this has nothing to do with the activist litigations,

15  correct?

16  A.  Repeat your question.

17  Q.  Does this spreadsheet and the calculations therein relate

18  to any of the activist litigations brought by John Moon or

19  other law firms?

20  A.  Well, this is the result of the benefit of all the

21  litigations that we did and all the work that we presented to

22  the responsible parties who caused a huge amount of damage to

23  all the positions being held by the Triaxx CDOs.

24  Q.  So it is your testimony that every single one of these

25  positions, Phoenix did analysis and work on before?

1    A.   Yes.

2    Q.   Where is that indicated on this spreadsheet?

3    A.   I'm not seeing any columns directly labeling each position,

4    but it's my understanding that Phoenix has worked on all these

5    positions.

6    Q.   But it's not indicated anywhere on this spreadsheet,

7    correct?

8    A.   Yeah, if needed, we can add in those information, that's

9    not going to be hard, because we did all the work.

10   Q.   And, Dr. Tang, you testified that you helped to prepare

11   invoices that PRES submitted to the Triaxx CDOs for its

12   services, correct?

13   A.   Yes.

14   Q.   Did you help Mr. Jonsson and Mr. Garg prepare those

15   invoices?

16   A.   So the actual sending of invoices to different parties,

17   that's outside of my domain, but any work within PRES related

18   to Triaxx that requires quantification, numbers, I would always

19   be involved and be responsible for providing analysis whenever

20   they are needed.

21   Q.   Did PRES determine whether PRES was entitled to the

22   incentive fee?

23   A.   I never asked that question.  It's outside of my regular

24   work responsibilities of providing analysis.  I get an

25   understanding from communicating to other team members,

N4LKUSB1                         Tang - Direct

1   describing to me what incentive payment is supposed to be and

2   how it's defined, and then I will trust them providing me that

3   information.  I will use that information to make my

4   calculation in the spreadsheet.

5   Q.  So, then, you were told to calculate an incentive fee at a

6   certain period of time, you did that data analysis work, and

7   you presented that number to -- to whom exactly?

8   A.  To whoever is going to submit the invoice.

9   Q.  Who was that?

10  A.  With this, I don't exactly remember who submitted this

11  particular invoice.

12  Q.  In general, who submitted the invoices?

13  A.  There are different people over time.  I think Vishal Garg,

14  at the initial stage, submitted invoices.  Ziggy was involved

15  submitting invoices.  There is someone by the name of Randy

16  Tokar who was responsible for invoices.  And, occasionally,

17  when everybody was out, I may have to step in their shoes and

18  call them up and say what do I have to do here, what number do

19  I put in where, and then submit them — occasionally.

20  Q.  When you submitted these numbers to those list of

21  individuals, did they ever ask you questions?

22  A.  Well, everyone is supposed to check everyone else's work.

23  So I'm responsible to do the calculation, but it will never get

24  sent out without other people's confirming, checking back and

25  forth, before they went out.

1    Q.   But you're not a hundred percent sure that the people did

2    that?

3    A.   That's my assumption.  We know that was the process from

4    the very beginning.

5    Q.   Let's go back to the spreadsheet, Exhibit 3137.  Let's just

6    look at one particular CUSIP, and to make it easy for everyone,

7    we're going to go with the first CUSIP, which is at line 10 of

8    the spreadsheet.

9            Dr. Tang, can you tell me, sitting here today, exactly

10   what work was done with regard to this CUSIP?

11   A.   I need to go back and check records because this many years

12   ago.  So, just on the face of it, it says CWALT 2006-7CB.  I

13   know it is an RMBS trust originated mostly by Countrywide

14   because it's a Countrywide trust.  It has thousands of

15   residential mortgage loans in it.  I know that a lot of the

16   loans were originated in violation of the reps and warranties

17   of the RMBS deal document.  I also know that some of the loans

18   may have suffered big losses because of the servicing breaches

19   where the servicer did not do the job properly.

20           Whether this was part of the Countrywide settlement —

21   I'm pretty sure it probably is --

22           THE COURT:  It was, according to the Excel

23   spreadsheet.

24   Q.   Maybe let's go to the next one, then, because that seems to

25   be one that was not a part of that settlement.

N4LKUSB1                              Tang - Direct

1          Could you tell me, for the CUSIPs that were not part

2     of the Countrywide settlement, what work you would have

3     completed on those CUSIPs?

4          THE COURT:  You want to pick a CUSIP?

5     Q.  Let's do number 2, which is in line 11.

6     A.  CMLTI 2005-12, that was a residential mortgage trust highly

7     likely by Citibank.  So Citibank would either originate

8     thousands of mortgage loans or purchase them from their

9     corresponding lenders and put together the trust in 2005, and

10    issued numerous notes using those mortgage loans as collateral.

11         Again, I know for sure there was a Citibank settlement

12    that John Moon was objecting to.  Most likely, that's the case.

13    So the trustee work involved with that, and there are loans

14    that we have sent Citibank as examples where the loans were

15    originated in violation of the reps and warranties, and the

16    servicers were not doing their job, leading to large losses in

17    the underlying RMBS trust, and brought damage to the position

18    that Triaxx was holding in 2006-1.

19    Q.  You just testified that we sent Citibank certain examples.

20         Who is the "we" you are referring to?

21    A.  The team.

22    Q.  Yourself, Mr. Jonsson, Mr. Savino?

23    A.  Vishal Garg and John Moon and maybe other attorneys.

24    Q.  Do you personally remember sending these examples to

25    Citibank?

1    A.  I was never sending any examples to anywhere.  I was

2    communicating all the fundings through attorneys.

3    Q.  But you never personally spoke to any of these banks

4    related to these RMBS, correct?

5    A.  Yes.  So we are small team.  I trust all the other team

6    members doing their job.  My job is to do the analysis and

7    identify wrongdoings.  For people my age, I'm sure you'll see

8    in the TV drama made by Peter Falk, Columbo, so my job is like

9    a three-stage process.  Stage one, there is a body there,

10   someone committed murder, maybe a perfect murder, but as time

11   goes on, my job is to get into the trenches, identify all the

12   critical information, and backtrack all this days and months

13   and years leading up to the murder, and identify who were

14   where, they did what, leading to someone died.

15            So, every month, when we receive trustee reports from

16   all the 200 or so trusts, RMBS trusts, we go through them all

17   and identify all the bodies being buried there.  The RMBS

18   trustees will never tell you any story.  They will say this

19   month, your trust lost $3 million, period.  That's the end of

20   the story.  So, it's our job to go in there and say, why did

21   that trust lose $3 million, why does my CDO suffer a $2 million

22   loss because of that?

23            So that's the nature of our work.  And when we

24   identify things, it became a story.  And that story is being

25   repeated millions of times to provide evidence so that legal

N4LKUSB1                          Tang - Direct

1   teams can pursue whatever solution they see fit.

2   Q.  Understood.

3            Dr. Tang, you're really testing my pop culture

4   knowledge, which is embarrassing.

5            THE COURT:  She's too young.

6            MS. BUCKEL:  I don't know if I'm too young.  I don't

7   know pop culture that well.

8   BY MS. BUCKEL:

9   Q.  Would it be your position that you were given directions

10  from other members of your team, and you're the one who really

11  just crunches the numbers?

12  A.  I'm the one running analysis using human intelligence,

13  whichever way possible, to uncover the truth and then

14  communicating the truth back to the team.

15  Q.  It's your position that if a particular CUSIP was a part of

16  a settlement, PRES would be -- and that amount was over

17  $500,000, PRES would be entitled to an incentive fee as a part

18  of -- let me start over.

19            Is it your testimony that if a particular CUSIP was

20  part of a settlement, and it was over -- the value was over

21  $500,000, PRES would be entitled to the incentive fee, correct?

22  A.  That was my understanding, yes.

23  Q.  From the spreadsheet, if a particular CUSIP was part of a

24  settlement, it would not be eligible for further incentive

25  fees, correct?

A.  So, the engagement between Triaxx Asset Management and
Phoenix, or PRES, is highly unusual in the investment
management world.  It's highly unusual in the sense that,
number one, there is a $250,000 cap, lifetime cap, the base
fee, and a $250,000 cap on the incentive fee.  It doesn't
matter if you generate a $2 billion benefit — it doesn't
matter.  That's highly unusual in the investment management
world.

        So, from that perspective, I give Tom Priore all the
credit and ingenuity to design a contract that will provide
PRES all the incentive to do hard work, while minimizing the
cost to Triaxx CDO investors.

Q.  And it's your position that PRES is acting as an investment
manager of sorts?

A.  PRES is in a position, being engaged with Triaxx Asset
Management, to serve the interests of the CDOs.  The labeling
doesn't matter.  At least to me, it doesn't matter.

Q.  How was it determined that the recovered value was a
result, direct result, of PRES's work?

A.  Again, in the investment management world, you begin by
asking yourself, I'm managing other people's wealth, what is my
AUM.  AUM is measured by how many dollars you're managing
today.  And regardless what the result is going to be, you get
paid a base fee.  If your performance, you have a percentage of
the performance fee.  That's a generic structure.

1                And, again, I'm saying, this contract, agreement,

2        between PRES and TAM is highly unusual in the favor of the CDOs

3        because there's no such concept of AUM.  It's per CUSIP.  And

4        when you do that per CUSIP, it force PRES to go through all the

5        CUSIP one at a time, do all the hard work, and the incentive

6        compensation is capped at 250K.  And keep in mind, there are

7        200 positions, and with 200 positions, $10 billion, you're

8        talking about $15 million per position many, many years ago,

9        when this became a thing, a CDO.

10               So the incentive is capped at 250K, and the active

11       implementation is capped at 250K.  That's a tiny percentage of

12       the average $15 million per position.

13       Q.  Thank you, Dr. Tang.

14               I guess my question is how -- there is increase in

15       value in a typical investment management situation, the

16       investment manager buying, selling, doing a lot of different

17       work over a long period of time to get an increase in value,

18       but it seems that here, PRES was doing an analysis of the

19       underlying collateral and giving that analysis to an attorney

20       to bring actions, but how do you know that the value that was

21       recovered was as a result of PRES's direct work?

22       A.  Sorry, I was a little bit carried away earlier.  I didn't

23       answer your question directly.  So now I understand your

24       question is asking the valid proposition that we bring to the

25       table.

1          So, basically, when we took over in 2011, this 104

2     positions had a $2.7 billion notional and roughly 1.4 billion

3     with the most optimistic assessment.  When all was said and

4     done, by 2017, there are 2.144 billion in realized value.  And

5     the simple math is 2.1 minus 1.4 is $700 million, and I don't

6     know for sure every penny of the $700 million is as a result of

7     the work that Phoenix did.  However, we have put in our heart

8     and soul into the many years of hard work going after every

9     responsible party of every CUSIP day in, day out, and those

10    results in a very, very high recovery for the Triaxx CDOs, no

11    comparison to any other CDOs of the kind back in the day.

12         So, there are 10 billion collateral in the three CDOs

13    in 2006-2007.  When all was said and done, there's only

14    $500 million losses as a result of the financial crisis when

15    all the other CDOs lost half or 50 -- or 70 percent or

16    80 percent or even a hundred percent of their value.  So you

17    tell me whether I created value or not.

18    Q.  Let's look back at the spreadsheet pretty quickly.

19         Is it your position that if PRES did absolutely no

20    work, that the column you see in B, the liquidation -- the

21    estimated liquidation proceeds that sold on March 25, 2011,

22    would be the same as column AC?

23    A.  I can never be a hundred percent sure and tell you that's

24    exactly what we did, but I can only show you the work that we

25    did and what happened to the other CDOs without PRES help.  So

1    that's the circumstantial evidence I can provide to you.  And

2    if you say that the 1.4 to 2.1 billion is purely by luck, I'll

3    tell you a fact that for other CDOs, that luck never

4    materialized.

5    Q.  Other CDOs were comprised of different assets, correct?

6    A.  We are talking about CDOs of similar underlying

7    collaterals.  I'm not talking about other CDOs with different

8    collateral.

9    Q.  But you've never done the analysis specifically of the

10   value that PRES brings versus the value that PRES increased

11   versus the general market increase that happened from the

12   depths of an economic recession to 2017?

13   A.  We did an analysis comparing CDOs.  The Triaxx CDO is like

14   a giant amount, it appears, in the similar asset class.

15   Q.  Let's turn to Exhibit 3497, which I believe is tab 3 of

16   binder 1.

17           I believe yesterday we looked at some charts that were

18   in this exhibit.  It was your testimony that you sent these

19   charts to be compiled in some sort of packet to someone; is

20   that correct?

21   A.  Yes.

22   Q.  Who did you submit these charts to?

23   A.  I don't remember.  Some of the team members, for sure, but

24   I don't remember who.

25   Q.  And it's your testimony that these team members reviewed

1  and audited these charts?

2  A.  Yes.  There's no secrets among our team members.  Everybody

3  understand what everybody else is doing, and there's

4  cross-check on work all the time.

5  Q.  And these charts don't provide any backup for the

6  information provided, correct?

7  A.  Can you flip the exhibit so that I can see?

8  Q.  Let's look at page 1656, for example.

9           Oh, Dr. Tang, if you want to take -- it's tab 3 in the

10 first binder, if you would like, or you can look at it on the

11 screen.  This is just an example.  I'm not going to go line by

12 line.

13 A.  Okay.

14           What's your question?

15 Q.  The question is:  When you presented this to someone on

16 your team, this doesn't have any backup to the calculations

17 done on this chart, correct?

18 A.  The backup calculation can be looked up in our file system,

19 or I can recreate one, and to the penny, if that's what you

20 want to see.

21 Q.  It's your belief that someone on your team just reviewed

22 that, audited that, made sure it was accurate?

23 A.  Yes.

24           MS. BUCKEL:  I'm just going to go through my notes

25 because Mr. Savla and Mr. Lauriello did cover a substantial

N4LKUSB1                         Tang - Direct

1   amount yesterday.

2            I just want to go back to one more thing, to the

3   spreadsheet that we were looking, and apologies for going back

4   and forth, your Honor.

5            THE COURT:  The Excel spreadsheet, Exhibit 3137?

6            MS. BUCKEL:  Excel, yes.

7   BY MS. BUCKEL:

8   Q.  So it's your testimony that this spreadsheet doesn't show

9   exactly when PRES worked on each CUSIP, correct?

10  A.  Correct.

11  Q.  And each CUSIP would only be eligible for an activist

12  implementation fee for, I think, $10,000 a month for 25 months,

13  correct?

14  A.  Correct.

15  Q.  And then you had to rotate the positions, right?

16  A.  Yes.

17  Q.  But your spreadsheet is showing an increase in value over a

18  period of five or six years?

19  A.  Yes.

20  Q.  Even though PRES only worked on that CDO for a period of

21  just over two years, correct?

22  A.  Incorrect.

23  Q.  So is it your testimony that PRES worked on all of these

24  CDOs for the period of -- sorry.

25            Is it your testimony that PRES worked on all of these

N4LKUSB1                          Tang - Direct

1    CUSIPs from March 2011 to the date, the liquidating date, in

2    2013 or 2017?

3    A.  Yes.

4    Q.  Even though there was the 25-month limit?

5    A.  It's my recollection that work for Triaxx never stopped

6    from the engagement point of 2011 to the liquidation.

7    Q.  And that's for all the CUSIPs, correct?

8    A.  All the CUSIPs.

9    Q.  And the spreadsheet doesn't indicate the amount of monthly

10   activist implementation fees that had been paid, correct?

11   A.  This spreadsheet is a simple summary designed to calculate

12   the $700 million value being created and the 18.25 million

13   incentive compensation that's due to Triaxx -- sorry, due to

14   Phoenix.

15   Q.  Is there a separate spreadsheet that shows which CUSIPs

16   were charged the monthly activist fees?

17   A.  I'm sure there are records.  We can identify them and go

18   through the file system.  I don't think it's going to be that

19   hard to find them out.

20   Q.  So, Dr. Tang, other witnesses have testified that PRES

21   could only work on a limited number of CUSIPs at a time.

22          Was that your understanding?

23   A.  From a compensation perspective, yes.

24          THE COURT:  From what perspective?

25          THE WITNESS:  Compensation.

1              THE COURT:  Compensation?  Thank you.

2     BY MS. BUCKEL:

3     Q.  In your role at 1/0 Capital or ARAM Global or now at

4     Better, do you do similar work for other CDOs or structured

5     finance vehicles?

6     A.  Not since 2018.  Before that, yes.

7     Q.  And that was when you were at 1/0 Capital?

8     A.  And also ARAM Global.

9     Q.  ARAM Global?

10             What other CDOs did you work on?

11    A.  This is going back many years, but we have had clients who

12    had CDOs that they asked us to look at.  And there are also

13    cases -- while we were at ARAM Global, prior to the Triaxx CDO

14    engagement, there are customers who have asked our help in

15    liquidating certain positions out of CDOs.  So we have been

16    actively engaged from the 2009-2010 crisis period to 2011,

17    prior to the engagement with Triaxx.

18    Q.  So you did similar analysis on behalf of other CDOs,

19    correct?

20    A.  I'm sorry, I didn't --

21    Q.  Have you done similar analysis on behalf of other CDOs?

22    A.  So my knowledge with CDOs started with my career from -- in

23    the late '90s with MBIA.  And CDO was the product created when

24    I was a professor at Fordham, and I got so interested in the

25    concept.  That's why I left my job in the academia, to pursue

1    my understanding of CDOs.

2    Q.  Right.

3          But did you do similar work to what is on the screen

4    right now on behalf of other CDOs?

5    A.  Not to the extent of going after wrongdoings, because

6    wrongdoing didn't happen on 2007, 2006, 2008.

7    Q.  So it's your testimony that you really only have done this

8    analysis for the Triaxx CDOs?

9    A.  I disagree with that statement because CDOs are complex

10   concepts, and it became an industry over time.  I was an active

11   participant on both the sell side and the buy side, so to

12   speak, sell side meaning the investment banking side, and buy

13   side, asset management insurance.

14   Q.  Dr. Tang, what I'm trying to understand is, did you do a

15   similar analysis on other CDOs like what's on the screen for

16   other CDOs?

17   A.  If you mean active litigation against responsible parties,

18   originators, servicers, whatever the case might be, this is

19   somewhat unique from that perspective, yes.

20   Q.  But you didn't do the activist litigation part, you did the

21   data behind that, correct?

22   A.  Again, I don't draw distinction between my litigation work

23   or whether I presented to the responsible party or not,

24   because, in my mind, when I'm investigating wrongdoing, I was

25   involved with the litigation.  So I disagree with saying I

1    never involved with litigation.  My work is all about

2    litigation with respect to all these positions.

3    Q.  For the Triaxx CDOs?

4    A.  For Triaxx's CDOs.

5    Q.  And the other CDOs, there was never any litigation or other

6    communications with the banks of the sort you spoke of earlier?

7    A.  There could be, because there are other attorney -- legal

8    firms approaching the 1/0 companies to do analysis, and I could

9    have been involved with that, and that will be CDOs, and that

10   will be litigation work.

11   Q.  But from the period of 2011 to 2018, you didn't do what is

12   on your screen for another CDO, correct?

13   A.  I'm not hundred percent sure.

14           MS. BUCKEL:  No further questions.

15           THE COURT:  Anyone else have cross-examination for

16   this witness?  Issuers, no?

17           MR. RAINER:  No, your Honor.

18           THE COURT:  All right.  Redirect?

19           MR. VASSANJI:  I have redirect, your Honor, but we

20   request a short break just to discuss.  We're almost at the

21   breaking point anyway.

22           THE COURT:  That's fine.  We would almost be ready for

23   a break anyway.  So let's take ten minutes, and then we'll be

24   back.

25           (Recess)

1              (In open court; case called)

2              THE COURT:  Mr. Vassanji, you have redirect; yes?

3              MR. VASSANJI:  Yes, your Honor.

4    REDIRECT EXAMINATION

5    BY MR. VASSANJI:

6    Q.  Good morning, Dr. Tang.

7    A.  Good morning.

8    Q.  We had been looking at Exhibit 3137.  Would you mind

9    turning to that spreadsheet, please.

10   A.  Yes.

11   Q.  You've testified and were asked about column AC, the total

12   principal proceeds column.  Is that right?

13   A.  Yes.

14   Q.  And I believe you testified that the numbers in that column

15   are comprised of columns AA and AB, the total principal

16   collections and actual liquidation proceeds?

17   A.  Correct.

18             THE COURT:  Are we going to see it on the screen?  The

19   Court so requests.  Thank you.

20   Q.  So looking at column AA, how were the numbers in this

21   column affected by PRES' work, if at all?

22   A.  Excuse me, how column AA is affected by what?

23   Q.  The column AA shows total principal collections.  Is that

24   correct?

25   A.  Yes.

Q.   And how were the total principal collections that are shown

in this column, how do those numbers reflect PRES' work?

A.   So, PRES has been going after CUSIP upon CUSIP, responsible

party on responsible party like a mad dog, and with all this

barking and going after responsible parties, people pay

attention.  The responsible parties with wrongdoing in the

past, they all of a sudden figure out that someone is watching

over their back, so their behavior does change.

         And it is our understanding that with PRES' work, and

the constant litigation, and funding, they made the responsible

parties behave in a responsible way.

         So all this principal collection and the reduced

losses over time, in our opinion, is a direct connection to the

work that we were doing.  Although as I mentioned earlier, we

can never 100 percent for sure.  But the fact of the matter is,

Triaxx did collect $1.369 billion over the period from 2011 to

the time they were liquidated.

Q.   You mentioned responsible parties.  Could you just explain

what you mean by that?  Who are the responsible parties?

A.   Initially, it was the originators who put loans in

violation of the reps and warranties in those trusts.  And to

the extent possible, they may be put back to the responsible

lenders at a time when they originated a loan, the loan was not

up to the standards, they need to be put back and cash need to

be reimbursed.  And also to the extent that servicers that were

not doing the job, either with respect to modification or
liquidation of the underlying loan, when they realized every
number is being scrutinized, they are no longer going to be not
responsible and not paying attention.  And as a result, in our
opinion, that has improved the collections.

Q.  You've also spoken about the actual liquidation proceeds
which is the column over in column AB.  Could you explain how
the numbers in that column were affected by PRES' work?

A.  So, the liquidation proceeds is calculated as the
liquidation price multiplied by the unpaid principal balance at
the time, which is column Z and column either S or T.

        So S or T is giving us the price of the instrument
when they were sold.  So combining those two numbers, we had a
liquidation proceeds totaling $776 million.  And as you can
see, the price of the instruments in column S, for the most
part, has improved a great deal, or column R.  And column R was
the instrument price when PRES took over in terms of the
engagement with Triaxx Asset Management.  And that improvement
to a large extent is reflection that the market is seeing the
positive result on those CUSIPs, and they are pricing them
accordingly.

Q.  You were also asked yesterday and gave testimony yesterday
about column O, the Triaxx position percent holding.  Do you
see that column?

A.  Yes.

1    Q.  What does that column indicate?

2    A.  That column indicates whether Triaxx CDOs owns 100 percent

3    of that CUSIP, or any percent of that CUSIP.  It is a column

4    that's important because, in general, the higher the percentage

5    you're holding the tranche or the class, the more effective you

6    will be.  So during the dividends process, prior to the

7    engagement with Triaxx, we find out that a lot of the positions

8    in those CDOs have high percentage holdings, and that make it

9    very, very profitable to pursue active strategies.  Because you

10   are the owner of 100 percent of that class, the responsible

11   peoples will take you very seriously versus if you are just

12   1 percent of nobody, they're not going to even open the door

13   and talk to you.

14   Q.  Some of the numbers here for the CDOs are in shown that the

15   CDO owned 27 percent or around a third of the position.  Do you

16   see that in the column O?

17   A.  Yes.

18   Q.  If the other CDOs owned similar proportions of that RMBS

19   class, how would that affect the activist strategy compared to

20   just one CDO owning a third of the tranche?

21            THE COURT:  By the other CDOs, you mean the other

22   Triaxx CDOs?

23            MR. VASSANJI:  Yes.  Thank you, your Honor.

24   A.  Not 100 percent sure the question.  You are saying if --

25   Q.  I'll give you an example.  Perhaps if you look at row 62 in

N4L3USB2                        Tang – Redirect

1    the spreadsheet.  That's a CDO entitled CWHL 2006-20 class

2    1A18.  And column O indicates that the 2006-1 CDO owns

3    27.7 percent of that CDO.  Do you see that?  Of that RMBS

4    tranche, excuse me.

5          Do you see that?

6    A.  Yes.

7    Q.  And in this case, if the other Triaxx CDOs, 2006-2 or

8    2007-1, owned similar proportions of this RMBS class, how would

9    that affect the activist strategy compared to just the 2006-21

10   CDO owning 27 percent of the tranche?

11   A.  Yes, so you're simply pointing to the fact that each

12   position in this table is a unique combination of Triaxx CDO

13   and the CUSIP.  So to the extent that they're duplicate CUSIPs,

14   among multiple CDOs, maybe up to three, because there are only

15   three Triaxx CDOs, the percentages will add up.  When you add

16   them up, they may become significant holdings and make the

17   active strategy much more powerful.

18   Q.  There are 104 entries in this spreadsheet, correct?

19   A.  Yes.

20   Q.  How many additional RMBS trusts did the CDOs own that are

21   not reflected in Exhibit 3137; do you know?

22   A.  There are in excess of 200 positions among all the three

23   CDOs.  And there might be on the order of roughly 150 unique

24   CUSIPs.  So there are fair amount of duplicates, means 50

25   positions may be allocated to multiple CDOs.

N4L3USB2                        Tang - Redirect

1    Q.  Did PRES work on those securities as well?

2    A.  PRES non-stopped working on most of the CUSIPs most of the

3    time with a focus sometimes higher intensity for certain CUSIPs

4    than others, depending on the litigation at hand.

5    Q.  Do you know if those securities that are not reflected in

6    this spreadsheet, but on which PRES did work, experienced

7    similar changes in value as a result of PRES' work?

8    A.  Yes, that I'm sure.  They're similar improvements, but it's

9    team's collective decision that they did not bring about the

10   incentive calculation for those positions for a couple reasons.

11   One is that about 70 positions already covered under the

12   Countrywide/Bank of America settlement, and there is also this

13   ongoing dispute with other parties of the CDO that even this

14   $18 million incentive invoice was in dispute.  So there no

15   point of bringing in other incentive compensations.

16          And while we're at this concept, let me say that the

17   way of compensation being designed as a position level, rather

18   than CUSIP level, as the question that was asked to me

19   yesterday with a yes no answer.  It is correct, when you have

20   one CUSIP occupying all three CDOs, incentive compensation are

21   paid three times.  As matter of fact, in the investment

22   management business, that's actually the norm.  By that norm,

23   what I'm saying is, basically, if PIMCO purchased a billion

24   dollar 10-year U.S. Treasury bill, or Treasury note, and they

25   decided that's a very good position for a thousand of the funds

N4L3USB2                         Tang - Redirect

1    they are managing, PIMCO will never charge fees on that one

2    CUSIP.  Instead, each of the thousand funds is going to send a

3    bill to their investors, and that one purchase is going to

4    carry management fees 1,000 times.

5              So from that perspective, it is entirely misleading to

6    say that PRES has been recklessly sending invoices to ask

7    Triaxx to pay them.  Because that's the norm.  It's by

8    position.  And position's defined by the combination of CDO and

9    the CUSIP.  Not the CUSIP.

10             To use I guess analogy of any other business, if the

11   entire world's assets being managed by one manager, and is

12   $100 trillion, they are not going to charge you only one time

13   management fee.

14             I give credit to Tom Priore in designing an incentive

15   structure so that PRES will be hard at work most of the time,

16   and trying to get the incentive compensation, while benefiting

17   trusts' investors.

18             THE COURT:  Dr. Tang.

19             THE WITNESS:  Yes.

20             THE COURT:  The question was, do you know if these

21   securities that are not reflected in this spreadsheet, but on

22   which PRES did work, experienced similar changes in value as a

23   result of PRES' work.

24             I will ask you to please confine your answer to the

25   question that's asked.  I'm sure that Mr. Vassanji will prompt

1    you if he wants to hear additional testimony from you.

2              THE WITNESS:  Thank you, your Honor.  Yes, I was a

3    little bit carried away.

4    A.   The answer is yes.  It's my opinion the other positions had

5    similar benefits, because we were working on all the CUSIPs.

6    Q.   By similar benefits, are you referring to the number that

7    aggregates column AE, found in cell AE5, the 725 million?

8    A.   Correct.

9    Q.   We've been discussing principal payments that flowed to the

10   CDOs.  Were there interest payments that the CDOs received as

11   well that the CDOs would not have received but for PRES'

12   activist strategies and recommendations?

13   A.   That's a very good question.

14             Yes, indeed.  All this CUSIPs positions, they have

15   constantly received interest payments, in addition to the

16   principal payments that's being calculated in column AA.  And

17   the reason we excluded those interest payments is because we

18   don't want to overstate the benefit that we're bringing to the

19   CDO investors.  And at the same time, we're also considering

20   that if we had sold all this positions back in 2011, people

21   would have been able to generate interest investing in

22   something similar.  So that's why we excluded all this interest

23   payment in the calculation of the benefits.

24   Q.   Do you recall yesterday Mr. Savla asking you some questions

25   about the orders from Judge Pauley and Judge Nathan which led

1   to the liquidation of the CUSIPs that are listed in Exhibit

2   3137?

3   A.  Yes, I do.

4   Q.  You testified earlier that column J, default date, or def

5   date, reflects the date each of these securities was considered

6   to be in default?

7   A.  Yes.

8   Q.  If each of the CUSIPs listed in Exhibit 3137 had been sold

9   immediately upon becoming so-called three year defaulted

10  securities, do you have an opinion as to whether any of them

11  would have increased in value enough at that point such that

12  PRES would have been entitled to receive an incentive fee?

13  A.  All this active strategies takes time for the impact to

14  show up.  Very much like a patient taking medication, it takes

15  time for the medication to be absorbed by the body.  So, the

16  longer the time frame you wait, the better the chance you would

17  have received benefits.

18       So, it's my opinion that upon the three year window,

19  and if you sell it early, you could very well miss a large

20  chunk of the benefit.

21       THE COURT:  You could very well miss a large chunk of

22  the benefit?

23       THE WITNESS:  Yes, if you sell early.

24  Q.  But if they were sold at the three-year mark, say, 2014,

25  '15, and some of these a little bit later, do you have an

1   opinion as to how many of the securities here would have

2   increased, such that PRES would have been eligible for an

3   incentive fee?

4   A.   You're saying out of the ones that run through the

5   three-year window, if we had sold them on the day they went

6   through the three-year window, rather than waiting?

7   Q.   Correct.  Rather than wait until they were sold, actually

8   sold, if they had been sold right at the end of the three-year

9   window, do you have an opinion as to how many of these 104

10  securities would have caused PRES to be eligible for an

11  incentive fee?

12           THE COURT:  How many of them, in a similar Excel

13  spreadsheet created as of that date, would have shown $500,000

14  or more in improved value?

15           MR. VASSANJI:  Yes, your Honor.

16           THE COURT:  Thank you.

17  A.   Yes.  So if the sale happened earlier, I would imagine that

18  the $700 million benefit would have been somewhat smaller.  And

19  the implication is that PRES would have been entitled to a

20  little bit less than the $18 million invoice that was

21  calculated on this sheet.

22  Q.   Do you have a rough estimate of what that lower incentive

23  fee would be in that circumstance?

24  A.   Probably somewhere -- right now it's 18.  I would guess

25  maybe between 12 and 15ish, give or take.  That's just a rough

1   estimate.

2   Q.  If asked to do so, could you calculate what such a pro

3   forma incentive fee would have been?

4   A.  We could.  However, there is one difficulty, because the

5   calculation of the benefit is dependent upon column S and T,

6   where we have the actual liquidation price.  So, any analysis

7   from that regard would require a hypothetical liquidation price

8   whenever the time might be, 2014, '15, '16.  To the extent

9   they're different from the liquidation date here.  It is worth

10  trying, but there is no guarantee we will know for sure how

11  much the liquidation price would have been.

12  Q.  Could you now turn to -- I think we're finally done with

13  this beautiful spreadsheet.  Could you now turn to Exhibit

14  2045, please, which is tab 10 in the PIMCO binder.  The second

15  PIMCO binder I should say.  Tab 10.

16  A.  186?

17  Q.  Exhibit 2045.

18  A.  Yes.

19  Q.  Do you recall that you were asked some questions about this

20  document yesterday?

21  A.  Yes.

22  Q.  Do you see at the top e-mail from you references an

23  attachment entitled Phoenix activist list August 2013.PDF?

24  A.  Yes.

25  Q.  There was no attachment to this exhibit, but do you

1    recognize the file name?

2    A.  Yes, I do.

3    Q.  What is that document?

4    A.  It is a list of instruments that was labeled as under the

5    active implementation concept.  Meaning PRES is due to the

6    active implementation fees for those positions.

7    Q.  So it's a document showing the --

8    A.  Actual CUSIPs that were under active investigation.

9    Q.  By PRES?

10   A.  By PRES, yes.

11            MR. VASSANJI:  Permission to approach, your Honor.  I

12   have an additional exhibit I would like to show the witness.

13            THE COURT:  Have you shown it to anyone else?

14            MR. VASSANJI:  All the counsel have copies.

15            THE COURT:  You may approach.

16            Mr. Savla?

17            MR. SAVLA:  We will be objecting.

18            THE COURT:  Let's see what we're objecting to first.

19   Q.  Dr. Tang, I've handed you a document marked as Exhibit

20   3507, and this has Bates number Khan 00058320.

21            THE COURT:  This document was produced in discovery?

22            MR. VASSANJI:  This document was produced in

23   discovery.  It is not on our exhibit list.

24   Q.  Dr. Tang, do you recognize this document?

25   A.  Yes.

N4L3USB2                        Tang - Redirect

1    Q.   What is this document?

2    A.   I recognize the format is the typical color choice I would

3    use to produce spreadsheets.  Not 100 percent sure if I put it

4    in the PowerPoint.  But the spreadsheet should be coming from

5    me, and is indicating the positions that are under active

6    investigation.  So they're eligible for active implementation

7    fees, which is capped at $250,000 per position.

8            MR. VASSANJI:  The TAM parties would like to move

9    Exhibit 3507 into evidence.

10           MR. SAVLA:  Objection, your Honor.

11           THE COURT:  Let me reread that answer, first.  Let me

12   hear the objection.

13           MR. LAURIELLO:  We were handed this in the break, and

14   I will remind the Court when the TAM parties last added an

15   exhibit after we submitted trial exhibits in the joint trial

16   order, you said they had one freebie and they used it up.

17           But even more so, your Honor, this document has a

18   parent e-mail which has not been produced with the exhibit.  It

19   is a different month that's referred to than the rotating CUSIP

20   e-mail we've shown you previously.  And we'd ask if your Honor

21   overrules the objection, that at the very least the parent

22   would come in with this document.

23           THE COURT:  Any other objections?

24           MS. BUCKEL:  That was my objection.  That there is a

25   parent e-mail.

N4L3USB2                         Tang - Redirect

1          THE COURT:  I am going to permit the exhibit to come

2     in, because I think it's appropriate redirect in response to

3     certain lines of examination that the TAM parties may or may

4     not have anticipated during cross.  But if there is a

5     completeness argument, I'll take the parent e-mail as well if

6     that can be rustled up.

7          MR. VASSANJI:  We'll make it available to the Court,

8     your Honor.

9          THE COURT:  Maybe we'll make it available to the Court

10    while the witness is still on the stand and we can take a break

11    for that purpose if you like.

12         Let me hear what Dr. Tang has to say about the

13    PowerPoint, and then we'll deal with the parent e-mail.  You

14    may proceed.  So you offered the exhibit?

15         MR. VASSANJI:  We offered the exhibit into evidence.

16         THE COURT:  I am going to admit Exhibit 3507, subject

17    to it being made complete with the parent e-mail which will be

18    forthcoming.  You may proceed.

19         (Joint Exhibit 3507 received in evidence)

20         MR. VASSANJI:  I have no further questions on this

21    particular exhibit.  So, I have a short amount of redirect

22    and --

23         THE COURT:  I wish you would ask some further

24    questions with regard to this exhibit, because I don't

25    understand how it helps your narrative.

1  Q.  Dr. Tang, can you explain what this exhibit shows, please.

2  A.  The exhibit shows the several pages on here, the time

3  sequence of when certain CUSIPs were placed under the active

4  implementation list.  And for every collection of CUSIP that's

5  labeled under the active implementation list, PRES is entitled

6  to $10,000 a month active implementation fee.

7          Also, by the way, in layman's terms, the active

8  implementation fee is nothing but a base fee, in the investment

9  management industry, which is separate from the incentive fee.

10  Incentive fee is 250K per position.  If the benefit is north of

11  500K, one time lifetime cap per position.  Now, this active

12  implementation fee is also lifetime --

13          THE COURT:  Can you control your witness,

14  Mr. Vassanji.

15  Q.  Dr. Tang, I'll ask you follow ups.

16  A.  Okay.

17  Q.  The first page, page 3, rather, of the document with Bates

18  number ending 322.  Can you turn to that page, please.

19  A.  Yes.

20  Q.  And the heading of this document list of active work out

21  CUSIPs as of August 2011.  Do you see that?

22  A.  Yes.

23  Q.  What does that mean?

24  A.  That means as of August 2011, this 32 positions represented

25  in the table, 12 positions from 06-1, 15 positions from 06-2,

1   five positions from 07-1 were under the definition of active

2   implementation.  Which means Phoenix is concentrating on those

3   32 positions to try to pursue litigation and benefit on behalf

4   of Triaxx.

5   Q.  So as of August 2011, these were the CUSIPs and securities

6   that PRES was actively working on in its activist strategies?

7   A.  Correct.

8   Q.  Then if we turn to page 4, Bates number with the page

9   ending 323, the title here is list of active work out CUSIPs as

10  of May 2012.  Can you explain what that indicates, please?

11  A.  That's the same table, except that starting in May 2012,

12  which is several months later, certain positions have been

13  removed and certain positions have been added.

14          So from 32 positions now it become 30 positions, with

15  10 of those 30 in 06-1, 11 of those in 06-2, and nine of those

16  in 07-1.

17  Q.  Again, this indicates that, as of May 2012, PRES was

18  working actively on these 30 CUSIPs for its activist

19  implementation strategies?

20  A.  Correct.

21  Q.  Then turning to page 5, ending in Bates 324, this is list

22  of active work out CUSIPs as of September 2012.  Can we assume

23  the same answer applies to this -- to the active CUSIPs that

24  PRES was working on as of September 2012?

25  A.  Yes.

1   Q.  Finally the last page, page 6.  Bates ending 325.  This is

2   the list of CUSIPs on which PRES was actively working as of

3   January 2013?

4   A.  Correct.

5   Q.  And do you know if there are later versions of this either

6   presentation or the information within the presentation?

7   A.  I'm not sure whether the list in this format, but I'm sure

8   there is an Excel spreadsheet tracking all the active positions

9   over time.  Because as I mentioned earlier, the structure of

10  the engagement between TAM and PRES is highly unusual because

11  it put a cap on both the base fee and the cap on the incentive

12  fee, which is highly unusual in the investment management

13  world.

14  Q.  Is it fair to say that the information and the charts

15  contained in this presentation come from the Excel spreadsheet

16  you were just referring to?

17  A.  Yes.

18  Q.  Turning now back to Exhibit 3497, Dr. Tang, which is tab 3

19  in the first PIMCO binder.  First, you were asked earlier this

20  morning by Ms. Buckel how you knew about other CDOs similar to

21  the Triaxx CDOs, and you mentioned you had conducted an

22  analysis.  Do you recall that?

23  A.  Yes.

24  Q.  Within Exhibit 3497, again, which is tab 3, could you

25  please turn to page 14 of the presentation, or with the Bates

1    number ending in 665.

2    A.  Yes.

3    Q.  Do you recognize this table?

4    A.  Yes.

5    Q.  What is this table?

6    A.  It is a project we undertook, this was done in 2014, '15

7    period, I remember, comparing the Triaxx CDOs with similar CDOs

8    that has similar underlying collateral to look at the

9    performance of Triaxx against its peers.

10   Q.  What does the table tell us about the performance of the

11   Triaxx CDOs compared to its peers?

12   A.  Basically says the Triaxx CDOs has performed dramatically

13   better than its peers.

14   Q.  What numbers on this chart show us that?

15   A.  Well, there are two numbers that are important.  One is

16   there is a line in the middle that says paramount redeemed.  In

17   the middle of the page, there is a row labeled as paramount

18   redeemed, and it shows 65.99, 70.28, and 53.76 for the three

19   Triaxx CDOs.  And the comparable numbers for the other CDOs

20   were much lower, as low as 1.08, as high as 29.18.

21        Which basically means, by 2014, the Triaxx CDOs has

22   received -- I'm talking about an average number now -- 60 cents

23   on the dollar or higher or 54 cents on the dollar or higher in

24   terms of a $100 investment, the investors have been paid back,

25   relative to the other CDOs, in the range of $1 to $29 on $100

1    invested.

2            So that's an important indication of how much

3    principal collection the Triaxx CDOs has outperformed its

4    peers.

5            And more importantly, there is another row in the same

6    table that is showing the impairment, there is a row labeled as

7    realized or unrealized impairment.  For the Triaxx CDOs, it is

8    0.55, 0.07, 2.27, versus the other CDOs, 71.43.  And there is

9    even one with 91.46.

10           So it basically shows the dramatic differences among

11   the performance of the comparable CDOs relative to how the

12   Triaxx CDOs were doing.

13   Q.  PRES didn't have any engagements with any of these five

14   CDOs, is that correct?

15   A.  No.

16   Q.  If we turn the page to page 15 to the document.

17           THE COURT:  Mr. Vassanji, before you leave this page,

18   I wonder if you could ask your witness to explain the active

19   collateral amount line.

20           MR. VASSANJI:  Yes.

21   Q.  Dr. Tang, would you mind explaining the active collateral

22   amount line on this chart.

23   A.  This is the total notional amount of collateral that are

24   still left in the CDOs.  So there are 884 million in 2006-1,

25   there were 1.486 billion in 06-2.  And 514 million --

1    Q.  I believe you are looking --

2    A.  Sorry.  I was reading the wrong -- so active collateral was

3    884 for 06-1, 1.642 for 06-2, and 477 for 07-1.

4    Q.  Can you just explain what that means, Dr. Tang?

5    A.  So, if you add all those numbers together, that's the

6    amount of UPB, or the unpaid principal balance, of all the

7    mortgage loans or all the tranches or the classes underlying

8    the Triaxx CDOs.

9    Q.  What's the significance of that number being much higher

10   than the numbers for the five comparable CDOs?

11   A.  It is a reflection of the combination of par redeemed as

12   well as accumulated unrealized realized impairment.  When you

13   have very low impairment, then you have more collateral to

14   service the rest of the capital structure going forward.

15   Relative to the other CDOs, they have realized they have

16   received less par, have more impairment, and have less

17   collateral to service the CDO capital structure going forward.

18   It is a reflection of the strength of the Triaxx CDOs relative

19   to its peers.

20   Q.  Did PRES' work help keep the Triaxx CDOs' impairment low?

21   A.  Can you repeat your question?

22   Q.  You mentioned the low impairment for the three Triaxx CDOs.

23   Was PRES' work involved in keeping that number low?

24   A.  That's our opinion, yes.

25   Q.  If you turn the page, Dr. Tang, with Bates number ending in

1    666, page 15 of this presentation.  Do you recognize this

2    chart?

3    A.  Yes.

4    Q.  What does this chart show?

5    A.  It is a graphic illustration of the table we just went

6    over.  It shows the Triaxx CDOs are all the way up in the

7    left-hand corner, where the other CDOs are in the right-hand

8    corner.  Because the horizontal axis is showing the impairment,

9    and Triaxx CDOs is a lot less impairment than the other CDOs.

10   And on the other hand, the vertical axis is showing the amount

11   of proceeds that's been collected.  And Triaxx has north of

12   50 percent collected, in all the three CDOs, while the other

13   CDOs have much less collected to date.

14   Q.  It appears that the labeling might be off.  If I look at

15   Duke HGV, which appears to be just above 10 percent, the number

16   doesn't -- that number appears to be indicating a different

17   CDO.  Do you see that?

18   A.  Yes, I remember that this chart was an outdated version.

19   It did have some mismatches with the action number on the

20   table.  So the label for some of them were not accurate, but

21   the message remained the same.

22   Q.  Other than the label -- so when you say the labeling is not

23   accurate, do you mean that the labels should be attributed to

24   different bullets on the chart?

25   A.  Yes.  Some of the dots for the other CDOs may be

1   mislabeled.  That's what I am saying.

2   Q.  Other than the mislabeling, is there anything inaccurate in

3   this chart in your opinion?

4   A.  No.

5              MR. VASSANJI:  No further questions, your Honor.

6              THE COURT:  You may not be quite done yet.

7              MR. VASSANJI:  This is the parent e-mail to Exhibit

8   3507 which I will pass around and give to the parties.

9              THE COURT:  Thank you.

10             MR. VASSANJI:  The Bates number is Khan 00058318.

11             THE COURT:  Does have it a trial exhibit on it?

12             MR. VASSANJI:  3507.

13             THE COURT:  So you're offering it as the rest of the

14  document you were just talk to the witness about.

15             MR. VASSANJI:  For the clarity of the record, we are

16  moving Khan 00058318 through Khan 00058325 as Trial Exhibit

17  3507.

18             THE COURT:  So I will take the rest of 3507.  So as

19  far as I'm concerned, Exhibit 3507, which has been admitted,

20  consists of a Bates range running with numbers ending 318

21  through 324.

22             MR. VASSANJI:  325.

23             THE COURT:  325.  So that's what I have as 3507.

24             Do you have any questions on the rest of the exhibit

25  or are you now done?

1          MR. VASSANJI:  I'm now done.

2          THE COURT:  Is there any very brief recross?

3          MR. SAVLA:  We will have recross, but we ask for a

4     brief adjournment if the Court will allow it.

5          THE COURT:  How much time do you need?

6          MR. SAVLA:  15 minutes.

7          THE COURT:  10.

8          MR. SAVLA:  Very good.

9          THE COURT:  We'll see you all in 10.

10         I will repeat to you, Dr. Tang, you will remain under

11    oath.  Please do not discuss your testimony or the underlying

12    facts with counsel or others during the break.

13         THE WITNESS:  Understand.

14         (Recess)

15         (In open court)

16         THE COURT:  I will remind you, Dr. Tang, that you are

17    still under oath.

18         I recalled there was to be recross.  From who first?

19         MR. LAURIELLO:  The noteholders, your Honor.

20         THE COURT:  The noteholders.  Will that be

21    Mr. Lauriello?

22         MR. LAURIELLO:  Yes, your Honor.

23         THE COURT:  You may proceed.

24         Because this is recross, this will be brief, correct?

25         MR. LAURIELLO:  Yes, your Honor.

1          THE COURT:  All right.

2     RECROSS EXAMINATION

3     BY MR. LAURIELLO:

4     Q.  Dr. Tang, please turn back to Exhibit 3507, and when I say

5     that, I mean the chart with the Bates stamp Khan 00058320.

6          THE COURT:  This is the new exhibit?

7          MR. LAURIELLO:  Yes, your Honor.

8          THE COURT:  Thank you.

9     A.  Which page?

10    Q.  I am looking at the first page of this PowerPoint that's

11    Khan 00058320.

12    A.  Got it.

13    Q.  I'd like to ask you about that Bates stamp.  Do you know

14    who Raza Khan is?

15    A.  Yes.

16    Q.  Mr. Khan is in litigation with Mr. Garg, correct?

17    A.  I believe so.

18    Q.  This Bates stamp is different than some other Bates stamps

19    we have looked at today that start out with Triaxx, correct?

20    A.  Yes.

21    Q.  This is just one month of the number of positions being

22    actively managed and earning that $10,000 a month fee, correct?

23    A.  I'm hesitating because this was the early stage of managing

24    the process.  And it says as of August 2011.  If memory serves

25    me well, it means from that point on, until a future time there

1  is an update, then there will be transitions from one set of

2  CUSIPs to other set of positions.  But it says as of

3  August 2011, it doesn't mean for that particular month.  It

4  means for an interval.

5  Q.  Understood.  But if I want to see which positions were

6  earning the $10,000 a month fee from March 2011 to the present

7  date, I would need updates every single time those are rotated,

8  correct?

9  A.  Yes.

10  Q.  I'll ask Mr. Gibson to also put this on screen.  Please go

11  to Exhibit 3497 and the page Triaxx 0091665.

12          THE COURT:  1665 you said?

13          MR. LAURIELLO:  Yes.

14          THE WITNESS:  I'm looking at it on the screen.

15          THE COURT:  Only the first page is on the screen.  It

16  is the document behind tab 3 I believe.  Is that correct,

17  Mr. Lauriello?

18          MR. LAURIELLO:  Yes.  It is the document behind tab 3

19  if everyone just wants to follow along on the binders.

20          THE WITNESS:  It is the second volume?

21  Q.  It is in the first binder, tab 3, and it ends in 09 -- here

22  we have it on the screen.

23          THE COURT:  There we go.

24  A.  Okay.

25  Q.  Mr. Vassanji asked you questions about this chart, correct?

1   A.  Yes.

2   Q.  And do you see that there are other CDOs listed, other than

3   Triaxx?

4   A.  Yes.

5   Q.  And Triaxx is not -- or ICP or TAM is not the collateral

6   manager for these CDOs, correct?

7   A.  Can you repeat your question?

8   Q.  Let me ask a better question.

9           Phoenix did not work on these other CDOs, correct?

10  A.  I don't believe so.

11  Q.  So you have more information about the Triaxx CDOs, right?

12  A.  Not necessarily true.

13  Q.  So Phoenix had no extra insight into the Triaxx CDOs

14  because they were doing activist work on them?

15  A.  All the CDOs have monthly trustee reports that are open to

16  the public.  So anyone who is interested in CDOs would have

17  very good knowledge about what they are, who managed them, what

18  the performance like.  Although, there is not enough details

19  about the RMBS trusts underlying those CDOs, if you are not

20  actively pursuing litigation.

21  Q.  Does this chart show the characteristics of each of

22  those -- of the each of the competitor CDOs, does it show the

23  note class?

24  A.  No, this is at the CDO high-level summary mostly on the

25  collateral.  It doesn't have the capital structure information

N4L3USB2                          Tang - Recross

1    here.

2    Q.   Thank you.

3            Do you see the adjustment for settlement at the

4    bottom?

5    A.   Yes.

6    Q.   And this chart doesn't show any settlements received by

7    those other CDOs, correct?

8    A.   There was no public information regarding settlement for

9    the other CDOs.

10   Q.   And settlements are not -- the amount of the settlement --

11           Settlement amounts are not typically public, right?

12   A.   But there will be announcement regarding settlements.

13   Although the amount may be unknown, but we were never aware of

14   any settlements for those CDOs.

15   Q.   This chart does not show the amount of fees Phoenix

16   charged, correct?

17   A.   I'm just looking at the Countrywide estimated total net

18   proceeds.  It appears to me this is net of the incentive fees

19   already.

20   Q.   Is it net of the due diligence fees?

21   A.   Diligence fees, I'm not sure.  But the incentive fees it

22   looks to me has been excluded, because 29 plus 9 plus 47,

23   that's well short of the 104 million.

24   Q.   Is this net of the monthly activist implementation fees?

25   A.   Let me do the quick math here.  38 plus 47, that's 85.

1           Maybe not.

2    Q.  I'd like to go back to Exhibit 3137 which is the Excel and

3    I'd ask Mr. Gibson please put that on the screen.

4           Earlier today, you testified that there were benefits

5    accrued to these various RMBSs due to Phoenix's activist

6    strategy, correct?

7    A.  Yes.

8    Q.  And that was because various parties were aware of

9    Phoenix's activist strategies in the litigation, correct?

10   A.  Yes.

11   Q.  And it was your opinion that there was a benefit, but you

12   couldn't be 100 percent sure, credibility?

13   A.  Correct.

14   Q.  And you never calculated or quantified what that benefit

15   was, correct?

16   A.  I don't believe so.

17   Q.  You also testified regarding the three-year default date.

18   Do you remember that?

19   A.  Yes.

20   Q.  And you testified that one could use the three-year default

21   date and then calculate the amount of proceeds received if the

22   bond had been sold on the three-year default date, and then as

23   opposed to liquidated on another date, correct?

24   A.  Yes.

25   Q.  And that information is not in this chart, correct?

1   A.  No.

2   Q.  This chart does not show the value of the various RMBSs at

3   the three-year defaulted date, correct?

4   A.  No.

5   Q.  And this chart does not account for any market improvement

6   in the housing market from 2011 to 2018, correct?

7   A.  Correct.

8           MR. LAURIELLO:  No further questions, your Honor.

9           THE COURT:  Issuers?

10          MR. RAINIER:  Nothing, your Honor.

11          THE COURT:  Trustee?

12          MS. BUCKEL:  Very short, your Honor.

13          THE COURT:  I thought I would take you out of turn for

14  a change.

15  RECROSS EXAMINATION

16  BY MS. BUCKEL:

17  Q.  Let's look back to Exhibit 39 -- I should write this down.

18  3497, please, and that page that ends in 91665.

19          Dr. Tang, isn't it true that the Triaxx CDOs were

20  unique because they held particularly high grade collateral?

21  A.  I believe all the eight CDOs on this page held high grade

22  collateral.

23  Q.  But didn't you just testify there was not enough detail in

24  the trustee reports for the other CDOs about the underlying

25  RMBS collateral?

1    A.   That's subject to interpretation, because the collateral

2    grading is included as public information for all CDOs.

3    Q.   Is that collateral grading at the time the CDOs were

4    created or at the time you created this spreadsheet?

5    A.   Both.  Both are public.

6    Q.   What time was the grading done?

7    A.   The grading is done continuously monthly, and they publish

8    the monthly findings.

9    Q.   They publish the monthly fundings?

10   A.   Yes.

11   Q.   Do they publish the monthly credit ratings of CDOs?

12   A.   To the extent that there are upgrades or downgrades, they

13   will be included in the CDO trustee report, yes.

14   Q.   Does the CDO trustee report include any ratings of

15   underlying RMBS collateral?

16   A.   Yes.

17   Q.   And you analyzed that?

18   A.   There is no need to analyze.  It is public information.

19   Q.   But you didn't look at the RMBS collateral that was listed

20   by CUSIP in the trustee reports, correct?

21   A.   I may have looked at, because CDOs is like my bread and

22   butter expert knowledge, and I work in CDOs.  I'm curious about

23   all CDOs.

24   Q.   You can't testify here today that you analyzed the

25   underlying RMBS collateral of these other CDOs, correct?

1  A.  Not to the extent the active litigation work like the

2  Triaxx CDOs, correct.

3  Q.  And this chart was put together in 2014, correct?

4  A.  Yes.

5  Q.  And Phoenix had been engaged since 2011?

6  A.  Yes.

7  Q.  From 2011 to 2013, Phoenix worked on putting an algorithm

8  together to analyze everything?

9  A.  From day one, yes.

10  Q.  From day one.  So this was only three years into the

11  Phoenix project, right?

12  A.  I take it back.  From day minus 90 days, because during the

13  diligence period we started doing work.

14  Q.  You started doing the work even though you didn't have

15  underlying information about the collateral?

16  A.  Yes.  Because we are trying to win the money so we are

17  illustrating our knowledge.  That's why the work started three

18  month earlier than the engagement.

19  Q.  Understood.  Previously, Dr. Tang, you talked about the

20  pressure that the Triaxx CDOs exerted against the responsible

21  parties, in your words, which increased the value of the CDOs.

22  Is that correct?

23  A.  Plus, in addition to that, their market perception of

24  Triaxx is pursuing all sorts of litigation active strategies,

25  so the market was anticipating outcome.

1   Q.  I just asked you if had you testified about that.

2          Isn't it true the Triaxx CDOs were not the only entity

3   bringing litigation against the responsible parties at that

4   time?

5   A.  As far as I know, the type of -- Triaxx type of CDOs Triaxx

6   CDO belongs, Triaxx was the only CDO entity that brought

7   litigation.

8   Q.  So there was no other, at that time, there was no other

9   RMBS litigation against originators, servicers, RMBS trustees,

10  at that time?

11  A.  No, that's not what I said.  I said from similar entities

12  to Triaxx CDOs there was none.  But RMBS litigation started in

13  2011 from all sorts of entities, like financial guaranty

14  insurance, like insurance companies, investors all over the

15  world.

16  Q.  Isn't it true that litigation, even the threat of that

17  litigation by anyone would have exerted pressures on servicers,

18  originators, and RMBS trustees to, quote unquote, get their act

19  together?

20  A.  There is an important distinction.

21  Q.  What's that distinction?

22  A.  A lot of the litigation were focused on giving the

23  responsible parties a slap on the wrist and let them go.  We

24  are the only party pursuing the wrongdoers and say that the

25  compensation they agreed upon to give to the investors in the

N4L3USB2                          Tang

```
 1   litigation is far from being enough.  We are the only one doing
 2   that.
 3   Q.  But you also testified that you personally were not
 4   responsible for speaking to the responsible parties, correct?
 5   A.  Correct.
 6   Q.  And you don't know who specifically was?
 7   A.  My duty is discover truth.
 8   Q.  Your duty is?
 9   A.  Discover truth about all the loans.
10   Q.  What I am trying to ask, you don't know who specifically
11   spoke to the responsible parties, right?
12   A.  I have an idea.
13   Q.  You don't know, and you don't know if that person spoke to
14   the responsible party regarding a particular CUSIP that Phoenix
15   entities were analyzing, correct?
16   A.  Correct.
17   Q.  You also testified that Mr. Priore cut a good deal with
18   Phoenix, is that correct?
19   A.  Super.
20   Q.  Are you aware that Mr. Priore received a cut of Phoenix's
21   fees?
22   A.  I don't know.
23           MS. BUCKEL:  No further questions.  Thank you.
24           THE COURT:  Thank you.
25           Dr. Tang, if you bear with me, I have some follow up
```

N4L3USB2                      Tang

1    questions myself.

2              THE WITNESS:  Okay.

3              THE COURT:  Let me arrange myself here.  Let me start

4    where Ms. Buckel left off and ask you a few questions about the

5    terms of engagement between what we call Phoenix or PRES and

6    the Triaxx CDOs.

7              I noticed that in your direct testimony declaration,

8    you say that the Triaxx CDOs were passively managed trusts.

9    That's in paragraph 13 of your direct testimony litigation if

10   you want to look at that.  You describe them as passively

11   managed trusts which had invested approximately $10 billion in

12   various RMBS trusts.

13             THE WITNESS:  Yes, I recall that.

14             THE COURT:  I am trying to get your place in the

15   testimony.

16             THE WITNESS:  Yes.

17             THE COURT:  Can you tell me what you mean by the

18   phrase "passively managed" there?

19             THE WITNESS:  So, in the investment management

20   industry, there is a widely considered to be two categories of

21   wealth management, investment management, however you want to

22   label them.  One type is called passive, the other type is

23   called active.

24             So the active strategies referring to private equity,

25   hedge funds, who are charging people 2 percent base fee,

N4L3USB2                          Tang

1     regardless what happens to the investment, and 20 percent

2     typical contingent fees, if you will, if there is performance.

3     If you have zero performance, you get zero percent.  If there

4     is performance, you get 20 percent of whatever the performance

5     based on the zero percent rate.

6                 THE COURT:  You may be drifting a little bit from what

7     it means to be passively managed to the fee structure for

8     different kinds of management.  We'll get to the fee structure

9     in a moment.

10                But, apart from how the manager gets paid, what's the

11    difference between a passive manager or a CDO that's being

12    passively managed, and I am assuming there is another category,

13    right, actively managed.

14                THE WITNESS:  Yes.

15                THE COURT:  Explain the difference between those to me

16    if you would.

17                THE WITNESS:  So the passive primarily refers to the

18    trading authority.  So once a collateral has been in the CDO

19    vehicle, the manager's not supposed to be buying and selling

20    them all the time.  That will be considered as active strategy.

21                THE COURT:  Okay.

22                THE WITNESS:  Traditional active strategy.

23                THE COURT:  Okay.  So, when you say in your direct

24    testimony that the CDOs, the Triaxx CDOs were passively

25    managed, does that mean that the existing collateral manager,

N4L3USB2                     Tang

1   which was then known as ICP, was not buying and selling RMBSs

2   or does it mean something else when you say it?

3           THE WITNESS:  My understanding, reading the documents,

4   they are not permitted to constantly trading in and out of

5   positions.  So it is a static portfolio.

6           THE COURT:  So again, when you call them passively

7   managed, is that what you mean?  The characteristic that the

8   RMBS positions were not being actively bought and sold, and as

9   a corollary, that they couldn't be, because that's not how the

10  governing documents were set up.

11          THE WITNESS:  Yes.  And there is another possible

12  meaning implied in there.  Passive from the standpoint of not

13  pursuing litigation as well.

14          THE COURT:  Okay.  So when you said that they were

15  passively managed trusts, you also meant that nobody was

16  looking for responsible parties to sue.

17          THE WITNESS:  Correct.

18          THE COURT:  So, in your view, as you use these terms,

19  did the Triaxx CDOs become actively managed at some point?

20          THE WITNESS:  In my opinion, 2009, 2010 was an

21  extraordinary time period in history.  And there is tremendous

22  amount of changes that has happened to Triaxx CDOs.  Most

23  employees had left for other careers.  It is at a time, the

24  passive management of the vehicle will lead to a certain

25  outcome.  From my professional vantage point, I feel by

N4L3USB2                         Tang

1  engaging another party, changing the way business is being

2  operated within the CDOs, the outcome could be dramatically

3  better for the trust.

4          THE COURT:  Let me try again.  At some point, for

5  example, when PRES got involved, in your view, did the Triaxx

6  CDOs become actively managed?

7          THE WITNESS:  The engagement allowed active

8  litigation.

9          THE COURT:  Active litigation.

10         THE WITNESS:  Yes.

11         THE COURT:  I don't mean to beat a dead horse here if

12 you can't answer the question.  But you did make a distinction

13 a little while ago between CDOs that are passively managed and

14 CDOs that are actively managed, and I'm trying to find out

15 whether, in contrast to these CDOs having been passively

16 managed before your group got involved, did they become, in

17 your view, actively managed once you were involved?

18         THE WITNESS:  That's my view, yes.

19         THE COURT:  Okay.  And did that happen in 2011, which

20 is the year that PRES was engaged?

21         THE WITNESS:  Yes.

22         THE COURT:  In your prior testimony, you said a couple

23 of times that it was highly unusual in the investment

24 management world to have a per CUSIP cap on fees.  Do you

25 remember that testimony.

N4L3USB2                    Tang

1             THE WITNESS:  Yes, yes.

2             THE COURT:  When you referred to the investment

3    management world, I'm wondering, who are you comparing PRES to

4    or what kind of engagements are you comparing the PRES

5    engagement to?  Who has -- let me ask a better question.

6             Are you thinking of any manager or group of managers

7    in particular that don't have a per CUSIP cap on their fees?

8             THE WITNESS:  When I made that statement, what's in my

9    head is the industry commonly considered to be investment

10   management industry, global that has about $100 trillion AUM.

11            THE COURT:  That's a hugely broad term.  That

12   includes, for example, hedge fund managers who make 2 in 20,

13   for example.

14            THE WITNESS:  Correct.

15            THE COURT:  And it includes private wealth managers

16   who may take X-amount under management and call it a day.

17   That's a huge, huge world with lots of kinds of managers in it.

18            THE WITNESS:  Yes.

19            THE COURT:  And you are saying that it is unusual to

20   have a per CUSIP cap on their fees compared to hedge fund

21   managers.

22            THE WITNESS:  Yes.

23            THE COURT:  Compared to private wealth managers.

24            THE WITNESS:  And compared to passive strategy

25   managers as well.

N4L3USB2                     Tang

1           THE COURT:  And compared to passive strategy managers

2     as well.

3           What about compared to litigation support consultants?

4     Are you familiar with that industry?  Folks who -- and I don't

5     mean this in a derogatory sense at all -- but folks who crunch

6     numbers in support of litigation.  How are they paid, if you

7     know?

8           THE WITNESS:  I don't know how people who are

9     crunching numbers are getting paid.  But I am aware of most of

10     the litigation in the legal community is on a contingency

11     basis, which means there are incentive payouts if there is

12     performance at the end.

13           THE COURT:  Were the CDOs' lawyers, Mr. Moon and so

14     forth, on a contingency basis?

15           THE WITNESS:  That I don't know.  I never seen their

16     engagement contract.

17           THE COURT:  Do you have any idea whether the CDOs'

18     litigation lawyers, including Mr. Moon and his firm, but there

19     were others as well, were paid on a traditional time plus

20     expenses basis or were paid on contingency?

21           THE WITNESS:  I don't know.  I don't have that

22     knowledge.

23           THE COURT:  But, your group was paid on an incentive

24     basis, correct?

25           THE WITNESS:  Yes.

N4L3USB2                          Tang

1              THE COURT:  If the CDOs did well in litigation, you

2        would get paid more.

3              THE WITNESS:  Yes.

4              THE COURT:  In your direct testimony, at paragraphs 49

5        through 53, you discussed activist litigations.  I'm not going

6        to grill you in detail about the words in here.  I am just

7        trying to place you as to what we are talking about.  But you

8        talk about the activist litigations, and I think during most of

9        this section in your direct testimony declaration, from

10       paragraph 49 to paragraph 53, you are talking about what we

11       have started to call in this room the Countrywide/BofA

12       litigation.  Is that right?

13             THE WITNESS:  Yes.

14             THE COURT:  That was the big lawsuit for the Triaxx

15       CDOs and for PRES.

16             THE WITNESS:  Yes.

17             THE COURT:  And there was a total recovery in that

18       lawsuit, you told us, and we've heard this from other sources

19       as well, of approximately $104 million.  Is that right?

20             THE WITNESS:  Yes.

21             THE COURT:  And your testimony is that because the

22       Triaxx CDOs objected to the global $8.5 billion settlement,

23       they were able to negotiate a better deal than if they had

24       simply waited to see what portion of that $8.5 billion they

25       would have got.  Is that fair?

N4L3USB2                      Tang

1           THE WITNESS:  Yes.

2           THE COURT:  Did any member of your team or the lawyers

3    that you were working with ever tell you that the Triaxx CDOs'

4    portion of that $8.5 billion settlement, had they done nothing

5    other than stand in line, would have been about $35 million?

6           THE WITNESS:  I'm not aware of that number.

7           THE COURT:  You are not aware of that?

8           THE WITNESS:  No.

9           THE COURT:  Okay.  In paragraph 54 of your

10   declaration, you say that you performed -- your team --

11   performed the same type of analysis with every litigation you

12   participated in.

13          THE WITNESS:  Yes.

14          THE COURT:  You say in each case, we identified the

15   individual loans owned by the RMBS trusts at issue in the

16   action, and for each loan, looked at red flags indicating

17   origination and servicing misdeeds, and you conclude this

18   paragraph by saying some of these litigations resulted in

19   payments of compensation to the Triaxx CDOs.

20          THE WITNESS:  Yes.

21          THE COURT:  Do you remember how much?

22          THE WITNESS:  I don't remember.

23          THE COURT:  Did any of the other litigations pay

24   anything close to $104 million?

25          THE WITNESS:  I don't believe so.

N4L3USB2                        Tang

1          THE COURT:  Did any of the other litigations pay more

2     than a million dollars?

3          THE WITNESS:  Could be.  I just don't know.

4          THE COURT:  Okay.  We had some testimony from Mr. Garg

5     earlier in the trial to the effect that when PRES was formed,

6     Phoenix Real Estate Solutions, he hoped that it would be able

7     to market its services not just to the Triaxx CDOs, but to

8     other CDOs as well through their collateral managers.  Do you

9     recall that being part of the strategy?

10          THE WITNESS:  Yes.

11          THE COURT:  But PRES never acquired any other

12     collateral manager clients, is that -- or CDO clients, I should

13     say.  Is that true?

14          THE WITNESS:  I think so, other than the engagements

15     with various law firms who might be representing other

16     entities, could be CDOs.

17          THE COURT:  Let me drill down with you a little bit on

18     that.  Did, to your knowledge, did PRES, that vehicle, that

19     entity, have any clients, other than the Triaxx CDOs?

20          THE WITNESS:  Yes.

21          THE COURT:  Who were they, if you recall?

22          THE WITNESS:  I recall Quinn Emanuel as a law firm

23     engaged PRES.

24          THE COURT:  On behalf of which CDOs?

25          THE WITNESS:  I don't know, because they never -- I

1    was never aware of for whom they were engaging us on.  We were

2    just asked to do certain analysis for them.

3              THE COURT:  An analysis of CDOs?  CDO collateral?

4              THE WITNESS:  Residential mortgage security.

5              THE COURT:  But not involving the positions held by

6    the Triaxx CDOs.

7              THE WITNESS:  There may be overlap.

8              THE COURT:  Let me see if I can ask the question

9    another way.  You had some involvement with preparing PRES'

10   invoices, correct?

11             THE WITNESS:  Yes.

12             THE COURT:  Did PRES send invoices to anyone other

13   than the Triaxx CDOs?

14             THE WITNESS:  I'm sure they sent invoice to Quinn

15   Emanuel.

16             THE COURT:  What makes you sure of that?

17             THE WITNESS:  Because I did a lot of work for them,

18   and I've seen the engagement.  There is a lot of fees that I

19   was aware of.

20             THE COURT:  You are sure that was through PRES?  It

21   was a PRES invoice you sent out?

22             THE WITNESS:  That I don't know, because I don't deal

23   with the actual sending of the invoice.  I know I performed the

24   work for Quinn Emanuel working with their legal team doing

25   something similar to the investigations and litigations that

N4L3USB2                              Tang

1    are similar in nature to the Triaxx CDO collateral.

2              THE COURT:  So when you did that work, with or for

3    Quinn Emanuel, were you using the same databases and knowhow

4    and algorithms that you brought to bear in the engagement for

5    the Triaxx CDOs?

6              THE WITNESS:  Yes.

7              THE COURT:  And did you call on the same staff as

8    well?

9              THE WITNESS:  Yes.

10             THE COURT:  Okay.  You were asked by a couple of

11   different lawyers in a couple of different ways about the

12   number of CUSIPs that were in rotation at any one time as being

13   under, I think you put it, active investigation.  That's one of

14   the phrases that you used for it.

15             And if you could take another look at the last exhibit

16   to come in, one that the lawyers were fighting about a little

17   bit, Exhibit 3507.  Which shows, as I understand it, the list

18   of CUSIPs under active investigation as of various dates,

19   August 2011 on page three, May 2012 on page four, and so on.

20   That's what this shows, right?

21             THE WITNESS:  Yes.

22             THE COURT:  And if a CUSIP was on the list, the list

23   of active work out CUSIPs, that meant, among other things, that

24   you were charging a monthly fee with respect to that CUSIP to

25   the relevant CDO, correct?

N4L3USB2                         Tang

1           THE WITNESS:  Yes.

2           THE COURT:  And in August 2011, there were 32

3    positions on the list; May 2012, there were 30 positions on the

4    list; September 2012, there were more, there were 40 positions

5    on the list.  And then by January 2013, it was down to 30

6    positions again.

7           THE WITNESS:  Yes.

8           THE COURT:  After January 2013, did the number hover

9    at around 30?

10          THE WITNESS:  I think so.

11          THE COURT:  Did it ever go back as high as 40?

12          THE WITNESS:  I don't have a clear memory of how that

13   aggregate number has fluctuated.  But somewhere between 30 and

14   40 sounds about correct.

15          THE COURT:  Okay.  There has been some discussion

16   about whether the number of positions that was on this list at

17   any one time was or was not related to the amount of monthly

18   fees that PRES could charge the Triaxx CDOs and get paid on,

19   given that there was a monthly expense cap in each CDO.

20          But I also heard you testify that at any one time, in

21   reality, your team was working on more than just the CUSIPs on

22   the list.  Is that fair?

23          THE WITNESS:  Yes.

24          THE COURT:  So, did you have the resources and

25   manpower to do that?  To work on more than 30 at a time?

N4L3USB2                         Tang

1              THE WITNESS:  Yes.

2              THE COURT:  How many did you have the resources and

3     manpower to work on at any one time?

4              THE WITNESS:  In the early years, it was a lot more

5     labor intensive.

6              THE COURT:  Because you were less automated?

7              THE WITNESS:  Yes.  As time went on, with Ziggy's

8     algorithm, it became a lot easier.  So, there was capacity,

9     because of the automation.

10             THE COURT:  So leaving aside any billing cap, based on

11    the way the CDO waterfall worked, there was no limit in terms

12    of time, personnel, and resources to how many of these CUSIPs

13    you could have under active investigation at any one time?

14             THE WITNESS:  Yeah, I don't think we had resource

15    issue.  We could always find resources, when there is a need.

16             THE COURT:  Okay.  Thank you.  I appreciate you

17    clearing those issues up for me.

18             If anyone has any brief follow up, I'll allow it.

19             All right.  So, we will excuse you, Dr. Tang.  You may

20    step down.

21             (Witness excused)

22             THE COURT:  I guess it is a good thing we are not

23    having closing arguments this afternoon, because we have one

24    witness left.  So, I'm going to assume Ms. Beaumont is not

25    going to take the entire afternoon?  Do we want to treat

N4L3USB2                      Tang

1    ourselves to more than an hour for lunch or shall we be back at

2    1:40?  Let's make it 1:45.  We'll be in recess.

3              (Recess)

4              (Continued on next page)

```
 1                         AFTERNOON SESSION

 2                              1:45 PM

 3            (In open court; trial resumed; case called)

 4            THE COURT:  I see everybody is back.

 5            Ms. Wityk, do you have a witness to call?

 6            MS. WITYK:  I do, your Honor.

 7            The TAM parties call Anne Beaumont.

 8            THE COURT:  Ms. Beaumont, step forward.  You know

 9    where to stand.

10            (Witness sworn)

11            MS. WITYK:  Permission to approach the witness, your

12    Honor?

13            THE COURT:  Hold on.

14            Please state and spell your name for the record,

15    please?

16            THE WITNESS:  Yes.  My name is Anne Beaumont.  Anne,

17    A-n-n-e, Beaumont, B-e-a-u-m-o-n-t.

18            THE COURT:  You may approach.

19            I take it what you have handed the witness is her

20    corrected trial declaration?

21            MS. WITYK:  Yes, your Honor.

22            (Continued on next page)

23

24

25
```

1    ANNE BEAUMONT,

2         called as a witness by the TAM parties,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MS. WITYK:

6    Q.  Ms. Beaumont, in front of you, do you have your corrected

7    trial declaration?

8    A.  I do.

9    Q.  Is this your direct testimony in this case?

10   A.  It is.

11            MS. WITYK:  Your Honor, the TAM parties offer this

12   declaration as Ms. Beaumont's direct testimony.

13            THE COURT:  Thank you, Ms. Wityk.

14            Ms. Beaumont's declaration is accepted as her direct

15   testimony.

16            Please tell me there's cross-examination, or else we

17   should have gotten this done an hour ago.

18            MR. GELBFISH:  Yes, your Honor, we'll cross-examine.

19            Just for the record, are the TAM parties admitting

20   Exhibit 3190 into evidence?

21            THE COURT:  Oh, that was not previously admitted, was

22   it?

23            MR. GELBFISH:  Correct.  And we would object to that,

24   and we ask the opportunity to cross-examine on them.

25            MS. WITYK:  Yes, we are seeking to admit 3190 into

1    evidence.

2              THE COURT:  Objection?

3              MR. GELBFISH:  The affidavit does not lay any hearsay

4    foundation for that, nor -- the affidavit does not provide

5    sufficient foundation for authenticity and hearsay.

6              THE COURT:  Let me take a look.  I see, in

7    paragraphs 14 through 16 of the affidavit, there appears to be

8    a business record foundation laid for Trial Exhibit 3190.  So

9    your objection is overruled, and 3190 is admitted.

10             (Trial Exhibit 3190 received in evidence)

11             MR. GELBFISH:  May I ask the witness questions about

12   her role in preparing this exhibit?

13             THE COURT:  If you're going to cross-examine, you can

14   step up and cross-examine.

15             MR. GELBFISH:  May I approach?

16             THE COURT:  You'll hand that to Ms. Kay.  Thank you.

17             MR. GELBFISH:  Good morning, Ms. Beaumont, your Honor.

18   My name is Isaac Gelbfish.  I'm from the law firm Davis Polk,

19   on behalf of Citi.

20   CROSS-EXAMINATION

21   BY MR. GELBFISH:

22   Q.  Ms. Beaumont, I'd like to turn to your declaration,

23   paragraph 7.  You state in paragraph 7, "I reviewed the

24   invoices generated by Friedman Kaplan for the work in

25   connection with this matter," and you state that these contain

1    detailed billing entries, correct?

2    A.  Yes.

3    Q.  These invoices have not been produced in this case,

4    correct?

5    A.  No, but the trustee has them.

6    Q.  These invoices are also not available for inspection in

7    this litigation, correct?

8    A.  I'm not sure what you mean by "available for inspection."

9    Q.  These invoices have not been produced in this litigation to

10   the parties in this litigation?

11   A.  Well, just to be clear, they have not been produced in

12   discovery in the litigation, but they have been provided to the

13   trustee, they have been submitted to the trustee.

14   Q.  So these have not been produced in this litigation to the

15   parties?

16   A.  That's correct.

17   Q.  Instead, in your declaration, you refer to a "invoice

18   ledger," which has been identified as Exhibit 3190?

19   A.  Yes.

20   Q.  You did not personally generate this report, correct?

21   A.  No, I did not.

22   Q.  Instead, you asked Ms. Priyanka Wityk to ask for a *Daubert*

23   to generate this report, correct?

24   A.  That's correct.

25   Q.  Your declaration does not describe what Ms. Wityk told

1   Ms. Daubert, correct?

2   A.  No.

3   Q.  Your declaration does not either state that you personally

4   observed the steps that Ms. *Daubert* took to generate this

5   report?

6   A.  I did not watch Mr. *Daubert* generate the report, no.

7   Q.  I'd like now to turn to the amount of fees referenced in

8   your declaration.

9          In your declaration, you indicate that as of

10  January 31st --

11  A.  I'm sorry, which paragraph?

12  Q.  Paragraph 17, please.

13         In your declaration, you indicate that as of

14  January 31st, 2023, TAM incurred fees and expenses of 1,877,000

15  or so?

16  A.  That's right.

17  Q.  Ms. Beaumont, in this litigation, the parties submitted a

18  joint pretrial order at docket 470, dated February 22, 2023,

19  correct?

20  A.  That's right.

21  Q.  You signed that order on behalf of the TAM parties?

22  A.  I believe so.

23  Q.  You signed that on behalf of the TAM parties?

24  A.  Do you want me to take a look?

25  Q.  I'll point your attention to tab 2 in your binder, at

N4LKUSB3                         Beaumont - Cross

1   page 2.

2   A.  Yes, there's an electronic signature.

3   Q.  In that joint pretrial order, the TAM parties indicate — I

4   would refer you to page 10 — that as of January 31st, 2023, the

5   same day, the TAM parties incurred fees and expenses of

6   3,309,000 or so.

7           Do you see that?

8   A.  Right, but that's the TAM parties, that's both of them.

9   Q.  Do you see in the joint pretrial order — I'll restate the

10  question.

11  A.  What page?

12  Q.  Page 10.

13  A.  Give me a second to get there.

14          Where exactly are you looking?

15  Q.  If you look at page 10, on the screen right now, in the

16  last sentence there, it says, "As of January 31st, 2023," do

17  you see where it says, "such fees and expenses total

18  $3,309,442.53"?

19          Do you see that?

20  A.  That's right.

21  Q.  That number, 3,309,000 or so, is roughly $1.4 million

22  higher than the $1.87 million referenced in your declaration,

23  correct?

24          THE COURT:  Hang on a minute.  I think I'm in the

25  wrong paragraph.  Give me a minute to just scan this page.

N4LKUSB3                        Beaumont – Cross

 1              (Pause)

 2              THE COURT:  You're looking at the paragraph headed

 3   TAM, right, not the paragraph headed Phoenix, et cetera?

 4              MR. GELBFISH:  Correct.  I'm focused on the TAM.

 5              THE COURT:  All right.  I'm caught up.  I don't know

 6   if the witness is caught up.

 7   BY MR. GELBFISH:

 8   Q.  Ms. Beaumont, let me know when you're ready.

 9   A.  Yeah, yeah, that seems right.  I have to go back and check

10   the math.  I'm not sure what the difference is.

11   Q.  So just so we're on the same page, the joint pretrial

12   order, TAM — not the TAM parties, just TAM — had fees and

13   expenses as of January 31st, 2023, of roughly 3.3 million,

14   right?

15   A.  Yeah, that looks --

16   Q.  And that --

17   A.  Can I answer?

18              THE COURT:  Both of you, please.  You're lawyers, so

19   you both know the rules.

20              Wait for the lawyer to finish the question before you

21   answer it, Ms. Beaumont.

22              THE WITNESS:  Yes, Judge.

23              THE COURT:  Wait for Ms. Beaumont to finish the answer

24   before you ask the next one, Mr. Gelbfish.

25              Let's get that last question again.

1              MR. GELBFISH:  If I can ask the court reporter to

2      repeat that one.

3              (Record read)

4              THE WITNESS:  Yes, that's what the pretrial order

5      says.

6      BY MR. GELBFISH:

7      Q.  And that $3.3 million is approximately $1.4 million more

8      than the $1.87 million referenced in your declaration, correct?

9      A.  That's right.

10     Q.  I wanted to ask you, Ms. Beaumont, a few questions about

11     the discounts you provided to the TAM parties.

12              According to footnote 1 of your declaration, you

13     state, "For a time at the beginning of the matter, our firm

14     provided a courtesy discount to the TAM parties.  In light of

15     the nonpayment of our invoices, and with the agreement of the

16     TAM parties, the courtesy discount was discontinued in the

17     second quarter of 2020."

18              Do you see that?

19     A.  Yes.

20     Q.  This discount was approximately 20 percent, correct?

21     A.  That's right.

22     Q.  You stopped this discount because of nonpayment by the TAM

23     parties in 2020?

24     A.  That's right.

25     Q.  Given that you stopped applying this discount after the

1    second quarter of 2020, the final fees referenced in your

2    declaration do not reflect any such discount following 2020?

3    A.  I'm sorry, can you say that again?

4    Q.  Sure.  I'll rephrase.

5         You stopped applying the discount in 2020, second

6    quarter of 2020?

7    A.  Yes.

8    Q.  So, after that period of time, the fees did not reflect a

9    20 percent discount, and the fees referenced in your invoice

10   ledger for after 2020 do not reflect any such 20 percent

11   discount?

12   A.  That's right.

13   Q.  In other words, for the period after 2020, you're seeking

14   indemnification for a fee that had the TAM parties paid timely

15   and had the discount that they were -- that they had in the

16   beginning of the case, that fee is 20 percent higher than you

17   would have received?

18        THE COURT:  Actually, 25 percent, if you're doing it

19   from the perspective of the 80 percent discount.

20        THE WITNESS:  Right.  That's where I get stuck, yes.

21        THE COURT:  But I take your point.

22        THE WITNESS:  The point is correct.  I'm not sure the

23   math is, but, yes.

24        MR. GELBFISH:  Okay.

25

1    BY MR. GELBFISH:

2    Q.  Ms. Beaumont, you attended a court conference in this case

3    on February 7, 2023?

4    A.  That sounds right.

5    Q.  During that conference, you discussed a letter filed by

6    Mr. Maron in this action on January 30, 2023?

7    A.  I believe that letter was discussed in the conference, yes.

8    Q.  And Mr. Maron is TAM's general counsel?

9    A.  Yes.

10   Q.  Please turn to tab 3, which has been premarked

11   Exhibit 2182.

12          This is the letter that you discussed at the

13   conference, correct?

14   A.  This is the letter that was discussed, yes.

15          MR. GELBFISH:  Your Honor, I move to admit

16   Exhibit 2182 into evidence.

17          MS. WITYK:  Objection, your Honor; relevance.

18          THE COURT:  What's your proffer?

19          MR. GELBFISH:  Your Honor, if I may continue with the

20   questions, I think it will be evident, but, in short, this

21   letter deals with the source of the fees paid to the TAM

22   parties, which, for a number of reasons, are relevant to this

23   case.

24          THE COURT:  Okay, okay, I get it.

25          You may sit down, Ms. Wityk.

1              I'll permit you to question on the letter.  As you've

2    heard me say a couple of times before in similar contexts, I'm

3    not sure that we need to admit as an exhibit a letter which is

4    already on the docket of this action.  That just makes a little

5    more administrative work all around.  Why don't we note that

6    the exhibit premarked as 2182 is already on the docket of this

7    action at 451.

8              But you may question on it.

9              MR. GELBFISH:  Your Honor, if I may add one point to

10   the public docket issue:  I think this document has the

11   additional point that it's an opposing party statement, as well

12   written by the TAM parties.

13   BY MR. GELBFISH:

14   Q.  Ms. Beaumont, if you look at page 1 of the letter --

15             MR. GELBFISH:  Excuse me, your Honor?

16             THE COURT:  I'm thinking, but you can go ahead and

17   question while I'm thinking.  I can listen and think at the

18   same time.

19   Q.  Ms. Beaumont, if you look at page 1 of Mr. Maron's letter,

20   it states, "TAM parties' counsel, Friedman Kaplan," and I will

21   summarize it, informed the TAM parties that it would be

22   imminently seeking leave to withdraw as counsel because of

23   nonpayment of past work.

24             Do you see that?

25   A.  I do.

N4LKUSB3                          Beaumont - Cross

1   Q.  Just to be clear on the timeline, the TAM parties, in fact,

2   stopped paying your fees three years earlier, in 2020?

3   A.  No.  I think we received some payments since then.

4           MR. GELBFISH:  Mr. Gibson, if we can turn to

5   footnote 1 of Ms. Beaumont's declaration.

6           THE COURT:  I'm sorry, footnote 1 of what?

7           MR. GELBFISH:  Ms. Beaumont's declaration.

8           THE COURT:  Thank you.

9   BY MR. GELBFISH:

10  Q.  Ms. Beaumont, do you see where it says, in footnote 1, that

11  the courtesy discount of the TAM parties was discontinued

12  because of nonpayment by the invoices or for the invoices?

13  A.  That's right.

14  Q.  If you look at the invoice ledger, you don't see, in any

15  significant amount, payments past that period of time, if you

16  look at the invoice ledger, correct?

17  A.  That's right.  I mean, there are payments; they're just not

18  large ones.

19          THE COURT:  I'm sorry, they're not what?

20          THE WITNESS:  They're not large ones.

21  BY MR. GELBFISH:

22  Q.  After 2020, there were not large payments by the TAM -- by

23  whoever was paying the bills at the time?

24  A.  That's right.

25  Q.  If you look at page 2 of Mr. Maron's letter, if you

1   continue --

2   A.  Hold on.

3   Q.  -- he says --

4   A.  Sorry, where?

5   Q.  Page 2 on Mr. Maron's letter.

6   A.  Where on page 2?

7   Q.  In the second paragraph.  It should be on your screen as

8   well.

9   A.  It's not, but that's okay.  I can read the letter.

10  Q.  Is it on the screen now?  Do you see it?

11  A.  No.

12          THE COURT:  It's on my screen.

13          THE WITNESS:  It's not on my screen.  I'm fine with

14  the paper letter.

15          MR. GELBFISH:  Okay.

16  BY MR. GELBFISH:

17  Q.  Mr. Maron states, on page 2 of his letter, "To date,

18  certain nonparties have been forced to pay Friedman Kaplan for

19  a portion of its fees incurred when those fees should have been

20  advanced by the trustee."

21          Do you see that?

22  A.  I do.

23  Q.  Ms. Beaumont, at the February 7th conference that you

24  attended, do you recall that the Court asked Mr. Maron whether,

25  if the trustee were to release the retained funds to pay legal

1    fees, whether the money would go to nonparties or go to the TAM

2    parties?

3    A.  I don't honestly remember the exact content of that

4    conference.

5    Q.  Ms. Beaumont, I point your attention to tab 4 of your

6    binder, page 34.

7    A.  34?

8    Q.  34, lines 11 and 12.

9            Does that refresh your recollection about the question

10   that the Court asked Mr. Maron?

11   A.  It does.

12   Q.  Do you recall that Mr. Maron's response was that he did not

13   know the full arrangement between the TAM parties and the third

14   parties, and the funds could be subject to certain loans, but

15   he wasn't sure?

16           Do you see that?

17   A.  It looks like his answer was it would go to Friedman

18   Kaplan.

19   Q.  I'd like to direct your attention to page 34, line 23,

20   through 35/13.  If you could just review that to refresh your

21   recollection.

22   A.  Okay.  So this is answering the next question from the

23   Court?

24   Q.  I'm sorry?

25   A.  I --

1    Q.  Let me point you to page 53, line 1.  Mr. Maron states,

2    "But I know that they -- I need to check what the full

3    arrangements are."

4          So Mr. Maron was unsure what the full arrangements

5    were between the TAM parties?

6          THE COURT:  Mr. Gelbfish, what are we doing here?  If

7    we're refreshing recollection, we're going beyond the

8    boundaries of appropriate refreshment of recollection.

9          MR. GELBFISH:  I'll move on.  I'll get to the

10   question, your Honor.

11         THE COURT:  Thank you.

12   BY MR. GELBFISH:

13   Q.  Ms. Beaumont, do you know if there are any arrangements

14   between the TAM parties and any nonparties to be paid if the

15   trustee releases the funds that the TAM parties seek?

16   A.  I do not.

17   Q.  Ms. Beaumont, who are the third parties referenced in

18   Mr. Maron's letter?

19   A.  I don't know.  I didn't see this letter before it was sent,

20   and I didn't participate in writing it, so I don't know.

21   Q.  Mr. Maron --

22         THE COURT:  Please let the witness finish her answer.

23   I don't know if there was more to the answer or not.

24         Ms. Beaumont?

25         THE WITNESS:  Yeah, I didn't participate in drafting

1    the letter that Mr. Maron submitted, and so I don't know what

2    he was referring to.

3    BY MR. GELBFISH:

4    Q.   Ms. Beaumont, are third parties paying your fees in this

5    action?

6    A.   What do you mean by "third parties"?

7    Q.   Parties that are not the TAM -- TAM, the entity TAM, or

8    Phoenix, the entity Phoenix?

9    A.   Are they paying them right now?  No.

10   Q.   Were they the ones that had paid your fees in this

11   litigation?

12   A.   I think we received some payments from persons or entities

13   that were not Triaxx Asset Management and not Phoenix Real

14   Estate Solutions.

15   Q.   Who are those individuals or entities?

16   A.   If I recall correctly, there were one or two payments from

17   Mr. Garg and I believe one or two payments from Triaxx Holdco,

18   and I think there might have been a payment from 1/0 Capital.

19   Q.   Do you recall the breakdown of how much fees were paid

20   between those three entities or individuals?

21   A.   I don't recall.

22   Q.   Did you have discussion with Mr. Garg or Mr. Calamari, when

23   you submitted to them the invoices for TAM and Phoenix, that

24   third parties would be paying these fees?

25   A.   No.

1    Q.  Were you surprised when you saw fees coming from parties

2    that you were not representing?

3    A.  I don't think I was surprised.  I was happy to get paid.

4    Q.  And how did you know that these were from third parties;

5    were they wires named differently?

6    A.  They weren't named differently, they were just wires, and I

7    did see who sent the wire.

8    Q.  How did you know that they were from third parties?

9    A.  I knew who sent the wire.  It says a wire transfer -- you

10   receive an advice from Fedwire, and it says who sent the wire,

11   and I can see who sent the wire.

12   Q.  When you say who sent the wire, who initiated the wire or

13   where the funds are coming from?

14   A.  Where the funds are coming from.

15   Q.  So you received funds from Mr. Garg in this litigation?

16   A.  I did.  My firm did.

17   Q.  Your firm and you received funds from Triaxx Holdco?

18   A.  Correct.

19   Q.  And you received funds from 1/10 Capital?

20   A.  1/0.

21   Q.  1/0, excuse me.

22        Did you have discussion with Mr. Garg or others about

23   who would be paying your fees and whether these entities rather

24   than TAM or Phoenix would be paying your fees, or did --

25   A.  I don't recall that, no.

1   Q.  So, essentially, you submitted your bills, and whoever

2   paid, paid?

3   A.  I mean, I submitted my bills, and there were some payments

4   and they came from different places at different times.

5   Q.  Were you ever concerned that you were representing an

6   entity that wasn't paying you and possibly didn't have funds to

7   pay you?

8   A.  Yes.

9   Q.  So this -- you didn't discuss that with Mr. Garg or your

10  contacts for TAM and Phoenix at the time?

11  A.  Oh, I most certainly did.

12  Q.  So you did discuss this issue with Mr. Garg and others at

13  the time?

14  A.  I discussed nonpayment with -- not with Mr. Garg.  I never

15  discussed it with Mr. Garg.

16  Q.  So you were concerned that the entities that you

17  represented did not have any funds?

18  A.  I was concerned that I wasn't getting paid.

19  Q.  And then you received wires from third parties to cover

20  those payments?

21  A.  Some of them, yes.

22  Q.  What do you mean by "some of them"?

23  A.  My fees haven't been paid in full.

24  Q.  Oh, yes, for the fees that were paid, were paid by them,

25  yes?

N4LKUSB3

1   A.   Yes.

2           MR. GELBFISH:   No further questions, your Honor.

3   Thank you.

4           THE COURT:   Is there any other cross-examination for

5   Ms. Beaumont?

6           Ms. Wityk, any redirect?

7           MS. WITYK:   No redirect, your Honor.

8           THE COURT:   Ms. Beaumont, you may step down.

9           (Witness excused)

10          THE COURT:   Ladies and gentlemen, there are no further

11  witnesses that you have made me aware of.

12          So before we adjourn until May the 31st, I will simply

13  ask:  Are there any exhibit housekeeping items that we need to

14  take care of?

15          MR. VASSANJI:   Yes, your Honor.

16          I think the parties have discussed, and there are

17  various unobjected to exhibits that we would like to move into

18  evidence.

19          THE COURT:   Have you written them down on a list?

20          MR. VASSANJI:   We have, and we can submit them to the

21  Court.   I can also read them into the record.

22          THE COURT:   Or we can do both; that's fine.   Go ahead.

23          Mr. Vassanji?

24          MR. VASSANJI:   The TAM parties would like to move the

25  following exhibits into evidence, which we have been advised

N4LKUSB3

1    are unobjected to:  Exhibit 3003, 3004, 3005, 3014, 3015, 3017,

2    3029, 3061, 3100, 3162, 3163, and Joint Exhibits 16, 17, 18,

3    20, 21, 22, 24, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 42, 43,

4    44, 46, 49, 50, 51, 52, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63,

5    64, 65, 67, 70, 72, 73, 74, 75, 76, 77, 78, 80, 81, 82, 83, 84,

6    85, and last but not least 86.

7              The TAM parties would also like to move, but we

8    understand that there are objections to, the following

9    exhibits --

10             THE COURT:  Well, let's stop there.

11             With respect to the numbers that have just been read

12   out to us, is there any objection?

13             MR. LAURIELLO:  Your Honor, I don't believe there is

14   an objection, but we would just like to reserve the ability to

15   check the list to make sure we agree with everything.

16             We can do that before that list is submitted to the

17   docket.

18             THE COURT:  I thought you were doing that over lunch.

19             MR. LAURIELLO:  I believe we've done it.  There are

20   just a lot of exhibits that were all just read in.  We just

21   want to audit that the list is the list we agreed to.  I have

22   no reason to believe it isn't, but there are quite a few

23   exhibits, and we'd just like the ability to check.

24             MR. VASSANJI:  For the record, this is the list of

25   exhibits that I sent to the parties at 8:35 p.m. last night, to

1  which I was informed there was no objection to the ones that I
2  read into the record.
3          MR. LAURIELLO:  For example, we also, as we have
4  discussed, would like to move in Exhibits 3124 --
5          THE COURT:  No, no, no, we're not doing your exhibits
6  now.
7          MR. LAURIELLO:  These are unobjected to exhibits that
8  I discussed with Mr. Vassanji --
9          THE COURT:  We're not doing the next set of exhibits
10  yet.  Just hold your horses.
11          MR. LAURIELLO:  Sorry, your Honor.
12          THE COURT:  Any other objections or semi objections to
13  Mr. Vassanji's list?
14          All right.  The exhibits that Mr. Vassanji just read
15  out are admitted.  If it turns out that he, through some
16  sleight of hand, Mr. Lauriello, switched up numbers for you and
17  did you a dirty, my ruling is without prejudice to your ability
18  to raise that.
19          MR. LAURIELLO:  Your Honor, the only thing I'll say
20  is, I never meant to imply that Mr. Vassanji was employing any
21  sleight of hand; this was simply about wanting to check for
22  clerical errors.
23          (Trial Exhibits 3003, 3004, 3005, 3014, 3015, 3017,
24  3029 received in evidence)
25          (Trial Exhibits 3061, 3100, 3162, 3163 received in

N4LKUSB3

1    evidence)

2              (Joint Exhibits 16, 17, 18, 20, 21, 22, 24, 30, 31,

3    32, 33 received in evidence)

4              (Joint Exhibits 34, 35, 36, 37, 38, 39, 42, 43, 44,

5    46, 49 received in evidence)

6              (Joint Exhibits 50, 51, 52, 54, 55, 56, 57, 58, 59,

7    60, 61 received in evidence)

8              (Joint Exhibits 62, 63, 64, 65, 67, 70, 72, 73, 74,

9    75, 76 received in evidence)

10             (Joint Exhibits 77, 78, 80, 81, 82, 83, 84, 85, 86

11   received in evidence)

12             THE COURT:  Okay.

13             Now, Mr. Vassanji is still standing up because he has

14   another list.

15             MR. VASSANJI:  Yes, your Honor.  Thank you.

16             This is a list of exhibits that we are also moving

17   into the record, but we understand there are certain objections

18   that the noteholders have to these exhibits.

19             THE COURT:  Is this a long list or a short list?

20             MR. VASSANJI:  A short list, and I will use hyphens to

21   speed up the process.

22             THE COURT:  All right.

23             MR. VASSANJI:  Exhibits 3168 through 3171 --

24   apologies, please strike that.  Exhibits 3172 through 3183.

25             THE COURT:  72 through 83?

1          MR. VASSANJI:  Yes.  And 3187 through 3189, and 3184

2      through 3186.  And to avoid any mystery, these are the attorney

3      invoices for Arnold & Porter, Schulte Roth & Zabel.

4          THE COURT:  All right.  Objections?

5          MR. LAURIELLO:  Your Honor, we object to these

6      invoices because there's no foundation laid for them.

7          We understand that they were submitted with

8      Mr. Calamari's declaration.  We don't believe that Mr. Calamari

9      can -- we understand that he received them, and we're willing

10     to accept that, but we believe that these invoices, to be moved

11     in, require these actual firms to lay the foundation of how

12     they were invoiced and how they were prepared.

13         THE COURT:  Let me see what Mr. Calamari says about

14     them.

15         (Pause)

16         THE COURT:  His testimony is limited to paragraph 68

17     of his direct testimony declaration.

18         Is that your understanding, Mr. Lauriello?

19         MR. LAURIELLO:  Yes, your Honor.  And Exhibit 67

20     through 68 of his declaration.

21         THE COURT:  67?  Oh, I see.

22         So, in 67 he says, we got these bills, and in 68 he

23     says, here's the amount that is unpaid or unreimbursed.  That's

24     the extent of his declaration.

25         MR. LAURIELLO:  Yes, your Honor.

N4LKUSB3

1              THE COURT:  And your objection is to what exactly?

2     The veracity of the contents of the bills?

3              MR. LAURIELLO:  Yes, and how they were prepared and

4     what the firms are invoicing for.

5              THE COURT:  Okay.

6              So, the Arnold & Porter invoices will be admitted for

7     the purpose of showing that they were sent to — and that

8     portions of them remain unpaid by — the TAM parties, and for

9     that limited purpose they are admitted.

10             MR. VASSANJI:  Your Honor, not only the Arnold &

11    Porter but the Schulte Roth & Zabel invoices.

12             THE COURT:  I'm sorry, I had understood that whole

13    range was A&P, no?

14             MR. VASSANJI:  No, that range includes --

15             THE COURT:  It's all of the lawyers other than your

16    firm?

17             MR. VASSANJI:  Yes, your Honor.

18             THE COURT:  The ruling is unchanged.  They will be

19    admitted for that purpose because I see that Mr. Calamari

20    testified to more than one firm.

21             Those were TAM exhibits, I believe?

22             MR. VASSANJI:  These are TAM.

23             THE COURT:  These are TAM party exhibits.  Tell me if

24    I've got it right 3172 through 3183.

25             MR. VASSANJI:  Yes.

N4LKUSB3

1          THE COURT:  3187 through 3189, and 3184 through 3186.

2    I don't know why you put them in that order, but you did it.

3          Is that the right set of numbers?

4          MR. VASSANJI:  That's the right set of numbers.  I put

5    them in that order to demarcate which set of invoices was

6    which; the first were for Arnold & Porter, the last set was for

7    Schulte Roth & Zabel.  And these were for indemnification

8    claims.

9          THE COURT:  I got that.  Thanks.

10          (Trial Exhibits 3187 through 3189, and 3184 through

11    3186 received in evidence)

12          THE COURT:  Any other exhibit business?

13          MS. BUCKEL:  Your Honor --

14          THE COURT:  Hold on one minute.  I'm not sure who's up

15    next.

16          You had more, Mr. Lauriello?

17          MR. LAURIELLO:  Your Honor, we just have some

18    exhibits, which I believe are unobjected, which we'd like to

19    move into evidence.

20          THE COURT:  This is by PIMCO?

21          MR. LAURIELLO:  Yes.  And these are Phoenix invoices,

22    which I know we've seen several this week.

23          THE COURT:  Phoenix invoices to the CDOs?

24          MR. LAURIELLO:  Yes, your Honor.

25          THE COURT:  Okay.

N4LKUSB3

1          MR. LAURIELLO:  Or to the collateral manager,

2     depending on which view you take.

3          THE COURT:  Phoenix invoices to the TAM parties.

4          MR. LAURIELLO:  Exhibits --

5          THE COURT:  No, that's not right either; I take that

6     back.

7          Fine, Phoenix invoices.

8          MR. LAURIELLO:  Exhibits 3124 through 3126 and

9     Exhibits 3139 to 3144.  And we'll also seek to include these on

10    the written list that will be filed.

11         THE COURT:  Any objection to 3124 to 36 and 3139 to

12    44?

13         MR. VASSANJI:  Not an objection, your Honor.  I just

14    wanted to note, it was our understanding that the PIMCO will be

15    moving all the Phoenix invoices in, which is why I didn't

16    mention it earlier, but I would just like for the record to

17    note that we will also be moving Exhibits 3168 through 3171 --

18         THE COURT:  All right.  You two go to the back of the

19    courtroom and compare your list of Phoenix exhibits, and then

20    come back and telling me which ones you want me to look at.

21         MR. VASSANJI:  Yes, your Honor.

22         THE COURT:  You're confusing me.

23         And while Mr. Vassanji and Mr. Lauriello are in the

24    back of the courtroom, do we have anything from the trustee?

25         MS. BUCKEL:  Yes, your Honor.  We have a fairly

N4LKUSB3

1    limited list.  There are five exhibits that are unobjected to,

2    and I believe there is one objection.

3            The five that are unobjected to are:  1019, 1044,

4    1053, 2072, and 2078.

5            THE COURT:  You want to tell me what these are?

6            MS. BUCKEL:  Just emails.  Basically, we looked at our

7    deposition designations and the documents referenced therein,

8    and these were documents referenced in that testimony.

9            THE COURT:  All right.

10           So, the trustee asks that I admit as evidence Trial

11   Exhibits 1019, 1044, 1053, 2072, and 2078.

12           Any objections?

13           MS. WITYK:  No, your Honor.

14           THE COURT:  Hearing no further objections, those five

15   exhibits, whose numbers I just read out, are admitted.

16           (Joint Exhibits 1019, 1044, 1053, 2072, and 2078

17   received in evidence)

18           THE COURT:  You have one more?

19           MS. BUCKEL:  Yes.  It's Exhibit 2022, which was

20   referenced in Mr. Priore's deposition transcript, which we have

21   designated is a press release from the SEC concerning

22   Mr. Priore.  We believe that is objected to.

23           THE COURT:  Who is objecting to 2022?

24           MS. WITYK:  Your Honor, the TAM parties object to the

25   admission of Exhibit 2022.

N4LKUSB3

1          MS. BUCKEL:  Tom can put it on the screen.

2          THE COURT:  That would be great.

3          This is an SEC press release?

4          MS. BUCKEL:  Yes.

5          THE COURT:  It's admitted.

6          MS. BUCKEL:  Thank you, your Honor.

7          (Trial Exhibits 2022 received in evidence)

8          THE COURT:  Are the Phoenix exhibits straightened out?

9  I'm sorry, the Phoenix invoices.

10         MR. LAURIELLO:  Yes, your Honor.

11         And, Mr. Vassanji, correct me if I am wrong, but the

12  Exhibit Nos. are 3124 through 3126, 3139 to 3144, 3168 to 3171,

13  3191 to 3981 --

14         THE COURT:  39.

15         MR. LAURIELLO:  3481.

16         THE COURT:  3481?

17         I'm going to read those back to you.

18         3124 to 26, 3139 to 44, 3168 to 71, and 3191 to 3481.

19         Any objection?

20         MR. VASSANJI:  No objection.

21         THE COURT:  The exhibits, the trial exhibits that I

22  just listed out are admitted.

23         (Trial Exhibits 3124 through 3126, 3139 to 3144

24  received in evidence)

25         (Trial Exhibits 3168 to 3171, 3191 to 3481 received in

1    evidence)

2              THE COURT:  Is that it?

3              Excellent.  So, just as a belts-and-suspenders

4    approach, I will ask counsel to submit, when you get back to

5    your office, on the docket, a single list containing everything

6    that we admitted at the end of the day without a witness, so

7    that we have a clear record of what's in and what's not in.

8              Any further business between now and my receipt of

9    your proposed findings, which I think we set for May 22nd, and

10   oral argument, which we set for 1:30 in the afternoon on

11   May 31st?

12             Thank you very much, ladies and gentlemen.  It was a

13   delight to have you before me in trial.  It was a well-tried

14   matter.  I enjoyed it; I hope you enjoyed it.  I'll see you

15   next month.

16             (Adjourned to May 31, 2023, at 1:30 p.m.)

17

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION
2    Examination  of:                             Page
3    MINGSUNG TANG
4    Direct By Ms. Buckel . . . . . . . . . . . . 841
5    Redirect By Mr. Vassanji . . . . . . . . . . 873
6    Recross By Mr. Lauriello . . . . . . . . . . 896
7    Recross By Ms. Buckel  . . . . . . . . . . . 901
8    ANNE BEAUMONT
9    Direct By Ms. Wityk  . . . . . . . . . . . . 921
10   Cross By Mr. Gelbfish  . . . . . . . . . . . 922
11                          JOINT EXHIBITS
12   Exhibit No.                                Received
13   [Exhibit]*[marked]                           832
14    3507    . . . . . . . . . . . . . . . . . . 886
15    16, 17, 18, 20, 21, 22, 24, 30, 31, 32, 33  941
16    34, 35, 36, 37, 38, 39, 42, 43, 44, 46, 49  941
17    50, 51, 52, 54, 55, 56, 57, 58, 59, 60, 61  941
18    62, 63, 64, 65, 67, 70, 72, 73, 74, 75, 76  941
19    77, 78, 80, 81, 82, 83, 84, 85, 86          941
20    1019, 1044, 1053, 2072, and 2078            946
21                          TRIAL EXHIBITS
22   Exhibit No.                                Received
23    3190    . . . . . . . . . . . . . . . . . . 922
24    3003, 3004, 3005, 3014, 3015, 3017, 3029  . 940
25    3061, 3100, 3162, 3163   . . . . . . . . . . 940
```

1   3187 through 3189, and 3184 through 3186    . 944

2   2022      . . . . . . . . . . . . . . . . 947

3   3124 through 3126, 3139 to 3144   . . . . . 947

4   3168 to 3171, 3191 to 3481    . . . . . . . 947